FILED
September 19, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003777450

Timothy M. Ryan, Bar No. 178059
tryan@theryanfirmm.com
Austin T. Beardsley, Bar No. 270046
Abeardsley@theryanfirm.com
THE RYAN FIRM
A Professional Corporation
1100 N. Tustin Avenue, Suite 200
Anaheim, California 92807
Telephone (714) 666-1362; Fax (714) 666-1443

Attorneys for Creditors WELLS FARGO BANK, N.A., as Trustee for MLMI Trust Series 2005-HE3; and BAC HOME LOANS SERVICING, LP, a Texas limited partnership,

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>Dwight Bennett<br><br>      Debtor, | CASE NO.: 11-40155<br><br>DCN:TRF-2<br><br>Chapter: 11<br><br>Assigned for All Purposes to<br>Hon. Michael S. McManus<br>Courtroom: 28<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CREDITORS WELLS FARGO BANK, N.A., AND BAC HOME LOANS SERVICING, LP'S MOTION FOR RELIEF FROM STAY AND TO EXCUSE THE TURNOVER REQUIREMENT (11 U.S.C §§ 362 (D) AND 543 (D))**<br><br>Date:      October 17, 2011<br>Time:      10:00 a.m.<br>Courtroom:  28<br><br>Trial Date:  None set. |

///

///

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1. INTRODUCTION AND SUMMARY

Creditors WELLS FARGO BANK, N.A., as Trustee for MLMI Trust Series 2005-HE3; and BAC HOME LOANS SERVICING, LP, a Texas limited partnership, (hereinafter referred to as "Creditors") seek relief from the automatic stay, pursuant to 11 U.S.C. § 362 (d) (1), as it pertains to the bankruptcy petition filed by debtor Dwight Bennett ("Debtor" or "Bennett"). Creditors are entitled to relief from the automatic stay for three distinct reasons. First, Creditors' interest in the property is not adequately protected as the amount due under the subject mortgage is greater than the value established in Bennett's bankruptcy petition. Second, debtor has no equity in the property and the property is not necessary for an effective reorganization. Third, good cause exists for granting relief from stay because Bennett's bankruptcy petition was not filed in good faith. Therefore, an order should issue granting Creditors relief from the automatic stay.

Creditors also seek an order nunc pro tunc, pursuant to 11 U.S.C. § 543 (d), excusing Vicki Lozano, the appointed receiver ("Receiver") from the turnover requirement of 11 U.S.C. § 543 (a)-(c). The requested order is necessary because there is no likelihood of Bennett's ability to reorganize because there are no funds available for reorganization. Furthermore, the impossibility for reorganization has been caused directly by Mr. Bennett's mismanagement. Therefore, this motion should be granted and an order nunc pro tunc should be issued, restoring the Receiver's authority over the Subject Property as directed by the Lassen County Superior Court.

## 2. FACTS

On or about May 19, 2005, Bennett sold a parcel of real property commonly known as Lassen County Assessor's parcel 099-260-70[1] to a man by the name of Norman Allen. (Request for Judicial Notice "RFJN" item a; Exhibit 1 attached to the List of Exhibits ("LOE") filed concurrently herewith). In order to obtain funds to consummate the purchase, Mr. Allen

---

[1] This property adjoins Lassen County Assessor's parcel 099-260-69, together the parcels will be referred to as the "Subject Property."

obtained a loan secured by a deed of trust from Option One Mortgage. (RFJN item b; LOE Ex. 2). On or about June 1, 2005, the deed of trust was assigned to Creditor WELLS FARGO BANK, N.A., as Trustee for MLMI Trust Series 2005-HE3 ("Wells Fargo"). (RFJN item c; LOE Ex. 3). Creditor BAC Home Loans Servicing, LP, as successor in interest to Wilshire Credit Corporation ("BAC") acts as the servicer of the subject loan on behalf of Creditor Wells Fargo. (RFJN item d; LOE Exhibit 4).

Subsequent to the land sale transaction described above, it was discovered that the improvements (house, stables, riding arena, etc.) believed by Bennett, Mr. Allen and Option One Mortgage (the original lender) to be on Assessor's Parcel number 099-260-70, were actually located on the adjoining lot, Assessor's Parcel number 099-260-69.[2] (*See* Declaration of Timothy M. Ryan, "Dec. of Ryan," ¶ 4; LOE Exhibit 5). On or about July 21, 2011, Creditors Wells Fargo and BAC's (collectively "creditors") moved for summary adjudication based on the collective intent of all parties, including Bennett, to convey and encumber the improvements. This motion was granted and an equitable mortgage and equitable lien in favor of Creditor Wells Fargo were ordered over the Subject Property. (*See* Dec. of Ryan ¶ 5; LOE Exhibit 5, page 42, lines 1-9; LOE Ex, 12). At that same hearing, and at the behest of all parties interested in the Subject Property, except Bennett, a receiver was appointed to preserve the property. (Dec. of Ryan ¶ 6; LOE Exhibit 5, page 27, line 14- page 28, line 2).

Upon the commencement of the receivership, the appointed receiver, Vicki Lozano, discovered a scene of abject mismanagement of the Subject Property by Bennett, including the presence of dozens of horse carcasses littering the Subject Property. (Declaration of Vicki Lozano, "Dec. of Lozano," ¶ 5 (a)-(h); LOE Exhibit 6, photographs 1-72). Furthermore, Bennett refused to cooperate with the receivership order, thereby jeopardizing the purpose of the receivership- to preserve the assets on the Subject Property. (Dec. of Lozano ¶ 8; LOE Exhibit 5, page 27, line 24- page 28, line 2). On the eve of a contempt hearing for Bennett's failure to comply with the court's receivership order, he filed this bankruptcy. (RFJN item e, LOE Exhibit

---

[2] This lot is held by Dwight Bennett and his ex-partner Judith St. John as joint tenants (*See* RFJN item h; LOE Exhibit 10).

2

7). As a result of Bennett's bankruptcy filing, the state court will not sign its order granting summary judgment to Creditors, depriving all parties with an interest in the Subject Property from adjudicating their rights. (Dec. of Ryan ¶ 8).

3.   **GROUNDS FOR RELIEF FROM STAY**

The bankruptcy court may grant relief from the automatic bankruptcy stay where a requesting party demonstrates: (1) good cause, including the lack of adequate protection of an interest in property of such party in interest; or (2) the debtor has no equity in the property and that the property is not necessary to an effective reorganization. (*See* 11 U.S.C. § 362, subd. (d)(1)-(2). Additionally, these scenarios are not the *exclusive* ground for finding "cause" that would warrant relief from stay. (*In re Elmore* (Bkrtcy. C.D. Cal. 1988) 94 BR 670, 678). In fact, as there is no certain definition of what is "cause," discretionary relief from stay must be determined on a case-by-case basis. (*In re MacDonald,* (9th Cir. 1985) 755 F.2d 715, 717).

For the reasons set forth below, good cause exists for granting Creditors relief from the automatic stay.

4.   **THERE IS "GOOD CAUSE" UNDER 11 U.S.C. § 362, (d)(1) and (d)(2) FOR RELIEF FROM STAY AS CREDITORS ARE NOT PROTECTED BY AN ADEQUATE EQUITY CUSHION AS THERE IS NO EQUITY IN THE SUBJECT PROPERTY, THE SUBJECT PROPERTY IS NOT NECESSARY FOR AN EFFECTIVE REORGANIZATION AND DEBTOR'S BANKRUPTCY PETITION WAS FILED WITHOUT GOOD FAITH**

Creditors seek relief from the automatic bankruptcy stay on the grounds that there is "good cause" pursuant to 11 U.S.C. § 362 (d) (1) and (2). First, there is not sufficient equity protecting Creditors' interest in the property. Specifically, the amount due under the subject mortgage loan at the time the petition was filed is substantially greater than the value of the Subject Property as stated in Debtor's bankruptcy petition. Second, there is no equity in the Subject Property and it is not necessary for an effective reorganization. Additionally, Debtor's bankruptcy was not filed in good faith, thereby establishing good cause for relief from the automatic stay.

**A.    Cause for relief from stay exists because Creditors are not protected by an adequate equity cushion as the equity cushion is far below the 20% line set by the Ninth Circuit**

The "lack of adequate protection" is one of the most common means for seeking relief under section 362, subdivision (d)(1).  The debtor has the burden of proving that the secured creditor's interest in the property (i.e., the collateral) is adequately protected. ( 11 U.S.C. § 362, subd. (g); *In re Gauvin* (9th Cir. BAP 1982) 24 B.R. 578, 580).   If the debtor cannot prove that the creditors are adequately protected, the creditors are entitled to relief.  (*In re Mellor* (9th Cir. 1984) 734 F.2d 1396, 1400 – 01).

To determine whether a secured creditor's interest in collateral is adequately protected, the collateral's fair market value must be determined.  Once the fair market value is determined, courts use a variety of methods to calculate the equity cushion of the creditor seeking relief from stay.  In the Ninth Circuit, courts generally divide the equity remaining (after subtracting liens of the movant and any liens senior to the movant from the collateral's fair market value) by the fair market value of the collateral. (*In re Mellor* (9th Cir. 1984) 734 F.2d 1396, 1401).  Additionally, some courts will deduct costs of sale from the collateral's fair market value in determining whether an equity cushion exists. (*See La Jolla Mortg. Fund v. Rancho El Cajon Assocs.* (Bkrtcy. S.D. Cal. 1982) 18 B.R. 283, 289 (deducting 7% of fair market value for liquidation costs); *In re Pitts* (Bkrtcy. C.D. Cal. 1979) 2 B.R. 476, 478).

There is no minimum amount or percentage of equity cushion that constitutes "adequate protection."  Rather, adequacy of the cushion depends on the circumstances of each case.  In the Ninth Circuit, courts generally follow the 20% rule; stated otherwise, a 20% "equity cushion" generally provides "adequate protection" to a creditor's security interest. (*In re Mellor* (9th Cir. 1984) 734 F.2d 1396, 1401).  While Ninth Circuit courts have generally followed the 20% rule since *Mellor*, at least one court has held that a 15% equity cushion may provide adequate protection.  (*In re Pitts* (Bkrtcy. C.D. Cal. 1979) 2 B.R. 476, 478).  However, an equity cushion of 10% or less does *not* provide adequate protection.  (*See In re Kost* (Bkrtcy. D. Wyo. 1989) 102 B.R. 829, 832).

First, Bennett has established the fair market value of the Subject Property to be $350,000.00.[3] (RFJN item 5; LOE Exhibit 7). Therefore, if the amount due and owing on the subject mortgage loan exceeds $291,667.00[4], Creditors are not protected by a sufficient equity cushion. Here, the amount due and owing on the subject loan exceeds $470,000.00.[5] (RFJN item f, LOE Exhibit 8). Therefore, Creditors are not protected by a sufficient equity cushion and good cause exists to grant Creditors relief from the automatic stay.

**B.     There is no equity in the Subject Property and the Subject Property is not necessary for an effective reorganization**

Under 11 U. S. C. § 362(d)(2), when a debtor lacks equity in a real property asset and that asset is not necessary for an effective reorganization, relief from the automatic stay is mandatory. (11 U.S.C. § 362(d)(2). As the party moving for relief, Creditors bear the initial burden of showing only that Bennett lacks equity in the Subject Property. (11 U.S.C. § 362(g)(1); In re Dahlquist, (BC D SD 1983) 34 B.R. 476, 481–483.) In contrast, Bennett bears the burden of proof on all other issues, including that the Subject Property is necessary for an effective reorganization of his debts. (11 U.S.C. § 362(g)(2); *In re San Clemente Estates*, (BC SD CA 1980) 5 B.R. 605, 609; *In re Dahlquist, supra*, 34 B.R. 476, 481, 483.) In order to satisfy his burden, Bennett must show that there is a reasonable possibility of a successful reorganization within a reasonable time, and that the Subject Property is necessary for this effort. (11 U.S.C. § 362(g)(2); *In re Bonner Mall Partnership*, (9th Cir. 1993) 2 F.3d 899, 902.) Further, an "Effective reorganization" requires Bennett to demonstrate that his proposed plan is *capable of confirmation*. (*In re Building 62 Ltd. Partnership*, (BC D MA 1991) 132 B.R. 219, 222 [Although not subject to same scrutiny as a confirmation hearing, debtor's proposed plan must not be obviously un-confirmable]).

---

[3] Bennett's bankruptcy petition and schedule I are executed under penalty of perjury and are treated as judicial admissions when offered against the declarant. (*In re Robert Scott Bohrer*, (N.D. Cal 2001) 266 B.R. 200, 201).
[4] $350,000.00 is 120% of $291,667.00
[5] Bennett's bankruptcy petition established the amount of the lien as $630,000.00. His recently filed schedule F also establishes the outstanding amount of the loan at $630,000.00. (RFJN item i; LOE Exhibit 11).

5

As has been established above, there is no equity in the Subject Property. In fact, the subject loan is under-secured by at least $120,000.00. Furthermore, there is no likelihood that Bennett will satisfy his burden of showing a reasonable probability of a successful reorganization. First, Bennett established that his monthly income is $680.00 per month.[6] (LOE Exhibit 7, Schedule I). Under Bennett's direct supervision, a horse-boarding facility and riding arena has become a dilapidated hovel, not fit for the habitation of horses. (LOE Exhibit 6, pictures 13-27). Dozens of horses have perished and their bones are strewn about the property. (LOE Exhibit 6, pictures 28-34). This mismanagement by Bennett has left the Subject Property in need of a staggering amount of repairs and improvements. These repairs, which are all mandatory in order for the Subject Property to be properly insured as a riding and boarding stable include:

- Repair of the barn including replacement of rotted boards and welding of hinges and latches. These repairs will take an estimated eight (8) to ten (10) days of carpentry work and an additional one (1) day of welding work. These costs are estimated at a minimum of $4,000.00. Material costs are estimated at $100.00 per stall, or $3,000.00 for thirty (30) stalls.
- Runs for each of the thirty (30) stalls must be built at an estimated cost of $400.00 per stall for materials and labor.
- Excavation of a pit for disposal of the existing mounds of manure and approximately twenty five (25) horse carcasses will cost between $5,000.00 and $7,500.00.
- Ten (10) man-days for digging the mounds of waste from the thirty (30) stall barn.
- Removal of all junk and debris would cost $3,000.00 minimum for dump fees (10 truck loads x 20 yards per load x $15.00 per yard) and another $3,000.00 for truck rental and labor.

---

[6] Bennett's updated Schedule I claims that he earns a total of $1,610.00 per month. (LOE Exhibit 11).

- Installation of a watering system for each stall and pen. This system is estimated to cost $300 to $400 per stall for a total of $9,000.00 to $12,000.00.
- Replacement of all barbed wire on the perimeter fences with smooth wire.
- Anchoring all small outside pens to avoid danger in high winds.
- Implementation of a system to dispose of manure, instead of compiling mounds of manure on the grounds of the stables.

(*See* Dec. of Lozano ¶ 7 (a)-(i)).

Clearly there is no likelihood that Bennett will be able to make all of the necessary repairs to the Subject Property to obtain the proper insurance to operate a boarding and riding business. Also, there is no likelihood that Bennett will be able to feed and care for dozens of horses in addition to making the necessary improvements. There is simply no possible way to accomplish these tasks on an income of $680.00 or $1,610.00 per month. Therefore, the Subject Property is not necessary for an effective reorganization because reorganization is impossible.

### C. Debtor's bankruptcy was not filed in good faith, thereby establishing good cause for relief from stay

The debtor's bad faith (or lack of good faith) in filing a bankruptcy case is also "cause" for granting relief from an automatic bankruptcy stay. (*In re Arnold* (9th Cir. 1986) 806 F.2d 937, 939). To determine whether a bankruptcy petition was filed with the requisite good faith, the ninth circuit analyzes a broad range of factors, including, but not limited to: a. the nature of the real property involved in debtor's petition; b. whether the real property is encumbered by secured creditor's lien; c. cash flow; d. the amount of employees involved in any business on the subject property. (*See In re ECV Development, LLC* (9th Cir. 2007) 7540960 at *4).

Here, it is clear that Bennett did not file his bankruptcy petition in good faith. As has been established above, the Subject Property is secured by a lien that dwarfs its market value. There is no cash flow from the Subject Property as the business operation (and dozens of the horses) has perished due to grave mismanagement. Furthermore, there are no employees

involved in the operation of the business because "business income" is only $1,610.00 per month.[7]

In addition to all of the aforementioned factors, the facts unique to this case illustrate Bennett's lack of good faith. First, Bennett knew the purpose of the receivership was to preserve the assets on the Subject Property for all interested parties as he was present at the hearing on the receivership. Furthermore, Bennett was acutely aware of his mismanagement of the Subject Property and the impossibility of any reorganization. From the inception of the receivership until the date of the filing of his bankruptcy petition, Bennett interfered with the receivership and its purpose. From these facts it is clear that Bennett's only purpose for filing bankruptcy was to interfere with the proper preservation of assets that he had mismanaged. Most troubling is Bennett's use of bankruptcy to interfere with a state court order providing for the surrender of all horses from the Subject Property to the County of Lassen due to the likelihood that more horses would perish. (RFJN item g; LOE Exhibit 9). In light of all of the facts and circumstances established above, it is clear that Bennett's bankruptcy petition was not filed with the necessary good faith.

5. **THE RECEIVER SHOULD BE EXCUSED FROM TURNOVER BECAUSE THERE IS NO LIKELIHOOD THAT BENNETT WILL BE ABLE TO REORGANIZE, AND THE DEPLORABLE CONDITION OF THE SUBJECT PROPERTY IS THE DIRECT RESULT OF BENNETT'S MISMANAGEMENT**

Typically, a receiver who has notice of a bankruptcy must immediately turn over all assets of the bankruptcy estate to the bankruptcy trustee. (11 U.S.C. § 543 (a) and (b); *In re Lizeric Realty Corp.*, (1995), 188 B.R. 499, 506). However, bankruptcy courts have discretion to waive that requirement if the interests of creditors would be better served by continuing the receiver in possession. (*In re Corporate and Leisure Event Productions, Inc.*, (2006), 351 B.R. 724, 732). Courts use a three pronged test in deciding whether to waive this turnover

---

[7] Only about $1,200.00 of this amount is alleged to come from operation of the ranch. The other $400.00 is derived from a number of "renters" who whose living conditions are so bleak that they burn garbage on the Subject Property during the dry summer. (Dec. of Lozano ¶ 10).

8

requirement. Specifically, courts examine: 1. The debtor's likelihood of reorganization; 2. The probability that funds required for reorganization will be available; and 3. Whether the evidence shows mismanagement of the property by the debtor. (*In re Bryan Manor, LLC*, (2010), 422 B.R. 278, 289). According to the facts set forth above, each of these tests weighs overwhelmingly in favor of excusing the turnover requirement and issuing a nunc pro tunc order reinstating the receivership pursuant to the Lassen County Superior Court Receivership Order. (*See* RFJN item j; LOE Exhibit 12).

### A. There is no likelihood that Bennett will be able to reorganize because there are absolutely no funds available to Bennett for reorganization

According to all of the facts set forth above, there is no likelihood that Bennett will be able to reorganize. First, Bennett's alleged income is a maximum of $1,610.00 per month. As admitted by Bennett, the operation of a horse-boarding business on the Subject Property has ground to a halt, and cannot improve until all of the necessary, extensive, costly repairs are made to the facilities h. According to the figures set forth in section 4-B above, at a minimum, these costs will exceed $39,000.00. (*See* Dec. of Lozano ¶ 7 (a)-(i)). Therefore, there are absolutely no funds available to Bennett for reorganization.

### B. Bennett has severely mismanaged the Subject Property

According to the extensive facts set forth above and extensively in the declaration of the Receiver, Vicki Lozano, Bennett is solely responsible for the current state of the Subject Property. These conditions include:

- Rotting carcasses of approximately twenty-four horses (who likely perished as a result of starvation), which were left for scavengers;
- A large herd of equines that is permitted to roam the Subject Property, without any restraint;
- Stalls in the stable that are literally buried feet deep in horse dung.
- Broken fencing, co-mingling of mares and stallions, and indiscriminate breeding;
- Animals roaming freely amongst mountains of discarded personal

9

property, such as toilets and old washing machines;

- Animals exhibiting severe malnutrition;

- A horse boarding business that has been decimated and cannot be revived without extensive repairs to the facilities on the Subject Property;

- A group of squatters living on the Subject Property who refuse to leave, at Bennett's urging, and who burn garbage on the Subject Property during fire season;

- Default on a loan held by Creditors that is secured by the Subject Property.

Clearly, these facts establish egregious mismanagement by Bennett. Additionally, these issues are compounded by the original purpose for the receivership- namely, that Bennett does not carry insurance on the Subject Property. (*See* LOE Exhibit 5, pp. 1-27). Therefore, an order should issue nunc pro tunc, excusing the Receiver from the turnover requirement of 11 U.S.C. § 543.

### 6. CONCLUSION

As a result of the foregoing, Creditors should be granted relief from the automatic stay and the Receiver should be excused from the turnover requirement of 11 U.S.C. § 543. Additionally, an order should issue, nunc pro tunc, confirming all acts taken by the Receiver subsequent to the filing of this bankruptcy petition.[8]

DATED:　September 19, 2011　　　　THE RYAN FIRM
　　　　　　　　　　　　　　　　　　　　A Professional Corporation

　　　　　　　　　　　　　　　　　By:　/S/ AUSTIN T. BEARDSLEY
　　　　　　　　　　　　　　　　　　　TIMOTHY M. RYAN
　　　　　　　　　　　　　　　　　　　AUSTIN T. BEARDSLEY
　　　　　　　　　　　　　　　　　　　Attorneys for Creditors WELLS
　　　　　　　　　　　　　　　　　　　FARGO BANK, N.A., as Trustee for
　　　　　　　　　　　　　　　　　　　MLMI Trust Series 2005-HE3; and
　　　　　　　　　　　　　　　　　　　BAC HOME LOANS SERVICING, LP

---

[8] Pursuant to this court's denial, without prejudice of Creditors' original motion to excuse turnover on September 2, 2011, the Receiver has turned over all real and personal property to debtor and has not taken any action in furtherance of the receivership.