

Dwight A. Bennett
P.O. Box 540
Susanville, CA 96130
530-257-2555
Cell 530-260-3366

FILED

OCT - 3 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

# UNITED STATES BANKRUPTCY COURT

## Eastern District of California

| | |
|---|---|
| In re | Case No.: 11-40155-A-11 |
| | Chapter 11 |
| DWIGHT ALAN BENNETT, | **DEBTOR'S OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER:** |
| Debtor | **and** |
| | **POINTS AND AUTHORITIES IN OPPOSITION.** |

### I. OPPOSITION TO MOTION TO LIFT STAY

#### 1. Introduction

The argumentative defense of any proposition is inversely proportionate to the truth contained.

Wells Fargo Bank N.A. (Hereinafter WFB) and BAC Home Loan Servicing Inc., L.L.P. (Hereinafter BAC) bring this motion to lift stay and excuse turnover as a defensive action to avoid the manifest and egregious violations of the automatic stay already perpetrated by movants and to maintain the unbridled offensive of outrageous violations and turnover. The incorporated motion to excuse turnover is nothing more than an underhanded effort to avoid the ramifications of extensive conversion of Debtor's estate by a alleged receivership acting on movant's orders,

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 1

compensated by movant and without regard for the jurisdictional authority of this Court or Federal Bankruptcy Law or due process required by California State and U. S. Constitutional law.

## 2. Statement Of Facts

On May 19, 2005, the Debtor's business associate and friend, Norman Allen, executed a promissory note in favor of Option One Mortgage Corporation. (Hereinafter OOMC). The mortgage was brokered by an unlicensed, un-bonded, uninsured and unregistered "alter ego" corporation from Reno, NV known as Summit Financial Group Inc. (Hereinafter SFG). This note was accompanied by a Deed of Trust to OOMC. (see the Notice at Docket #51, pdf pages 63-64). On November 3, 2009, a "Corporate Assignment of Deed of Trust", purportedly signed on June 1, 2005 was recorded into the Official Records of Lassen County transferring the underlying Deed of Trust to Wells Fargo Bank N. A. as Trustee for the M.L.M.I Trust Series 2005-HE3.(see Docket #50, pdf page 21) In addition to being un-witnessed and un-accompanied by corporate charter the "assignment" was signed by one Dana Denton, Assistant Secretary, Option One Mortgage Corp. Exhaustive inquiry has failed to produce any Dana Denton in the employment records of OOMC at any time during, prior or subsequent to 2005. More confounding yet the MLMI mortgage pool trust was not formed until December 1, 2005, six months after the recorded "assignment" is dated. The MLMI (Merrill Lynch Mortgage Investors) mortgage pool trust is subject to a controlling document conditioned by three more documents; all four are filed with the U. S. Securities and Exchange Commission. That controlling document; the "Pooling and Servicing Agreement" (hereinafter PSA), is specific as to the chain of title of each mortgage deposited into the trust series pool. (see title page at Docket #50, pdf page 23 ). The Originator

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 2

OOMC transferred the "note" to the "seller" Merrill Lynch Mortgage Lenders who in turn transferred the "note" to the "Buyer/Depositor" MLMI who deposits the "mortgage note" into the Trust Pool 2005-HE3, with Wilshire Credit Corporation as "Servicer" and Wells Fargo Bank N. A. as "Trustee". The PSA is specific in that no mortgage notes shall be deposited until the trust formation and opening date for depositing mortgages, in the case of 2005-HE3, December 1, 2005 and no mortgage notes shall be added after the trust closing date or December 28, 2005. The above alleged transfer by assignment on June 1, 2005 cannot have occurred according to the controlling PSA. The above conflicting versions of chain of title are compounded by the assertion of BAC employee; Operations Team Lead, Jennifer Fishman's assertion that the Allen "Note secured by a Deed of Trust…., naming Mortgage Electronic Registration Systems, Inc., as nominal Beneficiary" and asserting that M.E.R.S. "assigned all beneficial interest in the Note and Deed of Trust to Wells Fargo." (Fishman dec. Exh.1 pages 3-4). Fishman brings forth an assertion that MERS is represented in the OOMC Deed of Trust as holding beneficial interest. The DOT is void of any such provision. Her statements simply confuse an already clouded chain of title seemingly to provide legitimacy where none exists.

### 3. Argument

**Movant Lacks Standing**

A security interest cannot exist independent from the obligation which it secures. In Re *Leisure Time Sports, Inc.*, 194 B.R. 859, 861 (9thCir.Bap 1996) A security interest cannot exist, much less be transferred, independent from the obligation which it secures. *In re Di Santo & Moore Associates, Inc.*, 41 B.R. 935, 938 (C.D.Cal. 1984); *Union Supply Co. v. Morris*, 220 Cal. 331, 338-39, 30 P.2d 394, 397 (1934). The security interest follows the debt. If the debt is not

transferred, neither is the security interest. *Id.* The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. *Carpenter v. Longan,* 83 U.S. 271 (1872). It is well established that a plaintiff must prove standing by showing: (1) injury in fact; (2) a causal connection between the injury and the defendant's conduct; and (3) a likelihood that a favorable outcome will redress the injury. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). WFB/BAC hold no lien on Debtor's real property, have no privity with Debtor and never proceeded to foreclosure on Allen's Deed of Trust because of the same defects in chain of title named above.

To proceed as a Creditor in Bennett's Bankruptcy with "equitable interest" WFB/BAC must first foreclose the Allen DOT. To accomplish foreclosure WFB/BAC must demonstrate that it is the holder of not only the deed of trust but also the promissory note. If all three above are not accomplished, it has no injury in fact. See *In re Foreclosure Cases*, 521 F. Supp. 2d 650, 653 (S.D. Oh. 2007) (stating that, "[t]o show standing in a foreclosure action, . . . the plaintiff must show that it is the holder of the note and the mortgage at the time the complaint was filed [and] . . . that the holder of the note and mortgage is harmed, usually by not having received payments on the note").

Debtor is not the borrower on the Allen Deed of Trust, Bennett has no privity with WFB/BAC. The Debtor's estate including real property is not encumbered by any lien naming WFB/BAC. Further, the unknown beneficiary of the Allen Note and DOT has no valid Substitution of Trustee recorded to proceed with the NOD and Election to Sell currently recorded in Lassen County by Trust Deed Services, who was not the Trustee of record when the NOD was recorded. Wells Fargo Bank/BAC misled this court on September 2, 2011 by alleging a vested

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 4

interest in Debtor's real property, to date WFB/BAC has not foreclosed the Allen Deed of Trust and is barred from establishing any "equitable lien amount" on Bennett's estate pursuant to California Code of Civil Procedures § 327 (a), the "one action rule".

In the context of a relief from stay motion, a motion for relief from the automatic stay must satisfy both substantive and procedural requirements. The substantive requirements are provided by § 362(d). The procedural requirements are imposed by the United States Constitution (due process) and the Federal Rules of Bankruptcy Procedure (which mostly incorporates the Federal Rules of Civil Procedure). The applicable rules here are the "real party in interest" rule and the "required joinder" rule. See *In re Kang Jin Hwang*, 393 B.R. 701, 712 (C.D. Cal.2008). There is no valid evidence that Option One Mortgage Corp., ever assigned the underlying promissory note to WFB. In fact, the evidence seems to show that WFB/BAC have no interest in the subject property of the Allen DOT. Certainly they can produce no lien, no signed judgment encumbering Debtor's estate, thus have no standing to bring this motion.

### 4. <u>Law And Rules Governing Lift-Stay Motions</u>

WFB/BAC has no security interest in Debtor's estate and specific facts constituting cause inter alia only be asserted by the real party in interest. Rule 7017 of the Federal Rules of Bankruptcy Procedure incorporates the provisions of Rule 17 of the Federal Rules of Civil Procedure....The purpose of Rule 17 is to ensure that the person bringing a lawsuit has the right to enforce the asserted claim. *In re Smith*, 419 B.R. 622, 628 (Bankr. E.D. Va. 2008) (citation omitted) (emphasis added). Counsel for WFB/BAC acknowledges that Bennett is not the Borrower. (Ryan Email Exh. #2). Bennett is the Debtor in fact; As such, he has standing to oppose this motion.

## II. OPPOSITION TO MOTION TO EXCUSE TURNOVER

### 5. Statement of Facts

**Validity of state court imposed receiver**

Under the Code of Civil Procedure[1] §§ 564-574 exists the primary body of California statues regarding receivers. This covers establishment of the grounds for appointment, eligibility, powers and duties to turnover of property. The grounds for Wells Fargo/BAC's ex parte application was § 564(b)(1):

"In an action by a vendor to vacate a fraudulent purchase of property, or by a creditor to subject any property or fund to the creditor's claim…".

An ironic juxtaposition given the above questions above re: title and interest. The primary reasons for imposition of a receivership are to seize and return stolen assets, to assist *secured lenders*, or the fair division or disposition of corporate or partnership interests to Creditors or parties of interest by a neutral party. (Emphasis added.)

§564 Subdivision (c) states in part:
"The Secured lender shall not abuse the right of entry… or use it to harass the borrower or tenant of the property."

Subdivision (d) states:
"Any action by a secured lender to appoint a receiver under this section shall not constitute an action within the meaning of subdivision (a) of Section 726."

In other words the appointment of a receiver does not affect property rights but ensures them.

Section 566(b) states:
"If a receiver is appointed upon an ex parte application, the court, before making the order, must require from the applicant an

---
[1] All references are to the Code of Civil Procedure unless noted

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 6

undertaking in an amount to be fixed by the court, to the effect that the applicant will pay to the defendant all damages the defendant may sustain by reason of the appointment of the receiver and the entry by the receiver upon the duties, in case the applicant shall have procured the appointment wrongfully, maliciously, or without sufficient cause.

Section 568.5 states:
> "A receiver may, pursuant to an order of the court, sell real or personal property in the receiver's possession upon the notice and in the manner prescribed by Article 6 (commencing with Section 701.510) of Chapter 3 of Division 2 of Title 9. The sale is not final until confirmed by the court." Or "levied property"

The California Rules of Court receivership law was abandoned in the state court, to wit: A) The ex parte application was not verified; California Rules of Court, Rule 3.1175.(a). B) The ex parte application for appointment of receiver was not made returnable upon an order to show cause as required by C.R.C. Rule 3.1176.(a). C) The receivership and the Ryan Firm are in violation of neutrality required under C.R.C. Rule 3.1179. (a)&(b). (see Ryan email Exh. #2) Also, present are violations of C.R.C. Rules 3.1178, 3.1175.(a)(4).

### 6. Discussion

**a. Jurisdictional Statement**

This Court has core jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a) and (b)(1) and (2)(E) and (O).

**b.** Under Federal Bankruptcy Law: Code § 543(b) provides that a custodian as defined in Code § 101(11) "shall deliver to the trustee any property of the debtor. . . . . . .that is in such custodian's possession, custody or control on the date that such custodian acquires knowledge of the commencement of the case."

11 U.S.C. §543(b). or: "a custodian with knowledge of a bankruptcy case

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 7

.......has an absolute duty under 11 U.S.C. §543 to refrain from any further action in the administration of property of the debtor's estate and must deliver to the debtor in possession any property of the estate held by the custodian at the time knowledge of the bankruptcy case was acquired." *In re Constable Plaza Associates, L.P.*, 125 B.R. 98,103 (Bankr. S.D.N.Y. 1991). There is but one exception applicable to the mandate of Code § 543(b) and that exception is found in Code § 543(d). That section provides that after a notice and hearing, the court may excuse compliance with subsection (b) "if the interest of creditors. . . . .would be better served by permitting the custodian to continue in possession, custody and control of such property."

In the case at bar the petition was filed on August 18, at 3:18 p.m. The *following day*, with the receiver Vicki Lozano present in state court, Bennett served WFB/BAC and the Superior Court with the Chapter 11 petition, also present were Judith St. John and counsel, Norman Allen and counsel, Pete Heimbigner of Lassen County Animal control/Public Works. (Emphasis added) At the urging of counsel for WFB/BAC the automatic stay was disregarded and ultimately, Bennett the Debtor was jailed for failing to understand that property law had been dispensed with at Wells Fargo/BAC's orders under the receivership. Further ordered not to return to his real property after 5 days in jail Bennett was homeless for another 10 days watching from the neighboring Susanville Ranch Park woods as his livestock, business assets and personal property were freely hauled away. Neither the turnover of estate assets nor the violations of stay have ceased or even appreciably slowed from August 18, 2011, until this writing. WFB/BAC counsel convinced the state court judge that the proceeding was "quasi-criminal" thus not stayed by the Federal order. California contempt proceedings are either conducted under criminal rules or civil rules. This was a civil proceeding and the contempt charges, clearly stated by the court, at the conclusion before Bennett was arrested was a demand that Debtor vacate his vested and

the petition estate's real property and all business records regarding Whispering Pines Stables to an alleged Creditor of dubious standing. This clearly violated the ordered stay no matter what verbiage preceded or justified the action brought by the alleged Creditor. Since August 19th three contempt hearings re: Bennett, have been held in state court and another awaits at WFB/BAC's insistence scheduled for October 27, 2011. All of these hearings are sounded on Debtor and Debtor's tenants not vacating the Debtor's real property which bank's counsel claims is a current valid order under the "still existing receivership", because this court "did not dissolve the receivership on September 2, 2011". (see Ryan email Exh. #3 & #5a)

### 7. Argument

The egregious nature of the violations of stay and turnover ongoing in the instant case are outrageous and in defiance of this Court and the law. Even this pales when the facts are measured against the Declarations, Pleadings, Actions, correspondence and public statements of those requesting to be excused from turnover in the motion at bar. That those same parties who have continued violating this Court's orders after being ordered to comport with the law now return with nothing more than fabricated statements to support the demand for liberties without license or restraint, shocks the mind.

Where is the receiver's accounting of assets in possession? Where are the payments to Creditors accomplished by the extreme turnover or the income expense statements of the receiver's operation of the business? There are none.

Wells Fargo and receiver Vicki Lozano offer this court a self-fulfilling prophecy; remove the stock in trade after petition is filed, fully eight days after the automatic stay is operative, remove the most liquid and most needed assets for operation of the Debtor's business,

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 9

create fallacious "news stories", composed of provable mistruths and intentional misrepresentations aimed at destroying the Debtor's reputation and business. Then blithely assert that Debtor's business cannot operate thus conversion/theft in excess of $250,000 should be forgiven and stay lifted, in case Debtor finds another way to survive at business, it can be thwarted.

With specificity;

Mr. Ryan's loudly and oft repeated visual of "24 rotting corpses in various states of decay" littering the grounds collapses by the facts submitted as exhibitions in support of motion. Precisely hereby; Dr. Russell's April 12th 2011 site report, included no doubt for shock value, is specific and a work of scientific objectivity. Grace Foundation was present twice in April 2011 with numerous personnel on hand, as is their function they combed the entire property to ensure nothing missed or hidden. Dr. Michael Russell after these two site inspections April 12 & April 19th counts FIVE (5) corpses were found and the most recent too decomposed to ascertain cause of death.(see Docket # 20 pdf page 5) Further the same reports assert that there were 50-53 horses on site Bennett donated 22 in April, the receiver disposed of 37 estate horses August 26th totaling 59 animals, alive and breathing. Where are the receiver's and Ryan's 24 rotting corpses. Why is the count of horses that reached Grace Foundation so closely guarded that the Ryan Firm now "represents the horses"? (Ryan email Exh. #4). Could it be that these rare beautiful horses and the top selling breed in the United States for over five years now were dispersed as to ensure that Bennett will not recover them? Beth DiCaprio CEO of Grace, on Camera told Debtor that the horses were in excellent condition when taken, but that Wells Fargo/BAC had informed them that the property had been taken in foreclosure months before and that Bennett just refused to

accept the truth and was demented, simply delusional. That Wells Fargo had been as patient as possible but could wait no longer. Ms. DiCaprio also stated that this is a very controversial circumstance with many calls coming into Grace "the overwhelming majority in support of Bennett". Unfortunately, Beth DiCaprio is either too afraid or too guilt ridden to speak to Debtor at this time but a circumstance easily remedied by this Court. The Ryan Firm and specifically WFB/BAC counsel Timothy Ryan has consistently advised the remaining parties to the state court actions, that: "This order approved all of the acts of the receiver taken prior to the hearing... after which time, the real property and all personal property thereon vested back into your possession." And: "As you recall, the bankruptcy judge SPECIFICALLY said that the horses DO NOT come back to the ranch as that issue was not before him at that time." and repeatedly that Bennett is "Delusional". (Ryan emails Exh. #5, 5a, & 5b).

As to the allegations as set forth in the most recent Declarations by Mr. Ryan and Ms. Lozano:

5. a) The horses were not penned for several reasons, including natural fire reduction and the fact that much of their lives are spent in pens and paddocks during season as well as others afore mentioned.

5. b) Photographs 5-9 are of the same two horses carefully posed, that were not well but undergoing constant treatment. P.J. and Mandan.

5. c) Only two mares were bred for 2011 foaling, 1 in photos and one born August 5th.

5. d) At the time receiver came on July 21st, we were fully engaged in an annual Paddock cleaning and leveling. Both paddock areas were fully dragged and leveled and 6 stalls remained

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 11

to be cleaned before all paddock panels were reset on the barn. The receiver immediately ordered all work stopped and did not clean or repair one thing from July 21-Sept.2. The outside turnouts that hold 30-35 horses only need minor repairs and are not photographed. Receiver Lozano is correct in that cost for replacing panels now missing I have estimated at; $6,764.00. Only 12 watering troughs remain the facility takes 45-50 at $100-$200 each so $3,000-$6,000 for replacement. Not a single hinge is broken requiring welding. No more than 15 2"x6"x12' boards are required to replace every cracked board in the stables.

It is noteworthy that the "repairs estimated" by Lozano when extrapolated and estimated labor calculated in, total $72,500-$78,500 to make the Stables operational. This is slightly less than Bennett's estimated cost of replacing the estate business assets that were "turned over" to unknown persons. Moreover, Mr. Ryan has estimated $275,000 to bring the business operational about $4,000 less than the total "turnover" of $278,300 or $281,787 with the 3rd party horse trailers. I would appear that since Ryan and Lozano are both less than qualified as ranchers or horsemen that the actual "estimated costs" to become operational were determined by replacement cost of assets turned over and not by estimates from contractors, especially since none are referenced and the items requiring the highest repair costs *are imaginary.*(emphasis added). As to the condition of the horses at the time WFB/BAC told Judge Mason, who attended by phone thus could not receive evidence, that they "might not survive another day" on Friday July 29, 2011, over the next 2 days Vicki Lozano took several friends on trail rides on the horses, Mr. Ryan's response to the trail rides is included herein. (Ryan email Exh. #2).

Clearly WFB/BAC's outrageous disregard for this Court's automatic stay reconfirmed on 9/2/2011 is willful, reckless and premeditated.

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 12

As to the turnover of estate property after the petition was filed and WFB/BAC, the Ryan Firm and receiver Vicki Lozano were fully aware of the petition, the following is appropriate;

`[W]illfulness' can be established by inaction when it amounts to a reckless disregard of the § 362 stay. *See, Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126-27, 105 S.Ct. 613, 624-25, 83 L.Ed. 2d 523 (1985)

The actions of WFB/BAC and their admittedly compensated receiver as well as St. John and Pete Heimbigner are not any effort to recover debt or property but, sounded in different motives. To reward their behavior by excusing their actions would send a message to every future Creditor or adversary with hidden agendas that destroying someone's income is the first step to crushing them while they are engaged in, but not really protected under Bankruptcy Law.

In the case at bar the Debtor has missed filing schedules and confused hearing dates before the bankruptcy court due to a constant infringement of the automatic stay requirements and gone from confidently earning money to begin resolution to dodging violations of the stay ordered but ignored.

> "In Chapter 11 bankruptcy cases involving more complex issues, however, courts recognize that a debtor's ability to act responsively in its bankruptcy case can be hindered by the debtor's attention to litigation and expenses in multiple judicial forums." *Peterson*, 116 B.R. at 250 n.3. "Should litigation interfere with the administration of a bankruptcy estate, even to a slight degree, this would be enough to preclude relief from stay." *In re United States Brass Corp.*, 173 B.R. 1000, 1005 (Bankr. E.D. Tex. 1994) (citing to *In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984)).

WFB/BAC's willful disregard for the automatic stay ordered has infected St. John and the Grace Foundation while hindering Debtor's ability to prosecute his petition.

## 8. Prayer

Debtor respectfully requests that this Court:

1) Deny WFB/BAC's motions to lift stay and excuse turnover with prejudice.

2) Allow "In re Dwight Alan Bennett" to remain active under the protection of bankruptcy law, in the manner judged by this Court to best suit the current circumstances caused by egregious violations of the ordered stay.

3) Allow Debtor to proceed to adversarial action against Creditors and alleged Creditors under the jurisdiction of this Court.

4) Provide Debtor emergency injunctive relief by order or writ, returning Debtor to the post-petition status intended by the Automatic Stay, that he service and extinguish legitimate debts held by Creditors honoring the rule of law.

5) Order Wells Fargo Bank and BAC Home Loan Servicing LLP (Bank of America) and Judith St. John to "prove up" and perfect their purported claims of debt or be dismissed as Creditor's with prejudice.

6) Set forth an order that will clearly inform the state court of the authority and jurisdiction of the United States Bankruptcy Court in the matters at bar.

7) Afford any other protections or impose any other sanctions as determined proper and fitting and deemed within the powers of the Court to stop the harassment and violations by the above named parties.

8) To execute an Order to the Grace Foundation to allow Debtor access to the horses and animals turned over, whereby conversions can be halted and a

OPPOSITION TO MOTION TO LIFT STAY AND EXCUSE TURNOVER - 14

full accounting and inventory of Debtor's livestock can be conducted in preparation to return the same or Adversarial actions be commenced with knowledge and forethought.

9) Take any and all other appropriate actions available according to the wisdom and will of the Court and the rule of law.

Dated: October 1, 2011

Respectfully submitted,

Dwight A. Bennett, In pro se.