FILED
March 01, 2012
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0004101621

9

Carolyn Chan sbn147978
2485 Notre Dame B. Ste. 370
Chico, CA 95928
Telephone: 530.359.8810

Attorney for

Dwight Bennett

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIV.

| | |
|---|---|
| In re | Case No.: 11-40155-A-7 |
| DWIGHT A. BENNETT | DEBTOR DWIGHT BENNETT'S MOTION TO TERMINATE RECEIVER FOR GOOD CAUSE, ALLOW INVENTORY OF DEBTOR'S PROPERTY INCLUDING ANIMALS, FOR CAUSE and ALLOW DEBTOR'S RETURN TO POSSESSION |
| Debtor. | Date: 03/12 /2012<br>Time:10:00am   Dept: Ctr 28 |

--------------------------/

**POINTS AND AUTHORITIES IN SUPPORT OF TERMINATING RECEIVER**

Background:

Debtor requests that the Court terminate the receiver on this case for good cause. There is no legal authority underlying the receiver's appointment but even if there were, the receiver has breached her duty of neutrality, reasonable diligence, and fiduciary responsibility in failing to first file the

_____
Points and Authorities in Support of Debtor's Motion

1

undertaking, failing to preserve the property (especially inside the residence), and allowing debtor's property to be converted. Receiver has never done a receivership before and Mr. Timothy M. Ryan is drafting and executing her declarations. No inventory status reports have ever been given to debtor or to the Courts that we are aware. Debtor has no idea of the status of his personal property because he was run out of the premises by civil contempt actions.

## GOOD CAUSE EXISTS TO TERMINATE THE RECEIVER PLACED BY WELLS FARGO

Under California law, a receiver under rents and profits may be appointed where certain conditions exist. CCP Section 564 requires that authority for appointment of a receiver requires a perfected deed of trust or an agreement signed by debtor and creditor.

1. In this case, Wells Fargo has alleged they had some equitable lien or mortgage or that debtor Mr. Allen had that provision in his agreement on the loan. However this is not about a receiver over Mr. Allen, but Mr. Bennett. Mr. Bennett's name is not on the loan.

Wells Fargo has NEVER been able to secure a signed order from Lassen State Court which might possibly even give them any rights to the property. Judge has refused to sign the order by Wells Fargo attorney Timothy M. Ryan at least 4 (four) times now over 8 months.

2. Therefore, even now, there is no order for any title by Wells Fargo over the property of Mr. Bennett. Although Wells Fargo managed to get Judge to sign an order for "receiver", it is obvious that such an order requires the above stated prerequisite. Wells Fargo does not have either of the conditions required (deed or contract) and thus cannot possibly have a valid receivership over Mr. Bennett.

3. However, assuming for argument's sake that there was a valid receivership, it is debtor's position that the receiver should be immediately terminated for cause.

These reasons for termination include:

Failure to obtain the undertaking at outset

Failure to sufficiently execute and deliver the inventory list

Failure to account for debtor's personal property which was outside

Failure to reasonably stop the conversion of debtor's personal property

Purposeful collusion with several parties to illegally seize debtor's equines without

        Proper procedure

Failure to maintain the inside of the premises by allowing animal feces, trash and other debris to be in the living areas of the residence

At all times the person acting as "receiver" was simply a figurehead for Wells Fargo to gain legal title over the premises, and to oust debtor from the property.

The receiver basically did little to nothing except change the locks and carted off debtor's property, as witnesses saw her remove truckloads of tack and equipment.

4. Debtor has absolutely no idea where any of these possessions went.

Furthermore, the receiver does not act as a neutral party but essentially just does what Timothy M. Ryan tells her to do.

If Wells Fargo does not have title over Mr. Bennett's property, then there cannot be a receiver appointed for Wells Fargo for Bennett's property. Wells Fargo may have a claim under Mr. Allen's deed but Mr. Allen *is not the subject of the receivership.*

Essentially Wells Fargo managed to wrangle out a receivership order, but nothing else from the state court which supports such an order. If this is true as stated, then any receivership order is void ab initio because it does not meet the necessary criteria under CCP section 564.

5. Due to the other acts by Wells Fargo, such as ignoring the automatic stay and placing debtor in jail for civil contempt, debtor Bennett was driven from the residence without anything more than the civil contempt where he was homeless for days. All of his worldly possessions were at the residence which Wells Fargo and the receiver stated, were completely off limits to debtor. After the 'turnover excusal' the debtor was not able to remain in possession of the residence because Wells Fargo and the receiver would call the sheriff or have him cited for contempt.

Therefore, if the receiver did not have a valid receivership order, the ousting of the debtor from the premises, and without an unlawful detainer, would seem to violate procedural due process. There was no eviction process nor foreclosure but debtor was homeless under the receivership.

The automatic stay is designed to give the debtor some breathing room, not run him out of the premises quickly. All of the contempt actions were post petition. Debtor went to jail for the contempt cited.

It would appear under these circumstances that the receiver did none of the things a receiver is designed to do, and there is little and no basis for leaving the receiver in "possession" of the property that she has allowed to become damaged, showing she has no control over the property. The receivership is void and the receiver should be terminated.

# GOOD CAUSE EXISTS TO MANDATE AN INSPECTION OF DEBTOR'S ANIMALS WHICH ARE ALLEGEDLY HOUSED ON THE GRACE FOUNDATION'S PROPERTY

In another convoluted circumstance, Wells Fargo Timothy M. Ryan filed a motion in state court, asserting that his receiver was seizing debtor's equines upon "exigent medical" reasons and did this ex parte. There actually was NO medical exigency, and the equines were not even moved for almost a month after the hearing.

1. Under Penal Code Section 597 and 597.1, exigent medical seizure requires a very specific hearing process and it allows for opposition by the owner who can bring experts on his own behalf. Not only was the debtor owner not allowed to take opposition, he was basically ignored and not allowed to participate in the "receiver seizing equines" for Lassen County hearing.

The hearing was only to get authority to seize and did not involve any experts testifying as to the exigent circumstances of the animals.

No accounting or inventory was ever provided to owner of the animals seized. Subsequently, the Grace Foundation started large fund raising campaigns using the "seizure" of debtor's horses as the ploy for much of it, claiming they needed to buy hay. Grace Foundation continued to show their own home made video of patched together footage and claimed that debtor was responsible for killing horses.

The fact is that perpetrators were purposely killing debtor's horses and this is a matter of reported record to the Third District Court of Appeal when debtor filed a TRO to stop his ex live in partner from killing anymore horses.

2. Since the brief is judicially noticed, poisoning of the horses was not a secret, but it was not debtor that did the killing. Because Wells Fargo paid Grace Foundation and so did Bank of America (estimated $40,000 to $80,000+) to take the horses, debtor was shocked and surprised

when Grace Foundation announced they had killed several horses.

3. There is both controversy and deception involved with the Grace Foundation taking the horses because the veterinarian from Grace gave testimony that directly conflicted with that of press releases from Grace Foundation. Reading the press releases indicates that Grace is taking advice from Wells Fargo and telling people publicly, that Grace owns the horses and that Grace can sell, adopt or otherwise get rid of debtor's horses.

The reality is that Grace has NO ownership in the horses, the "seizure" of the horses was illegal and even if she was already paid to take them, she does not own the horses just because she has temporary custody of them.
And Grace absolutely cannot start selling back horses to purported owners as Grace has no legal authority to do so, even if the animals were abandoned back to debtor. Additionally, Grace has no knowledge of whether any purported "owner" has other offset debts pending as to debtor which exist, such as unpaid liens for boarding and feed by debtor as against others. Further, by virtue of the bankruptcy, debtor has property which is exempt and can claim all of the animals as his exempt property if he wishes to do so.

With all of these circumstances, debtor is now unsure as to what happened to his horses and whether in fact, all of the seized horses actually went to the Grace Foundation. Since conflicting stories have arisen, and Grace is killing debtor's horses, but blaming debtor for it, it is imperative that an accounting and inventory of the herd is done so that the animals can be accounted for. Without this, it will become even worse if Grace were to start selling and giving away property that is not theirs to give away, or fundraise off. As Grace is not the owner but only the temporary custodial caretaker, Grace willingly took the herd and was paid to do so. Very few rescues are ever paid $40,000 or $80,000 to take animals.

4. The reply filed for debtor in Response to the Trustee's abandonment of the animals (January 6 2012) lists out the requested data from Grace that should be provided.

6

Also, seeing as how the equines were seized illegally, it is incumbent that Grace be able to show sufficient records for the animals since Grace has already killed horses but blamed debtor for it. In fact Wells Fargo had no objection to the Humane Officers inventory of the horses but refused to *allow owner* to view the horses. It is imperative that the owner view the horses as he is the only person that can positively identify each animal, and he is the only individual who would know if any animal was missing.

### DEBTOR SHOULD BE ALLOWED BACK IN POSSESSION OF THE REAL PROPERTY AS WELLS FARGO CREATED A CONSTRUCTIVE EVICTION

Since Wells Fargo cannot prove up their own ownership of the property, and since Wells Fargo essentially evicted debtor without filing eviction notice, Wells Fargo has likely violated the stay because they had no order for colorable title in place at any time whatsoever in the history of this case.

1. While debtor understands that Wells Fargo got a receivership order, that in and of itself does not mean it is valid. It is debtor's position that the receiver order is void due to lack of colorable title by Wells Fargo despite attempting to gain such order over 8 months. It is obvious that Wells Fargo did not envision spending this much time in their bulldozer approach to gaining or seeking title.

In the meantime, Timothy M. Ryan for Wells Fargo did everything he could to ruin the debtor's name, reputation, business, and saw to it that debtor's property was either removed or not accounted for by his receiver. Debtor was then thrown in jail due to Wells Fargo's civil contempt order, which should be a violation of the automatic stay. Ryan argued that jailing debtor was proper because it was not related to debt collection. However the effect of ousting debtor from the property amounts to a constructive eviction, which would be a violation of the stay. Since the receivership was not valid, Wells Fargo never had any authority to even FILE a

7

contempt because the receiver order was void ab initio, and Wells Fargo knew that Judge had never signed the underlying order which Wells Fargo claimed gave them "title".

2. These facts as stated seem rather simplistic. However, after illegally seizing debtor's horses, and sending them off to Grace, Timothy M. Ryan proceeded to campaign online against debtor, and purposely and knowingly egged people on to join up and make debtor pay for crimes, to purposely denigrate, berate and cause hatred and oppression toward debtor by claiming debtor owed the ex live in partner, that debtor was an abuser, manipulator and other such choice words.

When we consider that Timothy M. Ryan was actually the source online of much of the hatred toward debtor, we can see that such hatred was also designed to get others to agree. And this is with full knowledge that debtor had filed a TRO against the ex former live in partner accusing her of being involved with the horse killing.

3. The cavalier, and purposefully hateful online postings by Timothy M. Ryan show that Ryan was disposed to ruin the reputation of debtor, no matter what it took. Even if it meant getting an order that was never signed over 8 months, even if it meant ousting debtor from property by placing him in jail using civil contempt, even if it meant attempting to coerce a potential witness to gain knowledge about debtor to use against him at trial, even if it meant having a swat team descend upon debtor's property for "abuse" when he didn't even have any animals, even if it meant turning over privileged communication from counsel to debtor and giving it to the District Attorney along with 800 more pages of nothing but unsigned declarations specifically made up to try and cast debtor in a bad light, even if it meant Timothy M. Ryan using profanity during an actual deposition wherein Ryan stated on the record, he and Wells Fargo did not give a f**k about debtor's horses, whether they lived or died?

These actions are all examples of just some of the many actions Wells Fargo's attorney has engaged in, in order to bring this case to this point. Further, Ryan then goes online to boast about HIMSELF, and had the gall to state that Lassen County had engaged him in a "penis-measuring" contest and wasted the County's money in even having the hearing. Ryan then

published this online on the Internet for the world to view. Which is how we were alerted to it.

If this case had not risen to this level of unprofessional, inappropriate and unbecoming conduct which should not be demonstrated by attorneys, the Court would never likely understand why debtor's life fell apart. This demonstrates but just a fraction of what has occurred to debtor.

It is safe to say that Wells Fargo Timothy M. Ryan perpetrated about 90% of it.

    It would be inequitable to allow Wells Fargo to keep possession of the debtor's property at this time, since debtor was ousted inappropriately and seemingly illegally when there is actually no showing of any order for colorable title to Wells Fargo. It would be fairly straightforward to have Wells Fargo prove up their ownership by showing their complete basis and documents, how they have actually demonstrated their loan documentation, and if needed, to use the ALTA title insurance and other insurance if they were actually eligible to claim ownership.

Dated: February 22, 2012                                __/s/__Carolyn Chan___
                                                                                  Attorney for Debtor Dwight Bennett