12
Carolyn Chan sbn147978
2485 Notre Dame B. Ste. 370
Chico, CA 95928
Telephone: 530.359.8810

Attorney for

Dwight Bennett

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIV.

| | |
|---|---|
| In re | Case No.: 11-40155-A-7 |
| DWIGHT A. BENNETT | DEBTOR DWIGHT BENNETT'S MOTION TO TERMINATE RECEIVER FOR GOOD CAUSE, ALLOW INVENTORY OF DEBTOR'S PROPERTY INCLUDING ANIMALS, FOR CAUSE and ALLOW DEBTOR'S RETURN TO POSSESSION |
| Debtor. | Date: 03/12 /2012 Time:10:00am   Dept: Ctr 28 |
| ---------------------------/ | |

**POINTS AND AUTHORITIES IN SUPPORT OF TERMINATING RECEIVER**

Background:

Debtor requests that the Court allow Chapter 7 trustee to perform inventory over debtor's property. There is no legal authority underlying the receiver's appointment but even if there were, the

_____
Points and Authorities in Support of Debtor's Motion

1

receiver has breached her duty of neutrality, reasonable diligence, and fiduciary responsibility in failing to first file the inventory or any inventory that we are aware, the undertaking, failing to preserve the property (especially inside the residence), and allowing debtor's property to be converted. Receiver has never done a receivership before and Mr. Timothy M. Ryan is drafting and executing her declarations. No inventory status reports have ever been given to debtor or to the Courts that we are aware. Debtor has no idea of the status of his personal property because he was run out of the premises by civil contempt actions.

## BAD FAITH HAS BEEN SHOWN BY WELLS FARGO AND RECEIVER
## MATERIAL FACTS IN BACKGROUND OF CASE

Under California law, a receiver under rents and profits may be appointed where certain conditions exist. CCP Section 564 requires that authority for appointment of a receiver requires a perfected deed of trust or an agreement signed by debtor and creditor. Wells Fargo specifically did  cite the California statute referring to rents and profits but used the section involving vendors, which is typically more akin to claim and delivery in practice.

The following facts *are material* in regard to the actions that occurred during the setting up of the "receiver."

1. In this case, Wells Fargo was brought into this entire case by Norm Allen initially suing Summit financial, then later brought another action to bring in Wells Fargo/BAC as a creditor.  Wells Fargo opposed and defended but Judge would not grant their relief and ordered them to be defendants in the case.  Prior to being ordered to stand as defendants, Wells Fargo had always indicated their status was "non monetary" and then when lodged as defendants, changed their position to that of beneficiary (lender) in the action.

2

Wells Fargo has NEVER been able to secure a signed order from Lassen State Court which might possibly even give them any rights to the property. Judge has refused to sign the order by Wells Fargo attorney Timothy M. Ryan at least 4 (four) times now over 8 months.

Debtor had *determined the reason for this*, which has to do with the signed stipulation which was signed by parties (but not debtor) on July 21, 2011. (See Exhibit "Settlement" 7/21/11)......in that agreement, Wells Fargo gave itself the 14.03 acres with improvements, and most of the 40 acres of raw land.  This left a small part of the 40acres to be (allegedly) divided between Mr. Allen, J. St John and debtor.  This was labeled a partial settlement but debtor had not signed and refused to sign.  This document was signed by Judge Giordano as well, and it is assumed that he knew debtor Bennett had not signed it.  Document was filed with the Court.

---

Judge Gordano signed the agreement on July 21, 2011, which at #1 indicates "Judgment entered for bank per court ruling on MSJ" even when no Judge had ever signed such an order. Therefore if there was no signed order on that issue, #2 on same document says "Subject to attorneys fees motion for purpose of foreclosure if necessary." This indicates that since no order was ever signed at ANY time (even now) for an "equitable lien or mortgage", the court did not intend to issue that order because they engaged in a stipulation, even though it did not include debtor Bennett. That entire case was DISMISSED (case no. 45679 herein) yet Mr. Ryan has a 'receiver' which is acting on THAT case right now. If the case was dismissed, how does one continue to have hearings on the case?

When Ryan could not OBTAIN his order for equitable relief, he amped it up to "reformation for first secured deed of trust" which exceeded the court's jurisdiction, and Judge did not sign that order either. Ryan has no equitable or colorable title to debtor's acreage and the agreement of the state court allegedly already GAVE the banks the 14.03 acres with the improvements. But without Bennett signing the agreement.

At this juncture, NO hearing was set for court of equity to determine anything. (Recall that the "settlement" claimed it was already done, but in fact, no order was ever signed.)

Key to this "agreement" was the fact that parties, including Wells Fargo, DISMISSED WITH PREJUDICE, Case No. 45679 (**the case herein**, Allen v Summit) and Case No. 52277 (Wells v Bennett, breach of contract) and Case No. 50324 (Allen v Wells Fargo et al naming them as additional defendants)

2. When debtor Bennett could not be forced to sign the agreement by Wells Fargo (even as attorney Timothy M. Ryan yelled, screamed and even threatened debtor), Wells Fargo attorney told Bennett and others that he would see to it that debtor would be buried and never recover, in so many words. It was then that the destruction of debtor was firmly cemented personally in Timothy M. Ryan's attitude and actions. This is clearly evidenced by data and discovery disclosed in the case that followed.

3. Timothy M. Ryan used the "receiver" *not only* to oust the debtor from possession, but had him jailed, illegally seized the animals that required no exigent circumstances, approached potential witness to have her testify in exchange for leniency with District Attorney, gathered unsigned documents and lodged them with the county, put together an entire package of claims, documents and other assorted data and bundled it up into a FLASH DRIVE and gave it to the District Attorney and Animal Control as the case against debtor for prosecution (on animals), had the animal rescue gather volunteers to call the District Attorney and force him to file charges on debtor, helped make sure that a SWAT team, heavy artillery, take down (meaning deadly force) was authorized claiming debtor was armed and dangerous, went online for months and months, personally inserting his personal attacks and opinions of debtor, tried to get others to go along with him by using glib remarks and his standard disgusting manner of catering to others in patronizing fashion, helped obtain $40,000 or $80,000+ from Wells Fargo and Bank of America, to go to the animal rescue for TAKING the debtor's illegally seized animals (not animals

voluntarily given to rescue by debtor, at debtor's request, asking for help in April 2011), claimed that he personally, as Wells Fargo counsel, also represented the animal rescue and told debtor not to contact the rescue except via Ryan himself, made it his job to act as the "prosecutor" in the case by working with both the County of Lassen and Animal control, claimed the seizure of debtor horses in July 29, 2011 was "by receiver-- for Lassen County" but Lassen County did not bring the motion nor initiate it at any time, and failed to hold the requisite legal hearing called for under Penal Code 597.1 and Section 597, purposely issued unprofessional emails to Lassen County Counsel, actually charged Lassen County Sheriffs and County Counsel for Contempt in not ousting the debtor's tenants (County counsel believed an unlawful detainer or other process was required), went into closed chambers after filing contempt on County Counsel and never allowed tenants to see or hear the actual verdict or agreement (if any) obtained, and then Sheriffs forced tenants off property of debtor's without any due process other than the alleged contempt [but Ryan claims on "Facebook" that he 'dropped' the contempt so if he did, how could tenants be ousted by contempt?]

**All of this was done with one, very large goal**: Take down Bennett, take his animals (that were not ill) and turn the community against him, defile, demean, and damage him so badly that he would either die of stress or be homeless, or both.

Considering that Wells Fargo had dismissed their lawsuit with prejudice against Bennett, it is only because Bennett refused to sign the agreement that Wells Fargo Timothy M. Ryan went on his rampage. Mr. Allen and the banks dismissed the underlying case (the case herein, No. 45679 from Lassen County) And the receiver was a main tool in that arsenal. How does a court "retain" any jurisdiction after it has dismissed the case? With prejudice? It is believed that Summit as a party, is still in the lawsuit.

3. However, assuming for argument's sake that there was a valid receivership, it is debtor's position that the receiver never did her job with the professional standard expected of a receiver:

These reasons include:

Failure to obtain the undertaking at outset, failure to sufficiently execute and deliver the inventory list, failure to account for debtor's personal property which was outside, failure to reasonably stop the conversion of debtor's personal property, purposeful collusion with several parties to illegally seize debtor's equines without proper procedure

Failure to maintain the inside of the premises by allowing animal feces, trash and other debris to be in the living areas of the residence

At all times the person acting as "receiver" was simply a figurehead for Wells Fargo to gain legal title over the premises, and to oust debtor from the property.

The receiver basically did little to nothing except change the locks and carted off debtor's property, as witnesses saw her remove truckloads of tack and equipment.

4. Debtor has absolutely no idea where any of these possessions went.
Furthermore, the receiver does not act as a neutral party but essentially just does what Timothy M. Ryan tells her to do.

Essentially Wells Fargo managed to wrangle out a receivership order, but nothing else from the state court which supports such an order. Specifically, Wells Fargo has specifically told all courts that it HAS an order for some type of colorable title, but there is no order signed that exists to show that. Outside of that fact, Wells Fargo has never proven up their perfected interest, and no Judge has issued any signed order indicating any colorable title. The only document that even mentions that Wells Fargo takes the 14.03 acres and most of the 40acres remaining is the agreement that debtor did not sign. It is nearly impossible to understand how an agreement only of other parties can actually vest title to debtor's land when he didn't even sign the agreement.

5. Due to the other acts by Wells Fargo, such as ignoring the automatic stay and placing debtor in jail for civil contempt, debtor Bennett was driven from the residence where he was homeless for days. All of his worldly possessions were at the residence which Wells Fargo and

6

the receiver stated, were completely off limits to debtor.  After the 'turnover excusal' the debtor was not able to remain in possession of the residence because Wells Fargo and the receiver would call the sheriff or have him cited for contempt.

It would appear under these circumstances that the receiver did none of the things a receiver is designed to do, and there is little and no basis for leaving the receiver in "possession" of the property that she has allowed to become damaged, showing she has no control over the property. As to debtor, the receiver has done nothing to protect his property or personal property. The Chapter 7 trustee would seem to be a party with more neutral position as to the estate preservation.

### GOOD CAUSE EXISTS TO ALLOW AN INSPECTION OF DEBTOR'S ANIMALS WHICH ARE ALLEGEDLY HOUSED ON THE GRACE FOUNDATION'S PROPERTY OR IN THE ALTERNATIVE, TO RECOGNIZE DEBTOR'S LEGAL EXEMPTIONS UNDER STATE LAW UNDER CA CCP 703.140(b)(1)(5) RE THE ANIMALS AS HIS PROPERTY

In another convoluted circumstance, Wells Fargo Timothy M. Ryan filed a motion in state court, asserting that his receiver was seizing debtor's equines upon "exigent medical" reasons and did this ex parte.  There actually was NO medical exigency, and the equines were not even moved for almost a month after the hearing.

1. Under Penal Code Section 597 and 597.1, exigent medical seizure *requires* a very specific hearing process and it allows for opposition by the owner who can bring experts on his own behalf.  Not only was the debtor owner not allowed to take opposition, he was basically ignored and not allowed to participate in the "receiver seizing equines" for Lassen County hearing.

The hearing was only to get authority to seize and did not involve any experts testifying as to the exigent circumstances of the animals.

No accounting or inventory was ever provided to owner of the animals seized.

2. Case law on the subject of giving away, selling, adopting, or allowing others to take the owner's animals and due process has been established in California, even where the owner has been alleged to have committed negligence with the animals. For example, in Judi Jackson v Placer County, Eastern District of California, 2007 WL 1429827, it was determined that volunteer rescue persons either sold or gave away the owner's horses. This was determined to be illegal without a prior hearing with notice and more. Eventually the case settled but it is a tenet of due process in almost any cases where animals are seized. This means that when debtor exempts his property (as stated above, CCP 703.140(b)(1)(5)) for the record, the animals should be retained pending the state case involving the animals, *and not sold by the rescue.*

The Grace Foundation started large fund raising campaigns using the "seizure" of debtor's horses as the ploy for much of it, claiming they needed to buy hay. Grace Foundation continued to show their own home made video of patched together footage and claimed that debtor was responsible for killing horses.

3. The fact is that perpetrators were purposely killing debtor's horses and this is a matter of reported record to the Third District Court of Appeal when debtor filed a TRO to stop his ex live in partner (St. John) from killing any more horses. This is not speculation as information has been discovered which implicates this person. That information is also the subject of a motion to compel.

Because Wells Fargo paid Grace Foundation and so did Bank of America (estimated $40,000 to $80,000+) to take the horses, debtor was shocked and surprised when Grace Foundation announced they (Grace) had killed several horses.

There is both controversy and deception involved with the Grace Foundation taking the horses because the veterinarian from Grace gave testimony that directly conflicted with that of

press releases from Grace Foundation. Reading the press releases indicates that Grace is taking advice from Wells Fargo and telling people publicly, that Grace owns the horses and that Grace can sell, adopt or otherwise get rid of debtor's horses.

4. The reality is that Grace has NO ownership in the horses, the "seizure" of the horses was illegal and even if she was already paid to take them, she does not own the horses just because she has temporary custody of them.
And Grace absolutely cannot start selling back horses to purported owners as Grace has no legal authority to do so, even if the animals were abandoned back to debtor. Additionally, Grace has no knowledge of whether any purported "owner" has other offset debts pending as to debtor which exist, such as unpaid liens for boarding and feed by debtor as against others. Further, by virtue of the bankruptcy, debtor has property which is exempt and can claim all of the animals as his exempt property if he wishes to do so.

With all of these circumstances, debtor is now unsure as to what happened to his horses and whether in fact, all of the seized horses actually went to the Grace Foundation. Since conflicting stories have arisen, and Grace is killing debtor's horses, but blaming debtor for it, it is imperative that an accounting and inventory of the herd is done so that the animals can be accounted for. Without this, it will become even worse if Grace were to start selling and giving away property that is not theirs to give away, or fundraise off. As Grace is not the owner but only the temporary custodial caretaker, Grace willingly took the herd and was paid to do so. Very few rescues are ever paid $40,000 or $80,000 to take animals.

5. The reply filed for debtor in Response to the Trustee's abandonment of the animals (January 6 2012) lists out the requested data from Grace that should be provided.

Also, seeing as how the equines were seized illegally, it is incumbent that Grace be able to show sufficient records for the animals since Grace has already killed horses but blamed debtor for it. In fact Wells Fargo had no objection to the Humane Officers inventory of the

9

horses but refused to *allow owner* to view the horses. It is imperative that the owner view the horses as he is the only person that can positively identify each animal, and he is the only individual who would know if any animal was missing.

## WELLS FARGO HAS NEVER OBTAINED COLORABLE TITLE OVER DEBTOR'S PROPERTY and TIMOTHY M. RYAN HAS MOUNTED A PERSONAL ATTACK AND CAMPAIGN AGAINST DEBTOR AS EVIDENCED BY "FACEBOOK" ** AND ONLINE POSTINGS OVER MONTHS OF TIME

Since Wells Fargo cannot prove up their own ownership of the property, and since Wells Fargo essentially evicted debtor without filing eviction notice, Wells Fargo has likely violated the stay because they had no order for colorable title in place at any time whatsoever in the history of this case.

1. While debtor understands that Wells Fargo got a receivership order, that in and of itself does not mean it is valid. It is debtor's position that the receiver order is void due to lack of colorable title by Wells Fargo despite attempting to gain such order over 8 months. It is obvious that Wells Fargo did not envision spending this much time in their bulldozer approach to gaining or seeking title. HOWEVER, according to the signed agreement by parties other than debtor, Wells Fargo gave itself both the improvements, and most of debtor's 40 acres on July 21, 2011, and even dismissed the case against debtor and Allen.

In the meantime, Timothy M. Ryan for Wells Fargo did everything he could to ruin the debtor's name, reputation, business, and saw to it that debtor's property was either removed or not accounted for by his receiver. Debtor was then thrown in jail due to Wells Fargo's civil

---

**Not surprisingly, the Facebook comments by Ryan *ceased when debtor's counsel called County Counsel re the postings.*

contempt order, which should be a violation of the automatic stay. Ryan argued that jailing debtor was proper because it was not related to debt collection. However the effect of ousting debtor from the property amounts to a constructive eviction, which would be a violation of the stay. Since there is NO color of title shown as to Wells Fargo, they never had any authority to even FILE a contempt because the receiver order was void ab initio, and Wells Fargo knew that Judge had never signed the underlying order which Wells Fargo claimed gave them "title".

2. These facts as stated seem rather simplistic. However, after illegally seizing debtor's horses, and sending them off to Grace, Timothy M. Ryan proceeded to campaign online against debtor, and purposely and knowingly egged people on to join up and make debtor pay for crimes, to purposely denigrate, berate and cause hatred and oppression toward debtor by claiming debtor owed the ex live in partner, that debtor was an abuser, manipulator and other such choice words.

When we consider that Timothy M. Ryan was actually the source online of much of the hatred toward debtor, we can see that such hatred was also designed to get others to agree. And this is with full knowledge that debtor had filed a TRO against the ex former live in partner accusing her of being involved with the horse killing.

3. The cavalier, and purposefully hateful online postings by Timothy M. Ryan show that Ryan was disposed to ruin the reputation of debtor, no matter what it took. Even if it meant getting an order that was never signed over 8 months, even if it meant ousting debtor from property by placing him in jail using civil contempt, even if it meant attempting to coerce a potential witness to gain knowledge about debtor to use against him at trial, even if it meant having a swat team descend upon debtor's property for "abuse" when he didn't even have any animals, even if it meant turning over privileged communication from counsel to debtor and giving it to the District Attorney along with 800 more pages of nothing but unsigned declarations specifically made up to try and cast debtor in a bad light, even if it meant Timothy M. Ryan using profanity during an actual deposition wherein Ryan stated on the record, he and Wells Fargo did not give a f**k about debtor's horses, whether they lived or died?

These actions are all examples of just some of the many actions of bad faith that Wells Fargo's attorney has engaged in, in order to bring this case to this point.  Further, Ryan then goes online to boast about HIMSELF, and *had the gall to state that Lassen County had engaged him in a "penis-measuring" contest and wasted the County's money in even having the hearing.* Ryan then published this online on the Internet for the world to view. Which is how we were alerted to it.

If this case had not risen to this level of unprofessional, inappropriate and unbecoming conduct which should not be demonstrated by attorneys, the Court would never likely understand why debtor's life fell apart.  This demonstrates but just a fraction of what has occurred to debtor.

It is safe to say that Wells Fargo Timothy M. Ryan perpetrated about 90% of it. [Note: Some of the Exhibits could not be loaded online and ECF helpdesk could not fix the PDFs so they will be mailed in.]

It would be inequitable to allow Wells Fargo to keep possession of the debtor's property at this time, since debtor was ousted inappropriately and seemingly illegally when there is actually no showing of any order for colorable title to Wells Fargo.  It would be fairly straightforward to have Wells Fargo prove up their ownership by showing their complete basis and documents, how they have actually demonstrated their loan documentation, and if needed, to use the ALTA title insurance and other insurance if they were actually eligible to claim ownership.

Dated: March 09, 2012                                     __/s/__Carolyn Chan___
                                                          Attorney for Debtor Dwight Bennett

12