08/03/2012 20:57 +18631570896 CHAN
Case 11-40155 Filed 08/07/12 Doc 199
JUL-25-2012 12:03 From:STUART L LEVITON ESQ To:18883503934
FILED
August 07, 2012
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0004378136



1 **LEVITON LAW GROUP, A P.C.**
2 Stuart L. Leviton (SB# 169046)
  3699 Wilshire Blvd., Ste. 1290
3 Los Angeles, CA 90010
  213.402.4576 (T)
4 213.559.0572 (F)
  sleviton@levitonlawgroup.com (E)
5
  Attorneys for Plaintiff
6 THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

8                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                       IN AND FOR THE COUNTY OF EL DORADO
10                              CAMERON PARK BRANCH

| | |
|---|---|
| 11 THE GRACE FOUNDATION OF NORTHERN CALIFORNIA, a California corporation,<br>12<br>13    Plaintiff,<br>14    v.<br>15 WELLS FARGO BANK, N.A., a federally chartered bank, on its own behalf and as trustee of the MLMI Trust Series 2005-HE3; BANK OF AMERICA, N.A., a federally chartered bank, on its own behalf; BAC HOME LOANS SERVICING, LP, a Texas limited partnership and a unit of Bank of America, N.A.; TIMOTHY M. RYAN, an individual; THE RYAN FIRM, a California professional corporation; DWIGHT ALAN BENNETT, an individual; VICKI LOZANO, an individual, but only in her official capacity as a receiver; COUNTY OF LASSEN, CALIFORNIA; and DOES 1 through 50, inclusive,<br>22    Defendants. | Case No. PC 2012 0382<br><br>**FIRST AMENDED COMPLAINT FOR**<br><br>1. **COMMON COUNT – QUANTUM MERUIT – SERVICES RENDERED;**<br>2. **FRAUD**<br>3. **BREACH OF FIDUCIARY DUTY**<br>4. **LEGAL MALPRACTICE**<br>5. **RESCISSION OF CONTRACT**<br>6. **DECLARATORY RELIEF – ABANDONMENT**<br>7. **INDEMNIFICATION – Civil Code § 1833**<br><br>**DEMAND FOR JURY TRIAL** |

23 ///
24 ///
25 ///
26 ///
27 ///
28

Plaintiff The Grace Foundation of Northern California alleges:

## PARTIES

1. Plaintiff The Grace Foundation of Northern California ("Grace") is a California non-profit corporation with it principal place of business in Eldorado Hills, California. Grace is an animal rescue and rehabilitation ranch. It provides critical care and rehabilitation for abused and neglected horses and utilizes many of its rescued horses in equine assisted learning and therapeutic programs for youth and adults. Grace also rescues and rehabilitates dogs, cats, cows, sheep, goat, pigs, chickens and more. Grace is authorized to do business in the State of California and conducts business in Eldorado County, California.

2. Defendant Wells Fargo Bank, N.A. ("Wells") is a federally chartered bank that does business in the State of California and the County of El Dorado. Wells is sued herein both in its own right and as trustee of the MLMI Trust Series 2005-HE3 ("Trust").

3. Defendant Bank of America, N.A. ("B of A") is a federally chartered bank that does business in the State of California and the County of El Dorado. B of A is sued herein in its own right, and as the parent and/or alter ego of BAC.

4. Defendant BAC Home Loan Servicing LP ("BAC") is a Texas limited partnership and a unit of B of A. BAC is sued herein in its own right.

5. Defendants Wells, B of A, and BAC shall be referred to collectively herein as the "Banks."

6. Defendant Timothy M. Ryan is an individual, and Grace is informed and believes and thereon alleges that Ryan resides in Orange County, California. Ryan is a member of the California Bar. At all relevant times, Ryan purported to act as Grace's attorney.

7. Defendant The Ryan Firm is a California professional corporation, and the law firm through which Ryan practices.

8. Defendant Dwight Alan Bennett is an individual. Grace is informed and believes and thereon alleges that Bennett resides in Lassen County. Bennett claims to be the owner of

the horses at issue in this action. Bennett either owns, once owned, or claims to own, Whispering Pines Stables, located at 695-725 Highway 36, Susanville, California, 96130.

9. Defendant Vicki Lozano is an individual. Grace is informed and believes and thereon alleges that Lozano is a resident of Lassen County, California. Ms. Lozano is a court-appointed receiver in the matter of Allen v. Summit Financial Group, et. al., and associated and related actions and cross-actions, Case No. 45679, Lassen County Superior Court. Ms. Lozano was appointed receiver with respect to the Whispering Pines Stables. Ms. Lozano is sued herein solely in her official capacity as a receiver.

10. Defendant County of Lassen, California, is a political subdivision of the State of California.

11. Unless otherwise alleged in this Complaint, Plaintiff is informed and believes, and on the basis of that information and belief alleges, that at all times mentioned in this Complaint, Defendants were the agents and employees of their Codefendants, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

12. Plaintiff does not know the true names of defendants DOES 1 through 50, inclusive, and therefore sues them by those fictitious names.

## BACKGROUND FACTS

13. We are all familiar with the phrase, "No good deed goes unpunished." Because Grace's good deeds have been punished mercilessly, and because Grace is in dire straits, prompt relief from the Court is requested and required.

14. On or about April 8, 2011, Grace first came into contact with Bennett. At the request of Lassen County animal control, Grace took custody of 20 horses from Whispering Pines Stables. Bennett agreed to surrender the horses to Lassen County, which then entered into a memorandum of understanding with Grace for the care, custody, and maintenance of the horses. These 20 horses are not at issue in this action.

///

///

15. After engaging in protracted litigation between the Banks and Bennett, on July 21, 2011, the Lassen County Superior Court, at the request of the Banks, appointed Lozano as receiver to take control of Whispering Pines Stables, including various animals on the property.

16. Grace is informed and believes and thereon alleges that upon becoming the receiver, Lozano assumed responsibility for the care of the Whispering Pines Horses, at a minimum monthly cost of $15,000, which was supposed to be paid by the Banks. Grace is further informed and believes and thereon alleges that the Banks have not, in fact, reimbursed Lozano for these costs.

17. Grace is informed and believes and thereon alleges that the Banks, or some of them, entered into one or more express written indemnification agreement(s) with Lozano by which the Banks, or some of them, agreed to pay any and all expenses Lozano incurred in connection with the receivership. These expenses would include, without limitation, all expenses incurred in connection with the care of the Whispering Pines Horses.

18. By Order dated July 29, 2011 (Exhibit A hereto), the Lassen County Superior Court "authorized" Lozano "to surrender any and all animals [at Whispering Pines Stables] ... to the County of Lessen." This included a surrender of the Whispering Pines Horses.

19. By the July 29, 2011 Order, the court also granted authority to Lassen County to "release any animals surrendered by the Receiver to its owner upon a sufficient showing by the purported owner of his or her ownership, and upon a sufficient showing by the purported owner that he or she can adequately care for the claimed animal."

20. On or about August 1, 2011, Ryan, on behalf of the Banks, contacted Grace about the urgent need to remove an additional 36 horses from Whispering Pines Stables (these horses, and the foals born to them, constitute the "Whispering Pines Horses"). Grace explained to Ryan that it would be willing to assist with the care of the Whispering Pines Horses on one of two conditions: either (1) the horses would be held in protective custody, with ownership of the horses remaining with their rightful owner, and the Banks assuming full financial responsibility for the care of the horses at Grace's standard rates for such care; or (2) the rightful owner of the horses would relinquish ownership of the horses to Grace, with a set sum of money paid to Grace to cover the costs of caring for them.

Ryan claimed that the Banks had already spent a great deal of money providing care for the horses and that they would only be interested in relinquishing ownership of the animals to Grace. Ryan did not disclose to Grace, however, that the Banks did not own the Whispering Pines Horses, and that the Banks did not have the lawful right to relinquish ownership of the Whispering Pines Horses to Grace.

21. Between August 2 and 17, 2011, Grace and Ryan continued to discuss Grace's assuming ownership of the Whispering Pines Horses and the care for them. Grace told Ryan that it would assume ownership of the horses on the express condition that Grace were paid $50,000, which was needed to supplement Grace's financial wherewithal to provide care for the horses until Grace could adopt out the horses to new owners. Grace made clear to Ryan that one of its major concerns was the possible pregnancies of the mares (adult female horses) because one or more stallions (male horses that have not been gelded (castrated)) had been housed with the mares, without appropriate separation. Grace told Ryan that pregnancy testing would need to be immediate, and that as an express condition for assuming ownership of the horses, and pursuant to standard shelter practice, all early pregnancies would need to be terminated. A further express condition of assuming ownership of the horses, and which was expressly communicated to Ryan, was that a majority of the Whispering Pines Horses needed to be ready for adoption by October 15, 2011, a day in which Grace had already planned a Nationwide-adoption effort.

22. On or about August 17, 2011, Ryan confirmed to Grace that the Banks would pay Grace a total of $40,000 ($20,000 from Wells and $20,000 from B of A/BAC). Ryan emphasized that these payments were "donations" and not payment for the horses care. Ryan requested a letter from Grace acknowledging the donations and asked Grace not to mention the termination of the pregnancies in the acknowledgment letter. Ryan also instructed Grace to include in the letter examples of how the "donations" were to be used, but emphasized that the letter needed to reflect a total cost approximately $40,000.

23. Lassen County agreed to pay an additional $10,000 for the Whispering Pines Horses care, which to date has not been paid.

///

5
COMPLAINT; DEMAND FOR JURY TRIAL

24. A few words about terminating early pregnancies. Grace follows standard shelter practice with respect to the termination of early pregnancies. Grace does not undertake this act lightly. That said, Grace's first priority is to the rescued animal. Moreover, given that the need for its services far outweigh its ability to provide services, Grace must exercise sound judgment in managing animals presented to it.

25. With respect to the Whispering Pines Horses, Grace also knew that they had been deprived of adequate feed and appropriate care for a period of time. Moreover, because many of the horses were either very young or very old, which precluded them from being considered good breeding candidates, Grace knew that if the horses were pregnant, and if the pregnancies were not terminated early, the pregnancies would be at high risk for complications and many would require very expensive veterinary care. As will be detailed herein, because Grace was not allowed to follow standard shelter practice in this case, the negative consequences have been extreme, and continue to grow by the day.

26. On August 18, 2011, Grace sent Ryan the requested letter via email, in which it stated, "This letter is to confirm details of our telephone conversation yesterday, concerning Wells . . . and B[] of A[] providing . . . Grace . . . with a $40,000 donation . . . . These grants will allow [Grace] to take ownership of and care for the approximately 37 [Whispering Pines] horses . . . ." Once again, Grace emphasized the importance of it obtaining outright ownership of the Whispering Pines Horses from the outset.

27. The most critical element of this agreement is Grace's ability to take ownership of the Whispering Pines Horses immediately, and to take all appropriate steps immediately to manage the horses. Neither Ryan nor the Banks told Grace, however, that none of them owned the Whispering Pines horses and none of them had the right to convey ownership of the horses to Grace.

28. On August 19, 2011, Bennett advised Ryan of his bankruptcy filing on August 18, 2011 during a contempt proceeding in Lassen County Superior Court. Rather than acknowledging that the automatic stay prevented the Superior Court proceeding from continuing, Ryan urged the Superior Court to proceed with the contempt proceeding because it "is a quasi-criminal proceeding. A

stay, a bankruptcy stay is simply a stay to prevent debtors from collecting on debts of the bankrupt. It has no bearing on this proceeding at all whatsoever." At the end of this proceeding, the Superior Court ordered Bennett jailed for five days.

29. Later on August 19, 2011, Grace's Executive Director, Beth DeCaprio, and Jeanne Warr drove to Lassen County to meet Ryan, Lozano, and Pete Heimbigner of Lassen County, to go over a plan for picking up the Whispering Pines Horses on August 26th and to do an inventory of the horses at Whispering Pines Stables. DeCaprio and Warr met everyone at Lozano's office in Susanville. DeCaprio and Warr were informed that Bennett had been placed in police custody during a hearing in Lassen County Superior Court that took place earlier on the morning of August 19. Critically, DeCaprio and Warr were not told, however, that Bennett informed Ryan and the Banks in court on August 19 that he had filed for bankruptcy protection, and Ryan and the Banks did not tell Grace how this event would significantly adversely impact Grace's ability to take ownership of the horses.

30. Rather than advising Grace of the negative impact Bennett's bankruptcy filing had on Grace's ability to take ownership of the Whispering Pines Horses, Ryan, along with DeCaprio, Warr, Lozano, and Heimbigner proceeded to Bennett's ranch, where they were joined by Judy St. John, Bennett's ex-wife, and St John's attorney. St. John showed proof of ownership of two of the horses on the property and Heimbigner provided a Bureau of Land Management document showing that Bennett's daughter also owned two of the horses. All Parties agreed that Grace would take the Whispering Pines Horses on August 26th. Everyone, including Ryan, also agreed that ownership of the Whispering Pines Horses would be conveyed to Grace immediately upon transfer. Everyone also agreed that with respect to the four horses whose ownership was held either by St. John or Bennett's daughter, those horses would be placed into Grace's protective custody subject to a pre-existing memorandum of understanding between Grace and Lassen County until the owners could arrange to pick up the horses from Grace.

31. Based on the foregoing, Grace continued to prepare to receive the Whispering Pines Horses on August 26, and stepped up its advertising efforts for the October 15, 2011 Nation-

wide adoption effort. Grace took these steps based on its belief, derived from the representations of Ryan and the Banks, among others, that it would obtain ownership of the Whispering Pines Horses upon transfer.

32. Grace did not learn of Bennett's bankruptcy until after it assumed responsibility for the horses.

33. On August 25, 2011, back in Bankruptcy Court, Ryan declared that "the Creditors (Banks) agreed to make a $40,000 donation to the Grace Foundation of Northern California for the transfer of the horses. This amount provides transportation, medical care, food and shelter for over thirty (30) horses for up to six (6) months." By this representation, the Banks knew that if Grace's care for the subject horses extended beyond six months, their "donation" would not be sufficient. Moreover, Ryan misrepresented to the Bankruptcy Court the minimum amount of money required to care for the horses ($50,000, not $40,000), and most importantly, Ryan also failed to disclose to the Bankruptcy Court that this amount of money would be sufficient only if "transfer" meant that Grace obtained immediate ownership of the horses.

34. Critically, Grace formulated its initial estimate of the cost for caring for the Whispering Pines Horses based on its belief that it would obtain immediate ownership of the horses and that the Nation-wide adoption program set for October 15, 2011 would result in the prompt adoption of many of the horses. When the bankruptcy filing precluded Grace from obtaining immediate ownership of the horses, this plan had no chance of success. Although Ryan and the Banks knew this, they nevertheless allowed Grace to proceed with accepting the horses.

35. Also on August 25, 2011, the Banks filed an application in the Bankruptcy Court because the Banks sought "an annulment of the stay so that the filing of the subject bankruptcy petition does not affect post-petition acts . . .," including transferring ownership of the horses to Grace. The Banks and Ryan knew, as of August 25, 2011, that ownership of the horses could not be transferred to Grace without further court action, yet they did it anyway, as detailed below.

36. On August 26, 2011, notwithstanding the bankruptcy and the automatic stay, Lozano, at the request of and for the benefit of the Banks, purported to grant "final disposition" of the

8
COMPLAINT; DEMAND FOR JURY TRIAL

subject horses to Lassen County, which in turn purported to "relinquish" the animals to Grace. Attached as Exhibit B hereto and incorporated herein by reference is the "Final Disposition" agreement dated August 26, 2011 entered into among Lozano, Lassen County, and Grace. Lozano also purported to enter into a "protective custody" agreement with Lassen County regarding other animals, and Lassen County then purported to enter into an agreement with Grace. Attached as Exhibit C hereto and incorporated herein by reference is the "Protective Custody" agreement dated August 26, 2011 entered into among Lozano, Lassen County, and Grace. The Banks and Ryan knew that Lozano had no such authority to enter into these agreements, yet they allowed this to proceed, and Lozano proceeded with these agreements at the request of and for the benefit of the Banks.

37. On August 26, 2011, Grace took custody of the Whispering Pines Horses and moved them to its ranch in Eldorado Hills, where the surviving horses live today.

38. On September 2, 2011, the Bankruptcy Court denied the Banks' Application, and denied Lozano the right to control the disposition of Whispering Pines Horses. Neither Ryan nor the Banks, however, advised the Bankruptcy Court that Lozano, without legal authority, had already turned the horses over to Grace via Lassen County on August 26, and under the false pretense that Grace was now the "owner" of the horses.

39. On September 15, 2011, Ryan, via email, advised Bennett that Ryan's "firm represents the Grace Foundation concerning all animals removed from Whispering Pines. Do not contact Beth DeCaprio or anyone related to the Grace Foundation concerning any matters. Additionally, please ensure that your agents do not contact anyone at the Grace Foundation concerning these animals. Please go through our office and our office alone." Although Ryan never entered into a fee agreement with Grace to provide legal representation, and never obtained a conflict of interest waiver from Grace regarding his joint representation of Grace and the Banks, Ryan nevertheless assumed legal representation of Grace at least by September 15, 2011, if not before.

40. On September 17, 2011, at a time when it was undisputed that Ryan was jointly representing the Banks and Grace, the Banks filed a Motion in Bankruptcy Court for relief from the automatic stay. The Banks and Ryan understood that the automatic stay prevented them and Lozano

from obtaining ownership of the horses and control over the horses. Moreover, by this time, Ryan expressly instructed Grace not to take any of the usual steps Grace might otherwise take with respect to newly rescued horses, including the termination of early pregnancies. This significantly adversely impacted Grace. Had Grace known on August 26, 2011 that it did not own the horses, that its efforts to manage these horses would be severely limited, and that the Banks would refuse to provide sufficient financial support for the horses, it never would have accepted the horses.

41. On September 19, 2011, in a declaration prepared by Ryan and for the Banks' benefit, and notwithstanding the stay, Lozano declared that Grace has "provided for the sa[f]e transfer of the horses for the time being." At this point, legally, Grace was at most an agent for Lozano, caring for the Whispering Pines Horses subject to a de facto protective custody agreement, with ultimate financial responsibility for Grace's costs in caring for the horses falling on the Banks, as the parties who requested the instatement of Lozano in the first instance.

42. On September 23, 2011, in an email, Ryan advised Grace that he has "spoke[n] to the DA for about a half hour" about Bennett. Ryan further stated that he told the DA he "would provide him with a real prosecution package."

43. On September 29, 2011, in an email, Ryan advised Grace that "the District Attorney received the package from our office . . . if I don't get good vibes about him moving forward soon, we need to find the outside pressure that you were referring to . . . seems like a pretty easy way to score some cheap political points . . . ."

44. On October 13, 2011, Austin Beardsley, an associate in The Ryan Firm, sent an email to Grace and asked whether Grace would provide a declaration in support of the Banks' position in the Bankruptcy Court. Beardsley stated, "thanks for all that you guys have done for the horses!!!!" Without any hesitation, Ryan and the Banks were willing to use Grace when it benefited them, but as set forth below, once Ryan and the Banks obtained all that they needed from Grace, they refused to provide any help for the horrific situation unfolding at Grace.

45. On October 14, 2011, Ryan sent an email to Grace and said, "My inside source talked to the DA on Monday night . . . . He said, 'I don't have a prosecutable file.' I heard that he and

---
10
COMPLAINT; DEMAND FOR JURY TRIAL

Dwight Bennett are drinking buddies from way back. It is all up to us now. Seriously. No one else cares.... By us, I mean me, you and Beth. I will be up on Monday for my hearing. I will win and I hope that the court will also dismiss Dwight's BK. We are simply moving to reimpose the receiver and complete our foreclosure. I didn't ask for that yet ... as I don't have grounds ... but if the court is disgusted enough by what we presented, we will get that result." Once again, while Ryan is trying to curry favor with Grace, it is now obvious that his sole motive was to use Grace for the benefit of himself and the Banks.

46. On October 19, 2011, Ryan prepared a declaration for DeCaprio in support of the Banks' motion in the Bankruptcy Court. In this declaration, DeCaprio stated that [o]n or about August 26, 2011, the Grace Foundation rescued an additional thirty six (36) horses from the Subject Property pursuant to an order by the Lessen County Superior Court surrendering the horses to the County of Lassen." Ryan knew that this could not have been a true statement, in light of the stay and Ryan's failure to get relief from the stay as of August 26, 2011. That said, Ryan permitted DeCaprio to make such a statement under oath, which DeCaprio had no idea that it was not a true statement. Tragically, DeCaprio believed that Grace had obtained ownership of the horses on August 26 based on what Ryan told her.

47. In her declaration, DeCaprio also provided details of the costs associated with caring for the horses, and by this time, the substantial costs associated with caring for the expected foals, given that no pregnancy was terminated.

48. On October 21, 2011, the Banks obtained relief from the automatic stay in Bennett's bankruptcy. Ryan sent Grace an email stating, "Thanks for letting me hang out with the cool kids yesterday. I think that the strategy for Beth's update to the Grace supporters is very critical for momentum. Beth obviously can't fold, and needs to continue to hold Burns [Lassen County DA] accountable." Ryan then proposed a message to Grace supporters. Ryan concluded, "As always, without you our mission is impossible. With you, our mission might actually be achievable."

49. On October 24, 2011, in an email, Ryan advised Grace that "the Sheriff's office called me today to inform me that they would be executing a search warrant at Whispering Pines

11
COMPLAINT; DEMAND FOR JURY TRIAL

TOMORROW!!!! Please don't tell anyone . . . as it is kind of a secret . . . he was just giving me a courtesy warning because of the bank's security interest in the property."

50. On October 25, 2011, Bennett was arrested on 70 counts of felony animal abuse.

51. On October 27, 2011, Ryan sent an email to Grace and stated, "My wife has lived through the nightmare with me. Silently suffering as I was brooding and angry about Lassen justice. She is amazed at what you folks are doing and you will be getting a very small token of appreciation from her company . . . and from mine. Thanks for all you continue to do! Without your donor pressure, I would still be brooding. That is worth at least a thousand bucks!"

52. On November 10, 2011, Ryan sent an email to DeCaprio, stating, "Beth, [a]s discussed today, we need to be very careful with the manner in which we deal with the horses. We need to act as a "reasonable manager" of these horse assets while the bankruptcy is pending. If the bankruptcy judge does what he is SUPPOSED to do, the bankruptcy case will be dismissed on Monday, and we will not have to worry about the bankruptcy court. To the extent we need to put down an animal, as long as the care decision is documented and appropriate, we can do that EVEN if the horses are still under the control of the bankruptcy court. As soon as the BK court dismisses his case, then we will need to weight the strategy. We have to choose one of two paths: 1. Lassen County gave us the horses, we can do what we want. (See Pete transfer paperwork) OR 2. We are caring for the horses, we are stepping in for Lassen, Lassen has provided us the parameters that we can use to release the horses, BUT Lassen is on the hook for the board and care because the Order from court says that the horses are released to Lassen. Each path is mutually exclusive." At no time did Ryan suggest that his other clients, the Banks, might be financially responsible for the horses.

53. On December 5, 2011, in an email, Ryan advised Grace, "[t]he Chapter 7 trustee was just appointed and we have a letter up to the trustee asking him to abandon the horses. Once the horses are abandoned, then we can act like the bankruptcy does not exist."

54. Also on December 5, 2011, in an email to Ryan's wife, DeCaprio stated, "I could not believe how lucky we were when Tim [Ryan] offered to help us with the Bennett case and I have watched in amazement as he has over and over again gone beyond the call of duty. . . . Without

Tim's help I do not think I would have had the fight in me to see this all the way through." Only now does Grace understand that the only "help" Ryan provided was to his other clients, the Banks. Only now does Grace understand the magnitude of the harm Ryan and the Banks have caused it.

55. On December 9, 2011, the Chapter 7 Trustee filed in the Bankruptcy Court an abandonment motion with respect to the animals. The Trustee sought abandonment "because the Horses are of inconsequential value or benefit to the estate and are otherwise burdensome to the administration of this case." By this time, all parties understood the extreme expense caring for the horses would entail, yet no one stepped forward to help with these costs.

56. On December 12, 2011, Ryan, in an email to DeCaprio, stated, "Our letter to the trustee had the desired effect. She filed a motion to deem the horses and all other animals as abandoned.... Once the court approves that motion, we can start the process of adopting out the horses as they will no longer be part of the bankruptcy estate."

57. On December 21, 2011, in an email, Ryan advised Grace that "[t]he squatters were removed yesterday ... Now, we can accomplish what we tried to accomplish in July. The horse abandonment motion has not yet been opposed! We will know very shortly if Grace is going to have a free hand in dealing with the horses."

58. On December 30, 2011, in an email, Ryan advised Grace, "Let's plan for a conference call during the first part of the year on an action plan for the animals. As I have told Beth, there are two mutually exclusive paths to go down: 1) the animals are Grace's and can be adopted out; 2) the animals are being held by Grace for the County and the County owes for their board care and med's. That signed piece of paper from the County is our get out of jail free card ... The County gave us the animals. PERIOD." Even as of this date, who owns the horses remained unclear.

59. On January 3, 2012, Ryan, in an email, advised DeCaprio, "Today, the bankruptcy court on the motion of the Chapter 7 Trustee ordered all of Bennett's animals abandoned. Now, the bankruptcy court has no jurisdiction over the animals from Whispering Pines and they can either be reclaimed by their rightful owners (who show proof of ownership and ability to care for the animals) or adopted out by the Grace Foundation to new, loving homes."

60. On January 24, 2012, DeCaprio sent an email to Ryan, stating, "I'm so sorry it has taken me so long to get these invoices to you. I wanted to be sure we were also able to add a reasonable estimate for the care of the mares. Also I am wondering if you have the original agreement that you wrote up between Lassen and us regarding the horses. I cannot seem to find mine. I'm not sure if we now have legal custody of the horses. . . . I'm wondering where we stand with legal ownership with them now." Believing that Ryan was still its lawyer, Grace inquiries of Ryan as to the legal status of the horses and who will be financially responsible for the horses.

61. On February 16, 2012, Ryan prepared a demand letter for Grace to send to Lassen County regarding the costs of caring for the horses. Importantly, Ryan never prepared demand letters to his other clients, the Banks.

62. Also on February 16, DeCaprio, via email, advised Ryan: "I am sorry I haven't been back in touch with you – I'm not sure if I dropped the ball or not. I know Tim was going to look over the demand letter and I'm not sure what transpired after that. There is so much money going out with these mares, that we are in a world of hurt. We had a pregnant mare pass away and we are in the midst of putting up all of the foaling stalls, and two of the mares are on medication that cost over $80 per day. And we're trying to keep our heads afloat. We are also having to put in electricity in the quarantine/med area in order to properly care for the 20 pregnant mares. Please let me know how we can move forward on financing all of this? You had mentioned the banks may be able to contribute a second and third grant – any ideas on progressing these? I would be very appreciative to hearing something as soon as possible."

63. Not hearing back from Ryan, on February 28, 2012, DeCaprio, in an email to Ryan, again inquired: "Hey Tim – wanted to check-in and touch bases with you. Wondering where thing are at with the demands being sent out? . . . We are in full blown PANIC mode, and scrambling to secure long term and short term funding!!! . . . Please let me know what you think of the letter below and if you have any thoughts on anyone that could assist in securing these funds or have any interest in this loan/donation. Who knows: perhaps WELLS FARGO might be able to fund this!"

///

64. Rather than responding directly himself, on March 5, 2012, Beardsley, Ryan's associate, in an email to DeCaprio, wrote: "Our demand letters have gone out, and we are awaiting responses from the County .... We will definitely be keeping a close eye on the county. You know us." Grace thought it knew Ryan. Only later did Grace discover the true Ryan.

65. On March 8, 2012, Ryan, in an email to DeCaprio, wrote: "Sorry for the radio silence but I was out in hearings yesterday ... I approached Wells and BAC for more dollars and they reminded me of the money spent so far on the case ... and encouraged me to contribute. Austin is on the County ... I have had to pass most of the responses, etc. over to Austin as I am training two new attorneys at the firm and my caseload is exploding. Austin is invested in this case and getting retribution from the County (and restitution), but if there is any lag in response, don't hesitate to text or call me."

66. Not having obtained any financial assistance, on April 25, 2012, DeCaprio, in an email to Ryan, wrote: "Austin and Tim, Hey guys, I hope that things are going well. I wanted to check in with you and see if we had heard anything from Lassen yet and ask for assistance. We are in the middle of HELL right now. About two months ago the birthing issues started.....sadly with the death of a mom and foal. We knew that these babies would have an uphill battle because of their past, but we could not have anticipated how bad it would be. So far we have 5 live foals that have dropped and sadly we have had 2 stillborn deaths already. As of today we have over 10 more to go. Because we have no idea of the actual due dates we have to provide around the clock coverage and most of us are getting less than 3 hours of sleep per night. We do not have the money to have cameras in every stall so we are taking two hour foal watch shifts all through the day and night. If a mare foals early which they are all doing, we have only a small amount [o]f time to get to the foal and administer oxygen or we may lose the foal. Saturday our Vet went home for just a couple of hours and a baby was born. These horses give us no warning when they drop early. On Saturday we were by the side of the foal within a minute and began administering CPR immediately and sadly we were still unable to save it. Everyone has worked so hard to care for these horses and the losses are devastating. . . . The Susanville case has really taken its toll on our organization and I am reaching out to you guys to beg

for your help. I HAVE TO DO SOMETHING NOW. Medical costs and the cost to care for these horses and foals are killing us. While I know that the care we are providing is the right thing to do and I am happy that we are here to do it, I just cannot comprehend how we ended up car[ry]ing the weight of this case because a mistake was made on the actual ownership of the horses. It would be one thing if I had taken the horses with the knowledge that their ownership was in question and that we may be having to carry the burden and financial responsibility of the horses and all of the foals, but we had no idea. Now our organization is in a horrible financial crisis trying to do the right things by these mares and foals and it is simply unacceptable.

We are very grateful for all the help you have given us and without your assistance I do not believe that Bennett would have been arrested for his horrendous crimes, but I am pleading with you to help us find a way to get money in now. We have to get reimbursed for all the costs we have incurred caring for the horses, but I realize that could take months. I have to move forward in the reimbursement process but I also MUST find some funding to get us through the next few months with these foals. PLEASE help me to figure out what to do....This is a heartbreaking case and all of us that are dealing with the daily care of these horses are feeling the stress of birthing babies that never had a chance because of their past. Plus the 24 hour watch that we have to do as well as all the care the live foals and moms need.....not to mention all of our other duties at the ranch. Please let me know how we should proceed with Lassen and any idea that you may have in regards to funding.....I would appreciate your help more than you can imagine.

Give me a call or email me at your convenience. Ryan is doing great by the way!!! I am hoping for a miracle!!!"

67.    DeCaprio believed that a "miracle" was possible because she continued to believe that Ryan was representing Grace, and that he was advocating diligently on its behalf. Only later did DeCaprio discover that Ryan was not acting in the best interests of Grace, but instead, was working solely in the best interests of his other clients, the Banks. Moreover, because of Ryan's deception and intentional misrepresentations, all for the benefit of the Banks, the harm to Grace and the horses has been greatly magnified.

68. Notwithstanding Grace's desperate pleas for help, on April 26, 2012, Ryan, in an email to DeCaprio, responded: "I just read your e-mail and Austin and I will meet on it this morning."

69. Six days later, on May 2, 2012: Ryan, in an email to DeCaprio, wrote what turned out to be his last communication with Grace: "We appreciate your email and its candid nature. We have always valued the open dialogue we have had with the Grace Foundation throughout this horrific ordeal. In that spirit of openness, please consider the following issues as we move forward.

First, we cannot express enough our respect for the efforts that the Grace Foundation has made to save the lives of dozens of horses abused by Dwight Bennett and your help in assisting (and ensuring) the prosecution of Mr. Bennett. Those horses most certainly would not be alive but for the specific efforts of the Grace Foundation. We appreciate and honor the memories of serving alongside you in this battle.

Second, we are continually shocked by the sheer volume of expense and waste caused by a single man- Dwight Bennett, and that the Grace Foundation has borne all of the expenses of the wreckage that his actions have brought. We also agree that the expenses were utterly unexpected by all parties when the County of Lassen seized the horses and surrendered them to the Grace Foundation. At that time, our clients made donations totaling $40,000.00 to help absorb the expense of the Grace Foundation taking these horses from the County of Lassen. The fact that unforeseen costs have reached astronomical heights, and put the Grace Foundation at risk magnifies the tragic nature of this situation.

Third, we understand the Grace Foundation's urgency in seeking to recover these costs. To this end, we provided comprehensive demand letters to three separate entities on behalf of the Grace Foundation, free of charge. We also agree that the County should bear the burden of caring for these horses as they knew about the dire situation and did little more than enable Dwight Bennett to continue his practices. Here is where we get to the "open and honest" section of this correspondence. In reading between the lines in your email, you are intimating that the Grace Foundation may need to seek to recover monies spent on the Whispering Pines animals from our clients via potential legal

action. As a result, it is vital that we fulfill our ethical duty to our clients, and refrain from providing any information or legal advice to the Grace Foundation that will compromise our ability to represent our clients to the fullest extent. Thus we will be unable to provide any assistance in recovering monies from the County of Lassen or any other entity for the Grace Foundation, or provide any further independent legal advice to the Grace Foundation as any such advice will necessarily be compromised by a clear conflict of interest as you have intimated.

As to the notion set forth in your e-mail that there was some "mistake" in ownership of the horses, we are unclear as to what exactly you mean. As you recall, an officer of the Lassen County Superior Court, receiver Vicki Lozano, obtained an order allowing the receivership estate to release the horses to the County of Lassen. The County of Lassen then released "possession" of the horses to The Grace Foundation. That release was drafted by the County of Lassen, was not reviewed by our office or any attorney for our clients, and was issued well prior to our firm providing any informal information or feedback to the Grace Foundation. The release is imprecise and (in our view) allowed the Grace Foundation to take one of two mutually exclusive positions: (1) the horses are ours, we can adopt them out; or (2) the horses still belong to Lassen County and it (therefore) needs to pay for their board and care. We provided this information to you in an e-mail on November 10, 2011. . . .

Obviously, we understand the dire nature of this unexpected situation. We will continue to echo the plight of the Grace Foundation to all who will listen. We will cooperate with any media requests regarding Dwight Bennett and the horses. However, as explained above, we are limited in the actions we can take to make this happen based on the clear subtext of your e-mail and the deep fiduciary duties to our clients that we must hold paramount as officers of the court and members of the bar."

70. On June 20, 2012, Grace implored the Banks either to assume financial responsibility for the care of the subject horses or to make other arrangements for the horses. To date, the Banks have refused to do either.

///

///

18
COMPLAINT; DEMAND FOR JURY TRIAL

## CURRENT CONDITIONS AND FORESEABLE EXPECTATIONS

71. As of the date of this First Amended Complaint, Grace is caring for a total of 46 horses, of which 16 are foals. Two feral (presently "wild") horses may also be pregnant, although this has yet to be determined.

72. Until the issue of who owns the horses is resolved, Grace cannot adopt out any horses. At present, Grace has identified homes for eight of the horses, and could effectuate adoptions but for the issue of ownership of the horses.

73. As of August 26, 2011, Grace believed that it could manage the rescue, care, and placement of the Whispering Pines Horses at issue at that time for a fee of $50,000. This assumed that Grace would have obtained ownership of and complete control over the horses as of that date.

74. Instead, Grace did not obtain ownership of the Whispering Pines Horses on August 26, 2011, and did not have complete control over them. As a result, a significant number of pregnancies have gone to term, and Grace is now trying to manage care for not only the mares but also the foals, many of whom have significant health issues.

75. To date, Grace has expended at least $870,000 on the care of the Whispering Pines Horses. By the end of the first year of custody of the horses, Grace expects to expend in excess of $1 million on the horses' care.

76. Although many Grace supporters have been very generous in providing donations, Grace has still had to borrow in excess of $200,000 to care for the Whispering Pines Horses. If Defendants do not step up and assume their financial responsibility for the horses, Grace will not be able to continue under the burden of this debt.

77. In addition to money expended, Grace's volunteers have donated approximately 8,500 hours of time caring for the Whispering Pines Horses to date. It has taken an extraordinary effort by Grace's volunteers to care for the horses, without whose unyielding dedication and commitment the horses could not have survived.

78. Going forward, Grace expects to expend at least $50,000 a month, and likely more, for the care of the horses, at least for the next several years.

79. At present, most of the horses are not adoptable, either because a horse has a foal by its side, their current physical condition is not conducive to adoption, or because there simply is no market for the types of horses for which Grace is providing care. Moreover, Grace is unaware of any other rescue or shelter that would be willing to assume responsibility for the horses, particularly if there is no financial assistance to provide for the care.

80. Grace is hopeful that within three years, when the foals are old enough to be adopted, most of them can be placed in new homes. Until that time, however, Grace will have to continue to care for them.

81. Grace anticipates that some of the horses will never find a new home. Grace estimates that perhaps 10 or more horses will never find a new home, and that Grace may have to care for them for as long as 20 years or more.

82. In total, Grace anticipates that its total cost to care for the subject horses will exceed $2 million. Depending on circumstances beyond Grace's control, this may be a conservative estimate.

## FIRST CAUSE OF ACTION

### (Common Count - Quantum Meruit – Services Rendered)

### (Against all Defendants except Lassen County)

83. Plaintiff incorporates by reference paragraphs 1- 82, inclusive, of this First Amended Complaint as if fully set forth.

84. Defendants, and each of them, jointly and severally, requested, by their words or conduct, as alleged herein, that Grace perform the services of caring for the subject horses for the benefit of the Defendants, and each of them, jointly and severally.

85. Grace has performed all services requested as requested in an appropriate manner.

86. Although Defendants, and each of them, have accepted the benefits of Grace's services willingly, Defendants, and each of them, have not paid for the services, except that Wells has paid $20,000 and B of A has paid $20,000.