Christine L. Garcia, SBN 209701
The Animal Law Office
2404 California St., #4
San Francisco, CA 94115
Telephone: 415-297-3179
Facsimile: 415-358-9947
Email: Christine@animalattorney.com


Attorneys for Creditor The Grace Foundation of Northern California, A California Corporation


UNITED STATES BANKRUPTCY COURT


IN RE:

DWIGHT ALLEN BENNETT,

              DEBTOR.

_____

CASE NO.  11-40155
DC No. CLG -2

MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES SUBMITTED
IN SUPPORT OF MOTION TO STRIKE
DECLARATION OF MICHAEL RUSSELL,
DVM AND FOR EQUITABLE LIEN
AGAINST DEBTOR'S REAL PROPERTY

[SUBMITTED CONCURRENTLY WITH
NOTICE OF DECLARATION OF MICHAEL
RUSSELL, DVM, DECLARATIONS OF
BETH DECAPRIO AND CHRISTINE
GARCIA AND REQUEST FOR JUDICIAL
NOTICE]

F.R.C.P. RULE 12(4) (F), LOCAL RULE
9014-1

Date:  March 10, 2014
Time: 10am
Courtroom: 28
Location:  Department A, Sacramento
Division, 501 I Street, 7th Floor
Honorable Judge: Michael S. McMannus

///

<u>MOTION</u>

Creditor The Grace Foundation of Northern California brings this motion to strike the declaration of Dr. Michael Russell (Document #18) and bring an for equitable lien against debtor's real property.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.   **INTRODUCTION**

Perhaps the most telling of all of the misrepresentations contained in the pleadings to be discussed herein is located at 3:18-21 of the Memorandum of Points and Authorities filed in this Court  representing that, "[u]pon a showing of this grave necessity, the Lassen County Superior Court signed an order ("Surrender Order") granting the receiver authority to surrender the Remaining Horses to the Shelter through the County."  (Request for Judicial Notice ("RJN"), Exhibit "L".)   As fully discussed herein:

A.    Despite representations to the contrary, there was no grave necessity at the time that the Surrender Order was signed because the horses were being taking care of by Creditors Wells Fargo Bank and BAC Home Loans (hereinafter "the Banks"), via their attorney, Timothy Ryan of The Ryan Firm ("Ryan") and their  Receiver, Vicki Lozano ("Lozano");

B.    The purported Surrender Order required that the Receiver turned over the horses only to the County in a way such that the County was only permitted to place the horses in a County Facility or to turn the horses over to their owners;

C.    Nothing in the Surrender Order authorized the surrender of any of the horses from the Debtor's property to The Grace Foundation ("TGF").

Through a litigation pending in Orange County, California, it has come to light that Creditors, the Banks, via their attorney, Ryan, manipulated the Court in Lassen County and this Court to achieve the foreclosure of Debtor's property. The hands of these creditors and their attorney and receiver are unclean and they should not benefit from a manipulation of the system that has victimized The Grace Foundation, a Creditor herein.  As fully set forth below:

The Banks retained a receiver, Vicki Lozano, and made a motion to the Lassen Court to appoint Lozano the Receiver to administer the Debtor's horse business;

Ryan represented Lozano but failed to advise the Lassen Court or this court of the representation, instead presenting Lozano as an agent of the court.  Lozano administered the receivership estate pursuant to the directions of Ryan, an agent of the Banks;

When it turned out that the Debtor's horse business did not exist and that the horses on the property were nothing more than a financial drain, the Banks and Ryan embarked on a course of action to get the horses off Debtor's property so they could foreclose.

In addition to representing the Banks and Lozano, Ryan "represented" The Grace Foundation ("TGF") and failed to disclose that representation to either court.  In fact, Ryan only pretended to represent TGF in order to manipulate TGF into taking Debtor's horses.

Ryan submitted the Declaration of Dr.  Michael Russell to this Court in support of the Banks' Motion to be Excused from turning over the horses to the Bankruptcy Trustee.  The Russell Declaration is false and was not signed by Dr. Russell.

This Motion will set forth an ongoing pattern of abuse and manipulation by the Banks, and their attorneys, of the judicial process to their benefit and to the detriment of Creditor TGF.  The multiple misrepresentations of the Banks resulted in the transfer of 34 of  Debtor's horses from the Debtor's property to TGF.  Transfer of the horses was achieved by the Banks to evict Bennett from the real property so that they could foreclose without bearing the expenses related to the care and maintenance of the horses.  Without removal of the horses, the Banks would not have been able to evict Bennett and foreclose because then there would be nobody to take care of the horses. TGF has borne the expense of care and feed of the horses from August 26, 2011, which cost, to date totals more than $1.4 million. TGF is entitled to a livestock lien which the Lassen Court has already recognized.  (Declaration of Christine Garcia,¶2.)  TGF seeks to impose its lien against the debtor's real property.

II.   **AUTHORITY**

A.  The False Declaration of Dr. Russell

When affidavits are filed, the affidavits must meet admissibility standards.  *See*, Krzesniak v. Cendant Cort, 2007 U.S. Dist. LEXIS 47518, 14-15 (N.D. Cal, 2007) (Hearsay); Wang v. Chinese Daily News Inc., 236 F.R.D. 485, 491 (C.D. Cal, 2006) (various objections ruled upon).   If declarations are not, at the very least, made under penalty of perjury and contain the proper foundation, then objections are properly sustained. Id. FRCP Rule 12(4)(f) states that the Court "may strike from a pleading …any … immaterial, impertinent, or

scandalous matter." Rule 12 goes on to state that the Court may act "on its own" or in response to a Motion. Upon presenting the relevant evidence before the Court, Creditor The Grace Foundation of Northern California requests that the Court grant the Motion brought by Creditor or use its own discretion and strike the Declaration of Dr. Russell (Doc #18).

      B.  The Equitable Lien

"An equitable lien is a right to subject property not in the possession of the lienor to the payment of a debt as a charge against that property. It may arise … out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings. The basis of equitable liens is variously placed on the doctrines of estoppel, or unjust enrichment, or on the principle that a person having obtained an estate of another ought not in conscience to keep it as between them; and frequently it is based on the equitable maxim that equity will deem as done that which ought to be done, or that he who seeks the aid of equity must himself do equity. (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 453, 61 Cal.Rptr.2d 707.)" *Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 912. *Also see, County of Los Angeles v. Construction Laborers* (2006) 137 Cal.App.4th 410, 414. The Lassen County Court, in the matter entitled *Allen v. Summit,* Lassen County Superior Court, Lead Case No. 45679 ("the *Allen* matter") has recognized TGF's lien.[1]

## II.    STATEMENT OF FACTS

In the *Allen* matter, the Banks sought to foreclose on Debtor's real property located in Lassen County. The Banks' attorney, Ryan and his firm, retained Vicki Lozano as the Receiver in the Spring of 2011. (Exhibit "A" to Garcia Declaration, Lozano Deposition, 28:13 – 24.) Lozano has testified that she had no previous experience as a receiver, that the Ryan Firm told her how much to charge, that she had no idea what her duties and responsibilities as a receiver would be and that she took direction from Ryan, the Banks' agent. (*Id.,* 30:16 – 35:6.) Lozano

---

1 TGF is entitled to a livestock lien. Civil Code § 3080(a) provides that "Livestock" includes horses. Section 3080(b) provides that "Livestock servicer" means any individual, corporation, … which provides livestock services. Section 3080(c) provides that "Livestock services" means any and all grazing, feeding, boarding, general care, which includes animal health services, obtained or provided by the livestock servicer …"

Civil Code § 3080.01 provides that a "livestock servicer shall have a general lien upon the livestock in its possession to secure the performance of all obligations of the owner of the livestock to the livestock servicer" for the care and services the livestock servicer provides.

also testified that on July 18, 2011, before being appointed as a receiver by the Lassen court, she retained Ryan as her attorney for purposes of the Receivership. (*Id.,* 15:10 – 18:9; 52:17 – 53:5.) Lozano stated that she never disclosed the fact that Ryan represented her in the receivership to either the State Court or to this Court. (*Id.,* 133:12 – 134:14.) Lozano disclosed that it was not her idea to remove the horses from Debtor's real property but Ryan's idea. (*Id.,* 132:20 – 23.) Lozano refused to state when, if ever, her attorney-client relationship with Ryan ended and therefore it may be that Mr. Ryan continues to represent this "court appointed receiver". (*Id.,* 138:1 – 13.)

According to the Banks' *Ex Parte*[2] Application for Appointment of a Receiver made in the Lassen Court on July 21, 2011 Bennett's interest in the real property at issue was originally approximately 54 acres. (RJN, Exhibit "B".) Unable to pay the existing mortgage, Bennett divided the land into a 14 acre lot and a 40 acre lot intending for the improvements to exist on the 14 acres. When WFB lent money on the 14 acres, WFB believed the improvements were on the 14 acres. As it turned out, WFB was wrong and endeavored to persuade the Lassen Court to allow WFB an equitable mortgage on the improvements on the 40 acres. It was in pursuit of this equitable mortgage, that the Banks brought an *Ex Parte* Application in the Lassen Court for appointment of a receiver to manage the entire 54 acres, including what the Banks believed were stables and a horse riding business. On 07-21-11, the Banks' *Ex Parte* Application was granted resulting in an Order Appointing Vicki Lozano, the Receiver. (RJN, Exhibit "C".) The 07-21-11 Order Appointing the Receiver specifically provided at ¶6 that, "If, … the financial affairs of said business is such that a Receivership would merely present a drain of resources, then the ***Receiver may, at her sole opinion, inform the court of her resignation*** in conjunction with an accounting of any sums collected by the Receiver, and the ***Receiver shall be discharged from all duties and liabilities*** upon the following terms: …" (*Id.*)

After appointment of the Receiver, the Banks were disappointed to find no stable/riding business but instead, more than thirty starving pregnant horses. But rather than allow Lozano to resign as provided by the July 21st Order, the Banks made an *Ex Parte* Application for "surrender" of the horses to Lassen County. (RJN, Exhibit "D"; Exhibit "A", 86:3 – 87:6.) In the *Ex Parte* Application, the Banks and Ryan represented to the Lassen Court that the animals were to be "surrendered" to Lassen County. The Court's Minute order provides:

2 All of the Applications to the Courts regarding the horses were done "ex parte" without any explanation as to what the emergency may have been. No emergency is discussed in the papers. The Debtor has repeatedly asserted that he was not provided statutory notice of many of the ex parte hearings.

1
2
3
4

> The Court inquires some clarification from Mr. Ryan and Mr. Beardsley [of the Ryan Firm] on the order appointing receiver attached to the current documents seems vague as to personal property. Mr. Ryan indicates to the court that the property in question is a business that operates boarding and horseback riding curriculum and therefore the horses are part of the business that would be subject to the receiver's analysis and their [WFB's][3] request to remove equines from the property and **place in Lassen County Animal Control Facility**.

5
6
7
8
9
10
11
12
13
14

(RJN, Exh. "E".)  The Lassen Court's July 29, 2011 Order called for the Receiver to transfer Debtor's horses **to the County** such as to allow the County to transfer the horses to persons who could show proof of ownership. (RJN, Exhibit "F".)  Instead, Lozano, represented by Ryan, transferred ownership of the horses to Lassen County by way of Final Disposition.  (Exhibit "G" to DeCaprio Declaration.)  The County then transferred ownership of the horses to TGF. (*Id.*)  TGF told both Lozano and the County, represented by Pete Heimbigner, that the purpose of the transfer was to rehabilitate and re-home or adopt out the horses.  (Exhibit "H" to Declaration of Beth DeCaprio.)  Lozano acknowledged at her deposition that she knew TGF intended to adopt out the horses.  (Exhibit "A", 163:13 – 25.)  When asked to explain how the horses could be adopted out when the Court had ordered that the horses be held by the County, Lozano asserted the attorney-client privilege.  (*Id.*)

15
16
17
18
19

To avoid transfer of the horses, the Debtor filed the within bankruptcy on August 18, 2011.  At a hearing in the Lassen Court on August 19, 2011, the Debtor disclosed the bankruptcy filing to Ryan and Lozano.  At this juncture, it was known to Ryan and Lozano that ownership of the horses was in question and therefore Final Disposition could not be given. Nonetheless, on August 26, 2011, the Final Disposition was signed and the Debtor's horses were transferred to TGF.

20
21
22
23
24
25
26
27

On 08-25-11, the day before TGF was given Final Disposition by Lozano and the County, the Banks filed an *Ex Parte* Application in this Court which attached a Notice of Motion and Motion of Creditors Wells Fargo and BAC Home Loans to excuse turn over by receiver pursuant to 11 USC §543(D).  (RJN, Exhibit "I".)  This Motion sought "an order excusing turnover of <u>estate property</u> by receiver Vickie Lozano … pursuant to 11 U.S.C. §543(D) to Dwight Bennett ("Bennett") … [and] order annulling the stay so that the filing of the subject bankruptcy petition does not affect post-petition acts, allowing all issues regarding the subject receivership to be determined by the Receiver's appointing court."  The receiver

28

---

3  Judicial Notice is requested of the fact that the moving party on July 29, 2011 was WFB, not the Receiver.

MOTION TO STRIKE AND FOR EQUITABLE LIEN

appointed by the court was, of course, an agent of the Banks and represented by Ryan.  The Banks also stated "this Motion should be heard on shortened notice … because the bankruptcy stay clouds the Receiver's authority to manage the ailing property." (*Id.,* 1:19-21) "Specifically, the bankruptcy stay impedes the Receiver's ability to transfer the remaining severely neglected, 34 horses ("Remaining Horses"), as ordered by the Lassen County Superior Court". (*Id.*)  Lozano had knowledge of the Application and Motion file by Ryan for the Banks and submitted a Declaration in Support of the Application and Motion.  (RJN, Exhibit "J".)  Despite admitting that the bankruptcy stayed the Receiver's ability to transfer the horses and the lack of an order excusing turnover of the property to the Trustee, on August 26, 2011, the Receiver transferred the horses via Final Disposition.  Lozano took this action because she was instructed to do so by an August 23, 2011 email by Ryan stating "[t]he BK filing does not disrupt the horse rescue as the court has already ordered the rescue." (Exhibit "K" to Garcia Declaration.)  At virtually the same time, Ryan represented to this Court, in an *Ex Parte* filed on behalf of WFB and BOA at 7:10-11, "Most importantly, the turnover requirement and bankruptcy stay disrupt the Receivers transfer of the Remaining Courses to the Shelter." (RJN, Exhibits "I".)

At the time the Banks and Ryan were manipulating the situation to ensure the horses got transferred off of Debtor's property,  Ryan asserted that he "represented" TGF (in addition to the Banks and Lozano). (Exhibit "Q" to DeCaprio Declaration.)

 The basis of the motions in this court relating to the transfer of the horses from the Debtor's property and the requests by the Banks to be Excused from turning over assets was an Order in the Lassen Court  allowing the receiver to turn over the Debtors horses to the County of Lassen.  The Banks' moving papers contain the following misrepresentations:

That "[t]he County … stands ready to rescue these animals". (RJN "D", 1:17-18.)  In fact, Pete Heimbigner, the County Official dealing with the WPH testified that the County was only a facilitator and never took or intended to take possession of the horses.  (Exhibit "M" to Garcia Declaration, Deposition of Pete Heimbigner, 115:11-20; 140:10-141:9; 145:1-146:14.)  This is primarily because, despite knowing of the neglect of Bennett's horses since 2009, the County did not have the resources to take these animals. (*Id.,* 12:19-21:5.)  While Lassen County has an animal shelter it cannot accommodate horses. (*Id.*)  In addition, the County's ability to take horses is limited by the staff it has to care for the horses.  The largest number of horses the County has ever had at one time is about five. (*Id.*)

The next misrepresentation is that in April, 2011, Lassen County "confiscated several horses" from Whispering Pines.  (RJN "D", 2:9.)  In fact, in April, 2011, TGF received 20 horses which the Debtor voluntarily surrendered.  (Exhibit "N" to DeCaprio Declaration.)

The *Ex Parte* Application in this Court represents that, "[a] hearing on short notice is necessary to prevent Dwight Bennett's abject mismanagement of the improvements, natural resources and livestock located on the real property."  (Exhibit "I", 2:2-6.)  But at this juncture, the receiver was already managing the property and taking care of the horses.  (Exhibit "A", Lozano Deposition, 129:3-131:12.)  The Receiver's Final Account and Report filed in Lassen County indicates that the horses were watered and fed on 7-25-11, 7-28-11, 7-29-11, *et al.* (RJN "O".)  Based on  a panopoly of misrepresentations,  both in this Court as well as in the Lassen Court, this Court entered an order setting WFB and BOA's motion to excuse turnover by Receiver pursuant to 11 U.S.C. §543 (d) (1) to be heard on 09-02-11.

The Banks filed their Notice of Motion and Motion to Excuse Turnover of the horses by Receiver to the Bankruptcy Estate. (RJN,  Exhibit "L".)  The misrepresentations in this motion are far and wide.

First, the Declaration of Michael Russell, DMW is a forgery.  Those facts are set forth in Dr. Russell's declaration and fully incorporated herein.  In summary, Dr. Russell states that on or about August 1, 2011, he signed a Declaration at the request of The Ryan Firm in the *Allen* matter; that he left the country on August 5, 2011 and that he has recently learned that a significantly modified version of his Declaration was filed on August 25, 2011 with this Court in support of the Banks' Motion to Excuse Turnover of the horses by Receiver to the Bankruptcy Estate.

Second, the Banks' moving papers assert, "the bankruptcy stay impedes the Receiver's ability to transfer the remaining, severely neglected, thirty four (34) horses."  (RJN, Exhibit "L", 1:22-23.)  But the horses had already been removed from Debtor's property on 08-26-13. (Exhibit "G" to DeCaprio Declaration.)

Referencing the transfer of 20 horses from Bennett to TGF in April, 2011, the moving papers state, "[t]he state of approximately twenty (20) horses at that time was so dire that they were immediately removed in order to save their lives."  (*Id.*, 3:6-8.)  This is absolutely untrue. The horses were not "removed".  The horses were surrendered voluntarily by Bennett to TGF for rehabilitation and adoption.  (Exhibit "N" to DeCaprio Declaration.)

The Banks' moving papers also assert, "[t]he receiver, working with the "Shelter" [TGF

MOTION TO STRIKE AND FOR EQUITABLE LIEN

is not a "Shelter"], secured a $40,000.00 grant from Creditors [WFB and BOA] to fund the transfer of the Remaining horses." (*Id.*, 3:14-16.)  The moving papers then recognize that, "[t]his grant includes funds sufficient to provide proper medical care, food and shelter to all of the Remaining Horses for a period of six (6) months." (*Id.*, 3:6-8.)  This representation is evidenced by the Ryan declaration at paragraph 6. (RJN, Exhibit "P".)  This is an important representation because TGF, a creditor in this bankruptcy, has been in continuous possession of the 36 horses and has been providing feed and care in addition to medical care to all of the horses transferred, as well as their foals (now approximately 50 horses) ever since August 26, 2011.  No party, including, Bennett, the Banks or Ryan have reimbursed TGF for the care of the horses beyond the six-month period.

The Banks' moving papers then represent, "the Lassen County Superior Court signed an order granting the Receiver authority to surrender the Remaining Horses to the Shelter [TGF] through the county."  (RJN, Exhibit "L", 3:20-21.)  This is untrue.  Both the Minute Order and the actual Order provide that the horses were to be transferred to a "***Lassen County Animal Control Facility***" and that the horses could only be transferred to their owners.  (RJN, Exhibit "E".)  The order signed by the Lassen County judge authorized the Receiver "to surrender any and all animals [at Whispering Pines Stables] … to the County of Lassen." (RJN, Exhibit "F".)  Instead of doing so, the Receiver who was being instructed and directed by Ryan, gave Final Disposition of the horses to the County and thereby transferred ownership of the horses to Lassen County.  This enabled the County to transfer ownership of the horses to TGF.

The Banks' moving papers state, "[t]he Receiver, the Department and the Shelters [TGF] seek to make this transfer immediately,…" and "[t]he turnover requirement jeopardizes this transfer".  (Exhibit "L"*,* 3:22-23 and 24-25.)  But the horses had already been transferred on 08-26-11.

At the hearing on the Banks' Motion held on September 2, 2011, this Court inquired of the Banks' attorney as follows:

THE COURT: Now, the other part that I'm concerned about is now some third – party has your horses.

Does Grace Foundation think that they can and give those horses away?

Mr. Beardsley: No, Your Honor. They understand, they have the order from the Superior Court. They have the funds to rehabilitate and keep the horses. And they are directed to remit any healthy horses to anyone providing proper title to the horse and showing that they

can take proper care of the horses. …

THE COURT: But there's no possibility, in your opinion, that someone who doesn't own the horses can get the horses?

Mr. Beardsley: No. ***There's been no conversation regarding giving those horses away***. The Grace foundation isn't under any understanding that there's been a foreclosure. Our office has never communicated that to Grace Foundation.

THE COURT: Now, the County got involved. The County inspected the horses, and it was the one that said they needed some care?

Mr. Beardsley:  Yes. In April, the County – – the County doesn't have the means to remove the horses. Initially, in April, 20 horses were removed, and the county and the Grace Foundation removed 20 horses. The county's been aware of the situation and desiring to find a place for all the horses.

(RJN, Exhibit "R".)

None of the above is true. TGF only took the horses on condition that they could rehabilitate and adopt them out, which was known by the receiver, the county, the Banks and Ryan. (Exhibit "H".)  TGF was given Final Disposition which transferred ownership of the horses. (Exhibit "G.) There is nothing more to disposing of the horses other than making the Disposition Final.  Further, as to the April horse, the County never "removed" or "transferred" any horses from Debtor's property. Bennett surrendered 20 horses in April to TGF, which horses were rehabilitated and adopted out.

Based on these misrepresentations, this Court entered an Order Excusing Turnover by Receiver pursuant to 11 U.S.C. §543 (d) (1). But the order was based on a myriad of misrepresentations which had the effect of leading the court to believe that the horses had been "rescued" and that even though the horses had been transferred they would be held by TGF for the sole purpose of being transferred to their owners. At the same time, TGF received the horses pursuant to a Final Disposition believing that it could rehabilitate and quickly thereafter adopt out the horses.  The Banks, the Receiver and Ryan transferred the horses to TGF under false pretenses and then asked the Lassen Court to grant the Banks an equitable mortgage on all of the real property, which the Lassen Court has done.  But with this new evidence, TGF asserts that the Banks' hands are unclean and that TGF is entitled to an equitable lien against the property for livestock services rendered to the Debtor's horses.

# IV.   ARGUMENT

## A.   THE RUSSELL DECLARATION VIOLATED LOCAL RULE 9001-1(f) AND 28 U.S.C. § 1746

Local Rule 9001-1 (f) states that a "[d]eclaration includes an affidavit prepared in accordance with federal law."  *See*, 28 U.S.C. § 1746.[4]  Federal law 28 U.S.C. § 1746 requires that where a "matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration…" that the declaration be submitted "in writing of such person which is subscribed by him, as true under penalty of perjury."  In this case, Dr. Russell did not write the declaration submitted to this Court and Dr. Russell did not sign the declaration under penalty of perjury.

## B.   THE DECLARATION VIOLATED LOCAL RULE 9014-1(d)(6)

Local Rule 9014-1(d)(6) reads in pertinent part the following:

Evidence.  Every motion shall be accompanied by evidence establishing its factual allegations and demonstrating that the movant is entitled to the relief requested.  Affidavits and declarations shall comply with Fed. R. Civ. P. 56(e).

In this case, the Banks should have had their motion accompanied by competent evidence, yet the Banks presented a false declaration to support their motion.  Fed. R. Civ. P. 56 (e) discusses the repercussions of (e) Failing to Properly Support or Address a Fact, but also

---

4 28 U.S.C. § 1746 reads in pertinent part:  Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".
(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

refers to Fed. R. Civ. P. 56 (c) which states that declarations shall be made "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *See*, <u>Fed. R. Civ. P</u>. 56 (c). Significantly, Dr. Russell asserts that he "did not sign this document [#18] and would not have signed this document because it contains substantial and significant misrepresentations." *See*, <u>Declaration of Dr. Russell</u>, p. 2, ¶ 4 lns. 14-16.

### C.  THE DECLARATION VIOLATED BANKRUPTCY RULE 9011

Bankruptcy Rule 9011(a) states in pertinent part that "[e]very petition, pleading, written motion, and other paper…shall be signed by at least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party." In this case, the declaration of Dr. Russell was not signed by him and therefore it should be stricken. The Banks are certain not to receive Dr. Russell's signature on this false declaration.

### D.  THE MOTION SUBMITTED ON BEHALF OF THE BANKS ASSERTS ARGUMENTS BASED UPON THE FALSE DECLARATION

The Banks allege observations of Dr. Russell which were not actually observed by Dr. Russell. *See*, <u>Motion to Excuse Turnover By Receiver Pursuant to 11 U.S.C. 543(D)</u>, (Document #14), 2. FACTS, p. 3. lns. 2-8. Within the Bank's Motion requesting this Court to Excuse the Turnover, the Banks argue that the third prong to push the Court to grant the motion is "[w]hether the evidence shows mismanagement of the property by the debtor." *See*, Banks Motion, (Document # 14), p. 7 of 10, ln 3. Seven of the nine reasons that the Banks present to this Court to try to prove "mismanagement of the property" hinge upon the alleged observations by Dr. Russell (which did not exist). *See*, Banks Motion, (Document # 14), § b. p. 7 of 10, lns. 23-28 and 8 of 10 lns 1-11.

### E.  SIGNIFICANT ADDITIONS WERE MADE TO THE FALSE DECLARATION DOCUMENT #18

The Banks added paragraph #5 to Dr. Russell's declaration which they submitted to the Bankruptcy Court. *See*, <u>Declaration of Dr. Russell</u>, p. 3, ¶ 8. Paragraph 5 to the submitted False Declaration implies that Dr. Russell acted and made observations that he did not. Dr. Russell's new declaration states in pertinent part the following:

> Paragraph 5…is objectionable because it implies that I did a much more thorough inventory and evaluation of the living condition of these horses than was actually done. The declaration that I signed on August 1, 2011 has been altered to add paragraph 5, the content of which is generally false by implication and specifically false as indicated below:

> A.     During the single site evaluation I conducted on April 12, 2011 of the horses at the Whispering Pines stables, I did not make an inventory of all the animals on the property as indicated by Paragraph 5A. I did not make notation of the species or sex of any of the horses other than described herein.

> B.     I did not evaluate the health of all the animals, their weight or body type as indicated by Paragraph 5C. In fact, due to the nature of the horses, most could not be handled at Whispering Pines for any kind of thorough medical examination. I did a visual examination of the herd and as to four horses relinquished by Mr. Bennett on that day I was able to conduct a full evaluation either at Whispering Pines or when they arrived at the Foundation.

*See*, <u>Declaration of Dr. Russell</u>, p. 3, ¶ 8.

Should this Court wish to review the actual report directly related to Dr. Russell's visit to the Whispering Pines Stable, such report is attached to his supporting Declaration. *See*, <u>Declaration of Dr. Russell</u>, p. 3, ¶ 9.

**F.     <u>BREAKDOWN OF HOW DR. RUSSELL'S FRAUDULENT DECLARATION IMPACTED DECISIONS MADE BY THE COURTS.</u>**

The only testimony about the horses came from Russell, Lozano and Ryan. Russell's declaration is fraudulent, and Lozano was the Banks' agent and admits that she is not a horse expert. Everything the Banks used to substantiate their case was a fraud.

Not only did they present Dr. Russell's declaration to the court without permission, but littered the declaration with lies that were used to mislead the courts into believing that the horses were taken as part of a policing action, as the following evidence clearly shows:

The only expert's opinion the court relied upon in making their decision, was the fraudulent declaration by Dr. Russell. In fact the most agregious violation by the Ryan Firm

MOTION TO STRIKE AND FOR EQUITABLE LIEN

involved the deceptive statements that were added to embellish Dr. Russell's declaration and mislead the bankruptcy courts.

Dr. Russell's Actual Declaration

Dr. Russell's Fraudulant Declaration
With embellishments highlighted

| Dr. Russell's Actual Declaration | Dr. Russell's Fraudulant Declaration With embellishments highlighted |
| --- | --- |
| (4) 'In April 2011, I was contacted by the County of Lassen Department of Public Works to evaluate the animals seized by the Department from the property located at 695-725 Highway 36, Susanville CA 96130 (the "Subject Property"), and to evaluate the living conditions and health of the animals remaining on the Subject Property.  I performed the site evaluation on April 12, 2011.' (Exhibit B) | (4)In April 2011, I was contacted by the County of Lassen Department of Public Works, to evaluate animals identified for possible seizure by the Department from the property located at 695-725 Highway 36, Susanville, CA 96130 (the "Subject Property"), and to evaluate the living conditions and health of the animals remaining on the Subject Property.  I was informed by the Department that some of the horses appeared severely malnourished, some appeared pregnant and some had already perished from apparent starvation.  I personally visited the Subject Property, evaluated the animals being seized, and performed a site evaluation on April 12, 2011.  This evaluation resulted in the removal of approximately twenty (20) horses, whose health was in serious jeopardy. |

From Doc 96 - United States Bankruptcy Court Eastern District of California Civil Minutes, Page 4, (E):

'The allegations of mismanagement of the business operated at the improvements on the 40 acre property. Prior to the appointment of the receiver, a veterinarian found the horses at the property to be in seriously poor health. 20 of them were in such a dire condition that they had to be removed immediately to save their lives.'

This is also cited in Doc 14, page 5 of 10:  '6) The state of approximately 20 horses at that time was so dire, that they were immediately removed in order to save their lives. (Declaration of Russell, paragraph 4).'

## G.    THE FALSE DECLARATION IS ONE ACTION IN A SERIES OF MISREPRESENTATIONS TO THE COURT

In order to view the Misrepresentation before the Court today, it is helpful to look at the false Declaration of Dr. Russell submitted without his consent as one item in a series of misrepresentations from the Banks.  *See*, <u>Declaration of Beth DeCarpio</u>.[5]  Significantly, the Eastern District Court of California has notably sanctioned parties for submitting false affidavits to the Court.  *See*, <u>Gary H. BRUSH v. J. WOODFORD</u>, U.S. Dist. Ct, <u>E.D. California</u>, No. 1:07–cv–01009–DLB PC. (Nov. 1, 2011).

## V.   <u>OTHER NOTABLE ISSUES WITH THE DECLARATION SUBMITTED WITHOUT DR RUSSELL'S CONSENT</u>

### A.  <u>THE DECLARATION WAS ALLEGEDLY SIGNED PRIOR TO THE BANKRUPTCY</u>

The Declaration (Document #18) predates the bankruptcy.  Dr. Russell notes that the declaration is signed on August 1, 2011.   However, this bankruptcy of Dwight Bennett Case No.  2:11-bk-40155 was not filed until mid-August, 2011.  *See*, <u>Declaration of Dr. Russell</u>, p. 2, ¶ 5.

### B.  <u>THE DECLARATION SUGGESTS THE DOCUMENT WAS INTENDED FOR A DIFFERENT PURPOSE</u>

Additionally, Dr. Russell notes that "beneath the signature line, the identifier on the document identifies the *Allen* action pending in Lassen County."  *See*, <u>Declaration of Dr. Russell</u>, p. 2, ¶ 5.  The document identifier indicates that the declaration may have initially been prepared and acquired for a different purpose, but ***not*** to support the Bank's Motion to Excuse Turnover By Receiver Pursuant to 11 U.S.C. 543(D).

### C.   <u>AN ENTIRELY NEW FALSE PARAGRAPH WAS ADDED</u>

Dr. Russell further notes that an entirely new false paragraph was added to his

5 <u>Misrepresentation</u>: On 8/23/2011, in an e-mail from Ryan to Lozano, Beardsley and Kemp, Ryan says "The bankruptcy does not disrupt the horse rescue, as the court has already ordered the rescue... and the judge stated on the record that the safety of the animals is paramount.  To make sure that we are covered however, we are trying to get into court on Thursday morning for an emergency relief from stay motion to remove the horses..."  <u>Clarification</u>: Nowhere in the Minute Order does it say that the Judge stated "the safety of the horses is paramount.' Additionally, a bankruptcy would in fact disrupt a horse rescue.

declaration.  He surmises that the false additional paragraph is the reason for there being "two paragraphs numbered 6."  *See*, Declaration of Dr. Russell, p. 2, ¶ 5.

### D.  DR. RUSSELL WAS OUT OF THE COUNTRY WHEN THE DOCUMENT WAS FILED

Dr. Russell states under penalty of perjury that he signed a different declaration on August 1st and then "[o]n August 5, 2011, I left to volunteer my veterinary services in Peru and I was out of the country for three weeks."  *See*, Declaration of Dr. Russell, p. 2, ¶ 6.  herefore, the declaration submitted on behalf of the Banks was submitted on at a time when Dr. Russell was unavailable to meet and confer with or sign the newly drafted declaration.

### E.  THE BANKS MISPELLED DR. RUSSELL'S NAME IN DOC #18

As an aside, had Dr. Russell reviewed his own declaration, he may have caught the misspelling of his own name.  *See*, Declaration of Dr. Russell, p. 2, ¶ 7.  However, the Banks submitted a declaration with Dr. Russell's misspelled name affixed to the front page.  *See*, Doc #18.

### VI.  TGF IS ENTITLED TO AN EQUITABLE LIEN AGAINST THE DEBTOR'S REAL PROPERTY

Those who come into equity must come with clean hands.  In *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1400, the Court stated, "The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands ... or he will be denied relief, regardless of the merits of his claim." The banks are not "Plaintiffs" in this bankruptcy matter but held that position as Cross Complainants in the *Allen* matter where they achieved summary adjudication and foreclosure of Debtor's real property based on the same false evidence asserted in this Court.  Presenting false evidence to attain a result such as excusing the receiver from turning over the horses to the trustee instead of pretending to give them TGF is unconscionable.  First, the Banks deprived (stole? Converted?) the Debtor's horses.  TGF is no fan or Mr. Bennett but TGF will not be party to theft.  Second, the Banks, knowing that the County would not take the horses because they could not accommodate them, transferred the horses to TGF pretending that the horses could be adopted out.

"The doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct

by the plaintiff in connection with the matter in controversy" and "a complete defense to both legal and equitable causes of action".  The matter in controversy is, of course, the Debtor's property.  *Bank of America, N.A. v. Roberts, surpra,* 217 Cal.App.4[th] at  1400.  "The decision of whether to apply the defense based on the facts is a matter within the trial court's discretion." *Id.*  TGF seeks a specific remedy: enforcement of its lien for the care of the horses it has provided.  Unlike the Banks, TGF's hands are clean.  TGF requests that this Court exercise its discretion to permit TGF to assert its lien against Debtor's real property.

## VI. <u>CONCLUSION</u>

In addition, The Grace Foundation of Northern California wishes that the record be made clear.  In order for the record to be clear, corrections need to be taken into account and Dr. Russell's declaration (Document #18) must be stricken.

Date:   February 10, 2014

_____
Christine Garcia