# EXHIBIT A

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ORANGE
--oOo--

THE GRACE FOUNDATION OF      )
NORTHERN CALIFORNIA, a       )
California corporation,      )  Case No.
                             )  30-2012-00612863-CU-BC-
     Plaintiff,              )  CJC
                             )
     vs.                     )
                             )
WELLS FARGO BANK, N.A., a    )
federally chartered bank, on )
its own behalf and as trustee)
of MLMI Trust Series         )
2005-HE3; BANK OF AMERICA,   )
N.A., a federally chartered  )
bank, on its own behalf; BAC )
HOME LOANS SERVICING, LP, a  )
Texas Limited Partnership and)
a unit of Bank of America,   )
N.A.; TIMOTHY M RYAN, an     )
individual; THE RYAN FIRM, a )
California Professional      )
Corporation; VICKI LOZANO, an)
individual in the capacity of)
Receiver; COUNTY OF LASSEN,  )
CALIFORNIA; and DOES 1       )
through 50,                  )
                             )
     Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF VICKI LOZANO
WEDNESDAY, DECEMBER 11, 2013
Susanville, California

REPORTED BY:    Janet Menges, CCR #206, RPR
                Computer-Aided Transcription

1

---

APPEARANCES:

For the Plaintiff:    LAW OFFICES OF SOHAILA SAGHEB
                      Attorneys at Law
                      By: SOHAILA SAGHEB, ESQ.
                      21112 Ventura Blvd.
                      Woodland Hills, CA

For the County of Lassen:  JONES & DYER
                      Attorneys at Law
                      By:  MARK JONES, ESQ.
                      1800 J Street
                      Sacramento, CA

For Bank of America:    BRYAN CAVE
(Telephonically)        Attorneys at Law
                      By:  EMMA DILL, ESQ.
                      560 Mission Street
                      San Francisco, CA

For Ryan and Lozano:    JAMPOL ZIMET
                      Attorneys at Law
                      By:  MANUEL BALAM, ESQ.
                      800 Wilshire Blvd.
                      Los Angeles, CA

For Wells Fargo:        SEVERSON & WERSON
(Telephonically)        Attorneys at Law
                      By:  ELENA KOUVABINA, ESQ.
                      One Embarcadero Center
                      San Francisco, CA

2

---

For The Grace Foundation:  BRACK & MASON
(Telephonically)        Attorneys at Law
                      By:  SUE MASON, ESQ.
                      1495 Pacific Highway
                      San Diego, CA

For Vicki Lozano:       EUGENE B. CHITTOCK
                      LAW OFFICES
                      Attorneys at Law
                      By:  EUGENE B. CHITTOCK, ESQ.
                      100 South Lassen Street
                      Susanville, CA

Also Present:           DAVID CORRAO, VIDEOGRAPHER
                      BETH DeCAPRIO
                      CINDY WALDEN
                      RHETTA VANDER PLOEG

3

---

I N D E X

| EXAMINATION | PAGE |
|---|---|
| BY MS. SAGHEB | 9 |
| BY MS. DILL | 226 |
| BY MS. KOUVABINA | 236 |
| BY MR. BALAM | 245 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Order | 46 |
| 2 | 3/29/11 letter | 63 |
| 3 | 12/3/12 letter | 104 |
| 4 | Indemnification Agreement | 106 |
| 5 | 8/3/11 e-mail | 122 |
| 6 | 7/27/11 e-mail | 143 |
| 7 | Order | 148 |
| 8 | Final Disposition | 151 |
| 9 | Final Disposition | 154 |
| 10 | Protective Custody | 154 |
| 11 | 8/4/11 e-mail | 159 |
| 12 | 8/4/11 e-mail | 164 |
| 13 | 8/3/11 e-mail | 177 |
| 14 | 8/3/11 e-mail | 188 |
| 15 | 10/17/11 e-mail | 197 |

4

BY MS. SAGHEB:

Q   Okay.

Well, from your office, for example, would you be somebody who is responsible for taking care of the landscaping on a particular piece of property?

A   **Yes.**

Q   Okay.

So that's part of the property management that you perform; right?

A   **Yes.**

Q   Okay.

Would you be retaining folks to clean the inside of the property?

A   **Yes.**

Q   Okay.

So when you say that 70 percent of the management portion of the business was dedicated to that, is that what you mean that you were hiring people to take care of properties?

A   **Yes.**

Q   Okay.

Before the Whispering Pines situation how many times had you been a court appointed receiver?

A   **None.**

Q   What --

13

MR. BALAM:  Vague and ambiguous.  What do you mean by Whispering Pines situation?  Are you going to be referring to that term throughout or --

MS. SAGHEB:  I don't know yet.

BY MS. SAGHEB:

Q   Do you hold any licenses related to acting as a court appointed receiver?

A   **No.**

Q   Did you -- Prior to becoming involved with the Whispering Pines matter did you obtain any education in terms of acting as a receiver?

MR. BALAM:  Objection, to the extent it calls for the disclosure of attorney-client communications, work product, don't disclose any conversations you had with any attorneys, vague and ambiguous.  You said education.  You can answer, though.

BY MS. SAGHEB:

Q   Go ahead.

A   **No.**

Q   Okay.

And what qualified you to act as a court appointed receiver in the Whispering Pines?

MR. BALAM:  Objection, calls for a legal conclusion, expert opinion, attorney-client work product, Rifkin versus Superior Court, instruct the

14

witness not to answer.

BY MS. SAGHEB:

Q   What representations did you make to Mr. Ryan regarding your qualifications to act as a court appointed receiver?

MR. BALAM:  Objection, calls for attorney-client work product communications.  I instruct the witness not to answer.

BY MS. SAGHEB:

Q   At any point were you Mr. Ryan's client?

A   **Yes.**

Q   Oh, okay.

When did you become Mr. Ryan's client?

A   **August 18th, 2011.**

Q   And did you enter into an attorney-client relationship with Mr. Ryan at that time pursuant to a written agreement?

A   **No.**

Q   So your agreement creating the attorney-client relationship was an oral agreement?

MR. BALAM:  Objection, calls for a legal conclusion, expert opinion, attorney-client communications, instruct the witness not to answer.

Just to clarify, you said the August 18th date as the start of the representation; is that correct?

15

MS. SAGHEB:  I didn't say that.  I'm going to rely on what the witness testified to.

BY MS. SAGHEB:

Q   Now, ma'am, prior to August 18, 2011 had you retained Mr. Ryan or -- Well, strike that.

Prior to August 18, 2011 was Mr. Ryan your attorney?

MR. BALAM:  Objection to the extent it calls for a legal conclusion or expert opinion.

THE WITNESS:  I'm going to change the date on my attorney relationship.  It was prior to the appointment of the receivership.

BY MS. SAGHEB:

Q   Okay.

Tell me when it was?

A   **It was July 18th.**

Q   So you believe that on July 18, 2011 Mr. Ryan became your attorney?

A   **Yes.**

Q   And he became your attorney with reference to the appointment as a receiver in the Whispering Pines matter?

A   **Yes.**

Q   Was he your attorney with reference to any other matters?

16

4  (Pages 13 to 16)

1  A  No.
2  Q  Okay.
3     Just trying to understand the scope of your
4  attorney-client relationship with Mr. Ryan so that I can
5  frame my questions around it.  If your attorney-client
6  relationship with Mr. Ryan started on July 18th, 2011
7  when did it end, if ever?
8     MR. BALAM:  Objection, vague and ambiguous,
9  calls for a legal conclusion, expert opinion.  You can
10  answer if you understand the question, if you know.
11     THE WITNESS:  I don't know.
12  BY MS. SAGHEB:
13  Q  Did you ever fire Mr. Ryan?
14     MR. BALAM:  Objection, calls for a legal
15  conclusion, expert opinion, attorney-client
16  communications, instruct the witness not to answer.
17  BY MS. SAGHEB:
18  Q  Okay.
19     Did Mr. Ryan ever terminate your relationship,
20  your attorney-client relationship with him?
21     MR. BALAM:  Same objections, same instruction.
22  BY MS. SAGHEB:
23  Q  Okay.
24     Mr. Ryan's representation of you, was it only
25  Mr. Ryan or was it Mr. Ryan and Mr. Ryan's firm?

                                                    17

1  A  The firm.
2  Q  Okay.
3     So your understanding of your representation as
4  it related to your receivership in the Whispering Pines
5  matter was that you were represented both by Mr. Ryan
6  and Mr. Ryan's firm?
7  A  Yes.
8  Q  And that started on July 18, 2011?
9  A  Yes.
10  Q  Okay.
11     And what event occurred to make you think that
12  that's the date on which it started?
13     MR. BALAM:  I'm going to object to the extent
14  it requires you to disclose any attorney-client
15  communications.  Otherwise you can respond to the
16  question.
17     THE WITNESS:  Communication that he and I had.
18  BY MS. SAGHEB:
19  Q  So when you had communications with Mr. Ryan --
20  Well, strike that.
21     Was there communication with Mr. Ryan that
22  established the attorney-client relationship or was it
23  communication with Mr. Ryan and other members of his
24  firm?
25

                                                    18

1     MR. BALAM:  Object.
2     MS. SAGHEB:  I'm sorry, just to establish the
3  relationship itself.
4     MR. BALAM:  Objection, legal conclusion, expert
5  opinion, attorney-client communication.
6     Counsel, I think she established that it was --
7  that Ryan was her attorney beginning approximately
8  around that date.  So anything related to communications
9  thereafter are privileged.
10     MS. SAGHEB:  Well, I'm not asking about whether
11  or not there were communications thereafter.  What I'm
12  asking is whether there were communications that
13  established the relationship with anybody other than
14  Ryan.
15     MR. BALAM:  Same objections, again all
16  protected by attorney-client privilege.
17  BY MS. SAGHEB:
18  Q  Okay.
19     MR. JONES:  Perhaps, counsel, just for the
20  record we should identify our newcomer.
21     MS. SAGHEB:  Oh, yes, I'm sorry.
22     MR. CHITTOCK:  Good morning, Eugene Chittock.
23  I represent Ms. Lozano in the receivership matter in
24  Lassen County.
25     MS. SAGHEB:  Why are you here, sir?  I know you

                                                    19

1  have many more things better to do.
2     MR. CHITTOCK:  I do, and I think my stay is
3  going to be somewhat short, but based on the deposition
4  subpoena that was issued to Ms. Lozano I believe it
5  included or encompassed potential documents that are
6  protected under the attorney-client privilege related to
7  our relationship, and so I just wanted to make sure,
8  one, that I lay that foundational objection on her
9  behalf in the receivership matter, and as well as review
10  through her present counsel here any other documents
11  that are requested that may encompass that same
12  objection.
13     MS. SAGHEB:  Okay.
14     Just so I'm clear, you can act as her attorney,
15  Mr. Balam, or you can act as her attorney, Mr. Chittock,
16  but you're not both going to make objections during the
17  course of the deposition, you're not both going to
18  represent her for purposes of this hearing, okay?
19     MR. BALAM:  Disagree to the extent they are
20  separate rights and issues.  Each counsel is allowed to
21  do whatever each counsel think are appropriate to
22  protect their clients.
23     MS. SAGHEB:  I disagree.
24     MR. BALAM:  I understand.  Let's move forward.
25     MS. SAGHEB:  And the ground rules were laid by

                                                    20

**Page 21**

```
 1    Mr. -- The partner of your firm?
 2         MR. BALAM:  Alan Jampol.
 3         MS. SAGHEB:  Mr. Jampol at the Ryan deposition.
 4         So let's just keep going and then if we have to
 5    cross the bridge we will, how's that?
 6         MR. BALAM:  Best way to deal with it.
 7    BY MS. SAGHEB:
 8    Q    All right.
 9         So Ms. Lozano, prior to July 18, 2011 did you
10    have any information, any information from any source
11    regarding issues related to the Whispering Pines
12    property?
13         MR. BALAM:  Objection again to the extent it
14    calls for a disclosure of any attorney-client
15    communications you have had, but you can go ahead and
16    answer.
17         THE WITNESS:  Can you repeat the question,
18    please?
19    BY MS. SAGHEB:
20    Q    Sure.
21         Prior to July 18, 2011 did you know Mr. Ryan?
22    A    No.
23    Q    Okay.
24         So July 18th, 2011 is the first time that you
25    ever met him?
```

**Page 22**

```
 1         MR. BALAM:  Misstates prior testimony, vague
 2    and ambiguous.
 3         THE WITNESS:  I'm -- I'm sorry, say it again.
 4    I'm --
 5    BY MS. SAGHEB:
 6    Q    Is July 18th, 2011 the first date on which you
 7    met Mr. Ryan?
 8         MR. BALAM:  Vague and ambiguous.
 9         THE WITNESS:  Yes.
10    BY MS. SAGHEB:
11    Q    Okay.
12         Prior to July 18, 2011 had you had any
13    telephone conversations with Mr. Ryan?
14    A    No.
15    Q    Okay.
16         Prior to July 18, 2011 had you had e-mail
17    exchange with Mr. Ryan?
18    A    I'm not sure.
19    Q    If you know, prior to July 18, 2011 when you
20    met Mr. Ryan did he tell you how he happened upon your
21    name?
22         MR. BALAM:  Misstates prior testimony, vague
23    and ambiguous.
24         THE WITNESS:  No, he did not.
25    ///
```

**Page 23**

```
 1    BY MS. SAGHEB:
 2    Q    Okay.
 3         And on July 18, 2011 when you first met
 4    Mr. Ryan was this an in-person meeting, a telephonic
 5    meeting or some other way did you meet?
 6         MR. BALAM:  Misstates prior testimony, vague
 7    and ambiguous.
 8         THE WITNESS:  We met in person.
 9    BY MS. SAGHEB:
10    Q    Okay.
11         Where did you meet?
12    A    At my office.
13    Q    Who else was there?
14    A    My office staff.
15    Q    Okay.
16         Prior to his retention, prior to you retaining
17    Mr. Ryan what discussions took place?
18         MR. BALAM:  Vague and ambiguous, again to the
19    extent that it requires you to disclose any
20    communications that you had with any attorney prior to
21    your -- Mr. Ryan's representation.  You can go ahead and
22    answer.
23         THE WITNESS:  I'm not sure.
24    BY MS. SAGHEB:
25    Q    You don't know what you discussed prior to
```

**Page 24**

```
 1    retaining Mr. Ryan?
 2         MR. BALAM:  Vague and ambiguous, overbroad,
 3    calls for attorney-client communications, but you can
 4    answer to the extent it excludes any discussions you had
 5    with attorneys.
 6         THE WITNESS:  He told me he was going to be in
 7    court that day.  That's -- I'm not sure.
 8    BY MS. SAGHEB:
 9    Q    Okay.
10    A    I'm not sure what we're -- what I'm aiming at
11    here.  I don't know.
12    Q    Well, to the extent that you recall.
13    A    Okay, I recall he was going to be in court that
14    day.
15    Q    Okay.
16         In which court, Lassen court, bankruptcy court,
17    do you know?
18    A    Lassen court.
19    Q    Okay.
20         Do you know what he was appearing for?
21    A    The Allen-Summit case.
22    Q    Okay.
23         Do you know what the hearing was for?
24    A    No.
25    Q    Before being retained as your attorney did
```

| | |
|---|---|
| 1    Mr. Ryan describe to you the Allen case? | 1    Q    Okay. |
| 2    **A    No.** | 2        When he called you did he tell you where he got |
| 3    Q    Did he describe to you the Whispering Pines | 3    your telephone number? |
| 4    property? | 4        MR. BALAM:  Same objections, same instruction. |
| 5    **A    No.** | 5    BY MS. SAGHEB: |
| 6    Q    Did he describe to you any issues related to | 6    Q    Did he tell you why he was calling you? |
| 7    the mortgages on the Whispering Pines property? | 7        MR. BALAM:  Same objections, same instruction. |
| 8    **A    No.** | 8        MS. SAGHEB:  I'm sorry, is this an |
| 9    Q    Did Mr. Ryan tell you that he was looking for a | 9    attorney-client privilege instruction? |
| 10    receiver? | 10        MR. BALAM:  Yes. |
| 11    **A    No.** | 11        MS. SAGHEB:  Prior to the formation of the -- |
| 12    Q    Did Mr. Ryan tell you that he had gone to the | 12        MR. BALAM:  It relates to the formation of the |
| 13    Whispering Pines property? | 13    relationship so attorney-client protected.  This is not |
| 14    **A    No.** | 14    a malpractice action between Grace Foundation and Lozano |
| 15    Q    Did Mr. Ryan tell you how he had found his way | 15    or Lozano and Ryan. |
| 16    to your office? | 16    BY MS. SAGHEB: |
| 17    **A    No.** | 17    Q    So the conversation, telephone conversation on |
| 18    Q    Had you given him directions to your office? | 18    July 17th, how long did that last? |
| 19        MR. BALAM:  Again prior to his representation? | 19        MR. BALAM:  Misstates prior testimony. |
| 20    BY MS. SAGHEB: | 20        THE WITNESS:  I don't recall. |
| 21    Q    Absolutely. | 21    BY MS. SAGHEB: |
| 22        Prior to your retention on July 18 of Mr. Ryan | 22    Q    Okay. |
| 23    or his firm did you give him directions to your office? | 23        Was it more or less than five minutes? |
| 24    **A    Yes.** | 24    **A    I don't remember.** |
| 25    Q    Okay. | 25    Q    Okay. |
| 25 | 27 |

| | |
|---|---|
| 1        When did you do that? | 1        At any time prior to July 17, 2011 had you ever |
| 2    **A    I don't recall.** | 2    had any communication with Timothy Ryan? |
| 3    Q    Was it the day before, the week before, eight | 3    **A    No.** |
| 4    months before, can you give me an estimate? | 4    Q    Had you ever met Timothy Ryan? |
| 5    **A    An estimate of the day before.** | 5    **A    No.** |
| 6    Q    Okay. | 6    Q    Had you ever e-mailed with Timothy Ryan? |
| 7        So does that mean that he called you the day | 7    **A    I'm not sure.** |
| 8    before he met you on July 18? | 8    Q    Okay. |
| 9    **A    It's possible, yes.** | 9        So why do you say you're not sure? |
| 10    Q    Okay. | 10    **A    I don't recall.  It could be in my e-mails that** |
| 11        When he called you on July 18th did he tell you | 11    **I've provided, so it could be in there.** |
| 12    why he was calling you? | 12    Q    Okay. |
| 13        MR. BALAM:  Objection, calls for a disclosure | 13        So what is it in your mind's eye that you're |
| 14    of attorney-client communication for purposes of seeking | 14    thinking about regarding any contact with Mr. Ryan prior |
| 15    representation and instruct the witness not to answer. | 15    to the 17th of July? |
| 16    BY MS. SAGHEB: | 16        MR. BALAM:  Vague and ambiguous, documents |
| 17    Q    When Mr. Ryan called you it was your | 17    speak for themselves.  You can answer, if you know. |
| 18    understanding that you were seeking representation? | 18        THE WITNESS:  Well, they did contact me to be |
| 19        MR. JONES:  I will object, mischaracterizes her | 19    the receive -- to ask if I would be the receiver. |
| 20    testimony as to whether or not Mr. Ryan called. | 20    BY MS. SAGHEB: |
| 21        MR. BALAM:  Join. | 21    Q    Okay. |
| 22    BY MS. SAGHEB: | 22        Do you recall whether it was Mr. Ryan or |
| 23    Q    Did Mr. Ryan call you the day before you | 23    whether it was somebody from Mr. Ryan's firm? |
| 24    retained him on July 18th, 2011? | 24    **A    It was somebody from Mr. Ryan's firm.** |
| 25    **A    It's possible, yes.** | 25    Q    Was it Mr. Beardsley? |
| 26 | 28 |

7 (Pages 25 to 28)

1    A   I believe there is a communication in the
2    e-mails from Miguel.
3    Q   Somebody named Miguel?
4    A   Yes.
5    Q   Okay.
6        Do you remember Miguel's last name?
7    A   I don't.
8    Q   Okay.
9        Now, when Miguel contacted you he indicated to
10   you that they were looking for a receiver?
11   A   Yes.
12   Q   In the Susanville area?
13   A   Yes.
14   Q   Did he specify that it was in relation to the
15   Whispering Pines property?
16   A   Yes.
17   Q   Did he specify that Mr. Bennett was involved at
18   all?
19   A   No.
20   Q   Okay.
21       Now, before July 17th, 2011 other than Miguel
22   was there anybody else from the Ryan Firm with whom you
23   had contact at all?
24   A   Mr. Tyler, I don't know Tyler's last name
25   either, Tyler.

                                                    29

1    Q   Okay.
2        Kemp?
3    A   Yes.
4    Q   Okay.
5        What was the sum and substance of your
6    discussions with Mr. Kemp?
7    A   Again about the -- if -- between the two of
8    them about the receivership.
9    Q   What did they say?
10   A   I don't recall.  The e-mails are in there.  I
11   can't tell you the exact words.  It was very brief.
12   Q   Okay.
13       Well, that's what we're here to find out today
14   is what you can recall.  So let's start with Miguel.
15   Was there an indication that they were looking to hire a
16   receiver?
17   A   Yes.
18       MR. BALAM:  Vague and ambiguous, documents
19   speak for themselves.
20   BY MS. SAGHEB:
21   Q   When the discussion regarding hiring the
22   receiver was had were you told who was seeking to hire a
23   receiver?
24   A   No.

                                                    30

1    Q   Okay.
2        Were you told that Bank of America was seeking
3    to hire a receiver?
4    A   No.
5    Q   Were you told that Wells Fargo was seeking to
6    hire a receiver?
7    A   No.
8    Q   Okay.
9        What about any other person or entity in the
10   Allen versus Summit matter, were they designated as
11   persons or entities seeking to hire a receiver?
12   A   No.
13       MR. BALAM:  Vague and ambiguous.
14   BY MS. SAGHEB:
15   Q   Was there an indication that the Ryan Firm was
16   seeking the appointment of a receiver?
17       MR. BALAM:  Vague and ambiguous, calls for
18   speculation.
19       THE WITNESS:  The -- the -- No.
20   BY MS. SAGHEB:
21   Q   Did you indicate to either Mr. -- or Mr. Kemp
22   or to Miguel that you had never acted as a receiver
23   prior to the situation they were presenting?
24   A   I don't recall.
25   Q   Did you tell them that you had acted as a

                                                    31

1    receiver in any other situation?
2    A   No.
3    Q   Did they ask you whether or not you had
4    experience in receiverships?
5    A   I don't recall.
6    Q   Did they ask you whether or not you acted as a
7    bankruptcy receiver?
8    A   No.
9    Q   Did they ask you whether or not you acted as a
10   receiver in estate matters?
11   A   No.
12   Q   Did they tell you that they were specifically
13   seeking somebody who did not have any receivership
14   experience?
15   A   No.
16   Q   Did they tell you why they had called you in
17   particular?
18   A   No.
19   Q   Did they ask you what your fees, your rates for
20   the receivership were?
21   A   Yes.
22   Q   What did you tell them?
23   A   I told them $200 an hour.
24   Q   To do what?
25   A   That wasn't discussed.

                                                    32

**Page 33**

```
 1     Q   Well, when you told them 200 -- When you told
 2  them $200 per hour, what were you talking about, to do
 3  what?
 4     A   That again wasn't discussed.  It --
 5     Q   Okay.
 6         Whether or not it was discussed --
 7     A   Um-hum.
 8     Q   -- when you said I will perform the acts of a
 9  receiver and I will charge you $200 an hour to do it,
10  what acts were you talking about when you were
11  referencing your $200 per hour?
12         MR. BALAM:  Misstates prior testimony, vague
13  and ambiguous, compound.
14         THE WITNESS:  I didn't have any specific acts
15  at that time to tell them.
16  BY MS. SAGHEB:
17     Q   You didn't even really know what you were going
18  to be doing, did you?
19         MR. BALAM:  Vague and ambiguous, argumentative,
20  calls for speculation.
21  BY MS. SAGHEB:
22     Q   Let me withdraw.
23         Did you at that time that you quoted them $200
24  an hour, did you understand what it was that you were
25  going to be doing?
```

**Page 34**

```
 1     A   No.
 2     Q   Now, did you inquire as to how long the
 3  receivership would be?
 4     A   No.
 5     Q   Did you inquire as to what duties and
 6  responsibilities you would be required to undertake?
 7         MR. BALAM:  Again prior to the representation?
 8  BY MS. SAGHEB:
 9     Q   Yes.
10         We're still -- Just so we're clear, we are
11  still talking about the -- your discussions with Miguel
12  and Mr. Kemp sometime before July 17th, 2011, and the
13  pending question is did they describe to you what duties
14  and responsibilities you were expected to undertake
15  during the receivership?
16         MR. BALAM:  Vague and ambiguous, calls for a
17  legal conclusion, expert opinion, but you can answer.
18         THE WITNESS:  Repeat the question.
19         MS. SAGHEB:  Why don't I have it read back that
20  time.
21         (The record was read by the reporter
22         as follows:  We're still -- Just so
23         we're clear, we are still talking
24         about the -- your discussions with
25         Miguel and Mr. Kemp sometime before
```

**Page 35**

```
 1  July 17th, 2011, and the pending
 2  question is did they describe to you
 3  what duties and responsibilities you
 4  were expected to undertake during
 5  the receivership?)
 6         THE WITNESS:  No.
 7  BY MS. SAGHEB:
 8     Q   When you perform property management work what
 9  do you charge?
10         Oh, no.  Strike that.  I will withdraw that and
11  ask you a different question.
12         In August of 2011 when you performed property
13  management work what did you charge?
14     A   Ten percent of rents collected.
15     Q   So if the property was successfully rented and
16  if the rent was received then your take would be ten
17  percent of whatever was paid?
18     A   Correct.
19     Q   Other than the receivership in which you
20  intended to charge $200 per hour, did you have any other
21  work that was paying you by the hour?
22     A   No.
23     Q   How did you know that the value of your
24  services was $200 per hour?
25     A   I asked Miguel what a receiver should charge.
```

**Page 36**

```
 1     Q   And he said $200 per hour?
 2     A   Yes.
 3     Q   But he didn't describe to you what you would be
 4  doing for your $200 per hour?
 5     A   No.
 6     Q   Did he describe to you how many hours would be
 7  involved?
 8     A   No.
 9     Q   Did either Miguel or Mr. Kemp identify
10  themselves as people working in a law firm?
11     A   Yes.
12     Q   Did Miguel identify himself as an attorney?
13     A   I don't recall.
14     Q   Okay.
15         Did Mr. Kemp identify himself as an attorney?
16     A   I don't recall.
17     Q   Did either one of them identify an attorney for
18  whom they were working?
19     A   I don't recall.
20     Q   Did either one of them identify a client for
21  whom they were working?
22     A   I don't recall.
23     Q   They did, however, identify, I think you said,
24  the Whispering Pines property; right?
25     A   Yes.
```

1    Q   Okay.
2        Now, let's go back in time prior to your
3    conversations with Miguel and Mr. Kemp.  To the best of
4    your recollection prior to your discussions with those
5    two folks had you ever heard from anybody at the Ryan
6    Firm?
7    A   No.
8    Q   Had you ever met anybody from the Ryan Firm?
9    A   No.
10   Q   So your first introduction to the Ryan Firm was
11   telephone conversations with Miguel and Tyler Kemp?
12       MR. BALAM:  Misstates prior testimony.
13   BY MS. SAGHEB:
14   Q   Is that an accurate statement or not?
15   A   It's a -- My first, my first conversation with
16   the Ryan Firm is a conversation with Miguel.
17   Q   Okay.
18       And then followed by a conversation with
19   Mr. Kemp?
20   A   I don't recall the exact --
21   Q   Order?
22   A   -- order, yes.
23   Q   Okay.
24       Does that mean that there was more than one
25   conversation with Miguel?

                                                    37

1    A   There could have been.
2    Q   Okay.
3        And what about with Mr. Kemp, was there more
4    than one conversation?
5    A   There could have been.
6    Q   What did they tell you about the Whispering
7    Pines property, Miguel and Mr. Kemp?
8    A   I don't know which one told me about it, but
9    they did tell me that Whispering Pines was in
10   foreclosure and they were looking for a receiver.
11   Q   What else did they tell you about it?
12   A   That's all I can recall.
13   Q   Did they mention the type of business that
14   might have been located on Whispering Pines?
15       MR. BALAM:  Vague and ambiguous.
16       THE WITNESS:  I don't recall.
17   BY MS. SAGHEB:
18   Q   Did they discuss anything about Mr. Bennett?
19   A   No.
20   Q   Did they say anything about Mr. Allen?
21   A   No.
22   Q   Did they say anything about the Grace
23   Foundation?
24   A   No.
25   Q   Did they say anything about the County of

                                                    38

1    Lassen?
2    A   No.
3    Q   Did they tell you that they typically hire
4    receivers?
5        MR. BALAM:  Calls for speculation, vague and
6    ambiguous.
7        THE WITNESS:  No.
8    BY MS. SAGHEB:
9    Q   Did they tell you how they came up with the
10   $200 per hour?
11   A   No.
12   Q   Did you ask them how did you come up with $200
13   an hour?
14   A   No.
15   Q   The $200 per hour, was that an in an e-mail
16   anywhere?
17   A   Yes.
18   Q   And that's in an e-mail from them to you?
19   A   It's from me to them.
20   Q   Did you try to negotiate a rate above the $200
21   per hour?
22   A   No.
23   Q   Did they at any point tell you that they
24   wouldn't pay the 200, that they were going to pay
25   something less?

                                                    39

1    A   Yes.
2    Q   And at what point did they tell you that?
3    A   I don't know the exact date.
4    Q   Is it before July 18, 2011?
5    A   Yes.
6    Q   Okay.
7        So before July 17, 2011?
8    A   Yes.
9    Q   Did you have any discussions with Mr. Ryan
10   before July 17, 2011?
11   A   No.
12   Q   Did you have any e-mail correspondence with Mr.
13   Ryan prior to July 17, 2011?
14   A   No.
15   Q   So your first recollection of any
16   communication, physical, electronic or telephone with
17   Mr. Ryan is July 17, 2011?
18   A   Around that time, yes.
19   Q   What is your first communication, if any, with
20   Mr. Beardsley?
21       MR. BALAM:  Objection, calls for
22   attorney-client communications.  If there is any
23   communication had before July 17, 2011 you can answer.
24       MS. SAGHEB:  Wait a minute, counsel.
25       When is not protected by the attorney-client

                                                    40

1  privilege.  There is case law that clearly sets that
2  out, and my only question was when was your first
3  contact, if any, with Mr. Beardsley, go ahead.
4       THE WITNESS:  What is Mr. Beardsley's first
5  name?
6  BY MS. SAGHEB:
7       Q   Austin.
8       **A   I don't know.**
9       Q   Was it before or after July 17, 2011?
10      **A   I -- I don't know.**
11      Q   So it could have been before July 17, 2011?
12      **A   I don't know.**
13      Q   Do you recall the content of your very first
14  conversation with Mr. Beardsley?
15      **A   I don't know.  I have e-mails from him, but I**
16  **didn't really review them to see what the contents was.**
17      Q   Are the e-mails dated prior to July 17, 2011?
18      **A   Probably not.**
19      Q   What documents did you review in preparation
20  for your deposition today?
21      **A   My e-mails.**
22      Q   Would that include your e-mails with Mr. Ryan?
23      **A   Yes.**
24      Q   All of them?
25      **A   No.**

41

1       Q   Did you review any e-mails after the 18th of
2  July, 2011 that you had with Mr. Ryan?
3       **A   Yes.**
4       Q   Did you bring those with you?
5       MR. BALAM:  Objection --
6       THE WITNESS:  No.
7       MR. BALAM:  -- calls for attorney-client
8  communications, work product, and e-mails,
9  communications or anything of that nature between Ms.
10  Lozano and the Ryan Firm are not being produced pursuant
11  to attorney-client work product.
12      MS. SAGHEB:  She reviewed them in preparation
13  for deposition.  That makes them fair game.
14      MR. BALAM:  No.
15  BY MS. SAGHEB:
16      Q   Okay.
17      So let's go back to what you reviewed in
18  preparation for your deposition, okay.
19      The e-mails that you reviewed in preparation
20  for your deposition, have those been produced here
21  today, do you know?
22      MR. BALAM:  Objection, calls for
23  attorney-client work product communications.  I instruct
24  you not to answer.
25  ///

42

1  BY MS. SAGHEB:
2       Q   Do you know whether or not you're -- Oh, I'm
3  sorry, did you instruct her?
4       MR. BALAM:  Yes, I did.
5       MS. SAGHEB:  Okay.
6       Q   Have you had an opportunity to independently
7       Q   Have you had an opportunity to independently
8  review -- There was a disk that your attorney brought
9  with him, have you reviewed the documents that are being
10  produced at the deposition today?
11      MR. BALAM:  Same objection, same instruction.
12      MS. SAGHEB:  Well, whether or not she reviewed
13  documents in preparation for a deposition is not subject
14  to the attorney-client privilege.
15      MR. BALAM:  I'm asserting the privilege and the
16  work product so -- Rifkin v Superior Court as well.
17      MS. SAGHEB:  I'm sorry?
18      MR. BALAM:  Rifkin v Superior Court as well.
19      MS. SAGHEB:  Okay.
20  BY MS. SAGHEB:
21      Q   Okay, let's go back to your discussions with
22  Tyler and Miguel prior to your retention of Mr. Ryan.
23      We have had some discussions regarding your
24  communications with them both electronically and
25  telephonically.  Did you ever get a chance to meet

43

1  either of those gentlemen?
2       **A   No.**
3       Q   To the extent that you had communication with
4  them telephonically, was there any category of
5  conversation that we have not already talked about?
6       MR. BALAM:  Objection to the extent it calls
7  for the disclosure of attorney-client work product after
8  your -- the representation of the Ryan Firm you can
9  answer.
10  BY MS. SAGHEB:
11      Q   So are you clear on the time frame?
12      **A   No.**
13      Q   Okay.
14      So we're talking about before July 17, 2011 I
15  -- we talked about some things, your rate, the
16  receivership, the Whispering Pines.  Is there any other
17  category of discussion that you had with Miguel and
18  Mr. Kemp that we have not already discussed?
19      **A   No.**
20      Q   Okay.
21      Did you have any discussions -- Well, strike
22  that.
23      I'm wondering about your discussions with
24  Mr. Beardsley and whether they were prior to your
25  retention of the Ryan Firm.  If you think about your

44

**Page 45**

1  first category of discussion with Mr. Beardsley, does
2  that assist you in remembering whether it was before or
3  after the 17th of July?
4     **A   I don't remember my conversations with**
5  **Mr. Beardsley.**
6     Q   Okay.
7       Do you think there was more than one?
8     **A   I don't know.**
9     Q   Did you ever meet him?
10     **A   No.**
11     Q   At some point you filed a lawsuit as against
12  Mr. Ryan's law firm; correct?
13     **A   No, I don't think so.**
14     Q   Did you ever file a lawsuit against Wells Fargo
15  Bank?
16     **A   No.**
17     Q   Did you ever file a lawsuit against Bank of
18  America?
19     **A   No.**
20     Q   Did you ever file a lawsuit against the County
21  of Lassen?
22     **A   No.**
23     Q   Did you ever file a lawsuit against Mr.
24  Bennett?
25     **A   No.**

**Page 46**

1     Q   When is the first time that you recall being in
2  court on the Allen versus Summit matter?
3     **A   During the -- I believe it was -- it was to get**
4  **the horses surrendered, I believe that's -- I don't know**
5  **the exact date, July 21st.**
6     Q   Okay.
7       So is your first recollection of being in court
8  in the Allen matter when the horses were to be
9  transferred or is it when you were to be appointed as
10  receiver?
11     **A   I wasn't in court to get appointed as receiver.**
12     MS. SAGHEB:  Okay.
13       So let me have the reporter mark this document
14  as 1.
15       (Exhibit 1 was marked.)
16  BY MS. SAGHEB:
17     Q   Could you take a moment and take a look at that
18  document and tell me to the best of your recollection --
19     MR. JONES:  Can you just identify it?
20     MS. SAGHEB:  Oh, I'm sorry.
21     MR. JONES:  We don't have a copy.
22     MS. SAGHEB:  I'm sorry.
23     MR. JONES:  For the people on the phone, too,
24  so we know what we're looking at.
25     MS. SAGHEB:  Okay.

**Page 47**

1       We have marked the document entitled Order
2  Appointing Receiver and Preliminary Injunction dated
3  July 21, 2011 as Exhibit 1 to the deposition transcript.
4  What I would like for the deponent to do is to take a
5  look at that order and tell me if she has seen it before
6  today.
7     THE WITNESS:  Yes.
8  BY MS. SAGHEB:
9     Q   When is the first time you saw that order?
10     **A   On July 21st, 2011.**
11     Q   And you've already indicated that you were not
12  in court when the order was issued; correct?
13     **A   Yes.**
14     Q   And how did you -- how did you see the order,
15  how did it come to you?
16     MR. BALAM:  Objection to the extent it calls
17  for disclosure of attorney-client communications I
18  instruct you not to answer, but otherwise you can answer
19  if it doesn't call for disclosure of attorney-client
20  communications.
21     THE WITNESS:  Okay.
22       Tim Ryan handed it to me.
23  BY MS. SAGHEB:
24     Q   Okay.
25       So he physically handed it to you as opposed to

**Page 48**

1  e-mailing it or sending it by mail or something like
2  that?
3     **A   Yes.**
4     Q   Is that in your office?
5     **A   Yes.**
6     Q   And did you read it at any point?
7     **A   Yes.**
8     Q   When did you read it?
9     **A   I read it that day, July 21st.**
10     Q   Did you ever give a copy of this order to
11  anybody?
12     **A   Yes.**
13     Q   Who did you give it to?
14     **A   I gave a copy to Pete Heimbigner.**
15     Q   When did you give it to Mr. Heimbigner?
16     **A   I gave it either July 21st or July 22nd.**
17     Q   How did you give it to him, by e-mail, by
18  dropping it off at his office, how?
19     **A   By e-mail.**
20     Q   Okay.
21       Who else did you give it to?
22     **A   I sent it to the Grace Foundation.**
23     Q   And how did you send it to the Grace
24  Foundation, by e-mail?
25     **A   By e-mail.**

1    Q   Okay.
2        And why did you send it to the Grace
3    Foundation?
4    A   Because they were -- they needed to know that
5    there was an order -- or -- I'm sorry, I am -- I'm on
6    the wrong document.  I'm sorry.
7    Q   That's okay.
8        So did you give a copy of the July 21st order
9    to the Grace Foundation?
10   A   I don't know.  I don't know.  I don't recall,
11   and this one I don't know that I sent it to Pete,
12   either, I'm sorry.  I don't know if I sent it to
13   anybody.
14   Q   Okay.
15       So let me reask the question.
16   A   Okay.
17   Q   Okay.
18       To the best of your recollection who did you
19   send the July 21st, 2011 order to?
20   A   I -- No one.  I don't recall --
21   Q   Okay.
22   A   -- at this moment.
23   Q   There were some folks at the Whispering Pines
24   facility; right?
25   A   Okay, yes.
                                                    49

1    Q   Okay.
2        So some of those folks might have received a
3    copy of the order?
4        MR. BALAM:  Objection, calls for speculation,
5    lacks foundation.
6    BY MS. SAGHEB:
7    Q   Is that right?
8    A   They were -- The people that were at Whispering
9    Pines were served a copy of the order.
10   Q   Right.
11       So were they served by you?
12       MR. BALAM:  Objection, calls for a legal
13   conclusion.
14       THE WITNESS:  No.
15   BY MS. SAGHEB:
16   Q   Okay.
17       Who were they served by?
18       MR. BALAM:  Same objection, calls for
19   speculation as well.
20       THE WITNESS:  Tim Ryan served the occupants of
21   Whispering Pines.
22   BY MS. SAGHEB:
23   Q   Other than the occupants of Whispering Pines,
24   to the best of your knowledge was the July 21st order
25   given to anybody else?
                                                    50

1        MR. BALAM:  Calls for speculation, lacks
2    foundation.
3        THE WITNESS:  The Lassen County Sheriff's
4    Department received a copy.
5    BY MS. SAGHEB:
6    Q   And how do you know that?
7    A   I gave it to them.
8    Q   And when did you give it to them?
9    A   I don't know the exact date.
10   Q   Okay.
11       Within a week of July 21st or within a month,
12   can you give me an estimate?
13   A   Within a week.
14   Q   Okay.
15       And what was the purpose of giving this to the
16   sheriff's department?
17   A   To inform them that a receiver had been
18   appointed to Whispering Pines.
19   Q   Okay.
20       Any other purpose in giving it to the sheriff's
21   department?
22       MR. BALAM:  Objection to the extent it calls
23   for the disclosure of any attorney-client communications
24   or work product issues.  You can respond.
25       THE WITNESS:  No.
                                                    51

1    BY MS. SAGHEB:
2    Q   You know, it just occurs to me that I may not
3    fully understand the attorney-client relationship.
4        Were you the client of Timothy Ryan in the
5    capacity of a receiver?
6        MR. BALAM:  Objection, calls for a legal
7    conclusion, expert opinion, but if you understand you
8    can respond.
9        THE WITNESS:  I don't understand.
10   BY MS. SAGHEB:
11   Q   Okay.
12       So you hired Timothy Ryan to represent your
13   interests.  I need to understand the scope of the
14   representation to be able to frame questions, so
15   primarily what I'm concerned about is your receiver --
16   your duties and responsibilities as a receiver.
17       So were you being represented by Ryan and his
18   firm in your capacity as a receiver?
19       MR. BALAM:  Same objections, but you can
20   respond as long as it doesn't require disclosure of any
21   attorney-client communications.
22       THE WITNESS:  Yes.
23   BY MS. SAGHEB:
24   Q   Okay.
25       Were you being represented by Mr. Ryan in any
                                                    52

BY MS. SAGHEB:

1    Q.  Okay.

2    By that do you mean that the expenses

3    associated with the Whispering Pines -- with operating

4    the Whispering Pines Stables exceeded the revenue coming

5    into the stables?

6    MR. BALAM:  Vague and ambiguous, calls for

7    expert opinion, legal conclusion.  You can respond if

8    you understand.

9    THE WITNESS:  Yes.

10   BY MS. SAGHEB:

11   Q.  Did you mean anything else?

12   **A.  No.**

13   Q.  Okay.

14   When you made the determination that the

15   expenses exceeded revenue did you inform the Court of

16   that?

17   **A.  I'm not sure.  The discussion was had with my**

18   **attorney.**

19   Q.  You're not sure whether or not you addressed

20   this matter with the Court?

21   **A.  Correct.**

22   Q.  Okay.

23   Do you have a recollection of being in court

24   when the matter was being discussed?

1    BY MS. SAGHEB:
2        Q.  Okay.
3        By that do you mean that the expenses
4    associated with the Whispering Pines -- with operating
5    the Whispering Pines Stables exceeded the revenue coming
6    into the stables?
7        MR. BALAM:  Vague and ambiguous, calls for
8    expert opinion, legal conclusion.  You can respond if
9    you understand.
10       THE WITNESS:  Yes.
11   BY MS. SAGHEB:
12       Q.  Did you mean anything else?
13       **A.  No.**
14       Q.  Okay.
15       When you made the determination that the
16   expenses exceeded revenue did you inform the Court of
17   that?
18       **A.  I'm not sure.  The discussion was had with my**
19   **attorney.**
20       Q.  You're not sure whether or not you addressed
21   this matter with the Court?
22       **A.  Correct.**
23       Q.  Okay.
24       Do you have a recollection of being in court
25   when the matter was being discussed?

85

1        **A.  No.**
2        Q.  Okay.
3        And did you inform the Court of -- that you
4    wanted to resign based on the fact that there wasn't
5    sufficient revenue to meet the expenses at the ranch?
6        **A.  No.**
7        MR. BALAM:  Lacks foundation, calls for
8    speculation.
9    BY MS. SAGHEB:
10       Q.  And why not?
11       MR. BALAM:  Objection, calls for -- to the
12   extent it requires disclosure of attorney-client
13   communications, work product I instruct you not to
14   answer.  Otherwise you can.
15       THE WITNESS:  I'm not going to answer.
16   BY MS. SAGHEB:
17       Q.  And why not?
18       Are you answering because the only answer that
19   you have is based on an attorney-client communication?
20       **A.  Yes.**
21       Q.  Okay.
22       Independent of your communications with your
23   attorney did you as a court appointed receiver decide to
24   resign?
25       **A.  No.**

86

1        Q.  And why not, again independent of discussions
2    with your attorney?
3        **A.  I don't have an answer.**
4        Q.  And that's because all of those decisions are
5    subject to an attorney-client communication; right?
6        **A.  Yes.**
7        Q.  When is the first time that you prepared any
8    kind of accounting with reference to your duties as a
9    receiver in the Whispering Pines matter?
10       MR. BALAM:  Vague and ambiguous, calls for
11   speculation and lacks foundation.
12       THE WITNESS:  Well, I worked with Mr. Chittock
13   to do that.
14   BY MS. SAGHEB:
15       Q.  Okay.
16       But independent of that -- Well, even if it's
17   with that I'm just asking when right now, when did you
18   prepare the first accounting?
19       MR. BALAM:  Vague and ambiguous, lacks
20   foundation, calls for speculation.
21       THE WITNESS:  When I hired Mr. Chittock to
22   prepare documents for the -- to file with the Court.
23   BY MS. SAGHEB:
24       Q.  When was that?
25       **A.  I -- I don't know the date.**

87

1        Q.  Okay.
2        Can you give me a year?
3        **A.  2012.**
4        Q.  Can you give me a season?
5        **A.  Fall.**
6        Q.  So before fall of 2012 you don't have any
7    recollection of preparing any accounting with reference
8    to the Whispering Pines property or the horses?
9        MR. BALAM:  Vague and ambiguous, calls for
10   speculation, lacks foundation, calls for disclosure of
11   attorney-client communication or work product.
12       MS. SAGHEB:  Is there an instruction?
13       MR. BALAM:  No, to the extent it doesn't
14   require you to disclose any work product.
15       THE WITNESS:  Okay, I kept a checkbook register
16   and did monthly statements.  Is that what you're looking
17   for?
18   BY MS. SAGHEB:
19       Q.  Yes.
20       **A.  Okay.**
21       Q.  So the monthly statements would be an
22   accounting; right?
23       **A.  Okay.**
24       Q.  Okay.
25       So when is the first time you started to do

88

BY MS. SAGHEB:

1   BY MS. SAGHEB:
2       Q   Now, why did you -- Well, strike that.
3           Do you have an understanding as to why there
4   was a motion made to transfer the horses?
5           MR. BALAM:  Calls for speculation, lacks
6   foundation.
7   BY MS. SAGHEB:
8       Q   Go ahead.
9       **A   Because there was nobody to care for the horses**
10  **on the property.**
11      Q   Well, you were there caring for the horses;
12  right?
13      **A   Yes, but I was not qualified to care for the**
14  **horses.**
15      Q   But you were somebody who could retain somebody
16  to -- to care for the horses; right?
17      **A   Well, yes.**
18      Q   Okay.
19          And in the management of other properties you
20  probably don't know how to change sheets and do whatever
21  else needs to be done in the management of a property;
22  right?
23          MR. BALAM:  Calls for an expert opinion, legal
24  conclusion.
25  ///

129

1       **A   No, they are cowboys.  They don't have**
2   **businesses.**
3       Q   Okay.
4           All right, and as far as you can tell were Mike
5   and Nick doing a good job taking care of the horses?
6           MR. BALAM:  Objection, calls for speculation,
7   lacks foundation.
8   BY MS. SAGHEB:
9       Q   Yes, no?
10      **A   All they were hired to do was feed the horses.**
11      Q   Okay.
12      **A   They fed the horses well.**
13      Q   Okay.
14          So when you say that there was nobody on -- at
15  Whispering Pines to take care of the horses, what do you
16  mean by that?
17      **A   There were -- The facilities were not -- they**
18  **were not sufficient enough to take care of the horses.**
19  **There were not enough corrals to pen up the horses.**
20  **There was debris all over the place so it wasn't safe**
21  **for the horses.**
22      Q   Okay.
23          But debris can be cleaned up; right?
24          MR. BALAM:  Calls for speculation, lacks
25  foundation, vague and ambiguous.

131

1   BY MS. SAGHEB:
2       Q   Is that right?
3       **A   Yes.**
4       Q   And so you hire other people to take care of
5   those tasks; right?
6       **A   Yes.**
7       Q   Okay.
8           Did you consider doing that with reference to
9   the Whispering Pines horses?
10      **A   Yes.**
11      Q   And why didn't you do that?
12      **A   Actually I did do that.**
13      Q   Okay, great.
14          So when did you first do that?
15      **A   The first day, July 21st.**
16      Q   Who did you hire?
17      **A   I hired a couple of cowboys to come feed the**
18  **horses.**
19      Q   Names of the cowboys?
20      **A   Mike and Nick, the cowboys.**
21      Q   Mike and Nick cowboys have a last name or maybe
22  a telephone number?
23      **A   They have invoices in the books.**
24      Q   Okay, good.
25          Do they have a business name?

130

1   BY MS. SAGHEB:
2       Q   Sorry.
3           It was the kind of debris that could be cleaned
4   up, taken off the ground; right?
5           MR. BALAM:  Same objections, expert opinion.
6           THE WITNESS:  It -- It could be.
7   BY MS. SAGHEB:
8       Q   Okay.
9           And corrals certainly can be put up; right?
10          MR. BALAM:  Same objections.
11          THE WITNESS:  Yes.
12  BY MS. SAGHEB:
13      Q   There was sufficient space on the grounds to
14  put up the corrals; right?
15      **A   Yes.**
16      Q   Okay.
17          So any other reason why you stated that there
18  was nobody there to care for the horses?
19      **A   No.**
20      Q   Was it your idea to transfer the horses?
21      **A   No.**
22      Q   Whose idea was it?
23      **A   It was Tim Ryan's.**
24      Q   Okay.
25          And did you communicate to the Court that it

132

1  was Mr. Ryan's idea to move the horses?
2     **A   No.**
3     Q   And why not?
4     **A   I wasn't asked.**
5     Q   Did you understand that you were a court
6  appointed receiver?
7     **A   Yes.**
8     Q   Okay.
9        Did you ever advise or inform the Court that
10 you were being represented by Timothy Ryan?
11    **A   Well, he had filed my declaration.**
12    Q   Okay, that's not what I asked you.
13       The question is did you tell the Court that in
14 acting as a court appointed receiver you were being
15 represented by Timothy Ryan?
16       MR. BALAM:  Objection, documents speak for
17 themselves, calls for speculation, lacks foundation.
18       THE WITNESS:  I wouldn't know how to do that.
19 BY MS. SAGHEB:
20    Q   Did you ask Mr. Ryan to inform the Court that
21 he was representing you?
22       MR. BALAM:  Objection, calls for
23 attorney-client communications, instruct you not to
24 answer.
25 ///

                                                  133

1  BY MS. SAGHEB:
2     Q   To the best that you know did Mr. Ryan
3  communicate with the Court that he was representing you
4  when you were acting as a receiver?
5        MR. BALAM:  Calls for speculation, lacks
6  foundation.
7        THE WITNESS:  I don't know.
8  BY MS. SAGHEB:
9     Q   Have you seen any document, a motion or a
10 declaration or even a letter that advises the Court that
11 you as the court appointed receiver were being
12 represented by Mr. Ryan?
13       MR. BALAM:  Vague and ambiguous, overly broad.
14       THE WITNESS:  No.
15 BY MS. SAGHEB:
16    Q   Were you paying Mr. Ryan for the
17 representation?
18       MR. BALAM:  Objection, calls for the disclosure
19 of attorney-client communications, instruct her not to
20 answer.
21 BY MS. SAGHEB:
22    Q   If you were paying Mr. Ryan for representation
23 would you have listed that as an item, an expense item
24 on your reports to the Court?
25       MR. BALAM:  Calls for speculation, lacks

                                                  134

1  foundation.  To the extent it still intrudes on
2  attorney-client communications I instruct her not to
3  answer.
4  BY MS. SAGHEB:
5     Q   But that's not an instruction.
6        Do you need -- You need to still answer it if
7  it doesn't come from your attorney.
8        MR. BALAM:  Attorney-client privileged
9  communication.  I instruct her not to answer.
10 BY MS. SAGHEB:
11    Q   Okay.
12       So did you in the preparation of your
13 accounting for the Court list as an expense payments to
14 the Ryan Firm related to your receivership?
15       MR. BALAM:  Documents speaks for themselves,
16 lacks foundation, calls for speculation.
17       THE WITNESS:  No.
18 BY MS. SAGHEB:
19    Q   Why not?
20    **A   There was --**
21       MR. BALAM:  Same objections, attorney-client
22 communications, instruct you not to answer.
23 BY MS. SAGHEB:
24    Q   Well, ma'am, you listed Mr. Chittock's fees;
25 right?

                                                  135

1     **A   Yes.**
2        MR. BALAM:  Documents speaks for themselves.
3  BY MS. SAGHEB:
4     Q   Yes, you listed Mr. Chittock's fees.
5        Did you list Mr. Ryan's fees?
6     **A   No.**
7     Q   Why did you list Mr. Chittock's fees as an
8  expense of the receivership estate?
9        MR. BALAM:  Objection, calls for disclosure of
10 attorney-client communications, work product.  I
11 instruct you not to answer.
12 BY MS. SAGHEB:
13    Q   Well, no, independent of your communications
14 with your attorney.  Well, strike that.
15       You did prepare the accountings relating to the
16 receivership -- receivership estate; correct?
17       MR. BALAM:  Vague and ambiguous, documents
18 speak for themselves.
19 BY MS. SAGHEB:
20    Q   Yes or no?
21    **A   Yes.**
22    Q   Okay.
23       Why did you list doctor -- Why did you list
24 Mr. Chittock's fees as an expense of the receivership
25 estate?

                                                  136

                            34  (Pages 133 to 136)

1      MR. BALAM:  Objection, calls for speculation,
2   lacks foundation, attorney-client communications, work
3   product.  I instructed you not to answer.
4   BY MS. SAGHEB:
5      Q   Why didn't you list Mr. Ryan's fees as part of
6   the receivership estate expense?
7      MR. BALAM:  Same objections, same instruction.
8   BY MS. SAGHEB:
9      Q   Okay.
10      And you still have no idea -- Oh, you know
11   what, strike that.
12      When you came back in you said something about
13   you recalling that a lawsuit had been filed against
14   Mr. Ryan; right?  Yes?
15      A   Yes.
16      Q   You had filed a lawsuit against Mr. Ryan;
17   right?
18      MR. BALAM:  Vague and ambiguous.
19   BY MS. SAGHEB:
20      Q   Yes or no?
21      MR. BALAM:  Lacks foundation, calls for
22   speculation.
23      THE WITNESS:  Yes.
24   BY MS. SAGHEB:
25      Q   Okay.

137

1      Once you filed a lawsuit against Mr. Ryan had
2   your relationship with Mr. Ryan ended?
3      MR. BALAM:  Calls for a legal conclusion,
4   expert opinion, attorney-client communications, work
5   product.  I instruct you not to answer.
6   BY MS. SAGHEB:
7      Q   Well, what was your understanding of the status
8   of your attorney-client relationship with Mr. Ryan as of
9   the date you filed the lawsuit against him?
10      MR. BALAM:  Same objections, also Rifkin versus
11   Superior Court.
12      MS. SAGHEB:  Instruction?
13      MR. BALAM:  Not to answer, instruct you not to
14   answer.
15   BY MS. SAGHEB:
16      Q   Are there any expenses that you incurred in
17   reference to the receivership estate that you
18   intentionally omitted from your report to the Court?
19      MR. BALAM:  Vague and ambiguous, calls for
20   legal conclusion, expert opinion, Rifkin versus Superior
21   Court, legal opinion.  I instruct you not to answer.
22   BY MS. SAGHEB:
23      Q   Is there any item of expense related to the
24   receivership which after submission of your documents to
25   the Court you realized you had inadvertently left out?

138

1      MR. BALAM:  Same objection, same instruction,
2   documents speak for themselves.
3   BY MS. SAGHEB:
4      Q   We've covered some of your discussions, maybe
5   all of them, with Pete Heimbigner between July 21st and
6   July 29th of 2011.
7      As you sit here now are there any other
8   discussions which you do recall, but which we have not
9   discussed?
10      A   No.
11      Q   Okay.
12      Let's move on to your discussions with --
13   directly with Beth DeCaprio in the same time period.
14   Did you have any discussions between -- with Ms.
15   DeCaprio between the 21st of July and the 29th of July?
16      MR. BALAM:  Vague and ambiguous as to
17   discussions.
18      THE WITNESS:  I'm not sure.  I know I spoke
19   with Taira lot, but I'm not sure I spoke with Beth.
20   BY MS. SAGHEB:
21      Q   Okay.
22      Prior to the 21st of July had you spoken with
23   anybody at the Grace Foundation?
24      A   No.
25      Q   Did you even know about them?

139

1      A   No.
2      Q   Okay.
3      The first time that you learned about them was
4   when Mr. Heimbigner mentioned the removal of the horses
5   in April; right?
6      A   Yes.
7      Q   Okay.
8      Was Taira your main contact in that time frame,
9   the 21st of July through the 29th of July?
10      A   Yes.
11      MR. BALAM:  Vague and ambiguous.
12      THE WITNESS:  Yes.
13   BY MS. SAGHEB:
14      Q   Okay.
15      Other than Taira were there any other people at
16   the Grace Foundation that you were discussing the
17   Whispering Pines horses with?
18      A   I don't recall.
19      Q   Was the first contact with the Grace Foundation
20   you calling them or them calling you?
21      A   I'm not sure.
22      Q   At some point there was communication, though;
23   right?
24      A   Yes.
25      Q   Okay.

140

**Page 161**

1  the third full paragraph, those referred to the August
2  2011 horses transferred from Whispering Pines to the
3  Grace Foundation?
4      MR. BALAM:  Calls for speculation, lacks
5  foundation, document speaks for itself.
6      MR. JONES:  Also mischaracterizes the document.
7      THE WITNESS:  So I don't even know -- I have
8  lost the question.  You wanted me to say that I
9  understood something?
10 BY MS. SAGHEB:
11     Q   Did you understand the last sentence of that
12 third paragraph to be referring to the August 2011
13 horses transferred from Whispering Pines to the Grace
14 Foundation?
15     A   Not at the time I --
16     MR. BALAM:  Vague and ambiguous, calls for
17 speculation.
18     THE WITNESS:  This was a proposal, no.  This
19 was --
20 BY MS. SAGHEB:
21     Q   Okay.
22         What do you mean?
23     A   This -- We -- The rescue hadn't even been
24 determined at this time.
25     Q   Okay.

**Page 162**

1         What do you mean the rescue?
2      A   Or the removal, as you call it.
3      Q   Okay.
4         So this was a proposal regarding the removal of
5  the August 2011 horses; right?
6      MR. BALAM:  Document speaks for itself, legal
7  conclusion, expert opinion.
8  BY MS. SAGHEB:
9      Q   Is that what you understood the document to be?
10     A   Not at the time I received it.
11     Q   What did you understand the document to be?
12     A   Just how much it cost if they removed the
13 horses, but this isn't --
14     Q   Right.
15     A   -- specific to what we were -- to that time
16 because it does haven't that date in it or anything.  It
17 -- so --
18     Q   I'm not sure what -- that I understand the
19 testimony you have given.
20     A   Okay.
21     Q   So you read the document and did you understand
22 the document to relate to the potential removal of the
23 horses in August or sometime thereafter from Whispering
24 Pines?
25     A   Yes.

**Page 163**

1      Q   Okay.
2          And you knew that it related to removing the
3  horses from Whispering Pines and taking them to Grace
4  Foundation?
5      A   Yes.
6      Q   Okay.
7          And you understood when you read this document
8  that once they were at the Grace Foundation they would
9  be rehabilitated; right?
10     MR. BALAM:  Objection, calls for speculation,
11 lacks foundation, vague and ambiguous.
12 BY MS. SAGHEB:
13     Q   You understood that rehabilitation was one of
14 the reasons for sending it -- sending them over to the
15 Grace Foundation; right?
16     MR. BALAM:  Same objections.
17     THE WITNESS:  That was their intention, yes.
18 BY MS. SAGHEB:
19     Q   Okay.
20         And you further understood that once the horses
21 were rehabilitated and the Grace Foundation could place
22 them, the intention was to adopt out the horses; right?
23     MR. BALAM:  Vague and ambiguous, lacks
24 foundation, calls for speculation.
25     THE WITNESS:  Yes.

**Page 164**

1  BY MS. SAGHEB:
2      Q   Now, from -- Well, strike that.
3          You forwarded -- Well, strike that.
4          I need to show you another document.  Mark this
5  as Exhibit 12.
6      (Exhibit 12 was marked.)
7      MR. JONES:  Can you identify that in some way
8  since we don't have copies.
9      MS. SAGHEB:  Yes, of course.
10         Exhibit 12 is the August 4, 2011 e-mail from
11 Mr. Ryan and this time it's rentalqueen@mtlhomes.com.
12 It's time stamped 6:10 p.m.
13     MR. BALAM:  As to the first page of this
14 document that contains the communications between Tim
15 Ryan, Rental Queen and Austin Beardsley and Vicki
16 Lozano, this document is subject to attorney-client
17 privilege and pursuant to the privilege this should not
18 have been disclosed.  No issue as to the next two pages.
19 BY MS. SAGHEB:
20     Q   Well, actually I have a pretty simple question.
21         The last two pages of Exhibit 12 -- I'm sorry,
22 yes, Exhibit 12, are -- is Exhibit 11; right?  It's the
23 e-mail transmittal to you from the Grace Foundation;
24 right?
25     MR. BALAM:  Documents speak for themselves.

**41 (Pages 161 to 164)**

BY MS. SAGHEB:

2    Q    Is that right?

3    A    Yes.

4    Q    Okay.

5        And you transmitted that document to Mr. Ryan

6    on August 4, 2011?

7        MR. BALAM:  Objection, calls for disclosure of

8    attorney-client communications, work product.  I

9    instruct you not to answer.

10   BY MS. SAGHEB:

11   Q    Did you at any time make any changes to the

12   document before the transmittal?

13       MR. BALAM:  Same objections, same instruction.

14   The documents speak for themselves.

15   BY MS. SAGHEB:

16   Q    So let's take the time period between August

17   26th, 2000 -- Oh, strike that.

18       There was a meeting on -- in your office on

19   August 19, 2011.  Do you recall the meeting?  Do you

20   recall the meeting?

21   A    I can't recall who it's with.  Can you refresh

22   my memory?

23   Q    I think -- What I've heard is that it was kind

24   of a -- it was everybody attended, Mr. Heimbigner,

25   Mr. Ryan, my clients.

165

1        MR. BALAM:  What date was this?

2    BY MS. SAGHEB:

3    Q    I think it was August 19th.

4    A    There -- I recall there was a meeting.  I don't

5    know the date.

6    Q    Okay.

7        Was there more than one meeting in your office

8    which constituted yourself, Mr. Heimbigner, my client,

9    Mr. Ryan?

10   A    I don't know.

11       MR. BALAM:  Vague and ambiguous, your client.

12   BY MS. SAGHEB:

13   Q    Ms. DeCaprio.

14   A    I don't know, maybe.

15   Q    Maybe there was one more, okay.  The one I'm

16   referencing is August 12th.

17   A    Okay.

18   Q    I'm sorry, the one I'm referencing is August

19   19th.

20       Do you recall the substance of the discussions

21   during that meeting?

22       MR. BALAM:  I'm going to object to the extent

23   that you had any discussions with Tim Ryan or any

24   attorney on that date and the question prompts -- calls

25   for that as well.

166

BY MS. SAGHEB:

2    Q    Well, any discussions you had with Mr. Ryan in

3    secret, I would agree with your attorney.  Any

4    discussions you had with Mr. Ryan in front of Ms.

5    DeCaprio or others, I would not necessarily agree with

6    your attorney.  So --

7        MR. BALAM:  And I will add to that any

8    discussions that you intended to have in secret, but

9    they may have been eavesdropped is a different issue.

10   BY MS. SAGHEB:

11   Q    Okay.

12       All right, so let's just concentrate on

13   discussions with the group.  Do you recall the

14   discussion within the group?

15   A    Not yet.  No, I'm assuming it was about the

16   horses.

17   Q    Okay.

18   A    Okay.

19   Q    So you're not -- It's not coming together for

20   you?

21   A    No.

22   Q    Okay.

23       Let's go then to the 26th of August.  Was there

24   a meeting at your office before the removal of the

25   horses?

167

1    A    Yes.

2    Q    Okay.

3    Q    Did it -- At that meeting on the 26th was Ms.

4    DeCaprio and Mr. Heimbigner, were they at your office as

5    well?

6    A    I don't think -- I -- I don't recall --

7    Q    That's okay.

8    A    -- who was there.

9    Q    Okay.

10       MR. BALAM:  We're talking about August 26th

11   right now?

12   BY MS. SAGHEB:

13   Q    Right.

14       I'm just trying to recreate --

15   A    Trying to --

16   Q    Yeah, I'm just trying to get you to remember

17   whether or not and how many meetings and that sort of

18   thing.  Nothing is coming to mind in particular?

19   A    No.

20   Q    Okay.

21       I was going to ask you other than the logistics

22   of, you know, how we're going to move horse A or horse

23   B, I don't want to know about any of that, was there any

24   discussion regarding the reasons for the removal or the

25   order that the Court had issued or the final

168

# EXHIBIT K

| From: | Timothy M. Ryan |
|-------|-----------------|
| To: | "Vicki Lozano" |
| Cc: | "abeardsley@theryanfirm.com"; "tkemp@theryanfirm.com" |
| Subject: | RE: Whispering Pines |
| Date: | Tuesday, August 23, 2011 10:55:00 AM |

Thanks.

The BK filing does not disrupt the horse rescue as the court has already ordered the rescue...

AND the judge stated on the record that the safety of the animals is paramount.

To make sure that we are covered, however, we are trying to get into court on Thursday morning for an emergency relief from stay motion to remove the horses...

Just to be safe.

Austin will be bothering you about that today.

Tim

Timothy M. Ryan
The Ryan Firm, APC

1100 N. Tustin Avenue, Suite 200
Anaheim, CA 92807

714-666-1362
714-666-1443 Fax

*NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

---

**From:** Vicki Lozano [mailto:rentalqueen@mtlhomes.com]
**Sent:** Tuesday, August 23, 2011 10:50 AM
**To:** tryan@theryanfirm.com
**Cc:** abeardsley@theryanfirm.com; tkemp@theryanfirm.com
**Subject:** RE: Whispering Pines

The squatters names are: Anthony Glen (or Glenn) and Carly Brashear. Do you think the BK disrupts the horse rescue?

Vicki Lozano Owner/Broker
License#00975314
Mt. Lassen Properties
822 Main Street Susanville, Ca 96130
530-257-8087 www.MTLhomes.com

---

**From:** Timothy M. Ryan [mailto:tryan@theryanfirm.com]

# EXHIBIT M

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ORANGE
--oOo--

THE GRACE FOUNDATION OF )
NORTHERN CALIFORNIA, a )
California corporation, ) Case No.
) 30-2012-00612863-CU-BC-
Plaintiff, ) CJC
)
vs. )
)
WELLS FARGO BANK, N.A., a )
federally chartered bank, on )
its own behalf and as trustee )
of MLMI Trust Series )
2005-HE3; BANK OF AMERICA, )
.N.A., a federally chartered )
bank, on its own behalf; BAC )
HOME LOANS SERVICING, LP, a )
Texas Limited Partnership and )
a unit of Bank of America, )
N.A.; TIMOTHY M RYAN, an )
individual; THE RYAN FIRM, a )
California Professional )
Corporation; VICKI LOZANO, an )
individual in the capacity of )
Receiver; COUNTY OF LASSEN, )
CALIFORNIA; and DOES 1 )
through 50, )
)
Defendants. )
_____)

VIDEOTAPED DEPOSITION OF PETER HEIMBIGNER
THURSDAY, OCTOBER 24, 2013
Susanville, California

REPORTED BY:     Janet Menges, CCR #206, RPR
Computer-Aided Transcription

1

For The Grace Foundation:  BRACK & MASON
(Telephonically)        Attorneys at Law
By:  SUE MASON, ESQ.
1495 Pacific Highway
San Diego, CA


For The Ryan Law Firm:    The Ryan Firm
Attorneys at Law
By:  TIMOTHY RYAN, ESQ.
30 Corporate Park
Irvine, CA


Also Present:        DAVID CORRAO, VIDEOGRAPHER
BETH DeCAPRIO
CINDY WALDEN
RHETTA VANDER PLOEG

3

APPEARANCES:

For the Plaintiff:    LAW OFFICES OF SOHAILA SAGHEB
Attorneys at Law
By: SOHAILA SAGHEB, ESQ.
21112 Ventura Blvd.
Woodland Hills, CA

For the County of Lassen:  JONES & DYER
Attorneys at Law
By:  MARK JONES, ESQ.
1800 J Street
Sacramento, CA

For Bank of America:    BRYAN CAVE
Attorneys at Law
By:  C. SCOTT GREENE, ESQ.
560 Mission Street
San Francisco, CA

For Ryan and Lozano:    JAMPOL ZIMET
Attorneys at Law
By:  MANUEL BALAM, ESQ.
800 Wilshire Blvd.
Los Angeles, CA

For Wells Fargo:      SEVERSON & WERSON
(Telephonically)      Attorneys at Law
By: ELENA KOUVABINA, ESQ.
One Embarcadero Center
San Francisco, CA

2

I N D E X

| EXAMINATION | PAGE |
| --- | --- |
| BY MS. SAGHEB | 9 |
| BY MR. GREENE | 225 |
| BY MS. KOUVABINA | 234 |
| BY MS. SAGHEB | 244 |
| BY MR. BALAM | 248 |
| BY MR. RYAN | 301 |
| BY MR. BALAM | 312 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | 6/2/09 letter from Verderosa | 49 |
| 2 | 11/3/10 e-mail string | 53 |
| 3 | Lassen County Animal Control Protective Custody memo | 97 |
| 4 | 7/21/11 order | 106 |
| 5 | 7/29/11 order | 122 |
| 6 | 7/22/11 e-mail string | 126 |
| 7 | Lassen County Animal Surrender Form | 136 |
| 8 | Lassen County Animal Control Final Disposition memo | 170 |
| 9 | Agreement | 176 |
| 10 | Agreement | 177 |

4

| 1  | 11 | 9/3/11 e-mail string          | 184 |
| 2  | 12 | 3/5/12 letter from Ryan       | 185 |
| 3  | 13 | 3/5/12 letter from Ryan       | 187 |
| 4  | 14 | 7/31/12 letter from Sheridan  | 189 |
| 5  | 15 | Handwritten notes             | 198 |
| 6  | 16 | 7/22/11 letter from Heimbigner | 209 |
| 7  | 17 | 10/21/11 e-mail string        | 220 |
| 8  | 18 | 4/8/11 e-mail string          | 237 |
| 9  | 19 | 4/14/11 e-mail                | 243 |
| 10 | 20 | 8/30/11 e-mail                | 249 |
| 11 | 21 | Bankruptcy document           | 282 |
| 12 | 22 | 10/21/11 e-mail               | 284 |
| 13 | 23 | 9/5/11 e-mail string          | 290 |
| 14 | 24 | 4/11/11 e-mail string         | 293 |
| 15 | 25 | 4/14/11 e-mail                | 295 |
| 16 | 26 | 4/22/11 e-mail string         | 297 |
| 17 | 27 | 8/4/11 e-mail string          | 299 |
| 18 | 28 | Handwritten notes             | 311 |
| 19 | 29 | 8/1/11 e-mail                 | 312 |

5

ATTORNEY'S NOTES/CORRECTIONS
PAGE  LINE

6

PURSUANT TO NOTICE, and on Thursday, the 24th day of October, 2013, at the hour of 11:10 a.m. of said day, at 3015 Riverside Drive, Susanville, Nevada, before me, Janet Menges, a notary public, personally appeared PETER HEIMBIGNER.

--oOo--

THE VIDEOGRAPHER:  We're on record.  The date is Thursday, October 24th, 2013 and the monitor time is approximately 11:10 a.m.

This is the video deposition of Peter Heimbigner -- Heimbigner, sorry about that, in the matter of the Grace Foundation of Northern California, plaintiffs versus Wells Fargo Bank, et al, defendants. The case number is 30-2012-00612863-CU-BC-CJC as filed in the Superior Court of the State of California, County of Orange.

This deposition is being held at High Country Inn, 3015 Riverside Drive, Susanville, California.  The court reporter is Janet Menges of Bonanza Reporting. I'm a certified court videographer.  My name is David Corrao of A. Corrao Video.  My address is 5375 Kietzke Lane, Reno, Nevada.

Counsel will now introduce themselves, the name of their firm and who they represent.  Counsel for the

7

plaintiff first, please.

MS. SAGHEB:  Sohaila Sagheb with the Law Office of Sohaila Sagheb for the Grace Foundation of Northern California.

MR. JONES:  Mark Jones from Jones and Dyer for the County of Lassen.

MS. VANDER PLOEG:  Rheeta Vander Ploeg, Lassen County counsel.

MR. BALAM:  Manuel Balam, Jampol Zimet for defendants, Tim Ryan, the Ryan firm, and Vicki Lozano.

MR. GREENE:  Scott Greene with Bryan Cave representing Bank of America.

THE VIDEOGRAPHER:  Will those participating telephonically please introduce themselves.

MS. KOUVABINA:  I'm sorry, Elena Kouvabina for Wells Fargo Bank.

MS. MASON:  Sue Mason from Brack and Mason for cross defendants Beth DeCaprio and the Grace Foundation of Northern California.

MR. RYAN:  Timothy Ryan of the Ryan Firm for cross complainants Timothy Ryan and the Ryan firm.

THE VIDEOGRAPHER:  For the record, Beth DeCaprio and Cindy Walden are also present at the deposition.

Will the court reporter now please swear in the

8

1  witness.

2

3          PETER HEIMBIGNER

4     called as a witness, being first duly

5     sworn, was examined and testified

6     as follows:

7

8          EXAMINATION

9  BY MS. SAGHEB:

10    Q   Mr. Heimbigner, could you state your full name

11  for the record and spell your last name?

12    A   Yes, it's Peter Christian Heimbigner.  Last

13  name is spelled H-e-i-m-b-i-g-n-e-r.

14    Q   The oath that you took from the court

15  reporter -- Was the witness sworn?  Okay, I'm a little

16  tired this morning myself.

17        So you were sworn, and the oath that you took

18  from the court reporter is the same oath that you would

19  take in a court of law.  So the testimony that you give

20  here today has the same force and effect, meaning that

21  it's given under penalty of perjury as if you were

22  giving it in a court of law.

23        Do you understand that?

24    A   Yes.

25    Q   All right.

                                                    9

1          Have you ever had your deposition taken before?

2    A   No.

3    Q   All right.

4        Sir, what is the highest level of education you

5  have attained?

6    A   Bachelor of science degree.

7    Q   And where did you obtain the BS degree?

8    A   From the University of Nevada Reno.

9    Q   And what area of study was that in?

10    A   Sports science.

11    Q   Okay.

12        When did you obtain that degree?

13    A   I believe I graduated in 1994.

14        MR. JONES:  Keep your voice up, okay?

15        THE WITNESS:  Yeah.

16        MR. JONES:  It's easier for the court reporter.

17        THE WITNESS:  Sorry.

18  BY MS. SAGHEB:

19    Q   So since that -- Since 1994 have you had any

20  other formal or informal education?

21    A   No.

22    Q   All right.

23        And where are you currently employed?

24    A   For the County of Lassen.

25    Q   And what do you do for the County of Lassen?

                                                    10

1    A   I work for the department of public works as a

2  deputy director for facilities maintenance.

3    Q   Deputy director for facilities maintenance?

4    A   Facilities maintenance.

5    Q   Okay.

6        And what does your job entail?

7    A   Responsible for most of the county facilities,

8  including like buildings, grounds, cemeteries, airports.

9  It excludes roads, and then also animal control does

10  fall under there as oversight function.

11    Q   Okay.

12        So tell me what -- what kind of oversight

13  function you have for animal control?

14    A   Animal control has -- typically has a

15  supervisor out there and then I'm above that supervisor

16  out there.  I usually don't get involved in the daily

17  operation of the -- of the animal control.

18    Q   Okay.

19        So you said there is a supervisor out there.

20  Out where?

21    A   At the animal shelter.  They are not located --

22  Sorry, they are not located in the same building that I

23  am located in.

24    Q   Okay.

25        And what is the name of that supervisor?

                                                    11

1    A   We don't currently have -- that position is not

2  currently filled right now.

3    Q   Okay.

4        In 2011 was the position filled?

5    A   We -- I can't remember what time frame that the

6  supervisor left employment with the county.  It may have

7  been sometime in 2011 or following 2011.

8    Q   Okay.

9        Well, let's put it this way, who was the last

10  supervisor that you know about?

11    A   Judy Walesch.

12    Q   And do you know where Ms. Walesch is now?

13    A   No, I do not.

14    Q   And so if there is a supervisor -- Well, strike

15  that.

16        The animal shelter, that's about five miles

17  south of here, I think I passed it on the road coming

18  in?

19    A   Yes, it's a couple of miles down the road, yes.

20    Q   Does that animal shelter have facility to

21  accommodate horses?

22    A   No.

23        So whatever shelter is out there it cannot

24  accommodate or take care of horses?

25

                                                    12

**Page 13**

1    A    No.

2    Q    Okay.

3         Does Lassen County have a separate animal

4    shelter that can take care of horses?

5    A    No.

6    Q    Does Lassen County contract with any other

7    state, city or county facility for animal shelter

8    purposes?

9    A    On a regular type yearly basis or on an as

10   needed?

11   Q    Well, that's a good question and what I'm

12   wondering is, for example, if horses come into the

13   county's possession and they can't be accommodated at

14   the local animal shelter, what do you do with them?

15        MR. JONES:  Let me just object.  I think it's

16   overbroad and vague as to number of horses, that kind of

17   thing.

18   BY MS. SAGHEB:

19   Q    Okay.

20        Well, let's start generally.

21        MR. JONES:  He can answer it.

22   BY MS. SAGHEB:

23   Q    Yeah.

24        What do you do with them in general?

25   A    If I had a situation where we have custody of

**Page 14**

1    horses typically we try to resolve the situation at the

2    property, you know, if there's -- you know somebody's

3    trying to -- having problems caring for horses or

4    something like that we usually try to reach out to a

5    rescue and deal with the situation there so we don't

6    actually have to take possession of them.

7         If we do have to take possession of them we

8    utilize the fairgrounds facility.

9    Q    And what does that mean we utilize the

10   fairgrounds --

11   A    They have -- Sorry.

12   Q    No, I'm sorry, my fault actually.  I should

13   have gone through a list of admonitions with you.

14   You're represented by fine counsel.  I'm sure that he

15   has gone through those with you, but one of the rules,

16   it's kind of a mechanical process, I have to finish the

17   question and then you start, because the reporter, as

18   lovely as she is, can't take down two people talking at

19   the same time.

20        So you indicated that the county utilizes the

21   fairgrounds when it comes to sometimes keeping

22   possession of horses.  Can you tell me what that means?

23   A    They have the -- There's corrals there and we

24   have the building to put horses in there.  It's set up

25   for livestock situations.  Water is available there and

**Page 15**

1    we bring in feed and so forth.

2         It's on a temporary basis there.  It's not set

3    to do it all the time because we don't want to interfere

4    with the other operations there, if possible.

5    Q    Are the fairgrounds owned by the county as far

6    as you know?

7    A    Yes.

8    Q    Okay.

9         And when the situation calls for it and you

10   take horses out there, do you utilize county employees

11   to take care of them?

12   A    Yes.

13   Q    Okay.

14        And when is the last time you recall doing

15   that?

16   A    2012 sometime.  I don't recall.

17   Q    How long have you been in the position that you

18   identified as deputy director for facility maintenance?

19   A    Approximately January, February of 2006, I

20   believe.

21   Q    And you've held the same position since that

22   time?

23   A    Yes.

24   Q    Have your duties and responsibilities changed

25   in terms of the animal control section of your job?

**Page 16**

1    A    No.

2    Q    Okay.

3         Other than yourself, who else is involved in

4    animal control?  What other department or division is

5    involved in animal control in Lassen County?

6    A    I'm not -- What do you mean by involvement?

7    Q    Well, who is your direct supervisor when it

8    comes to issues related to animal control?

9    A    My immediate supervisor is the department head

10   for the department of public works.

11   Q    And who is that?

12   A    Larry Millar.

13   Q    Is it M-a-l-a-r?

14   A    It is M-i-l-l-a-r.

15   Q    What department, if you know, does Mr. Millar

16   work for?

17   A    The same department I work for, department of

18   public works.

19   Q    Okay.

20        Is animal control dealt with in any department

21   other than public works in Lassen County?

22        MR. JONES:  I will just object as vague, dealt

23   with.  I'm not sure what you mean by that.  If you

24   understand it you can go ahead.

25        THE WITNESS:  I'm not really clear.  I mean,

1  there's a rabies control function that the department
2  implemented, the division implements, but that is on
3  behalf of the health department.
4  BY MS. SAGHEB:
5    Q   Okay.
6        So when it comes to animal control in Lassen
7  County, the department that is primarily responsible for
8  that function would be your department, public works, is
9  that an accurate statement?
10   A   Yes.
11       MS. SAGHEB:  On the phone whoever is dialing
12  please stop.  Did somebody hang up?
13       MR. BALAM:  Do we still have everyone on the
14  phone?
15       MS. SAGHEB:  Why don't we have the reporter
16  hang up --
17       MR. RYAN:  This is Tim Ryan.  I'm still on the
18  phone.  I'm not sure what that beeping is about.
19       MS. MASON:  This is Sue Mason.  I'm still here.
20       MR. JONES:  Who was that?
21       MS. KOUVABINA:  Elena Kouvabina is on the
22  phone.
23       MS. MASON:  And so is Sue Mason.
24       MS. SAGHEB:  Okay.
25       Anybody know what the beeping is about?

                                                    17

1    Q   All right.
1        MS. MASON:  You know what, I think it's mine.
2  I don't know if it's my phone.
3        THE VIDEOGRAPHER:  Do you want to go off the
4  record?
5        MS. SAGHEB:  Give them a minute.  Let's see if
6  they can fix it.
7        MR. JONES:  Okay.
8        MR. RYAN:  This is Tim Ryan.  I don't hear any
9  more beeping.
10  BY MS. SAGHEB:
11   Q   All right.
12       So in 2006 -- Well, strike that.  Let's go back
13  to 2012.  You said that was the last occasion on which
14  you recall housing temporarily some horses at the
15  fairgrounds.
16       Since 2006 how many times do you estimate you
17  have had to do that?
18   A   Less than five occasions.
19   Q   Okay.
20       Now, I had initially asked you whether Lassen
21  County has agreements with any other governmental entity
22  for horse care specifically because your animal shelter,
23  you indicated, does not -- is not equipped to take care
24  of that.
25       So to the best of your knowledge does Lassen

                                                    18

1  County have any such agreements?
2    A   Specific to horse care?
3    Q   Specific to animal care that can't be
4  accommodated within your county?
5    A   No.
6    Q   Okay, all right.
7        In the half dozen or so occasions where you
8  have temporarily housed --
9        MR. GREENE:  Pardon me.
10       MR. JONES:  And just for the record, I know
11  we're in the middle of a question, but you said on the
12  half dozen occasions.  The testimony was less than five.
13       MS. SAGHEB:  Okay, let me rephrase the
14  question.
15       MR. JONES:  Thank you.
16  BY MS. SAGHEB:
17   Q   In the less than five occasions where horses
18  have temporarily been housed at the fairgrounds, can you
19  give me an estimate as to the largest number of horses
20  that you were able to accommodate on the fairgrounds for
21  whatever particular occasion it was?
22   A   Approximately five.
23   Q   Okay.
24       And what is your best estimate as to the
25  capacity of the fairgrounds for temporarily housing

                                                    19

1  horses?
2    A   The capacity would be driven by the ability of
3  staff to care for the animals there.  The fairgrounds
4  has a large capacity, which would exceed probably the
5  ability of staff to care for that amount of animals.
6    Q   Okay.
7        So taking into consideration your staff
8  limitations, what is the largest number of animals or
9  rather horses that can be taken care of at the
10  fairgrounds at any one time?
11   A   I really don't have an answer for that.  We've
12  never got to a situation where we have calculated the
13  number we could or couldn't care for there.
14       MS. SAGHEB:  Counsel on the phone, we don't
15  know whether it's you or whether it's internal to this
16  phone, but we hear a -- as if somebody is dialing
17  followed by several beeps.
18       If it's you, could you let us know and maybe
19  stop.  If it's us, then we need to take care of it so we
20  don't keep getting interrupted.
21       MR. RYAN:  This is Tim Ryan.  It sounds to me
22  like it's somebody on your end picking up the phone
23  trying to make an outgoing call on this line.
24       MS. SAGHEB:  Okay.
25       Well, let's -- Yeah.

                                                    20

**Page 21**

```
1   BY MS. SAGHEB:
2      Q   Let's change the topic a little bit.  I would
3   like to talk about your duties and responsibilities in
4   terms of retaining contractors or independent
5   contractors to provide services for the city.
6         Speaking in general --
7      MR. JONES:  County.
8   BY MS. SAGHEB:
9      Q   I'm sorry, for the county.
10        Speaking in general, do you have generally a
11  function that deals with retaining contractors or
12  independent contractors to retain -- or to provide
13  services for the county?
14     A   Yeah, I have the ability to engage with
15  consultants, contractors for services.
16     Q   And that -- does that include engaging
17  contractors to provide services in the area of animal
18  control?
19     MR. JONES:  Let me just object to the word
20  engage.  I know you both used it, but it hasn't been
21  defined and I don't know if it has some legal
22  ramification or not.
23     MS. SAGHEB:  Yeah.
24     MR. JONES:  I don't know if you intend engage
25  to mean contract or enter into an agreement with or
```

**Page 22**

```
1   what?
2   BY MS. SAGHEB:
3      Q   Right now we're going to agree that engage just
4   means the common English word, common English
5   understanding of the word engage.  It has no legal
6   meaning.  We haven't defined it yet, but with that in
7   mind do you have an ability within your position to
8   engage contractors to render services in the area of
9   animal control?
10     MR. JONES:  Well, again it is vague because I
11  don't know what the common definition is, but it could
12  mean talked to, it could mean write a letter to.
13        So I think we need to define that term engage
14  or ask the question in such a way that is more specific
15  as to what you're actually trying to get at.
16  BY MS. SAGHEB:
17     Q   Well, eventually we're going to be talking
18  about retaining them to provide services, but before you
19  do that you need to talk to them; right?
20     A   I can talk to them, yes.
21     Q   You can talk to them, good.
22        Can you write to them?
23     A   Yes, I can correspond with them.
24     Q   Okay.
25        You can write -- You can e-mail with them?
```

**Page 23**

```
1      A   Yes.
2      Q   Okay.
3         You can talk to them about how much they
4   charge?
5      A   Yes.
6      Q   Okay.
7         You can talk to them about what services they
8   can or cannot provide?
9      A   Yes.
10     Q   Okay.
11        You have the ability to evaluate whether or not
12  they can provide the services that they represent that
13  they can provide?
14     A   Yes.
15     Q   Okay.
16        So you perform an investigatory function in
17  making that evaluation; right?
18     A   To what extent?  I --
19     Q   Well, if you wanted to engage a horse ranch to
20  take care of some horses and they said they could, would
21  you, for example, go out there and make sure there's a
22  ranch out there?
23     A   Yes, I would seek out somebody that had -- that
24  could do that scope of service.  I guess I wouldn't be
25  looking for a guy that does concrete work to do some
```

**Page 24**

```
1   other function that he's not familiar with.
2      Q   Right.
3         So you investigate and you evaluate the
4   potential contractor, right, and determine whether or
5   not he can provide that service?
6      A   Yes.
7      Q   Okay.
8         And in engaging such a contractor do you in
9   your position have a limit as to the number of dollars
10  you are authorized to spend in that regard?
11     A   Yes.
12     Q   Okay.
13        And what is that limit?
14     A   It depends on what type of service I'm trying
15  to procure.
16     Q   Okay.
17        In this case we're talking about services
18  rendered to horses.  So let's talk about horse ranches
19  and -- in general and -- and determine what your
20  authority is in the County of Lassen to engage such a
21  service?
22     A   Well, that --
23     MR. JONES:  Well, again wait a minute.  Again
24  you went back to using the word -- Let me object it's
25  vague.  You went back to using the word engage where it
```

**Page 113**

1  asking for there.
2  BY MS. SAGHEB:
3      Q   Okay.
4          So you reviewed the document, but you just
5  didn't understand paragraph 6, is that your testimony?
6      A   It states what you have stated there, but I
7  don't -- Like I said, I'm not a -- I can't offer an
8  opinion on --
9      Q   The only question pending is did you understand
10 paragraph 6?
11     A   I can read it and understand it.
12     Q   Okay.
13     A   Do I understand it from an attorney's
14 standpoint, probably not, no.
15     Q   Yeah.
16         Well, we're not expecting you to be an attorney
17 today, just a witness and working for the County of
18 Lassen, and so in that capacity you read paragraph 6 and
19 you understood it; right?
20     MR. JONES:  Well, he just -- he has already --
21 Asked and answered twice.
22 BY MS. SAGHEB:
23     Q   Okay.
24         So you didn't --
25     MR. JONES:  He understands it as a lay person.

**Page 114**

1  That's what his testimony is.
2      MS. SAGHEB:  Okay, very good.
3  BY MS. SAGHEB:
4      Q   You didn't go to county counsel and seek an
5  understanding, a further understanding of paragraph 6,
6  did you?
7      A   I may have talked to county counsel with this.
8  I don't know that the -- I don't know if it was this one
9  I talked with county counsel about or the subsequent
10 one.  I'm -- Like I said, I'm not recalling explicit
11 conversations on this.
12         I knew when this came forward that it was a
13 legal document that I didn't have expertise to ascertain
14 everything that was in it.
15     Q   Okay.
16         Did Ms. Lozano share with you the idea that the
17 Whispering Pines Ranch was not a profitable business?
18     A   No, I didn't get -- I don't recall -- What --
19 No, I don't recall that in the conversation.
20     Q   Okay.
21         Did she indicate to you that she was going to
22 resign her position as receiver?
23     A   I don't recall.
24     Q   Okay.
25     A   I can tell you what I do recall from the

**Page 115**

1  conversation.
2      Q   Okay, go ahead.
3      A   Just that we were aware that there were horses
4  on the property, she was unsure of how to deal with
5  them.  I mentioned that I had been working with a
6  rescue, that there may be a way to engage them to, you
7  know, deal with the horses up there.
8      Q   And when you were talking about a rescue you
9  were talking about the Grace Foundation; correct?
10     A   Yes.
11     Q   Did you indicate to Ms. Lozano during that
12 conversation or at any time prior to August 26th, 2011
13 that engaging the Grace Foundation would cost money?
14     A   I don't really recall.  I was just trying to
15 facilitate what was going on at the Whispering Pines
16 Stables and I said, hey, there is a resource out here
17 that may be able to help with what you're dealing with
18 up there.
19         So I was trying to be the facilitator to put
20 those two parties together.
21     Q   And why is that?
22     A   Because they had a situation that they were
23 trying to deal with and I knew of the Grace Foundation.
24 I thought it might be applicable to put them together
25 and talk.

**Page 116**

1      Q   Well, just to be clear, the Whispering Pines
2  horses were no -- were not in any imminent danger, as
3  you have testified to this morning; right?
4      A   Yes, that is what I testified to.
5      Q   Okay.
6          And so something must have led you to believe
7  that the government should be involved in this transfer;
8  right?
9      A   No, that is incorrect.
10     Q   Okay.
11     A   I didn't believe the government necessarily had
12 to be involved in the transfer.
13     Q   Okay.
14         Well, I didn't say had to be.  I said should
15 be.  Did something lead you to believe that the
16 government should be involved in this transfer?
17     A   No.
18     Q   Okay.
19         No court told you that, did they?
20     A   Well, the 29th court order did involve the
21 county.
22     Q   Right, let's talk about the -- the time period
23 from the 21st when the first order was issued and the
24 29th.
25     A   Yes.

**Page 137**

1     A  Because at that time the Grace Foundation was
2 involved with the removal of the horses or there was
3 discussion about them being involved with the removal of
4 the horses from the property, I believe.
5     Q  Well, how does that change the form that you
6 use to surrender animals? How does the Grace
7 Foundation's involvement or ABC Horse Ranch involvement
8 change the form that Lassen County uses to surrender
9 animals?
10     A  It appeared to be a unique situation that the
11 -- I did not construct this, you know, court order, that
12 the animals were going to be surrendered through to the
13 county and that the Grace was interested in being able
14 to receive the animals.
15     Q  You did not deem -- I'm sorry, did you say I
16 did not deem the court order to be a surrender of the
17 animals to the county?
18     A  No, I said the court order -- At that time that
19 Grace was in the loop on the Whispering Pines situation.
20     Q  Okay.
21     A  And we knew that they were in play with, you
22 know, the nice term of art there, that they were going
23 to be involved with possibly removing the animals on
24 that. So then by the time we got to the date that they
25 were removed that's when that document that created, the

**Page 138**

1 unique one for that situation, the 26th document from
2 August.
3     Q  Let me ask you, Mr. Heimbigner, do you use
4 different county forms for different animal service
5 facilities?
6     A  Not typically, no.
7     Q  So somehow you knew that the transfer of these
8 Whispering Pines horses was not a typical transfer;
9 right?
10     A  Well, the fact that the court was involved was
11 definitely non-typical.
12     Q  Okay.
13     Anything else, other than court involvement,
14 anything else that made the transfer of the Whispering
15 Pines horses unique?
16     MR. BALAM: Misstates prior testimony.
17     MR. RYAN: Objection, vague and ambiguous,
18 unintelligible.
19     MR. JONES: Rather than unique you mean
20 atypical, I suppose. Is that fair enough?
21     MS. SAGHEB: That's fair enough.
22     MR. JONES: Okay.
23     THE WITNESS: I had never been involved where
24 we had a court order stating this is, you know, what's
25 involved regarding animals.

**Page 139**

1 BY MS. SAGHEB:
2     Q  I'm just wondering why you felt compelled to
3 create an entirely new form for a process called
4 surrender in a court document for which Lassen County
5 already had a form?
6     A  Because this was turning out to be a different
7 process than we have ever dealt with before.
8     Q  Okay.
9     And how so, that's what I'm trying to ask?
10     A  The court was involved.
11     Q  Okay.
12     How --
13     A  We've never had the court be involved in a
14 situation -- well, to my knowledge be involved.
15     Q  Okay.
16     Other than the court being involved was there
17 anything else that made this an atypical situation?
18     A  The number of parties, I guess, that were
19 involved with the situation.
20     Q  Okay.
21     A  We had a receiver. You had a bank attorney.
22 You had the property owner, I guess, or through his
23 attorney or pro per whatever. It was a pretty unique
24 situation at least from my layman's view of things.
25     Q  Okay.

**Page 140**

1     So based on your testimony before when the
2 receiver was ordered to surrender the horses to Lassen
3 County she surrendered ownership of those horses; right?
4     A  To be honest with you --
5     Q  I wish you would be. I think you're required
6 to be.
7     MR. BALAM: I'm sorry, what was the question?
8     (The record was read by the reporter
9     as follows:
10     So based on your testimony before when
11     the receiver was ordered to surrender
12     the horses to Lassen County she
13     surrendered ownership of those
14     horses; right?)
15     MR. BALAM: Lacks foundation, calls for legal
16 conclusion, expert opinion.
17     MR. JONES: It does, and also mischaracterizes
18 his testimony as to the use of the form.
19 BY MS. SAGHEB:
20     Q  Okay, go ahead.
21     A  The way that this was structured wasn't
22 necessarily how ideally I -- the county -- I was
23 surprised how the judge had, you know, again I'm not
24 sure, you know, you've said that Mr. Ryan was the one
25 that developed this or whatever for the judge to sign.

1    The role I saw the county being in this was a
2    facilitator to pass the animals through to the Grace
3    Foundation from the receiver. That's the role I saw the
4    county playing. That's what I stated in my 22nd, July
5    22nd letter. That's how I saw it.
6    The way this was structured here I was -- I
7    wasn't -- I wasn't -- it was somewhat problematic to me.
8    I thought, okay, the county does not want to be the
9    direct middleman on this.
10   Q    Okay.
11        So did you voice those problems, those issues
12   to anybody?
13   A    I talked with our counsel.
14   Q    Well, you don't -- you don't need to tell me
15   anything you told your attorney.
16   A    Well, that's --
17   Q    I'm talking about did you give notice to
18   anybody, the world, the court, Mr. Ryan, the Grace
19   Foundation, Lozano, did you give notice to anybody that
20   this was a problematic transfer as far as the county was
21   concerned?
22        MR. BALAM: Calls for a legal conclusion, vague
23   and ambiguous.
24        MR. JONES: I agree, join.
25        THE WITNESS: Based on what the parties

141

1    involved were saying it appeared to me that it was
2    workable to remove the horses from the property as far
3    as the parties involved with it, so --
4    BY MS. SAGHEB:
5    Q    So you agreed to take ownership of those horses
6    by way of a surrender from --
7    A    I did not agree to take -- Sorry, excuse me.
8    Q    You have to let me finish.
9    A    Pardon me.
10   Q    So you believed it was workable so you looked
11   at the order, understood the order, and agreed that the
12   county would, by way of surrender, take ownership of
13   those animals and then transfer them to the Grace
14   Foundation?
15        MR. JONES: Objection, it's hopelessly compound
16   and it mischaracterizes his testimony.
17        MR. BALAM: Join, legal conclusion, expert
18   opinion, document speaks for itself as well.
19        MR. JONES: You don't need to answer that.
20        MS. SAGHEB: Oh, I didn't hear an instruction.
21        MR. JONES: Why don't you ask one that doesn't
22   have like five different parts to it.
23        MS. SAGHEB: Okay, I will give it a go.
24        MR. JONES: Thanks.
25   ///

142

1    BY MS. SAGHEB:
2    Q    So --
3        MR. JONES: And hopefully not mischaracterizes
4    his testimony about taking ownership of the horses.
5        MS. SAGHEB: It's not my testimony. It's his
6    testimony.
7        MR. JONES: Right, and I'm just asking that you
8    not mischaracterize it in asking him any further
9    questions.
10   BY MS. SAGHEB:
11   Q    Well, let's get a clarification, then, because
12   I think it might be important for us to understand
13   exactly what you're saying in terms of surrender.
14        Is it your testimony that when animals are
15   surrendered that possession and custody are transferred?
16        MR. JONES: Objection, vague. He has already
17   testified about the form and the form wasn't used.
18        MR. BALAM: Join, legal conclusion.
19        MR. JONES: So it calls for speculation.
20        MR. BALAM: Join, legal conclusion.
21        MR. RYAN: Objection it calls for a legal
22   conclusion.
23        MR. JONES: It does.
24        MR. RYAN: Join in the other objections.
25        MR. JONES: Go ahead.

143

1        THE WITNESS: Reporter, please read the
2    question back to me.
3        MS. SAGHEB: And please put the question again
4    for -- you know, in the transcript.
5        (The record was read by the reporter
6        as follows:
7        QUESTION: Well, let's get a
8        clarification, then, because I think
9        it might be important for us to
10       understand exactly what you're saying
11       in terms of surrender.
12       Is it your testimony that when animals
13       are surrendered that possession and
14       custody are transferred?)
15       THE WITNESS: In a standard situation regarding
16   this form, yes.
17   BY MS. SAGHEB:
18   Q    Okay.
19       Did you tell anybody that this was not the
20   standard situation?
21   A    Tell who?
22   Q    Anybody?
23   A    I don't know that I went and told him. No, I
24   don't, no.
25   Q    Okay.

144

36 (Pages 141 to 144)

1      Did you, for example, send a memo in your
2  office saying we're surrendering animals, but we're not
3  giving the standard possession and ownership in this
4  deal, did you do that?
5      A    We -- We weren't surrendering animals.
6      Q    Okay.
7      We're accepting animals pursuant to Lozano's
8  surrender, but we're not taking custody or ownership in
9  this particular case, did you send a memo?
10      MR. BALAM: Misstates the documents, testimony.
11      MR. JONES: Join.
12      THE WITNESS: No, I didn't send a memo.
13  BY MS. SAGHEB:
14      Q    Okay.
15      Did you tell anybody at the Grace Foundation
16  that this surrender that Lozano surrendered to the
17  county was somehow different than the word surrender as
18  used on the Lassen County Surrender Form?
19      MR. BALAM: Vague and ambiguous.
20      MR. JONES: Join.
21      THE WITNESS: I don't -- I don't know what the
22  judge's --
23  BY MS. SAGHEB:
24      Q    It's a yes or no question.
25      A    -- interpretation of the surrender. That's --

145

1      Q    It's a yes or no question.
2      Did you tell the Grace Foundation that Lozano's
3  surrender of the horses to the county was somehow
4  different than the word surrender as it's used in the
5  Lassen County Animal Surrender Form?
6      A    I don't --
7      MR. BALAM: Vague and ambiguous.
8      THE WITNESS: -- recall.
9  BY MS. SAGHEB:
10      Q    So you might have told them, you just recall?
11      A    I don't recall what I talked about with Lozano
12  and --
13      Q    We're talking --
14      A    -- or -- or the Grace Foundation.
15      Q    Okay.
16      So your testimony is you may have told them
17  it's not an actual surrender from Lozano to the county,
18  but as you sit here you just can't recall one way or the
19  other?
20      A    No --
21      MR. BALAM: Misstates prior testimony.
22      THE WITNESS: I don't believe I said it was
23  different than this.
24  BY MS. SAGHEB:
25      Q    Okay.

146

1      A    But --
2      Q    And this meaning Exhibit 7?
3      A    Correct.
4      Q    Okay.
5      On Exhibit 7 does it provide that the owner is
6  to relinquish the animals?
7      MR. BALAM: The document speaks for itself,
8  calls for a legal conclusion, expert opinion.
9      MR. JONES: You're just directing his attention
10  to that section, I take it?
11      MS. SAGHEB: Right.
12      MR. JONES: Okay.
13      So now he has got the phrase in mind. Is there
14  a question that goes with that?
15      MS. SAGHEB: Okay, yes, there is.
16  BY MS. SAGHEB:
17      Q    So in this form -- You know actually can I ask
18  you a foundational question.
19      How many times since 2006 have you used this
20  surrender form that we marked as Exhibit 7?
21      A    Myself personally?
22      Q    Yeah, where you have been involved in the
23  transaction at least?
24      A    I don't -- I don't get into the daily
25  operations --

147

1      Q    Okay.
2      A    -- on this.
3      Q    And who -- who typically does use these forms?
4      A    It would be the staff at the shelter.
5      Q    Okay.
6      So were you involved in the transfer involving
7  Exhibit 7?
8      A    I was on the property when the discussions with
9  Mr. Bennett were occurring, yes, for the April horses.
10      Q    Okay.
11      What about when the document was actually
12  filled out, were you the one who prompted the use of
13  this particular form?
14      A    No, I believe it was our animal control
15  officer.
16      Q    Okay.
17      So the animal control officers' routine, their
18  basic practice in the transfer of animals when they are
19  being surrendered or relinquished is the use of Exhibit
20  7; right?
21      A    Yes.
22      Q    When you read the July 29th order on page 3,
23  first paragraph --
24      A    Yes.
25      Q    -- where it says that Mr. Bennett is to

148

37 (Pages 145 to 148)