# EXHIBIT O

1  Jill N. Robbins, SBN 227796
   LAW OFFICES OF EUGENE B. CHITTOCK
2  100 South Lassen Street
   Susanville, CA 96130
3  Telephone: (530) 257-9351
   Facsimile: (530) 257-9359
4
   Attorneys for Vicki Lozano, Receiver
5

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  IN AND FOR THE COUNTY OF LASSEN

9
   NORMAN W. ALLEN,                          Case No. 45679 (Consolidated with
10                                           Case No. 50324)
             Plaintiff,
11                                           Unlimited Jurisdiction
       v.
12                                           RECEIVER'S FINAL ACCOUNT
   SUMMIT FINANCIAL GROUP; DANA              AND REPORT; PETITION FOR
13 CAPITAL CORP.; STEVE WEICH; ROD           ITS SETTLEMENT, FOR
   HOSILYK; DWIGHT A. BENNETT; JUDITH        APPROVAL OF RECEIVER AND
14 A. ST. JOHN; WILSHIRE CREDIT              ATTORNEY FEES REQUEST TO
   CORPORATION; EVANS APPRAISAL             DISCHARGE RECEIVER
   SERVICES, INC.; AND DOES 1-10,
15
             Defendants.
16
17 NORMAN W. ALLEN,

18           Plaintiff,

19     v.

20 T.D. SERVICE COMPANY; WELLS FARGO
   BANK, N.A., as Trustee for the MLMI Trust
21 Series 2005-HE3; and DOES 1-10,

22           Defendants.

23

24

25

26                                   

27

                                     i

WELLS FARGO BANK, N.A., as Trustee for
MLMI Trust Series 2005-HE3; and BAC HOME
LOANS SERVICING, LP, a Texas limited
partnership, successor by merger to Wilshire
Credit Corporation, erroneously sued as BAC
Home Loan Servicing, LLP,

        Cross-Complainants,

v.

NORMAN W. ALLEN; DWIGHT A.
BENNETT; JUDITH A. ST. JOHN; EVANS
APPRAISAL SERVICES, INC.; and ROES 1-10,

        Cross-Defendants.

AND ALL OTHER CROSS-ACTIONS

VICKI LOZANO, the duly appointed, qualified, and acting receiver renders her final

account and report of her administration, covering the period from July 21, 2011 to October 29,

2012 as follows:

## SUMMARY OF ACCOUNT
### July 21, 2011 through October 29, 2012

Petitioner should be charged and credited as shown in the following Summary of Account

for the period of July 21, through October 29, 2012, supported by the schedules referred to,

which are incorporated here by reference:

### CHARGES

| | |
|---|---|
| Beginning Cash Assets: | $      0.00 |
| Income (Schedule A): | $22,703.30 |
| **TOTAL CHARGES** | **$22,703.30** |

### CREDITS

| | |
|---|---|
| Expenditures (Schedule B): | $20,818.19 |
| Cash Assets in hands of receiver (Schedule C): | $ 1,885.11 |
| **TOTAL CREDITS** | **$22,703.30** |

2

1    This summary of account is with respect to the cash assets of the estate only, and does not

2    include any real or personal property. The real and personal property of the estate has not been

3    appraised or sold by this receiver, making it difficult to assign cash values for the purposes of an

4    accounting. Further, squatters and vandals have frequented the property in spite of receiver's

5    efforts to prevent them from doing so, and thus, she does not guarantee that all of original assets

6    continue to be part of the estate. This matter is dealt with in more detail in the Inventory being

7    served and filed simultaneously with this Report.

8    There are six individuals named in the expenditure schedule of this accounting who were

9    employed by the receiver to assist in maintenance of the property: Dan Gaumont, Mike Gribble,

10   Nick Lozano, Jonathan Tripp, Lena Lozano and Tony Dixon. Mainly, they were hired to feed

11   and water the horses while they remained on the property. All but four of the horses ran free in a

12   heard which ate twelve bales of hay each day. In order to feed the horses, one person had to

13   drive a truck while another tossed the hay out as the driver circled the property. The remaining

14   four horses required extra care, as they were under weight and would not get enough food in a

15   heard situation. They were put in corrals and fed twice a day. In addition, the horses required

16   water twice a day. It took approximately one to one and a half hours each time to fill the horse

17   troughs with water, since the water was coming from a well system. While the troughs were

18   filling, the workers would brush the horses and apply fly spray to the ones that were tame

19   enough.

20   Payment for the six different workers varied and was based on the following:

21   Dan Gaumont: fed and watered the horses while the receiver was out of town for five

22   days for a fee of one hundred dollars ($100.00) per day.

23   Mike Gribble: fed and watered the horses on an emergency basis the first three days after

24   the receiver was appointed for a fee of seventy-five ($75.00) per feeding.

25   Nick Lozano (the receiver's son): fed and watered the horses twenty-one times for a fee

26   of twenty-five ($25.00) per feeding.

27   Jonathan Tripp: fed and watered the horses fifteen time for a fee of twenty-five ($25.00)

Receiver's Final Account and Report; Petition for its Settlement, for Approval of Receiver and Attorney Fees and Request
to Discharge Receiver

per feeding.

Lena Lozano (the receiver's daughter): fed and watered the horses and assisted with a few other duties for a total of 82.5 hours. She was paid $8.00 per hour for a total of $660.00. Her time sheet is attached to this Report as **EXHIBIT A**, and incorporated by this reference.

## REPORT OF ADMINISTRATION

Vicki Lozano was appointed receiver herein by an order of this Court duly made and entered on July 21, 2011. Immediately thereafter, she qualified to act as receiver by executing the oath required by law and filing a bond in the amount of $10,000 as fixed by the Court. Pursuant to the Court's order, the receiver took possession and control over the real property which is the subject of this action (APN 099-260-69, also known as "the 40 acres" and 099-260-70, also known as "the 14.03 acres"). As part of her duties, receiver inventoried all of the property at the ranch, assured that the horses were cared for while they were on the property, dealt with third parties making claims on various pieces of personal property, made extensive efforts to secure the property, maintained insurance, paid bills and took over all other administration of the receivership estate. Her services are itemized in the attached statements, attached hereto as **EXHIBIT B** and incorporated by this reference. The total unpaid balance of the attached statements is $43,761.50. Based on the time expended in performance of her duties, this is a reasonable and fair amount to be allowed to her as compensation for her services as receiver as well as reimbursement for money she expended in maintaining the horses.

Receiver's fees are charged at $190 per hour. The amount for her services was agreed to by Mr. Tim Ryan of the Ryan Firm, who also assured Receiver that his client would be responsible for her fees (see attached **EXHIBIT C**, letter from Tim Ryan to Vicki Lozano, dated March 29, 2011). Thus, in the absence of cash assets available to pay receiver's fees from the receivership estate, they should be paid by Mr. Ryan's clients, Wells Fargo and BAC Home Loans Servicing. It has been over a year since Ms. Lozano originally submitted her first bill to Mr. Ryan and she has not received any payment for her services to this date. Thus, Receiver

1    requests that the court approve her fees and order payment from Wells Fargo and BAC.

2    In addition, Ms. Lozano requests approval and payment of her attorney fees. Pursuant to

3    the order of this Court, receiver employed the Law Offices of Eugene B. Chittock as her attorney

4    to represent her in matters pertaining to the administration of the receivership estate; the attorney

5    performed the services and has submitted to receiver itemized statements, copies of which are

6    attached hereto as **Exhibit D**, for services rendered to the date of filing this petition in the

7    amount of $5,403.00. Receiver is informed and believes that the amount stated represents the

8    reasonable value of the services rendered; the attorney has already been paid the sum of

9    $1,500.00 towards these services from the receivership estate, leaving an outstanding balance of

10   $3,903.00. In addition, receiver anticipates an additional $900.00 in attorney fees for appearance

11   at the hearing on this accounting, as well additional time to assist her with winding down the

12   receivership (3 hours at $300.00 per hour). Thus, receiver requests that the court order Wells

13   Fargo and BAC to pay the sum of $4,803.00 to the Law Offices of Eugene B. Chittock, and to be

14   responsible for any additional attorney fees reasonably incurred in concluding the receivership.

15   WHEREFORE, receiver prays as follows:

16   1.    After due notice is given and proceedings had, this Court make its order settling and

17   approving this Final Account and Report;

18   2.    Wells Fargo and BAC be authorized and directed to pay the sum of $4,803.00 to the

19   Law Offices of Eugene B. Chittock;

20   3.    Wells Fargo and BAC be authorized and directed to pay Receiver the sum of

21   $43,761.50 as compensation and reimbursement for her services and expenditures as receiver

22   4.    Wells Fargo and BAC be ordered to pay any additional compensation earned by

23   receiver from October 31, 2012 until her duties as receiver are complete;

24   5.    This Court order and direct the manner in which the funds and assets remaining in

25   receiver's hands are to be distributed;

26   6.    On distribution of the funds and assets in accordance with the Court's order,

27   receiver be discharged and that her bond be exonerated.

28

LAW OFFICES OF EUGENE B. CHITTOCK

Dated: 10/30/12 , 2012

By _____
JILL N. ROBBINS, Attorneys for Petitioner

Dated: 10/30/12 ,2012

_____
VICKI LOZANO, Receiver

**VERIFICATION**

I, Vicki Lozano, the Receiver in this matter, declare that I have read the foregoing Account and Report and know its contents, which are true to my own knowledge except for those matters stated on my information and belief, and as to those matters I believe the petition to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 10/30/12

_____
VICKI LOZANO, Receiver

Receiver's Final Account and Report; Petition for its Settlement, for Approval of Receiver and Attorney Fees and Request to Discharge Receiver

**NORMAN W. ALLEN v. SUMMIT FINANCIAL GROUP, et. al. RECEIVERSHIP**
**SCHEDULE A- RECEIPTS**
**July 21, 2011- August 1, 2012**

<u>Plumas Bank Checking Account #*****1598</u>

| <u>Date</u> | <u>Payor</u> | <u>Description</u> | <u>Amount</u> |
|---|---|---|---|
| 8-1-11 | Receiver | Contribution from Receiver | 5,000.00 |
| 8-4-11 | T-Mobile | Cell Tower Payment | 900.00 |
| 8-15-11 | Receiver | Contribution from Receiver | 3,000.00 |
| 8-23-11 | T-Mobile | Cell Tower Payment | 900.00 |
| 9-22-11 | T-Mobile | Cell Tower Payment | 900.00 |
| 10-21-11 | T-Mobile | Cell Tower Payment | 900.00 |
| 12-5-11 | T-Mobile | Cell Tower Payment | 900.00 |
| 1-5-12 | T-Mobile | Cell Tower Payment | 900.00 |
| 1-31-12 | T-Mobile | Cell Tower Payment | 960.30 |
| 2-24-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 3-23-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 4-27-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 5-25-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 6-26-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 7-25-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 8-23-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 9-18-12 | T-Mobile | Cell Tower Payment | 927.00 |
| 10-23-12 | T-Mobile | Cell Tower Payment | 927.00 |

**TOTAL RECEIPTS**                                        $22,703.30

# NORMAN W. ALLEN v. SUMMIT FINANCIAL GROUP, et. al. RECEIVERSHIP
## SCHEDULE B- EXPENDITURES
### July 21, 2011- October 29, 2012

### Plumas Bank Checking Account #*****1598

| Date | CK # | Payee | Description | Amount |
|------|------|-------|-------------|--------|
| 8-2-11 | 101 | Barnum Farming | Hay | 675.00 |
| 8-5-11 | 2 | Barnum Farming | Hay | 1,300.00 |
| 8-12-11 | 3 | The Pardner | Fly spray /chicken feed | 33.34 |
| 8-12-11 | 4 | Dan Gaumont | Horse Feeding | 500.00 |
| 8-14-11 | 5 | Barnum Farming | Hay | 2600.00 |
| 8-22-11 | 101 | LMUD | Electricity | 50.00 |
| 8-23-11 | 102 | Schroeder, Inc. | Consulting/Appraisal of Whispering Pines business | 375.00 |
| 8-15-11 | 6 | Mike Gribble | Animal Expense | 300.00 |
| 9-2-11 | 103 | Billington Ace Hardware | Ranch | 78.77 |
| 9-5-11 | 104 | LMUD | Electricity | 328.81 |
| 9-5-11 | 105 | Fed Ex | Shipping Charges | 20.99 |
| 9-6-11 | 107 | Pregill Insurance | Insurance | 469.44 |
| 9-11-11 | 108 | UPS Store | Receiver sign - Ranch | 45.59 |
| 9-11-11 | 109 | Nick Lozano | Feeding - Ranch | 525.00 |
| 9-11-11 | 110 | Jonathan Tripp | Feeding - Ranch | 375.00 |
| 10-5-11 | 111 | Billington Ace Hardware | Ranch | 88.74 |
| 10-18-11 | 112 | LMUD | Electricity | 327.15 |
| 10-26-11 | 113 | Sequoia Premium Finance | Insurance | 843.75 |
| 12-21-11 | 115 | Pardner | Chicken Feed | 13.75 |
| 12-23-11 | 114 | Wal-Mart | | 22.50 |

| 1-3-12 | 116 | Tony Dixon | Heaters to prevent pipes from freezing | 100.00 |
| 1-6-12 | 117 | Lena Lozano | Hours worked | 660.00 |
| 1-9-12 | 118 | Billington Ace Hardware | Ranch | 169.59 |
| 1-9-12 | 119 | LMUD | Electricity | 55.34 |
| 1-9-12 | 120 | Tony Dixon | Property Security Patrol | 129.00 |
| 2-12-12 | 121 | Vicki Lozano | Reimbursement | 2099.80 |
| 3-6-12 | 122 | LMUD | Electricity | 202.89 |
| 3-29-12 | 123 | Garoppo Locksmith | Rekey locks/keys made | 209.98 |
| 5-4-12 | 124 | Womack Plumbing | Plumbing | 425.00 |
| 5-18-12 | 125 | LMUD | Electricity | 57.26 |
| 5-18-12 | 126 | Vicki Lozano | Reimbursement | 4,000.00 |
| 5-31-12 | | Service Charge | Bank Charge | 9.00 |
| 6-30-12 | | Service Charge | Bank Charge | 9.00 |
| 7-17-12 | 127 | Sequoia Premium Finance | Insurance | 121.89 |
| 7-17-12 | 128 | LMUD | Electricity | 40.00 |
| 7-31-12 | | Service Charge | Bank Charge | 9.00 |
| 8-12-12 | 129 | LMUD | Electricity | 20.00 |
| 8-12-12 | 130 | Eugene B. Chittock | Attorney Fees | 1,500.00 |
| 8-12-12 | 131 | Sequoia Premium Finance | Insurance | 576.79 |
| 8-31-12 | | Service Charge | Bank Charge | 9.00 |
| 9-7-12 | 132 | Billington Ace Hardware | Ranch Supplies | 134.34 |
| 9-30-12 | | Service Charge | Bank Charge | 9.00 |
| 10-2-12 | 133 | Sequoia Premium Finance | Insurance | 288.07 |
| 10-5-12 | 134 | LMUD | Electricity | 40.24 |
| 10-5-12 | 135 | Donahue Glass | Board up windows | 687.77 |

| 10-19-12 | 136 | Donahue Glass | Board up windows | 75.00 |
| 10-23-12 | 137 | Vicki Lozano | Bond Fee | 200.00 |
| 10-23-12 | 138 | Vicki Lozano | Reimbursement for postage | 7.40 |

|  |  |  | **TOTAL EXPENDITURES** | $20,818.19 |

NORMAN W. ALLEN v. SUMMIT FINANCIAL GROUP, et. al. RECEIVERSHIP

SCHEDULE C- CASH ASSETS

July 21, 2011- October 29, 2012

Funds held in receivership account                                    $1,885.11

EXHIBIT A

8/31/11

Lena Lozano
405 N. Spring St
Susanville, Ca  9613

| Date | Times | Hours | |
|------|-------|-------|--|
| 7/25/11 | 7:00-11:00 AM   6:00-7:30 PM | 3.5 | Watered & fed horses. |
| 7/26/11 | 7:00-10:00 AM   6:00-7:00 PM | 4 | 2 hr inventory, 2 hr water & feed horses |
| 7/27/11 | 7:00-10:00 AM   6:00-8:00 PM | 5 | 2 hr inventory 3 hrs feed & water horses |
| 7/28/11 | 7:00-8:00  AM   5:00-6:30 PM | 2.5 | Watered & fed horses. |
| 7/29/11 | 7:00-8:30 AM   5:30-7:00 PM | 3 | Watered & fed horses. |
| 7/30/11 | 10:30A M-12:00 PM   5:00-6:00 PM | 2.5 | Watered & fed horses. |
| 7/31/11 | 8:30-11:00 AM   1:00-3:00 PM | 4.5 | Watered & fed horses. |
| 8/1/11 | 7:00-8:30 AM   4:45-6:30 PM | 3.25 | Watered & fed horses. |
| 8/2/11 | 7:00-8:30 AM   4:30-6:30 PM | 3.5 | Watered & fed horses. |
| 8/3/11 | 7:00-8:30 AM   5:00-6:30 PM | 3 | Watered & fed horses. |
| 8/4/11 | 7:00-8:30 AM   7:00-9:00 PM | 3.5 | Watered & fed horses. |
| 8/5/11 | 7:00-8:30 AM   5:00-6:30 PM | 3 | Watered & fed horses. |
| 8/11/11 | 7:00-8:30 AM   5:00-6:30 PM | 3 | Watered & fed horses. |
| 8/12/11 | 7:00-8:00 AM   5:00-6:30 PM | 2.5 | Watered & fed horses. |
| 8/13/11 | 10:30 AM-2:00 PM   5:00-6:00 PM | 4.5 | 3 hr inventory 1.5 Watered & fed horses |
| 8/14/11 | 8:30-10:00 AM   5:00-6:30 PM | 3 | Watered & fed horses. |
| 8/15/11 | 5:00-6:30 PM | 1.5 | Watered & fed horses. |
| 8/16/11 | 5:00-6:30 PM | 1.5 | Watered & fed horses. |
| 8/17/11 | 5:00-7:00 PM | 2 | Watered & fed horses. |
| 8/18/11 | 5:00-7:00 PM | 2 | Watered & fed horses. |
| 8/19/11 | 3:30-5:15 PM | 1.75 | Watered & fed horses. |
| 8/20/11 | 12:00-1:30 PM   5:00-6:30 PM | 3 | Watered & fed horses. |
| 8/21/11 | 10:00 AM-12:00 PM | 2 | Watered & fed horses. |
| 8/22/11 | 5:30-7:30 PM | 2 | Watered & fed horses. |
| 8/23/11 | 5:30-7:30 PM | 2 | Watered & fed horses. |
| 8/24/11 | 5:45-7:15 PM | 1.5 | Watered & fed horses. |
| 8/25/11 | 5:30-7:30 PM | 2 | Watered & fed horses. |
| 8/26/11 | 7:00 AM-2:00 PM Rescue | 7 | Horse rescue day. |

Total hours 82.5 X $8.00 per hour + $660.00

# EXHIBIT B

# Statement

Vicki Lozano
Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date |
|------|
| 10/30/2012 |

| To: |
|-----|
| Wells Fargo |

| | Amount Due | Amount Enc. |
|---|------------|-------------|
| | $43,761.50 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 06/30/2011 | Balance forward | | 0.00 |
| 08/21/2011 | INV #1. | 1,463.00 | 1,463.00 |
| 08/21/2011 | INV #2. | 4,522.00 | 5,985.00 |
| 08/21/2011 | INV #3. | 3,458.00 | 9,443.00 |
| 08/21/2011 | INV #4. | 4,465.00 | 13,908.00 |
| 08/21/2011 | INV #5. | 3,249.00 | 17,157.00 |
| 08/31/2011 | INV #6. | 6,194.00 | 23,351.00 |
| 01/01/2012 | INV #7. | 6,155.50 | 29,506.50 |
| 02/08/2012 | INV #8. | 2,099.80 | 31,606.30 |
| 02/11/2012 | INV #9. | 8,000.00 | 39,606.30 |
| 02/13/2012 | PMT #121. Funds from receiver trust account | -2,099.80 | 37,506.50 |
| 05/18/2012 | PMT #126. Funds from receiver trust account | -4,000.00 | 33,506.50 |
| 07/30/2012 | INV #10. | 5,324.50 | 38,831.00 |
| 10/22/2012 | INV #11. | 4,930.50 | 43,761.50 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 0.00 | 4,930.50 | 0.00 | 0.00 | 38,831.00 | $43,761.50 |

Vicki Lozano

# Invoice

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 8/21/2011 | 1 |

**Bill To**

Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave  Suite 200
Anaheim, Ca  92807

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.35 | 7-21-11  Received bond application via e-mail, printed, completed, scanned and sent it back via e-mail. | 190.00 | 66.50 |
| 4 | 7/21/11  Met with Tim Ryan at ranch, interviewed occupants that were living on property, ordered hay, walked property with Judith St. John and Glen Close, took pictures of entire property for preliminary inventory, cowboys picked up hay and fed horses, | 190.00 | 760.00 |
| 0.25 | 7-22-11  Spoke with Donna at Lassen County animal control about the past and present issues with the horses.  Donna advised me to call Pete Heimbigner with Lassen County. | 190.00 | 47.50 |
| 0.1 | 7-22-11  Left message for Pete Heimbigner | 190.00 | 19.00 |
| 0.25 | 7-22-11  Pete Heinbigner called me.  We spoke about the horse neglect happening at Whispering Pines.  20 horses were removed in April 2011 and they would like to remove the rest.  Lassen County did not have the legal authority to remove the horses. | 190.00 | 47.50 |
| 0.5 | 7-22-11  Called Jeff Pregill with Pregill Insurance about placing insurance on the Whispering Pines. | 190.00 | 95.00 |
| 0.75 | 7-22-11  Reviewed receivership court order. | 190.00 | 142.50 |
| 0.25 | 7-22-11  Spoke with Dwight Bennett about receivership and feeding horses over the weekend. | 190.00 | 47.50 |
| 0.25 | 7-22-11  Spoke with Tim Tyler about indemnity agreement and my conversation with Pete Heimbigner.  Tim wanted Pete to call him. | 190.00 | 47.50 |
| 0.25 | 7-22-11  Downloaded pictures of the property taken on 7-21-11.  E-mail pictures of horses and condition of property to Tyler Kemp from The Ryan Firm. | 190.00 | 47.50 |
| 0.25 | 7-22-11  Spoke with Pete Heimbigner about horses.  Pete advised me he went to the property with law enforcement after he spoken with me to do a welfare check on the horses.  Gave Pete Tim Tyler's contact information. | 190.00 | 47.50 |
| 0.25 | 7-22-11  Called 3 local ranches about getting hay delivered.  None of them would deliver hay in the summer.  Too busy. | 190.00 | 47.50 |
| 0.25 | 7-22-11  Dwight came in my office to get a check to purchase hay.  The check would purchase enough hay for 3 days. | 190.00 | 47.50 |

| | Total | $1,463.00 |
|--|-------|-----------|

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA. 96130

| Date | Invoice # |
|---|---|
| 8/21/2011 | 2 |

**Bill To**

Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave  Suite 200
Anaheim, Ca  92807

| P.O. No. | Terms | Project |
|---|---|---|
|  |  |  |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 2 | 7-25-11  Met with Eugene Chittock, attorney to review the receivership and indemnity agreement. | 190.00 | 380.00 |
| 0.5 | 7-25-11  Purchase grain The Pardner. | 190.00 | 95.00 |
| 0.15 | 7/25/11  Called Barnum Farming to arrange 100 bales of hay to be delivered. | 190.00 | 28.50 |
| 0.15 | 7-25-11  Spoke with Tyler Kemp, he wanted the all pictures from the initial inspection.  E-mailed 209 pictures. | 190.00 | 28.50 |
| 0.15 | 7-25-11  Uploaded inspection pictures and ordered them to be printed at Walgreens. | 190.00 | 28.50 |
| 0.1 | 7-25-11  Read e-mail from Tim Ryan | 190.00 | 19.00 |
| 0.4 | 7-25-11  Chuck Sweatland, a local plumber, called me and said the 2 semi trailers full of plumbing supplies were his and had been stolen from his property. | 190.00 | 76.00 |
| 0.3 | 7/25/11  Mother and father, parents of 18 year old girl living in a trailer on the ranch, came into my office.  We discussed wether Alisha could stay on the property and wether it was safe for her to be there. | 190.00 | 57.00 |
| 1.5 | 7/25/11  PM Feed and water.  Met John Barnum at ranch for hay delivery. | 190.00 | 285.00 |
| 1.5 | 7/26/11  AM Water and feed horses. | 190.00 | 285.00 |
| 2 | 7/26/11  Inventory property at ranch | 190.00 | 380.00 |
| 0.15 | 7-26-11  Read and responded to Tyler Kemp e-mail. | 190.00 | 28.50 |
| 0.2 | 7-26-11  Went to Walgreens to pick up printed pictures. | 190.00 | 38.00 |
| 1 | 7/26/11  PM Water and feed horses | 190.00 | 190.00 |
| 2 | 7/26/11  Inventory property at ranch | 190.00 | 380.00 |
| 1.5 | 7/27/11  AM Feed and water horses | 190.00 | 285.00 |
| 2 | 7/27/11  Inventory property at ranch | 190.00 | 380.00 |
| 0.25 | 7/27/11  Faxed request to electric company for change electric service to my name.  Called to confirm they received fax and understood the request.  Also requested any refunds be paid to me. | 190.00 | 47.50 |
| 0.3 | 7/27/11  Spoke with Lassen County tax collector and requested documents of past due taxes faxed to me. | 190.00 | 57.00 |
| 0.25 | 7/27/11  Spoke with Dwight Bennett and requested tack rooms be unlocked. | 190.00 | 47.50 |
| 0.25 | 7/27/11  Spoke with Tyler Kemp, requested copy of bond, title report and Dwight not cooperating. | 190.00 | 47.50 |
| 0.15 | 7/27/11  Spoke with Austin Beardsley from The Ryan Firm about Dwight's refusal to open tack room.  Austin will be preparing a declaration to state conflicts. | 190.00 | 28.50 |
| 0.25 | 7/27/11  Read and responded to 4 e-mails. | 190.00 | 47.50 |

**Total**

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|---|---|
| 8/21/2011 | 2 |

| Bill To |
|---|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|---|---|---|
|  |  |  |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 0.25 | 7/27/11  Contact Terrie at Plumas Bank about opening an account for the receivership. Faxed her the receivership court order. | 190.00 | 47.50 |
| 2 | 7/27/11 PM Feed and water horses | 190.00 | 380.00 |
| 1 | 7/28/11 AM Feed and water horses | 190.00 | 190.00 |
| 0.5 | 7/28/11 Chuck Sweatland called.  Tractor on the property belongs to him.  He stated he had a police report reporting it stolen. | 190.00 | 95.00 |
| 0.15 | 7/28/11 Carrie from Lassen Municipal Utility District called and confirmed electric had been put in my name. | 190.00 | 28.50 |
| 0.2 | 7/28/11  Read and responded to 3 e-mails. | 190.00 | 38.00 |
| 0.15 | 7/28/11  Chuck Sweatland called again. | 190.00 | 28.50 |
| 1 | 7/28/11  Spoke with Tyler Kemp about cell tower agreement and oath of receiver. Tyler e-mailed oath that I signed and took to the courthouse to file.  Tyler said to serve receivership order to anyone on the ranch property. | 190.00 | 190.00 |
| 1.5 | 7/28/11 PM Feed and water horses.  Served Anthony & James Brown copy of receivership order.  Told them they needed to vacate immediately. | 190.00 | 285.00 |

| | Total | $4,522.00 |
|---|---|---|

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

# Invoice

| Date | Invoice # |
|---|---|
| 8/21/2011 | 3 |

| Bill To |
|---|
| Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave Suite 200
Anaheim, Ca 92807 |

| P.O. No. | Terms | Project |
|---|---|---|
| | | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1.5 | 7/29/11 AM Feed and water horses. | 190.00 | 285.00 |
| 1.15 | 7/29/11 Appeared in court for the Declaration to Remove Horses. | 190.00 | 218.50 |
| 0.15 | 7/29/11 Called Tim Ryan after court. | 190.00 | 28.50 |
| 0.15 | 7/29/11 Called Pete Heimbigner about outcome of court. | 190.00 | 28.50 |
| 0.1 | 7/29/11 Called Grace Foundation and left message about the rescue of the horses. | 190.00 | 19.00 |
| 0.2 | 7/29/11 Spoke with Bob Border about the horse with the swollen eye. | 190.00 | 38.00 |
| 0.2 | 7/29/11 Beth from the Grace Foundation called to talk about the rescue of the horses. | 190.00 | 38.00 |
| 0.1 | 7/29/11 Judith St. John called about getting her horses off the ranch. | 190.00 | 19.00 |
| 1 | 7/29/11 Danielle and Jay Harris came to my office to talk about the horses they own that are on the ranch. | 190.00 | 190.00 |
| 1.5 | 7/29/11 PM  Feed and water horses.  Check horse with swollen eye.  Served Anthony Glenn and James Brown with receivership order. | 190.00 | 285.00 |
| 1.5 | 7/30/11 AM Feed and water horses.  Check horse with swollen eye. | 190.00 | 285.00 |
| 1 | 7/30/11 PM  Feed and water horses.  Check horse with swollen eye. | 190.00 | 190.00 |
| 2.5 | 7/31/11 AM Feed and water horses.  Check horse with swollen eye. | 190.00 | 475.00 |
| 2 | 7/31/11 PM Feed and water horses.  Check horse with swollen eye. | 190.00 | 380.00 |
| 1.5 | 8/1/11  AM Feed and water horses. | 190.00 | 285.00 |
| 0.2 | 8/1/11  Spoke with Doug Sutten from BLM about checking the horses before they are removed from the ranch.  BLM mustangs may not be eligible to be rescued.  The BLM will take them back.  Doug offered his wranglers to assist with the rescue. | 190.00 | 38.00 |
| 0.1 | 8/1/11  Left message for Pete Heimbigner. | 190.00 | 19.00 |
| 0.1 | 8/1/11  E-mail Pete Heimbigner copy of order for the receiver to remove the horses. | 190.00 | 19.00 |
| 0.75 | 8/1/11  Dwight called to talk about the horses being removed from the property.  I requested the name and phone number of the one boarded horse, Chico.  He did not give me the information. | 190.00 | 142.50 |
| 0.1 | 8/1/11 Pete Heimbigner called.  Grace Foundation cannot take the horses without more money.  Grace Foundation will send Pete and I a proposal. | 190.00 | 19.00 |
| 0.15 | 8/1/11 E-mail Daniel Harris pictures of all the horses per her request so that she could identify the horses to help with the rescue. | 190.00 | 28.50 |
| 0.15 | 8/1/11 Judith St. John delivered some papers to my office regarding what horses she owned.  I reviewed the papers and called her. | 190.00 | 28.50 |

| | Total |
|---|---|
| | |

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 8/21/2011 | 3 |

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.35 | 8/1/11  Karen Mulugan from the Grace Foundation called to discuss the rescue of the horses.  Karen said they were working on a proposal.  I e-mailed Karen a copy of the court order allowing for the horse removal. | 190.00 | 66.50 |
| 1.75 | 8/1/11  PM Feed and water horses.  Met Mike Gribble at ranch to build a corral. | 190.00 | 332.50 |

| | Total | $3,458.00 |
|--|-------|-----------|

Vicki Lozano

# Invoice

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 8/21/2011 | 4 |

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1.5 | 8/2/11  AM Feed and water horses. | 190.00 | 285.00 |
| 0.1 | 8/3/11  Ordered hay. | 190.00 | 19.00 |
| 0.2 | 8/2/11  Mary Murphy from Tallac Tower Group called to verify payment information. | 190.00 | 38.00 |
| 0.1 | 8/2/11  Chuck Sweatland called about tractor. | 190.00 | 19.00 |
| 2 | 8/2/11  PM Feed and water horses.  Meet John Barnum for hay delivery. | 190.00 | 380.00 |
| 1.5 | 8/3/11  AM Feed and water horses. | 190.00 | 285.00 |
| 0.15 | 8/3/11  Reviewed e-mail that I was copied on between Dwight Bennett and Tim Ryan. | 190.00 | 28.50 |
| 0.2 | 8/3/11  Read 2 e-mails from Grace Foundation. | 190.00 | 38.00 |
| 0.15 | 8/3/11  Read and responded to 2 e-mails from Tim Ryan | 190.00 | 28.50 |
| 0.1 | 8/3/11  Called Jeff Preggill.  Left message. | 190.00 | 19.00 |
| 0.1 | 8/3/11  Reviewed receivership order. | 190.00 | 19.00 |
| 0.15 | 8/3/11  Spoke with Pete Heimbigner about herd and Grace Foundation. | 190.00 | 28.50 |
| 0.15 | 8/4/11  Read and responded to 2 e-mails from Grace Foundation.  Forward 1 e-mail to Tim Ryan. | 190.00 | 28.50 |
| 1.5 | 8/4/11  AM  Feed and water horses. | 190.00 | 285.00 |
| 3.5 | 8/4/11  PM Feed and water horses.  One horse sick and laying on the ground.  Contacted Dwight for help.  Gave horse medicine and walked horse until he started to eat again. | 190.00 | 665.00 |
| 0.1 | 8/4/11  Ordered hay. | 190.00 | 19.00 |
| 1.5 | 8/5/11 AM Feed and water horses. | 190.00 | 285.00 |
| 1.5 | 8/5/11 PM Feed and water horses.  Met John Barnum at ranch with hay delivery.  Met Dan Gaumont to train on caring for horses while I am out of town. | 190.00 | 285.00 |
| 0.1 | 8/8/11  Dan Gaumont called about concern with a horse that got out of a corral. | 190.00 | 19.00 |
| 0.1 | 8/10/11 Dan Gaumont called about new colt born. | 190.00 | 19.00 |
| 1 | 8/12/11  AM Feed and water horses. | 190.00 | 190.00 |
| 0.15 | 8/12/11  Taira from Grace Foundation called. | 190.00 | 28.50 |
| 0.1 | 8/12/11  E-mail Tim and Tyler with details from conversation with Grace Foundation.  Inform them new colt was born. | 190.00 | 19.00 |
| 0.1 | 8/12/11  Ordered Hay | 190.00 | 19.00 |
| 0.2 | 8/12/11 Met with Dan Gaumont to pay him and go over what happened at the ranch. | 190.00 | 38.00 |
| 0.1 | 8/12/11 Spoke with Austin Beardsley about the Grace Foundation. | 190.00 | 19.00 |
| 0.15 | 8/12/11 Responded to 3 e-mails from Tim Ryan. | 190.00 | 28.50 |
| 1.5 | 8/12/11 PM Feed and water horses. | 190.00 | 285.00 |

| | Total |
|-|-------|
| | |

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 8/21/2011 | 4 |

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1.5 | 8/13/11  AM Feed and water horses. | 190.00 | 285.00 |
| 3 | 8/13/11  Inventory at ranch. | 190.00 | 570.00 |
| 1 | 8/13/11  PM Feed and water horses. | 190.00 | 190.00 |

| | Total | $4,465.00 |
|-|-------|-----------|

Case 11-40155    Filed 02/10/14    Doc 266

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/21/2011 | 5 |

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave. Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|---------|-------------|------|--------|
| 1.5 | 8/14/11  AM Feed and water horses. | 190.00 | 285.00 |
| 3 | 8/14/11  Worked on computer compiling inventory | 190.00 | 570.00 |
| 0.5 | 8/14/11  Went to Walmart to purchase flash drive. | 190.00 | 95.00 |
| 2 | 8/14/11  PM feed and water horses.  Met Bob Borders to fix corral for draft horse. Changed out broken panel.  Met with John Barnum for hay delivery. | 190.00 | 380.00 |
| 2 | 8/15/11  Finished inventory, loaded onto flash drive. | 190.00 | 380.00 |
| 0.5 | 8/15/11  Prepared Fedex a package to mail.  Took package to Fed ex mailbox.  Took deposit to bank. | 190.00 | 95.00 |
| 0.5 | 8/15/11  Met with Geoff Pregill at my office, regarding insurance for the ranch. | 190.00 | 95.00 |
| 0.15 | 8/15/11  Spoke with Pete Heimbigner about getting papers prepared for me to sign to turn horses over to County of Lassen. | 190.00 | 28.50 |
| 1.75 | 8/15/11  PM feed and water horses. | 190.00 | 332.50 |
| 0.1 | 8/16/11  Spoke with Austin from The Ryan Firm about The Grace Foundation. | 190.00 | 19.00 |
| 0.15 | 8/16/11  Spoke with Dave Schroeder about his report. | 190.00 | 28.50 |
| 2 | 8/16/11  PM Feed and water. | 190.00 | 380.00 |
| 0.15 | 8/17/11  Met with Jeff Pregill in my office about the insurance. | 190.00 | 28.50 |
| 0.1 | 8/17/11  LM for Grace Foundation about horse rescue. | 190.00 | 19.00 |
| 0.2 | 8/17/11  Spoke with Taira from The Grace Foundation regarding Beth coming up to Susanville on 8/26/11. | 190.00 | 38.00 |
| 0.15 | 8/17/11  Called Doug Satica from BLM to set day for horse rescue. | 190.00 | 28.50 |
| 0.1 | 8/17/11  Call Taira from The Grace Foundation and let her know BLM would help at horse rescue. | 190.00 | 19.00 |
| 0.1 | 8/17/11  Left message for Pete Hiembigner about date for horse rescue. | 190.00 | 19.00 |
| 0.15 | 8/17/11  Spoke with Pete Hiembigner about meeting on 8/19/11 with Beth and Tim Ryan. | 190.00 | 28.50 |
| 2 | 8/17/11  PM Feed and water horses. | 190.00 | 380.00 |

| | Total | | $3,249.00 |
|--|-------|--|-----------|

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|---|---|
| 8/31/2011 | 6 |

**Bill To**

Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave  Suite 200
Anaheim, Ca  92807

| P.O. No. | Terms | Project |
|---|---|---|
|  |  |  |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 2 | 8/18/11 PM Feed and water horses. | 190.00 | 380.00 |
| 6 | 8/19/11 Went to court for contempt hearing with Dwight Bennett.  Went to working lunch with Tim Ryan and other attorneys.  Met with Pete Heimbigner, Beth from The Grace Foundation and then went to the ranch with Beth, Pete, Judy St. John and Tim Ryan. | 190.00 | 1,140.00 |
| 1.5 | 8/20/11 AM Feed and water horses. | 190.00 | 285.00 |
| 1.5 | 8/20/11 PM Feed and water horses. | 190.00 | 285.00 |
| 2 | 8/21/11 PM Feed and water horses. | 190.00 | 380.00 |
| 0.15 | 8/22/11 Called Dwight's phone, Carly answered, asked if she was leaving property. | 190.00 | 28.50 |
| 0.15 | 8/22/11 Called Tim Ryan to inform him squatters were not leaving the property. | 190.00 | 28.50 |
| 2 | 8/22/11 PM  Feed and water horses. | 190.00 | 380.00 |
| 0.5 | 8/23/11 Dirk Regan, Folsom police officer, called me about the horse rescue. | 190.00 | 95.00 |
| 0.2 | 8/23/11 Spoke with Pete Heimbigner about removing dogs from property. | 190.00 | 38.00 |
| 2 | 8/23/11 PM Feed and water horses. | 190.00 | 380.00 |
| 0.2 | 8/23/11 Judy St. John called. | 190.00 | 38.00 |
| 0.2 | 8/24/11 Spoke with Pete Heimbigner. | 190.00 | 38.00 |
| 0.15 | 8/24/11 Met with Pete Heimbigner, signed over 2 dogs to County of Lassen. | 190.00 | 28.50 |
| 0.35 | 8/24/11 Katie called me about past issues at Whispering Pines. | 190.00 | 66.50 |
| 0.4 | 8/24/11 Spoke with Pete Heimbigner | 190.00 | 76.00 |
| 0.1 | 8/24/11 Judy St. John called. | 190.00 | 19.00 |
| 1.5 | 8/24/11 PM Feed and water horses. | 190.00 | 285.00 |
| 0.2 | 8/24/11 Spoke with Pete Heimbigner. | 190.00 | 38.00 |
| 0.15 | 8/25/11 Read and replied to 2 e-mails. | 190.00 | 28.50 |
| 1.75 | 8/25/11 Met Pete Heimbigner and Doug Satica from BLM at Whispering Pines. | 190.00 | 332.50 |
| 2 | 8/25/11 PM Feed and water horses. | 190.00 | 380.00 |
| 7 | 8/26/11 Day of horse rescue. | 190.00 | 1,330.00 |
| 0.15 | 8/26/11 Spoke with Tim Ryan about the horse rescue. | 190.00 | 28.50 |
| 0.1 | 8/30/11 Paid bills for ranch. | 190.00 | 19.00 |
| 0.2 | 8/31/11 Spoke with Pete Heimbigner. | 190.00 | 38.00 |
| 0.15 | 8/31/11 Spoke with Tim Ryan. | 190.00 | 28.50 |

| | Total | $6,194.00 |
|---|---|---|

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 1/1/2012 | 7 |

**Bill To**

Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave  Suite 200
Anaheim, Ca  92807

| P.O. No. | Terms | Project |
|----------|-------|---------|
| Sept – Dec 2011 | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.1 | 9/2/11 Read e-mail from Tim Ryan | 190.00 | 19.00 |
| 0.15 | 9/6/11 Respond to e-mail from Tyler Kemp and Tim Ryan | 190.00 | 28.50 |
| 0.1 | 9/7/11 Read and responded to e-mail from Grace Foundation | 190.00 | 19.00 |
| 2 | 9/14/11 Prepare bill and reconcile bank account | 190.00 | 380.00 |
| 0.1 | 9/14/11 Respond to e-mail from Austin Beardsley | 190.00 | 19.00 |
| 0.1 | 9/15/11 Respond to e-mail from Austin Beardsley | 190.00 | 19.00 |
| 0.5 | 9/19/11 Review declaration for bankruptcy court, sign and e-mail to Austin Beardsley | 190.00 | 95.00 |
| 0.5 | 9/22/11 Prepare deposit, go to bank | 190.00 | 95.00 |
| 0.1 | 9/22/11 Respond to e-mail from Tim Ryan | 190.00 | 19.00 |
| 0.3 | 9/27/11 Review and sign inventory declaration | 190.00 | 57.00 |
| 1 | 10/18/11 Read Dwight Bennett's's bankruptcy papers, speak with Austin Beardsley about accusations, read and sign declaration. | 190.00 | 190.00 |
| 0.2 | 10/17/11 Read and respond to e-mail from Tim Ryan.  E-mail article from local newspaper. | 190.00 | 38.00 |
| 0.5 | 10/21/11 Prepare deposit, go to bank | 190.00 | 95.00 |
| 0.2 | 10/24/11 Sheriff office called regarding search warrant | 190.00 | 38.00 |
| 0.15 | 10/26/11 Call Sheriff's office | 190.00 | 28.50 |
| 0.5 | 10/26/11 Respond to e-mail from Tim Ryan & Austin Beardsley | 190.00 | 95.00 |
| 0.15 | 10/26/11 Review updated court order | 190.00 | 28.50 |
| 0.15 | 10/27/11 Responded to e-mail from Tim Ryan | 190.00 | 28.50 |
| 1 | 10/27/11 Went to Whispering Pines Ranch, served the squatters new court order, spoke with them, walked around the property. | 190.00 | 190.00 |
| 1 | 11/1/11 Went to WP took pictures of cut down trees. | 190.00 | 190.00 |
| 0.5 | 11/2/11 Downloaded pictures and e-mail to Austin Beardsley. | 190.00 | 95.00 |
| 0.75 | 11/3/11 Spoke with about declaration, responded to e-mail, reviewed declaration, signed and returned to Ryan Firm | 190.00 | 142.50 |
| 0.5 | 11/3/11 Reviewed insurance policy received for WP, call agent for clarification. | 190.00 | .95.00 |
| 0.1 | 11/4/11 Read e-mail regarding WP. | 190.00 | 19.00 |
| 0.15 | 11/7/11 E-mail Austin Beardsley about contempt hearing. | 190.00 | 28.50 |
| 0.1 | 11/8/11 Read e-mail from Austin Beardsley | 190.00 | 19.00 |
| 0.1 | 11/10/11 Read e-mail from Tim Ryan, sent newspaper article. | 190.00 | 19.00 |
| 2 | 11/15/11 Reconciled bank account, organized files | 190.00 | 380.00 |
| 0.15 | 11/15/11 Reviewed receivership order, e-mail Austin Beardsley. | 190.00 | 28.50 |

**Total**

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 1/1/2012 | 7 |

**Bill To**

Wells Fargo
C/O The Ryan Firm
1100 N. Tustin Ave  Suite 200
Anaheim, Ca  92807

| P.O. No. | Terms | Project |
|----------|-------|---------|
| Sept – Dec 2011 | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.15 | 11/15/11   Filed bond with court. | 190.00 | 28.50 |
| 0.15 | 11/15/11   E-mail Tim Ryan regarding court the next day. | 190.00 | 28.50 |
| 0.15 | 11/17/11   Met with Tim Ryan before court. | 190.00 | 28.50 |
| 3 | 11/17/11   Appeared in court for contempt hearing against squatters and amended receivership order. | 190.00 | 570.00 |
| 1.5 | 11/18/11   Contacted Sheriff Department to enforce receivership order.  Went to WP with Sheriff. | 190.00 | 285.00 |
| 0.15 | 11/18/11   Spoke with Tim Ryan about what had happened with the Sheriff's office, sent e-mail to Tim Ryan. | 190.00 | 28.50 |
| 0.15 | 11/21/11   Responded to Tim Ryan e-mail. | 190.00 | 28.50 |
| 1 | 11/28/11   Spoke with Austin Beardsley about declaration, received and reviewed declaration, requested a change, signed and returned it to Austin. | 190.00 | 190.00 |
| 0.5 | 12/2/11   Sheriff's office contact me regarding 11/18/11. | 190.00 | 95.00 |
| 0.15 | 12/2/11   Read and respond to e-mail from Austin Beardsley | 190.00 | 28.50 |
| 0.5 | 12/5/11   Prepare deposit, go to bank | 190.00 | 95.00 |
| 1 | 12/13/11   Went to WP, checked property, spoke with James  Brown. | 190.00 | 190.00 |
| 1 | 12/14/11   Went to WP, walked property, extinguished burn pile fire. | 190.00 | 190.00 |
| 2 | 12/15/11   Court appearance of 2 employees from Mt. Lassen Properties. | 90.00 | 180.00 |
| 2 | 12/20/11   Went to WP with Sheriff Department to enforce court order of removing the squatters. | 190.00 | 380.00 |
| 0.15 | 12/21/11   Turn on electricity at ranch | 190.00 | 28.50 |
| 0.15 | 12/22/11   Spoke with Michelle Newkirk. | 190.00 | 28.50 |
| 4 | 12/22/11   Went to WP, met with plumber, locksmith and maintenance guy to secure property. | 190.00 | 760.00 |
| 2 | 12/23/11   Took pictures of condition of property | 190.00 | 380.00 |
| 0.15 | 12/23/11   Spoke with Michelle Newkirk. | 190.00 | 28.50 |
| 0.45 | 12/28/11   Went to WP to check property. | 190.00 | 85.50 |
| | **Total** | | $6,155.50 |

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 2/8/2012 | 8 |

**PAID**

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| Description | Amount |
|-------------|--------|
| 7/21/11  The Pardner | 168.00 |
| 7/22/11  Jay Dow | 320.00 |
| 7/24/11  Barnum Farming | 1,300.00 |
| 7/25/11  Eugene Chittock | 225.00 |
| 7/26/11  The Pardner | 19.99 |
|          Walgreens | 33.62 |
| 7/30/11  Walmart | 5.56 |
| 8/14/11  Walmart | 27.63 |
| **Total** | **$2,099.80** |

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/11/2012 | 9 |

| Bill To |
|---------|
| Wells Fargo<br>C/O The Ryan Firm<br>1100 N. Tustin Ave  Suite 200<br>Anaheim, Ca  92807 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | Personal funds put into receivership checking account 8/1/11 | 5,000.00 | 5,000.00 |
|  | Personal funds put into receivership checking account 8/15/11 | 3,000.00 | 3,000.00 |
|  | **Total** |  | $8,000.00 |

Vicki Lozano

# Invoice

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 7/30/2012 | 10 |

| Bill To |
|---------|
| Wells Fargo |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.15 | 12-30-11 Read and answered email | 190.00 | 28.50 |
| 0.15 | 1-3-12 Paid 1 bill | 190.00 | 28.50 |
| 0.5 | 1-5-12 Prepare deposit go to bank | 190.00 | 95.00 |
| 0.15 | 1-6-12 Read and answered email | 190.00 | 28.50 |
| 2 | 1-6-12  Neighbor called, went to property, called sheriff and met him at property | 190.00 | 380.00 |
| 2 | 1-6-12  Employee had to go with me to property | 45.00 | 90.00 |
| 1 | 1-6-12 Second visit to property to check back gates | 190.00 | 190.00 |
| 0.15 | 1-6-12 Paid 1 bill | 190.00 | 28.50 |
| 0.5 | 1-7-12 Spoke with Tony Dixon about watching the property | 190.00 | 95.00 |
| 2 | 1-7-12  Neighbor called, saw some trucks at property, went to property. | 190.00 | 380.00 |
| 1 | 1-8-12  Went to property to meet with Tony | 190.00 | 190.00 |
| 2 | 1-8-12  Tony called, someone on property, called sheriff, met them and walked the property. | 190.00 | 380.00 |
| 1 | 1-9-12  Met with McNeil Security about installing cameras | 190.00 | 190.00 |
| 0.2 | 1-9-12 Paid 3 bills | 190.00 | 38.00 |
| 1 | 1-10-12  Went to property to check house | 190.00 | 190.00 |
| 1 | 1-13-12 Met with Mitch Beems about watching the property | 190.00 | 190.00 |
| 0.3 | 1-18-12 Chuck Sweatland called about squatters recycling things from ranch | 190.00 | 57.00 |
| 0.5 | 1-18-12 Went to Bullseye Recycling and talked about James Brown | 190.00 | 95.00 |
| 0.1 | 1-31-12 LMUD called need meter read | 190.00 | 19.00 |
| 0.5 | 1-31-12 Prepared deposit, go to bank | 190.00 | 95.00 |
| 0.2 | 2-3-12 Read and answered email | 190.00 | 38.00 |
| 1 | 2-4-12 Met with Susan Didriksen from bankruptcy court at the property | 190.00 | 190.00 |
| 0.15 | 2-12-12 Paid 1 bill | 190.00 | 28.50 |
| 1 | 2-22-12 Went to property to read electric meters, Faxed reads to LMUD | 190.00 | 190.00 |
| 0.5 | 2-24-12 Prepared deposit, go to bank | 190.00 | 95.00 |
| 0.2 | 3-6-12 Read and answered email | 190.00 | 38.00 |
| 0.15 | 3-6-12  Paid 1 bill | 190.00 | 28.50 |
| 0.2 | 3-13-12 read and answered email | 190.00 | 38.00 |
| 1 | 3-23-12 Went to property to read electric meters. Faxed reads to LMUD | 190.00 | 190.00 |
| 0.2 | 3-23-12 Read and answered email | 190.00 | 38.00 |
| 0.15 | 3-28-12  Read and answered email | 190.00 | 28.50 |
| 0.15 | 3-29-12 Paid 1 bill | 190.00 | 28.50 |

| Total | |
|-------|--|
|       |  |

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|---|---|
| 7/30/2012 | 10 |

| Bill To |
|---|
| Wells Fargo |

| P.O. No. | Terms | Project |
|---|---|---|
| | | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 0.2 | 3-29-12  Read and answered email | 190.00 | 38.00 |
| 0.2 | 3-29-12  Spoke with Sergeant Smidt about the property | 190.00 | 38.00 |
| 0.25 | 3-30-12  Read and answered 2 emails | 190.00 | 47.50 |
| 0.25 | 4-2-12 Read and answered 2 emails | 190.00 | 47.50 |
| 0.5 | 4-13-12  Went to property to check it. | 190.00 | 95.00 |
| 0.5 | 4-27-12 Prepare deposit, go to bank | 190.00 | 95.00 |
| 0.2 | 5-4-12 Paid 2 bills | 190.00 | 38.00 |
| 0.15 | 5-18-12  Paid one bill | 190.00 | 28.50 |
| 0.15 | 5-18-12  Spoke to Austin Beardsley. | 190.00 | 28.50 |
| 0.5 | 5-25-12  Prepared deposit, went to bank | 190.00 | 95.00 |
| 0.15 | 6-21-12  Read and answered email | 190.00 | 28.50 |
| 1 | 6-26-12 Went to property to read electric meters.  Faxed reads to LMUD | 190.00 | 190.00 |
| 0.5 | 6-26-12  Prepared deposit, went to bank | 190.00 | 95.00 |
| 0.2 | 7-17-12 Paid 2 bills | 190.00 | 38.00 |
| 0.5 | 7-25-12  Prepared deposit, went to bank | 190.00 | 95.00 |
| 1 | 7-25-12  Met with Eugene Chittock regarding receivership. | 190.00 | 190.00 |
| 2 | 7-29-12 Prepare bill, organize files | 190.00 | 380.00 |
| 0.2 | 7-30-12  Met with Eugene Chittock regarding Grace Foundation lawsuit | 190.00 | 38.00 |

| Total | $5,324.50 |
|---|---|

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 10/22/2012 | 11 |

| Bill To |
|---------|
| Wells Fargo |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| | | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.2 | 8-1-12  Phone call with Eugene Chittock. | 190.00 | 38.00 |
| 0.15 | 8-2-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-4-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-5-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-7-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-9-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.3 | 8-10-12  Reconciled bank account | 190.00 | 57.00 |
| 0.2 | 8-12-12  Paid 3 bills | 190.00 | 38.00 |
| 1 | 8-12-12  Prepared documents for lawyer for receivership. | 190.00 | 190.00 |
| 0.3 | 8-13-12  Read and answered several emails to Jill Robbins | 190.00 | 57.00 |
| 1 | 8-15-12  Met with Eugene Chittock regarding Grace Foundation lawsuit | 190.00 | 190.00 |
| 0.5 | 8-18-12  Went to Ace Hardware and purchased chains and padlocks | 190.00 | 95.00 |
| 1 | 8-19-12  Met Sheriff at property to check property.  Resecured gates with chains and padlocks. | 190.00 | 190.00 |
| 0.75 | 8-20-12  Went to Ace Hardware to copy keys to gate.  Took the keys to the Sheriffs office at their request. | 190.00 | 142.50 |
| 0.25 | 8-22-12  Read and answered 2 mails to Jill Robbins | 190.00 | 47.50 |
| 0.5 | 8-23-12  Prepared deposit and went to bank | 190.00 | 95.00 |
| 0.25 | 8-25-12  Read and answered 2 emails to Jill Robbins | 190.00 | 47.50 |
| 0.15 | 8-27-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-28-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-29-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 8-30-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 1.5 | 9-1-12  Met Donahue Glass at ranch to board up house. | 190.00 | 285.00 |
| 0.15 | 9-7-12  Paid 1 bill | 190.00 | 28.50 |
| 0.15 | 9-8-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.3 | 9-10-12  Reconciled bank account | 190.00 | 57.00 |
| 0.15 | 9-17-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 1 | 9-18-12  Met insurance inspector at ranch to inspect the property.  Read electric meters | 190.00 | 190.00 |
| 0.5 | 9-18-12  Prepared deposit and went to bank | 190.00 | 95.00 |
| 0.15 | 9-18-12  Faxed meter readings to LMUD | 190.00 | 28.50 |
| 0.15 | 10-2-12  Paid 1 bill | 190.00 | 28.50 |

| | Total |
|---|-------|
| | |

# Invoice

Vicki Lozano

Receiver for Whispering Pines
822 Main Street
Susanville, CA 96130

| Date | Invoice # |
|------|-----------|
| 10/22/2012 | 11 |

| Bill To |
|---------|
| Wells Fargo |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          |       |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 0.15 | 10-5-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 10-5-12  Paid 1 bill | 190.00 | 28.50 |
| 0.3 | 10-10-12  Reconciled bank account | 190.00 | 57.00 |
| 0.5 | 10-10-12  Spoke with Beth DeCaprio | 190.00 | 95.00 |
| 1 | 10-11-12  Spoke with Beth DeCaprio about the condition of the property and bringing the horses back to Lassen County. | 190.00 | 190.00 |
| 2 | 10-15-12  Met with Beth DeCaprio at ranch to inspect property to see if horses could come back. | 190.00 | 380.00 |
| 0.25 | 10-16-12  Read and answered 4 e-mails to Jill Robbins | 190.00 | 47.50 |
| 0.5 | 10-16-12  Prepared deposit and went to bank | 190.00 | 95.00 |
| 1 | 10-16-12  Emailed Chittock Court filings from BofA | 190.00 | 190.00 |
| 0.5 | 10-17-12  Met with Eugene Chittock | 190.00 | 95.00 |
| 0.15 | 10-18-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 2 | 10-17-12  Prepared letter for Scott Green | 190.00 | 380.00 |
| 3 | 10-18-12  Went to Lassen Superior Court for emergency ex parte hearing | 190.00 | 570.00 |
| 0.5 | 10-18-12  Prepared letter to Scott Green | 190.00 | 95.00 |
| 0.15 | 10-18-12  Went to post office mailed letter to Scott Green | 190.00 | 28.50 |
| 0.2 | 10-18-12  Read e-mail from Scott Green | 190.00 | 38.00 |
| 0.15 | 10-19-12  Read and answered 2 e-mails to Jill Robbins | 190.00 | 28.50 |
| 0.15 | 10-19-12  Paid 1 bill | 190.00 | 28.50 |
| 0.15 | 10-22-12  Read and answered e-mail to Jill Robbins | 190.00 | 28.50 |
| 1.5 | 10-22-12  Read 2 emails from Bryan Cave LLP | 190.00 | 285.00 |

| | Total | $4,930.50 |
|--|-------|-----------|

EXHIBIT C

# THE RYAN FIRM
### A Professional Corporation
1100 North Tustin Avenue, #200
Anaheim, California 92807

Timothy M. Ryan
Barry G. Coleman
Paul A. Grammatico
Austin T. Beardsley
Michael W. Stoltzman
Daniel J. Lee
Sina Sadrieh

Telephone (714) 666-1362
Facsimile (714) 666-1443
http://www.theryanfirm.com

March 29, 2011

**SENT VIA E-MAIL TO** rentalqueen@mtlhomes.com

Vicki Lozano
Mt. Lassen Properties
822 Main Street
Susanville, CA 96130

Re:    **Normal Allen v. Summit Financial Group, et al.**
    Our File No.:    8045-1267
    Lead Case No.:    45679

Dear Ms. Lozano:

    We are in receipt of your letter of interest regarding the potential receivership our clients will seek against the Whispering Pines Ranch in the above matter. Our client recently authorized an hourly budget for the receiver of $190.00. We would like to work with you on this matter; however, your requested fees are in excess of those authorized by our client. If you reduce your hourly rate to $190 per hour to fall within our client's budget, we can begin the process of seeking the receivership.

    We look forward to hearing from you.

    Very truly yours,

    **THE RYAN FIRM**
    A Professional Corporation

    TIMOTHY M. RYAN
    tryan@theryanfirm.com

TMR:tjk:mab

8045-1267 Norman Allen v. Wilshire\CORRESPONDENCE\Lozano Re Receiver's Fees 3-28-11.doc

EXHIBIT D

# Law Offices of Eugene B. Chittock

100 S. Lassen Street
Susanville, CA 96130
Telephone: 530-257-9351
Fax: 530-257-9359

September 18, 2012
Invoice No. 5792

Vicki Lozano
Mt. Lassen Properties
822 Main Street
Susanville, CA 96130

Client Number:   1074  Vicki Lozano
Matter Number:   LOZANO5  Lozano/Whispering Pine Receivership
For Services Rendered Through 8/28/2012.

## Fees

| Date | Timekeeper | Description | Hours | Amount | |
|------|-----------|-------------|-------|--------|---|
| 07/25/2012 | EBC | Meet with client regarding accounting on receivership of Whispering Pine Resort. | 1.20 | $360.00 | |
| 07/27/2012 | JNR | Telephone call from EBC regarding his meeting with client and need for accounting | 0.20 | $0.00 | N/C |
| 07/28/2012 | JNR | Research requirements for Receivership accountings and reports. | 0.50 | $0.00 | N/C |
| 07/30/2012 | EBC | Meet with client. | 0.20 | $60.00 | |
| 07/30/2012 | EBC | Meet with Jill Robbins regarding status. | 0.20 | $60.00 | |
| 07/30/2012 | JNR | Meeting with client to review documents and discuss status of matter (.5); review all documents provided by client (.5). | 1.00 | $300.00 | |
| 08/01/2012 | EBC | Review letters. | 0.40 | $120.00 | |
| 08/01/2012 | EBC | Call to get bids on care of horses. | 0.60 | $180.00 | |
| 08/01/2012 | EBC | Call to Vicki Lozao regarding letters. | 0.20 | $60.00 | |
| 08/01/2012 | EBC | Call from Emma Dill of Bank of America regarding status. | 0.30 | $90.00 | |
| 08/02/2012 | JNR | Review and respond to e-mail from client. | 0.10 | $30.00 | |
| 08/03/2012 | JNR | Review e-mail from client with attached letter and statement from Susan Sheridan re discontinued care of the horses. | 0.20 | $60.00 | |

Continued On Next Page

Client Number:      1074                                              09/18/2012
Matter Number:      LOZANO5                                           Page:   2

| Date | Init. | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 08/04/2012 | JNR | Respond to 8/3/12 e-mail from client (no charge); preparation of Receivership Accounting Schedules (1.0). | 1.00 | $300.00 |
| 08/05/2012 | JNR | Preparation of Receiver's Interim Account and Report and Petition for Approval (.8); Preparation of Notice of Hearing on Account and Report (.2); Research issue of litigation against receiver without court approval and interoffice memo re same (.2); preparation of e-mail to client (.1). | 1.30 | $390.00 |
| 08/07/2012 | EBC | Meet with Jill Robbins regarding status. | 0.30 | $90.00 |
| 08/07/2012 | JNR | Telephone call to Tim Ryan (.3); preparation of e-mail to client (.2); review documents obtained from Lassen County Courthouse to determine if inventory had been field (.1); meeting with EBC to discuss status of matter (.3). | 0.90 | $270.00 |
| 08/08/2012 | EBC | Review e-mails. | 0.20 | $60.00 |
| 08/08/2012 | EBC | Calls to counsel Emma Dill (Bank of America) regarding status. | 0.40 | $120.00 |
| 08/09/2012 | JNR | Review e-mails from Tim Ryan containing various attachments re matter (.1); Preparation of e-mail to client (.1); Review and respond to e-mail from client (.1). | 0.30 | $90.00 |
| 08/12/2012 | JNR | Review e-mail from client with attached stipulation proposed by grace foundation (.2); review attachments to e-mail from client for inclusion in report/accounting (.3). | 0.50 | $150.00 |
| 08/14/2012 | EBC | Review stipulation with intervenor. | 0.60 | $180.00 |
| 08/15/2012 | EBC | Telephone call to Jill Robbins regarding stipulation. | 0.20 | $60.00 |
| 08/15/2012 | EBC | Meet with Vicki Lozano regarding lawsuit filed by Grace Foundation. | 1.60 | $480.00 |
| 08/16/2012 | EBC | Telephone call to S. Leviton regarding stipulation. | 0.20 | $60.00 |
| 08/20/2012 | EBC | Review e-mail from Leviton regarding horses. | 0.20 | $60.00 |
| 08/22/2012 | EBC | Meet with Dave Schroeder regarding care of horses. | 0.80 | $240.00 |
| 08/22/2012 | EBC | Respond to e-mail previously received from Stuart Leviton regarding care of horses. | 0.30 | $90.00 |
| 08/27/2012 | JNR | Review inventory documents provided by client (.2); preparation of inventory (.3). | 0.50 | $150.00 |
| 08/28/2012 | EBC | Review e-mail from Leviton regarding horses. | 0.20 | $60.00 |

                                          Billable Hours / Fees:    13.90    $4,170.00

Continued On Next Page

| Client Number: | 1074 | | | 09/18/2012 |
|---|---|---|---|---|
| Matter Number: | LOZANO5 | | | Page:   3 |

## Timekeeper Summary

Timekeeper EBC worked 8.10 hours at $300.00 per hour, totaling $2,430.00.

Timekeeper JNR worked 5.80 hours at $300.00 per hour, totaling $1,740.00.

Timekeeper JNR worked 0.70 hours at no charge.

## Cost Detail

| Date | Description | Amount | Check No. |
|---|---|---|---|
| 08/07/2012 | Copies of documents from court. | $3.00 | |
| | Total Costs | $3.00 | |

## Payment Detail

| Date | Description | Amount |
|---|---|---|
| 09/18/2012 | Transfer from trust account. | ($1,500.00) |
| | Total Payments Received: | ($1,500.00) |

| | | | |
|---|---|---|---|
| Prior Balance: | $0.00 | Last Payment: | 09/18/2012 |
| Payments Received: | ($1,500.00) | | |
| Current Fees: | $4,170.00 | | |
| Advanced Costs: | $3.00 | | |
| TOTAL AMOUNT DUE: | $2,673.00 | | |

Thank You for Letting Us Serve You.
Payment Due Upon Receipt.

Continued On Next Page

Client Number:     1074                                                                           09/18/2012
Matter Number:     LOZANO5                                                                        Page:   4

## TRUST ACTIVITY RECAP

| Date | Description | Deposit | Withdrawal | Balance |
|------|-------------|---------|------------|---------|
|  |  |  |  | $0.00 |
| 08/15/2012 | Retainer (Check #130) | $1,500.00 |  | $1,500.00 |
| 09/18/2012 | Legal services rendered. |  | $1,500.00 | $0.00 |
|  | Our Check:      3490      Payee:      Eugene B. Chittock |  |  |  |

Continued On Next Page

# Law Offices of Eugene B. Chittock

100 S. Lassen Street
Susanville, CA 96130
Telephone: 530-257-9351
Fax: 530-257-9359

October 31, 2012
Invoice No. 5895

Vicki Lozano
Mt. Lassen Properties
822 Main Street
Susanville, CA 96130

Client Number: 1074  Vicki Lozano
Matter Number: LOZANO5  Lozano/Whispering Pine Receivership
**For Services Rendered Through 10/31/2012.**

## Fees

| Date | Timekeeper | Description | Hours | Amount |
|------|-----------|-------------|-------|--------|
| 10/05/2012 | JNR | Preparation of e-mail to client. | 0.10 | $30.00 |
| 10/16/2012 | JNR | Review 5 e-mails received from client regarding current action in Lassen County Case. | 0.50 | $150.00 |
| 10/18/2012 | JNR | Preparation of e-mail to client. | 0.10 | $30.00 |
| 10/22/2012 | JNR | Preparation of e-mail to client re updated accounting. | 0.10 | $30.00 |
| 10/22/2012 | JNR | Review and respond to e-mail from client (.1); research time to file accounting (.2); begin review of Accounting for updating (.1). | 0.40 | $120.00 |
| 10/28/2012 | JNR | Review documents received from client re updated accounting; review and revise accounting and inventory for filing with the court. | 1.50 | $450.00 |
| 10/29/2012 | JNR | Finalize Petition for Approval of Accounting; preparation of e-mail to client; preparation of interoffice memo; prepare and print pictures of all inventoried assets. | 1.00 | $300.00 |
| 10/30/2012 | JNR | Finalize all documents for filing; review and respond to two e-mails from client. | 0.40 | $120.00 |
| | | **Billable Hours / Fees:** | 4.10 | $1,230.00 |

Continued On Next Page

Client Number:    1074
Matter Number:    LOZANO5

10/31/2012
Page:    2

## Timekeeper Summary

Timekeeper JNR worked 4.10 hours at $300.00 per hour, totaling $1,230.00.

| | |
|---|---|
| Prior Balance: | $2,673.00 |
| Payments Received: | $0.00 |
| Current Fees: | $1,230.00 |
| Advanced Costs: | $0.00 |
| **TOTAL AMOUNT DUE:** | $3,903.00 |

Thank You for Letting Us Serve You.
Payment Due Upon Receipt.

Continued On Next Page

## PROOF OF SERVICE

I am a citizen of the United States and a resident of the County of Lassen, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 100 South Lassen Street, Susanville, California 96130.  I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.  On the date indicated below, the following document was served as follows:

RECEIVER'S FINAL ACCOUNT AND REPORT; PETIOTION FOR ITS SETTLEMENT, FOR APPROVAL OF RECEIVER AND ATTORNEY FEES REQUEST TO DISCHARGE RECEIVER

[X]    BY MAIL.  By placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid, and deposited in accordance with this firm's practice in a United States Post Office Box after the close of the day's business, addressed as follows:

| Name & Address | Telephone/Fax/E-Mail | Role |
|---|---|---|
| Peter M. Talia<br>Law Offices of Peter M. Talia<br>470-345 Circle Drive<br>Susanville, CA 96130 | Tel: 530-257-5199<br>Fax: 530-257-5995 | Attorney for Plaintiff<br>NORMAN W. ALLEN |
| David Hosilyk<br>Fine, Boggs & Perkins, LLP<br>80 Stone Pine Road, Ste. 210<br>Half Moon Bay, CA 94109 | Tel: 650-712-8908<br>Fax: 650-712-1712 | Attorney for Defendants<br>ROD HOSILYK and SUMMIT<br>FINANCIAL GROUP |
| Dwight Bennett<br>General Delivery<br>Susanville, CA 96130 | Tel: 530-257-2555<br>Fax: 530-257-0340<br>email:<br>whisperingpines@frontiernet.net | Defendant/Cross-<br>Defendant in Pro Per |
| Craig Close<br>Close Associates Law Offices<br>P. O. Box 2522<br>Truckee, CA 96160 | Tel: 530-587-7666<br>Fax: 530-550-8888 | Attorney for<br>Defendant/Cross-<br>Complainant JUDITH ST.<br>JOHN |
| Steve Welch<br>5876 Coyote Road<br>Reno, NV 89523 | Tel:<br>Fax: | Counsel for Defendant<br>EVANS APPRAISAL<br>SERVICES, INC. |
| Jerrald Pickering<br>Pickering Law Corporation<br>1915 Placer Street<br>Redding, CA 96001 | Tel: 530-241-5811<br>Fax: 530-241-3145 | Counsel for Defendant<br>EVANS APPRAISAL<br>SERVICES, INC. |
| Timothy M. Ryan<br>The Ryan Firm<br>1100 N. N. Tustin Avenue, #200<br>Anaheim, CA 92807 | e-mail:tryan@theryanfirm.com | |

| Stuart L. Leviton<br>Leviton Law Group, A P.C.<br>3699 Wilshire Blvd, Ste. 1290<br>Los Angeles, CA 90010 | Tel: 213-402-4576<br>Fax: 213-559-0572<br>email:<br>sleviton@levitonlawgroup.com | Attorney for<br>GRACE FOUNDATION |
| Carolyn Chan<br>2485 Notre Dame Blvd., Ste. 30<br>Chico, CA 95928 | Tel: 530-359-8810 | Attorney for<br>DWIGHT BENNETT |

[ ]    BY PERSONAL SERVICE.  By personal delivery to the addressee(s) designated as follows:

[ ]    BY EXPRESS MAIL.  By express mail, with all fees prepaid, to the addressee(s) designated as follows:

[ ]    BY OVERNIGHT MAIL.  By overnight mail pursuant to C.C.P. § 1013, with all fees prepaid, addressed to the addressee(s) designated as follows:

[ ]    BY FACSIMILE.  By facsimile transmission, reported as complete and without error, to the person(s) and number(s) set forth below; and a transmission report properly issued by the transmitting machine as follows:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 31ST . day of October, 2012, at Susanville, California.

_Linda Stewart_
LINDA STEWART

# EXHIBIT P



August 25, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003726975

1  Timothy M. Ryan, Bar No. 178059
2  Austin T. Beardsley, Bar No. 270046
   THE RYAN FIRM
   A Professional Corporation
3  1100 N. Tustin Avenue, Suite 200
   Anaheim, California 92807
4  Telephone (714) 666-1362; Fax (714) 666-1443

5  Attorneys for Creditors WELLS FARGO BANK, N.A., as Trustee for MLMI Trust
6  Series 2005-HE3; and BAC HOME LOANS SERVICING, LP, a Texas limited
   partnership,

7

8              UNITED STATES BANKRUPTCY COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11 In re:                          )  CASE NO.: 11-40155
                                   )  Chapter: 11
12 Dwight Bennett                  )  Dated Filed: August 18, 2011
                                   )
13          Debtor,               )  Assigned for All Purposes to
                                   )  Hon. Michael S. McManus
14                                 )  Courtroom: 28
                                   )
15                                 )  DECLARATION OF TIMOTHY M
                                   )  RYAN IN SUPPORT OF CREDITORS
16                                 )  WELLS FARGO BANK, N.A. AND BAC
                                   )  HOME LOANS SERVICING, LP'S
17                                 )  MOTION TO EXCUSE TURNOVER BY
                                   )  RECEIVER PURSUANT TO 11 U.S.C.
18                                 )  §543 (D); MEMORANDUM OF POINTS
                                   )  AND AUTHORITIES
19                                 )
                                   )
20                                 )  Date:      August 29, 2011
                                   )  Time:      10:00 a.m.
21                                 )  Courtroom: 28
                                   )
22                                 )  Trial Date:   None set.
                                   )
23                                 )

24      I, Timothy M. Ryan, declare:

25      1.      I am over the age of eighteen and I am competent to make this declaration.

26 I am an attorney admitted to practice law before all of the courts of the State of

27 California, including this court.

28

Declaration of Timothy M. Ryan

00509

THE RYAN FIRM
A Professional Corporation

2.      I am the principal of The Ryan Firm, counsel for Creditors Wells Fargo Bank, N.A. and BAC Home Loans Servicing, LP (collectively "Creditors") herein. I oversee and monitor all work done in this matter, in addition to contributing my own work product. I have personal knowledge of the facts stated herein, and if called upon to do so I could and would competently testify thereto.

3.      I am the custodian of records for The Ryan Firm. The records maintained by The Ryan Firm were created at or about the time of the events of which they are a record, are maintained by employees of The Ryan Firm who have a duty to ensure that the records are accurate as to the facts or matters of which they are a record, and the employees have been trained in the preparation and/or maintenance of these records. The Ryan Firm relies on these records in its conduct of business. I make this declaration in part on my review of these records. I am familiar with The Ryan Firm's customs and practices, procedures and policies for conducting business.

4.      On or about July 21, 2011, on behalf of Creditors, I accompanied the Receiver to the property located at 695-725 Highway 36, Susanville, California 96130 (the "Subject Property"). I observed the emaciated state of the horses, the disrepair of the facilities and a group of squatters burning garbage.

5.      Troubled by the manifest suffering of the horses, I informed the receiver that Creditors would participate in any way necessary to ensure a transfer of the horses a safe shelter where they would be provided necessary medical care, food and lodging.

6.      In or about the second week of August, 2011, the Creditors agreed to make a $40,000.00 donation to the Grace Foundation of Northern California for the transfer of the horses. This amount provides transportation, medical care, food and shelter for over thirty (30) horses for up to six (6) months.

7.      Notwithstanding the dire conditions of the horses on the Subject Property, debtor Dwight Bennett has refused to comply with the order appointing a receiver ("Receivership Order") in any way. This outright refusal to comply with the Receivership Order ultimately resulted in Bennett's incarceration for five (5) days upon a

2

Declaration of Timothy M. Ryan

1  finding of contempt for his failure to relinquish possession of the Subject Property and

2  the requisite business records. Further, ignoring the threat of continued incarceration,

3  Bennett insists that he is entitled to possession of the Subject Property and control over

4  the horses as a result of his bankruptcy. As part of The Ryan Firm's representation of

5  Creditors, The Ryan Firm received a copy of the transcript of Dwight Bennett's OSC re:

6  Contempt. A true and correct copy of this transcript is attached as Exhibit 2 to the List of

7  Exhibits filed concurrently herewith and incorporated by reference. Pages 13-17 of the

8  transcript are informative in delineating Bennett's refusal to comply with the

9  Receivership Order, and his attempted use of a bankruptcy filing to thwart efforts to

10  provide necessary medical care to the horses.

11      8.    On or about August 19, 2011, after Bennett was remanded to custody, I

12  visited the Subject Property. While there I observed Bennett's foster child being

13  removed by Lassen County Child Protective Services.

14      I declare under penalty of perjury under the laws of the State of California that the

15  foregoing is true and correct. Executed on August 25, 2011, at Anaheim, California.

16

17  _____

18  TIMOTHY M. RYAN—DECLARANT

19

20

21

22

23

24

25

26

27

28

Declaration of Timothy M. Ryan

THE RYAN FIRM
A Professional Corporation

00511

# EXHIBIT R

1

UNITED STATES BANKRUPTCY COURT

2

EASTERN DISTRICT OF CALIFORNIA

3

SACRAMENTO DIVISION

4

---oOo---

5

In re:                              )
                                    )
6

DWIGHT ALAN BENNETT,                ) Case No. 11-40155-A-11
                                    ) Chapter 11
7

            Debtor.                 )
_____)

8

---oOo---

9

10

        BEFORE THE HONORABLE MICHAEL S. MCMANUS, JUDGE OF
THE UNITED STATES BANKRUPTCY COURT, EASTERN DISTRICT OF
CALIFORNIA, AND ON SEPTEMBER 2, 2011.

11

12

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION/APPLICATION TO EXCUSE TURNOVER BY RECEIVER

13

14

APPEARANCES:

15

For the Debtor:          DWIGHT ALAN BENNETT, PRO PER
                         P.O. Box 540
16
                         Susanville, CA 96130

17

                         MARK WOLFF, ATTORNEY AT LAW
                         (Also Present)
18

For the Creditors:       AUSTIN T. BEARDSLEY
19
                         THE RYAN FIRM
                         1100 N. Tustin Avenue #200
20
                         Anaheim, CA 92807

21

For the US Trustee:      ALLEN C. MASSEY
                         U.S. TRUSTEE'S OFFICE
22
                         501 I Street #7-500
                         Sacramento, CA 95814

23

24

Reported by:  VICKI L. BRITT, RPR, CSR No. 13170

25

DIAMOND COURT REPORTERS (916) 498-9288

1        SEPTEMBER 2, 2011 AT THE HOUR OF 1:45 P.M.

2        BEFORE THE HONORABLE MICHAEL S. MCMANUS

3                      ---oOo---

4        THE COURT:  Dwight Bennett.  Motion to excuse

5   turnover by receiver.

6        MR. BENNETT:  Good afternoon, Your Honor.  My name

7   is Dwight Bennett.

8        THE COURT:  Anyone else in the courtroom appearing

9   on the Bennett matter?

10       MR. MASSEY:  Yes, Your Honor.  Al Massey for the

11  U.S. Trustee.

12       MR. BEARDSLEY:  Yes, Your Honor.  Austin Beardsley

13  on behalf of Creditors Wells Fargo Bank and Bank of America.

14       MR. WOLFF:  Your Honor, Mark Wolff appearing.

15  Mr. Bennett has asked me to appear specially with him today.

16  I have not filed an application to be employed by the Estate

17  obviously, nor has an order been entered.  But he has

18  requested that I assist him with this motion, possibly a

19  countermotion for a violation of the automatic stay.

20       THE COURT:  That counter motion's not going to be

21  entertained today.  Not on no notice.

22       MR. WOLFF:  Understood, Your Honor.  And that's

23  something I'm looking forward to.  But, frankly, I haven't

24  had the opportunity to review this case in its entirety

25  prior to my representation fully in the Chapter 11,

1          MR. BENNETT:  So that's my difficulty with the

2    paperwork.

3          THE COURT:  That's fine.  I mean, as I said, I

4    generally will grant an extension, but don't count on it

5    being more than 14 days, all right?

6          MR. BENNETT:  Okay.

7          THE COURT:  Mr. Beardsley, go ahead.

8          MR. BEARDSLEY:  Yes, Your Honor.  The Creditors

9    request that their motion be granted and that an order be

10   issued allowing the receipt, excusing the receiver from the

11   543 requirements, and allowing the receiver to continue to

12   do her job.

13         THE COURT:  Why?

14         MR. BEARDSLEY:  Well, because --

15         THE COURT:  Well, let's start with why was the

16   receiver appointed in the first place?

17         MR. BEARDSLEY:  The receiver was appointed because

18   initially there were admissions made that there was no

19   insurance on the property.  The Superior Court found that

20   there were grounds to appoint a receiver over what was

21   thought to be an operating business, a horse ranch.  What it

22   turned out to be was, I believe -- it's shown in our

23   exhibits in those photographs -- it was more of a gruesome

24   scene.

25         THE COURT:  All right.  So I take it that Wells

1    Fargo or BAC has a mortgage on the property?

2              MR. BEARDSLEY:  Yes.

3              THE COURT:  And it went into default?

4              MR. BEARDSLEY:  Yes, Your Honor.

5              THE COURT:  It went into default solely because

6    there wasn't insurance?  Or because there wasn't insurance

7    and payments weren't being made?

8              MR. BEARDSLEY:  Well, payments were not being

9    made, Your Honor.

10             THE COURT:  All right.  So when did that default

11   begin?

12             MR. BEARDSLEY:  Actually, what happened, Your

13   Honor, is that -- it's a very long, complicated case.  But a

14   short version of it would be, initially, there were two

15   adjoining parcels, and the bank's mortgage only secured a

16   smaller adjoining parcel.  But the bank received an

17   equitable lien and mortgage over the entire ranch for

18   reasons that were fleshed out in Superior Court.

19             THE COURT:  All right, so your client's

20   predecessor made a loan to Mr. Bennett that was supposed to

21   have been secured by the whole thing?

22             MR. BEARDSLEY:  Made a loan to another party, a

23   Mr. Allen, that was supposed to be secured by the

24   improvements located on this ranch.  And, basically, we made

25   a showing that through the mistake of all the parties, the

1    improvements on the ranch were not secured by the loan.  So

2    the Superior Court of Lassen County gave us an equitable

3    lien and mortgage over the entire ranch.

4              THE COURT:  Okay, was that part of the same action

5    in which the receiver was appointed?

6              MR. BEARDSLEY:  Absolutely.

7              THE COURT:  So a lawsuit was commenced to sort of

8    reform the mortgage, that relief was granted, and then the

9    default occurred, the payment default occurred?

10             MR. BEARDSLEY:  No, the default had occurred I

11   believe in March of 2009.

12             THE COURT:  All right.  So payments stopped.

13   Someone at the bank says, hey, we need to foreclose.  Then

14   someone read the legal description, said, uh-oh, we've got a

15   problem?

16             MR. BEARDSLEY:  There was already a civil action

17   that has been filed probably a year before the default for

18   the parties to reform.

19             THE COURT:  So someone took it out before the

20   payment defaulted?

21             MR. BEARDSLEY:  Yes, and then default happened.

22             THE COURT:  And then while that was going on,

23   there was a default?

24             MR. BEARDSLEY:   Yes, absolutely.

25             THE COURT:  And then there was no insurance?

1          MR. BEARDSLEY:  Absolutely.

2          THE COURT:  And so sometime in this pending

3    ligation, the bank makes a motion for a receiver?

4          MR. BEARDSLEY:  Upon receiving a security interest

5    in the property, they made a motion to appoint a receiver.

6          THE COURT:  I got you.  So once it perfected its

7    mortgage, it got a receiver because of these other defaults.

8    And then the receiver goes out there and finds all sorts of

9    health and welfare problems for the horses?

10          MR. BEARDSLEY:  Yes.

11          THE COURT:  Including dead horses?

12          MR. BEARDSLEY:  Yes.

13          THE COURT:  And why was that?  What caused that?

14          MR. BEARDSLEY:  Well, we submitted a

15    veterinarian's report.  At the time he made the report, the

16    only horse corpse that was in sufficient shape to identify

17    the cause of death, it was starvation.  The rest of the

18    corpses, their cause of death is unidentified.

19          THE COURT:  Okay.  And what about the horses that

20    were alive?

21          MR. BEARDSLEY:  As the vet report states, the

22    horses that were alive were undersized.  They weren't in

23    good shape.  There were several pregnant horses with no care

24    being taken to them.  The female horses were roaming with a

25    stallion, who was impregnating them indiscriminately.

1          THE COURT:  They were malnourished?

2          MR. BEARDSLEY:  Yes.

3          THE COURT:  Somehow the Department of Public Works

4    gets involved.  How is that?

5          MR. BEARDSLEY:  Yes.  I'm not sure how they were

6    involved.  But I know in April, they came.  And with the aid

7    of the Grace Foundation of Northern California, they did

8    remove about 20 of the most malnourished horses, but there

9    remained over 30 horses from April to July.

10         THE COURT:  All right, so they take 20?

11         MR. BEARDSLEY:  Yes.

12         THE COURT:  And where are they now?

13         MR. BEARDSLEY:  They're at the Grace Foundation.

14         THE COURT:  All right.  So there's another 30

15   still out there at the ranch?

16         MR. BEARDSLEY:  Thirty some odd, with some mares

17   preparing to foal, so the number is always changing.  But

18   they were also -- from April to July, not only were there

19   still corpses, but the stallion, there's still pregnant

20   mares, and there are skinny horses with no food.

21         THE COURT:  So, basically, who's providing the

22   day-to-day care of this herd?

23         MR. BEARDSLEY:  What happened was amid the shock

24   of it all, the bank stepped in, provided a $40,000 donation

25   to the Grace Foundation.

1          They first received an order from Lassen County

2    for permission to remove the horses, to remand them to the

3    Grace Foundation.   The funds were secured by creditors, and

4    that's where they are.

5          THE COURT:  But there's still horses roaming

6    around, is that right?

7          MR. BEARDSLEY:  It's my understanding the

8    remainder of the horses were removed.

9          THE COURT:  So they're all removed now to the

10   Grace Foundation?

11         MR. BEARDSLEY:  Yes.

12         THE COURT:  All right.  So it's just taking care

13   of them?  It's not selling them?

14         MR. BEARDSLEY:  No, it's taking care of -- the

15   state court order states that those claiming an act of title

16   to any horses, upon proof, and upon proof that they can take

17   care of them, they can go pick up the horse from the Grace

18   Foundation.

19         THE COURT:  All right, now, there was some sort of

20   proceeding in state court after this bankruptcy was filed at

21   which Mr. Bennett was incarcerated, right?

22         MR. BEARDSLEY:  Yes.

23         THE COURT:  What was that all about, from your

24   point of view?

25         MR. BEARDSLEY:  Well, the facts were, from the

1  initial receivership order, until that date, Mr. Bennett was

2  not in compliance with the receivership order.  So that date

3  was an order to show cause re contempt of the order.  And

4  the Court, I believe, we submitted the --

5          THE COURT:  Well, I'm trying to figure out exactly

6  what the court did.  I mean, I understand what happened to

7  Mr. Bennett.  But did the state court say, Mr. Bennett, you

8  didn't comply with the order?  You're going to jail for five

9  days?

10          MR. BEARDSLEY:  Yes.

11          THE COURT:  Or did it say you're going to jail

12  until you do certain things?

13          MR. BEARDSLEY:  No, they said, Mr. Bennett, from

14  the issuance of the order, July 31, until this moment, you

15  had not complied.  And apparently -- I wasn't there.  I read

16  the transcript.  But apparently the Court found Mr. Bennett

17  in contempt and provided a five-day --

18          THE COURT:  All right.  So there wasn't anything

19  Mr. Bennett could do once he was sentenced to get out

20  earlier?  In other words, he didn't hold the keys to the

21  jail cell?

22          MR. BEARDSLEY:  Not that I'm aware of, no.

23          THE COURT:  All right, so you want the receiver to

24  remain in place to do what?  The horses are gone.

25          MR. BEARDSLEY:  Well, at this point, it's a matter

DIAMOND COURT REPORTERS (916) 498-9288

1   of the receiver trying to fix up the property and making it

2   suitable for an actual business to run.

3           THE COURT:  Okay, see, what I was concerned about

4   when I read the motion was that there were still horses

5   there that no one was taking care of.  That's not the case?

6           MR. BEARDSLEY:  At this point, those horses have

7   been removed, and they're in the care of the facility.

8           THE COURT:  All right.  Well, in my understanding

9   of the procedure that's to be followed when a receiver is in

10  place, and a bankruptcy is filed, and someone wants the

11  receiver to remain in possession post-petition, all you have

12  to do is make a motion, and in the gap period, the receiver

13  stays in place.

14          When I read the motion in more detail the other

15  day, I was concerned that the receiver would walk away from

16  it, and Mr. Bennett wouldn't be able to get onto the

17  property, and some horses could starve.  So I issued an

18  order in the interim saying, look, until this comes on for

19  hearing, the receiver is to remain in place.

20          MR. BEARDSLEY:  And to be fair, I believe when the

21  motion was drafted, the horses had not been removed.

22          THE COURT:  That was my concern.  I mean, I want

23  Mr. Bennett to understand, I don't normally fire off an

24  order like that, but, you know, I thought horses were

25  starving in the North 40s somewhere.  I understand.  So

1    that's why you sought the order.

2            MR. BENNETT:  And I couldn't address it because I

3    couldn't go there.

4            THE COURT:  No, I understand.

5            But, basically, you want a receiver in place to

6    just clean up the property so your client can foreclose?

7            MR. BEARDSLEY:  Well, I wouldn't go that far at

8    this point.  There's still a lot of unresolved issues in the

9    civil case, which right now is stayed.

10           THE COURT:  Like what?

11           MR. BEARDSLEY:  The bank is working with the rest

12   of the parties to basically -- because, initially, the lien

13   wasn't intended to encumber the entire ranch, but right now

14   it does.  The creditors are working with the rest of the

15   parties in that case to carve out and deed over a portion of

16   that land that they can have an interest in.  And, so,

17   there's still a lot of issues regarding the value of the

18   property.

19           THE COURT:  But you don't need the receiver to do

20   that, do you?

21           MR. BEARDSLEY:  That's a separate issue.

22           THE COURT:  Right.  I mean, you may need relief

23   from stay to do that.  But I'm just dealing with the

24   immediate issue, and that is, whether a receiver should

25   remain in place.  That's it.  I'm not hearing any

1  countermotions.  I'm not granting any relief from stay so

2  you can foreclose.  I just have to figure out should I let a

3  receiver remain in place for the case, or some part of the

4  case, until something happens?

5          MR. BENNETT:  May I speak to this?

6          THE COURT:  You'll get your chance.  Why do you

7  need a receiver now?

8          MR. BEARDSLEY:  Well, Your Honor, again, since

9  drafting that motion, the horses were removed.  That was the

10 biggest emergency of course.

11         THE COURT:  Right.  That's gone.  That's been

12 solved.

13         MR. BEARDSLEY:  Yes.  Currently, what the receiver

14 would do next is begin preparing the property, cleaning out

15 the barns.  Also, there are a number of people living on the

16 grounds, who, as is stated in our motion, are burning trash.

17 And the receiver would do the job of keeping the grounds

18 free of any intruders.

19         THE COURT:  Were these campers or what?  You don't

20 know who they are?

21         MR. BEARDSLEY:  No.

22         THE COURT:  Are they living in structures?

23         MR. BEARDSLEY:  I believe trailers.  I don't know.

24         THE COURT:  Someone's moved trailers onto the

25 property?  All right, well, I'll ask him when it's his turn.

1              So from your point of view, squatters are on the
2    property?
3              MR. BEARDSLEY:  Exactly.  And it would be an
4    impediment to clearing out the property and making the
5    improvements necessary.
6              THE COURT:  So repair it and remove third parties
7    occupying the property?
8              MR. BEARDSLEY:  Absolutely.
9              THE COURT:  Anything else?
10             MR. BEARDSLEY:  Right now, that's what I believe
11    the next steps the receiver would take.
12             THE COURT:  All right.  And before I come to you,
13    Mr. Bennett, what's the U.S. Trustee's position on all of
14    this?
15             MR. MASSEY:  Well, Your Honor, as our papers
16    indicated, we didn't think there was enough evidence to
17    support this.  And the issue of the horses was a big deal
18    admittedly.
19             THE COURT:  Right.  But now that we know that's
20    not an issue.
21             MR. MASSEY:  Now we know that's not the case.  And
22    it just strikes me it's a ranch without a horse issue.  And
23    I don't see any problem -- I don't see why a receiver would
24    be necessary at this point.  I don't know all the facts, but
25    it just doesn't sound like the necessity is there.

1        THE COURT:  All right.  Mr. Bennett, go ahead.

2        MR. BENNETT:  Okay, sir.  I'd like to go back to

3   that, I'd like to get to your little shorter question at the

4   very beginning there about the equitable lien, the mortgage,

5   and the note.

6        As Mr. Beardsley said, on the 21st of July, there

7   was a hearing for equitable lien and equitable mortgage, and

8   the ex parte motion for the receivership.  I opposed the

9   summary adjudication for equitable lien and equitable

10  mortgage because I do feel like that's the correct court of

11  equity to resolve the issue where you have obstructions on

12  the other side.

13       However, the Ryan firm submitted an order seven

14  days later, which called for that same equitable lien and

15  equitable mortgage.  But they also added a refirmation with

16  a nondischargeable $630,000 to it.  Now --

17       THE COURT:  What do you mean a nondischargeable

18  $630,000?

19       MR. BENNETT:  I don't know.  That's what they call

20  it, so I'm not sure about that.  Mr. Ryan calls it a

21  nondischargeable refirmation of the deed of trust on me.

22       Your Honor, that's never been signed.  The order

23  for the equitable lien and equitable mortgage was never

24  signed.  Further, there was a partial settlement with some

25  of the parties, and I'm not sure if that settlement exists

1    or not.

2              But this much is certain, the property is in my

3    name.  It is not vested in Wells Fargo's name.  There's no

4    lien -- as of the 26th of this month, there's no lien.

5    There's no recording of an intent to lien.  The equitable

6    process did not proceed.  The summary adjudication was --

7              THE COURT:  But there was a pending action?

8              MR. BENNETT:  There was a pending action.

9              THE COURT:  Let me ask one more question.  Did

10    Wells Fargo record something, what the lawyers call a notice

11    of pending action?  They give notice that there was a

12    pending action that could affect title.

13              MR. BENNETT:  No, sir.

14              MR. BEARDSLEY:  Yes, there is.

15              THE COURT:  Well, he says there is, but all right.

16              MR. BEARDSLEY:  As of the 26th, anyway, of August,

17    there was not.  This motion was the 21st of July.  So

18    perhaps by now there is.

19              Now, I think it's really important at this point,

20    you know, I've heard all this about the horses.  So first of

21    all, I will advise the Court that the matter of the deaths

22    of the horses began in 2008, in 2009, May 25.  There are

23    three cases that deal with that, including 469327 in the

24    Lassen Superior Court.  DV49 --

25              THE COURT:  You don't need to give me the numbers.

1          MR. BENNETT:  And then the Third District Court of

2     Appeals as well regarding the deaths of the horses.  Now,

3     I'd like to show the Court --

4          THE COURT:  Well, were there horses on the

5     property?

6          MR. BENNETT:  There were horses on the property.

7     I've had horses on the property for years, sir.  I've been

8     in the horse business for years.  They're very expensive

9     horses.  I purchased them.  I care very much for them.  And

10    I've had a great deal of difficulty with a lot of people.

11         So to talk about the problem of the horses -- and

12    there's this really significant problem with the horses, the

13    receivership and the entire pact.

14         I thought the best way really to deal with that --

15    I know there's photographs that we've taken and whatnot, but

16    what I'd like the Court to -- these are the photographs that

17    Wells Fargo provided (indicating).  The difference is, sir,

18    that they are in color, and there aren't a lot of horses

19    standing in the distance.  And if I can give them to the

20    Court, maybe you can see that these horses are healthy.

21    Every one of them is in weight.  They're healthy.  They're

22    groomed, sir.

23         THE COURT:  All right --

24         MR. BENNETT:  May I finish, please?

25         THE COURT:  Go ahead.

1              MR. BENNETT:  Now, there are two horses on the

2    ranch that are ridden, a black and white stallion -- it's

3    worth a lot of money.  And he's had difficulties.  He's had

4    health problems.  I've been pumping it to him, including

5    just finishing a power pack right before this happened.

6              I will say this, the Grace Foundation's told me as

7    of three days ago that they are getting ready to start

8    adopting the horses.  The horses do not need any

9    rehabilitation.  It will be the most miraculous healing of

10   starving horses in the history of the world.  Further --

11             THE COURT:  I need to ask a question.  So the

12   Grace Foundation is going to give away your horses?

13             MR. BENNETT:  Yes, sir, they're beginning to adopt

14   them.  You see, the Grace Foundation believes that we lost

15   the property to foreclosure months ago.  But I've refused to

16   accept it and refused to leave.  And we've advised them that

17   there's a Chapter 11 bankruptcy, and they advised me to get

18   medication, seek counseling.

19             Wells Fargo has assured them that the problem is

20   that I refused to accept the foreclosure that took place

21   some time ago.  This is according to Beth DeCaprio, who is

22   the president and founder of the Grace Foundation.

23             I love my horses.  I take good care of my horses,

24   sir.  Since the day the receiver came in -- for one thing,

25   there are not nearly the number of horses that they talk

1    about, living horses, in the photographs.  It's short, the

2    number of horses.

3         THE COURT:  Well, Mr. Bennett, I am not going to

4    decide today whether the horses were mistreated or not.

5    This hearing is all about whether I require a receiver

6    remain in place.

7         MR. BENNETT:  Yes, sir, and I understand that.

8    All I'm asking is that if we can at least consider that

9    there's a possibility that these horses were not in danger

10   whatsoever, not in danger whatsoever.  And I will prove

11   that, not only with the photographs, but with some of their

12   submissions as well.

13        THE COURT:  All right.  I don't need to -- I'm not

14   going to conclude that they were mistreated today.

15        MR. BENNETT:  Okay, very good.  My concern is they

16   represent the heart of my living.  They're my business.

17   There's over $200,000 worth of horses.

18        THE COURT:  I understand that.  The only issue

19   today is whether I enter an order permitting the receiver to

20   remain in possession for some part or all of this case.

21   That's the only issue.

22        And, quite frankly, I'm having trouble with the

23   idea, given that the horses aren't on the property anymore,

24   and that was the emergency that I was being asked to deal

25   with when the case was filed.

1          Now, the other part that I'm concerned about is
2     now some third-party has your horses.
3          Does Grace Foundation think that they can give
4     those horses away?
5          MR. BEARDSLEY:  No, your Honor.  They understand,
6     they have the order from the Superior Court.  They have the
7     funds to rehabilitate and keep the horses.  And they're
8     directed to remit any healthy horses to anyone providing
9     proper title to the horse and showing that they can take
10    proper care of the horses.
11         THE COURT:  So Mr. Bennett can --
12         MR. BEARDSLEY:  If he could tomorrow show that he
13    had the means to take care of the horse, it would be
14    returned.
15         THE COURT:  But there's no possibility, in your
16    opinion, that someone who doesn't own the horse can get the
17    horse?
18         MR. BEARDSLEY:  No.  There's been no conversation
19    regarding giving those horses away.  The Grace Foundation
20    isn't under any understanding that there's been a
21    foreclosure.  Our office has never communicated that to
22    Grace Foundation.
23         THE COURT:  Now, the County got involved.  The
24    County inspected the horses, and it was the one that said
25    they needed some care?

1          MR. BEARDSLEY:  Yes.  In April, the County -- the

2    County doesn't have the means to remove the horses.

3    Initially, in April, 20 horses were removed, and the County

4    and the Grace Foundation removed 20 horses.  The county's

5    been aware of the situation and desiring to find a place for

6    all the horses.

7          THE COURT:  All right, I got you.

8          Look, Mr. Bennett, you know, I can't promise that

9    someone's not standing in front of me won't do something,

10   okay?  But I haven't been showed anything in the way of an

11   order from the Superior Court, or something from Grace, that

12   indicates it's going to give your horses away, or that you

13   can't get them back under some set of circumstances.  That's

14   got nothing to do at this point with respect to the

15   receiver.

16         MR. BENNETT:  Except that they refuse to speak

17   with me, sir.  They say that I've been warned not to --

18         THE COURT:  And you may have to do something about

19   Grace.  If you're entitled to get your horses back -- see,

20   the problem is this, the automatic stay does not stop the

21   exercise of police and regulatory powers.  So if the County

22   is the one who came in onto the property and said these

23   horses need care, and directed the turnover, then there's

24   nothing I can do about that.

25         MR. BEARDSLEY:  I understand that, Your Honor.

1    But if I can just speak to this for a few moments, if I

2    could?  I know -- when I walk in here, and you've seen this,

3    and you've heard these horrible things about 24 dead horses

4    starved to death.  And I know how it looks, and I know how

5    it's been made to look.

6              And, yet, just as a matter of law, this is simple

7    law.  I've been in this business for a long time.  If one

8    horse had been starved to death for sure, or even a

9    possibility that one horse was starved to death, that's a

10   felony, and I would be charged with that felony.  If these

11   horses, or the 20 before them, which I donated to Grace,

12   because of the struggles with the lawsuit, I donated those

13   horses so that there wouldn't be a problem.

14             The Grace Foundation -- my daughter was going --

15   she's an equine biologist and works for the vet center in

16   Roseville.  She was going the other night -- they've already

17   castrated my dogs and they're giving them away.

18             I have witnesses -- I wasn't there.  I was going

19   to see Mr. Wolff when they were taking the horses.  But I

20   have witnesses that a number of the horses did not go to the

21   Grace Foundation.  We have no way at this point, we have no

22   authority to say just to the Grace Foundation, please, there

23   really is a bankruptcy.

24             Your Honor -- and I know that while you would

25   think, well, that's silly because the Grace Foundation must

1  know.  But I spoke with Beth DeCaprio for about an hour, and

2  she was being filmed.  They're making a documentary.  So

3  this is all on film and recorded, sir.  And what she told me

4  is this, she told me that Dr. Michael Russell did not make

5  any declaration to the bankruptcy court --

6          MR. BEARDSLEY:  Objection, Your Honor.  This is

7  hearsay.

8          THE COURT:  All right, look.  Everyone's going way

9  beyond what I'm going to decide today.  You may have to sue

10  Grace Foundation.  I don't know.  But whatever I do, I can't

11  enter any order vis-a-vis you and Grace Foundation today

12  because that's not before me.

13          MR. BENNETT:  And I understand that.  I'm just

14  trying to explain to the Court where I am, sir.  And, also,

15  we're missing the fact that on the 18th, I received the

16  petition.  On the 19th, I returned to court.  And it's an

17  amazing transcript.  It's worth reading some of the pages

18  because they -- there were no contempt charges against me.

19  There was no contempt application ever completed.  And, yet,

20  they went forward with it.  They said the bankruptcy stay

21  doesn't have any jurisdiction over us, and they proceeded.

22          There's two reasons that I went to jail, sir, is

23  because the receiver was installed on the 21st of July, and

24  on the 23rd of July, two days later, I received a letter

25  from the Ryan firm telling me that I had to be gone by

1   Monday at 5:00 p.m.

2           And so, again, this company's not in their name.

3   There's not even a lien recorded on this property.  I've

4   never had a loan with Wells Fargo Bank.  I do not owe Wells

5   Fargo Bank any money, other than what would be determined in

6   the equitable process.  That day, they got a motion for an

7   equitable process, and then that afternoon, they evicted me.

8   And they took my horses under possession that day on the

9   21st.

10          And then, also, in the following time, never the

11  receiver -- I've never received an order from the receiver.

12  I asked her in court on the stand, have you ever given me an

13  order to leave the land?  And she said no.  And I said has

14  the judge ever told you to tell me to leave the land?  And

15  she said, no, I've never spoken with the judge.  So the only

16  orders we actually have are from the Ryan firm.

17          THE COURT:  All right.

18          MR. BENNETT:  And then the second part of this,

19  there are two more contempt hearings, sir.  They already

20  have another failure to appear on another contempt charge

21  against me, and there's another upcoming one on the 15th.

22  They're all for the same thing.

23          They told me to leave the land.  They really

24  didn't.  If you read the order of the receiver, it's really

25  not an order.  The judge just sets up the receivership.  But

1  that is what they call the judge's order that told me to

2  leave the land, was just the description of the

3  receivership.  That is the order that they say evicts me.

4        THE COURT:  All right.

5        MR. BENNETT:  So he told me, did you leave?  And I

6  said, no, sir, I didn't.  I was a real estate broker.  I'm

7  pretty familiar with property laws.  And I'm not quite sure

8  how I cannot have a debtor, not have a creditor, not have a

9  mortgage on my land.  I understand that we're in a civil

10  suit.  But normally under the law, you go through a series

11  of processes, that a lien be applied, and then if I couldn't

12  pay it, then a foreclosure, and then a writ of possession.

13        And so we jumped though right from the concept of

14  an equitable lien, which was never developed or imposed --

15  that's what the receiver should have done if the receiver

16  was applied.  They should have developed the equity of the

17  court of equity.  What do I owe?  What is the difference in

18  the value of the land?  But, instead, two days later, I was

19  evicted.

20        Following that eviction, and before I even

21  actually left -- to my knowledge, in the history of

22  California and American law, you can't, there's no grounds

23  in just a theory that you will get an equitable judgment

24  signed at some point to take the property from someone.

25        Further, according to the court transcript and

1    according to what she told us and how it began, it was all
2    of the business property, all of my personal property and
3    the real property.  I was not allowed to touch anything.  I
4    can't drive my truck still today.  I borrowed a truck to
5    come here.  I borrowed money to come here.  I cannot live in
6    my home.  And I'm under a court order.  I'll be arrested if
7    I return to it.

8            On the 25th, when I got out of jail -- and I
9    should finish.  He said I'm debating whether to put you in
10   jail for two days, but then he said I might do -- anyway, I
11   got five days for not turning over my records.

12           Now, there's a new order to show cause.  One was
13   on the 25th, which I didn't get notice for.  They told
14   Mr. Wolff there wasn't one.  And then now there's another
15   one scheduled for the 15th.  And they're saying on the face
16   of it that I may be looking at prison time.  And the reason
17   is because my renters, the people -- they're squatters -- my
18   renters -- there are rental agreements.  They worked for me
19   long before this.  They've moved trailers onto the property.
20   The main one lives in a $25,000 Fifth Wheel with pop-outs,
21   my trailer.  It's not a bunch of squatters burning trash.
22   And you imagine dead horses and these guys with their --

23           THE COURT:  Mr. Bennett, slow down.

24           MR. BENNETT:  Okay.  So I'm to go to court.  The
25   state court is completely -- they have completely

1    disregarded this Court's stay.

2          THE COURT:  All right, look, let me suggest

3    something and then see where we're going to go.  All right,

4    Mr. Beardsley, I don't see a need at this point to allow the

5    receiver to remain in place because the horses are not on

6    the property.  And I generally don't allow receivers to

7    remain in place absent some emergency.

8          Now, I would suggest that if you think, if you've

9    got some -- I can't even tell from this motion that you've

10   got some interest in Mr. Bennett's property, from this

11   motion.  I'm not saying you don't.  I'm just saying, from

12   this motion, I can't tell what your interest is.  And from

13   what I can tell from what Mr. Bennett's telling me, there's

14   a serious dispute about the interest.

15         So it seems to me that you ought to be

16   contemplating a motion for a relief from stay to get this

17   all squared away, all right?  Or someone needs to move the

18   dispute here, if that's the appropriate thing.  I don't

19   know.  But it seems to me that that dispute's got to get

20   resolved.  But other than the fact that there's people

21   living on the property, you know, to me, that doesn't

22   translate into you need a receiver right now.

23         MR. BEARDSLEY:  Well, Your Honor, I would just say

24   that right now, Mr. Bennett's steading is $680 per month.

25         THE COURT:  That may be grounds for relief from

1    stay.

2         MR. BEARDSLEY:  Your Honor, I guess our only

3    concern at this point is the presence, is potential

4    interference with the property by Mr. Bennett and his --

5         THE COURT:  All right, well, let me say the second

6    part of what I was going to say.  Now, Mr. Bennett and

7    Mr. Wolff, I'm not telling a state court what it can and

8    can't do.  I'm telling the parties to the litigation what

9    they can and can't do, all right?

10        If there was a state order in place before the

11   bankruptcy was filed that's disobeyed, or there's a state

12   court order that's exempt from the automatic stay, such as

13   one that's for the animals, that's disobeyed, the state

14   court can proceed with a criminal contempt matter

15   irrespective of this bankruptcy.

16        So no one should go away under the illusion that

17   because there's a bankruptcy on file, that doesn't mean the

18   state court can't do things.  It might be able to.

19        MR. WOLFF:  Understood, Your Honor.  I certainly

20   agree with that.  And the order that was at issue was a

21   violation of the order appointing the receiver, and --

22        THE COURT:  That could be a criminal contempt

23   matter.

24        MR. WOLFF:  I agree that it could be a criminal

25   contempt matter for a violation of that order in not

1   complying with the order.  There are other issues of them

2   actually taking the horses and things.

3           And I have a further concern that the hearing that

4   they have scheduled for September 15 for further contempt

5   for a violation that occurred after the filing of the

6   bankruptcy and after he was previously jailed.

7           THE COURT:  I don't know what the violation is

8   from what was said.

9           MR. WOLFF:  It is not turning over the property

10  and not turning over other assets.

11          THE COURT:  Well, if there was a final judgment

12  that said he didn't own -- and I understand from what was

13  said that this may not be the case -- if it was a judgment

14  that said he doesn't own this property, and he's on the

15  property, I mean, it seems to me a state court could treat

16  him as a trespasser and order him off.

17          MR. WOLFF:  I agree.

18          THE COURT:  But all I know from what I've heard

19  and read is that this is a complete mess, all right?  And

20  despite there being a mess, I would have allowed a receiver

21  to remain in place if I thought there was some danger of

22  irreparable injury to animals, something like that.  But,

23  apparently, the people that are living on the property have

24  been there for quite some time.  And if they're burning

25  trash in violation of some County ordinance, then someone

1   call up the County and have them come down there and cite

2   it, okay?

3           But, Mr. Bennett, despite your resources, if you

4   haven't insured the property, and you don't have the

5   resources to operate the property, they're going to ask

6   me -- or assuming they have some interest in the property --

7   they're going to ask me for a relief from the automatic stay

8   to go in to take the horses.  And you're going to have to

9   demonstrate an ability to reorganize.

10          Now, my last concern is, I don't want to read

11  tomorrow that all the horses came back on the property and

12  no one could afford the feed for the horses.  What's going

13  to happen with the horses?

14          MR. BENNETT:  Your Honor, I would like to leave

15  these.  These are the photographs that were produced by the

16  receiver, and these are photographs that were taken on the

17  29th of July, which was the date of the contempt of court.

18  When you look at them, I think that you will see, the horses

19  are in excellent health.

20          MR. WOLFF:  They were the same pictures that were

21  on file with the court but a color version.

22          THE COURT:  All right, that's fine.  But what I'm

23  trying to convey to you is, I will assume for sake of

24  argument that the horses were fine back then.  But now, you

25  don't seem to have the financial resources to feed the

1  horses.

2          MR. BENNETT:  But I make my money with the horses.

3  Your Honor, if you'll look at those color photographs they

4  took that I just submitted, they say that -- they took those

5  photographs, and the horses are standing in hay, eating hay,

6  and they're fat.

7          THE COURT:  All right, again, that was in July.

8          MR. BENNETT:  That was in July.  I'm in the horse

9  business.  If I was a taxi company, and they seized all my

10  taxis, and a 625 stipend is incorrect because they found the

11  foster agency and had the child removed from my home, so

12  that they could arrest me.  But I don't have that stipend

13  anymore either.

14          However, if I was a taxi company and they took all

15  of my taxis, then it would be very easy to say, well,

16  Mr. Bennett, we don't believe the taxi company will be able

17  to operate without taxis.

18          It's very true.  These are valuable horses.  They

19  are horses I use in my business.  They're not semi-feral.

20  They are barefoot and some are pregnant.  I will acknowledge

21  that.  Some have long hair.  There are two foals on the

22  ground.  There will be no more foals this year, sir.

23          THE COURT:  All right.  Well, Mr. Bennett, look,

24  to use your taxi cab analogy, assuming all that happened,

25  I've got to look out for everybody.  And if you can't afford

1  insurance for your taxi cabs, I can't let them go out on the

2  street.

3          I'm not saying you're wrong here.  What I'm saying

4  is, you may have recourse against somebody for something.

5  But the fact is, I've got to be in the hearing now, okay?

6  Do you have the resources to feed the horses?

7          MR. BENNETT:  Yes, sir.  If I have the horses, I

8  have the resources to feed them.  I'm turning down rides

9  every day.  This is my busiest time of the year.  I average

10  $10,000 a month on riding and training lessons.

11          THE COURT:  Well, I suspect what's going to happen

12  in this case is I'm going to get a request for an order

13  shortening time for relief from the automatic stay or a

14  request for a dismissal of the case.  And I'm going to want

15  to know in connection with that motion, from your point of

16  view, Counsel, what your client's interest in this property

17  is, and what stage is the state court matter in.  Is there a

18  judgment?  I mean, I need to be able to assess whether your

19  client has an interest in Mr. Bennett's property and whether

20  that interest secures something and that obligation is in

21  default.

22          From your point of view, Mr. Bennett, I need to

23  know that you have the prospect of reorganizing and

24  maintaining this property.  And if there's any whiff that

25  horses are dying, or anything like that, it's going to be

1  over.  I'm not saying you don't have recourse against

2  somebody if you're right.  But right now, you know, I'm not

3  going to let you take horses if you can't feed them.

4       MR. BENNETT:  I can feed the horses if I have

5  them.  That's how I make my money, sir.  People are calling

6  every day to ride the horses.

7       But, first, I really haven't dealt with the part

8  that all of my structures are locked up with chains around

9  them, and I'm not allowed to return to the property.  So I

10 wouldn't be able to even be there to feed the horses, unless

11 that stay is lifted.

12      THE COURT:  Well, you may need to deal with the

13 state court.  All I'm doing is denying without prejudice the

14 request that the receiver remain in possession.  If the

15 state court is enforcing some police power regarding the

16 horses, that just doesn't help you.  If you violated a state

17 court order before the case was filed, or even after the

18 case was filed, if it's not subject to the automatic stay,

19 you know, you can be held in contempt of court.

20      MR. BENNETT:  I understand and I agree with that,

21 Your Honor.  I didn't understand, quite understand that you

22 had lifted the receiver today, and I'm satisfied with that,

23 and we can take it from there.

24      MR. WOLFF:  Your Honor, could the order, in

25 addition to denying, specifically order the receiver to turn

1    over the property back to the debtor?

2         THE COURT:  There is an order, section 543.  I am

3    denying the motion without prejudice for the receiver

4    remaining in place because I see no irreparable injury

5    likely to occur because the horses are off the property.

6    And they're not on the property.  They're not being

7    maltreated.  There may be other issues that warrant relief

8    from the automatic stay, but they don't warrant a receiver

9    being in place.

10        But, you know, if they go back and they show me

11   that 10-acres burned up because someone was burning trash,

12   that may change.  You know, something.  I mean, this could

13   change.

14        MR. WOLFF:  Understood, Your Honor.  My concern is

15   that in the hearing, and it was in the transcript, the state

16   court expressed concern that, over their knowledge of the

17   automatic stay, the breadth of the automatic stay and --

18        THE COURT:  I can't help what someone does and

19   doesn't know.

20        MR. WOLFF:  Understood.  And that's why we were

21   simply hoping to have an order that when it denied the --

22   just order the receiver to turn over the real property and

23   personal property.

24        THE COURT:  There is a part of section 543 that

25   requires custodians to turn over possession to a debtor in

1  possession or a trustee.  Now, part of the difficulty with

2  the translation is it probably says "trustee," and there's

3  no trustee in this case.  So you have to cite them to the

4  section in Chapter 11 that says the debtor in possession is

5  a trustee.

6           But, Mr. Bennett, you are a trustee, all right?

7           MR. BENNETT:  Yes, sir.

8           THE COURT:  And any breach of your duty as trustee

9  will bring about a swift result.

10          Now, I said I'm not telling the state court what

11 it has and hasn't, because I don't have that record, all

12 right?

13          MR. BENNETT:  You do.

14          THE COURT:  Well, no, I don't have it.  I have

15 pieces of it.  I don't have all of it.  And if it's of the

16 opinion that there's criminal contempt of one of its orders,

17 then you better deal with the state court.

18          MR. BENNETT:  And if I just may quickly, Your

19 Honor?  Actually, you do have the entire transcript of that.

20          THE COURT:  I have a transcript.  I don't have the

21 entire court trial.

22          MR. BENNETT:  Right.  But prior to that, there was

23 no hearing prior to that hearing.

24          THE COURT:  Well, no.  There's all sort of

25 pleadings that I don't know about, be it the complaint, the

1    answer, the motion for the receiver.

2    MR. BENNETT: Well, absolutely. The 21st, there

3    was a motion for a receiver. The 29th, the contempt order

4    or the application was not heard. And then -- so I'm just

5    saying -- I'm sorry, Your Honor. But I'm saying that in

6    terms of their contempt, I think that we'll show that

7    that's --

8    THE COURT: All right. Well, Mr. Bennett, the

9    only thing I'm trying to do is make sure you understand,

10   don't ignore what is going on in state court. Because I

11   can't tell from what I have in front of me whether you're

12   being cited for civil or criminal contempt.

13   MR. BENNETT: Very well. I do understand.

14   THE COURT: And you could end up in jail again if

15   you don't pay attention.

16   Now, the state court action, to the extent it is

17   an enforcement of a claim, or a right in property, it's

18   stayed, right?

19   MR. BEARDSLEY: Absolutely.

20   THE COURT: All right. To the extent it's, you

21   know, an enforcement of public health and welfare laws, it's

22   not stayed, all right? I know the County got involved in

23   some way, maybe just tangentially -- I don't know -- but

24   that hasn't been taken care of here.

25   MR. BEARDSLEY: Well, the County approached us.

1          THE COURT:  No, I'm not being critical.

2          MR. BEARDSLEY:  I understand, Your Honor.  Your

3    Honor, just to clarify your ruling.  So the receiver's

4    subject to 543 from this point, the turnover requirement,

5    except as it relates to the horses?

6          THE COURT:  Well, the horses aren't in her

7    possession?

8          MR. BEARDSLEY:  They are not in her possession.

9          THE COURT:  So there's a different custodian.  And

10   I haven't made any order with reference to that.

11         Now, if you think you're entitled to get those

12   horses back, you're going to need to confer with Mr. Wolff

13   and do what's necessary to get them back.  I can't do

14   anything to Grace Foundation because Grace Foundation isn't

15   standing here or didn't have notice that it should be

16   standing here.

17         MR. BENNETT:  I understand, Your Honor.  And I'm

18   sorry to go on here.  It's exciting for me, but it's very

19   frustrating.

20         THE COURT:  No, I understand.  But, you know, I

21   can't say I'm a horse person, but I don't want to read in

22   the paper that horses are dying because someone's not taking

23   care of them.  And, so, if Grace Foundation says they don't

24   want to turn them over because they're concerned about

25   something, I'm not saying I'm going to believe it, but I'm

1    going to listen to it.

2              MR. BENNETT:  I understand.  And we'll proceed

3    with that in that place, where the rest of the information

4    is.  I'm comfortable with that.

5              THE COURT:  You know, if you think you want to go

6    forward with the state court action, make a motion for a

7    relief from stay.

8              MR. BEARDSLEY:  Absolutely, we will.

9              THE COURT:  And if I grant that motion, if a

10   receiver would make some sense in connection with going

11   forward, make that case.

12             MR. BEARDSLEY:  Absolutely.

13             THE COURT:  But until I grant relief from the

14   automatic stay, I don't see the necessity of a receiver at

15   this point, all right?

16             But you're going to file your schedules in 14

17   days.  If your schedules aren't filed in 14 days, your case

18   is going to be dismissed.  And there won't be another

19   hearing about it, and then you will have relief from the

20   automatic stay.

21             MR. BENNETT:  So I can return to my home where the

22   documents are and have the receiver --

23             THE COURT:  The receiver is required by bankruptcy

24   law to turn over what's in her charge, all right?  I made an

25   order through today; that order is expired, all right?

1          And I can't fault the bank for making the motion.

2    I didn't set the hearing when it requested because I didn't

3    think it was enough notice for you.  If I had known you were

4    going to be here, I would have heard it, but I didn't know

5    that.  And I know you said the 20 largest weren't notified,

6    but, quite frankly, if it was a question of animal welfare,

7    I don't care.

8          MR. BENNETT:  And so I'm returned to the trustee

9    in possession?

10          THE COURT:  You are the debtor in possession.

11          MR. BENNETT:  Debtor in possession, okay.  Thank

12    you very much.  I really appreciate your time.

13          MR. WOLFF:  Thank you, Your Honor.  A minute order

14    will issue?

15          THE COURT:  I'm going to issue a minute order,

16    madam clerk, dissolving the interim order allowing a

17    receiver to remain in possession, all right?  And denying

18    the motion without prejudice to allow a receiver to take

19    possession, all right?

20          Thank you.

21          MR. WOLFF:  Thank you, Your Honor.

22          MR. BENNETT:  Thank you, Your Honor.

23          (Thereupon, the hearing concluded at 3:17 p.m.)

24

25

1    CERTIFICATE OF SHORTHAND REPORTER

2

3        I, VICKI L. BRITT, a Certified Shorthand Reporter,

4    of the State of California, do hereby certify that I am a

5    disinterested person herein; that I reported the foregoing

6    proceedings in shorthand writing; that I thereafter caused

7    my shorthand writing to be transcribed into typewriting.

8        I further certify that I am not of counsel of

9    attorney for any of the parties to said proceedings, or in

10   any way interested in the outcome of said proceeding.

11       IN WITNESS THEREOF, I have hereunto set my hand

12   this September 15, 2011.

13

14       /s/Vicki L. Britt_____
         Vicki L. Britt, RPR, CSR No. 13170

15

16

17

18

19

20

21

22

23

24

25