# EXHIBIT F

GEORGE M. ROSENBERG, ESQ. (STATE BAR NO. 62570)
A Professional Corporation
12100 Wilshire Boulevard, Suite 1250
Los Angeles, CA 90025
Telephone: (310) 207-0703
Facsimile: (310) 207-0787

Sohaila Sagheb, SBN 144202
Law Office of Sohaila Sagheb
21112 Ventura Blvd.
Woodland Hills, California 91364
Phone: (818) 346-3724
Fax: (818) 702-9916
sslawoffice@sbcglobal.net

Attorneys for Plaintiff The Grace Foundation of Northern California, A California Corporation

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF ORANGE

| | |
|---|---|
| THE GRACE FOUNDATION OF NORTHERN CALIFORNIA, A CALIFORNIA CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> WELLS FARGO BANK, N.A., a federally chartered bank, on its own behalf and as trustee of MLMI Trust Series 2005-HE3; BANK OF AMERICA, N.A., a federally chartered bank, on its own behalf; BAC HOME LOANS SERVICING, LP, a Texas Limited Partnership and a unit of Bank of America, N.A.; TIMOTHY M. RYAN, an individual; THE RYAN FIRM, a California Professional Corporation; VICKI LOZANO; COUNTY OF LASSEN, CALIFORNIA; and Does 1 through 50, <br><br> Defendants. | CASE NO. 30-2012-00612863-CU-BC-CJC <br> *Assigned for all Purposes to the Honorable David R. Chaffee, Dept. C20* <br><br> FOURTH AMENDED COMPLAINT FOR: <br><br> 1. COMMON COUNT—QUANTUM MERIT—SERVICES RENDERED; <br> 2. FRAUD; <br> 3. BREACH OF FIDUCIARY DUTY; <br> 4. LEGAL MALPRACTICE RYAN AND THE RYAN FIRM; <br> 5. NEGLIGENCE AGAINST LOZANO AND THE BANKS; <br> 6. NEGLIGENT TAKING AGAINST COUNTY OF LASSEN; <br> 7. NEGLIGENT MISREPRESENTATION AGAINST ALL PARTIES, EXCEPT THE COUNTY; <br> 8. BREACH OF ORAL AGREEMENT AGAINST COUNTY OF LASSEN; <br> 9. RECESSION AND REFORMATION; <br> 10. INDEMNIFICATION—Civil Code §1833 <br><br> DEMAND FOR JURY TRIAL <br><br> [UNLIMITED JURISDICTION] |

-1-

FOURTH AMENDED COMPLAINT

COMES NOW Plaintiff The Grace Foundation of Northern California, a California corporation and says as follows:

PARTIES

1. Plaintiff The Grace Foundation of Northern California ("Grace") is a California non-profit corporation with its principal place of business in El Dorado Hills, California. Grace is an animal rescue and rehabilitation ranch. It provides critical care and rehabilitation for abused and neglected horses and utilizes many of its rescued horses in equine assisted learning and therapeutic programs for youth and adults. Grace also rescues and rehabilitates dogs, cats, cows, sheep, goats, pigs, chickens and more. Grace is authorized to do business in the State of California and conducts business in El Dorado County, California.

2. Defendant Wells Fargo Bank, N.A. ("WFB") is a federally chartered bank that does business in the County of El Dorado, State of California. WFB is sued herein both in its own right and as trustee of the MLMI Trust Series 2005-HE3 ("Trust").

3. Defendant Bank of America, N.A. ("BOA") is a federally chartered bank that does business in the State of California and the County of El Dorado. BOA is sued herein in its own right, and as the parent and/or alter ego of BAC.

4. Defendant BAC Home Loan Servicing LP ("BAC") is a Texas limited partnership and a unit of BOA. BAC is sued herein in its own right.

5. Defendants WFB, BOA, and BAC shall be referred to collectively herein as the "Banks".

6. Defendant Timothy M. Ryan is an individual, and Grace is informed and believes and thereon alleges that Ryan resides in Orange County, California. Ryan is a member of the California Bar. At all relevant times, Ryan purported to act as Grace's attorney.

7. Defendant The Ryan Firm is a California Professional Corporation, and the law firm through which Ryan practices.

8. Defendant Vicki Lozano (hereinafter "Lozano") is an individual. Grace is informed and believes and thereon alleges that Lozano is a resident of Lassen County, California. Ms. Lozano is a Court-appointed Receiver in the matter of *Allen v. Summit Financial Group, et al.,* and associated and related actions and cross-actions, Case No. 45679, Lassen County Superior Court. Ms. Lozano was appointed Receiver with respect to the Whispering Pines Stables and horses.

9.  Defendant County of Lassen, California, is a political subdivision of the State of California (hereinafter "County").

10.  Dwight Alan Bennett (hereinafter "Bennett") is an individual.  Grace is informed and believes and thereon alleges that Bennett resides in Lassen County.  Bennett claims to be the owner of the horses at issue in this action.  Bennett has never abandoned the horses.  In fact, in face of losing the horses to the Receiver, Bennett filed for Bankruptcy to avoid the transfer of the horses to the Receiver.  Bennett either owns, once owned, or claims to own, Whispering Pines Stables, located at 695-725 Highway 36, Susanville, California 96130 and all personal property thereon, including the horses.  The Banks have or continue in their attempts to foreclose the real property comprising Whispering Pines Stables.  However, the animals on that property were never abandoned.  See Lassen County Code Section 8.10.110.

11.  Unless otherwise alleged in this 4th Amended Complaint, Plaintiff is informed and believes, and on the basis of that information and belief alleges, that at all times mentioned in this 4th Amended Complaint, Defendants were the agents and employees of their Co-Defendants, and in doing the things alleged in this 4th Amended Complaint, were acting within the course and scope of that agency and employment.  Specifically, but without limitation, Plaintiff is informed and believes that Ryan was the agent of the Banks; and that Lozano's appointment as Receiver was as an agent of Ryan and the Banks.  Plaintiff is further informed and believes that Lozano's actions were directed and orchestrated by Timothy Ryan, also an agent of the Banks.

12.  Plaintiff does not know the true names of Defendants Does 1 through 50, inclusive, and therefore sues them by those fictitious names.

## BACKGROUND FACTS

13.  On or about April 8, 2011, Grace and the County entered into an Agreement whereby Grace took custody of 20 horses from Whispering Pines Stables belonging to Bennett.  The County agreed to pay for "equine protective services" provided by Grace for the care, custody and maintenance of the horses.  A true and correct copy of this Agreement is attached hereto as Exhibit "A".  Ownership of these horses was transferred to Grace via the County of Lassen's "Animal Surrender Form", a true and correct copy of which is attached hereto as Exhibit "B".

-3-
FOURTH AMENDED COMPLAINT

14.    After protracted litigation between the Banks and Bennett, on July 21, 2011, the Lassen County Superior Court, in the matter entitled *Allen v. Summit Financial,* Lassen County Superior Court, Lead Case No. 45679, at the request of the Banks, appointed Lozano as Receiver "immediately empowered and directed to take possession and control over the real property which is the subject of this action, which property bears the assessor's parcel numbers 099-260-69 (the '40 acres') and 099-260-70 (the '14.03 acres') ... and to demand, receive and check all rents, issues, profits and income therefrom, and all monies arising from the subject property, to collect debts and compromise same, and to perform all acts respecting the subject property which the Court may authorize." A true and correct copy of the July 21, 2011 Order is attached hereto as Exhibit "C". The "real property" referenced in this Order is the Whispering Pines Stables. The Banks were represented by Ryan in the *Allen* Court matter.

15.    The Banks and Ryan sought the appointment of a Receiver because they believed that Whispering Pines Stables was a viable business that the Receiver would manage pursuant to the appointment and which would render profits that could be used to pay Bennett's arrearages on the mortgage on Whispering Pines Stables.

16.    Instead, what Lozano found was dead and starving horses that she was now charged with the care of. Lozano looked to Ryan and the Banks for funds to care for and feed the horses. Grace is informed and believes that the minimum monthly cost of caring for the horses was $15,000, which sums was to be paid by the Banks. Eliminating this financial liability would have benefited the Banks.

17.    On July 22, 2011, Ryan and WFB entered into a written Indemnification Agreement with Lozano, which provides "Wells Fargo shall be liable for and agrees to defend, indemnify, and hold harmless Receiver, and her respective agents, employees, and subcontractors, against any and all liability, damages, losses, expenses, demands, claims, suits or judgments arising out of any adverse proceeding against Receiver in the Action [defined as the action in which the Receiver was appointed], *or in any other civil forum*, related to Receiver's commission of her duties, responsibilities, rights, and obligations granted or imposed by the Order."

18.    Again on motion of Ryan and the Banks, the *Allen* Court entered an Order on July 29, 2011 providing that Bennett was to "relinquish possession of the animals subject to this Order, and shall fully cooperate with the Receiver in her execution of the acts performed under

the authorization granted by this Order." The July 29, 2011, Order then authorized Lozano "to surrender any and all animals [at Whispering Pines Stables] … to the County of Lassen." Finally, the July 29, 2011 Order, granted the County authority to "release any animals surrendered by the Receiver *to its owner* upon a sufficient showing by the purported owner of his or her ownership, and upon a sufficient showing by the purported owner that he or she can adequately care for the claimed animal." A true and correct copy of this Order is attached hereto as Exhibit "D". As such, the only manner by which the County could release any of the animals it received from Lozano was to those who could show proof of ownership and the owners could further show that they could adequately care for the animal.

19.    After obtaining the Order to release the animals to the County, Lozano sought cost information for care of the animals. On August 4, 2011, Ryan wrote to Lozano: "Let's see what the local rancher would charge…to just caretaker them until foreclosure…But THEN what do we do with them??? This is a huge financial drain…" A true and correct copy of this email is attached hereto as Exhibit "E". The Banks, via Ryan, had to "give" the horses to somebody else to stop the "financial drain". Otherwise, the horses would have remained the financial responsibility of the Banks. As suggested by Ryan's email the Banks wanted to make the horses the financial responsibility of somebody other than the Banks who were responsible for paying the Receiver. If Ryan could accomplish this task, it would be to the financial benefit of the Banks.

20.    In or about August, 2011, Ryan, on behalf of the Banks, and/or Lozano contacted Grace indicating an urgent need to remove approximately 36 horses from Whispering Pines Stables (these horses, and the foals born to them, constitute the "Whispering Pines Horses"). Grace explained to Ryan that it would be willing to assist with the care of the Whispering Pines Horses on one of two conditions: either (1) the horses would be held in protective custody, with ownership of the horses remaining with their rightful owner, and the Banks assuming full financial responsibility for the care of the horses at Grace's standard rates for such care; or (2) the rightful owner of the horses would relinquish ownership of the horses to Grace, with a set sum of money paid to Grace to cover the cost of caring for them. Ryan claimed that the Banks had already spent a great deal of money providing care for the horses and that they would only be interested in relinquishing ownership of the animals to Grace. Ryan did not disclose to Grace, however, that the Banks did not own the Whispering Pines Horses, and that the Banks

-5-

FOURTH AMENDED COMPLAINT

did not have the lawful right to relinquish ownership of the Whispering Pines Horses to Grace, via Lozano or in any other manner.

21.   On or about August 2, 2011, Grace told Ryan that it would assume ownership of the horses on the express condition that Grace were paid $50,000, which was needed to supplement Grace's financial wherewithal to provide care for the horses until Grace could adopt out the horses to new owners.  Grace made clear to Ryan that one of its major concerns was the possible pregnancies of the mares (adult female horses) because one or more stallions (male horses that have not been gelded (castrated)) had been housed with the mares, without appropriate separation.  Grace told Ryan that pregnancy testing would need to be immediate, and that as an express condition for assuming ownership of the horses, and pursuant to standard shelter practice, all early pregnancies would need to be terminated.  A further express condition of assuming ownership of the horses, and which was expressly communicated to Ryan, was that a majority of the Whispering Pines Horses needed to be ready for adoption by October 15, 2011, a day in which Grace had already planned a Nationwide-adoption effort.

22.   On or about August 17, 2011, Ryan confirmed to Grace that the Banks would pay Grace a total of $40,000 ($20,000 from WFB and $20,000 from BOA/BAC).  Ryan emphasized that these payments were "donations" and not payment for the horses' care.  Ryan requested a letter from Grace acknowledging the donations and asked Grace not to mention the termination of the pregnancies in the acknowledgement letter.  Ryan also instructed Grace to include in the letter examples of how the "donations" were to be used, but emphasized that the letter needed to reflect a total cost approximately $40,000.

23.   Lassen County agreed, via Pete Heimbigner, the County's Public Works Deputy Director, to pay an additional $10,000 for the Whispering Pines Horses' care, which to date has not been paid.

24.   On August 18, 2011, Grace sent Ryan the requested letter via email regarding the donations stating that the horses would be prepared for the October, 2011 adoption.

25.   The most critical element of this agreement is Grace's ability to take ownership of the Whispering Pines Horses immediately, and to take all appropriate steps immediately to manage the horses.  None of the Defendants told Grace that they did not have legal title to pass to Grace; none of them disclosed the July 29, 2011 court order or disclosed the fact that the owner of the Whispering Pines Horses were unknown.  In fact, the County of Lassen had

specifically been ordered to surrender the animals <u>only</u> to the owners – nobody else.

26.    On August 19, 2011, during a contempt proceeding in Lassen County Superior Court against Bennett, Bennett advised Ryan, Lozano and the Court of his bankruptcy filing on August 18, 2011. Rather than acknowledging that the automatic stay prevented the Superior Court from proceeding, Ryan urged the Superior Court to proceed with the contempt proceeding because it "is a quasi-criminal proceeding. A stay, a bankruptcy stay is simply a stay to prevent debtors from collecting on debts of the bankrupt. It has no bearing on this proceeding at all whatsoever." Ryan failed to mention to the Court that the Bankruptcy filing had the legal effect of staying the July 29, 2011 Order which transferred assets (animals which now belonged to the Bankruptcy estate – not to Bennett).

27.    Later the same day, on August 19, 2011, Grace's Executive Director, Beth DeCaprio, and Jeanne Warr met Ryan, Lozano, and Pete Heimbigner of Lassen County met to go over a plan for picking up the Whispering Pines Horses, which Ryan, Lozano and the County knew belonged to Bennett and/or the Bankruptcy Estate/Trustee. DeCaprio and Warr met everyone at Lozano's office in Susanville. DeCaprio and Warr were informed that Bennett had been placed in police custody during a hearing in Lassen County Superior Court that took place earlier on the morning of August 19. Critically, DeCaprio and Warr were not told that Bennett informed Ryan, the Banks, Lozano and the Court that on August 18th Bennett had filed for bankruptcy protection. Ryan, the Banks and Lozano did not tell Grace that the Bankruptcy had the legal effect of transferring Bennett's assets, including the horses, to the Bankruptcy estate, thereby effectively staying the July 29th Order permitting Lozano to transfer the horses to the County.

28.    In any case, Grace never had the ability to take ownership of the horses as Lozano and the County never had ownership to transfer. All that the July 29th Order authorized Lozano to do was to surrender the equine to the County and the County to release the animals to their owners.

29.    Ryan, the County and Lozano failed to disclose the contents of the July 29th Order to Grace. Instead, Ryan, the County and Lozano represented that ownership of the horses was being transferred. Further, Grace was not told of Bennett's bankruptcy filing which might have prompted Grace to ask why Bennett's filing Bankruptcy would have any impact on the transfer of the horses if ownership was being conveyed by Lozano to the County and from the County to

-7-
FOURTH AMENDED COMPLAINT

Grace. Instead, Grace was told that it was receiving ownership of the Whispering Pines Horses via Final Disposition. Attached hereto as Exhibit "F" is a true and correct copy of the Final Disposition transferring ownership of the August horses. The "Final Disposition" appears on the County's Letter head with title, address and telephone number and purports to be a legal document pertaining to the transferring of the horses.

30.    By contrast, with respect to the four horses whose ownership was not being transferred to Grace, those horses would be placed into Grace's protective custody subject to a pre-existing Memorandum of Understanding between Grace and Lassen County until the owners could arrange to pick up the horses from Grace. Attached hereto as Exhibit "G" is a true and correct copy of the Protective Custody Agreement signed on the same date as the Final Disposition Agreement.

31.    Based on the foregoing, Grace continued to prepare to receive the Whispering Pines Horses on August 26, and stepped up its advertising efforts for the October 15, 2011 Nation-wide adoption effort. Grace took these steps based on its belief, derived from the representations of Defendants, including the "Final Disposition Agreement" that it would obtain ownership of the Whispering Pines Horses upon transfer.

32.    On August 25, 2011, Ryan and the Banks filed an application in the Bankruptcy Court seeking "an annulment of the stay so that the filing of the subject bankruptcy petition does not affect post-petition acts …," including transferring ownership of the horses to Grace. The Banks and Ryan knew, as of August 25, 2011, that ownership of the horses could not be transferred to Grace without further Court action, yet they did it anyway.

33.    On August 25, 2011, Ryan and the Banks tried to do an end run around the Bankruptcy trustee by making a Motion to Excuse the Receiver from turning over the horses to the trustee. On August 25, 2011, Ryan wrote in the Memorandum of Points and Authorities executed under his name and by an attorney at his office, that the Motion to Excuse the Receiver's transfer of property to the Trustee should be heard on shortened notice "because the bankruptcy stay clouds the Receiver's authority to manage the ailing property. Specifically, the bankruptcy stay impedes the Receiver's ability to transfer the remaining, severely neglected, thirty-four (34) horses ('Remaining Horses'), as ordered by the Lassen County Superior Court, from the dilapidated subject property to a rehabilitation facility where the horses will receive necessary and immediate medical treatment." Knowing that the "bankruptcy clouded title"

-8-

(which Lozano and the County never had to begin with), Ryan went to Whispering Pines on August 26th where he watched as the horses were removed from Whispering Pines by Grace without saying a word about "clouded title", the Bankruptcy, or the fraudulent form of transfer.

34.    Grace formulated its initial estimate of the cost for caring for the Whispering Pines Horses and its agreement to do so at a cost of $50,000.00 was based on its belief that it would obtain immediate ownership of the horses and that the Nation-wide adoption programs set for October 15, 2011 would result in the prompt adoption of many of the horses.  Grace would never have taken the horses under such terms had it known that title to the horses was more clouded then ever after the July 29, 2011 Order and the Bankruptcy filing.

35.    On August 26, 2011, notwithstanding the bankruptcy, the automatic stay and the other issues related to title, Lozano, at the request of and for the benefit of the Ryan and the Banks, purported to grant "Final Disposition" of the subject horses to Lassen County, which in turn purported to "relinquish" the animals to Grace.  Exhibit "F".  Lozano also purported to enter into a "protective custody" agreement with Lassen County regarding other animals, and Lassen County entered into such an agreement with Grace.  Exhibit "G".  The Banks and Ryan knew that Lozano had no authority to grant "Final Disposition" to the County.  Lozano's transfer authority was limited to transferring the animals to the County for transfer of the animals to their rightful owners.  Yet, the Final Disposition purported to transfer to the County "Final Disposition" of the horses.  Lozano proceeded with these agreements at the request of and for the benefit of the Banks who would have been responsible for feeding and caring for the horses absent the transfer of the horses to Grace.  The County, in direct violation of the Court Order accepted ownership of the horses and thereafter purported to give "Final Disposition" to Grace.

36.    Believing there was no cloud on title and that they were receiving ownership of the horses, on August 26, 2011, Grace took custody of the Whispering Pines Horses and moved them to its ranch in El Dorado Hills, where the surviving horses and their foals live today.

37.    On September 2, 2011, Ryan's Motion to Excuse turnover of the horses by the Receiver to the Trustee was denied by the Bankruptcy Court.  The Bankruptcy Court denied Lozano the right to control the disposition of Whispering Pines Horses.  Neither Ryan nor the Banks, however, advised the Bankruptcy Court that Lozano, without legal authority, had already turned the horses over to Grace via Lassen County on August 26, and under the false

pretense that Grace had received the horses via "Final Disposition".

38.    No longer could Ryan pretend that ownership had been conveyed to Grace. After the September 2nd hearing, Ryan finally disclosed to Grace that Bennett had filed bankruptcy and that this was "bad news". Ryan instructed Bennett, by a September 15, 2011 email that Ryan's "firm represents the Grace Foundation concerning all animals removed from Whispering Pines. Do not contact Beth DeCaprio or anyone related to the Grace Foundation concerning any matters. Additionally, please ensure that your agents do not contact anyone at the Grace Foundation concerning these animals. Please go through our office and our office alone."

39.    Ryan told DeCaprio that the bankruptcy was filed AFTER August 26, 2011, the date Grace was given Final Disposition of the horses. Nonetheless, Ryan stated that because of the bankruptcy, Grace needed to "postpone" adopting the horses out but that he would have the problem resolved in just a couple of weeks. This was yet another deliberate misrepresentation. The obstacle to adopting out the horses was primarily the fact that Grace had never received ownership of the horses via the Final Disposition, which was a false document on the letter head of Lassen County, consented to by Lassen County and signed by Lassen County.

40.    On September 17, 2011, at a time when it is undisputed that Ryan was jointly representing the Banks and Grace, the Banks filed a Motion in Bankruptcy Court for relief from the automatic stay. Couched in the language of the Bankruptcy, Ryan expressly instructed Grace not to take any of the usual steps Grace might otherwise take with respect to newly rescued horses, including the termination of early pregnancies. This significantly adversely impacted Grace. Had Grace known on August 26, 2011 that it did not own the horses and that its efforts to manage these horses would be severely limited Grace would never have accepted the horses.

41.    On September 19, 2011, in a declaration prepared by Ryan and for the Banks' benefit, and notwithstanding the stay, Lozano declared that Grace has "provided for the sa[f]e transfer of the horses for the time being."

42.    On September 23, 2011, in an email, Ryan advised Grace that he had "spoke[n] to the DA for about a half hour" about Bennett. Ryan further stated that he told the DA he "would provide him with a real prosecution package."

43.    On September 29, 2011, in an email, Ryan advised Grace that "the District

FOURTH AMENDED COMPLAINT

Attorney received the package from our office … if I don't get good vibes about him moving forward soon, we need to find the outside pressure that you were referring to … seems like a pretty easy way to score some cheap political points…." Clearly, Ryan was attempting to remove Bennett from the picture by having the state impose criminal prosecution so as to prevent Bennett was asserting his ownership over the horses.

44.     On October 13, 2011, Austin Beardsley, an associate in The Ryan Firm, sent an email to Grace and asked whether Grace would provide a declaration in support of the Banks' position in the Bankruptcy Court. Beardsley stated, "thanks for all that you guys have done for the horses!!!!" Without any hesitation, Ryan and the Banks were willing to use Grace when it benefited them, but as set forth below, once Ryan and the Banks obtained all that they needed from Grace, they refused to provide any help for the horrific situation unfolding at Grace.

45.     On October 14, 2011, Ryan sent an email to Grace and said, "my inside source talked to the DA on Monday night …. He said, 'I don't have a prosecutable file.' I heard that he and David Bennett are drinking buddies from way back. It is all up to us now. Seriously. No one else cares …. By us, I mean me, you and Beth. I will be up on Monday for my hearing. I will win and I hope that the Court will also dismiss Dwight's BK. We are simply moving to reimburse the Receiver and complete our foreclosure. I didn't ask for that yet … as I don't have grounds … but if the Court is disgusted enough by what we presented, we will get that result." Once again, while Ryan is trying to curry favor with Grace, it is now obvious that his sole motive was to use Grace for the benefit of himself and the Banks.

46.     On October 21, 2011, the Banks obtained relief from the automatic stay in Bennett's bankruptcy. Ryan sent Grace an email stating, "Thanks for letting me hang out with the cool kids yesterday. I think that the strategy for Beth's update to the Grace supporters is very critical for momentum. Beth obviously can't fold, and needs to continue to hold Burns [Lassen County DA] accountable." Ryan then proposed a message to Grace supporters. Ryan concluded, "As always, without you our mission is impossible. With you, our mission might actually be achievable."

47.     On October 24, 2011, in an email, Ryan advised Grace that "the Sheriff's office called me today to inform me that they would be executing a search warrant at Whispering Pines TOMORROW!!!! Please don't tell anyone … as it is kind of a secret … he was just giving me a Courtesy warning because of the bank's security interest in the property.

48.    On October 25, 2011, Bennett was arrested on 70 counts of felony animal abuse.

49.    On October 27, 2011, Ryan sent an email to Grace and stated, "My wife has lived through the nightmare with me. Silently suffering as I was brooding and angry about Lassen justice. She is amazed at what you folks are doing and you will be getting a very small token of appreciation from her company … and from mine. Thanks for all you continue to do! Without your donor pressure, I would still be brooding. That is worth at least a thousand bucks!"

50.    On November 10, 2011, Ryan sent an email to DeCaprio, stating, "Beth, [a]s discussed today, we need to be very careful with the manner in which we deal with the horses. We need to act as a "reasonable manager" of these horse assets *while the bankruptcy is pending*. If the bankruptcy judge does what he is SUPPOSED to do, the bankruptcy case will be dismissed on Monday, and we will not have to worry about the bankruptcy Court. To the extent we need to put down an animal, as long as the care decision is documented and appropriate, we can do that EVEN if the horses are still under the control of the bankruptcy Court. As soon as the BK Court dismisses his case, then we will need to weigh the strategy. We have to choose one of two paths: *1. Lassen County gave us the horses, we can do what we want. (See Pete transfer paperwork) OR 2. We are caring for the horses, we are stepping in for Lassen, Lassen has provided us the parameters that we can use to release the horses, BUT Lassen is on the hook for the board and care because the Order from Court says that the horses are released to Lassen. Each path is mutually exclusive.*" At no time did Ryan suggest that Lozano's transfer to the County was wrongful or that the County's transfer to Grace was wrongful.

51.    On December 5, 2011, in an email, Ryan advised Grace, "[t]he Chapter 7 trustee was just appointed and we have a letter up to the trustee asking him to abandon the horses. Once the horses are abandoned, then we can act like the bankruptcy does not exist." Again Ryan fails to disclose that the Final Disposition is a false document and that irrespective of the Bankruptcy, Grace never received ownership of the horses.

52.    Also on December 5, 2011, in an email to Ryan's wife, DeCaprio stated, "I could not believe how lucky we were when Tim [Ryan] offered to help us with the Bennett case and I have watched in amazement as he has over and over again gone beyond the call of duty …. Without Tim's help I do not think I would have had the fight in me to see this all the way through."

-12-

FOURTH AMENDED COMPLAINT

53.    On December 9, 2011, the Chapter 7 Trustee filed in the Bankruptcy Court an abandonment motion with respect to the animals. The Trustee sought abandonment "because the Horses are of inconsequential value or benefit to the estate and are otherwise burdensome to the administration of this case." By this time, all parties understood the extreme expense caring for the horses would entail, yet no one stepped forward to help with these costs.

54.    On December 12, 2011, Ryan, in an email to DeCaprio, stated, "Our letter to the trustee had the desired effect. She filed a motion to deem the horses and all other animals as abandoned .... Once the Court approves that motion, we can start the process of adopting out the horses as they will not longer be part of the bankruptcy estate."

55.    On December 21, 2011, in an email, Ryan advised Grace that "[t]he squatters were removed yesterday ... Now, we can accomplish what we tried to accomplish in July. The horse abandonment motion has not yet been opposed! We will know very shortly if Grace is going to have a free hand in dealing with the horses."

56.    On December 30, 2011, in an email, Ryan advised Grace, "Let's plan for a conference call during the first part of the year on an action plan for the animals. As I have told Beth, there are two mutually exclusive paths to go down: 1) the animals are Grace's and can be adopted out; 2) the animals are being held by Grace for the County and the County owes for their board care and med's. *That signed piece of paper from the County is our get out of jail free card ... The County gave us the animals. PERIOD.*"

57.    On January 3, 2012, Ryan, in an email, advised DeCaprio, "Today, the bankruptcy Court on the motion for the Chapter 7 Trustee ordered all of Bennett's animals abandoned. Now, the bankruptcy Court has no jurisdiction over the animals from Whispering Pines and they can either be reclaimed by their rightful owners (who show proof of ownership and ability to care for the animals) or adopted out by the Grace Foundation to new, loving homes."

58.    On January 24, 2012, DeCaprio sent an email to Ryan, stating, "I'm so sorry it has taken me so long to get these invoices to you. I wanted to be sure we were also able to add a reasonable estimate for the care of the mares. Also I am wondering if you have the original agreement that you wrote up between Lassen and us regarding the horses. I cannot seem to find mine. I'm not sure if we now have legal custody of the horses.... I'm wondering where we stand with legal ownership with them now." Believing that Ryan was still its lawyer, Grace inquires Ryan as to the legal status of the horses and who will be financially responsible for

the horses.

59.    On February 16, DeCaprio, via email, advised Ryan: "I am sorry I haven't been back in touch with you – I'm not sure if I dropped the ball or not.  I know Tim was going to look over the demand letter [to the County] and I'm not sure what transpired after that.  There is so much money going out with these mares, that we are in a world of hurt.  We had a pregnant mare pass away and we are in the midst of putting up all of the foaling stalls, and two of the mares are on medication that costs over $80 per day.  And we're trying to keep our heads afloat.  We are also having to put in electricity in the quarantine/med area in order to properly care for the 20 pregnant mares.  Please let me know how we can move forward on financing all of this?  You had mentioned the banks may be able to contribute a second and third grant – any ideas on progressing these?  I would be very appreciative to hearing something as soon as possible."

60.    Not hearing back from Ryan, on February 28, 2012, DeCaprio, in an email to Ryan, again inquired: "Hey Tim – wanted to check-in and touch bases with you.  Wondering where things are at with the demands [to the County] being sent out? … We are in full blown PANIC mode, and scrambling to secure long term and short term funding!!! … Please let me know what you think of the letter below and if you have any thoughts on anyone that could assist in securing these funds or have any interest in this loan/donation.  Who knows:  perhaps WELLS FARGO might be able to fund this!"

61.    Rather than responding directly himself, on March 5, 2012, Beardsley, Ryan's associate, in an email to DeCaprio, wrote: "Our demand letters [to the County] have gone out, and we are awaiting responses from the County …. We will definitely be keeping a close eye on the county.  You know us."

62.    On March 28, 2012, Ryan, in an email to DeCaprio, wrote: "Sorry for the radio silence but I was out in hearings yesterday … I approached Wells and BAC for more dollars and they reminded me of the money spent so far on the case … and encouraged me to contribute.  Austin is on the County … I have had to pass most of the responses, etc. over to Austin as I am training two new attorneys at the firm and my caseload is exploding.  Austin is invested in this case and getting retribution from the County (and restitution), but if there is any lag in response, don't hesitate to text or call me."

63.    Not having obtained any financial assistance, on April 25, 2012, DeCaprio, in an email to Ryan, wrote: "Austin and Tim, Hey guys, I hope that things are going well.  I wanted

to check in with you and see if we had heard anything from Lassen yet and ask for assistance. We are in the middle of HELL right now. About two months ago the birthing issues started ..... sadly with the death of a mom and foal. We knew that these babies would have an uphill battle because of their past, but we could not have anticipated how bad it would be. So far we have 5 live foals that have dropped and sadly we have had 2 stillborn deaths already. As of today we have over 10 more to go. Because we have no idea of the actual due dates we have to provide around the clock coverage and most of us are getting less than 3 hours of sleep per night. We do not have the money to have cameras in every stall so we are taking two hour foal watch shifts all through the day and night. If a mare foals early which they are all doing, we have only a small amount [o]f time to get to the foal and administer oxygen or we may lose the foal. Saturday our Vet went home for just a couple of hours and a baby was born. These horses give us no warning when they drop early. On Saturday we were by the side of the foal within a minute and began administering CPR immediately and sadly we were still unable to save it. Everyone has worked so hard to care for these horses and the losses are devastating .... The Susanville case has really taken its toll on our organization and I am reaching out to you guys to beg for your help. I HAVE TO DO SOMETHING NOW. Medical costs and the cost to care for these horses and foals are killing us. While I know that the care we are providing is the right thing to do and I am happy that we are here to do it, I just cannot comprehend how we ended up car[r]ing the weight of this case because a mistake was made on the actual ownership of the horses. It would be one thing if I had taken the horses with the knowledge that their ownership was in question and that we may be having to carry the burden and financial responsibility of the horses and all of the foals, but we had no idea. Nor our organization is in a horrible financial crisis trying to do the right things by these mares and foals and it is simply unacceptable.

We are very grateful for all the help you have given us and without your assistance I do not believe that Bennett would have been arrested for his horrendous crimes, but I am pleading with you to help us find a way to get money in now. We have to get reimbursed for all the costs we have incurred caring for the horses, but I realize that could take months. I have to move forward in the reimbursement process but I also MUST find some funding to get us through the next few months with thee foals. PLEASE help me to figure out what to do .... This is a heartbreaking case and all of us that are dealing with the daily care of these horses are

-15-

FOURTH AMENDED COMPLAINT

feeling the stress of birthing babies that never had a chance because of their past. Plus the 24 hour watch that we have to do as well as all the care the live foals and moms need …. not to mention all of our other duties at the ranch. Please let me know how we should proceed with Lassen and any idea that you may have in regards to funding …. I would appreciate your help more than you can imagine.

Give me a call or email me at your convenience. Ryan is doing great by the way!!! I am hoping for a miracle!!!"

64. DeCaprio believed that a "miracle" was possible because she continued to believe that Ryan was representing Grace, and that he was advocating diligently on its behalf. Only later did DeCaprio discover that Ryan was not acting in the best interests of Grace, but instead, was working solely in the best interests of his other clients, the Banks. Moreover, because of Ryan's deception and intentional misrepresentations, all for the benefit of the Banks, the harm to Grace and the horses has been greatly magnified.

65. Notwithstanding Grace's desperate pleas for help, on April 26, 2012, Ryan, in an email to DeCaprio, responded: "I just read your e-mail and Austin and I will meet on it this morning."

66. Six days later, on May 2, 2012: Ryan, in an email to DeCaprio, wrote what turned out to be his last communication with Grace: "We appreciate your email and its candid nature. We have always valued the open dialogue we have had with the Grace Foundation throughout this horrific ordeal. In that spirit of openness, please consider the following issues as we move forward.

First, we cannot express enough our respect for the efforts that the Grace Foundation has made to save the lives of dozens of horses abused by Dwight Bennett and your help in assisting (and ensuring) the prosecution of Mr. Bennett. Those horses most certainly would not be alive but for the specific efforts of the Grace Foundation. We appreciate and honor the memories of serving alongside you in this battle.

Second, we are continually shocked by the sheer volume of expense and waste caused by a single man – Dwight Bennett, and that the Grace Foundation has borne all of the expenses of the wreckage that his actions have brought. We also agree that the expenses were utterly unexpected by all parties when the County of Lassen seized the horses and surrendered them to the Grace Foundation. At that time, our clients made donations totaling $40,000.00 to

help absorb the expense of the Grace Foundation taking these horses from the County of Lassen. The fact that unforeseen costs have reached astronomical heights, and put the Grace Foundation at risk magnifies the tragic nature of this situation.

Third, we understand the Grace Foundation's urgency in seeking to recover these costs. To this end, we provided comprehensive demand letters to three separate entities on behalf of the Grace Foundation, free of charge. We also agree that the County should bear the burden of caring for these horses as they knew about the dire situation and did little more than enable Dwight Bennett to continue his practices. Here is where we get to the "open and honest" section of this correspondence. In reading between the lines in your email, you are intimating that the Grace Foundation may need to seek to recover monies spent on the Whispering Pines animals from our clients via potential legal action. As a result, it is vital that we fulfill our ethical duty to or clients, and refrain from providing any information or legal advice to the Grace Foundation that will compromise our ability to represent our clients to the fullest extent. This we will be unable to provide any assistance in recovering monies from the County of Lassen or any other entity for the Grace Foundation, or provide any further independent legal advice to the Grace Foundation as any such advice will necessarily be compromised by a clear conflict of interest as you have intimated.

As to the notion set forth in your e-mail that there was some "mistake" in ownership of the horses, we are unclear as to what exactly you mean. As you recall, an officer of the Lassen County Superior Court, Vicki Lozano, obtained an order allowing the Receivership estate to release the horses to the County of Lassen. The County of Lassen then released "possession" of the horses to The Grace Foundation. That release was drafted by the County of Lassen, was not reviewed by our office or any attorney for our clients, and was issued well prior to our firm providing any informal information or feedback to the Grace Foundation. The release is imprecise and (in our view) allowed the Grace Foundation to take one of two mutually exclusive positions: (1) the horses are ors, we can adopt them out; or (2) the horses still belong to Lassen County and it (therefore) needs to pay for their board and care. We provided this information to you in an e-mail on November 10, 2011 ....

Obviously, we understand the dire nature of this unexpected situation. We will continue to echo the plight of the Grace Foundation to all who will listen. We will cooperate with any media requests regarding Dwight Bennett and the horses. However, as explained

above, we are limited in the actions we can take to make this happen based on the clear subtext of your e-mail and the deep fiduciary duties to our clients that we must hold paramount as officers of the Court and members of the bar."

67.    On June 20, 2012, Grace implored the Banks either to assume financial responsibility for the care of the subject horses or to make other arrangements for the horses. To date, the Banks have refused to do either.

<u>CURRENT CONDITIONS AND FORESEEABLE EXPECTATIONS</u>

68.    A few words about terminating early pregnancies.  Grace follows standard shelter practice with respect to the termination of early pregnancies.  Grace does not undertake this act lightly.  That said, Grace's first priority is to the rescued animal.  Moreover, given that the need for its services far outweigh its ability to provide services, Grace must exercise sound judgment in managing animals presented to it.

69.    With respect to the Whispering Pines Horses, Grace knew that they had been deprived of adequate feed and appropriate care for a period of time.  Moreover, because many of the horses were either very young or very old, which precluded them from being considered good breeding candidates, Grace knew that if the horses were pregnant, and if the pregnancies were not terminated early, the pregnancies would be at high risk for complications and many would require very expensive veterinary care.  Because Grace was not allowed to follow standard shelter practice in this case, the negative consequences have been extreme, and continue to grow by the day.

70.    As of the date of the Third Amended Complaint was filed, Grace was and continues to care for a total of approximately 50 horses.  The cost as of several month ago was as follows:

Standard Layup Facility Fees – Board and Daily Care Fees: $372,060.00.

Prenatal and Post-Natal Care Fees.  24 hour a day housing and observation: $182,225.00.

Additional Daily Services and Additional Feed, Grain and Supplements: $296,640.00.

Total Emergency/Non-Emergency Veterinary  Expenses and Costs:  $193,888.00.

Build-Out of Foaling Facilities Costs and Expenses: $87,200.00.

Purchase of Additional Medical Equipment and Medical Supplies for Care of Horses:

$37,000.00.

Transport of Horses to Grace Ranch on August 26, 2011: $5,950.00.

Total Costs between August 26, 2011 through January 15, 2013: $1,174,963.00.

These costs are ongoing and exceed the sums above to date and on a daily basis.

Payments made by WFB and BOA offset TGF's damages in the amount of $40,000.00.

FIRST CAUSE OF ACTION

(Common Count – Quantum Meruit – Services Rendered)

(Against All Defendants, Except Lassen County)

71.    Plaintiff incorporates by reference Paragraphs 1 through 70, inclusive, of this Third Amended Complaint as if fully set forth.

72.    Defendants, and each of them, jointly and severally, requested, by their words or conduct, as alleged herein, that Grace perform the services of caring for the subject horses for the benefit of the Defendants, and each of them, jointly and severally.

73.    Grace has performed all services requested as requested in an appropriate manner.

74.    Although Defendants, and each of them, have accepted the benefits of Grace's services willingly, Defendants, and each of them, have not paid for the services, except that Wells has paid $20,000 and BOA has paid $20,000.

75.    The reasonable value of the services is at least $1.2 million, which is the responsibility of all Defendants, and each of them, jointly and severally.

SECOND CAUSE OF ACTION

(Fraud)

(Against the Banks, Ryan, The Ryan Firm, and Does 1 through 10, inclusive (collectively, "Fraud Defendants")

76.    Plaintiff incorporates by reference Paragraphs 1 through 75, inclusive, of the Third Amended Complaint as if fully set forth.

77.    The Fraud Defendants, and each of them, knew that on August 26, 2011, when they purported to convey ownership of the Whispering Pines Horses to Grace, that ownership of them could not be conveyed to Grace at least because of Bennett's bankruptcy filing.

-19-
FOURTH AMENDED COMPLAINT

78.    The Fraud Defendants, and each of them, knew on August 26, 2011, when they purported to convey ownership of the Whispering Pines Horses to Grace, that Grace's obtaining ownership of the horses on August 26, 2011 was a material term and condition of Grace's accepting care for the horses, and without ownership, Grace would not have accepted the horses.

79.    Knowing that Grace would not accept the horses without ownership, the Fraud Defendants, and each of them, lied to Grace and represented to Grace that the transfer on August 26, 2011 included ownership of the horses.  The Fraud Defendants knew that if they did not lie about this critical fact, Grace would not accept the horses.

80.    The Fraud Defendants, and each of them, intended Grace to rely on its misrepresentation as to the ownership of the horses.

81.    Grace, in fact, reasonably relied on this material misrepresentation.  Throughout its negotiations with the Fraud Defendants, Grace made clear the essential role ownership of the horses played in Grace's accepting the horses.  Moreover, by this time, Grace developed a trust in Ryan.  Ryan sent his family members to Grace's Ranch to interact with DeCaprio and her staff and had his wife donate $1,000.00 to Grace.  The fraud defendants baited Grace to ensure that Grace would continue to rely on their representations.  Grace now believes and thereon alleges that Ryan induced Grace into trusting him so that he could obtain benefits for his clients, the Banks, without any regard for Grace or the horses.  The benefits derived by Ryan, the attorney for the Banks should be obvious.  When the clients are happy, they pay their bills.

82.    The harm to Grace and the horses from this fraud borders on unimaginable.  Not only is Grace teetering on the brink of bankruptcy, but the well being of the horses has been significantly jeopardized.  Mares have needlessly, and in some cases, dangerously, been forced to carry pregnancies to term, sometimes with tragic outcomes, either to the mare or the foals, or both.  Grace's resources have been completely depleted.  And this could have all been avoided had the Fraud Defendants simply told the truth from the outset.

83.    The Fraud Defendants' fraud has been a substantial factor in the harm caused to Grace and the horses.  Grace estimates that its actual compensatory damages will exceed $2 million by the time of trial, subject to proof at trial.

84.    Grace is informed and believes and thereon alleges that the Fraud Defendants acted solely or substantially because of their greed.  Had the Fraud Defendants not transferred

control of the horses to Grace, the Banks would still be bearing the costs associated with the horses' care, either as the parties requesting the instatement of a Receiver and/or pursuant to an express indemnity agreement with Lozano.  Under this scenario, rather than grace incurring $2 million plus in costs, the Banks would have bore this expense.  Moreover, had the Banks been required to pay private parties to care for the horses, the care would have been even more expensive.

85.    Because of this fraud, and the harm caused thereby, Grace is entitled to punitive damages against the Fraud Defendants, and each of them, in an amount sufficient to punish them and to deter similar misconduct in the future.

THIRD CAUSE OF ACTION

(Breach of Fiduciary Duty)

(Against Ryan, The Ryan Firm, and Does 11-20, inclusively

(Collectively, "Ryan Defendants")

86.    Plaintiff incorporates by reference Paragraphs 1 through 85, of this Third Amended Complaint as if fully set forth.

87.    As Grace's attorneys, the Ryan Defendants owed Grace a fiduciary duty, including a duty of loyalty and a duty of care.

88.    By engaging in the acts and/or omissions alleged herein, the Ryan Defendants breached their fiduciary duty.

89.    The Ryan Defendants' acts, as alleged herein, have proximately caused damage to Grace in an amount to be determined at trial, but in an amount of no less than $2 million.

90.    The Ryan Defendants committed the acts described herein oppressively, fraudulently, and maliciously, entitling Grace to an award of punitive damages against the Ryan Defendants in an amount appropriate to punish and make an example of them.

FOURTH CAUSE OF ACTION

(Legal Malpractice)

(Against Ryan, The Ryan Firm, and Does 11-20, inclusive

(Collectively, "Ryan Defendants")

91.    Plaintiff incorporates by reference Paragraphs 1 through 90, inclusive, of this

-21-

FOURTH AMENDED COMPLAINT

Third Amended Complaint as if fully set forth.

92.    The Ryan Defendants owed Grace a duty to use such skill, prudence, and diligence as members of the legal profession commonly posses and exercise on behalf of their clients.

93.    The Ryan Defendants breached that duty, as alleged herein.  By example only, and without limitation, the Ryan Defendants created the Final Disposition Form and advised Grace that it transferred ownership of the horses to Grace; failed to advised Grace of the Bankruptcy or the effect the Bankruptcy had on Bennett's assets, including the horses; did not advise against the transfer of the horses to Grace on August 26, 2011, even though they knew or should have known that ownership of the horses was not being transferred to Grace, and that this was a material term of Grace's accepting the horses.  Thereafter, at no time did the Ryan Defendants advise Grace to seek reimbursement from the Banks, or to otherwise protect its rights with respect to the Banks.  Ryan appears to have filed a claim on behalf of Grace with the County but failed to advise Grace of its rights against Lozano.  The Ryan Defendants, to the detriment of Grace, favored the rights of the Banks and Lozano and attempted to protect the Banks from any liability to Grace.

94.    The Ryan Defendants' acts and/or omissions, as alleged herein, proximately caused harm to Grace, as alleged herein.

95.    As a direct result of the Ryan Defendants' acts and/or omissions, Grace has been damaged in an amount to be determined at trial, but in no amount not less than $2 million.

FIFTH CAUSE OF ACTION

(Negligence)

(Against Lozano and the Banks)

96.    Plaintiff incorporates by reference Paragraphs 1 through 95 of this Third Amended Complaint as if fully set forth.

97.    Pursuant to Motion by the Banks in the matter entitled *Allen v. Summit Financial, et al*, Lassen County Superior Court, Case No. 45679, the Court entered an Order on July 21, 2011, appointing Vicki Lozano, the Receiver of that certain property called "Whispering Pines Stables", located at 695-725 Highway 36, Susanville, California 96130. Exhibit "B" attached hereto.  Plaintiff is informed and believes that Lozano's appointment as

-22-

Receiver was in the capacity of agent of WFB and BOA. Plaintiff is further informed and believes that Lozano's actions were directed and orchestrated by Ryan, also an agent of WFB and BOA.

98.     Pursuant to the July 21st Order the Receiver was authorized and directed, *inter alia*, to take immediate possession and control of the subject property and to demand, receive, and check all rents, issues, profits and income therefrom.

99.     Pursuant to the July 29, 2011, the *Allen* Court entered an Order authorizing Lozano, as the Receiver charged with caring for the horses on the property, to surrender the animals on the subject property to the County of Lassen. As the Receiver charged with surrendering the animals to Lassen County, Lozano knew that the surrender to Lassen County was only for the purpose of allowing owners of the horses to claim said horses from the County. As such, Lozano had a duty to transfer the horses to the County in such a manner as conveyed the County's limited rights to transfer the horses.

100.    In breach of her duty to transfer the horses in limited fashion to permit the County to release the horses only to their owners, Lozano, as an agent of WFB, BOA and Ryan, gave Final Disposition of the horses to the County of Lassen. Lozano's transfer of ownership of the horses to the County of Lassen by way of Final Disposition exceeded and therefore violated the July 29, 2011 Court Order. In exceeding the Court Order, Lozano was not acting in her capacity as a Court Appointed Receiver.

101.    Plaintiff is informed and believes that in the context of animal transfers, a Final Disposition is the transfer of ownership. Pete Heimbigner, the County's Public Works Deputy Director, in charge of the transfer of these horses, stated in a July 22, 2011 letter to Ryan, the attorney for the Banks, that: "Due to some uncertainty being expressed as to who is legally responsible for caring for the animals at this time, the County is willing to arrange for removal and temporary protective custody of all animals on the property until final disposition can be determined." Final Disposition had not been determined on August 26, 2011 when the Final Disposition Agreement was executed by Lozano and Heimbigner. The only party who did not know that Final Disposition had not been determined was De Caprio.

102.    Lozano knew or should have known that she was only authorized by court order to surrender the horses to Lassen County so that the horses could be returned by the County to their legal owners. Lozano had a duty to abide by the court order. Lozano breached her duty to

abide by the court order when she surrendered the horses to Lassen County by way of Final Disposition which transferred ownership of the horses to the County.

103.    Lozano's negligence exceeded her authority as a Court received and her excessive conduct was as an agent of WFB, BOA and Ryan.  Lozano's breach of duty, individually and as an agent, has caused damage to TGF, which amount of damages will in probability exceed $2 million by the time of trial, in that Lozano's transfer of the horses to the County by way of Final Disposition allowed the County to transfer the horses via Final Disposition to Grace even though the County did not have authority to do so.

## SIXTH CAUSE OF ACTION
### (Negligent Taking in Violation of Article I, Sec. 19 of California Constitution, *et al*)
### (Against Lassen County)

104.    Plaintiff incorporates by reference Paragraphs 1 through 103, inclusive, of this Third Amended Complaint as if fully set forth.

105.    California Constitution Article I, §19 provides:  "(a) Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. ... (e)(6) 'State' means the State of California and any of its agencies or departments."  Further, the Fifth Amendment of the United States Constitution, applied to the States via the Fourteenth Amendment, prohibits governmental taking without just compensation.  (*See* Government-induced temporary flooding is not categorically exempted from Takings Clause liability, see *Arkansas Game and Fish Com'n v. U. S.* (2012) 133 S.Ct. 511, 184 L.Ed.2d 417.  Economic development, taking property from one private party for transfer to another, see *Kelo v. City of New London* (2005) 125 S.Ct. 2655, 545 U.S. 469, 162 L.Ed.2d 439, rehearing denied, rehearing denied 126 S.Ct. 24, 545 U.S. 1158, 162 L.Ed.2d 922, miscellaneous rulings 126 S.Ct. 326, 546 U.S. 807, 163 L.Ed.2d 40. Forfeiture of car used in prostitution, joint owner's interest, see *Bennis v. Michigan* (1996) 116 S.Ct. 994, 516 U.S. 442, 134 L.Ed.2d 68, rehearing denied 116 S.Ct. 1560, 517 U.S. 1163, 134 L.Ed.2d 661.  Water rights, rights of littoral owners, eminent domain, future accretions, see *Stop the Beach Renourishment, Inc. v. Florida Dept. of Env. Prot.* (2010) 130 S.Ct. 2592, 177 L.Ed.2d 184.)

106.    The Fourteenth Amendment of the United States Constitution reads, in part, that

-24-

no State shall "deprive any person of life, liberty, or property, without due process of law." This applies to the states and to local governments.

107.    The constitutional guarantee of due process of law, found in the Fifth and Fourteenth Amendments to the U.S. Constitution, prohibits all levels of government from arbitrarily or unfairly depriving individuals of their basic constitutional rights to life, liberty, and property.  Under the Fifth Amendment, as applied against the States through the Fourteenth Amendment, States effect a taking if they recharacterize as public property what was previously private property (here, recharacterizing Grace's goods and services in feeding and caring for the horses which were public property at the time of transfer to Grace). U.S.C.A. Const.Amends. 5, 14. The Takings Clause of the Fifth Amendment, as applied against the States through the Fourteenth Amendment, bars the State from taking private property without paying for it, no matter which branch is the instrument of the taking. U.S.C.A. Const.Amends. 5, 14. *Stop the Beach Renourishment v. Florida Department of Environmental Protection* (2010) 130 S. Ct. 2592. This includes a taking by the Judiciary. *Id.*

108.    When Lozano gave Final Disposition of the Whispering Pines Horses to Lassen County, they became public property.  The July 29, 2011 Order provides "the County of Lassen Department of Public Works may release any animal surrendered by the Receiver to its owner upon a sufficient showing by the purported owner of his or her ownership, and upon a sufficient showing by the purported owner that he or she could adequately care for the claimed animal." Therefore, Lassen County had a duty to care for the animals until such time that transfer of the horses to the owner could be achieved.  Further, the County had a duty to Grace not to give Grace possession of the horses without ownership because transfer of the horses without ownership or compensation for the care and feed of the horses would constitute an unlawful taking in violation of the constitutional provisions recited herein.  In other words, the County had a duty to execute the July 29, 2011 order without effecting an unlawful taking for the feed and care of the horses.

109.    The transfer of the horses by the County of Lassen to The Grace Foundation exceeded and therefore violated the July 29, 2011 Court Order and was a breach of the County's duty to Grace to maintain public property in a manner that it does not transform into a private obligation and not endanger to the business and assets of Grace without just compensation.  Breach of this duty resulted in an unlawful taking.  The County was authorized

to transfer the horses only to their owners, who would have had a legal duty to care for and feed the horses. In fact, the Order provided for the owner to take possession, the owner was required to show it ability to care for the horses.

110.    When Lassen County transferred the horses to Grace by way of Final Disposition, such transfer violated and exceeded the scope of the July 29, 2011 Order and resulted in an unlawful taking in breach of the County's Constitutional duty to provide just compensation for a private taking and to prevent an unlawful taking. In addition, the County's transfer of the horses to Grace violated Grace's substantive and procedural rights to due process and violated Plaintiff's rights under the California Constitution, Article I, Section 1, of Inalienable Rights; plaintiff's rights pursuant to California Constitution, Article I, Section 7 of due process and equal protection, plaintiff's right to compensation for a governmental taking, Article I, Section 19 and plaintiff's right to due process under the 5th and 14th Amendments of the United States Constitution.

111.    By way of the Final Disposition entered into on August 26, 2011, the County unlawfully deprived Grace of the funds and resources needed to care for the horses until the owners of the horses could be located and the horses could be transferred to said owners. Some of the horses were pregnant, leading to a practical transfer of approximately 50 horses that needed to be fed and cared for by Grace without just compensation by the County. In the absence of the unlawful transfer to Grace it would have been the duty and responsibility of the County to feed and care for the horses after transfer of those horses from Lozano to the County.

112.    Government Code §815.2 makes a public entity liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. Heimbigner negligently placed the horses with Grace by way of Final Disposition, causing an unlawful taking.

113.    In addition, the County was authorized by the *Allen* court order only to release the horses to their rightful owners. Food & Agriculture Code §16522 provides: "Evidence of ownership of an animal or hide may include any of the following: (a) A recorded brand registered in the name of the person in possession of the animal or hide. (b) A brand inspection certificate. (c) A bill of sale from the owner of the brand on the animal or hide. (d) In the case of an unbranded animal or hide, a bill of sale which gives a description of the breed, sex, color,

and natural markings, if any. (e) A dairy exemption number." Also, Government Code §6203 makes it a misdemeanor to provide a false certificate, as was provided by the Final Disposition. The County failed to obtain evidence of ownership and transferred the horses, which were then in the county's custody and control, to Grace, thereby effecting an unlawful taking.

114.    Finally, pursuant to Government Code §830, a public entity has liability when personal property, owned *or* controlled by the public entity, causes damage or injury. Because Government Code §830(c) refers to property that is either owned *or* controlled by the public entity, that property does not lose public property status when the entity cedes temporary control to third parties. Witkin, *Summary of California Law, Torts,* (10th Ed.) §250, p. 417. When Lozano gave Final Disposition of the Whispering Pines Horses to Lassen County, they became public property. Lassen County thereafter negligently transferred the public property to TGF in violation of the *Allen* court order, in violation of Food & Agriculture Code §16522, in violation of Government Code §6203 in addition to the violation of the Constitutional provisions recited herein.

115.    In his capacity as the County's Public Works Deputy Director, Pete Heimbigner, a County Employee, was negligent in his transfer of the WP horses which, at the time of transfer to TGF, were the personal property of Lassen County, i.e. under the custody and control of the County. Heimbigner's acts violated the *Allen* Court's order in accepting the horses from Vicki Lozano by way of Final Disposition and by turning the horses over to TGF by way of a Final Disposition. Heimbigner knew that a Final Disposition transferred ownership of the horses and had stated as much in his letter of July 22, 2011 to Ryan. Heimbigner also knew that he had no authority to either accept ownership or to transfer ownership. Heimbigner had a duty to properly handle and maintain public property in compliance with the Court order such as to prevent violating the Constitutional rights of any private person, including Grace. Heimbigner breached his duty to properly place the public property without effecting an unconstitutional taking.

116.    Pursuant to Government Code §815.2, the County is liable for damage proximately caused by the negligent acts of its employee, within the scope of his employment when those acts would give rise to a cause of action against that employee. *M.P. v. City of Sacramento* (2009) 177 Cal.App.4th 121. Transfer of the horses by way of Final Disposition to

TGF, gives rise to a cause of action against Heimbigner for negligence and thereby liability on the part of the public entity by which he is employed.

117.    On March 5, 2012, the Ryan firm submitted a Claim on behalf of Grace to Lassen County, pursuant to the Government Tort Claims Act, for damages incurred by Grace for the feed and care of the WPH.  In that Claim, Grace asserted and placed the County on notice of its "demand for reimbursement for costs incurred from its [Grace's] custodianship over the thirty-six (36) horses removed from the Whispering Pines Stables".  A true and correct copy of the Claim is attached hereto as Exhibit "H" and reflects damages asserted in the amount of $351,515.00.  To the best of Grace's knowledge, the County never responded to this Claim in any way and therefore it was rejected as a matter of law.  Since Grace's loss is a continuing one, another Claim was made to the County as reflected in Exhibit "I" attached hereto on July 31, 2012.  Specifically, that Claim put the County on notice as follows: "This will also serve as our demand that Lassen County, Wells Fargo Bank, N.A., Bank of America, N.A., and Vicki Lozano immediately indemnify the [Grace] Foundation for any and all expenses, which have been incurred to date by the Foundation for the feeding and care of the horses and foals. Attached is a spread sheet documenting the expenses incurred by the Foundation to date.  We will provide all back up documentation on request."  To the best of The Grace Foundation's knowledge, the County failed to respond to this Claim and therefore it was rejected as a matter of law.  Finally, to reflect the increasing and continuing loss, on or about April 12, 2013, Grace submitted a Claim for Damages in the sum of $1,174,963.00, which damages were specified to have been incurred between August 26, 2011 through January 15, 2013.  A true and correct copy of this Claim (without exhibits) is attached hereto as Exhibit "J".  On or about May 7, 2013, The County sent a "Notice of Return, without Action, of a Claim Required to be filed within one (1) Year."  A true and correct copy of the Return of Claim is attached hereto as Exhibit "K".  Grace continues to feed and care for the horses and its Claim against the County continues to increase with each passing day.  Grace alleges that it has timely presented a Claim pursuant to the Government Tort Claims Act.

118.    Grace has been damaged as a proximate and legal cause of the County's negligent transfer of the horses in violation of the Court's order and in violation of Grace's right to be free from unlawful taking by the Government.  The Grace Foundation continues to incur losses as a result of the negligent taking of the County.

-28-

FOURTH AMENDED COMPLAINT

SEVENTH CAUSE OF ACTION

(Negligent Misrepresentation)

(Against All Defendants, Except County of Lassen)

119.    Plaintiff incorporates by reference Paragraphs 1 through 118, inclusive, of this Third Amended Complaint as if fully set forth.

120.    All defendants had a duty to disclose accurately disclose the nature and scope of the transfer of the horses to Grace.

121.    All defendants breached the duty to disclose accurately the nature and scope of the transfer of horses to Grace, as fully detailed above.

122.    All defendants knew or should have known that representing to Grace that Grace would receive Final Disposition and therefore ownership of the horses was not true.  All defendants made this representation to Grace with reckless disregard of the content of the orders or their authority to transfer the horses.

123.    Grace relied on the representations of all defendants in accepting transfer of the horses.  If Grace had known the truth, that none of the defendants could transfer ownership of the horses, Grace would not have accepted the transfer or entered into the Final Disposition Agreement.

124.    The Grace Foundation has been damaged as a proximate and legal cause of the negligent representations regarding ownership and transfer of the horses in violation of the Court's order.  The Grace Foundation continues to incur losses as a result of the negligence of all parties as set forth herein.

EIGHT CAUSE OF ACTION

(Beach of Oral Agreement)

(Against Lassen County)

125.    Plaintiff incorporates by reference Paragraphs 1 through 124, inclusive, of this Third Amended Complaint as if fully set forth.

126.    Upon transfer of the horses, Pete Heimbigner, as Deputy Director of the Department of Public Works for the County of Lassen, orally agreed to pay Grace the sum of $10,000.00 for the care and feed of the horses after the August 26, 2011 transfer of same as just compensation up to October 15, 2011 when the horses were supposed to be adopted to third

parties. This agreement was in conjunction with the agreement of the Banks to pay $40,000.00 as described above. The Banks paid the $40,000.00. The County failed to pay the $10,000.00 Heimbigner orally agreed the County would pay.

127.    Government Code §25502.5 provides: "In counties having a population of 200,000 or more, the board of supervisors may authorize the purchasing agent to engage independent contractors to perform services for the county or the county officers, with or without the furnishing of material, where the annual aggregate cost does not exceed one hundred thousand dollars ($100,000). Subsection (b) provides "The board of supervisors may establish rules and regulations to effectuate the purposes of this section."

128.    Plaintiff is informed and believes that the population of Lassen County exceeds 200,000.

129.    Plaintiff is informed and believes that Lassen County has authorized its animal control officers, including Pete Heimbigner, to engage independent contractors to perform services for the county or the county officers, with or without the furnishing of material, where the annual aggregate cost does not exceed one hundred thousand dollars ($100,000). Pursuant to this authority Plaintiff was engaged by County of Lassen to provide feed and care for the WPH at Grace from August 26, 2011 thru October 15, 2011 in conjunction with the $40,000 to be paid by the Banks.

130.    Plaintiff performed all matters referred to it for performance by Defendant, except for those matters which were excused by Defendant's breach of the agreement or negligence in the performance of the agreement.

131.    As a proximate cause of Defendant's breach of the oral Agreement, Plaintiff has been damaged in the sum of $10,000.00 for the time period covered by the agreement, i.e. August, 2011 thru October, 2011.

NINTH CAUSE OF ACTION

(Rescission and Reformation)

(Against Lassen County)

132.    Plaintiff incorporates by reference Paragraphs 1 through 131, inclusive, of the Third Amended Complaint as if fully set forth.

-30-

FOURTH AMENDED COMPLAINT

133. Civil Code §3399 provides the authority upon which a contract may be reformed: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (See generally, 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 806, pp. 221–222.)

134. "Recession may be had for mistake of fact if the mistake is material to the contract and is not the result of neglect of a legal duty, if enforcement of the contract as made would be unconscionable, if the other party can be placed in status quo, if the party seeking relief gives prompt notice of his election to rescind, and if he restores or offers to restore to the other party everything of value which he has received under the contract. (Civ.Code, ss 1577, 1689, 1691, 3406, 3407.)" *White v. Berrenda Mesa Water Dist.* (1970)7 Cal.App.3d 894, 900-901.

135. As set forth above, Grace entered into the Final Disposition Agreement because Grace was defrauded by Ryan into believing that the Final Disposition would give Grace ownership of the Whispering Pines Horses. Due to the misrepresentations of Ryan, Grace entered into the Final Disposition based on a mistake of fact, i.e. that the Final Disposition would result in transfer of ownership of the horses to Grace. Grace never knew that the County did not have authority to give Grace Final Disposition.

136. As also forth above, Grace entered into the Final Disposition Agreement because Grace was led to believe by the County that the County could transfer ownership via Final Disposition and the County failed to disclose the July 29, 2011 Order or its contents to Grace and of which the County was well aware. The County allowed Grace to believe that the Final Disposition transferred ownership of the horses and that a $10,000 payment by the County, coupled with a $40,000 payment from the Banks would be sufficient or just compensation for the few months Grace would feed and care for the horses until Grace could put up the horses for adoption in October, 2011. The County did not disclose to Grace that the Final Disposition was a false certificate subject to the provisions of Government Code §6203. Instead, Grace was defrauded by the County which provided a false certificate, knowing that title to the horses was clouded and that the County could not convey by Final Disposition. Alternatively, the County was mistaken in its understanding of the July 29, 2011 Order of the Court and provided the

Final Disposition with the mistaken belief that Lozano was authorized to transfer ownership of the horses and that the County was likewise authorized to transfer ownership of the horses such that Grace could fully manage and thereafter place the horses for adoption. Due to the misrepresentations of the County as encompassed by the Final Disposition, Grace entered into the Final Disposition based on a mistake of fact, i.e. that the Final Disposition would result in transfer of ownership of the horses to Grace. Grace never knew that the County did not have authority to give Grace Final Disposition and was either mistaken or deliberately misrepresented its authority to transfer the horses by way of Final Disposition. The County, however, due to its participation in the issuance of the July, 2011 Order knew the Order limited the County to transfer of the horses to its owner, a fact the County failed to disclose to Grace until after Grace was in possession of the horses by way of the purported Final Disposition.

137.   The Final Disposition is a written contract that does not truly express the intention of the parties.

138.   The Final Disposition is a written contract that must be revised, on the application of Grace as the party aggrieved, so as to express the only authority that the County had pursuant to the *Allen* Court's July 29, 2011 Order, i.e., to "release any animals surrendered by the Receiver *to its owner* upon a sufficient showing by the purported owner of his or her ownership, and upon a sufficient showing by the purported owner that he or she can adequately care for the claimed animal."

139.   Enforcement of the Final Disposition as made would be unconscionable as Grace, a non-profit organization, has been unable to transfer or properly manage the horses and has therefore incurred significant cost and been required to close its doors. But for the material misrepresentation regarding the ownership status of the animals, Grace would never have entered into the Final Disposition Agreement.

140.   Rescission and reformation would put all parties back to status quo: Lassen County who was charged to hold the horses until the owners were determined would have had to pay for their care, maintenance and upkeep from August 26, 2011 until such time as the horses were properly placed with their owners. Recession and reformation will therefore allow for all parties to maintain status quo and to comply with the Court Order, which is the way the transfer of the horses should have occurred on August 26, 2011. The County should be deemed the depositor of the horses and Grace the depository thereby reforming the Final Disposition to

a contract of deposit.

141.  Grace has not received anything of value from either Lozano or Lassen County in support of the Final Disposition Agreement.  As such, there is nothing for Grace to return to either party upon the rescission of the Final Disposition Agreement.

TENTH CAUSE OF ACTION

(Declaratory Relief—Indemnification – Civil Code §1833)

(Against All Defendants)

142.    Plaintiff incorporates by reference Paragraphs 1 through 141, inclusive, of this Third Amended Complaint as if fully set forth.

143.    All Defendants, collectively or individually, are "depositors" within the meaning of Civil Code Section 1814.

144.    All Defendants, collectively or individually, "voluntarily" deposited the subject horses with Grace, as a "voluntary" depositary.

145.    Per Civil Code Section 1833, all Defendants,  collectively or individually, must indemnify Grace for all costs incurred as a result of Grace's care of the subject horses, and for all damages the deposit has caused Grace.  Grace has incurred at least $1,174,963.00 in costs caring for the subject horses, subject to proof.

146.  Pursuant to Code of Civil Procedure Section 1060, Grace seeks a determination and declaration as to whether the Whispering Pines Horses currently in its care, custody, and control were deposited by the Defendants collectively or individually on August 26, 2011 such that Defendants collectively or individually are responsible for indemnifying Grace for the care and maintenance of the horses from August 26, 2011 to the present.

147.  Pursuant to Code of Civil Procedure Section 1062.3, this claim is entitled to preference in the setting of a trial date, and Grace requests the earliest possible trial date.


WHEREFORE, Grace demands judgment against Defendants, and each of them, as follows:

1.      For compensatory and general damages according to proof;

2.      For punitive and exemplary damages according to proof on Grace's

-33-

FOURTH AMENDED COMPLAINT

second and third causes of action;

        3.     For a Declaration requiring defendants to: A) pay for the continued upkeep of the animals on a monthly basis; and / or B) pay those sums due and owing to Grace for the damages incurred to date;

        4.     On all causes of action, for attorneys' fees and costs, if applicable;

        5.     On all causes of action, for prejudgment interest on all amounts claimed; and

        6.     On all causes of action, for any other and further relief that the Court considers just and proper.

LAW OFFICE OF SOHAILA SAGHEB

DATED:  September 9, 2013

SOHAILA SAGHEB
Attorney for Plaintiff
The Grace Foundation of Northern California,
A California Corporation

-34-

FOURTH AMENDED COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury as to all causes of action so triable.

LAW OFFICE OF SOHAILA SAGHEB

DATED:  September 9, 2013

_____/s/_____
SOHAILA SAGHEB
Attorney for Plaintiff
The Grace Foundation of Northern California,
A California Corporation

FOURTH AMENDED COMPLAINT

GEORGE M. ROSENBERG, ESQ. (STATE BAR NO. 62570)
A Professional Corporation
12100 Wilshire Boulevard, Suite 1250
Los Angeles, CA 90025
Telephone:  (310) 207-0703
Facsimile:  (310) 207-0787

Sohaila Sagheb, SBN 144202
Law Office of Sohaila Sagheb
21112 Ventura Blvd.
Woodland Hills, California  91364
Phone: (818) 346-3724
Fax: (818) 702-9916
sslawoffice@sbcglobal.net

Attorneys for Plaintiff The Grace Foundation of Northern California, A California Corporation

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| THE GRACE FOUNDATION OF NORTHERN CALIFORNIA, A CALIFORNIA CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> WELLS FARGO BANK, N.A., a federally chartered bank, on its own behalf and as trustee of MLMI Trust Series 2005-HE3; BANK OF AMERICA, N.A., a federally chartered bank, on its own behalf; BAC HOME LOANS SERVICING, LP, a Texas Limited Partnership and a unit of Bank of America, N.A.; TIMOTHY M. RYAN, an individual; THE RYAN FIRM, a California Professional Corporation; VICKI LOZANO; COUNTY OF LASSEN, CALIFORNIA; and Does 1 through 50, <br><br> Defendants. | CASE NO.  30-2012-00612863-CU-BC-CJC <br> *Assigned for all Purposes to the Honorable* <br> *David R. Chaffee, Dept. C20* <br><br> EXHIBITS "A" – "B" TO FOURTH AMENDED COMPLAINT FOR: <br><br> 1. COMMON COUNT—QUANTUM MERIT—SERVICES RENDERED; <br> 2. FRAUD; <br> 3. BREACH OF FIDUCIARY DUTY; <br> 4. LEGAL MALPRACTICE RYAN AND THE RYAN FIRM; <br> 5. NEGLIGENCE AGAINST LOZANO AND THE BANKS; <br> 6. NEGLIGENT TAKING AGAINST COUNTY OF LASSEN; <br> 7. NEGLIGENT MISREPRESENTATION AGAINST ALL PARTIES, EXCEPT THE COUNTY; <br> 8. BREACH OF ORAL AGREEMENT AGAINST COUNTY OF LASSEN; <br> 9.  RECESSION AND REFORMATION; <br> 10. INDEMNIFICATION—Civil Code §1833 <br><br> DEMAND FOR JURY TRIAL <br><br> [UNLIMITED JURISDICTION] |

-1-

EXHBITS "A" – "K" TO FOURTH AMENDED COMPLAINT

# Exhibit A

## AGREEMENT BETWEEN LASSEN COUNTY

## AND

## THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

**THIS AGREEMENT** is made between the COUNTY OF LASSEN, a political subdivision of the State of California (hereinafter "COUNTY"), and THE GRACE FOUNDATION OF NORTHERN CALIFORNIA, a California Corporation with a principal place of business at 5800 Latigo Lane, El Dorado Hills, CA 95672 (hereinafter "CONTRACTOR").

This Agreement is made with reference to the following facts and circumstances:

      **WHEREAS** COUNTY has need for equine protective custody services and,

      **WHEREAS** CONTRACTOR desires to provide those services.

In consideration of the services to be rendered, the sums to be paid, and each and every covenant and condition contained herein, the parties hereto agree as follows:

**1.    SERVICES.**

      The CONTRACTOR shall provide those services described in Attachment "A". CONTRACTOR shall provide said services at the time, place and in the manner specified in Attachment "A".

**2.    TERM.**

      The term of the agreement shall be for the period of April 12, 2011 through December 30, 2011.

**3.    PAYMENT.**

      COUNTY shall pay CONTRACTOR for services rendered pursuant to this Agreement at the time and in the amount set forth in Attachment "B". The payment specified in Attachment "B" shall be the only payment made to CONTRACTOR for services rendered pursuant to this Agreement. CONTRACTOR shall submit all billing for said services to COUNTY in the manner specified in Attachment "B".

**4.    FACILITIES, EQUIPMENT AND OTHER MATERIALS AND OBLIGATIONS OF COUNTY.**

      CONTRACTOR shall, at its sole cost and expense, furnish all facilities, equipment, and other materials which may be required for furnishing services pursuant to this Agreement.

      COUNTY shall:

_____ _____ County Initials          Contractor Initials _____ _____

[v.20090513]    AGREEMENT BETWEEN LASSEN COUNTY AND THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

       4.1     Provide program consultation and technical assistance to CONTRACTOR.

       4.2     Monitor and evaluate CONTRACTOR's performance, expenditures and service levels for compliance with the terms of this Agreement.

       4.3     Provide CONTRACTOR with reporting forms and/or formats and time frames for submission of reports.

       4.4     Review all invoices submitted by CONTRACTOR for allowable costs and approve for payment as appropriate conditioned in the availability of state funds.

       4.5     Retain ownership and have prompt access to any report, evaluations, preliminary findings, or data assembled/developed by CONTRACTOR under this Agreement.

**5.     ADDITIONAL PROVISIONS.**

Those additional provisions unique to this Agreement are set forth in Attachment "C".

**6.     GENERAL PROVISIONS.**

The general provisions set forth in Attachment "D" are part of this Agreement.  Any inconsistency between said general provisions and any other terms or conditions of this Agreement shall be controlled by the other terms or conditions insofar as the latter are inconsistent with the general provisions.

**7.     DESIGNATED REPRESENTATIVES.**

Pete Heimbigner is the designated representative of the COUNTY and will administer this Agreement for the COUNTY.  Beth Decaprio is the authorized representative for CONTRACTOR.  Changes in the designated representatives shall occur only by advance written notice to the other party.

**8.     ATTACHMENTS.**

All attachments referred to herein are attached hereto and by this reference incorporated herein.  Attachments include:

       Attachment A - Services
       Attachment B - Payment
       Attachment C - Additional Provisions
       Attachment D - General Provisions

_____ _____ County Initials                               Contractor Initials _____ _____

[v.20090513]       AGREEMENT BETWEEN LASSEN COUNTY AND THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates shown opposite their respective signatures.

CONTRACTOR
The Grace Foundation of Northern California
501(c)(3) ID# 52-2444981

Dated:_____     By:_____
                                        Beth Decaprio
                                        Executive Director

Dated: _____     By: _____
                                        Jeannie Warr
                                        Secretary

                                  COUNTY
                                  County of Lassen

Dated: _____     By: _____
                                        Tom C. Stone
                                        County Administrative Officer

Dated:_____     By:_____
                                        Larry D. Millar
                                        Director of Public Works

Approved as to form:

_____
Lassen County Counsel

[1Contract Standard Professional Services Master v20090513]

**ATTACHMENT A**

**AGREEMENT BETWEEN LASSEN COUNTY**
**AND**
**THE GRACE FOUNDATION OF NORTHERN CALIFORNIA**

**SCOPE OF SERVICES**

A.1  The services to be provided by CONTRACTOR and the scope of CONTRACTOR's duties include the following:

A.1.1  Provide protective custody services for horses surrendered to Lassen County Animal Control from Whispering Pines Stable located at 695-725 Highway 36, Susanville, CA  96130.

A.1.2  Protective custody services will include standard medical care and intake services to include:

A.1.2.1  
- Photos, video and intake forms completed on each horse.
- Veterinarian medical evaluation and report.
- All farrier services and x-rays if needed for corrective trimming and shoeing.
- Vaccinations that include five-way, west nile and rabies.
- Teeth floating, manual and power floating, if needed.
- Worming and fecal floats.
- Pregnancy check if needed.

**END OF ATTACHMENT "A"**

**ATTACHMENT B**

**AGREEMENT BETWEEN LASSEN COUNTY
AND
THE GRACE FOUNDATION OF NORTHERN CALIFORNIA**

**PAYMENT**

B.1     COUNTY shall pay CONTRACTOR as follows:

   B.1.1   The COUNTY will reimburse the CONTRACTOR for service provided, not to exceed the maximum contract amount.

   B.1.2   The service rate will be based on a one time per horse cost.

      B.1.2.1  The standard rate will be $250 per horse.

   B.1.3   Payment frequency.

      B.1.3.1   Invoices may be submitted no more frequently than once monthly.

      B.1.3.2  The invoice will itemize and describe each horse in adequate detail for correlation with COUNTY's inventory of surrendered animals.

      B.1.3.3  Upon receipt of invoice detailing service provided and after County approval, a payment will be made.

The maximum amount payable under this contract shall not exceed $7,500.00.

**END OF ATTACHMENT "B"**

_____  _____  County Initials                                      Contractor Initials _____ _____

[v.20090513]        AGREEMENT BETWEEN LASSEN COUNTY AND THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

**ATTACHMENT C**

**AGREEMENT BETWEEN LASSEN COUNTY AND**
**AND**
**THE GRACE FOUNDATION OF NORTHERN CALIFORNIA**

**ADDITIONAL PROVISIONS**

No additional provisions.


**END OF ATTACHMENT "C"**

_____  _____ County Initials                                    Contractor Initials _____ _____

[v.20090513]          AGREEMENT BETWEEN LASSEN COUNTY AND THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

# ATTACHMENT D

# GENERAL PROVISIONS

**D.1.    INDEPENDENT CONTRACTOR**. For all purposes arising out of this Agreement, CONTRACTOR shall be: an independent contractor and CONTRACTOR and each and every employee, agent, servant, partner, and shareholder of CONTRACTOR (collectively referred to as "The Contractor") shall not be, for any purpose of this Agreement, an employee of COUNTY. Furthermore, this Agreement shall not under any circumstance be construed or considered to be a joint powers agreement as described in California Government Code sections 6000, et seq., or otherwise. As an independent contractor, the following shall apply:

    D.1.1    CONTRACTOR shall determine the method, details and means of performing the services to be provided by CONTRACTOR as described in this Agreement.

    D.1.2    CONTRACTOR shall be responsible to COUNTY only for the requirements and results specified by this Agreement and, except as specifically provided in this Agreement, shall not be subject to COUNTY's control with respect to the physical actions or activities of CONTRACTOR in fulfillment of the requirements of this Agreement.

    D.1.3    CONTRACTOR shall be responsible for its own operating costs and expenses, property and income taxes, workers' compensation insurance and any other costs and expenses in connection with performance of services under this Agreement.

    D.1.4    CONTRACTOR is not, and shall not be, entitled to receive from or through COUNTY, and COUNTY shall not provide or be obligated to provide the CONTRACTOR with workers' compensation coverage, unemployment insurance coverage or any other type of employee or worker insurance or benefit coverage required or provided by any federal, state or local law or regulation for, or normally afforded to, any employee of COUNTY

    D.1.5    The CONTRACTOR shall not be entitled to have COUNTY withhold or pay, and COUNTY shall not withhold or pay, on behalf of the CONTRACTOR any tax or money relating to the Social Security Old Age Pension Program, Social Security Disability Program or any other type of pension, annuity or disability program required or provided by any federal, state or local law or regulation for, or normally afforded to, an employee of COUNTY.

    D.1 .6    The CONTRACTOR shall not be entitled to participate in, or receive any benefit from, or make any claim against any COUNTY fringe benefit program including, but not limited to, COUNTY's pension plan, medical and health care plan, dental plan, life insurance plan, or other type of benefit program, plan or coverage designated for, provided to, or offered to COUNTY's employees.

    D.1 .7    COUNTY shall not withhold or pay on behalf of CONTRACTOR any federal, state or local tax including, but not limited to, any personal income tax owed by CONTRACTOR.

    D.1 .8. The CONTRACTOR is, and at all times during the term of this Agreement shall represent and conduct itself as, an independent contractor and not as an employee of COUNTY.

    D.1.9    CONTRACTOR shall not have the authority, express or implied, to act on behalf of, bind or obligate the COUNTY any way without the written consent of the COUNTY.

**D.2    LICENSES, PERMITS, ETC.** CONTRACTOR represents and warrants to COUNTY that it has all

licenses, permits, qualifications, and approvals of whatsoever nature which are legally required for CONTRACTOR to practice its profession. CONTRACTOR represents and warrants to COUNTY that CONTRACTOR shall, at its sole cost and expense, keep in effect or obtain at all times during the term of this Agreement any licenses, permits, and approvals which are legally required for CONTRACTOR to practice its profession at the time the services are performed.

**D.3    CHANGE IN STATUTES OR REGULATIONS.** If there is a change of statutes or regulations applicable to the subject matter of this Agreement, both parties agree to be governed by the new provisions, unless either party gives notice to terminate pursuant to the terms of this Agreement.

**D.4    TIME.** CONTRACTOR shall devote such time to the performance of services pursuant to this Agreement as may be reasonably necessary for the satisfactory performance of CONTRACTOR's obligations pursuant to this Agreement. Neither party shall be considered in default of this Agreement to the extent performance is prevented or delayed by any cause, present or future, which is beyond the reasonable control of the party.

**D.5    INSURANCE.**

D.5.1    Prior to rendering services provided by the terms and conditions of this Agreement, CONTRACTOR shall acquire and maintain during the term of this Agreement insurance coverage (hereinafter referred to as "the insurance") through and with an insurer acceptable to COUNTY. The insurance shall contain the following coverages:

D.5.1.1 Comprehensive general liability insurance including comprehensive public liability insurance with minimum coverage of One Million Dollars ($1,000,000) per occurrence and with not less than One Million Dollars ($1,000,000) aggregate; CONTRACTOR shall insure both COUNTY and CONTRACTOR against any liability arising under or related to this Agreement.

D.5.1.2 Comprehensive automobile liability insurance with minimum coverage of Five Hundred Thousand Dollars ($500,000) per occurrence and with not less than Five Hundred Thousand Dollars ($500,000) on reserve in the aggregate, with combined single limit including owned, non-owned and hired vehicles.

D.5.1.3 Workers' Compensation Insurance coverage for all of CONTRACTOR's employees and other persons for whom CONTRACTOR is responsible to provide such insurance coverage, as provided by Division 4 and 4.5 of the California Labor Code.

D.5.2    The limits of insurance herein shall not limit the liability of the CONTRACTOR hereunder.

D.5.3    In respect to any insurance herein, if the aggregate limit available becomes less than that required above, other excess insurance shall be acquired and maintained immediately. For the purpose of any insurance term of this Agreement, "aggregate limit available" is defined as the total policy limits available for all claims made during the policy period.

D.5.4    Except for automobile liability insurance, the insurance shall name the COUNTY and COUNTY's officers, employees, agents and independent contractors as additional insureds and shall include an endorsement that no cancellation or material change adversely affecting any coverage provided by the insurance may be made until twenty (20) days after written notice is delivered to COUNTY.

D.5.5    The insurance policy forms, endorsements and insurer(s) issuing the insurance shall be satisfactory to COUNTY at its sole and absolute discretion. The amount of any deductible payable by

the insured shall be subject to the prior approval of the COUNTY and the COUNTY, as a condition of its approval, may require such proof of the adequacy of CONTRACTOR's financial resources as it may see fit.

D.5.6    Prior to CONTRACTOR rendering services provided by this Agreement, and immediately upon acquiring additional insurance, CONTRACTOR shall deliver a certificate of insurance describing the insurance coverages and endorsements to:

> Pete Heimbigner
> Public Works Deputy Director
> 707 Nevada St., Suite 4
> Susanville, CA  96130

Upon COUNTY's request, CONTRACTOR shall deliver certified copies of any insurance policies to COUNTY.

D.5.7    CONTRACTOR shall not render services under the terms and conditions of this Agreement unless each type of insurance coverage and endorsement is in effect and CONTRACTOR has delivered the certificate(s) of insurance to COUNTY as previously described. If CONTRACTOR shall fail to procure and maintain said insurance, COUNTY may, but shall not be required to, procure and maintain the same, and the premiums of such insurance shall be paid by CONTRACTOR to COUNTY upon demand. The policies of insurance provided herein which are to be provided by CONTRACTOR shall be for a period of not less than one year, it being understood and agreed that twenty (20) days prior to the expiration of any policy of insurance, CONTRACTOR will deliver to COUNTY a renewal or new policy to take the place of the policy expiring.

D.5.8    COUNTY shall have the right to request such further coverages and/or endorsements on the insurance as COUNTY deems necessary, at CONTRACTOR's expense. The amounts, insurance policy forms, endorsements and insurer(s) issuing the insurance shall be satisfactory to COUNTY in its sole and absolute discretion.

D.5.9    Any subcontractor(s), independent contractor(s) or any type of agent(s) performing or hired to perform any term or condition of this Agreement on behalf of CONTRACTOR, as may be allowed by this Agreement (hereinafter referred to as the "SECONDARY PARTIES"), shall comply with each term and condition of this Section D.5 entitled "INSURANCE". Furthermore, CONTRACTOR shall be responsible for the SECONDARY PARTIES' acts and satisfactory performance of the terms and conditions of this Agreement.

## D.6    INDEMNITY.

COUNTY shall not be liable for, and contractor shall defend and indemnify COUNTY and its officers, agents, employees, and volunteers (collectively "County Parties"), against any and all claims, deductibles, self-insured retentions, demands, liability, judgments, awards, fines, mechanics; liens or other liens, labor disputes, losses, damages, expenses, charges or costs of any kind or character, including attorney's fees and court costs (hereinafter collectively referred to as "Claims"), which arise out of or are in any way connected to the work covered by this Agreement arising either directly or indirectly from any act, error, omission or negligence of contractor or its officers, employees, agents, contractors, licensees or servants, including, without limitation, Claims caused by the concurrent negligent act, error or omission, whether active or passive of County Parties. CONTRACTOR shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties.

---

**D.7** **CONTRACTOR NOT AGENT.** Except as COUNTY may specify in writing, CONTRACTOR shall have no authority, express or implied, to act on behalf of COUNTY in any capacity whatsoever as an agent. CONTRACTOR shall have no authority, express or implied, pursuant to this Agreement to bind COUNTY to any obligation whatsoever.

**D.8** **ASSIGNMENT PROHIBITED**. CONTRACTOR may not assign any right or obligation pursuant to this Agreement. Any attempted or purported assignment of any right or obligation pursuant to this Agreement shall be void and of no legal effect.

**D.9** **PERSONNEL.** CONTRACTOR shall assign only competent personnel to perform services pursuant to this Agreement. In the event that COUNTY, in its sole discretion at any time during the term of this Agreement, desires the removal of any person or persons assigned by CONTRACTOR to perform services pursuant to this Agreement, CONTRACTOR shall remove any such person immediately upon receiving written notice from COUNTY of its desire for removal of such person or persons.

**D.10** **STANDARD OF PERFORMANCE.** CONTRACTOR shall perform all services required pursuant to this Agreement in the manner and according to the standards observed by a competent practitioner of the profession in which CONTRACTOR is engaged. All products of whatsoever nature which CONTRACTOR delivers to COUNTY pursuant to this Agreement shall be prepared in a first class and workmanlike manner and shall conform to the standards of quality normally observed by a person practicing in CONTRACTOR's profession.

**D.11** **POSSESSORY INTEREST.** The parties to this Agreement recognize that certain rights to property may create a "possessory interest", as those words are used in the California Revenue and Taxation Code section 107. For all purposes of compliance by COUNTY with Section 107.6 of the California Revenue and Taxation Code, this recital shall be deemed full compliance by the COUNTY. All questions of initial determination of possessory interest and valuation of such interest, if any, shall be the responsibility of the County Assessor and the contracting parties hereto. A taxable possessory interest may be created by this, if created, and the party in whom such an interest is vested will be subject to the payment of property taxes levied on such an interest.

**D.12** **TAXES.** CONTRACTOR hereby grants to the COUNTY the authority to deduct from any payments to CONTRACTOR any COUNTY imposed taxes, fines, penalties and related charges which are delinquent at the time such payments under this Agreement are due to CONTRACTOR.

**D.13** **TERMINATION.**

D.13.1  COUNTY shall have the right to terminate this Agreement at any time by giving notice in writing of such termination to CONTRACTOR. In the event COUNTY gives notice of termination, CONTRACTOR shall immediately cease rendering service upon receipt of such written notice and the following shall apply:

D.13.1.1 CONTRACTOR shall deliver to COUNTY copies of all writings prepared by it pursuant this agreement.  The term "writings" shall be construed to mean and include: handwriting, typewriting, printing, photocopying, photographing computer storage medium (tapes, disks, diskettes, etc.) and every other means of recording upon any tangible thing, and form of communication or representation, including letters, pictures, sounds, or symbols, or combinations thereof.

D.13.1.2 COUNTY shall pay CONTRACTOR the reasonable value of services rendered by CONTRACTOR to the date of termination pursuant to this Agreement not to exceed the amount documented by CONTRACTOR and approved by COUNTY as work accomplished to date; provided, however, that in no event shall any payment hereunder exceed **SEVEN**

**THOUSAND, FIVE HUNDRED and 00/100 DOLLARS ($7,500)**. Further provided, however, COUNTY shall not in any manner be liable for lost profits which might have been made by CONTRACTOR had CONTRACTOR completed the services required by this Agreement. In this regard, CONTRACTOR shall furnish to COUNTY such financial information as in the judgment of the COUNTY is necessary to determine the reasonable value of the services rendered by CONTRACTOR. In the event of a dispute as to the reasonable value of the services rendered by CONTRACTOR, the decision of the COUNTY shall be final. The foregoing is cumulative and does not affect any right or remedy which COUNTY may have in law or equity.

D.13.2 CONTRACTOR may terminate its services under this Agreement upon thirty (30) working days written notice to the COUNTY, without liability for damages, if CONTRACTOR is not compensated according to the provisions of the Agreement or upon any other material breach of the Agreement by COUNTY, provided that CONTRACTOR has first provided COUNTY with a written notice of any alleged breach, specifying the nature of the alleged breach and providing not less than ten (10) working days within which the COUNTY may cure the alleged breach.

**D.14    OWNERSHIP OF INFORMATION.** All professional and technical information developed under this Agreement and all work sheets, reports, and related data shall become and/or remain the property of COUNTY, and CONTRACTOR agrees to deliver reproducible copies of such documents to COUNTY on completion of the services hereunder. The COUNTY agrees to indemnify and hold CONTRACTOR harmless from any claim  arising out of reuse of the information for other than this project.

**D.15    WAIVER.** A waiver by any party of any breach of any term, covenant or condition herein contained or a waiver of any right or remedy of such party available hereunder at law or in equity shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition herein contained or of any continued or subsequent right to the same right or remedy. No party shall be deemed to have made any such waiver unless it is in writing and signed by the party so waiving.

**D.16    COMPLETENESS OF INSTRUMENT.** This Agreement, together with its specific references and attachments, constitutes all of the agreements, understandings, representations, conditions, warranties and covenants made by and between the parties hereto. Unless set forth herein, neither party shall be liable for any representations made, express or implied.

**D.17    SUPERSEDES PRIOR AGREEMENTS.** It is the intention of the parties hereto that this Agreement shall supersede any prior agreements, discussions, commitments, representations, or agreements, written or oral, between the parties hereto.

**D.18    ATTORNEY'S FEES.** If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, which may be set by the Court in the same action or in a separate action brought for that purpose, in addition to any other relief to which such party may be entitled.

**D.19    MINOR AUDITOR REVISION.** In the event the Lassen County Auditor's office finds a mathematical discrepancy between the terms of the Agreement and actual invoices or payments, provided that such discrepancy does not exceed one percent (1%) of the Agreement amount, the Auditor's office may make the adjustment in any payment or payments without requiring an amendment to the Agreement to provide for such adjustment. Should the COUNTY or the CONTRACTOR disagree with such adjustment, they reserve the right to contest such adjustment and/or to request corrective amendment.

**D.20    CAPTIONS.** The captions of this Agreement are for convenience in reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

_____ _____ County Initials        ATTACHMENT D, Page 5        Contractor Initials _____ _____

**D.21**    **DEFINITIONS.** Unless otherwise provided in this Agreement, or unless the context otherwise requires, the following definitions and rules of construction shall apply herein.

**D.21.1 Number and Gender.** In this Agreement, the neuter gender includes the feminine and masculine, the singular includes the plural, and the word "person" includes corporations, partnerships, firms or associations, wherever the context so requires.

**D.21.2 Mandatory and Permissive.** "Shall" and "will" and "agrees" are mandatory. "May" is permissive.

**D.22**    **TERM INCLUDES EXTENSIONS.** All references to the term of this Agreement or the Agreement Term shall include any extensions of such term.

**D.23**    **SUCCESSORS AND ASSIGNS.** All representations, covenants and warranties specifically set forth in this Agreement, by or on behalf of, or for the benefit of any or all of the parties hereto, shall be binding upon and inure to the benefit of such party, its successors and assigns.

**D.24**    **MODIFICATION.** No modification or waiver of any provisions of this Agreement or its attachments shall be effective unless such waiver or modification shall be in writing, signed by all parties, and then shall be effective only for the period and on the condition, and for the specific instance for which given.

**D.25**    **COUNTERPARTS.** This Agreement may be executed simultaneously and in several counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

**D.26**    **OTHER DOCUMENTS.** The parties agree that they shall cooperate in good faith to accomplish the object of this Agreement and, to that end, agree to execute and deliver such other and further instruments and documents as may be necessary and convenient to the fulfillment of these purposes.

**D.27**    **PARTIAL INVALIDITY.** If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provision and/or provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**D.28**    **VENUE.** It is agreed by the parties hereto that unless otherwise expressly waived by them, any action brought to enforce any of the provisions hereof or for declaratory relief hereunder shall be filed and remain in a court of competent jurisdiction in the County of Lassen, State of California.

**D.29**    **CONTROLLING LAW.** The validity, interpretation and performance of this Agreement shall be controlled by and construed under the laws of the State of California.

**D.30**    **CALIFORNIA TORT CLAIMS ACT.**    Notwithstanding any term or condition of the Agreement, the provisions, and related provisions, of the California Tort Claims Act, Division 3.6 of the Government Code, are not waived by COUNTY and shall apply to any claim against COUNTY arising out of any acts or conduct under the terms and conditions of this Agreement.

**D.31**    **TIME IS OF THE ESSENCE.** Time is of the essence of this Agreement and each covenant and term herein.

**D.32**    **AUTHORITY.** All parties to this Agreement warrant and represent that they have the power and authority to enter into this Agreement in the names, titles and capacities herein stated and on behalf of any entities, persons, estates or firms represented or purported to be represented by such entity(s), person(s), estate(s) or firm(s) and that all formal requirements necessary or required by any state and/or federal law in order to enter into this Agreement are in full compliance. Further, by entering into this Agreement, neither party

_____ _____  County Initials          ATTACHMENT D, Page 6          Contractor Initials _____ _____

hereto shall have breached the terms or conditions of any other contract or agreement to which such party is obligated, which such breach would have a material effect hereon.

**D.33    CORPORATE AUTHORITY.** If CONTRACTOR is a corporation or public agency, each individual executing this Agreement on behalf of said corporation or public agency represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of said corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the bylaws of said corporation or Board or Commission of said public agency, and that this Agreement is binding upon said corporation or public entity in accordance with its terms. If CONTRACTOR is a corporation, CONTRACTOR shall, within thirty (30) days after execution of this Agreement, deliver to COUNTY a certified copy of a resolution of the Board of Directors of said corporation authorizing or ratifying the execution of this Agreement.

**D.34    CONFLICT OF INTEREST.**

**D.34.1    Legal Compliance.** CONTRACTOR agrees at all times in performance of this Agreement to comply with the law of the State of California regarding conflicts of interest, including, but not limited to, Article 4 of Chapter 1, Division 4, Title 1 of the California Government Code, commencing with Section 1090 and Chapter 7 of Title 9 of said Code, commencing with Section 87100, including regulations promulgated by the California Fair Political Practices Commission.

**D.34.2    Advisement.** CONTRACTOR agrees that if any facts come to its attention which raise any questions as to the applicability of this law, it will immediately inform the COUNTY designated representative and provide all information needed for resolution of the question.

**D.34.3    Admonition.** Without limitation of the covenants in subparagraphs D.34.1 and D.34.2, CONTRACTOR is admonished hereby as follows:

The statutes, regulations and laws referenced in this provision D.34 include, but are not limited to, a prohibition against any public officer, including CONTRACTOR for this purpose, from making any decision on behalf of COUNTY in which such officer has a direct or indirect financial interest. A violation occurs if the public officer influences or participates in any COUNTY decision which has the potential to confer any pecuniary benefit on CONTRACTOR or any business firm in which CONTRACTOR has an interest of any type, with certain narrow exceptions.

**D.35    NONDISCRIMINATION.** During the performance of this Agreement, CONTRACTOR shall not unlawfully discriminate against any employee of the CONTRACTOR or of the COUNTY or applicant for employment or for services or any member of the public because of race, religion, color, national origin, ancestry, physical handicap, medical condition, marital status, age or sex. CONTRACTOR shall ensure that in the provision of services under this Agreement, its employees and applicants for employment and any member of the public are free from such discrimination. CONTRACTOR shall comply with the provisions of the Fair Employment and Housing Act (Government Code Section 12900 et seq.). The applicable regulations of the Fair Employment Housing Commission implementing Government Code Section 12900, set forth in Chapter 5, Division 4 of Title 2 of the California Code of Regulations are incorporated into this Agreement by reference and made a part hereof as if set forth in full. CONTRACTOR shall also abide by the Federal Civil Rights Act of 1964 and all amendments thereto, and all administrative rules and regulation issued pursuant to said Act CONTRACTOR shall give written notice of its obligations under this clause to any labor agreement. CONTRACTOR shall include the non-discrimination and compliance provision of this paragraph in all subcontracts to perform work under this Agreement.

**D.36    JOINT AND SEVERAL LIABILITY.**    If any party consists of more than one person or entity, the liability of each person or entity signing this Agreement shall be joint and several.

# Exhibit B

**DEPARTMENT OF PUBLIC WORKS**
**ANIMAL CONTROL DIVISION**

*County of Lassen*

Larry Millar, Director
Public Works/Transportation
County Engineer

Judy Welpich, Animal Control
707 Nevada
Susanville,

Animal Shelter: (530)
Fax: (530)

Open Sat
10-2-00

SHELTI
Mon-Fri
Sat. 1
Cl
&

# Lassen County Animal Surrender Form

Name of Owner: _Dwight Bennett_

Mailing Address: _Same_
Street / P.O. Box          City,          State          Zip code.

Physical Address: _695 - 725 Hwy 36 W. Susanville Ca. 96130_
Street          City,          State          Zip code.

Phone #'s : _257-2555 / 260-3366_

| | | Name | Breed(s) | Sex | Color(s) | I.D.# |
|---|---|---|---|---|---|---|
| 4-19-11 | #1.) | Friday | Welsh X | F 9yr | WHT/Cream Heinz | |
| 4-19-11 | #2.) | Dolly | Mule | F 8yr | Bay | |
| 4-19-11 | #3.) | Hawk | App | G 6-7 | App/Leopard | |
| 4-19-11 | #4.) | Ronan | Mustang | SHD 3yr | Bay | |
| 4-12-11 | #5.) | Bay | Mustang | SHD 3 | Bay | 8807 |
| 4-19-11 | #6.) | Pine Tree | Foxtrotter | F 9yr | Palomino | |
| 4-19-11 | #7.) | T.C. | Paint stock | F 3yr | Sorrel Sabine Bald face Blue eye | |
| 4-19-11 | #8.) | T.C. JR. | Paint stock | | Sorrell Colt | |

*I swear under penalty of perjury that I am the lawful owner/owner's authorized agent of the animal(s) described herein and that I am unable to provide financial support, care or alternate placement provisions for the shelter, care, medical needs, licensing and physical control over above entitled animal(s)*

*I, therefore, voluntarily transfer all title and ownership of said animal(s) aforementioned to the Lassen County Animal Shelter, who at their own option, reserve the right to place said animal(s) for adoption or to be humanely euthanized. The animal(s) will not be used, sold or transferred for medical research or any inhumane purposes while in the custody of Lassen County.*

*I certify that this animal(s) have not bitten any person or animal within the last 11 days.*

Signed, Owner/ Owners agent: _Dwight Bennett_                    Date: 4/8/11

Signed, Shelter Staff: _____                        Date: 4/8/11

*Please note that unless you specify otherwise, your personal information, including but not limited to, name, address, and telephone number, will not be released to the public. to include records ...*

# DEPARTMENT OF PUBLIC WORKS
# ANIMAL CONTROL DIVISION

## County of Lassen



Larry Miller, Director
Public Works/Transportation
County Engineer

Judy Weisech, Animal Control Supervisor
707 Nevada St. Suite4
Susanville, Ca, 96130

Animal Shelter: (530) 257-9200
Fax: (530) 257-0456

## Lassen County Animal Surrender Form

SHELTER HOURS
Mon.-Fri 9am-3pm
Sat. 10am-2pm
Closed Sun.
& Holidays

Name of Owner: _Dwight  Bennett_

Mailing Address: _P.O. Box 540_
Street / P.O. Box        City,        State        Zip code.

Physical Address: _695-825 Hwy 36W  Susanville Ca  96130_
Street        City,        State        Zip code.

Phone #'s: _257-2555 / 260-3366_

| | Name | Breed(s) | Sex: | Color(s) | I.D.# |
|---|---|---|---|---|---|
| 4-19-11 1.) | Sunny | Poodle Mix | Std | Palomino | 4 |
| 4-19-11 2.) | Dunbar | Ranch Bay | Gd | Dun Bay | 14 |
| 4-19-11 3.) | Starling | AQHA | Mare | Bay | 12 yr |
| 4-19-11 4.) | Baby Souxzy | AQHA Appaloosa Filly | Roan | 4mo |
| 5.) | | | | | |
| 6.) | | | | | |
| 7.) | | | | | |
| 8.) | | | | | |

I swear under penalty of perjury that I am the lawful owner/owner's authorized agent of the animal(s) described herein and that I am unable to provide financial support, care or alternate placement provisions for the shelter, care, medical needs, licensing and physical control over above entitled animal(s)

I, therefore, voluntarily transfer all title and ownership of said animal(s) aforementioned to the Lassen County Animal Shelter, who at their own option, reserve the right to place said animal(s) for adoption or to be humanely euthanized. The animal(s) will not be used, sold or transferred for medical research or any inhumane purposes while in the custody of Lassen County.

I certify that this animal(s) have not bitten any person or animal within the last 11 days. _N/a_

Signed, Owner/ Owners agent: _Dwight Bennett_        Date: _4/19/11_
Signed, Shelter Staff: _____        Date: _4/19/11_

... personal information, including but not limited to, name:

# DEPARTMENT OF PUBLIC WORKS
# ANIMAL CONTROL DIVISION

*County of Lassen*

Larry Miller, Director
Public Works/Transportation
County Engineer

Judy Walpoch, Animal Control
787 Nevad
Susanville

Animal Shelter: (530)
Fax: (530)

*Open Sat. 10-2:00*

## Lassen County Animal Surrender Form

SHELT
Mon.-Fri
Sat. 1
0:
a



Name of Owner: _Dwight Bennett_

Mailing Address: _Same_
Street / P.O. Box            City,            State            Zip code.

Physical Address: _695-725 Hwy 36 W Susanville Ca 96130_
Street            City,            State            Zip code.

Phone #'s : _257-2555 / 260-3366_

| | Name | Breed(s) | Sex | Color(s) | |
|---|---|---|---|---|---|
| 1.) | Jimmy | Cuter Res. Mustang | Stud 2yr | Peanut Butter Dun | |
| 2.) | P Ceder | Reeker Res Mustang | Stud yr | Red Dun | |
| 3.) | Pete | Carter Res Mustang | Stud yr | Grulla | |
| 4.) | Peanut | Carter Res Mustang | Stud yr | Peanut Butter Dun | |
| 5.) | Penny | Belgian X | F 10yr | Roan Sorrel with Blaze | |
| 6.) | Tulax | Paint | F 5yr | Buckskin Paint | |
| 7.) | Candy Cane | Paint | F 3yr | Sorrel Paint | |
| 8.) | Pass | Paso Peruvian | F 7yr | Sorrel Flax | |

I swear under penalty of perjury that I am the lawful owner/owner's authorized agent of the animal(s) described herein and that I am unable to provide financial support, care or alternate placement provisions for the shelter, care, medical needs, licensing and physical control over above entitled animal(s)

I, therefore, voluntarily transfer all title and ownership of said animal(s) aforementioned to the Lassen County Animal Shelter; who at their own option, reserve the right to place said animal(s) for adoption or to be humanely euthanized. The animal(s) will not be used, sold or transferred for medical research or any inhumane purposes while in the custody of Lassen County.

I certify that this animal(s) have not bitten any person or animal within the last 11 days.

Signed, Owner/ Owners agent: _____ Date: _4/8/11_

Signed, Shelter Staff: _____ Date: _4/8/11_

*Please note that unless you specify otherwise, your personal information, including but not limited to address, and telephone number...*