# EXHIBIT G

EL DORADO CO. SUPERIOR CT.

FILED    JUL 06 2012

BY _____
            Deputy

FILED BY FAX

**LEVITON LAW GROUP, A P.C.**
Stuart L. Leviton (SB# 169046)
3699 Wilshire Blvd., Ste. 1290
Los Angeles, CA 90010
213.402.4576 (T)
213.559.0572 (F)
sleviton@levitonlawgroup.com (E)

Attorneys for Plaintiff
THE GRACE FOUNDATION OF NORTHERN CALIFORNIA

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF EL DORADO

CAMERON PARK BRANCH

| | |
|---|---|
| THE GRACE FOUNDATION OF NORTHERN CALIFORNIA, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., a federally chartered bank, on its own behalf and as trustee of the MLMI Trust Series 2005-HE3; BANK OF AMERICA, N.A., a federally chartered bank, on its own behalf; BAC HOME LOANS SERVICING, LP, a Texas limited partnership and a unit of Bank of America, N.A.; TIMOTHY M. RYAN, an individual; THE RYAN FIRM, a California professional corporation; DWIGHT ALAN BENNETT, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.  **PC  2 0 1 2 0 3 8 2**<br><br>**COMPLAINT FOR**<br><br>1.  **COMMON COUNT – QUANTUM MERUIT – SERVICES RENDERED;**<br>2.  **FRAUD**<br>3.  **BREACH OF FIDUCIARY DUTY**<br>4.  **LEGAL MALPRACTICE**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Assigned to<br>Judge Nelson K. Brooks<br>For all purposes |

///
///
///
///
///
///
///

1
COMPLAINT; DEMAND FOR JURY TRIAL

E. Romero

Plaintiff The Grace Foundation of Northern California alleges:

**PARTIES**

1.      Plaintiff The Grace Foundation of Northern California ("Grace") is a California non-profit corporation with it principal place of business in Eldorado Hills, California. Grace is an animal rescue and rehabilitation ranch. It provides critical care and rehabilitation for abused and neglected horses and utilizes many of its rescued horses in equine assisted learning and therapeutic programs for youth and adults. Grace also rescues and rehabilitates dogs, cats, cows, sheep, goat, pigs, chickens and more. Grace is authorized to do business in the State of California and conducts business in Eldorado County, California.

2.      Defendant Wells Fargo Bank, N.A. ("Wells") is a federally chartered bank that does business in the State of California and the County of El Dorado. Wells is sued herein both in its own right and as trustee of the MLMI Trust Series 2005-HE3 ("Trust").

3.      Defendant Bank of America, N.A. ("B of A") is a federally chartered bank that does business in the State of California and the County of El Dorado. B of A is sued herein in its own right, and as the parent and/or alter ego of BAC.

4.      Defendant BAC Home Loan Servicing LP ("BAC") is a Texas limited partnership and a unit of B of A. BAC is sued herein in its own right.

5.      Defendants Wells, B of A, and BAC shall be referred to collectively herein as the "Banks."

6.      Defendant Timothy M. Ryan is an individual, and Grace is informed and believes and thereon alleges that Ryan resides in Orange County, California. Ryan is a member of the California Bar. At all relevant times, Ryan purported to act as Grace's attorney.

7.      Defendant The Ryan Firm is a California professional corporation, and the law firm through which Ryan practices.

8.      Defendant Dwight Alan Bennett is an individual. Grace is informed and believes and thereon alleges that Bennett resides in Lassen County. Bennett claims to be the owner of the horses at issue in this action.

1    9.    Unless otherwise alleged in this Complaint, Plaintiff is informed and believes,

2  and on the basis of that information and belief alleges, that at all times mentioned in this Complaint,

3  Defendants were the agents and employees of their Codefendants, and in doing the things alleged in

4  this Complaint, were acting within the course and scope of that agency and employment.

5    10.    Plaintiff does not know the true names of defendants DOES 1 through 50,

6  inclusive, and therefore sues them by those fictitious names.

7                        **BACKGROUND FACTS**

8    11.    We are all familiar with the phrase, "No good deed goes unpunished." Because

9  Grace's good deeds have been punished mercilessly, and because Grace is in dire straits, prompt relief

10  from the Court is requested and required.

11    12.    On or about April 8, 2011, Grace first came into contact with Bennett. At the

12  request of Lassen County animal control, Grace took custody of 20 horses from Bennett's property.

13  Bennett agreed to surrender the horses to Lassen County, which then entered into a memorandum of

14  understanding with Grace for the care, custody, and maintenance of the horses. These 20 horses are

15  not at issue in this action.

16    13.    After engaging in protracted litigation between the Banks and Bennett, on July

17  21, 2011, the Lassen County Superior Court, at the request of the Banks, appointed a receiver to take

18  control of Bennett's property, including various animals on the property.

19    14.    On or about August 1, 2011, Ryan, on behalf of the Banks, contacted Grace

20  about the urgent need to remove an additional 36 horses from Bennett's property. Grace explained to

21  Ryan that it would be willing to assist with the care of the horses on one of two conditions: either (1)

22  the horses would be held in protective custody, with ownership of the horses remaining with their

23  rightful owner, and the Banks assuming full financial responsibility for the care of the horses at

24  Grace's standard rates for such care; or (2) the rightful owner of the horses would relinquish ownership

25  of the horses to Grace, with a set sum of money paid to Grace to cover the costs of caring for them.

26  Ryan claimed that the Banks had already spent a great deal of money providing care for the horses and

27  that they would only be interested in relinquishing ownership of the animals to Grace. Ryan did not

28

                              3
                    COMPLAINT; DEMAND FOR JURY TRIAL

1  disclose to Grace, however, that the Banks did not own the horses, and that the Banks did not have the

2  lawful right to relinquish ownership of the horses to Grace.

3          15.     Between August 2 and 17, 2011, Grace and Ryan continued to discuss Grace's

4  assuming ownership of the subject horses and the care for them.  Grace told Ryan that it would assume

5  ownership of the horses on the express condition that Grace were paid $50,000, which was needed to

6  supplement Grace's financial wherewithal to provide care for the horses until Grace could adopt out

7  the horses to new owners.  Grace made clear to Ryan that one of its major concerns was the possible

8  pregnancies of the mares (adult female horses) because one or more stallions (male horses that have

9  not been gelded (castrated)) had been housed with the mares, without appropriate separation.  Grace

10  told Ryan that pregnancy testing would need to be immediate, and that as an express condition for

11  assuming ownership of the horses, and pursuant to standard shelter practice, all early pregnancies

12  would need to be terminated.  A further express condition of assuming ownership of the horses, and

13  which was expressly communicated to Ryan, was that a majority of the subject horses needed to be

14  ready for adoption by October 15, 2011, a day in which Grace had already planned a Nationwide-

15  adoption effort.

16          16.     On or about August 17, 2011, Ryan confirmed to Grace that the Banks would

17  pay Grace a total of $40,000 ($20,000 from Wells and $20,000 from B of A/BAC).  Ryan emphasized

18  that these payments were "donations" and not payment for the horses care.    Ryan requested a letter

19  from Grace acknowledging the donations and asked Grace not to mention the termination of the

20  pregnancies in the acknowledgment letter.  Ryan also instructed Grace to include in the letter examples

21  of how the "donations" were to be used, but emphasized that the letter needed to reflect a total cost

22  approximately $40,000.

23          17.     Lassen County agreed to pay an additional $10,000 for the horses care, which to

24  date has not been paid.

25          18.     A few words about terminating early pregnancies.  Grace follows standard

26  shelter practice with respect to the termination of early pregnancies.  Grace does not undertake this act

27  lightly.  That said, Grace's first priority is to the rescued animal.  Moreover, given that the need for its

28

4
COMPLAINT; DEMAND FOR JURY TRIAL

1  services far outweigh its ability to provide services, Grace must exercise sound judgment in managing

2  animals presented to it.

3        19.    With respect to the specific subject horses, Grace also knew that they had been

4  deprived of adequate feed and appropriate care for a period of time.  Moreover, because many of the

5  horses were either very young or very old, which precluded them from being considered good breeding

6  candidates, Grace knew that if the horses were pregnant, and if the pregnancies were not terminated

7  early, the pregnancies would be at high risk for complications and many would require very expensive

8  veterinary care.  As will be detailed herein, because Grace was not allowed to follow standard shelter

9  practice in this case, the negative consequences have been extreme, and continue to grow by the day.

10       20.    On August 18, 2011, Grace sent Ryan the requested letter via email, in which it

11  stated, "This letter is to confirm details of our telephone conversation yesterday, concerning Wells . . .

12  and B[] of A[] providing . . . Grace . . . with a $40,000 donation . . . .  These grants will allow [Grace]

13  to take ownership of and care for the approximately 37 [subject] horses . . . ."  Once again, Grace

14  emphasized the importance of it obtaining outright ownership of the horses from the outset.

15       21.    The most critical element of this agreement is Grace's ability to take ownership

16  of the horses immediately, and to take all appropriate steps immediately to manage the horses.  Neither

17  Ryan nor the Banks told Grace, however, that none of them owned the horses and none of them had

18  the right to convey ownership of the horses to Grace.

19       22.    On August 19, 2011, Bennett advised Ryan of his bankruptcy filing on August

20  18, 2011 during a contempt proceeding in Lassen County Superior Court.  Rather than acknowledging

21  that the automatic stay prevented the Superior Court proceeding from continuing, Ryan urged the

22  Superior Court to proceed with the contempt proceeding because it "is a quasi-criminal proceeding.  A

23  stay, a bankruptcy stay is simply a stay to prevent debtors from collecting on debts of the bankrupt.  It

24  has no bearing on this proceeding at all whatsoever."  At the end of this proceeding, the Superior Court

25  ordered Bennett jailed for five days.

26       23.    Later on August 19, 2011, Grace's executive director, Beth DeCaprio, and

27  Jeanne Warr drove to Lassen County to meet Ryan, receiver Vicki Lozano, and Pete Heimbigner of

28

5
COMPLAINT; DEMAND FOR JURY TRIAL

1    Lassen County, to go over a plan for picking up the subject horses on August 26th and to do an

2    inventory of the horses at Bennett's ranch.  DeCaprio and Warr met everyone at Lozano's office in

3    Susanville.  DeCaprio and Warr were informed that Bennett had been placed in police custody during a

4    hearing in Lassen County Superior Court that took place earlier on the morning of August 19.

5    Critically, DeCaprio and Warr were not told, however, that Bennett informed Ryan and the Banks in

6    court on August 19 that he had filed for bankruptcy protection, and Ryan and the Banks did not tell

7    Grace how this event would significantly adversely impact Grace's ability to take ownership of the

8    horses.

9        24.    Rather than advising Grace of the negative impact Bennett's bankruptcy filing

10   had on Grace's ability to take ownership of the horses, Ryan, along with DeCaprio, Warr, Lozano, and

11   Heimbigner proceeded to Bennett's ranch, where they were joined by Judy St. John, Bennett's ex-wife,

12   and St John's attorney.  St. John showed proof of ownership of two of the horses on the property and

13   Heimbigner provided a Bureau of Land Management document showing that Bennett's daughter also

14   owned two of the horses.  All Parties agreed that Grace would take the subject horses on August 26th.

15   Everyone, including Ryan, also agreed that ownership of the subject horses would be conveyed to

16   Grace immediately upon transfer.  Everyone also agreed that with respect to the four horses whose

17   ownership was held either by St. John or Bennett's daughter, those horses would be placed into

18   Grace's protective custody subject to a pre-existing memorandum of understanding between Grace and

19   Lassen County until the owners could arrange to pick up the horses from Grace.

20       25.    Based on the foregoing, Grace continued to prepare to receive the subject horses

21   on August 26, and stepped up its advertising efforts for the October 15, 2011 Nation-wide adoption

22   effort.  Grace took these steps based on its belief, derived from the representations of Ryan and the

23   Banks, among others, that it would obtain ownership of the subject horses upon transfer.

24       26.    Grace did not learn of Bennett's bankruptcy until after it assumed responsibility

25   for the horses.

26       27.    On August 25, 2011, back in Bankruptcy Court, Ryan declared that "the

27   Creditors (Banks) agreed to make a $40,000 donation to the Grace Foundation of Northern California

28
COMPLAINT; DEMAND FOR JURY TRIAL

1   for the transfer of the horses.  This amount provides transportation, medical care, food and shelter for

2   over thirty (30) horses for up to six (6) months."  By this representation, the Banks knew that if

3   Grace's care for the subject horses extended beyond six months, their "donation" would not be

4   sufficient.  Moreover, Ryan misrepresented to the Bankruptcy Court the minimum amount of money

5   required to care for the horses ($50,000, not $40,000), and most importantly, Ryan also failed to

6   disclose to the Bankruptcy Court that this amount of money would be sufficient only if "transfer"

7   meant that Grace obtained immediate ownership of the horses.

8            28.    Critically, Grace formulated its initial estimate of the cost for caring for the

9   subject horses based on its belief that it would obtain immediate ownership of the horses and that the

10   Nation-wide adoption program set for October 15, 2011 would result in the prompt adoption of many

11   of the subject horses.  When the bankruptcy filing precluded Grace from obtaining immediate

12   ownership of the horses, this plan had no chance of success.  Although Ryan and the Banks knew this,

13   they nevertheless allowed Grace to proceed with accepting the horses.

14            29.    Also on August 25, 2011, the Banks filed an application in the Bankruptcy

15   Court because the Banks sought "an annulment of the stay so that the filing of the subject bankruptcy

16   petition does not affect post-petition acts . . .," including transferring ownership of the horses to Grace.

17   The Banks and Ryan knew, as of August 25, 2011, that ownership of the horses could not be

18   transferred to Grace without further court action, yet they did it anyway, as detailed below.

19            30.    On August 26, 2011, notwithstanding the bankruptcy and the automatic stay, the

20   receiver, at the request of and for the benefit of the Banks, purported to grant "final disposition" of the

21   subject horses to Lassen County, which in turn purported to "relinquish" the animals to Grace.  The

22   receiver also purported to enter into a "protective custody" agreement with Lassen County regarding

23   other animals, and the County then purported to enter into an agreement with Grace.  The Banks and

24   Ryan knew that the receiver had no such authority to enter into these agreements, yet they allowed this

25   to proceed.

26            31.    On August 26, 2011, Grace took custody of the subject horses and moved them

27   to its ranch in Eldorado Hills, where the surviving horses live today.

28

COMPLAINT; DEMAND FOR JURY TRIAL

32.     On September 2, 2011, the Bankruptcy Court denied the Banks' Application, and denied the receiver the right to control the disposition of horses.  Neither Ryan nor the Banks, however, advised the Bankruptcy Court that the receiver, without legal authority, had already turned the horses over to Grace via Lassen County on August 26, and under the false pretense that Grace was now the "owner" of the horses.

33.     On September 15, 2011, Ryan, via email, advised Bennett that Ryan's "firm represents the Grace Foundation concerning all animals removed from Whispering Pines.  Do not contact Beth DeCaprio or anyone related to the Grace Foundation concerning any matters.  Additionally, please ensure that your agents do not contact anyone at the Grace Foundation concerning these animals.  Please go through our office and our office alone."  Although Ryan never entered into a fee agreement with Grace to provide legal representation, and never obtained a conflict of interest waiver from Grace regarding his joint representation of Grace and the Banks, Ryan nevertheless assumed legal representation of Grace at least by September 15, 2011, if not before.

34.     On September 17, 2011, at a time when it was undisputed that Ryan was jointly representing the Banks and Grace, the Banks filed a Motion in Bankruptcy Court for relief from the automatic stay.  The Banks and Ryan understood that the automatic stay prevented them and the receiver from obtaining ownership of the horses and control over the horses.  Moreover, by this time, Ryan expressly instructed Grace not to take any of the usual steps Grace might otherwise take with respect to newly rescued horses, including the termination of early pregnancies.  This significantly adversely impacted Grace.  Had Grace known on August 26, 2011 that it did not own the horses, that its efforts to manage these horses would be severely limited, and that the Banks would refuse to provide sufficient financial support for the horses, it never would have accepted the horses.

35.     On September 19, 2011, in a declaration prepared by Ryan and for the Banks' benefit, and notwithstanding the stay, the receiver declared that Grace has "provided for the sa[f]e transfer of the horses for the time being."  At this point, legally, Grace was at most an agent for the receiver, with ultimate financial responsibility for Grace's costs in caring for the horses falling on the Banks, as the parties who requested the instatement of the receiver in the first instance.

COMPLAINT; DEMAND FOR JURY TRIAL

36.     On September 23, 2011, in an email, Ryan advised Grace that he has "spoke[n] to the DA for about a half hour" about Bennett.  Ryan further stated that he told the DA he "would provide him with a real prosecution package."

37.     On September 29, 2011, in an email, Ryan advised Grace that "the District Attorney received the package from our office . . . if I don't get good vibes about him moving forward soon, we need to find the outside pressure that you were referring to . . . seems like a pretty easy way to score some cheap political points . . . ."

38.     On October 13, 2011, Austin Beardsley, an associate in The Ryan Firm, sent an email to Grace and asked whether Grace would provide a declaration in support of the Banks' position in the Bankruptcy Court.  Beardsley stated, "thanks for all that you guys have done for the horses!!!!"  Without any hesitation, Ryan and the Banks were willing to use Grace when it benefited them, but as set forth below, once Ryan and the Banks obtained all that they needed from Grace, they refused to provide any help for the horrific situation unfolding at Grace.

39.     On October 14, 2011, Ryan sent an email to Grace and said, "My inside source talked to the DA on Monday night . . . . He said, 'I don't have a prosecutable file.'  I heard that he and Dwight Bennett are drinking buddies from way back.  It is all up to us now.  Seriously.  No one else cares . . . .  By us, I mean me, you and Beth.  I will be up on Monday for my hearing.  I will win and I hope that the court will also dismiss Dwight's BK.  We are simply moving to reimpose the receiver and complete our foreclosure.  I didn't ask for that yet . . . as I don't have grounds . . . but if the court is disgusted enough by what we presented, we will get that result."  Once again, while Ryan is trying to curry favor with Grace, it is now obvious that his sole motive was to use Grace for the benefit of himself and the Banks.

40.     On October 19, 2011, Ryan prepared a declaration for DeCaprio in support of the Banks' motion in the Bankruptcy Court.  In this declaration, DeCaprio stated that [o]n or about August 26, 2011, the Grace Foundation rescued an additional thirty six (36) horses from the Subject Property pursuant to an order by the Lessen County Superior Court surrendering the horses to the County of Lassen."  Ryan knew that this could not have been a true statement, in light of the stay and

1  Ryan's failure to get relief from the stay as of August 26, 2011. That said, Ryan permitted DeCaprio

2  to make such a statement under oath, which DeCaprio had no idea that it was not a true statement.

3  Tragically, DeCaprio believed that Grace had obtained ownership of the horses on August 26 based on

4  what Ryan told her.

5         41.    In her declaration, DeCaprio also provided details of the costs associated with

6  caring for the horses, and by this time, the substantial costs associated with caring for the expected

7  foals, given that no pregnancy was terminated.

8         42.    On October 21, 2011, the Banks obtained relief from the automatic stay in

9  Bennett's bankruptcy. Ryan sent Grace an email stating, "Thanks for letting me hang out with the cool

10 kids yesterday. I think that the strategy for Beth's update to the Grace supporters is very critical for

11 momentum. Beth obviously can't fold, and needs to continue to hold Burns [Lassen County DA]

12 accountable." Ryan then proposed a message to Grace supporters. Ryan concluded, "As always,

13 without you our mission is impossible. With you, our mission might actually be achievable."

14        43.    On October 24, 2011, in an email, Ryan advised Grace that "the Sheriff's office

15 called me today to inform me that they would be executing a search warrant at Whispering Pines

16 TOMORROW!!!! Please don't tell anyone . . . as it is kind of a secret . . . he was just giving me a

17 courtesy warning because of the bank's security interest in the property."

18        44.    On October 25, 2011, Bennett was arrested on 70 counts of felony animal abuse.

19        45.    On October 27, 2011, Ryan sent an email to Grace and stated, "My wife has

20 lived through the nightmare with me. Silently suffering as I was brooding and angry about Lassen

21 justice. She is amazed at what you folks are doing and you will be getting a very small token of

22 appreciation from her company . . . and from mine. Thanks for all you continue to do! Without your

23 donor pressure, I would still be brooding. That is worth at least a thousand bucks!"

24        46.    On November 10, 2011, Ryan sent an email to DeCaprio, stating, "Beth, [a]s

25 discussed today, we need to be very careful with the manner in which we deal with the horses. We

26 need to act as a "reasonable manager" of these horse assets while the bankruptcy is pending. If the

27 bankruptcy judge does what he is SUPPOSED to do, the bankruptcy case will be dismissed on

28

1   Monday, and we will not have to worry about the bankruptcy court. To the extent we need to put

2   down an animal, as long as the care decision is documented and appropriate, we can do that EVEN if

3   the horses are still under the control of the bankruptcy court. As soon as the BK court dismisses his

4   case, then we will need to weight the strategy. We have to choose one of two paths: 1. Lassen County

5   gave us the horses, we can do what we want. (See Pete transfer paperwork) OR 2. We are caring for

6   the horses, we are stepping in for Lassen, Lassen has provided us the parameters that we can use to

7   release the horses, BUT Lassen is on the hook for the board and care because the Order from court

8   says that the horses are released to Lassen. Each path is mutually exclusive." At no time did Ryan

9   suggest that his other clients, the Banks, might be financially responsible for the horses.

10          47.    On December 5, 2011, in an email, Ryan advised Grace, "[t]he Chapter 7 trustee

11  was just appointed and we have a letter up to the trustee asking him to abandon the horses. Once the

12  horses are abandoned, then we can act like the bankruptcy does not exist."

13          48.    Also on December 5, 2011, in an email to Ryan's wife, DeCaprio stated, "I

14  could not believe how lucky we were when Tim [Ryan] offered to help us with the Bennett case and I

15  have watched in amazement as he has over and over again gone beyond the call of duty. . . . Without

16  Tim's help I do not think I would have had the fight in me to see this all the way through." Only now

17  does Grace understand that the only "help" Ryan provided was to his other clients, the Banks. Only

18  now does Grace understand the magnitude of the harm Ryan and the Banks have caused it.

19          49.    On December 9, 2011, the Chapter 7 Trustee filed in the Bankruptcy Court an

20  abandonment motion with respect to the animals. The Trustee sought abandonment "because the

21  Horses are of inconsequential value or benefit to the estate and are otherwise burdensome to the

22  administration of this case." By this time, all parties understood the extreme expense caring for the

23  horses would entail, yet no one stepped forward to help with these costs.

24          50.    On December 12, 2011, Ryan, in an email to DeCaprio, stated, "Our letter to the

25  trustee had the desired effect. She filed a motion to deem the horses and all other animals as

26  abandoned. . . . Once the court approves that motion, we can start the process of adopting out the

27  horses as they will no longer be part of the bankruptcy estate."

28
COMPLAINT; DEMAND FOR JURY TRIAL

51.     On December 21, 2011, in an email, Ryan advised Grace that "[t]he squatters were removed yesterday . . . Now, we can accomplish what we tried to accomplish in July. The horse abandonment motion has not yet been opposed!  We will know very shortly if Grace is going to have a free hand in dealing with the horses."

52.     On December 30, 2011, in an email, Ryan advised Grace, "Let's plan for a conference call during the first part of the year on an action plan for the animals.  As I have told Beth, there are two mutually exclusive paths to go down: 1) the animals are Grace's and can be adopted out; 2) the animals are being held by Grace for the County and the County owes for their board care and med's.  That signed piece of paper from the County is our get out of jail free card . . . The County gave us the animals.  PERIOD."  Even as of this date, who owns the horses remained unclear.

53.     On January 3, 2012, Ryan, in an email, advised DeCaprio, "Today, the bankruptcy court on the motion of the Chapter 7 Trustee ordered all of Bennett's animals abandoned.  Now, the bankruptcy court has no jurisdiction over the animals from Whispering Pines and they can either be reclaimed by their rightful owners (who show proof of ownership and ability to care for the animals) or adopted out by the Grace Foundation to new, loving homes."

54.     On January 24, 2012, DeCaprio sent an email to Ryan, stating, "I'm so sorry it has taken me so long to get these invoices to you.  I wanted to be sure we were also able to add a reasonable estimate for the care of the mares.  Also I am wondering if you have the original agreement that you wrote up between Lassen and us regarding the horses.  I cannot seem to find mine.  I'm not sure if we now have legal custody of the horses. . . . I'm wondering where we stand with legal ownership with them now."  Believing that Ryan was still its lawyer, Grace inquiries of Ryan as to the legal status of the horses and who will be financially responsible for the horses.

55.     On February 16, 2012, Ryan prepared a demand letter for Grace to send to Lassen County regarding the costs of caring for the horses.  Importantly, Ryan never prepared demand letters to his other clients, the Banks.

56.     Also on February 16, DeCaprio, via email, advised Ryan: "I am sorry I haven't been back in touch with you – I'm not sure if I dropped the ball or not.  I know Tim was going to look

1  over the demand letter and I'm not sure what transpired after that. There is so much money going out

2  with these mares, that we are in a world of hurt. We had a pregnant mare pass away and we are in the

3  midst of putting up all of the foaling stalls, and two of the mares are on medication that cost over $80

4  per day. And we're trying to keep our heads afloat. We are also having to put in electricity in the

5  quarantine/med area in order to properly care for the 20 pregnant mares. Please let me know how we

6  can move forward on financing all of this? You had mentioned the banks may be able to contribute a

7  second and third grant – any ideas on progressing these? I would be very appreciative to hearing

8  something as soon as possible."

9          57.    Not hearing back from Ryan, on February 28, 2012, DeCaprio, in an email to

10  Ryan, again inquired: "Hey Tim – wanted to check-in and touch bases with you. Wondering where

11  thing are at with the demands being sent out? . . . We are in full blown PANIC mode, and scrambling

12  to secure long term and short term funding!!! . . . Please let me know what you think of the letter below

13  and if you have any thoughts on anyone that could assist in securing these funds or have any interest in

14  this loan/donation. Who knows: perhaps WELLS FARGO might be able to fund this!"

15          58.    Rather than responding directly himself, on March 5, 2012, Beardsley, Ryan's

16  associate, in an email to DeCaprio, wrote: "Our demand letters have gone out, and we are awaiting

17  responses from the County . . . . We will definitely be keeping a close eye on the county. You know

18  us." Grace thought it knew Ryan. Only later did Grace discover the true Ryan.

19          59.    On March 8, 2012, Ryan, in an email to DeCaprio, wrote: "Sorry for the radio

20  silence but I was out in hearings yesterday . . . I approached Wells and BAC for more dollars and they

21  reminded me of the money spent so far on the case . . . and encouraged me to contribute. Austin is on

22  the County . . . I have had to pass most of the responses, etc. over to Austin as I am training two new

23  attorneys at the firm and my caseload is exploding. Austin is invested in this case and getting

24  retribution from the County (and restitution), but if there is any lag in response, don't hesitate to text or

25  call me."

26          60.    Not having obtained any financial assistance, on April 25, 2012, DeCaprio, in an

27  email to Ryan, wrote: "Austin and Tim, Hey guys, I hope that things are going well. I wanted to

28                                          13
                          COMPLAINT; DEMAND FOR JURY TRIAL

1    check in with you and see if we had heard anything from Lassen yet and ask for assistance. We are in

2    the middle of HELL right now. About two months ago the birthing issues started.....sadly with the

3    death of a mom and foal. We knew that these babies would have an uphill battle because of their past,

4    but we could not have anticipated how bad it would be. So far we have 5 live foals that have dropped

5    and sadly we have had 2 stillborn deaths already. As of today we have over 10 more to go. Because

6    we have no idea of the actual due dates we have to provide around the clock coverage and most of us

7    are getting less than 3 hours of sleep per night. We do not have the money to have cameras in every

8    stall so we are taking two hour foal watch shifts all through the day and night. If a mare foals early

9    which they are all doing, we have only a small amount [o]f time to get to the foal and administer

10   oxygen or we may lose the foal. Saturday our Vet went home for just a couple of hours and a baby

11   was born. These horses give us no warning when they drop early. On Saturday we were by the side of

12   the foal within a minute and began administering CPR immediately and sadly we were still unable to

13   save it. Everyone has worked so hard to care for these horses and the losses are devastating. . . . The

14   Susanville case has really taken its toll on our organization and I am reaching out to you guys to beg

15   for your help. I HAVE TO DO SOMETHING NOW. Medical costs and the cost to care for these

16   horses and foals are killing us. While I know that the care we are providing is the right thing to do and

17   I am happy that we are here to do it, I just cannot comprehend how we ended up car[ry]ing the weight

18   of this case because a mistake was made on the actual ownership of the horses. It would be one thing

19   if I had taken the horses with the knowledge that their ownership was in question and that we may be

20   having to carry the burden and financial responsibility of the horses and all of the foals, but we had no

21   idea. Now our organization is in a horrible financial crisis trying to do the right things by these mares

22   and foals and it is simply unacceptable.

23           We are very grateful for all the help you have given us and without your assistance I do

24   not believe that Bennett would have been arrested for his horrendous crimes, but I am pleading with

25   you to help us find a way to get money in now. We have to get reimbursed for all the costs we have

26   incurred caring for the horses, but I realize that could take months. I have to move forward in the

27   reimbursement process but I also MUST find some funding to get us through the next few months with

28

1  these foals. PLEASE help me to figure out what to do....This is a heartbreaking case and all of us that

2  are dealing with the daily care of these horses are feeling the stress of birthing babies that never had a

3  chance because of their past. Plus the 24 hour watch that we have to do as well as all the care the live

4  foals and moms need.....not to mention all of our other duties at the ranch. Please let me know how we

5  should proceed with Lassen and any idea that you may have in regards to funding.....I would appreciate

6  your help more than you can imagine.

7       Give me a call or email me at your convenience. Ryan is doing great by the way!!! I

8  am hoping for a miracle!!!"

9       61.    DeCaprio believed that a "miracle" was possible because she continued to

10  believe that Ryan was representing Grace, and that he was advocating diligently on its behalf. Only

11  later did DeCaprio discover that Ryan was not acting in the best interests of Grace, but instead, was

12  working solely in the best interests of his other clients, the Banks. Moreover, because of Ryan's

13  deception and intentional misrepresentations, all for the benefit of the Banks, the harm to Grace and

14  the horses has been greatly magnified.

15       62.    Notwithstanding Grace's desperate pleas for help, on April 26, 2012, Ryan, in

16  an email to DeCaprio, responded: "I just read your e-mail and Austin and I will meet on it this

17  morning."

18       63.    Six days later, on May 2, 2012: Ryan, in an email to DeCaprio, wrote what

19  turned out to be his last communication with Grace: "We appreciate your email and its candid nature.

20  We have always valued the open dialogue we have had with the Grace Foundation throughout this

21  horrific ordeal. In that spirit of openness, please consider the following issues as we move forward.

22       First, we cannot express enough our respect for the efforts that the Grace Foundation

23  has made to save the lives of dozens of horses abused by Dwight Bennett and your help in assisting

24  (and ensuring) the prosecution of Mr. Bennett. Those horses most certainly would not be alive but for

25  the specific efforts of the Grace Foundation. We appreciate and honor the memories of serving

26  alongside you in this battle.

27

28

1        Second, we are continually shocked by the sheer volume of expense and waste caused

2  by a single man- Dwight Bennett, and that the Grace Foundation has borne all of the expenses of the

3  wreckage that his actions have brought.  We also agree that the expenses were utterly unexpected by

4  all parties when the County of Lassen seized the horses and surrendered them to the Grace

5  Foundation.  At that time, our clients made donations totaling $40,000.00 to help absorb the expense of

6  the Grace Foundation taking these horses from the County of Lassen.  The fact that unforeseen costs

7  have reached astronomical heights, and put the Grace Foundation at risk magnifies the tragic nature of

8  this situation.

9        Third, we understand the Grace Foundation's urgency in seeking to recover these costs.

10  To this end, we provided comprehensive demand letters to three separate entities on behalf of the

11  Grace Foundation, free of charge.  We also agree that the County should bear the burden of caring for

12  these horses as they knew about the dire situation and did little more than enable Dwight Bennett to

13  continue his practices.  Here is where we get to the "open and honest" section of this correspondence.

14  In reading between the lines in your email, you are intimating that the Grace Foundation may need to

15  seek to recover monies spent on the Whispering Pines animals from our clients via potential legal

16  action.  As a result, it is vital that we fulfill our ethical duty to our clients, and refrain from providing

17  any information or legal advice to the Grace Foundation that will compromise our ability to represent

18  our clients to the fullest extent.  Thus we will be unable to provide any assistance in recovering monies

19  from the County of Lassen or any other entity for the Grace Foundation, or provide any further

20  independent legal advice to the Grace Foundation as any such advice will necessarily be compromised

21  by a clear conflict of interest as you have intimated.

22        As to the notion set forth in your e-mail that there was some "mistake" in ownership of

23  the horses, we are unclear as to what exactly you mean.  As you recall, an officer of the Lassen County

24  Superior Court, receiver Vicki Lozano, obtained an order allowing the receivership estate to release the

25  horses to the County of Lassen.  The County of Lassen then released "possession" of the horses to The

26  Grace Foundation.  That release was drafted by the County of Lassen, was not reviewed by our office

27  or any attorney for our clients, and was issued well prior to our firm providing any informal

28

COMPLAINT; DEMAND FOR JURY TRIAL

1   information or feedback to the Grace Foundation.  The release is imprecise and (in our view) allowed

2   the Grace Foundation to take one of two mutually exclusive positions:  (1) the horses are ours, we can

3   adopt them out; or (2) the horses still belong to Lassen County and it (therefore) needs to pay for their

4   board and care.  We provided this information to you in an e-mail on November 10, 2011. . . .

5           Obviously, we understand the dire nature of this unexpected situation.  We will

6   continue to echo the plight of the Grace Foundation to all who will listen.  We will cooperate with any

7   media requests regarding Dwight Bennett and the horses.  However, as explained above, we are

8   limited in the actions we can take to make this happen based on the clear subtext of your e-mail and the

9   deep fiduciary duties to our clients that we must hold paramount as officers of the court and members

10  of the bar."

11  ## CURRENT CONDITIONS AND FORESEABLE EXPECTATIONS

12          64.     As of the date of this Complaint, Grace is caring for a total of 46 horses, of

13  which 16 are foals.  Two feral (presently "wild") horses may also be pregnant, although this has yet to

14  be determined.

15          65.     Until the issue of who owns the horses is resolved, Grace cannot adopt out any

16  horses.  At present, Grace has identified homes for eight of the horses, and could effectuate adoptions

17  but for the issue of ownership of the horses.

18          66.     As of August 26, 2011, Grace believed that it could manage the rescue, care, and

19  placement of the 36 horses at issue at that time for a fee of $50,000.  This assumed that Grace would

20  have obtained ownership of and complete control over the horses as of that date.

21          67.     Instead, Grace did not obtain ownership of the horses on August 26, 2011, and

22  did not have complete control over them.  As a result, a significant number of pregnancies have gone

23  to term, and Grace is now trying to manage care for not only the mares but also the foals, many of

24  whom have significant health issues.

25          68.     To date, Grace has expended at least $870,000 on the care of the subject horses.

26  By the end of the first year of custody of the horses, Grace expects to expend in excess of $1 million

27  on the horses' care.

28

69.     Although many Grace supporters have been very generous in providing donations, Grace has still had to borrow in excess of $200,000 to care for the horses. If Defendants do not step up and assume their financial responsibility for the horses, Grace will not be able to continue under the burden of this debt.

70.     In addition to money expended, Grace's volunteers have donated approximately 8,500 hours of time caring for the subject horses to date. It has taken an extraordinary effort by Grace's volunteers to care for the horses, without whose unyielding dedication and commitment the horses could not have survived.

71.     Going forward, Grace expects to expend at least $50,000 a month, and likely more, for the care of the horses, at least for the next several years.

72.     At present, most of the horses are not adoptable, either because a horse has a foal by its side, their current physical condition is not conducive to adoption, or because there simply is no market for the types of horses for which Grace is providing care. Moreover, Grace is unaware of any other rescue or shelter that would be willing to assume responsibility for the horses, particularly if there is no financial assistance to provide for the care.

73.     Grace is hopeful that within three years, when the foals are old enough to be adopted, most of them can be placed in new homes. Until that time, however, Grace will have to continue to care for them.

74.     Grace anticipates that some of the horses will never find a new home. Grace estimates that perhaps 10 or more horses will never find a new home, and that Grace may have to care for them for as long as 20 years or more.

75.     In total, Grace anticipates that its total cost to care for the subject horses will exceed $2 million. Depending on circumstances beyond Grace's control, this may be a conservative estimate.

///

///

///

## FIRST CAUSE OF ACTION

### (Common Count - Quantum Meruit – Services Rendered)

### (Against all Defendants)

76.     Plaintiff incorporates by reference paragraphs 1- 75, inclusive, of this Complaint as if fully set forth.

77.     Defendants, and each of them, jointly and severally, requested, by their words or conduct, as alleged herein, that Grace perform the services of caring for the subject horses for the benefit of the Defendants, and each of them, jointly and severally.

78.     Grace has performed all services requested as requested in an appropriate manner.

79.     Although Defendants, and each of them, have accepted the benefits of Grace's services willingly, Defendants, and each of them, have not paid for the services, except that Wells has paid $20,000 and B of A has paid $20,000.

80.     The reasonable value of the services is at least $2 million, which is the responsibility of all Defendants, and each of them, jointly and severally.

## SECOND CAUSE OF ACTION

### (Fraud)

### (Against the Banks, Ryan, The Ryan Firm, and Does 1 – 10, inclusive (collectively, "Fraud Defendants"))

81.     Plaintiff incorporates by reference paragraphs 1- 75, and 77 – 80, inclusive, of this Complaint as if fully set forth.

82.     The Fraud Defendants, and each of them, knew that on August 26, 2011, when they purported to convey ownership of the subject horses to Grace, that ownership of the subject horses could not be conveyed to Grace at least because of Bennett's bankruptcy filing.

83.     The Fraud Defendants, and each of them, knew on August 26, 2011, when they purported to convey ownership of the subject horses to Grace, that Grace's obtaining ownership of the horses on August 26, 2011 was a material term and condition of Grace's accepting care for the horses,

1   and without ownership, Grace would not have accepted the horses.

2              84.    Knowing that Grace would not accept the horses without ownership, the Fraud

3   Defendants, and each of them, lied to Grace and represented to Grace that the transfer on August 26,

4   2011 included ownership of the horses.  The Fraud Defendants knew that if they did not lie about this

5   critical fact, Grace would not accept the horses.

6              85.    The Fraud Defendants, and each of them, intended Grace to rely on its

7   misrepresentation as to the ownership of the horses.

8              86.    Grace, in fact, reasonably relied on this material misrepresentation.  Throughout

9   its negotiations with the Fraud Defendants, Grace made clear the essential role ownership of the horses

10  played in Grace's accepting the horses.  Moreover, by this time, Grace developed a trust in Ryan, as

11  Ryan appeared to be acting in the best interests of the horses.  Grace now believes and thereon alleges

12  that Ryan induced Grace into trusting him so that he could obtain benefits for his clients, the Banks,

13  without any regard for Grace or the horses.

14             87.    The harm to Grace and the horses from this fraud borders on unimaginable.  Not

15  only is Grace teetering on the brink of bankruptcy, but the well being of the horses has been

16  significantly jeopardized.  Mares have needlessly, and in some cases, dangerously, been forced to carry

17  pregnancies to term, sometimes with tragic outcomes, either to the mare or the foal, or both.  Grace's

18  resources have been completed depleted.  And this could have all been avoided had the Fraud

19  Defendants simply told the truth from the outset.

20             88.    The Fraud Defendants' fraud has been a substantial factor in the harm caused to

21  Grace and the horses.  Grace estimates that its actual, compensatory damages will exceed $2 million,

22  subject to prove at trial.

23             89.    Grace is informed and believes and thereon alleges that the Fraud Defendants

24  acted solely or substantially because of their greed.  Had the Fraud Defendants not transferred control

25  of the horses to Grace, the Banks would still be bearing the costs associated with the horses' care, at

26  the parties requesting the instatement of a receiver.  Under this scenario, rather than Grace incurring $2

27

28
COMPLAINT; DEMAND FOR JURY TRIAL

1  million plus in costs, the Banks would have bore this expense.  Moreover, had the Banks been required

2  to pay private parties to care for the horses, the care would have been even more expensive.

3        90.    Because of this fraud, and the harm caused thereby, Grace is entitled to punitive

4  damages against the Fraud Defendants, and each of them, in an amount sufficient to punish them and

5  to deter similar misconduct in the future.

6  **THIRD CAUSE OF ACTION**

7  **(Breach of Fiduciary Duty)**

8  <u>**(Against Ryan, The Ryan Firm, and Does 11 – 20, inclusive (collectively, "Ryan Defendants"))**</u>

9        91.    Plaintiff incorporates by reference paragraphs 1 - 75, 77 – 80, and 82 – 89

10  inclusive, of this Complaint as if fully set forth.

11        92.    As Grace's attorneys, the Ryan Defendants owed Grace a fiduciary duty,

12  including a duty of loyalty and a duty of care.

13        93.    By engaging in the acts and/or omissions alleged herein, the Ryan Defendants

14  breached their fiduciary duty.

15        94.    The Ryan Defendants' acts, as alleged herein, have proximately caused damage

16  to Grace in an amount to be determined at trial, but in an amount of no less than $2 million.

17        95.    The Ryan Defendants committed the acts described herein oppressively,

18  fraudulently, and maliciously, entitling Grace to an award of punitive damages against the Ryan

19  Defendants in an amount appropriate to punish and make an example of them.

20  **FOURTH CAUSE OF ACTION**

21  **(Legal Malpractice)**

22  <u>**(Against Ryan, The Ryan Firm, and Does 11 – 20, inclusive (collectively, "Ryan Defendants"))**</u>

23        96.    Plaintiff incorporates by reference paragraphs 1 - 75, 77 – 80, 82 – 89, and 92 -

24  94 inclusive, of this Complaint as if fully set forth.

25        97.    The Ryan Defendants owed Grace a duty to use such skill, prudence, and

26  diligence as members of the legal profession commonly possess and exercise on behalf of their clients.

27        98.    The Ryan Defendants breached that duty, as alleged herein.  By example only,

28

1    and without limitation, the Ryan Defendants did not advise against the transfer of the horses to Grace

2    on August 26, 2011, even though they knew or should have known that ownership of the horses was

3    not being transferred to Grace, and that this was a material term of Grace's accepting of the horses.

4    Thereafter, at no time did the Ryan Defendants advise Grace to seek reimbursement from the Banks, or

5    to otherwise protect its rights with respect to the Banks. Instead, the Ryan Defendants, to the detriment

6    of Grace, favored its other clients, the Banks, and attempted to protect the Banks from any liability to

7    Grace.

8            99.    The Ryan Defendants' acts and/or omissions, as alleged herein, proximately

9    caused harm to Grace, as alleged herein.

10          100.    As a direct result of the Ryan Defendants' acts and/or omissions, Grace has been

11   damages in an amount to be determined at trial, but in an amount no less than $2 million.

12         WHEREFORE, Grace demands judgment against Defendants, and each of them, as

13   follows:

14         1.    For compensatory damages according to proof on Grace's first, second, third,

15   and fourth causes of action;

16         2.    For punitive and exemplary damages according to proof on Grace's second and

17   third causes of action;

18         3.    On all causes of action, for attorney fees and costs, if applicable;

19         4.    On all causes of action, for prejudgment interest on all amounts claimed; and

20         5.    On all causes of action, for any other and further relief that the court considers

21   just and proper.

22   Dated: July 5, 2012          LEVITON LAW GROUP, A P.C.
           Stuart L. Leviton

23

24

25         By:

26         Stuart L. Leviton
           Attorneys for Plaintiff

27         THE GRACE FOUNDATION OF NORTHERN
           CALIFORNIA

28
COMPLAINT; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2    Plaintiff hereby demands trial of this matter by jury as to all causes of action so triable.

3    Dated: July 5, 2012

LEVITON LAW GROUP, A P.C.
Stuart L. Leviton

By: _____
Stuart L. Leviton
Attorneys for Plaintiff
THE GRACE FOUNDATION OF NORTHERN
CALIFORNIA

23
COMPLAINT; DEMAND FOR JURY TRIAL

# EXHIBIT H

Christine L. Garcia (SBN 209701)
THE ANIMAL LAW OFFICE
2404 California Street, #4
San Francisco, CA 94115
T:  415-297-3109 - F:  415-358-9947
E-mail:  christine@animalattorney.com

Attorneys for Party,
*The Grace Foundation*

SUPERIOR COURT OF CALIFORNIA – LASSEN COUNTY
UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| Norman W. Allen<br>            Plaintiff<br>v.<br>Summit Financial Group, et al<br>           Defendants | Lead Case No: 45679<br>(Consolidated with Case No. 50324)<br><br>NOTICE OF LIEN PURSUANT TO CIVIL CODE §§ 3080.01, 3080.02, et seq., 1856; STATUTORY CONTRACT and EQUITABILITIES |
| Norman W. Allen<br>           Plaintiff<br>v.<br>T.D. Service Company, et al<br>           Defendants | Date:  January 17, 2012<br>Time: 11:00am<br>Dept.:    6<br>Judge: Honrable Raymond Giordano |
| Wells Fargo Bank NA, et al<br>           Plaintiffs<br>v.<br>Norman W. Allen, et al.<br>           Defendants | Action Filed:  Unknown<br>Trial Date:  None Set |
| The Grace Foundation of Northern California<br>           Intervenor | |
| And All other Cross-Actions | |

PLEASE TAKE NOTICE THAT, the Grace Foundation of Northern California has a Lien

Pursuant to CA Civil Code §§ 3080.01, 3080.02 and 1856 and the following information:

The Grace Foundation in El Dorado County has a lien in the amount of $1,134,963 for the care, feed, boarding, and veterinarian bills in connection with what is now being referred to as "The Whispering Pines Horses."

1. Name:  The Grace Foundation of Northern California, Street Address: 5800 Latigo Lane, EL Dorado Hills, CA 95762, Mailing Address:  P.O. Box 4692, El Dorado Hills, CA 95862.

2.  This Lien Is Claimed Against the Following Livestock: Forty three (43) Horses (aka referred to as The Whispering Pines Horses) under the care of The Grace Foundation of Northern California and located in El Dorado County, CA.

3.  This lien is filed for the amount due for the feeding, herding, pasturing, keeping, ranching, boarding, or medical care provided for the livestock and the current amount of this lien is $1,134,963 as of January 16, 2013.

4.  Terms of Contract: On August 26, 2011, The Grace Foundation of Northern California took custody from Wells Fargo and Bank of America of the Whispering Pine Horses and an agreement was entered into by Timothy Ryan and other agents of Wells Fargo and B of A and Grace Foundation to take custody of the horses and provide Grace with all lien rights under Civil Code §§ 3080.1, et seq, 3080.2 and 1856.  Grace Foundation provided feed, care, veterinary services and boarding pursuant to that agreement.

Attached, hereto as **<u>Exhibit A</u>** is a true and correct copy of the Lien prepared and served upon parties by Attorney Anthony Perez yesterday, Tuesday, January 15, 2013.

Date:  January 16, 2012                    THE ANIMAL LAW OFFICE

*Christine L. Garcia*

_____ Christine Garcia

NOTICE OF LIEN PURSUANT TO CIVIL CODE §§ 3080.01, 3080.02, et seq., 1856; STATUTORY CONTRACT and EQUITABILITIES                                    2

1

2

3

4

5

6

7

8   **Exhibit A**

9   Lien Served Tuesday, January 15, 2013

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Animal Law Office
2404 California St #4
San Francisco 94115

NOTICE OF LIEN PURSUANT TO CIVIL CODE §§ 3080.01, 3080.02, et seq., 1856; STATUTORY
CONTRACT and EQUITABILITIES                                                                          3

# EXHIBIT A

1   **PEREZ LAW OFFICES**
    Anthony M. Perez, Jr., SB# 113041
2   Natalya Kozlova-Grunwald SB#265084
    455 Capitol Mall Suite 225
3   Sacramento, California 95814
    Telephone: (916) 441-0500
4   Facsimile: (916) 441-0555
    **ATTORNEYS FOR**
5   THE GRACE FOUNDATION OF
    NORTHERN CALIFORNIA

6

7

8                IN THE SUPERIOR COURT IN AND FOR

9           COUNTY OF EL DORADO, CAMERON PARK BRANCH

10

11   **IN RE: AGISTOR'S LIEN PURSUANT**
    **TO CALIFORNIA CIVIL CODE**
12   **SECTIONS 3080.01 AND 3080.2, et seq.**     **PROOF OF SERVICE**
    **and C.C. §1856 STATUTORY,**
13   **CONTRACTUAL AND EQUITABLE**
    **LIEN BY THE GRACE FOUNDATION**
14   **OF NORTHERN CALIFORNIA**

15   ━━━━━━━━━━━━━━━━━━━━━━━━

16

17         I am a citizen of the United States and employed in Sacramento County, California.

18 I am over the age of eighteen years and not a party to the within action. My business address is 455

19 Capitol Mall,  Suite 225, Sacramento, California 95814. On this date, I served the within:

20         **NOTICE OF LIEN; LIEN** and
          **DECLARATION OF BETH DECAPRIO IN SUPPORT OF LIEN**

21     __x___       By US MAIL and Via E Mail addressed as set forth below:

22         BANK OF AMERICA, N.A.
        Scott Greene, Esq.      sgreene@bryancave.com
23         Bryan Cave LLP
        333 Market Street 25th Floor
24         San Francisco, CA 94105

25         WELLS FARGO BANK, N.A.
        Mark D. Lonergan, Esq   mlonergan@seversonwerson.com
26         Severson & Werson
        1 Embarcadero Center 26th Floor
27         San Francisco, CA 94111

28

1

2          By US MAIL addressed as follows:

3          LASSEN COUNTY
           Mark Jones, Esq.
4          Jones & Dyer
           1800 J Street
5          Sacramento, California 95814

6          Judith St. John
           Catherine Close, Esq.
7          3254 Woodleigh Lane
           Cameron Park, California 95682
8

9
           I declare under penalty of perjury of the laws of the State of California  that the
10
    foregoing is true and correct.
11
           Executed on January 15, 2013, at Sacramento, California.
12

13

14                                                  V. Sechrist

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | PEREZ LAW OFFICES
Anthony M. Perez, Jr., SB# 113041
2 | Natalya Kozlova-Grunwald, SB# 265084
455 Capitol Mall Suite 225
3 | Sacramento, California 95814
Telephone: (916) 441-0500
4 | Facsimile: (916) 441-0555

5 | Attorneys for Plaintiff
THE GRACE FOUNDATION
6 | OF NORTHERN CALIFORNIA

7

8 |                SUPERIOR COURT OF CALIFORNIA

9 |                   COUNTY OF **EL DORADO**

10

11 | **In re: THE GRACE**
**FOUNDATION OF NORTHERN**          **NOTICE OF LIEN PURSUANT TO CIVIL CODE**
12 | **CALIFORNIA, a California**          **§§ 3080.01, 3080.02, et seq., 1856; STATUTORY**
**Corporation**                        **CONTRACT and EQUITABLE LIENS**
13 |

14 | _____

15

16

17

18 |        **PLEASE TAKE NOTICE**, THE GRACE FOUNDATION OF NORTHERN

19 | CALIFORNIA has filed and recorded a lien in the amount of $1,134,963 for the care, feed,

20 | boarding, and veterinarian bills in connection with what are now being referred to as "The

21 | Whispering Pines Horses" located at The Grace Foundation in El Dorado County.

22 | Dated: Jan 15      , 2013              PEREZ LAW OFFICES

23

24 |                                       By: _____

25 |                                           Anthony M. Perez, Jr.
                                            Attorneys for Plaintiff The Grace
26 |                                          Foundation of Northern California in
                                            Connection of Lien Filing
27

28

_____
NOTICE OF LIEN PURSUANT TO CIVIL CODE §§ 3080.01, 3080.02, et seq.

1   **PEREZ LAW OFFICES**
     Anthony M. Perez, Jr., SB# 113041
2   Natalya Kozlova-Grunwald SB#265084
     455 Capitol Mall Suite 225
3   Sacramento, California 95814
     Telephone: (916) 441-0500
4   Facsimile: (916) 441-0555
     **ATTORNEYS FOR**
5   THE GRACE FOUNDATION OF
     NORTHERN CALIFORNIA

6

7

8                IN THE SUPERIOR COURT IN AND FOR

9            COUNTY OF EL DORADO, CAMERON PARK BRANCH

10

11   **IN RE: AGISTOR'S LIEN PURSUANT**        **LIEN**
     **TO CALIFORNIA CIVIL CODE**
12   **SECTIONS 3080.01 AND 3080.2, et seq.**
     **and C.C. §1856 AND STATUTORY**
13   **CONTRACTUAL AND EQUITABLE**
     **LIEN BY THE GRACE FOUNDATION**
14   **OF NORTHERN CALIFORNIA**

15

16
        I, BETH DECAPRIO, swear under oath that the following statements are true and correct.
17
        1. INFORMATION ABOUT THE AGISTOR:
18
        Name: THE GRACE FOUNDATION OF NORTHERN CALIFORNIA,
19
        Street Address:    5800 Latigo Lane, El Dorado Hills, California. 95762.
20
        Mailing Address: P. O. Box 4692, El Dorado Hills, California 95862.
21
        2. THIS LIEN IS CLAIMED AGAINST THE FOLLOWING LIVESTOCK:
22
        Forty three (43) Horses (aka referred to as The Whispering Pines Horses) under the care
23
of THE GRACE FOUNDATION OF NORTHERN CALIFORNIA and located in EL DORADO
24
COUNTY, CALIFORNIA.
25
        3.    This lien is filed for the amount due for the feeding, herding, pasturing, keeping,
26
ranching, boarding or medical care provided for the livestock and the current amount of this lien
27
is $1,134,963 as of January 16, 2013.
28

4.    Terms of Contract:

A.    On August 26, 2011 THE GRACE FOUNDATION OF NORTHERN

CALIFORNIA, a California corporation, (hereinafter referred to as GRACE) took custody from

WELLS FARGO, N.A. and BANK OF AMERICA, N. A., of The Whispering Pines Horses (see

Declaration of BETH DECAPRIO with attachments 1 and 2). B. An agreement was entered into by

Timothy M. Ryan, an agent and other agents for WELLS FARGO, N.A. and BANK OF AMERICA,

N.A.,  and GRACE to take custody of said horses and provide GRACE with all lien rights under

Civil Code Sections 3080.1, et seq., Section 3080.2 and Section 1856.   GRACE FOUNDATION

provided feed, care, veterinary services and boarding  pursuant to that agreement.  Attached hereto

is a Declaration by BETH DECAPRIO outlining the specific  identities of the Whispering Pine

horses and the amount owed for boarding, care and feed.

5.    GRACE  hereby files and records its lien in the amount of  $1,134,963.00  which

equals the amount owed as of January 16, 2013 after receipt of payment of $40,000 paid by WELLS

FARGO BANK, N. A.,  and BANK OF AMERICA, N. A. to date.

GRACE hereby files its lien pursuant to Civil Code §3080.01,  § 3080.02, et., seq.

and Civil Code §1856 as well as all contractual and equity liens by GRACE has.  With this lien

**NOTICE** is hereby given to WELLS FARGO, N.A.,  and BANK OF AMERICA, N.A. and related

Parties  in connection with its lien for $1,134,963.00 as of January 16, 2013.


DATE: January 15, 2013.


                    THE GRACE FOUNDATION OF NORTHERN
                    CALIFORNIA

                    By _____

                         BETH DECAPRIO

1   **PEREZ LAW OFFICES**
    Anthony M. Perez, Jr., SB# 113041
2   Natalya Kozlova-Grunwald SB#265084
    455 Capitol Mall Suite 225
3   Sacramento, California 95814
    Telephone: (916) 441-0500
4   Facsimile: (916) 441-0555
    **ATTORNEYS FOR**
5   THE GRACE FOUNDATION OF
    NORTHERN CALIFORNIA

6

7

8               IN THE SUPERIOR COURT IN AND FOR

9            COUNTY OF EL DORADO, CAMERON PARK BRANCH

10

11   **IN RE: AGISTOR'S LIEN PURSUANT**
    **TO CALIFORNIA CIVIL CODE**
12   **SECTIONS 3080.01 AND 3080.2, et seq.**     **DECLARATION OF BETH DECAPRIO**
    **and C.C. §1856, STATUTORY,**
13   **CONTRACTUAL AND EQUITABLE**           **IN SUPPORT OF LIEN**
    **LIEN BY THE GRACE FOUNDATION**
14   **OF NORTHERN CALIFORNIA**

15

16
          I, BETH DECAPRIO, hereby declare that:
17
          1.     I am the Executive Director for THE GRACE FOUNDATION OF NORTHERN
18
  CALIFORNIA, (GRACE) a non profit corporation, whose purpose is to board, feed and provide
19
  veterinary services to horses removed or otherwise received by GRACE.
20
          2.     Attached as Exhibit 1 is identification of all horses in connection with the lien.
21
          3.     WELLS FARGO, N.A., and BANK OF AMERICA, N.A., through its agents,
22
  agreed to pay for veterinary bills, boarding, care and feeding for the above mentioned horses and
23
  upon retrieval of the horses agreed to pay all funds due and owed.
24
          4.     Exhibit 2 attached hereto is an accounting for services provided by GRACE for
25
  veterinary bills, boarding, care and feeding of the horses.
26

27

28

1    I declare under penalty of perjury of the laws of the State of California that the foregoing

2  is true and correct.

3

4        DATE: January 15, 2013.

5                                    BETH DECAPRIO

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT ONE

| HORSES NAME | GRACE ID | DESCRIPTION |
|---|---|---|
| | | |
| ALI – MARE - FOSTER | 11GFD8LAS449 | MUSTANG – BAY |
| ARIEL - FILLY | 12GF05BAG745 | MUSTANG – LIGHT PINTO |
| BABE - MARE | 11GF08LAS450 | QTR - CHESTNUT |
| BRIDGETTE - MARE | 11GF08LAS456 | PALOMINO - DECEASED |
| BONNY- MARE | 11GF08LAS454 | DRAFT / PALOMINO |
| BOOTS – MARE | 11GF08LAS455 | QTR – FOX TROTTER |
| BUTTERFLY – MARE | 11GF08LAS458 | APPENDIX |
| CHEVEYO – COLT | 12GF03BAG680 | MUSTANG PINTO |
| CHICO – GELDING – RETURNED TO OWNER | 11GF08LAS459 | MUSTANG PINTO |
| CLYDE – COLT | 12GF03BAG676 | BELGIAN DRAFT |
| COOKIE – MARE | 11GF08LAS460 | GRAY APPY |
| COWBOY – COLT | 12GF06BAG830 | PINTO – BRN /WHITE |
| DANI – MARE | 11GF08LAS461 | QTR - BLACK |
| DROGON – COLT | 12GF06BAG831 | QTR – SEAL BAY |
| EMMA – MARE | 11GF08LAS452 | MUSTANG - BAY |
| EUNA – MARE | 11GF08LAS462 | CREMELLO - WHITE / BLUE EYES |
| GAMBLER – MARE | 11GF08LAS466 | FOX TROTTER - CHESTERNUT |
| GOLDIE – MARE | 11GF08LAS453 | QTR – PALOMINO - DECEASED |
| JD BUSHWACHER - COLT | 12GF04BAG719 | MUSTANG – PINTO - DECEASED |
| K. LEA – FILLY | 12GF06BAG803 | QTR – X - APPLY |
| GUCCI – MARE- FOSTER | 11GF08LAS451 | QTR – X - SEAL BAY |
| MAN MAN – PRINCE - GELDING | 11GF08LAS464 | PAINT – BLACK / WHITE |
| MARBLES – MARE | 11GF08LAS465 | PINTO – PONY – BRN / WHITE |
| MIDNIGHT STAR – FILLY | 12GF04BAG720 | APPLY - X |
| MIRA – FILLY | 12GF04BAG704 | QTR - CHESTNUT |
| MISCHIEF | 11GF08LAS467 | FOX TROTTER - CHESTNUT |
| MISS MARGARET – MARE | 11GF08LAS468 | MUSTANG - BAY |
| MOSES – GELDING – FOSTER | 11GF08LAS469 | DONKEY |

| | | |
|---|---|---|
| NANA – MARE | 11GF08LAS470 | APPENDIX – PINTO – BRN/ WHITE |
| NUDGE – MARE | 11GF08LAS471 | QTR - BUCKSKIN |
| PATCHES – MARE - FOSTER | 11GF08LAS472 | APPENDIX – PINTO – BLK / WHITE |
| PEANUT – MARE | 11GF08LAS473 | QTR- X -DUN - DECEASED |
| PJ – MARE | 11GF08LAS474 | ARABIAN - GRAY |
| PRINCESS – MARE | 11GF08LAS475 | QTR - APPY |
| ROGUE – MARE | 11GF08LAS475 | QTR- APPY |
| SALLIE MAE – MARE | 11GF08LAS477 | MUSTANG - DUN |
| SCOUT – FILLY | 12GF04BAG721 | MUSTANG - PAINT |
| SNOW ANGEL – FILLY | 12GF05BAG737 | CREMELO – WHITE - BLUE EYES |
| SPECKS – MARE | 11GF08LAS478 | QTR - BAY |
| SPICE – MARE | 11GF08LAS479 | MUSTANG - BUCKSKIN |
| SUZY – FILLY | 11GF08LAS480 | MUSTANG - BUCKSKIN |
| TAG A LONG – MARE | 11GF08LAS481 | QTR – X PALOMINO |
| TANGLES – MARE | 11GF08LAS482 | QTR - BUCKSKIN |
| TRIXIE – FILLY – FOSTER | 11GF08LAS484 | QTR - BAY |
| TOFFEE- MARE | 11GF08LAS483 | QTR- BUCKSKIN |
| VISCONTI – FILLY | 12GF05BAG731 | FOX TROTTER – X - CHESTNUT |
| WILLIAMS – COLT – FOSTER | 12GF04BAG702 | APPENDIX - GRULLO |
| YURI – COLT | 12GF04BAG686 | MUSTANG – CREMELLO - PINTO |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 2

**Standard Layup facility fees- boarding and daily care fees.**
Daily feed and board: Includes basic care and twice per day feed (does not include supplemental feed and additional care costs.
From 8/26/2011 Through 1/15/2013 @20.00 per day per horse.  Based on providing care for normal 8 hour day: Based on exact number of horses housed per day (From 32-45 horses)
**$372,060.00**

**Pre-natal and post-natal care fees. 24 hour a day housing and observation:** Pre-natal and post-natal care includes 24 hour a day observation (2 people per shift). Special bedding, round the clock monitoring of temps etc.... upon delivery of foal care includes getting foal to stand, nurse, bottle feeding for "dummy foals" oxygen, observation until placenta is expelled.  Without actual delivery dates these services had to be provided throughout their pregnancy.  Many mares experienced complications as did the foals.  Of the 22 confirmed pregnancies only 14 foals survived. @20.00 for overnight care includes observation of 2 people per shift 7 days per week.
**$182,225.00**

**Additional daily services and additional feed, grain and supplements:** Additional Services -these services include various daily medical care (dispensing meds, wraps), turn out and exercise service, handling of horses during vet and farrier services, brushing etc...supplemental feed and meds include grain, complete feeds, sand clear, vitamins etc... average $15.00 per day
**$296,640.00**

**Total emergency/non-emergency veterinary expenses and costs:** Initial Medical Costs/ intake exams blood work and emergency care for the initial 36 horses picked up on August 26, 2011.  Ongoing veterinary and farrier treatment and care for all Susanville horses.  Includes sedation and medications associated with care.
**$193,888.00**

**Build-out of foaling facilities costs and expenses:** build out of 22 24x24  foaling stalls and shelters, turnout pens, foaling turnout pasture, surveillance cameras, additional plumbing and electrical
**$87,200.00**

**A Purchase additional medical equipment and medical supplies** Medical equipment and medical supplies that were necessary for care and delivery of 22 pregnant mares including ultrasound.  Cost would be doubled if purchase was not made, as horses would have needed to be taken to UC Davis for ultra sounds
**$37,000.00**

**Transport of horses to Grace Ranch on August 26, 2011:**
**$5950.00**

Total costs for services and care directly relating to the care of Susanville horses from

8/26/1- 1/15/13:  **$1,174,963.00**

Payment made by wells Fargo and Bank of America in August 2011: **$40,000.00**

**Total owed to grace minus payment for horses care from 8/26/1- 1/15/13: 1,134,963.00**

# EXHIBIT I

1  **BRYAN CAVE LLP**
   C. Scott Greene, California Bar No. 277445
2  Bahareh Mostajelean, California Bar No. 258903
   Emma L. Dill, California Bar No. 288801
3  560 Mission Street, 25th Floor
   San Francisco, California 94105
4  Telephone:    415-675-3400
   Facsimile:    415-675-3434
5  Email:    scott.greene@bryancave.com
             bahareh.mostajelean@bryancave.com
6             emma.dill@bryancave.com

7  Attorneys for Cross-Complainant BANK OF AMERICA, N.A. as successor by merger to BAC
   HOME LOANS SERVICING, LP and Defendant/Cross-Complainant WELLS FARGO BANK,
8  N.A., AS TRUSTEE FOR THE MLMI TRUST SERIES 2005-H3

9

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                        **COUNTY OF LASSEN**

12  NORMAN W. ALLEN,                          Lead Case No. 45679
                                              (Consolidated with Case No. 50324)
13            Plaintiff,

14       v.

15  SUMMIT FINANCIAL GROUP; DANA              **[PROPOSED] ORDER DENYING THE**
    CAPITAL CORP.; STEVE WEICH; ROD           **MOTIONS OF THE GRACE**
16  HOSILYK; DWIGHT A. BENNETT; JUDITH        **FOUNDATION TO INTERVENE AND TO**
    A. ST. JOHN; WILSHIRE CREDIT              **VACATE AND/OR STAY THE ORDER**
17  CORPORATION; EVANS APPRAISAL             **OF THIS COURT OF DECEMBER 15,**
    SERVICES, INC.; and DOES 1-10,            **2012**
18
              Defendants.
19                                            Date: April 29, 2013
                                              Time: 9:00 a.m.
20  NORMAN W. ALLEN,                          Dept: 3
                                              Judge: Honorable C. Anders Holmer
21            Plaintiff,
         v.                                   Complaint Filed:    Unknown
22                                            Trial Date:         None set

23  T.D. SERVICE COMPANY; WELLS FARGO
    BANK, N.A., as Trustee for the MLMI Trust
24  Series 2005-HE3; and DOES 1-10,

25            Defendants.

26

27

28

[PROPOSED] ORDER

| | |
|---|---|
| 1 | WELLS FARGO BANK, N.A., as Trustee for MLMI Trust Series 2005-HE3; and BAC |
| 2 | HOMES LOANS SERVICING, LP, a Texas limited partnership, successor by merger to |
| 3 | Wilshire Credit Corporation, erroneously sued as BAC Home Loan Servicing, LLP, |
| 4 | |
| 5 | Cross-Complainants, |
| 6 | v. |
| 7 | NORMAN W. ALLEN; DWIGHT A. BENNETT; JUDITH A. ST. JOHN; EVANS |
| 8 | APPRAISAL SERVICES; INC.; and ROES 1-10, |
| 9 | Cross–Defendants. |
| 10 | |
| 11 | AND ALL OTHER CROSS-ACTIONS. |

[PROPOSED] ORDER

1    The motions of The Grace Foundation of Northern California to intervene and to vacate

2  and/or stay the order of this Court of December 15, 2012 came on regularly for hearing on

3  April 29, 2013, at 9:00 a.m.

4        After reviewing the briefing and hearing oral argument of counsel, and the Court being

5  fully advised and good cause appearing therefore, the Court rules as set out in the Ruling,

6  attached as **Exhibit A**, and as follows:

7        1.       Defendants Wells Fargo Bank and Bank of America, N.A.'s Request for Judicial

8  Notice is granted.

9        2.       The Motion to Intervene of the Grace Foundation is denied.

10       3.       The Motion to Vacate and/or Stay the December 15, 2012 order is denied.

11   **IT IS SO ORDERED.**

12

13  Dated:   6/3/13                             C. Anders Holmer

14                                      The Honorable C. Anders Holmer
                                        Judge of the Superior Court
15                                      LASSEN COUNTY SUPERIOR COURT

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | **Prepared by:**

2

3 | _____    Dated: _5/24/2013_

4 | Bahareh Mostajelean, Attorney for Wells Fargo Bank, N.A. and Bank of America, N.A.

5

6 | **Agreed as to form:**

7

8 | _____    Dated: _5-29-13_

9 | Craig Close, Attorney for Judith St. John

10

11

12 | _____    Dated: _____

13 | Norman Allen, Pro Per

14

15

16 | _____    Dated: _____

17 | Eugene Chittock, Attorney for Vicki Lozano

18

19

20 | _____    Dated: _____

21 | Christine Garcia, Attorney for Non-Party The Grace Foundation of Northern California

22

23

24

25

26

27

28

SF01DOCS\141362.1\C071566\0342632                    2

[PROPOSED] ORDER

# Exhibit A

ENDORSED FILED

MAY 01 2013

A. ASHBY, COURT EXEC. OFFICER
LASSEN SUPERIOR COURT
By_____Deputy
K. Gallagher

IN THE SUPERIOR COURT OF CALIFORNIA

IN AND FOR THE COUNTY OF LASSEN

| | |
|---|---|
| NORMAN W. ALLEN, | Lead Case No.: 45679 |
| Plaintiff, | (Consolidated Case 50324) |
| v. | |
| SUMMIT FINANCIAL GROUP, ET AL, | RULING |
| Defendants. | |
| NORMAN W. ALLEN, | |
| Plaintiff, | |
| v. | |
| T.D. SERVICE COMPANY, ET AL, | |
| Defendants. | |

The motions of The Grace Foundation (hereinafter TGF) to intervene and to vacate and/or stay the order of this court of December 15, 2012 came on regularly for hearing on April 29, 2013. The court considered argument of counsel and Mr. Allen, In Pro Per. Mr. Bennett did not appear. The court took the matter under submission and now rules. The court grants the request for judicial notice as requested by defendants Wells Fargo Bank and Bank of America.

In Major League Baseball it is not uncommon for one player to be traded for another with the second player "to be named later". In the instant matter counsel for TGF is truly the "player to be named later". Since TGF took custody

Ruling — Page 1 of 3

of horses pursuant to court order and agreement with the County of Lassen, TGF
has been represented by a myriad of counsel (Sheridan, Leviton, Perez, Garcia),
each acting in succession to their predecessor. Although there certainly is
nothing wrong with that, the interests of TGF have been somewhat inconsistently
advanced. The declaration of Ms. Dill contains Exhibit R where one of TGF's
counsel consents to transfer of horses. That declaration also contained Exhibit U
which clearly reflected TGF's position to not release the horses and the assertion
of a claim of lien. The case now pending in Orange County clearly seeks
enforcement of that lien.

The motion to intervene here is permissive not mandatory. The instant case
does not directly involve any claim of right, title or interest to the horses. The
horses, in light of the disputes between the parties, needed to receive appropriate
care. If the court grants the motion to intervene, the possibility of inconsistent
rulings between two courts exists and the parties here become involved in a
matter way beyond the relief requested here.

The motion to intervene is denied.

The simple answer to the motion to vacate or stay the order of December
15, 2012 is that TGF lacks standing in light of the order here denying the motion
to intervene.[1]   That said, the court nevertheless rules that CCP §916(a) does not
apply as the questioned court order is not subject to appeal. TGF's citation to
*Young v. Tri-City Healthcare Dist* (2012) 210 Cal.App.4th 35, 41, is misplaced as the
appeal there clearly included the questioned motion for reconsideration. Finally,
the rulings of the Bankruptcy Court make it abundantly clear there was no
violation of the automatic stay.

---

[1] The court understands the Opposition of defendants Wells Fargo Bank and Bank of
America did not actually oppose the motion.

Ruling - Page 2 of 3

1
2      The motion to vacate and/or stay the December 15, 2012 order is denied.
3      Counsel for appearing defendants shall prepare an order consistent with
4  this ruling.
5
6  Dated:  May 1, 2013
7                                    C. Anders Holmer
                                     Judge of the Superior Court, Assigned
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LASSEN

**ENDORSED FILED**

JUL 22 2013

A. ASHBY, COURT EXEC. OFFICER
LASSEN SUPERIOR COURT
By_____Deputy

**S. Glines**

ALLEN, NORMAN                          Case No.: 45679

        Plaintiff                     RULING

    vs.

SUMMIT FINANCIAL GROUP , ET AL

        Defendant

And related, consolidated,  and cross actions

_____

    The Motion for Reconsideration filed by potential  intervener "The Grace Foundation of  Northern  California",

(hereafter TGF), was heard on July 16, 2013 and taken under submission. The court now rules.


    TGF seeks reconsideration of this court's ruling denying the petition of TGF to intervene pursuant to CCP

§1008.   The court partially grants the request of  cross-complainants  Bank of  America N.A .and  Wells Fargo

Bank N.A  (hereafter, The Banks) for Judicial Notice as follows:

Exhibit A,B,C  granted

Exhibit D,  denied.

RULING ON ORDER - 1

1    The motion for reconsideration is denied as the claimed new developments, ( i e, the amended complaint in

2    Orange County, and the revised proposed complaint in intervention) do not reduce the likelihood of inconsistent

3    rulings between this court and the court in Orange County. The legal requirements for CCP § 1008 are not met.

4

5

6

7

8    Date  7-23-13

9                                                        Honorable C Anders Holmer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RULING ON ORDER - 2

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF LASSEN
### 2610 Riverside Drive
### Susanville, CA  96130

|  |  |  |
|---|---|---|
| NORMAN ALLEN | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| SUMMIT FINANCIAL | ) | **AFFIDAVIT OF SERVICE** |
| | ) | **AND OF MAILING** |
| | ) | |

**STATE OF CALIFORNIA**            )

                                                    **ss.**  )

**COUNTY OF LASSEN**               )        **Case No.**  45679

I am now and at all times hereafter mentioned, a citizen of the United States of America over the age of eighteen (18) years, and that on
I mailed to:
 Norman Allen  PO Box 70  Janesville  Ca  96114
 Fine, Boggs & Perkins   80 Stone Pine Rd Ste 210   Half Moon Bay  Ca 94019
 Christine Garcia   2404 California St #4   San Francisco  Ca 94115
 Steve Weich   5876 Coyote Rd  Reno  Nv  89523
 Craig Close   PO Box 2522  Truckee  Ca 96160
 Eugene Chittock   Placed in Box in Hall of Justice
 Jerrald Pickering   PO Box 992200   Redding  ca  96099
 Bryan Cave     560 Mission St  25th Floor  San Francisco  Ca  94105
 Dwight Bennett  General Delivery  Susanville  Ca  96130
a copy of:
 Ruling of Court
in the above entitle action by depositing prepaid postage, in the United States Post Office at Susanville, California, addressed to his/her proper address.

I swear under penalty of perjury, that the foregoing is true and correct.

CLERK/EXECUTIVE OFFICER

Dated: _JUL 2 2 2013_                    By: S. Glines          *A. Ashby*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LASSEN

ALLEN, NORMAN

       Plaintiff

       vs.

SUMMIT FINANCIAL GROUP , ET AL

       Defendant

Case No.: 45679
Consolidated with case 50324

RULING

---

During a hearing on September 10, 2013 regarding a motion for discharge of Vicki Lozano as court-appointed receiver, this court mentioned it might reconsider an earlier Ruling which denied the petition of The Grace Foundation, to intervene.

This court has the inherent authority to reconsider an earlier ruling on its own motion. Le Francois v Goel (2006) 35 cal 4th 1094.

Ms Lozano was appointed receiver upon the application of the Bank defendants in this case. She was directed to take custody of real and personal property of the Whispering Pines Ranch, a subject of this action. As such, she acts as the agent of the court, not of any party. Rule 3.1179(a), Calif. Rules of Court.

With court approval, the receiver transferred horses to Lassen County. The order allowing that was signed July 29, 2011. On August 26, 2011, the receiver, Ms Lozano, The Grace Foundation (Proposed Intervener), and a representative of Lassen County signed agreements memorializing the transfer of the horses by the receiver to Lassen County and Lassen County's

RULING ON ORDER - 1

relinquishment of the horses to the Grace Foundation, an animal rescue and adoption foundation. The second agreement of August 26, 2011 allows this court to determine possession and ownership of the horses therein described.

On August 26, 2011 the horses were subject to the jurisdiction of the Bankruptcy court as Dwight Bennett, a purported owner of the horses, had earlier filed a petition in bankruptcy. Later, the Bankruptcy Court granted a motion to abandon the horses from the bankruptcy estate and also, in a separate order allowed this court to enter "a valid order (deciding) what is appropriate for the transfer of ownership and/or custody of the horses and their progeny from debtors custody and control in 2011".

Although The Grace Foundation filed a disclaimer of any ownership in the horses on November 16, 2012, it later refused to abide by an order of this court entered December 15, 2012 requiring release of the horses to a third party, as The Grace Foundation claimed a lien upon the horses for board and care under Civil Code §1856, 3080.01, 3080.02 et. seq. That same order terminated any interest of Dwight Bennett in the horses. Claims for possession of the horses remain.

Any and all claims for money and indemnification are present in a case now pending in Orange County [1] between many of the same parties as here exept St. John.

Reconsideration is granted only in part. Intervention is allowed only for The Grace Foundation to appear and be heard regarding possession of horses as well as the defense of St. John's cross complaint. Any other aspect of intervention is denied largely due to a strong chance of inconsistent rulings occurring between this court and the court in Orange County if intervention were fully allowed.

---

[1] The issues of St. John's cross-complaint, particularly regarding The Grace Foundation, remain here.

RULING ON ORDER - 2

1    Date **9-11-13**

                       *C. Anders Holmer*

2

                      C. Anders Holmer

3

                      Judge of the Superior Court

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF LASSEN**
**2610 Riverside Drive**
**Susanville, CA 96130**

| | | |
|---|---|---|
| NORMAN ALLEN | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| SUMMIT FINANCIAL GROUP ET AL | ) | **AFFIDAVIT OF SERVICE** |
| | ) | **AND OF MAILING** |
| | ) | |

**STATE OF CALIFORNIA** )
                                          **ss.** )
**COUNTY OF LASSEN** )        **Case No.** 45679

I am now and at all times hereafter mentioned, a citizen of the United States of America over the age of eighteen (18) years, and that on
I mailed to:
 Norman Allen  PO Box 70 Janesville  Ca  96114
 Craig Close  PO Box 2522 Truckee  Ca  96160
 John Boggs   80 Stone Pine Rd Ste 210 Half Moon Bay  Ca  94019
 Ori Edelstein  560 Mission St  Ste 2500 San Francisco  Ca  94105
 Jerald Pickering II  PO Box 992200  Redding  Ca  96001
 Dwight Bennett  PO Box 1191 Susanville  Ca  96130
 Eugene Chittock   placed in attorney box at Hall of Justice

a copy of:  Ruling dated September 11, 2013

in the above entitle action by depositing prepaid postage, in the United States Post Office at Susanville, California, addressed to his/her proper address.

I swear under penalty of perjury, that the foregoing is true and correct.

                                                    CLERK/EXECUTIVE OFFICER
Dated:  SEP 1 1 2013    By:  S. Glines    *A. Ashby*