# Exhibit B

to Beth Decaprio's Reply Declaration

**Deposition of Timothy Ryan**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

THE GRACE FOUNDATION OF          )
NORTHERN CALIFORNIA, A           )
CALIFORNIA CORPORATION,          )
                                 )
             Plaintiff,          )
    vs.                          ) CASE NO.
                                 ) 30-2012-00612863-CU-BC-CIC
WELLS FARGO BANK, N.A., a        )
federally chartered bank, on its)
own behalf and as trustee of     )
MLMI Trust Series 2005-HE3;      )
BANK OF AMERICA, N.A., a         )
federally chartered bank, on its)
own behalf; BAC HOME LOANS       ) VIDEOTAPED DEPOSITION OF
SERVICING, LP, a Texas Limited   )
Partnership and unit of Bank of  ) TIMOTHY M. RYAN
America, N.A., TIMOTHY M. RYAN,  )
an individual; THE RYAN FIRM,    ) VOLUME I (PAGES 1-255)
a California Professional         )
Corporation; VICKI LOZANO, an    ) THURSDAY, AUGUST 8, 2013
individual in the capacity of    )
Receiver; COUNTY OF LASSEN,      )
CALIFORNIA; and Does 1           )
through 50,                      )
                                 )
             Defendants.         )
_____)

REPORTED BY LORRIE L. POIRY, CSR 6003, RPR

```
 1                 VIDEOTAPED DEPOSITION OF TIMOTHY M. RYAN, A
 2                 DEFENDANT, TAKEN ON BEHALF OF PLAINTIFF,
 3                 AT 7545 IRVINE CENTER DRIVE, SUITE 200,
 4                 IRVINE, CALIFORNIA 92618, COMMENCING AT
 5                 11:00 A.M., ON THURSDAY, AUGUST 8, 2013,
 6                 BEFORE LORRIE L. POIRY, CSR NO. 6003, RPR,
 7                 PURSUANT TO NOTICE OF CONTINUANCE OF
 8                 DEPOSITION.
 9                            * * *
10   APPEARANCES OF COUNSEL:
     FOR PLAINTIFF:              GEORGE M. ROSENBERG
11                              BY:  GEORGE M. ROSENBERG
                                12100 Wilshire Boulevard
12                              Suite 1250
                                Los Angeles, California 90025
13                              (310) 207-0703
14                              - and -
15                              LAW OFFICES OF SOHAILA SAGHEB
                                BY:  SOHAILA SAGHEB
16                              21112 Ventura Boulevard
                                Woodland Hills, California
17                              (818) 346-3724        91364
18   FOR DEFENDANT WELLS        SEVERSON & WERSON
     FARGO BANK:                BY:  ELENA KOUVABINA
19                                   (Telephonically)
                                One Embarcadero Center
20                              Suite 2600
                                San Francisco, California 94111
21                              (415) 398-3344
22   FOR DEFENDANT             BRYAN CAVE LLP
     BANK OF AMERICA AND        BY:  EMMA L. DILL
23   BAC HOME LOANS SERVICING:  560 Mission Street
                                Suite 2500
24                              San Francisco, California 94105
                                (415) 675-3497
25
```

```
 1  APPEARANCES (CONT.):
 2  FOR DEFENDANT                LAW OFFICES OF ALAN R. JAMPOL
    THE RYAN FIRM AND            BY:  ALAN R. JAMPOL
 3  VICKI LOZANO:                800 Wilshire Boulevard
                                 Suite 1400
 4                               Los Angeles, California 90017
                                 (213) 689-8500
 5
 6  FOR DEFENDANT                LAW OFFICES OF JONES & DYER
    COUNTY OF LASSEN,            BY:  KRISTEN K. PRESTON
 7  CALIFORNIA:                  1800 J Street
                                 Sacramento, California 95811
 8                               (916) 552-5959
 9  FOR CROSS-DEFENDANT          BRACK & MASON
    THE GRACE FOUNDATION         BY:  SUSAN L. MASON
10  OF NORTHERN CALIFORNIA:      12396 World Trade Drive
                                 Suite 103
11                               San Diego, California 92128
                                 (858) 674-7414
12
13  ALSO PRESENT:                JOSEPH BUSSINO, Videographer
                                   Century Court Reporters
14
                                 Beth DeCaprio, Executive Director
15                               The Grace Foundation of Northern
                                 California
16
17
18
19
20
21
22
23
24
25
```

```
1                        I N D E X
2    WITNESS                  EXAMINATION               PAGE
3    TIMOTHY M. RYAN          BY MS. SAGHEB          10, 251
4                            BY MS. PRESTON             250
5
6
7                       E X H I B I T S
8    PLAINTIFF'S:              Volume I
9    1 (1-8)  Timothy M. Ryan - summary notes           46
10   2 (1-7)  ORDER APPOINTING RECEIVER AND PRELIMINARY  57
                INJUNCTION; Lead Case No. 45679; July 21, 2011
11
     3 (1-3)  ORDER GRANTING DEFENDANT/CROSS-COMPLAINANT WELLS  58
12              FARGO BANK EX PARTE APPLICATION; July 29, 2011
13   4 (1-2)  Email exchange Fr: Timothy M. Ryan; To: Vicki   79
                Lozano; Wednesday, August 03, 2011
14              TMR/TRF 000729-000730
15   5        Email exchange Fr: Timothy M. Ryan To: Vicki   79
                Lozano; Wednesday, August 03, 2011
16              TMR/TRF 000731
17   6 (1-3)  Email chain Fr: Taira Mulliken; To: Timothy M.   82
                Ryan; Sunday, July 08, 2012; attachment Fr: The
18              Grace Foundation; Date: Thursday August 4, 2011
                TMR/TRF 000249-000251
19
     7 (1-4)  DECLARATION OF MICHAEL W. RUSSELL; July 29, 2011   88
20
     8 (1-4)  DECLARATION OF MICHAEL W. RUSSEL; August 29, 2011  90
21
     9 (1-4)  DECLARATION OF MICHAEL W. RUSSEL; August 29, 2011  92
22              TMR/TRF 000779-000782
23   10       Email exchange Fr: Michael Russell; To: Beth    100
                DeCaprio; Sun, Jul 31, 2011; To: Tyler J. Kemp
24
25
```

```
1                    I N D E X (cont.)
2                   E X H I B I T S
3    PLAINTIFF'S:         Volume I
4    11        Taira Mulliken email To: tryan@the ryanfirm.com  102
5    12 (1-3)  Email exchange Fr: Timothy M. Ryan; To: Taira     106
               Mulliken; Thursday, August 18, 2011
6
     13 (1-2)  DEPARTMENT of PUBLIC WORKS; LASSEN COUNTY ANIMAL 111
7              CONTROL - Final Disposition; dated 8/26/11
8    14 (1-2)  DEPARTMENT of PUBLIC WORKS; LASSEN COUNTY ANIMAL 127
               CONTROL - Protective Custody; dated 8/26/11
9
     15 (1-5)  Timothy M. Ryan letter to Lassen County           135
10             Department; dated March 5, 2012
               TMR/TRF 000744-000748
11
     16 (1-2)  Timothy M. Ryan letter to Close Associates Law    148
12             Offices, Judith St. John c/o Craig Close; dated
               March 5, 2012; TMR/TRF 000749-000750
13
     17 (1-2)  Timothy M. Ryan letter to Sharon Wickwire         149
14             dated March 6, 2012; TMR/TRF 000751-000752
15   18 (1-3)  Email exchange Fr: Timothy M. Ryan; To: Taira     160
               Byrne; Fri, 16 Sep 2011; Re: Adoption
16             TMR/TRF 000005-000007
17   19 (1-5)  INDEMNIFICATION AGREEMENT; Vicki Lozano, Receiver 179
               Dated 7/22/11
18
     20 (1-2)  Peter C. Heimbigner letter to Timothy M. Ryan     180
19             Dated July 22, 2011
20   21 (1-4)  Email exchange Fr: Taira Mulliken; To: Timothy    184
               M. Ryan; Friday, January 06, 2012
21             TMR/TRF 000402-000405
22   22        Email exchange Fr: Timothy M. Ryan; To: Vicki     217
               Lozano; Thursday, August 04, 2011
23             TMR/TRF 000718
24   23 (1-4)  Email exchange Fr: Timothy M. Ryan; To: Beth      229
               DeCaprio; January 03, 2012
25
```

```
 1                    I N D E X (cont.)
 2                    E X H I B I T S
 3    PLAINTIFF'S:              Volume I
 4
      24 (1-3)  Timothy M. Ryan email; To: Austin T. Beardsley   231
 5              Thursday, February 02,  2012; attachment From:
                Beth DeCaprio; Tuesday, January 24, 2012; Invoices
 6              TMR/TRF 000387-000389
 7    25        Austin T. Beardsley email To: Beth DeCaprio;     233
                Thu, Feb 2, 2012
 8
      26 (1-7)  DECLARATION OF BETH DICAPRIO; October 31,  2011  246
 9              TMR/TRF 000760-000766
10    27 (1-3)  Table of Contents; Timothy M. Ryan - Notebook    250
11
12              I N F O R M A T I O N   R E Q U E S T E D
13                       PAGE    LINE
14                        (None)
15
16              U N A N S W E R E D   Q U E S T I O N S
16
                    PAGE    LINE    PAGE    LINE
17
                     20      22     158      15
18                   24      17     179      19
                     38      22     180      24
19                   39      25     183       9
                     54      20     190      18
20                   55      10     191       9
                     89      16     202       7
21                   97       2     203       1
                    107      25     204      14
22                  109       1     220      19
                             25     225      13
23                  117      15     239       5
                    118       1              20
24                  125      23
                    138      22
25                  155      17
```

```
 1            IRVINE, CALIFORNIA; THURSDAY, AUGUST 8, 2013

 2                     11:04 A.M.

 3

 4

 5       THE VIDEOGRAPHER:  Good morning.  This begins Video Disc

 6   Number 1, Volume I of the deposition of Timothy Ryan in the

 7   case of Grace Foundation of Northern California versus Wells

 8   Fargo Bank in the Superior Court of California, County of

 9   Orange.  The case number is 30-2012-00612863-CU-BC-CJC.

10   Today's date is August 8, 2013.  The time on the video monitor

11   is approximately 11:04.

12            The deposition is being taken at 7545 Irvine Center

13   Drive, Suite 200, Irvine, California 92618, and was made at

14   the request of the Plaintiff Law Offices of Sohaila Sagheb.

15   The Court Reporter producing the official transcript of

16   today's testimony is Lorrie Poiry.  The Videographer is Joseph

17   Bussino.  Both Court Reporter and Videographer represent

18   Century Court Reporters.

19            Would Counsel please identify themselves and please

20   state whom you represent in this case.

21       MS. SAGHEB:  Sohaila Sagheb on behalf of Plaintiff The

22   Grace Foundation.

23       MR. ROSENBERG:  George Rosenberg on behalf of Plaintiff

24   The Grace Foundation.

25       MS. MASON:  Sue Mason on behalf of Cross-Defendant The
```

1    Grace Foundation.

2        MS. PRESTON:  Kristen Preston on behalf of Defendant

3    County of Lassen.

4        MS. DILL:  Emma Dill on behalf of Defendant Bank of

5    America N.A.

6        MS. KOUVABINA:  Elena Kouvabina on behalf of Wells Fargo

7    Bank as Trustee.

8        MR. JAMPOL:  I am Alan Jampol and I am here representing

9    Timothy Ryan, the Law Offices of Timothy Ryan and Vicki

10   Lozano.

11       THE VIDEOGRAPHER:  Any other Counsel on the phone that

12   needs to identify themselves?

13       MS. KOUVABINA:  Yes, Elena Kouvabina.  I have identified

14   myself.

15       THE VIDEOGRAPHER:  Okay.  Very good.

16       MS. KOUVABINA:  I am Counsel for Wells Fargo Bank.

17       THE VIDEOGRAPHER:  Thank you.

18           Would the Court Reporter please swear in the

19   witness.

20       THE REPORTER:  Do you solemnly swear that the testimony

21   you are about to give in this deposition will be the truth,

22   the whole truth and nothing but the truth so help you God?

23       THE WITNESS:  Yes, I do.

24       THE REPORTER:  Thank you, sir.

25       THE VIDEOGRAPHER:  Counsel, begin, please.

1      MS. DILL:  I apologize.  I think there was one thing that

2    we wanted to put on the record before the questioning began. I

3    didn't want to interrupt you once you got started.

4           Alan, I don't know if you want to.

5      MR. JAMPOL:  Well, I will just indicate that it is our

6    intention as we made clear to Counsel that Mr. Ryan's

7    deposition be completed today if at all possible, and to that

8    end we have agreed that the entire seven hours of today will

9    be devoted to the Plaintiff.  Plaintiff can take as long as

10   they want.  We have also agreed that to accomplish that, that

11   the other Defendants, the Bank of America, Wells Fargo and the

12   County of Lassen may redepose Mr. Ryan at some later date

13   should they elect to do so so that they can accord the

14   Plaintiff that courtesy of having today to itself really.  I

15   think that is -- is there anything else?

16     MS. DILL:  That is right.  I mean, to the extent we have

17   follow-up questions today, we expect to ask them, but

18   otherwise, you guys have it.

19     MS. SAGHEB:  All right.  Ms. Jampol, Counsel, I

20   understand and appreciate where you are coming from and I will

21   make every effort to complete Mr. Ryan's deposition today.

22   However, I can't promise you that it will be complete today.

23   The Court has recognized that this matter is exceptional.  I

24   am not sure whether or not it has been deemed complex, but it

25   has certainly been deemed exceptional.

1          So why don't we get started and we will make our

2    best effort to complete Mr. Ryan's deposition today.  And if

3    we are unsuccessful in that effort, we will have to engage in

4    a meet and confer to discuss that; okay?

5          MR. JAMPOL:  Well, if that is your position, that is

6    fine.

7          MS. SAGHEB:  Thank you.

8

9

10                        TIMOTHY M. RYAN,

11          THE WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN, DEPOSED

12          AND TESTIFIED AS FOLLOWS:

13

14

15                          EXAMINATION

16    BY MS. SAGHEB:

17          Q    Mr. Ryan, please state your full name and spell your

18    last name for the record.

19          A    Timothy Matthew Ryan, R-Y-A-N.

20          Q    Mr. Ryan, are you --

21               Well, first of all, the oath that you took from the

22    Court Reporter is the same oath that you would take in a court

23    of law; so the testimony that you give here today has the same

24    force and effect as if you were testifying in a court of law.

25               Do you understand that?

1        A      Yes, I do.

2        Q      How long have you been a member of the California

3    State Bar?

4        A      I think 18 years.

5        Q      And what year were you admitted to the California

6    State Bar?

7        A      1995.

8        Q      Where did you go the law school?

9        A      University of the Pacific McGeorge School of Law in

10   Sacramento.

11       Q      And what year did you graduate?

12       A      1995.

13       Q      What university did you attend?

14       A      California State University at Fullerton.  The

15   Titans.

16       Q      What year did you graduate from there?

17       A      1988, I believe.  It could have been 1989.

18       Q      I am just wondering, do the Titans have a football

19   team, is that why they are called the Titans?

20       A      No.  No, they do not.

21       Q      All right.

22              So Mr. Ryan, what is your date of birth?

23       A      2/21/65.

24       Q      Since 1995 have you been a practicing attorney in

25   the state of California?

1       A       Yes.

2       Q       Are you admitted to any bars other than to the state

3   of California?

4       A       No, I am not.

5       Q       Are you admitted to any federal courts?

6       A       Every federal court in the state of California.

7       Q       In 1995 where did you start practicing law?

8       A       I started at a boutique banking litigation firm

9   called Nichols & Andrews, N-I-C-H-O-L-S, ampersand, Andrews,

10  A-N-D-R-E-W-S.

11      Q       And what city were they located in?

12      A       Oddly enough they were located in Lake Forest,

13  California.

14      Q       Do they continue to be in Lake Forest, California?

15      A       I have no idea.

16      Q       How long were you with Nichols & Andrews?

17      A       I don't recall.  It was some -- I will say

18  approximately a year.  I began with them before I passed the

19  Bar and then practiced with them after I passed the bar for

20  some time.

21      Q       And when did you leave them?

22      A       Approximately a year after I began.  I don't know

23  the date.

24      Q       Were you then associate counsel at that firm?

25      A       I don't understand your question.

1       Q      Were you an associate?  A partner?  Or some other

2  designation at that firm?

3       A      At Nichols & Andrews?

4       Q      Yes.

5       A      I was an associate.

6       Q      Okay.

7       A      Well, that is incorrect.  First I was a law clerk.

8  Then I took the Bar exam and received my results and then I

9  became an associate.

10      Q      And after you left Nichols & Andrews, where did you

11  go after that?

12      A      I went to Saxon, Barry, Gardner and Kincannon.

13  That's S-A-X-O-N, B-A-R-R-Y --

14      Q      Thank you.  We know the firm.  The --

15      MR. JAMPOL:  The Reporter might not.

16      THE WITNESS:  I am trying to get the spelling correct for

17  the record.  If you would like the spelling to be correct, we

18  can do that.  If not, it is your deposition.

19      Q      BY MS. SAGHEB:  If the Reporter has questions

20  regarding the spelling, I am sure she will address them with

21  you during a break, as is usual in deposition.

22            So the office of the Saxon firm where you worked,

23  where was that located?

24      A      It was located in Newport Beach.  I was in the

25  Newport Beach office most of the time.

1       Q       And what year did you leave the Saxon firm?

2       A       I believe I was with them for two years, perhaps

3       three.

4       Q       Were you an associate, partner, or did you hold some

5       other designation at that firm?

6       A       I was an associate at the firm.

7       Q       And what kind of practice did you practice then?

8       A       I was -- it was a boutique real estate banking firm,

9       and we did a little bit of bankruptcy reorganization for small

10      corporations.

11      Q       Was your practice at the Saxon firm primarily

12      transactional or primarily litigation?

13      A       Primarily litigation.

14      Q       And the client base of the Saxon firm as far as you

15      were concerned and involved in their litigation, was it

16      primarily plaintiff or primarily defendant?

17      A       I would not be able to state it was primarily one or

18      the other.  We did approximately 30 percent corporate -- my

19      work was approximately 30 percent corporate reorganization

20      work through Chapter 11, probably 25 percent plaintiff's work,

21      and the other portion defense work.

22      Q       When did you leave -- what year did you leave the

23      Saxon firm?

24      A       I don't remember.  I told you I was there two to

25      three years.

1      Q      When you called -- you called both the firms

2  boutique firms.  What do you mean when you say that?

3      A      They were not large firms.  They had one area, one

4  general area of specialty or two small areas of specialty.

5  They did not take everything that came in the door.  That is

6  what I meant by that.

7      Q      Did you represent either Wells Fargo Bank or Bank of

8  America when you worked at the Saxon firm?

9      A      I don't remember.

10      Q      So you may have, you just don't recall?

11      A      My answer is I don't remember.

12      Q      And where did you go after you left the Saxon firm?

13      A      I went to another boutique firm called the Law

14  Offices of Wolf & Richards.

15      Q      And the office from which you worked, where was that

16  located?

17      A      It was in Newport Beach as well.

18      Q      Let me back up a minute.

19             At the Saxon firm, who was the primary partner or

20  member of that firm with whom -- who supervised your activity?

21      A      If I had to name someone who supervised my activity,

22  that would be Jeffrey Gardner, Jeffery B., as in boy, Gardner.

23      Q      And what about at the Wolf & Richards firm?

24      A      Well, I was there for a number of years; so it would

25  not be one person.  Would you like to give me the series of

1    people?

2        Q    Well, why don't you tell me what years you were with

3    Wolf & Richards?

4        A    I don't recall.  It was approximately two to three

5    years.

6        Q    Tell me who the last person was who primarily

7    supervised your work at that firm.

8        A    I believe it would be Janice Celotti, C-E-L-O-T-T-I.

9        Q    When you left the Saxon firm, did you leave

10   voluntarily or involuntarily?

11       A    Voluntarily.

12       Q    And what about the Richards firm -- go ahead.

13       A    Are you finished?

14       Q    Yes.

15       A    Voluntarily.

16       Q    At the Wolf & Richards firm, did you continue to do

17   litigation work?

18       A    I did.

19       Q    And did it continue to be in the areas of real

20   estate and banking?

21       A    Yes.

22       Q    At the Wolf & Richards firm, did you represent Wells

23   Fargo Bank or Bank of America?

24       A    I might have.

25       Q    And when you left the Wolf & Richards firm, where

1    did you go after that?

2         A     I went to a firm called Cameron & Dreyfuss.

3         Q     And what office of that firm did you work out of?

4         A     The Orange office.

5         Q     And who was your supervising attorney at that

6    office?

7         A     Larry Dreyfuss.

8         Q     Did you do litigation work at that firm?

9         A     I did.

10        Q     And was the litigation work primarily in the area of

11   banking and real estate?

12        A     Yes, it was.

13        Q     Did you represent either Wells Fargo Bank or Bank of

14   America at the Cameron & Dreyfuss firm?

15        A     I don't believe I did, but I cannot say with 100

16   percent certainty that I did not.

17        Q     At the Wolf & Richards firm when you indicated that

18   you had represented or you believed that you might have

19   represented one of the those entities, Wells Fargo or Bank of

20   America, which were you referencing, or were you referencing

21   both?

22        A     I was referencing both.

23        Q     How long did you stay at the Cameron & Dreyfuss

24   firm?

25        A     The Cameron & Dreyfuss firm existed as Cameron &

1    Dreyfuss for approximately one year after I started working

2    there.

3         Q    And then they came what entity?

4         A    They became Dreyfuss, Ryan & Weidenbach.

5         Q    Were you an associate at Cameron & Dreyfuss?

6         A    Initially, yes.

7         Q    When they became Dreyfuss -- I'm sorry, what was the

8    name of the new firm?

9         A    Are you asking me?

10        Q    Yes.

11        A    Dreyfuss, Ryan and Weidenbach.

12        Q    Are you the Ryan referenced in the Dreyfuss, Ryan

13   part?

14        A    I am.

15        Q    So for the single year that you left Cameron &

16   Dreyfuss, were you an associate at that firm?

17        A    I don't believe I said it was a single year.  I

18   think I said it was approximately a single year.

19             But for the approximately one year prior to me

20   becoming a partner, I was an associate, yes.

21        Q    And do you recall what year you became a partner at

22   that firm?

23        A    No, I do not.

24        Q    How long did the Dreyfuss, Ryan firm exist?

25        A    I think it existed for approximately two years.

1    Q    And what was the impetus for the end of that firm?

2    A    That is a rather open ended question.  I didn't

3  believe that my practice area was being developed fully.

4    Q    Did you leave the firm?

5    A    I did.

6    Q    And did you take any clients with you?

7    A    Yes.

8    Q    Which clients did you take?

9    A    All of them.

10   Q    You took all of the clients from the Dreyfuss, Ryan

11  firm?

12   A    All of the clients I was working with, yes.

13   Q    Did those include Wells Fargo Bank and Bank of

14  America?

15   A    No, they don't.

16   Q    Did they include other financial institutions?

17   MR. JAMPOL:  Well, generically, you can answer.

18   THE WITNESS:  Yes.

19   Q    BY MS. SAGHEB:  After you left the Dreyfuss, Ryan

20  firm, what firm did you establish or go to?

21   A    I established The Ryan Firm.

22   Q    And where -- and what year did you establish The

23  Ryan Firm?

24   A    2004.

25   Q    Where was it located at that time?

1        A     I believe the address was 4050 La Palma in Anaheim.

2   I am not 100 percent certain of the address.

3        Q     How many different locations has The Ryan Firm

4   occupied?

5        A     Three -- oh, excuse me.  Four.

6        Q     Has it ever had more than one office at a time?

7        A     Well, if you include the office at my home that is

8   five hours a day spent in, yes.  If you don't include that

9   office, no.

10        Q     Do you include your office -- your home office as a

11   second office?

12        A     I consider it a second office.

13        Q     You consider it a second office of The Ryan Firm?

14        A     It is not on my letterhead.

15   MR. JAMPOL:  Well, the question is --

16        Q     BY MS. SAGHEB:  That is not the question.

17   MR. JAMPOL:  Do you consider it?

18   THE WITNESS:  No.

19        Q     BY MS. SAGHEB:  You spend five hours a day at your

20   home working on The Ryan Firm business?

21        A     Three to five hours a day, yes.

22        Q     Is the home insured?

23   MR. JAMPOL:  Is the home insured?

24   THE WITNESS:  I am not going to answer that question.

25   MR. JAMPOL:  I will object on the grounds it is totally

1    irrelevant.  He has rights of privacy which are not

2    compromised here.  So I will instruct you not to answer.

3         Q    BY MS. SAGHEB:  Is The Ryan Firm insured?

4         MR. JAMPOL:  You can answer.

5         THE WITNESS:  Yes.

6         Q    BY MS. SAGHEB:  Through that what carrier?

7         A    I have no idea.

8         Q    With what policy?

9         A    I believe one million.

10        Q    And do you know whether or not the limits of the

11   policy are reduced by attorneys fees?

12        A    Yes, they are.

13        Q    What about litigation costs?

14        A    You know what?  We are getting into this -- I don't

15   understand what you mean by litigation costs, and I don't -- I

16   should retract that last answer.  What do you mean by are --

17   is my policy reduced by attorneys fees?  Do you mean is the

18   current balance of your current policy reduced by attorneys

19   fees that have been incurred?  Is that your question?

20        Q    Mr. Ryan, how many depositions have you taken in

21   your career as an attorney?

22        A    Many.

23        Q    When you don't understand a question, is it not your

24   obligation to advise me that you don't understand the

25   question?

1      A      I just recognized that I did not understand the

2   question.  That's why I went back and said, you know, I need

3   to change that answer.

4      Q      Let's go back a moment.

5             How many would you estimate -- how many depositions

6   have you taken in your career as a litigation attorney?

7      A      Somewhere between 100 and 200.

8      Q      Would it be accurate to state that you are

9   intimately familiar with the rules applying at a deposition?

10     A      Yes.

11     Q      And that you are entirely familiar with the rules of

12  perjury that go along with giving deposition testimony?

13     MR. JAMPOL:  I will object on the ground that is

14  argumentative.

15             But if you have an answer, answer.

16     THE WITNESS:  Ms. Sagheb, I am aware that today I have to

17  tell the truth, that if I don't tell the truth, I am violating

18  the law.

19     Q      BY MS. SAGHEB:  How many malpractice actions have

20  you been personally a defendant to?

21     A      There is this one.  And there is one that was filed

22  and withdrawn approximately six months ago.

23     Q      The one that was withdrawn, what was the caption of

24  the case?

25     A      I don't remember what the caption of the case was.

1       Q      What was the name of the Plaintiff?

2       A      The last name was that Tarnuetzer,

3    T-A-R-N-U-E-T-Z-E-R.  I don't recall if it was him

4    individually or him as Trustee of his family trust.

5       Q      To how many malpractice lawsuits has The Ryan Firm

6    been a defendant?

7       A      Two.

8       Q      This one and the Tarnuetzer matter?

9       A      That is correct.

10      Q      Do you know what your insurance deductible is?

11      A      No.

12      Q      Do you know whether or not the policy is one that is

13   a depleting policy?

14      A      What do you mean by depleting policy?

15      Q      Well, if you don't know the answer to my question,

16   you can just say "I don't know."

17      A      Well, I believe you are being argumentative.

18      MR. JAMPOL:  Just a minute, Tim.

19          He has a right to have you explain what you mean by

20   your question if he does not understand it.  If you want to

21   withdraw the question, that is your choice.  But if you don't

22   want to withdraw it, then you need to explain it to him so

23   that he can answer it correctly.

24      Q      BY MS. SAGHEB:  Is your answer that you do not

25   understand the term "depleting policy"?

1          A     My answer speaks for itself.

2          Q     Do you understand the term "depleting policy"?

3          A     No.

4          Q     Do you know how much coverage is left on the policy,

5     the one that is on your policy?

6          A     No.

7          Q     Do you know whether your policy pays for the defense

8     of Vicki Lozano?

9          A      I believe it does.

10         Q     Under your policy is there an indemnity limit of

11    $1,000,000?

12         A     I don't understand the question.

13         Q     You do not understand the term "indemnity?"

14         A     I know the term indemnity.

15         Q     Do you not understand the term "indemnity limit"?

16         A     Exactly.

17         Q     In this litigation have you produced all of the

18    documents relating to your insurance coverage?

19         A     I don't believe --

20         MR. JAMPOL:  Well, wait a minute.  I will object to that

21    and instruct him not to answer that.  That is so broad that it

22    is not capable of being answered.  What is related to this

23    insurance coverage is something I can't even determine.

24              So don't answer that question.  If you want to

25    narrow it down, you can go ahead and do that.

1          MS. SAGHEB:  There is a specific Code provision that

2     entitles the Plaintiffs to seek insurance coverage.  But you

3     have taken your position.  We will meet and confer about that

4     later.

5          Q     Have you produced a copy of your policy in this

6     litigation?

7          A     If you asked for it, it has been produced.

8          Q     Have you produced a copy of your declaration page?

9          A     If you have asked for it, it has been produced.

10         Q     Have you --

11         MR. JAMPOL:  The declaration page, of course, is part of

12    the policy.

13         Q     BY MS. SAGHEB:  Have you provided all information in

14    reference or in answer to Form Interrogatory 4.1 relating to

15    disputes regarding coverage?

16         A     I have no idea what my answer to Form Interrogatory

17    4.1 is.  If you would like to show that to me, I would review

18    it and then I would answer your question.

19         Q     Is there a reservation of rights in the defense of

20    yourself or your law firm in this litigation?

21         A     I am not certain.

22         Q     Is there a reservation of rights in the defense of

23    Vicki Lozano in this litigation?

24         A     I am not certain.

25         Q     What is the first time that you started representing

1    Wells Fargo Bank in your career at The Ryan Firm?

2        A    I don't think that you could ever say that I

3    represented Wells Fargo Bank.

4        Q    In the litigation entitled Allen versus Summit

5    Financial Group, Lead Case No. 45679, did you represent Wells

6    Fargo Bank?

7        A    I don't believe I did.

8        Q    Did you represent Wells Fargo Bank as Trustee for

9    MLMI Trust Series?

10       A    Yes, I did.

11       Q    When is the first time you represented Wells Fargo

12   Bank in any capacity including as Trustee for any series?

13       A    I don't know the answer to that question.  I can

14   give you a date range, but I could not give you the specific

15   date.

16       Q    A date range would be just fine.

17       A    It would likely be sometime between 2005 and 2009.

18       Q    Is the first time that you represented Wells Fargo

19   Bank in any capacity as Trustee or otherwise in relation to

20   the Allen versus Summit matter?

21       A    I don't believe so.

22       Q    So you had had business dealings with Wells Fargo

23   Bank prior to representing Wells Fargo Bank's interest in that

24   matter?

25       MR. JAMPOL:  Well, business dealings.  I don't know.  If

1    you understand it, you can answer --

2         THE WITNESS:  In my individual capacity or as an

3    attorney?

4         Q    BY MS. SAGHEB:  Either yourself or your firm.

5         A    I banked at Wells Fargo Bank, yes.  I think I have a

6    home loan with Wells Fargo Bank as well.

7         MS. SAGHEB:  Why don't we read the question back to the

8    Deponent and I will move to strike the answer.

9              (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

10             "Q    So you had had business dealings with Wells

11        Fargo Bank prior to representing Wells Fargo Bank's

12        interest in that matter?")

13        Q    BY MS. SAGHEB:  Let me ask you a different question.

14             Are you indicating that other than banking at Wells

15   Fargo Bank, you had no other communications or negotiations or

16   dealings with Wells Fargo Bank prior to representing them in

17   the Allen versus Summit matter?

18        MR. JAMPOL:  I will object.  I don't understand that

19   question.  I think it is completely unintelligible.  It would

20   be better if you would just ask him a direct question.

21   Because first of all, I could not follow the question; and

22   secondly, you referred to something that he had said before.

23   So just ask him the direct question.

24             Anyway, the objection is it is vague and

25   unintelligible, and I don't see how anybody can answer it.

1          If you have got some answer, go ahead.

2     THE WITNESS:  No.

3     Q     BY MS. SAGHEB:  No, what?

4     A     I am answering your question.

5          No.

6     Q     So other than banking with Wells Fargo Bank and

7 other than your representation of Wells Fargo Bank as a

8 Trustee in the Allen matter, what other dealings did you have

9 with Wells Fargo Bank prior to representing them in the Allen

10 matter?

11    A     I can't say with certainty, because I don't want to

12 be inaccurate because I am under oath.  But I believe my that

13 my firm probably represented them, Wells Fargo Bank, as

14 Trustee in a number of matters.

15    Q     In the five years prior to representing Wells Fargo

16 Bank in the Allen versus Summit matter, what percentage of

17 your or your firm's income was related to representing Wells

18 Fargo as Trustee or in any other capacity?

19    MR. JAMPOL:  Well, if you know the answer, you can give

20 it.

21    THE WITNESS:  A very small percentage.  It would be less

22 than two percent.  I am estimating there.

23    Q     BY MS. SAGHEB:  Okay.

24          Can you give a response to the same question as to

25 Bank of America?

1          A      If you can repeat the question.

2          Q      Prior to representing BAC Home Loan Servicing in the

3     Allen versus Summit matter, what percentage of your or your

4     firm's income was related to representing -- was related to

5     doing business with that entity?

6          A      Prior to that, then it would probably be the same.

7     Some number under five percent.

8          Q      After your commencement of representation for Wells

9     Fargo Bank in the Allen matter, did the two percent

10    increase --

11         A      I don't believe it did.

12    MR. JAMPOL:  Excuse me.  I just need to make one

13    statement to Ms. Kouvabina, who is on the phone and to

14    Ms. Dill here.

15             With these questions relating to Wells Fargo and to

16    Bank of America as to the business dealings or otherwise,

17    Mr. Ryan is going to do his best to answer.  But if either of

18    you believe there is something improper or privileged or

19    something that he shouldn't answer, we expect you to tell us

20    that.

21    MS. DILL:  Understood.

22    MS. SAGHEB:  And then -- did we just have a law school

23    class in the middle of a depo?

24         Q      And what about Bank of America?  Your estimate of

25    five percent, would that have increased after you started

1    representing BAC Home Loan Servicing in the Allen matter?

2        A    I don't want to be technically correct, but

3    generally inaccurate.  The technical answer is no.  The

4    general answer without being hyper technical is yes.

5        Q    Okay.

6            I'm sorry, but really -- I don't think I understand

7    the difference.  Could you explain it to me.

8        A    Yes.

9            A client of mine was purchased by Bank of America,

10   and at one general point in time the representation switched

11   over from that former client to representing Bank of America.

12   So there was no before, there was a switch and it kind of

13   happened at the same time.  So by segregating it into before

14   and after, if I just said it stayed the same, that would have

15   been a misleading answer, while technically correct.

16       Q    So since the sale and purchase would -- the general

17   knowledge regarding the sale and purchase would be a matter of

18   public record anyway, which entity are we talking about that

19   they purchased which coincidentally collided with the event of

20   you representing Bank of America's interest in the Allen firm?

21       A    I don't think anything collided with anything.  But

22   the company was Wilshire Credit Corporation.

23       Q    And in the five years prior to your representation

24   of Wells Fargo Bank and Bank of America in the Allen matter,

25   what percentage of your income or your firm's income was tied

1    to doing business with Wilshire Credit Corporation?

2        A    It varied year to year.

3        Q    Could you tell me for let's say the two years prior

4    to your commencement of representing the banking interests in

5    the Allen matter?

6        A    I couldn't.  I couldn't give an accurate answer.  I

7    would just say I could give you a range.

8        Q    Okay.

9        A    It would probably be somewhere between 10 and 25

10   percent.

11       Q    In 2011 how many lawyers worked at The Ryan Firm?

12       A    Including me?

13       Q    Yes, please.

14       A    I believe it was five.  Could have been six.

15       Q    You were one of those lawyers; correct?

16       A    Yes.

17       Q    And Mr. Beardsley, Austin Beardsley was another

18   lawyer; right?

19       A    Yes.

20       Q    Who else worked there?

21       MR. JAMPOL:  You mean as a lawyer?

22       Q    BY MS. SAGHEB:  As a lawyer?

23       A    I am going to try my best.  I can't guarantee the

24   accuracy of this, because I just don't have a frame of

25   reference for everything that was in the office in 2011.  If I

1    may get a pen so I can write.

2                (Pause)

3        THE WITNESS:  I believe that looking at the year in

4    total, not necessarily how many attorneys were there at any

5    one time, I believe there were seven different lawyers plus

6    me; so that would be eight.

7        Q    BY MS. SAGHEB:  So can we reform your answer, then,

8    to read eight instead of five?

9        A    We can.

10       Q    As we discussed, you were one of them.  Austin

11   Beardsley we know was the second.

12            Who else was at your firm in 2011?

13       A    Mike Stoltzman.

14       Q    S-T-O-L-T-Z-M-A-N?

15       A    Correct.

16       Q    Okay.

17       A    Chase Otis.

18       Q    O-T-I-S?

19       A    Correct?

20       A    Barry Coleman.

21       Q    C-O-L-E-M-A-N?

22       A    That is correct.

23       Q    Okay.

24       A    Scott Meininger.

25       Q    M-E-I-N-G-E-R?

```
 1        A     I believe M-E-I-N-I-N-G-E-R.  Paul Grammatico.

 2        Q     Okay.  Who else?

 3        A     Daniel Lee.

 4        Q     What about non attorney personnel?  How many non

 5    attorney personnel worked for The Ryan Firm in 2011?

 6        A     Let me write that down as well.

 7        Q     If you can give me an estimate.  I am not going to

 8    ask all of their names.

 9        A     I want to give you an accurate estimate.  In order

10    to do that, I need to write down their names.

11        Q     I am going to withdraw the question.

12              Did Tyler Kemp work at your office?

13        A     He did.

14        Q     What were Mr. Kemp's duties and responsibilities?

15        A     He was a legal assistant.

16        Q     Is he still there?

17        A     No, he is not.

18        Q     When did he leave?

19        A     I believe January of 2013.

20        Q     Is Austin Beardsley still there?

21        A     No, he is not.

22        Q     Do you know where Mr. Kemp moved on to

23    professionally?

24        MR. JAMPOL:  Do you know is the question?

25        THE WITNESS:  No.  No.
```

1    Q    BY MS. SAGHEB:  Mr. Beardsley, do you know where he

2    moved on to professionally?

3    A    I believe he moved on to Katten, Muchin.

4    Q    Do you know what office he is in?

5    A    I believe he is in the Century City office and in

6    the Irvine office.

7    Q    And when is the last time you spoke with

8    Mr. Beardsley?

9    A    I spoke with Mr. Beardsley yesterday or the day

10   before.

11   Q    And in your discussions with Mr. Beardsley, could

12   you tell me what discussions you had that related to the Allen

13   firm -- strike that.  Start over.

14        In your discussions with Mr. Beardsley yesterday,

15   did the topic of the Allen versus Summit litigation, the topic

16   of The Grace Foundation versus Ryan matter, were either of

17   those discussed?

18   A    I think towards the end of the conversation I told

19   him that I was being deposed today.  And I should clarify my

20   answer both the last two days have been a bit of a blur.  So

21   it could have been the day before yesterday.

22   Q    Have you had e-mail communications with

23   Mr. Beardsley concerning The Grace Foundation case in the last

24   two years?

25   A    Yes.

1     Q     Have you produced the documents relating to those

2   e-mail communications?

3     A     To the extent they were requested and to the extent

4   the e-mails occurred prior to the request, they were produced.

5     MR. JAMPOL:  And to the extent they are not privileged.

6     THE WITNESS:  Correct.

7     Q     BY MS. SAGHEB:  Do you believe that there are any

8   e-mails between yourself and Mr. Beardsley since the time that

9   he started working for the Katten firm that relate in any way

10  to The Grace Foundation case?

11    A     There probably are, yes.

12    Q     Do you believe that those e-mails have been

13  produced?

14    A     To the extent that they occurred prior to the -- to

15  the extent that the communication occurred prior to the

16  request for production or to the production, I should say, I

17  believe they were produced.

18    MR. JAMPOL:  And to the extent they exist.

19    THE WITNESS:  And to that extent that they do exist and

20  to the extent they are not privileged.  I just can't recall

21  exactly what -- when we communicated via e-mail concerning

22  this case.

23    Q     BY MS. SAGHEB:  Have you had communications with

24  Mr. Beardsley regarding our attempt to serve a deposition

25  subpoena on him?

1       A       Yes, I have.

2       Q       And has he indicated to you that he has attempted to

3   evade process?

4       A       He indicated to me that he was going to Europe.  And

5   I don't know that he has indicated to me that he would be

6   evading.  I don't know how I would characterize it.

7       Q       You don't know how you would characterize what?

8       A       I don't recall exactly what he said.  I know that,

9   of course, he was not happy about being subpoenaed, as no one

10  is, but I just don't want to mischaracterize our discussions.

11      Q       Well, why don't you tell me what he said.

12      A       I don't remember what he said.

13      Q       You have no recollection of the words that he said

14  to you yesterday or the day before yesterday regarding our

15  attempts to serve him with a deposition subpoena?  Is that

16  your testimony?

17      A       No.  You are mischaracterizing my testimony and you

18  are mischaracterizing what you asked me before.  You are

19  assuming in your statement that we spoke yesterday or the day

20  before about your attempts to serve him.

21      Q       Okay.

22              When did you speak about our attempts to serve him?

23      A       I think I spoke with him about your attempts to

24  serve him the day of the status conference or whatever it was

25  two weeks ago, when you indicated to the Court that you

1    thought he had been served.  I believe at the conclusion of

2    that hearing or sometime shortly thereafter I communicated

3    with him and asked him if he had indeed been served.

4         Q     And why did you make that communication?

5         A     I wanted to know.

6         Q     Are you concerned about Mr. Beardsley testifying in

7    this matter?

8         A     Not at all.

9         Q     Is he concerned, to the extent that you have been

10   able to gather in your communications with him --

11        MR. JAMPOL:  Objection.

12        Q     BY MS. SAGHEB:  -- about testifying in this matter?

13        MR. JAMPOL:  I will object on the ground he is not

14   competent to give that kind of answer; so there is no

15   foundation.

16             But if you can read his mind.

17        THE WITNESS:  Well, I don't understand what you mean by

18   concerned.  Do you mean that he doesn't want to take the time

19   to do that because he is expected to bill many hours a month?

20   He probably is concerned.  As to whether or not about the

21   about the key facts of the case, I don't believe he is.

22        Q     BY MS. SAGHEB:  Has Mr. Beardsley ever indicated to

23   you that he has made a misrepresentation to any judicial

24   officer regarding the facts that relate to either the

25   Whispering Pines horses or The Grace Foundation?

1        MR. JAMPOL:  Well, before you answer that, I am going to

2    object on the ground that it may call for attorney-client

3    privilege or attorney work product privilege.

4            If there are communications that don't involve Wells

5    Fargo or the Bank of America in connection with the Allen

6    action, then you can go ahead and answer.  But if they do,

7    then I am going to instruct you not to answer and claim the

8    attorney-client privilege.  Although we have the lawyers for

9    the clients here if they want to elaborate on that.

10       MS. SAGHEB:  I am not sure how that has anything to do

11   with Wells Fargo and Bank of America.

12       Q     But go ahead.

13       A     Can you repeat the question or have it read back.

14       Q     I will have it read back, sir.

15           (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

16           "Q     BY MS. SAGHEB:  Has Mr. Beardsley ever

17       indicated to you that he has made a misrepresentation to

18       any judicial officer regarding the facts that relate to

19       either the Whispering Pines horses or The Grace

20       Foundation?")

21       THE WITNESS:  No, he has not.

22       Q     BY MS. SAGHEB:  Do you believe as you sit here today

23   that Mr. Beardsley has made a misrepresentation to any

24   judicial officer, federal or state --

25       MR. JAMPOL:  Well --

1    Q    BY MS. SAGHEB:  -- regarding Whispering Pines matter

2  or The Grace Foundation?

3    MR. JAMPOL:  Are you done?  All right.  I will object on

4  the grounds that calls for his work product.

5         And if you have an answer and it does not involve

6  your work product, then you can give it, but if it does

7  involve your work product, then I instruct you not to answer.

8    THE WITNESS:  Of course it would involve my work product.

9    MR. JAMPOL:  Then you can't answer.

10    MS. SAGHEB:  Okay.

11    MR. JAMPOL:  It is also frankly I will add the objection

12  it is irrelevant what he believes.

13    Q    BY MS. SAGHEB:  Have you reviewed the September 2,

14  2011 transcript of the bankruptcy court in the matter of

15  Dwight Alan Bennett, Case No. 11-40155-A-11?

16    A    I probably read it ten times.

17    Q    When is the last time you read it?

18    A    Probably when I was preparing my Declaration in

19  Opposition to the anti-SLAPP motion filed by Ms. Mason as

20  counsel for The Grace Foundation as Cross-Complainants in this

21  action.

22    Q    So that would have been within the last 30 days

23  certainly?

24    A    No.  That would have been back in March.

25    Q    So when Mr. Beardsley represented to the Court that

1    Wells Fargo Bank provided a donation of $40,000 to The Grace

2    Foundation and that they first received an order from Lassen

3    County for permission to remove the horses to remand them to

4    The Grace Foundation, that was a true statement?

5        A    I don't understand what you are saying.

6        MR. JAMPOL:  In any event, it is calling for your work

7    product.  So I will object and I will instruct you not to

8    answer.

9        MS. SAGHEB:  I'm sorry, the objection is work product?

10       MR. JAMPOL:  That is what I said.

11       MS. SAGHEB:  His review of information to prepare a

12   declaration in an action in which he is a party is work

13   product?

14       MR. JAMPOL:  Next question, please.

15       Q    BY MS. SAGHEB:  Now, on September 2, 2011,

16   Mr. Beardsley represented to the Court that The Grace

17   Foundation understands that they have an order from the

18   Superior Court they have the funds to rehabilitate and keep

19   the horses and they're directed to remit any healthy horses to

20   anyone providing proper title to the horses and showing that

21   they can take proper care of the horses.

22            Was that a true statement at the time that it was

23   made?

24       A    Yes.

25       Q    So are you indicating that prior to September 2,

1    2011, you or your firm shared information with The Grace

2    Foundation related to the orders that were entered in the

3    Allen matter?

4         A     I don't recall if my firm or I shared information

5    with The Grace Foundation concerning the contents of the

6    order.  I know that the order specifically referenced on the

7    transfer paperwork given to The Grace Foundation by the County

8    of Lassen.

9         Q     The fact of the order is referenced, you mean?

10        A     If the fact of the order and the date of the order.

11        Q     What about the contents of the order?  Is the

12   contents of the order reflected in those documents?

13        MR. JAMPOL:  Well, I will object that the documents speak

14   for themselves.  So it is a violation of -- objection on the

15   best evidence rule.

16             You can answer.

17        THE WITNESS:  I may need to think for a minute, because I

18   don't want to give an incorrect answer.

19        MR. JAMPOL:  If you are going to testify as to what the

20   document says, you should have a copy in front of you.

21        THE WITNESS:  No.  I won't testify as to that.

22             (Pause)

23             Now, it would be speculation to say what The Grace

24   Foundation did and did not know as to that order prior to

25   September 2nd from my perspective; so I really can't answer

1    that question.

2        Q    BY MS. SAGHEB:  But certainly the context of those

3    orders were not transmitted to The Grace Foundation via any

4    document prepared by the County, were they?

5        MR. JAMPOL:  Objection.

6        THE WITNESS:  I have no idea.

7        MR. JAMPOL:  Lack of foundation for that question.  Lack

8    of personal knowledge.

9        MS. SAGHEB:  It's been answered.

10       MR. JAMPOL:  Excuse me, did he answer it?

11       MS. SAGHEB:  Yes.

12       THE WITNESS:  I said I have no idea.

13       MR. JAMPOL:  Wait for me to finish.

14       THE WITNESS:  I will do so.

15       MS. SAGHEB:  Yes.  Actually, I think that is an excellent

16   idea.

17            Your objections as to form, they are all preserved

18   by stipulation.  I certainly stipulate, I think that all of

19   the attorneys would stipulate, and I think that that is what

20   the Code provides.

21            Certainly privilege and an instruction is acceptable

22   but there is really no need to interrupt the proceedings with

23   form objections.

24       Q    Now, Mr. Ryan, let's go back to your retention with

25   Wells Fargo Bank.  Could you identify the person at Wells

1    Fargo Bank who was your contact in reference to the Allen

2    matter?

3            A    Initially I believe it was Graham Oglesby.

4            Q    I'm sorry, could you spell Ogelsbey, please.

5            A    O-G-E-L-S-B-E-Y.

6            Q    What office of Wells Fargo Bank did Mr. Oglesby work

7    out of?

8            A    I don't know.

9            Q    Do you know what city it was in?

10           A    I don't know.  It was a different time zone.

11           Q    In my experience in doing defense work, typically I

12   have somebody who I have to report to and have to write, you

13   know, summaries of various matters that occur either in or out

14   of court.

15           Did you as your contact, was Mr. Oglesby somebody

16   you routinely wrote to, to report regarding the Allen matter

17   and the happenings therein?

18           A    Yes.

19           Q    When you wrote to Mr. Oglesby, what city was your

20   communication directed to?

21           A    .com.

22           Q    So you only communicated in writing to Mr. Oglesby

23   via the Internet; is that --

24           A    That is correct.

25           Q    And you never knew where in the United States

1    Mr. Oglesby was?

2         A    That is not correct.

3         Q    Do you know where Mr. Oglesby was when you were

4    communicating with him?

5         A    Did I know where he was when I was communicating

6    with him?

7         Q    Yes.

8         A    Yes, I did.

9         Q    Where was he?

10        A    I already answered that question.  I don't remember.

11        Q    Do you know whether he was on the west coast or on

12   the east coast?

13        A    I said he was in a different time zone; so I believe

14   he was either in the Midwest or on the east coast.

15        Q    Do you recall the number of hours that were

16   different between the Orange County area --

17        A    No.

18        MR. JAMPOL:  Let her finish her question.

19        THE WITNESS:  Sure.

20        Q    BY MS. SAGHEB:  Was there anybody else to whom you

21   routinely reported at Wells Fargo Bank regarding the Allen

22   matter?

23        A    Yes.

24        Q    Who else?

25        A    Daniel Cohen, C-O-H-E-N.

```
 1        Q     Do you happen to know what city Mr. Cohen was in

 2   when you were reporting to him?

 3        A     No, I do not.

 4        Q     Do you know what state he was in?

 5        A     No, I do not.

 6        Q     Do you have an e-mail address for Mr. Cohen?

 7        A     I am sure I do at my office, but I don't have one

 8   with me.

 9        Q     So you don't recall?

10        A     No, I don't recall his e-mail address.

11        Q     What about for Mr. Oglesby?  Do you have an e-mail

12   address for him?

13        A     I am sure I do.

14        Q     When is the last time you communicated with

15   Mr. Oglesby regarding the Allen matter?

16        A     It would have been sometime in 2011 or 2012.

17        Q     What about Mr. Cohen?  When is the last time you

18   communicated with him regarding the Allen matter?

19        A     I believe that would be sometime in 2012.

20        Q     Was there anybody else at Wells Fargo Bank with whom

21   you communicated regarding the Allen matter?

22        A     Yes.

23        Q     Who?

24        A     I did not want to leave off any names; so I wrote

25   them down last night.
```

1    Q    What is it -- before you answer the question, what

2    is it that you are referencing?

3    A    I am looking at notes that I have taken to insure

4    that I don't mix up any dates and that I remember the names of

5    Wells Fargo Bank and BAC employees.

6    Q    Did you, in order to create the notes, did you

7    review documents to do that?

8    A    Yes, I did.

9    Q    Was it in preparation for your deposition?

10   A    It has been ongoing since the beginning of the case.

11   Q    Since the beginning of The Grace Foundation case?

12   A    That's correct.

13   Q    Did you review your notations last evening to

14   prepare for the deposition?

15   A    I absolutely did and I reviewed contents of this

16   file.

17   Q    Well, let's do this, let's mark as Exhibit 1 to the

18   deposition transcript your notes.

19   A    Certainly.

20       (EXHIBIT No. 1 WAS IDENTIFIED FOR THE RECORD AND

21     MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

22     INCLUDED HEREWITH.)

23   Q    BY MS. SAGHEB:  Let's return to the question at

24   hand, which was:  Who else were you communicating with at

25   Wells Fargo Bank regarding the Allen matter?

1        A      Danny Leon.  It might be produced Leon.

2        Q      Same questions:  Did you know what city or state

3   Mr. Leon was located in when you were communicating with him?

4        A      I am sure that I did.

5        Q      Do you know now?

6        A      No.

7        Q      Do you happen to recall Mr. Leon's e-mail address?

8        A      No, I do not.

9        Q      The document that we have marked as Exhibit 1 to the

10   deposition transcript, does that happen to contain addresses,

11   telephone numbers of the folks that we have already

12   discussed -- Mr. Oglesby, Mr. Cohen or Mr. Leon?

13       A      No, it does not.

14       Q      What about telephone numbers, did you have telephone

15   numbers for these folks?

16       A      I would be speculating, but I believe that in the

17   signature block of their e-mail their telephone number was

18   listed.

19       Q      And so in an e-mail, especially a business e-mail,

20   typically not only is there a name of the person you are

21   communicating with and the name of the firm that they

22   represent, but also an address, telephone number, sometimes a

23   fax number.

24              Would all of that information be contained in the

25   e-mail communications you have had with Mr. Oglesby, Mr. Cohen

1    and Mr. Leon?

2        A    I can't say all of it would be.  Sometimes people

3    forget to click the button and make their signature line

4    appear.  Sometimes it is not set as a default.  But I believe

5    in a great many of the communications all of the their contact

6    communication would be contained in the e-mail.

7        Q    Do you know whether that information has been

8    provided to date?

9        A    Quite certain it has not.

10       Q    But if we were to ask for that information, would

11   that be information that is still accessible to you?

12       A    It is within my electronic systems, yes.

13       Q    Do you know what time period you were communicating

14   with Mr. Leon in?

15       A    I don't recall.

16       Q    Who else at Wells Fargo Bank were you communicating

17   with regarding the Allen matter?

18       A    Linda Stinson, S-T-I-N-S-O-N.

19       Q    Do you know what city or state Ms. Stinson is

20   located in?

21       A    No, I do not.

22       Q    Do you continue to -- did you ever have an e-mail

23   address for Ms. Stinson?

24       A    Yes.

25       Q    Do you continue to have that information?

1          A      I do.

2          Q      Have you communicated with any of these people --

3     Mr. Oglesby, Mr. Cohen, Mr. Leon or Ms. Stinson -- since

4     January, 2013?

5          A      I don't believe I have.

6          Q      Does Wells Fargo Bank, in any capacity either as a

7     trustee or in its own stead, remain a client of The Ryan Firm?

8          A      Yes, they do.

9          Q      And do they continue to account for approximately

10    two percent of the income of The Ryan Firm?

11         A      No, they do not.

12         Q      And is that number now greater, or has it decreased?

13         A      It would be something under two percent.

14         Q      Your current contacts with Wells Fargo Bank, they

15    don't include communications with Oglesby, Cohen, Leon or

16    Stinson?

17         A      No, they do not.

18         Q      As it concerns communications regarding the Allen

19    litigation, who else at Wells Fargo Bank were you

20    communicating with?

21         A      Linda Stinson.

22         MR. JAMPOL:  I think you mentioned her.

23         THE WITNESS:  Oh, I'm sorry.  Elise Wilkerson.

24              I forgot to make my check mark.

25         Q      BY MS. SAGHEB:  Wilkerson, W-I-L-K-E-R-S-O-N?

1       A       That is correct.

2       Q       Anybody else?

3       A       Julie Campbell, C-A-M-P-B-E-L-L.

4       Q       Anybody else?

5       A       Brian Bartlett, B-A-R-T-L-E-T-T.

6       Q       Okay.

7       A       Tim Collins, C-O-L-L-I-N-S.

8       Q       Anybody else?

9       A       Tim Carlin, C-A-R-L-I-N.

10      Q       Does that exhaust the list?

11      A       No.

12      Q       Who else?

13      A       Alan Elias, E-L-I-A-S.

14      Q       Who else?

15      A       That is it.

16      Q       Starting with Julie Campbell and the remainder of

17      the folks you named -- Bartlett, Collins, Carlin and Elias --

18      are these people that you continue to deal with in your

19      transactions with Wells Fargo Bank?

20      A       No.

21      Q       With reference to The Grace Foundation litigation,

22      considered separately from the Allen versus Summit litigation,

23      who were the people at Wells Fargo Bank with whom you were

24      communicating?

25          A       Mark Lonergan.

Case 11-40155    Filed 03/03/14    Doc 280

Page 51

```
 1      Q     I'm sorry, spell the last name.

 2      A     L-O-N-E-R-G-A-N.

 3      Q     Mark Lonergan, the attorney in this matter?

 4      A     That is correct.

 5            Megan Gruber.

 6      Q     Okay.  And the gentle lady who is on the phone whose

 7   last name I don't want to mispronounce.

 8      Q     Ms. Kouvabina.

 9      A     Yes.

10            Aside from attorneys, is there anybody directly at

11   Wells Fargo Bank with whom you were communicating regarding

12   The Grace Foundation matter?

13      A     Regarding The Grace Foundation litigation?

14      Q     Yes.

15      A     No.

16      Q     Did you ever represent The Grace Foundation --  I'm

17   sorry.  Strike that.

18            Did you ever represent Wells Fargo Bank in the

19   litigation brought by The Grace Foundation?

20      A     In this lawsuit?

21      Q     Yes.

22      A     No.

23      Q     Did you ever represent Bank of America in this

24   lawsuit?

25      A     No.
```

CENTURY COURT REPORTERS      1-800-555-0014

Case 11-40155    Filed 03/03/14    Doc 280

1        Q      At Bank of America, who were the people with whom

2    you were having communications regarding the Allen matter?

3        A      That would be Jenna Shumate.

4        Q      Chena, C-H-E-N-A?

5        A      Jenna, J-E-N-N-A.

6        Q      Jenna.  Shoemate, S-H-O-E-M-A-T-E?

7        A      S-H-U-M-A-T-E.

8        Q      Okay.  Anybody else?

9        A      Tiffany Jacobs, T-I-F-F-A-N-Y, J-A-C-O-B-S.

10       Q      Okay.

11       A      Mayrion Washington, M-A-Y-R-I-O-N.  Washington,

12   spelled like it sounds.

13       Q      Anybody else?

14       A      Cori Latala, L-A-T-A-L-A.

15       Q      Anybody else?

16       A      Jessica Reyes, R-E-Y-E-S.

17       Q      Anybody else?

18       A      Emanda Carlos-Valentino.

19       Q      Emanda --

20       A      Carlos-Valentino.  It's E-M-A-N-D-A.

21       Q      Anybody else?

22       A      Jumana Bowens, B-O-W-E-N-S.

23       Q      Anybody else?

24       A      There is another attorney that I was dealing with, a

25   male attorney, I just have not been able to locate his name.

1      Q      But you were dealing with him that in the context of

2   the Allen versus Summit litigation?

3      A      That is correct.

4      Q      Was he an attorney who was an attorney of record in

5   that litigation?

6      A      He was in-house counsel at BAC.

7      Q      Does Bank of America continue to be a client of The

8   Ryan Firm?

9      A      Yes, they do.

10     Q      You indicated that after -- well, you indicated that

11  there was approximately five percent of income to yourself and

12  the firm that came from doing business with Bank of America,

13  and then they took over an entity that accounted for

14  approximately 10 to 25 percent of the income at that firm.

15             Would it be accurate to state that currently if you

16  combined those estimations, Bank of America accounts were

17  between 15 and 30 percent of The Ryan Firm's income?

18     A      I don't understand the question.

19     Q      What percentage of the income currently does Bank of

20  America account for in The Ryan Firm?

21     A      I have not looked at the numbers as it pertains to

22  Bank of America.  I would say somewhere between probably four

23  and ten percent.

24     Q      And you understand that when I use the term Bank of

25  America generically, I mean Bank of America and all of its

1  divisions and all of its family; right?

2      A     No, I don't understand that.

3      Q     Well, with that understanding, what percentage of

4  The Ryan Firm's income is related to Bank of America business?

5      A     As you have just defined it?

6      Q     Correct.

7      A     It would be the same.

8      Q     Do you have addresses or telephone numbers for any

9  of the Bank of America personnel that you named?

10     A     I am sure I do, yes.

11     Q     Do you keep those electronically, paper or some

12  other form?

13     A     Both.

14     Q     So unlike the Wells Fargo personnel, for Bank of

15  America personnel, you seem to have addresses and telephone

16  numbers?

17     A     Well, I testified that I have addresses and

18  telephone numbers of the Wells Fargo people as well.

19     Q     Of the people that you named, in relation to your

20  reporting to Wells Fargo Bank, which, if any of them, were

21  involved in the decisions relating to the Whispering Pines

22  horses?

23     MR. JAMPOL:  Well, I will object on the ground that calls

24  for information on which he has no personal knowledge.  So

25  there is no foundation for it and he is not competent to

1   answer it.

2          And to the extent that you know as a product of

3   information that was conveyed to you by the bank, it is

4   attorney-client privilege, and I will instruct you not to

5   answer.

6      MS. KOUVABINA:  And Wells Fargo asserts attorney-client

7   privilege as well.

8      THE WITNESS:  I will follow my attorney's instruction.

9      Q    BY MS. SAGHEB:  And the same question as to Bank of

10  America:  Which of those folks were involved in relation to

11  making decisions as to the Whispering Pines horses?

12     MR. JAMPOL:  And the same objections, based on lack of

13  foundation, lack of confidence, violation of attorney-client

14  privilege.

15          Instruct him not to answer.

16     THE WITNESS:  And I will accept my attorney's

17  instruction.

18     Q    BY MS. SAGHEB:  When you initially obtained an order

19  for the appointment of a Receiver relating to the Whispering

20  Pines property, was it your understanding that that was a

21  horse business that brought in revenue?

22     A    Yes.

23     Q    Had you been out to that ranch prior to seeking an

24  order on appointing a Receiver?

25     A    No.

1      Q     When is the first time that you personally were at

2  the Whispering Pines ranch?

3      A     It was in mid July of 2011.

4      Q     And what was the purpose of your initial visit to

5  the Whispering Pines ranch?

6      A     It was a property inspection.

7      Q     Who attended the property inspection other than

8  yourself?

9      A     I believe it was Peter Talia.  Jerry Pickering.

10 Counsel for Judy St. John, whose name escapes me.  Dwight

11 Bennett.  And I believe the Receiver, Vicki Lozano.

12     Q     And was this before or after the order appointing

13 Receiver on July 21, 2011?

14     A     I believe it would have been that afternoon.

15     Q     What was the purpose of the property inspection?

16     A     It was an inspection provided under the Code of

17 Civil Procedure for discovery purposes.

18     Q     What were you there to discuss?

19     MR. JAMPOL:  Well, just a minute.  To the extent you are

20 asking him for his impressions and his legal theories and his

21 intentions, I will instruct him not to answer.  That is

22 attorney work product privilege.

23          But if you have -- if there is some factual thing

24 that you were ordered to discover or --

25     MS. SAGHEB:  Let's back up a minute.

1      Q     You filed Memorandum of Points and Authorities

2   requesting that on behalf of the Wells Fargo Bank and Bank of

3   America that a Receiver be appointed; correct?

4      A     Correct.

5      Q     Okay.

6            And pursuant to those points and authorities, the

7   Court entered an order appointing a Receiver; correct?

8      A     Pursuant to those points and authorities and oral

9   argument and a general stipulation by all parties on the

10  record, except for Mr. Bennett at the hearing, yes.

11     MS. SAGHEB:  Let's look at that Order.  Let's mark this

12  document as Exhibit 2 to the deposition transcript, and after

13  the Reporter has marked that, if you could take a look at it.

14          (EXHIBIT No. 2 WAS IDENTIFIED FOR THE RECORD AND

15      MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

16      INCLUDED HEREWITH.)

17     MS. SAGHEB:  The document that I have marked as Exhibit 2

18  bears a LEAD CASE NO.:  45679, and it is captioned:  ORDER

19  APPOINTING RECEIVER AND PRELIMINARY INJUNCTION in the Allen

20  versus Summit Financial Group matter.

21     MR. JAMPOL:  Let's put this away for now.

22     THE WITNESS:  Sure.

23     MR. JAMPOL:  It is here behind you if you need it.

24     THE WITNESS:  Thanks.

25     MR. JAMPOL:  Do you want him to read the Order?

1          Q     BY MS. SAGHEB:  Well, let's just identify it first.

2                Is this the Order that was entered pursuant to the

3    Memorandum of Points and Authorities you filed on behalf of

4    Wells Fargo Bank and Bank of America?

5          MR. JAMPOL:  I think he has already indicated it was more

6    than just the points and authorities.

7                But the question is:  Is that the Order to which you

8    refer?

9          THE WITNESS:  I believe it is.

10         Q     BY MS. SAGHEB:  At any point prior to May 2, 2012,

11   did you or your firm provide a copy of this order to The Grace

12   Foundation?

13         A     I don't believe so.

14         Q     Now, subsequent to the July 21st Order, there was

15   also entered a July 29th Order that related to the Whispering

16   Pines horses.

17               Do you generally recall that?

18         A     I can't recall if it was the 26th or the 29th, but I

19   will accept your representation on the 29th.

20         MS. SAGHEB:  Now, let's mark as Exhibit 3 that subsequent

21   Order, what I believe to be a copy of that subsequent order.

22               (EXHIBIT No. 3 WAS IDENTIFIED FOR THE RECORD AND

23            MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

24            INCLUDED HEREWITH.)

25         Q     BY MS. SAGHEB:  At any point prior to May 2, 2012,

1    did you or your firm share a copy of that Order with The Grace

2    Foundation?

3        A    I don't recall.  I know we discussed the contents of

4    the Order and how they were to treat the horses significantly,

5    but I cannot recall whether or not we specifically sent them a

6    copy of this Order.

7        Q    If you had specifically sent them a copy of the

8    Order, would it have contained a cover sheet or an e-mail or

9    some other reference, perhaps even a Proof of Service?

10        A    No.  No as to the Proof of Service.  And I would be

11    speculating as to the other aspects of your question.

12        Q    Okay.

13            So as you sit here today, you don't know of any

14    writing which evidences the transmittal to The Grace

15    Foundation of the July 29th Order marked as Exhibit 3?

16            Is that an accurate statement?

17        A    I think I have already answered that question.

18        Q    Why don't you answer it again.

19        A    I don't know.

20        Q    You don't know if it is accurate or not?

21        A    No, I don't know if such an order was sent to The

22    Grace Foundation by my firm.

23        Q    Other than you or your firm, do you have any reason

24    to believe that The Grace Foundation obtained a copy of the

25    July 29th Order at any time prior to May 2, 2012?

1      A      Can you repeat the question.

2      MS. SAGHEB:  Go ahead.  Why don't you read it.

3           (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

4      "Q      Other than you or your firm, do you have any

5      reason to believe that The Grace Foundation obtained a

6      copy of the July 29th Order at any time prior to May 2,

7      2012?")

8      THE WITNESS:  I would be speculating.  I don't know.  I

9  can't testify as to anyone who did or did not send them an

10  order.

11      Q      BY MS. SAGHEB:  But you have no reason to believe

12  that they had the Order prior to May 2, 2012, do you?

13      A      I would be speculating.  If you want me to

14  speculate, I will.

15      Q      Do you have any reason to believe one way or the

16  other?

17      MR. JAMPOL:  Do you know of anything that indicates that

18  they got it prior to that date?

19      THE WITNESS:  As to your question, no.  And by your

20  question, I meant my Counsel.

21      MR. JAMPOL:  That was the question she meant to ask you.

22      Q      BY MS. SAGHEB:  When is -- what occurred at the

23  July 21, 2011 meeting at Whispering Pines?

24      A      It was over two years ago; so I believe the

25  following occurred -- but like I said, it was over two years

1    ago; so it might be conflating two different dates.

2            But I believe on the 21st at Whispering Pines we did

3    a physical inspection of the property under Code of Civil

4    Procedure, and we discussed various ways to settle the matter

5    amongst the parties.

6    Q    To settle the Allen litigation?

7    A    That is correct.

8    Q    Since that had been the first time that you had been

9    to the property, on that occasion did you learn that in fact

10   the Whispering Pines stated they were not a thriving horse

11   business as you had initially thought?

12   A    Yes.

13   Q    In fact, did you find that a number of the animals

14   were starving and/or abused in some fashion?

15   A    I am not a horse expert; so I can't testify as to

16   whether animals were or were not starving or abused.  I did

17   not notice a lot of food around, I did not notice a lot of

18   water around, and I noticed the decomposing corpses of

19   approximately two dozen horses strewn about the property.

20   Q    Was there any way to identify the owners of those

21   horses on July 21, 2011?

22   A    I have no idea.

23   Q    Were you interested in finding out?

24   A    No.

25   Q    On -- as you understood them, what were the duties

1    and responsibilities of the Receiver on July 21, 2011?

2        A    As set forth in the receivership order, she was to

3    act as receivers do in any case in which they are appointed,

4    which is to manage, properly manage the rest.

5        Q    In order to properly manage the property as it

6    existed, did that require Ms. Lozano to then buy food for the

7    animals that were on the property?

8        MR. JAMPOL:  If you know.  I mean, I think there is -- I

9    will object on the grounds insufficient foundation as to his

10   personal knowledge.

11           If you have some knowledge, you can answer.

12       THE WITNESS:  I am not comfortable giving a legal

13   impression of what Ms. Lozano should and should not have done

14   vis-a-vis the horses.  I will just -- I mean, that was that

15   out of my area.

16       Q    BY MS. SAGHEB:  Who was paying Ms. Lozano on or

17   about July 21, 2011?

18       A    Well, she was appointed by the Court.  And the way a

19   receivership works is that --

20       Q    I'm sorry, let me interrupt you, because you are not

21   answer my question.

22           My question is:  On or about July 11, 2011, who was

23   paying Ms. Lozano?

24       A    On July 11th?

25       Q    I'm sorry.  Did I misstate?

1      A     If you talking about July 11th, you did.

2      Q     The date of the Order, the date of the initial

3   order, who was paying her?

4      MR. JAMPOL:  If anybody was.

5      THE WITNESS:  Who was paying -- Ms. Lozano on July 21?

6             As I sit here, I am not aware that anyone was paying

7   her.

8      Q     BY MS. SAGHEB:  Who first made contact with

9   Ms. Lozano regarding the receivership of the Whispering Pines

10  horses?

11     A     Jerry Pickering's client, the appraiser who was a

12  defendant -- strike that.

13            I don't believe anyone first made contact with

14  Ms. Lozano concerning Whispering Pines horses.

15     Q     BY MS. SAGHEB:  Who made contact with her with

16  respect to the receivership?

17     A     She was initially contacted by Jerry Pickering,

18  Jerry Pickering's client in the Allen matter, who is an

19  appraiser.  I don't recall his name.

20     Q     All right.

21            And how did you learn of that?

22     A     Through Jerry Pickering.

23     Q     Was Ms. Lozano at the site inspection on July 21,

24  2011 on behalf of Mr. Pickering and his client?

25     A     No.

```
 1        Q     In what capacity was she there?

 2        A     I believe she was there as a Receiver.

 3        Q     How did she have any information regarding the

 4   Receiver, if you know?

 5        A     I don't understand your question.

 6        Q     How did she know that she had been appointed the

 7   Receiver?

 8              I think you do understand my question.  I think you

 9   are playing a game, and I think it is really unprofessional.

10              Having said that --

11        MR. JAMPOL:  Just a minute now.  You are not going to

12   argue with this witness.  If that is what you are going to do,

13   then we are leaving.  So you just ask your questions, and you

14   ask them politely and courteously and not offensively, and you

15   don't argue with him and you don't comment upon his answers.

16   You ask your questions and he will answer them.  That's it.

17   All right.  With that in mind, let's go on.

18        Q     BY MS. SAGHEB:  All right.

19              Now, Mr. Ryan --

20        A     Yes.

21        Q     -- how did Ms. Lozano come to be at the site

22   inspection on July 21, 2011?

23        A     She was appointed as the Receiver that day and it

24   was appropriate that she go out and look at the property.

25        Q     Was she in the courtroom when she was appointed as
```

1    Receiver?

2        A    I don't want to miss testify.  I believe that she

3    was.

4        Q    So prior to coming to be in the courtroom, do you

5    know how she knew that she might become the Receiver in this

6    matter?

7        A    Absolutely.  My office sent her an e-mail in

8    approximately -- probably spring of 2011, asking if she would

9    like to be a Receiver on this project.

10       Q    Okay.

11       A    To the extent one is appointed.

12       Q    Okay.

13            And did you know about Ms. Lozano's services as a

14   Receiver through Mr. Pickering?  Is that what you were

15   indicating?

16       A    No.  I was answering your question.

17       Q    Well, how did you know about Ms. Lozano's services

18   as a Receiver?

19       MR. JAMPOL:  You mean in this action?  Or in some prior

20   capacity?  I don't understand the question.  You can -- I will

21   object on the ground it is vague, but if you understand it.

22       THE WITNESS:  I think I understand it.

23            It is going to have be answered with a narrative.

24   Is that all right?

25       Q    BY MS. SAGHEB:  Yes.

1      A      Okay.

2             Susanville is a very small town.  And it is very

3      important in a small town that you make sure that you choose

4      the right people to do things like receiverships.

5             So my office reached out to Jerry Pickering, who is

6      a very reputable attorney in -- I believe he is in Redding

7      just on the other side of the hill from Susanville.  And

8      Mr. Pickering suggested -- I asked him who he would recommend

9      because it is a similar small town, although a little bigger

10     than Susanville, and Mr. Pickering suggested that he contact

11     his client who is an appraiser who is in the area of

12     Susanville.  And he contacted his client, and his client said

13     that he thought that the property manager or the person with

14     the most experience up there to handle this type of project

15     would be Vicki Lozano.

16     Q      Okay.

17            And once you learned her name, did you make contact

18     with Ms. Lozano?

19     A      I did.  Either -- I should say my office did.

20     Q      And was the general representation to Ms. Lozano

21     that there was a horse business that might require a Receiver?

22     A      I don't believe that was the representation.  I

23     believe the representation was there is a property just north

24     of town that we will be moving for summary judgment slash

25     summary adjudication on, and the property is uninsured, and

1    the owner of the property is very unstable, and there is a lot

2    of dry brush on that property.  And that once we win our

3    motion for summary adjudication, he will likely -- I was

4    concerned that he would do something to damage the property.

5         So that was the purpose of me reaching out to

6    Ms. Lozano, to see if she would be able to undertake the task

7    of managing that property as a Receiver while we completed a

8    nonjudicial foreclosure.

9         Because once we obtained our summary judgment, we

10   would have the reforms, deed of trust and then have to begin a

11   nonjudicial foreclosure from the beginning, and that takes

12   approximately 120 days, assuming everything goes properly.

13   So I was concerned during that 120-day period of time that he

14   would destroy the collateral.

15        Q    So I take it from your description that you did

16   indeed prevail on your motion for summary judgment?

17        A    I believe it was a motion for summary adjudication,

18   but as to the causes of action necessary to have the deed of

19   trust reformed and initiate the nonjudicial foreclosure, yes,

20   we did.

21        Q    And pursuant to prevailing on that motion, you moved

22   for the appointment of a Receiver; correct?

23        A    I don't know if I would use the term pursuant to,

24   but immediately thereafter, yes.

25        Q    And in order to fill the role of Receiver, it was

1  Ms. Lozano who you contacted?

2     A    We contacted Ms. Lozano in March.  I see that date

3  in my head.

4        And the reason that we had to do so in March is

5  because our case was assigned to Judge Girdano, who only is in

6  Susanville two days a week.  And so we wanted to combine the

7  property -- two days a month -- excuse me.  Two days a month.

8        And we wanted to combine the property inspection and

9  the summary judgment motion and the application for Receiver

10  for that -- for one day.  And because of the number of days

11  required for summary judgments slash adjudication motions, the

12  closest date that we could get was the July 21st date.

13        So the initial contact was in March.

14     Q    I am not sure why, but you and I are having a

15  disconnect as to the date and the purpose.

16        All I am trying to figure out is whether or not you

17  contacted her in order to ask her whether or not she would

18  agree, if appointed, to act as Receiver on this property?

19     A    I believe I have answered that.  If I haven't, I

20  apologize.

21        We contacted her in March.  And she agreed sometime

22  shortly thereafter.

23     Q    And did you describe to her how she would be

24  compensated, whether it was in March or sometime in July?

25     A    I don't recall.

1     Q      If not yourself, then would somebody at your firm

2  have discussed that with Ms. Lozano?

3     A      I don't recall.

4     Q      As you sit here today, do you believe that

5  Ms. Lozano had an expectation of compensation for the services

6  that she would perform in association with her role as

7  Receiver at the Whispering Pines property?

8     A      Yes.  Yes, I did.

9     Q      What, to the best that you know, what would those

10 expectations have been based on?

11    A      They would have been based on e-mails back and forth

12 between I believe Tyler Kemp of my office and Vicki Lozano,

13 negotiating an hourly rate.

14    Q      And Mr. Kemp as the legal assistant in your office,

15 he was authorized to enter into those negotiations?

16    A      He -- I wouldn't call it entering into the

17 negotiations.  He sent her an e-mail -- strike -- I'm sorry.

18         She sent probably me an e-mail, with him cc'd

19 likely, with a given rate.  And you know, as all good lawyers

20 do, we respond with another e-mail with a lower rate.  And I

21 believe that that e-mail was likely sent by Tyler Kemp with me

22 being cc'd after I approved of the lower rate counter

23 proposal.

24    Q      I see.

25         So you are indicating that Mr. Kemp was more or less

1    functioning in an administrative capacity, he was not

2    negotiating the rate with the Receiver?

3         A    That's correct.

4         Q    That would have been your function?

5         A    That would have been my function.

6         Q    Okay.

7              At some point after the -- whatever the negotiation

8    process was, was an agreement reached between yourself and

9    Ms. Lozano as to the rate of the services that she would be

10   providing?

11        A    Yes.

12        Q    What was the rate?

13        A    I don't recall.

14        Q    In order to agree to the rate, did you have to get

15   approval from your clients?

16        A    Once we had a rate that seemed within the ballpark,

17   we obtained approval from our clients.

18        Q    Would those clients have been Wells Fargo and Bank

19   of America?

20        A    I don't want to violate the attorney-client

21   privilege, and in order to answer that question, I may

22   inadvertently do so.  Can I have a moment to confer with my

23   Counsel to insure that that doesn't occur?

24        MS. SAGHEB:  Yes.  In fact, why don't we take five

25   minutes.

 1      MR. JAMPOL:  May I suggest this, if it is possible for

 2  you to go on, we are getting toward a time when we have to

 3  break for lunch or something, we could discuss that over

 4  lunch.  But if you prefer to do it this way, that is fine.

 5      THE VIDEOGRAPHER:  Counsel, I need to change tapes in 20

 6  minutes.

 7      MR. JAMPOL:  Well, that would be the time to break in any

 8  event.

 9      MS. SAGHEB:  Let's keep going.

10      MR. ROSENBERG:  Hold on.  Do you want --

11      MS. SAGHEB:  Oh, yes.

12      MR. JAMPOL:  If you want the answer now, then I need to

13  talk to him now.

14      MS. SAGHEB:  Okay.

15      MR. JAMPOL:  We will excuse ourselves for a moment.

16      THE VIDEOGRAPHER:  We are now going off the record.  The

17  time on the video monitor is now 12:33.

18          (WHEREUPON COUNSEL AND THE WITNESS LEFT THE

19          DEPOSITION ROOM).

20          (RECESS HAD; 12:33-12:43 P.M.)

21      THE VIDEOGRAPHER:  We are now going back on the record.

22  The time on the video monitor is 12:43.

23      MR. JAMPOL:  If the Reporter could read back the

24  question.

25          (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

1          "Q      Would those clients have been Wells Fargo

2      and Bank of America?")

3       THE WITNESS:  Yes.

4       MS. KOUVABINA:  Was the question if he had to obtain

5    approval, and it sounds like what he was supposed to do or

6    whether he actually obtained approval?

7       Q    BY MS. SAGHEB:  Well, I am happy to have the Report

8    read it back to you.  Would you like that, Elena?

9       MS. KOUVABINA:  Yeah, please.

10          (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

11          "Q      In order to agree to the rate, did you have

12      to get approval from your clients?")

13       MS. KOUVABINA:  Okay.  So I find it somewhat ambiguous,

14    this question.  But to the extent it asks about actual

15    communications with Wells Fargo, I would object on the grounds

16    of attorney-client privilege.

17       Q    BY MS. SAGHEB:  All right.

18          Do you know the date on which Ms. Lozano was

19    actually appointed -- I'm sorry.  The date that she was -- not

20    the date she was appointed, but the date she was retained as

21    the Receiver?

22       MS. DILL:  I am going to object that assumes that he

23    actually --

24       THE REPORTER:  I need some volume, Ma'am.

25       MS. DILL:  Sorry.  I'm objecting that that assumes facts

1    that he hasn't testified to.

2        Q    BY MS. SAGHEB:  Do you know the date?

3        A    Well, I think the question misstates the role of the

4    Receiver.

5        Q    So the indication is what?  That you are not going

6    to answer it?

7        A    Well, no.  It can't be answered.  A Receiver isn't

8    retained, a Receiver is appointed.

9        Q    Right.

10       A    By the Court.

11       Q    Prior to the appointment by the Court, had the

12   Receiver's rate been agreed upon by Wells Fargo Bank, Bank of

13   America and the Receiver?

14       A    Yes.

15       Q    Do you know what date that occurred?

16       A    It would have been spring of 2011.

17       Q    So well before the July 21st Order?

18       A    Yes.

19       Q    Is there a document reflecting the rate that was

20   agreed upon between Wells Fargo Bank, Bank of America and

21   Ms. Lozano?

22       A    Yes.

23       Q    What is the document?

24       MR. JAMPOL:  What is the title of the document?

25       THE WITNESS:  An electronic mail.

1        Q    BY MS. SAGHEB:  Would the e-mail be dated spring of

2   2011?

3        A    It would have a date on it that would fall within

4   spring of 2011, yes.

5        Q    Okay.

6             Other than the e-mail, is there any other recording

7   of the agreement as to the rate between Wells Fargo, Bank of

8   America and the Receiver?

9        A    Likely, no.

10        Q    Was there a limit in the number of hours that the

11   Receiver would be compensated for at a particular rate?  Well,

12   actually, let me strike that and let me start over again.

13             Was the rate per hour, the one that was agreed upon,

14   was it per hour?  Per week?  Per month?  What was the rate?

15        A    It is was per hour.

16        Q    Was there a cap on the number of hours that the

17   parties agreed upon, Wells Fargo, Bank of America and Lozano?

18        A    Cap is the wrong word.

19        Q    Okay.

20        A    But there is a limit on the number of hours that the

21   Receiver may be compensated for.

22        Q    And is the limit reflected the e-mail communication

23   that you referenced?

24        A    No, it is not.

25        Q    Where is it -- where is the limits set forth?

1        A      It is set forth in the judge's ultimate order upon

2    the receivership's application to be paid.

3        Q      Would that be the July 21st Order?

4        A      No.

5        Q      Which order are you addressing now?

6        A      I don't know when it occurred or if it has occurred.

7        Q      I am sorry, I don't understand.

8              You don't know if an order has occurred that limits

9    the Receiver's time to be billed at a particularly hourly

10   rate?

11       A      Well, your question assumes facts that don't exist.

12   So if I answer no, it is going to look like I am being

13   evasive.  So perhaps I need to give a narrative.

14       Q      Okay.

15       A      The Court is the ultimate arbiter of the hours that

16   are responsible or reasonable for a Receiver to carry out his

17   or her duties as a Receiver as an officer of the Court.  So

18   that is the only limit that exists for the compensation of the

19   Receiver, is the reasonable -- the judgment of the Court as to

20   whether the services rendered and the time allotted were

21   reasonable.

22              And I do not know if that order has been entered.

23       Q      What is your first recollection of meeting anybody

24   or discussing with -- facts related to the Allen matter with

25   anybody at The Grace Foundation?

1      A     The first discussion would have been either

2  August 16th or August 17th.  It would have been via telephone.

3      Q     And would that have been you or somebody at your

4  office?

5      A     It would have been me.

6      Q     And who were you speaking with?

7      A     I believe I was on speaker phone with Taira Mulliken

8  and Beth DeCaprio.  I am not a thousand percent certain of

9  that, as it was two years ago, but that is my best

10 recollection.

11     Q     What is your best memory of the content of that

12 conversation?

13     A     My best memory is that I was -- I don't recall if

14 they called me or I called them.  I believe I called them.  I

15 am not a hundred percent certain.

16           And it was to ask them to please prepare a grant

17 proposal, as Wells Fargo Bank and Bank of America were each

18 going to be contributing $20,000 to The Grace Foundation.

19     Q     What was your understanding at that time as to The

20 Grace Foundation's role in taking the horses?

21     A     My understanding of The Grace Foundation's role is

22 that --

23     Q     I'm sorry.  Let's make sure that we understand each

24 other.

25           On August 16th or 17th when you were having the

1    initial discussion with Ms. Mulliken and Ms. DeCaprio, what

2    was your understanding at that time as to The Grace

3    Foundation's case in terms of being involved with the

4    Whispering Pines horses?

5        A    As to The Grace Foundation's case?

6        Q    I'm sorry, The Grace Foundation's involvement with

7    the Whispering Pines horses.

8        A    I was informed by Vicki Lozano that The Grace

9    Foundation would be accepting the horses from the County of

10   Lassen, but required a donation in order to do so.  I believe

11   that is where I understood The Grace Foundation to have a role

12   in this process.

13       Q    When you say that The Grace Foundation would accept

14   the horses, what does that mean?

15       A    It means what I said.

16       Q    That they would take them in?

17       A    That they would accept them.

18       Q    Forever and ever?

19       A    I did not say forever and ever.

20       Q    For how long?

21       A    As I sit here, I don't know for how long, and I

22   don't think anyone knew for how long.

23       Q    Now, you referenced obtaining information from Vicki

24   Lozano with respect to The Grace Foundation's role?

25       A    That's correct.

1       Q      That information, is it embodied in a document

2  somewhere?

3       A      It is an e-mail that Vicki Lozano sent me on

4  August 4th, 2011, I believe.

5       Q      On August 4, 2011, who did you think owned the

6  horses?

7       A      I didn't know.

8       MS. SAGHEB:  Let's mark as Exhibit 4 to the deposition

9  transcript one set of e-mails which appear to be dated

10  August 3, 2011.

11           And let's mark a second --

12       MR. JAMPOL:  And that is one page?

13       MS. SAGHEB:  That is one page.

14           -- E-mail of the same date at Exhibit 5.

15       THE WITNESS:  I don't want to mark them incorrectly.

16       MS. SAGHEB:  Is this the -- I'm sorry.  Exhibit 4 should

17  be two pages.  Give me one moment, please.

18       THE WITNESS:  Neither of these are complete.

19       MS. SAGHEB:  I'm sorry, I only have one copy of the

20  second page, but it is I believe associated with Exhibit 4.

21       MS. DILL:  Could you please give us the Bates number.

22       THE WITNESS:  Yes.  729 and 730.

23       MS. SAGHEB:  And let me take that back.  That is the

24  second page of Exhibit 5.

25       MR. JAMPOL:  729 is one page that I have which is marked

1    as Exhibit 4.

2        THE WITNESS:  And 730 is the second page, the

3    continuation of that e-mail.

4        MR. JAMPOL:  Exhibit 5 continues to be a single page.

5        MS. DILL:  And that is 731.

6        MR. JAMPOL:  731.

7        (EXHIBITS 4-5 WERE IDENTIFIED FOR THE RECORD

8        AND MARKED FOR IDENTIFICATION BY THE REPORTER AND ARE

9        INCLUDED HEREWITH.)

10       Q    BY MS. SAGHEB:  Would you agree that Exhibit 4 and

11   Exhibit 5 are two e-mails to and from your office and Vicki

12   Lozano?

13       A    I would agree Exhibit 4 is.  Exhibit 5, it doesn't

14   appear to be a complete e-mail.  The bottom is cut off and I

15   am not sure therefore if there is additional information that

16   would flow on to the next page.  That is Bates number 731.

17       Q    Okay.  But --

18       A    But yes, they do come -- they are representative of

19   communications between my office and Vicki Lozano.

20       Q    Okay.  Now, during the break we will get Page 732

21   and hopefully make that complete.

22            But are these the e-mails you are referencing

23   regarding your first introduction to The Grace Foundation as

24   information obtained from Ms. Lozano?

25       A    Yes.

1    Q    Okay.  Now --

2    A    And now I need to clarify my earlier testimony.

3         This I received on August 3rd, and the proposal that

4    is discussed I received on August 4th.

5    Q    You received the proposal on August 4th?

6    A    Or the e-mail from Lozano.

7    Q    Okay.

8         Between August 3rd or 4th, which I think is what you

9    have indicated is the first that you learned anything about

10   The Grace Foundation?

11   A    That is correct.

12   Q    Okay.

13        Between August 3rd or 4th until August 16th or 17th,

14   did you have any communication with anybody you believed to be

15   affiliated with The Grace Foundation?

16   A    I don't believe I did.

17   Q    And what about anybody at your firm?

18   A    I don't believe so.

19   Q    Do you know of any communications between Ms. Lozano

20   and The Grace Foundation with reference to the Whispering

21   Pines horses in that same time period?

22   A    I know there was an e-mail from Whispering -- excuse

23   me -- from Grace to Vicki Lozano on 8/4.  Vicki Lozano

24   forwarded to me when she informed me that Grace would not take

25   the horses without $40,000.

1          As to -- I was aware that Vicki was working with the

2    County of Lassen to try and find a way to remove the horses.

3    She might have mentioned The Grace Foundation.  It is a

4    possibility.  I don't recall.

5          Q    Okay.

6          Did you see the 8/4 e-mail exchange between The

7    Grace Foundation and Vicki Lozano on or about 8/4, or did you

8    see it sometime subsequent?

9          A    Did I see it -- I read the e-mail from Vicki to me

10   that was at the top of that e-mail exchange.  I believe that

11   e-mail said something to the effect of goodness gracious, we

12   are going to need $40,000, or something to that effect.

13         I would have to see it to refresh my recollection.

14   I don't want to testify improperly.

15   MS. SAGHEB:  Let's mark the next document, which is Bates

16   stamped TMR 000259, 000260, and 000261 as Exhibit 6 to the

17   deposition transcript.

18         Q    Is this the August 4 e-mail that you received on or

19   about August 4th from Ms. Lozano?

20         A    No.

21         Q    As to Exhibit 6 --

22         A    These are Bates 259 through 261, and it is

23   Exhibit 6?

24         Q    Actually, I must have handed you the incorrect

25   document.  Let me give you pages 249 through 251.

1        MR. JAMPOL:  So Exhibit 6 is now 249 through 251?

2        MS. SAGHEB:  Yes.

3        MR. JAMPOL:  Give that back to her.

4            Also, when it is convenient for you in the next ten

5    or fifteen minutes, I would like to stop for lunch.

6        MS. SAGHEB:  You know what?  We are going to stop within

7    four minutes because the Videographer is going to run out of

8    tape.

9            Give me one moment and let me see if I can find this

10   document to put this issue to rest.

11           (EXHIBIT No. 6 WAS IDENTIFIED FOR THE RECORD AND

12       MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

13       INCLUDED HEREWITH.)

14   Q    BY MS. SAGHEB:  Ignoring the highlighting on that

15   document, not representing that the highlighting is in the

16   original, is Exhibit 6 the document you are referencing that

17   you received on or about August 4 from Ms. Lozano?

18   A    No.

19   Q    Okay.

20   A    No.  I mean, this is an e-mail from Taira Mulliken

21   to me containing an e-mail within it, and this is not the  --

22   no.

23   Q    Have you ever seen that Exhibit 6 prior to today?

24   A    Yeah.  I produced Exhibit 6.

25   Q    Okay.

1          When is the first time that you saw it?

2     A     When Taira Mulliken e-mailed me on July 8, 2012 at

3     10:05 AM.

4     Q     May I?

5          So your testimony is as you sit here today, you have

6     no recollection of seeing this document, being Exhibit 6, an

7     August 4, 2011 e-mail from The Grace Foundation to Vicki

8     Lozano prior to May 2, 2012?

9     A     No, that is not what you asked me.

10    Q     Okay.

11         Prior to May 2, 2012, id you see this document?

12    A     No,  did not see Exhibit 6 prior to May -- whatever

13    date is on that e-mail from Taira Mulliken to me.

14    Q     Okay.  I'm sorry.  Maybe very have some confusion.

15         Let's focus on the date.  May 2, 2012 is a date I am

16    asking about.

17         Prior to May 2, 2012, did you see the e-mail which

18    is dated August 4, 2011 from The Grace Foundation to Vicki

19    Lozano?

20    A     Yes.

21    Q     When did you see it?

22    A     On August 4, 2012.

23    Q     Except that August 4, 2012 comes after May 2, 2012.

24    A     Excuse me.  August 4, 2011.

25    Q     Okay.

1              So you did see it on August 4, 2011?

2        A    Well, not so you did see it.  You were asking me

3    about Exhibit 6.  Exhibit 6 is an e-mail from Taira Mulliken

4    to me.  You finally asked me the question.

5        Q    Perhaps I am being unclear.  Let me try it again.

6              On or about August 4, 2011, did you see the e-mail

7    that has now been marked as Exhibit 6?

8        A    No.

9        MR. JAMPOL:  The Exhibit 6 is the July, 2012 e-mail.  It

10   may have something inside it, but that is what Exhibit 6 is,

11   and that is what confuses your questions, Counselor.  If you

12   just ask him about the e-mail that is contained within

13   Exhibit 6, then I think he can answer you directly.

14       Q    BY MS. SAGHEB:  Did you see the August 4, 2011

15   contained within Exhibit 6 on or about August 4, 2011?

16       MS. DILL:  I'm sorry, I know this is getting obnoxious,

17   but the copy of Exhibit 6 that I have does not have an

18   August 4th e-mail in it, it has an August 2nd e-mail in it.

19       MS. SAGHEB:  I understand.  We actually revamped that.

20   I'm sorry, I don't have extra copies.

21       MS. DILL:  We have changed which exhibit we are talking

22   about.

23       MS. SAGHEB:  Right.  It is 00249, 000250 and 000251.

24       MS. DILL:  Thank you.

25       MS. PRESTON:  000249 through 000251 is Exhibit 6.

1        MS. SAGHEB:  Right.

2        Q    So would you like the question read back?

3        MS. PRESTON:  Since we don't have a copy of that

4    document, could we get a description of what it is for the

5    record.

6        MS. SAGHEB:  I am not sure you can, because I don't seem

7    to be able to describe it precisely.

8        MS. PRESTON:  Well, I mean, if there is a date on it, if

9    it is e-mails, just a general description would be great.

10        MS. SAGHEB:  It is an August 4, 2011 e-mail, it appears

11    to me from The Grace Foundation.

12        MR. JAMPOL:  Well, that is not what this is.

13        THE WITNESS:  That's not accurate.

14        MR. JAMPOL:  Excuse me.  Exhibit 6 is an e-mail dated

15    July 8, 2012.

16        MS. SAGHEB:  Folks, the Videographer has to stop.

17        THE VIDEOGRAPHER:  I need to go off the record.

18        MR. JAMPOL:  This is what she is talking about.

19        THE VIDEOGRAPHER:  I need to go off the record.

20        MR. JAMPOL:  We are off the record anyway, aren't we?

21        THE VIDEOGRAPHER:  We are now going off the record.

22            This is the end of DVD No. 1 in a continuing

23    deposition of Timothy Ryan.  The time on the video monitor is

24    13:08.  We are now going off the record.

25            (LUNCH RECESS; 1:08-2:13 P.M.)

1        THE VIDEOGRAPHER:  We are now going back on the record.

2   The time on the video monitor is 14:13.

3            This is the beginning of DVD No. 2 in the continuing

4   deposition of Timothy Ryan.

5            Counsel begin, please.

6        Q    BY MS. SAGHEB:  Mr. Ryan, isn't it true that in late

7   July, 2011, your office was communicating with Dr. Russell

8   regarding a declaration to be submitted in relationship to

9   filings in the state court action dealing with the Allen

10  matter?

11       A    Yes.  Yes, we were.

12       Q    Do you have an understanding those declarations were

13  signed, or at least that declaration of Dr. Russell was signed

14  August 1, 2011?

15       A    No, I don't.

16       Q    Isn't it true that that declaration provides that

17  Dr. Russell is employed or otherwise affiliated by The Grace

18  Foundation in the second paragraph?

19       A    Well, you can show it to me.  I can read it.

20       Q    Well, I could, except I am asking you question.

21            Please answer the question?

22       A    What is your question, what does the declaration

23  say?

24       Q    I am asking you whether the second paragraph of the

25  declaration signed by Dr. Russell clearly indicates an

1    affiliation with The Grace Foundation?

2        A    I have no idea.

3        MR. JAMPOL:  Just a minute.

4            I will object on the grounds this is irrelevant and

5    violates the best evidence rule and there is no foundation for

6    it, and --

7        MS. SAGHEB:  And your objections have been preserved, as

8    we indicated.  All objections as to form are preserved.

9        MR. JAMPOL:  Okay.  I still need to make them.

10       THE WITNESS:  I answered the question.

11       Q    BY MS. SAGHEB:  Yes.  Could you answer the question?

12       A    No, I did answer the question.

13       Q    I am sorry, I didn't hear you.

14       A    You can have it read back.

15       MS. SAGHEB:  What was the answer, please.

16           (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

17           "A   I have no idea.")

18       Q    BY MS. SAGHEB:  You have no idea what paragraph two

19   of the declaration provides?  Is that what you are testifying

20   to?

21       A    Yes.

22       Q    Do you have any idea as to the affiliation listed on

23   the declaration regarding Dr. Russell.

24       MR. JAMPOL:  Well, he has no foundation.  He doesn't know

25   what it says.  And the question 'any idea' is totally

1    unintelligible and incapable of an answer.

2         Q    BY MS. SAGHEB:  Do you have an answer, sir?

3         MR. JAMPOL:  If you have an answer, you can answer it.

4         THE WITNESS:  I don't understand your question.

5         MS. SAGHEB:  Let's mark as Exhibit 7 to the deposition

6    transcript a document entitled DECLARATION OF MICHAEL RUSSELL

7    IN SUPPORT OF DEFENDANT/CROSS-COMPLAINANT WELLS FARGO BANK,

8    N.A. EX-PARTE APPLICATION FOR AN ORDER AUTHORIZING THE

9    RECEIVER TO SURRENDER EQUINES TO THE COUNTY....

10             Please look at paragraph two of that Declaration.

11             (EXHIBIT No. 7 WAS IDENTIFIED FOR THE RECORD AND

12        MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

13        INCLUDED HEREWITH.)

14        THE WITNESS:  Okay.  Firstly --

15        MS. SAGHEB:  There is no question pending.

16        THE WITNESS:  Okay.  Ask your question.

17        Q    BY MS. SAGHEB:  The second paragraph provides:  I am

18    a doctor in veterinary medicine, and I have been admitted to

19    practice veterinary medicine in California.

20             Is that correct?

21        A    That is what you are telling me this paragraph says,

22    yes.

23        Q    Are you saying that it does not say that?

24        A    I had not read it yet.

25        Q    Go ahead.

1          MR. JAMPOL:  Well, why don't you read it --

2          THE WITNESS:  Yes, that is what it says.

3          MR. JAMPOL:  Are you sure it says exactly what she said?

4          THE WITNESS:  I am sure.

5          Q     BY MS. SAGHEB:  Paragraph 3 states that he is the

6     custodian for records at Grace Veterinary Services.

7              Do you see that?

8          A     Yes, I do.

9          Q     This document was prepared by your office; correct?

10         A     Well, you are representing to me that it is a

11    Declaration that was filed by our office.  The caption is

12    unintelligible.  It is unsigned.  And so, no, I can't be

13    certain that this is a true and correct copy of something that

14    my office prepared and filed with the Court.

15         Q     Are you denying that it is a true and correct copy

16    of something that your office prepared?

17         MR. JAMPOL:  Objection.  It is argumentative.  He just

18    gave you his answer that he cannot say that.

19         THE WITNESS:  Were you representing that it says that --

20         Q     BY MS. SAGHEB:  I am not giving deposition

21    testimony.

22              Please answer the question.

23         A     I already did.

24         Q     No, you have not answered the last question.

25              Are you refusing to answer the last question?

1          A      I answered the last question.

2          MS. SAGHEB:  Well, well let the Judge decide.

3                 Let's mark as Exhibit 8 the next deposition -- or I

4     am sorry -- the next Declaration of Michael Russell.  This

5     time Russel is spelled R-U-S-S-E-L, and this one is filed in

6     the Bankruptcy Court, Eastern District of California.

7                 (EXHIBIT No. 8 WAS IDENTIFIED FOR THE RECORD AND

8          MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

9          INCLUDED HEREWITH.)

10         Q    BY MS. SAGHEB:  Do you recognize that document?

11         A      Are we going to mark this?

12         Q      We marked it.

13         A      No, we didn't.

14                That's okay.

15         Q      No. 8.

16                (Intermittent discussion).

17         THE WITNESS:  Yes.  Go head.

18         Q      BY MS. SAGHEB:  Did your office prepare that

19     document?

20         A      Let me look at it.  It appears that my office has

21     prepared this document, although the document -- I don't

22     understand why that there are words that don't line up all

23     over the document.  And I don't believe the writing at the

24     bottom of the document is something that my office would have

25     done.  But it appears to be a document that would have been

1    created by my office, notwithstanding those qualifications.

2         Q    Did your office cause this document to be filed with

3    the United States Bankruptcy Court?

4         A    Again, I believe it is likely that it did, but

5    because of the alterations in the caption, the alterations on

6    line seven and eight of Page 1 and the handwritten Exhibit 4 -

7    Page 1 of 4, no.  That -- it is likely that this document was

8    not filed with the Bankruptcy Court, because it would not

9    have -- we would not have written Exhibit 4 - Page 1 of 4

10   across the bottom in felt pen.

11        Q    So you are indicating that this document, if we were

12   to go on to the bankruptcy site, Bankruptcy Court site, we

13   would not find this document as a document filed by your

14   office in support of its motion related to the Receiver;

15   correct?

16        A    Well, I don't -- go ahead.

17        MR. JAMPOL:  Please straighten this out.  Do you mean --

18        MS. SAGHEB:  No.

19        MR. JAMPOL:  -- this form of document in the form that

20   you have it now as Exhibit 8?

21        MS. SAGHEB:  I am not going to --

22        MR. JAMPOL:  -- or in the original form?

23        MS. SAGHEB:  I am not going to play this game.

24        THE WITNESS:  It is not a game.

25        MR. JAMPOL:  Then you can't answer it.  You can't answer

1    it, because she won't clarify her question.  And you are not

2    going to answer a question that she can't articulate.

3         Q    BY MS. SAGHEB:  Okay.

4              Was a copy of this document, without the felt

5    markings at the bottom, filed by your office with the United

6    States Bankruptcy Court?

7         A    Again, I believe it is likely that such a document

8    was filed with the United States Bankruptcy Court.

9              But this document has alterations to the caption and

10   alterations to lines seven and eight of Page 1.  And given the

11   the fact that your client has altered other documents before

12   that she placed in her original Complaint, I am not prepared

13   to say that this is indeed the exact document that my office

14   filed with the United States Bankruptcy Court.

15       MS. SAGHEB:  All right.  Let's mark another document.  We

16   are going to mark this one No. 9.

17            (EXHIBIT No. 9 WAS IDENTIFIED FOR THE RECORD AND

18       MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

19       INCLUDED HEREWITH.)

20       Q    BY MS. SAGHEB:  Is this document a document your

21   office filed with the United States Bankruptcy Court?

22       MR. JAMPOL:  What is Exhibit 9 exactly?

23        MS. SAGHEB:  It is the -- may I?  Exhibit 9.

24       MR. JAMPOL:  Let her -- give her Exhibit 9 so she can

25   describe it for the record.

1      Q      BY MS. SAGHEB:  This document is -- indicates that

2  it was filed August 25, 2011 with the United States Bankruptcy

3  Court in the matter of Dwight Bennett, Debtor; CASE NO.:

4  11-40155, bearing the caption of DECLARATION OF MICHAEL

5  RUSSEL, spelled R-U-S-S-E-L.

6           Is that a document your office caused to be filed

7  with the United States Bankruptcy Court?

8      A      Let me review it and I will be able to tell you.

9           (Pause).

10          It appears that it was.

11     Q      Was this document altered after the Declarant signed

12  the document before it was filed with the Bankruptcy Court?

13     A      I don't understand your question.

14     Q      Did you or your office alter the contents of the

15  Declaration after the Declarant signed the document on

16  August 1, 2011 and before it was filed with the Bankruptcy

17  Court on August 25, 2011?

18     A      You know, Austin Beardsley was in charge of this

19  motion.  I believe he appeared in court for this motion, this

20  Declaration supports.

21          So I don't think I can answer that question.  I

22  don't have any reason to believe that it was, but I don't

23  think that I would be the appropriate person to answer that

24  question.

25     Q      Very good.

1              You just don't know?

2      A      My answer is my answer.

3      Q      Do you know or do you not know?

4      A      I have no reason to believe that it was.

5      Q      All right.  Thank you.

6      Q      Now, let's get back to your prior testimony, wherein

7  you indicated that your office's first contact with The Grace

8  Foundation was on either August 16 or August 17 of 2011.

9              Does your review of the document that is dated

10 August 1, 2011 refresh your recollection as to the first time

11 that you had any contact with -- you or your office -- had any

12 contact with The Grace Foundation?

13     A      Which document are you referring to?

14     Q      Exhibit 9.

15     A      I am not sure how this document would refresh that

16 recollection.

17     Q      So the answer is "no;" correct?

18     A      I will just state again that I don't believe my

19 office had any contact with The Grace Foundation before

20 August 16, 2011.

21     Q      Very good.

22             Now, let's look back at Exhibit 6.  That is a

23 document dated August 4, 2011.  When we left off, there was

24 back and forth about when you first saw the August 4th e-mail

25 that is contained within Exhibit 6.

1          When is the first time you saw the August 4th e-mail

2    contained within Exhibit 6?

3          A     Well, just to --

4          MR. JAMPOL:  Asked and answered.

5               But you can answer it again.

6          THE WITNESS:  Well, just to correct the question, there

7    wasn't any back and forth as to when the first time it was

8    that I saw this August 4th e-mail.  There was back and forth

9    about when I saw this document which is Exhibit 6, which is a

10   July 8, 2012 e-mail.

11              But the first time that I saw this August 4th e-mail

12   contained within Exhibit 6, which is July 8, 2012 e-mail,

13   would have been August 4th.

14         THE REPORTER:  Wait.

15              Which is July --

16         MR. JAMPOL:  You need to slow down.

17              (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

18              "Q     But the first time that I saw this

19         August 4th e-mail contained within Exhibit 6, which is

20         July --")

21         THE WITNESS:  -- which is a July 8, 2012 e-mail would have

22   been on July 8, 2012.

23         Q     BY MS. SAGHEB:  All right.

24              When you saw this e-mail on August 4, 2011 -- and

25   may I? -- I don't have another copy to reference.

1       A       Let me look at it first.

2       Q       Certainly.

3       MR. JAMPOL:  If you take a second, they could probably

4  make a couple copies.  If you are going to be a short time, it

5  won't matter.

6       MS. SAGHEB:  It is just two questions.

7       Q       Now, when you first saw the August 4, 2011 e-mail

8  and read the reference to the horses getting -- getting the

9  horses healthy and re-homed, what did you think that meant?

10      A       I don't know that I read that entire e-mail.

11      Q       All right.

12              Well, do you remember reading the section regarding

13 getting them healthy and getting them re-homed?

14      A       No.  It was two years ago.  I don't remember reading

15 that part of the e-mail.

16      Q       What about on page two the e-mail where it talks

17 about options, about how the horses are going to get fed at

18 the Grace Foundation and the custody of the horses for their

19 care?

20              Did you read that aspect of the e-mail?

21      A       I don't know that I did.  The e-mail was forwarded

22 to me -- forwarded to me by Vicki Lozano, and Vicki Lozano had

23 information that she was providing to me and attached that

24 e-mail.  So I am not certain that I read that e-mail any time

25 before the litigation commenced.

1      Q    In your assessment, the care and custody of those

2   horses and who paid for that care and custody, was that an

3   important issue to your clients?

4      MS. DILL:  I am going to object and instruct the witness

5   not to testify as to any privileged communications.

6      THE WITNESS:  I am going to accept Counsel of Bank of

7   America's instruction.

8      Q    BY MS. SAGHEB:  Except I did not ask for

9   communications.

10         I asked you whether this was an important factor to

11   your client?

12      MR. JAMPOL:  Well, I will add the objection that it

13   obviously calls for his work product, which is his theories,

14   conclusions and  opinions.

15         And so I will object and instruct him not to answer

16   on that ground, as well as on the grounds of the

17   attorney-client privilege.

18      MS. SAGHEB:  Okay.

19      MR. JAMPOL:  And I presume Wells Fargo would join in

20   that.

21         Is Elena on the phone?

22      MR. ROSENBERG:  Okay.  You have objections on there

23   already.

24      MR. JAMPOL:  Yeah, but I want --

25      MR. ROSENBERG:  You don't have to coach everyone with

1   what to do.

2       Q     BY MS. SAGHEB:  All right.

3             I don't think we got through -- or maybe we did --

4   you let me know -- the contents of the conversation you had

5   with Ms. Mulliken and Ms. DeCaprio on either the 16th or 17th

6   of August.

7             Was there anything else discussed other than what

8   you have already told us?

9       A     They thanked me and they thanked the banks for

10  obtaining the $40,000.  They said wonderful things, and that

11  they would get me a grant proposal as soon as possible.

12      Q     At that point did you make any representation to The

13  Grace Foundation as to the length of time that the Whispering

14  Pines horses would be in their custody?

15      A     It would not have been part of that conversation,

16  no.

17      Q     Did they ask you, "Gosh, how long are we going to

18  have these horses?"

19      A     I don't believe so.

20      Q     Did they ask you, you know, anything relative to,

21  you know, "What happens when the $40,000 runs out, and the

22  care and custody of the horses after that time?"

23            Did they ask anything like that?

24      A     No, they did not.

25      Q     Did you offer information in that regard?

1          A      No, I did not.

2          Q      And you nor your firm had had any relations or

3    discussions with The Grace Foundation prior to August 16,

4    2011; correct?

5          A      You know, I don't believe we did.

6          Q      All right.

7          A      You know, I have a lot of people that work for me

8    and I can't discount some conversation might have taken place,

9    but to the best of my recollection, I don't believe my firm

10   had any contact with them prior to August 16.

11         Q      Did you have discussions with Pete Heimbigner at the

12   County of Lassen with regard to the Whispering Pines horses,

13   you or your firm, and if so, when was the first contact, the

14   initial contact in that regard?

15         A      I am just going to get some water.  If I could have

16   two, that would be great.  Make sure I get my money's worth.

17   Thank you very much.

18         Q      And the initial contact, the date of the initial

19   contact?

20         A      Let me, if I may, pull out Exhibit 1 and see if that

21   refreshes my recollection.

22         Q      Okay.

23         A      It was sometime immediately prior to July 22, 2011.

24         MS. SAGHEB:  I am going to mark as Exhibit 11 an e-mail

25   from Michael Russell to Tyler Kemp.  And the e-mail is

1    tkemp@theryanfirmj.com.

2              Did your --  yes?

3              (REPORTER INQUIRY DISCUSSION).

4         MR. JAPOL:  I don't have an Exhibit 10.

5         MS. SAGHEB:  Oh, okay, Exhibit 10.  July 31, 2011.

6              (EXHIBIT No. 10 WAS IDENTIFIED FOR THE RECORD AND

7         MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

8         INCLUDED HEREWITH.)

9         Q    BY MS. SAGHEB:  Did your office receive that e-mail?

10        A    I don't know.  Let me review it.  Show it to my

11   Counsel first.

12        MR. JAMPOL:  Just put it here so I can read it.

13        THE WITNESS:  You know, when I started this case, I did

14   not need these (indicating).

15             (Pause)

16        THE WITNESS:  It looks like within the body of -- this

17   e-mail is a --

18        Q    BY MS. SAGHEB:  All I asked you is whether your

19   office received the e-mail?

20        MR. JAMPOL:  Well, when you say the e-mail, which one are

21   you talking about?

22        THE WITNESS:  You have given me an e-mail that is a

23   Sunday, November 25, 2012 e-mail sent at 8:16 that contains

24   two e-mails.  One on July 31 -- sorry -- 2011 and one on

25   July 28, 2011.

1           Which of the three e-mails are you talking about?

2      Q    BY MS. SAGHEB:  Let's start with the one I

3  referenced at the top that is dated July 31 to Tyler Kemp.

4      A    Okay.

5      Q    Did your office receive that e-mail?

6      A    I have no reason to disbelieve that it did.

7      Q    Thank you.  We are done with that exhibit.

8           So after the 16th or 17th of August, after you had

9  your initial conversation with The Grace Foundation, what was

10  your next contact, if at all, with anybody at The Grace

11  Foundation?

12      A    My next contact was Ms. DeCaprio tried to send me an

13  e-mail with the grant proposal, and I believe that was on

14  either the 17th of August or the 18th of August.

15      Q    What do you mean she tried to send you an e-mail?

16      A    Well, she sent me an e-mail, but there was no

17  attachment that I could open.

18      Q    Okay.

19           What was the body of the e-mail, what did it say?

20      A    I don't remember.  It was something to the effect of

21  here is the grant proposal.

22      Q    All right.

23           And at some point did you receive a version that you

24  could open?

25      A    Yes.  On the 18th, I received an e-mail from Taira

1    Mullekin.  I am not sure if her name was Taira Byrne,

2    B-Y-R-N-E, at that time, but I received an e-mail on the 18th

3    that did contain a grant proposal for me to forward to the

4    banks.

5        MS. SAGHEB:  We will mark it as Exhibit 11, a document

6    which at the top is dated August 18, 2011.  It appears to be

7    an e-mail To: tryan@theryanfirm.  I will go ahead and pass it

8    to you.

9            (EXHIBIT No. 11 WAS IDENTIFIED FOR THE RECORD AND

10           MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

11           INCLUDED HEREWITH.)

12       Q    BY MS. SAGHEB:  If you could look at August 11 --

13   I'm sorry.

14           If you could look at Exhibit 11, and let us know

15   whether you received this document?

16       A    This is a Word pasting of an e-mail of mine -- of

17   Beth DeCaprio to me.

18       Q    Excuse me?

19       A    I am not -- I am trying to answer your question.

20       Q    Well, you are not answering the question.

21           Did you receive the e-mail?  Yes or no?

22       A    You are presuming this is a printout of an e-mail.

23   It is not.  It is a cut and paste from an e-mail to a Word

24   doc.

25           Your client, Ms. DeCaprio, has cut and pasted

1    e-mails to Word docs in the Allen case and altered the

2    contents of those documents and attached them to declarations

3    and filed them with the Court.

4           So because this is not an e-mail, this is a copy and

5    paste from an e-mail onto a Word document, if you would allow

6    me a moment, I will have my office find this e-mail and we

7    will confirm whether it has this information or other

8    information.  But as you presented this document to me that

9    you are calling an e-mail, I can't answer that question.

10       MS. SAGHEB:  I am going to move to strike, because I did

11   not ask you the electronic -- to define the electronic format

12   in which the exhibit is presented, but rather whether or not

13   the -- you have ever received this particular e-mail.

14       Q    Is your answer that you don't know?

15       A    No.  This isn't an e-mail.

16       MR. JAMPOL:  Wait.

17          I object on the ground that you are misstating the

18   evidence.  I am instructing him not to answer this question

19   because he has told you it is not an e-mail.  So don't call it

20   an e-mail if you want him to answer.

21       MS. SAGHEB:  You know what?  I disagree that it is not an

22   e-mail.  It appears to me to be an e-mail.

23          But irrespective of the form in which it is

24   presented, the contents of the question is not different:

25          Did you receive the document as it starts to read:

1    Dear Timothy M. Ryan, and ends with the words:  The Grace

2    Foundation of Northern California?

3            Did you receive that communication?

4        MS. DILL:  I am just going to object that I cannot tell

5    looking at this letter whether it is a complete copy of the

6    communication, just for the record.

7        MR. JAMPOL:  The problem is it is not a copy of anything.

8        THE WITNESS:  It is a cut and paste of an e-mail.

9        MR. JAMPOL:  It is not an e-mail, and we don't know what

10   this was.

11       THE WITNESS:  If you will give me five minutes, I will

12   call my office and they will pull up the actual e-mail, and I

13   can answer the question.

14       Q    BY MS. SAGHEB:  Is that the only way that you feel

15   competent to answer the question?

16       A    Yes.

17            Your client has altered e-mails that she has

18   filed --

19       MR. JAMPOL:  You know what --

20       Q    BY MS. SAGHEB:  I wish you would stop saying that.

21       A    You know what?  I am answering the question you've

22   asked.  I am telling you why the only way I would feel

23   confident in saying whether or not this is a true and correct

24   e-mail is by doing that and why.

25       Q    BY MS. SAGHEB:  Here is the thing.  You have imposed

1    a time limitation that is unrealistic in this case.  And now

2    you are asking us to accommodate -- rather than coming

3    prepared to the deposition, you are asking us to accommodate

4    you in every question.  So is this -- is this the response

5    that I can expect to get to every single e-mail communication?

6    I am going to go -- I need five minutes to call my office?

7        A    Yes.  To the extent that you cut and paste an e-mail

8    and --

9        Q    No, I don't --

10       A    Your client cuts and pastes an e-mail and pastes it

11   onto a Word document, I will absolutely give that answer.  If

12   you will give me two minutes, I will call my office and I will

13   confirm.  If you don't want to give me two minutes, you don't

14   have to.

15       MR. JAMPOL:  Unless you have the original e-mail.

16       MS. SAGHEB:  I have what I have put in front of you.  If

17   I had something different, I would give it to you.

18       THE WITNESS:  Well, it was produced to you.

19       MR. JAMPOL:  Well, he can't answer it in the form that

20   you --

21       MS. SAGHEB:  Well, he's got two minutes.  He is going to

22   go check.  We are off the record.

23       THE VIDEOGRAPHER:  We are now going off the record.  The

24   time on the video monitor is 14:42.

25            (RECESS HAD; 2:42-2:52 P.M.)

1          THE VIDEOGRAPHER:  We are now going back on the record.

2     The time on the video monitor is 14:52.

3               Counsel, begin please.

4          Q     BY MS. SAGHEB:  Now, Mr. Ryan, you provided us with

5     a three-page document?

6          A     Yes, I have.

7          Q     The first two pages appear to be e-mails between

8     your firm and a Ms. Mulliken; correct?

9          A     That is correct.

10         Q     And the last two pages appears to be a

11    correspondence or communication of some kind; right?

12         A     It is indeed a correspondence or communication of

13    some kind.

14        MS. SAGHEB:  We are going to mark all of those documents

15    as coming directly from Mr. Ryan's binder as Exhibit 12 to the

16    deposition transcript.

17              You have one in front of you.

18             (EXHIBIT No. 12 WAS IDENTIFIED FOR THE RECORD AND

19          MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

20          INCLUDED HEREWITH.)

21         THE WITNESS:  Just for the record, it has already been

22    produced.

23         Q     BY MS. SAGHEB:  So you were going to make a point

24    between the discrepancies, I believe, in what we have marked

25    as No. 12 and what we marked previously as No. 11.

1       MR. JAMPOL:  Well, that is not a question.  So wait for

2   the question.

3       Q    BY MS. SAGHEB:  The question is:  Why don't we go

4   ahead and have you do that.

5       A    Would you like me to do it in a narrative fashion?

6       Q    Yes.

7       A    That document that you have -- may I have that,

8   please.  What exhibit number is this?

9       Q    11.

10      A    The document you have presented as Exhibit 11 --

11      MR. JAMPOL:  Why don't you put the tag on that.

12      THE WITNESS:  -- is a cut and paste of the document we

13  have labeled as Exhibit 12.

14      Q    BY MS. SAGHEB:  And how do you know that?

15           Excuse me, but how do you know that?

16      A    Because I know that.  You can read Exhibit 11 and

17  you can read Exhibit 12.  You can read the date, and you can

18  see that Ms. DeCaprio or someone on her behalf has taken a

19  three-page grant proposal and altered the three-page grant

20  proposal to be 10 or 11 lines, very importantly changing the

21  word possession to the word ownership.

22      Q    Let me stop you again.

23      A    Yes.

24      Q    Why is the word choice "possession" versus

25  "ownership" important in your mind?

1       A     I guess I would ask -- I would wonder why it is

2    important in your client's mind.  She is the one who changed

3    it.

4       MS. SAGHEB:  Move to strike the response.  Because it is

5    not responsive to the question I asked.

6       MR. JAMPOL:  Well, it assumes facts not in evidence.  It

7    assumes that it is important in his mind.  And in his mind as

8    the attorney, I am sorry, that is attorney work product, and I

9    will instruct him not to answer the question as phrased.

10      Q     BY MS. SAGHEB:  Well, you have said on the record

11   here today at least three times, maybe more, that my client,

12   The Grace Foundation, has manipulated, modified documents.

13      A     Yes.

14      Q     In a way that you find to be important.  The only

15   words that you have now identified as being different in

16   Exhibits 11 and 12 are the words "ownership" versus

17   "possession."

18      A     Are you discounting the other 700 words that she has

19   eliminated from Exhibit 12?

20      Q     Well, okay.  Yes, I am for the purpose of this

21   question; okay?

22            Now, for the purpose of this question -- just bear

23   with me.

24      A     I will.

25      Q     Why is it important that those two words were

1    changed?

2        MR. JAMPOL:  Again, that calls for his work product.

3        MS. SAGHEB:  It also assumes that they were changed, but

4    I am just trying to get an answer from the Deponent as to why

5    he thinks this is so important.

6        MR. JAMPOL:  You can try anything you want to, but if you

7    are asking a question that is protected by his work product

8    privilege, and I object on that ground, and instruct him not

9    to answer the question.

10       MS. SAGHEB:  Very good.  Thank you.

11       Q    Let's turn now to the content of the August 17th

12   communication, the one that came to your office, came out of

13   your files, and you have indicated you produced in this

14   litigation; okay?

15       A    Yes, Exhibit 12.

16       Q    Exhibit 12?

17       A    Yes.

18       Q    Now, did contents -- let's start --

19            Did you read the August 17th communication on or

20   about August 17th or 18th?

21       A    I am sure that I did.

22       Q    When you read the entirety of that document, did you

23   understand -- well, you know what?

24            Did you understand from the second page of the

25   document that The Grace Foundation intended to adopt out these

1    horses, meaning the Whispering Pines horses?

2        MR. JAMPOL:  Wait just a minute.

3            When you say did you understand, do you mean did he

4    believe?  Because that is his work product, and I will object

5    and instruct him not to answer anything that deals with his

6    opinions, conclusions, theories or anything having to do with

7    his interpretation of any of this stuff.  He is a lawyer, and

8    you can ask him the facts.

9        MS. SAGHEB:  I am pretty sure that those privileges, the

10   one you are talking about, anyway, does not come into play

11   when you are sued for malpractice.

12           But I -- that wasn't the question that I asked him.

13   I asked him for his understanding of the document.

14       MR. JAMPOL:  Yes.  And I objected on the ground it calls

15   for his work product and it is also lacking foundation.  He

16   has no personal knowledge of what this document means, and

17   anything he says would be speculative.  It would just be his

18   idea.  And his ideas are protected by the work product

19   privilege.  So I instruct him not to answer on that ground.

20       MS. SAGHEB:  Well, his ideas of what was happening and

21   what deal he was negotiating are at the heart of this case.

22   So let me propose that you reconsider.

23       MR. JAMPOL:  Next question, please.

24           I should also add an objection, just to make it

25   complete, under Brandt, B-R-A-N-D-T, versus California

1    Dairies, his unilateral understanding would not be relevant or

2    admissible in any event.

3        MS. SAGHEB:  I would disagree with that proposition in

4    the context of this case, but let's move forward.

5            Let's mark as Exhibit 13 a document entitled Lassen

6    County ANIMAL CONTROL, DEPARTMENT of PUBLIC WORKS.  The

7    document appears to be signed 8/26/11, and it starts with the

8    words:  Final Disposition of Animals at Whispering Pines.

9            (EXHIBIT No. 13 WAS IDENTIFIED FOR THE RECORD AND

10           MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

11           INCLUDED HEREWITH.)

12       Q    BY MS. SAGHEB:  Would you look at that, please.

13       A    Certainly.  Both pages or just one?

14       Q    Both pages if you like.

15       A    Okay.

16       Q    Have you seen the document before?

17       A    I have.

18       Q    When is the first time you saw the document?

19       A    The first time I saw this document was -- I don't

20    want to -- I am trying to be exact, and I don't think I can

21    really give you a date, but it would have been in the fall of

22    2011 sometime after the horses were surrendered to -- by the

23    County of Lassen to The Grace Foundation.  Probably late

24    September or early October, if I had to try and place a time.

25       Q    So you were -- were you present at the time that it

1    was signed on 8/26/11?

2        A    No, I was not.

3        Q    On 8/26/11, was there a meeting of any kind which

4    you attended regarding the Whispering Pines horses?

5        A    No, here was not.

6        Q    Was there ever a time when you met with Ms. DeCaprio

7    at the Whispering Pines ranch?

8        A    Yes.

9        Q    Do you recall the date of that meeting?

10       A    That would have been on August 19, 2011.

11       Q    Who else was present at the meeting?

12       A    At the Whispering Pines ranch?

13       Q    Yes.

14       A    Vicki Lozano was there.  I believe Vicki Lozano's

15   daughter was there.  I believe Judy St. John was there.  An

16   agent of Dwight Bennett's who was in court that day was there.

17   Pete Heimbigner was there.  And Ms. DeCaprio had with her

18   someone from The Grace Foundation who I think was some sort of

19   therapist or some such thing.

20           Those were -- there were -- there was some squatters

21   that were living on the property that were there.  And there

22   was a 16-year-old foster child that Dwight Bennett -- excuse

23   me -- had living with him and who had been placed there by a

24   local foster care agency on that ranch.

25       Q    Let's go back in -- what time was this during the

1    day, approximately when the meeting began?

2        A    Well, I don't know that I would call it a meeting.

3    I would call it a bunch of people were out at Whispering Pines

4    ranch.  I would say that it began sometime in the early

5    afternoon, because more than likely I had a six o'clock flight

6    out of Reno, and it is about an hour and a half to get to

7    Reno.

8        Q    Earlier that morning had you flown into the area?

9        A    Most of the time I would fly in in the morning,

10   because there was a flight out of LAX that if Judge Girdano is

11   feeling charitable, he will allow you to take so you don't

12   have to come in the night before.  So it is more than likely

13   that I flew out that morning, but I just can't be certain as

14   he we sit here.

15       Q    When you flew in, it was -- well, initially the

16   meeting, the court meeting, the court call; right?

17       A    Well, it wasn't a court call, it was a hearing.  And

18   it was an OSC re contempt of court.

19       Q    And that was against Dwight Bennett?

20       A    That's correct.

21       Q    And during that hearing Mr. Bennett indicated to you

22   and the Court and everybody else that was listening in the

23   courtroom that he had filed for bankruptcy; correct?

24       A    Yes.  That was his --

25       Q    Oops.

1    A    That was his defense to the contempt citation that

2    the Court had issued against him that was being heard that

3    day.

4    Q    Whether or not it was -- his defense, whether it was

5    a good one or a bad one, the disclosure is made that he had

6    filed for bankruptcy; correct?

7    A    Yes.  That disclosure is made to everybody in the

8    courtroom, including Dwight Bennett's agent, who was out on

9    the ranch later that afternoon.  He was in court that morning

10   as well.

11   Q    Okay.

12        You indicated an agent.

13        Do you know his name?

14   A    I don't recall his name.  I don't know that I ever

15   knew his name.

16   Q    Vicki Lozano, was she in court with you that

17   morning?

18   A    Yes, she was.  She was on the witness stand for

19   quite some time.

20   Q    So yourself, Ms. Lozano, Mr. Bennett, Mr. Bennett's

21   agent.

22        Who else was in the courtroom at the time that

23   Mr. Bennett disclosed that he had filed for bankruptcy?

24   A    Mr. Bennett's mother.

25   Q    Okay.

1       A     Mr. Bennett's daughter.  I'm not sure if

2   Mr. Bennett's son-in-law was there.  I don't know the names of

3   all of the people that were there.  I know Judy St. John was

4   there.  I know Judy St. John's attorney was there.

5             It was a rather a full courtroom, and I would be

6   remiss if I pretended to know everyone that was there.

7       Q     And you were there on behalf of Wells Fargo Bank and

8   Bank of America; correct?

9       A     That is correct.

10      Q     You were acting as an agent for those two entities;

11  correct?

12      MR. JAMPOL:  Well, an agent, that is sort of a legal

13  conclusion.  He was their lawyer.  You can consider anything

14  you want to.

15      MS. SAGHEB:  I think the case law says he was an agent.

16      Q     You were there as the lawyer representing the

17  interests of Wells Fargo Bank and Bank of America; correct?

18      A     I was.

19      Q     And then after the hearing, you went where that day?

20      A     I think we were going to reconnoiter at the ranch.

21      Q     I'm sorry, the word "we" connotes you were with

22  somebody.

23            Who were you talking about?

24      A     A bunch of people.  I am not sure.  More than likely

25  it would have been Pete Heimbigner, the Receiver, Judy

1    St. John, Judy St. John's counsel.  And I think that is it.

2        Q    And the conversation or idea was that the people in

3    that group were going to meet again later that day at the

4    ranch; right?

5        A    That is correct.

6        Q    Did you know that Ms. DeCaprio was going to be at

7    the ranch as well?

8        A    I did.

9        Q    Was there anything about the ranch property, any

10   signs, anything that indicated that Mr. Bennett had filed for

11   bankruptcy earlier that day or the prior day?

12       A    Yes.

13       Q    Okay.  Tell me what that would have been.

14       A    That would have been Mr. Bennett's agent --

15       Q    I'm sorry, Mr. Bennett's agent was wearing a sign

16   that said Bennett filed bankruptcy?

17       A    If you will let me finish my answer, I will make it

18   sound nonsensical -- or less nonsensical.

19            Mr. Bennett's agent was posting on -- I don't want

20   to say every structure that exists, because that would be over

21   stating things -- but on just about every structure on the

22   property, copies of the notice of bankruptcy stay.

23            The most prominent copy was placed on the metal gate

24   that you had to move to get into the ranch.  The ranch opens

25   onto the main highway.  You pull off the main highway, you get

1    out of your car, you move this gate, and then you have to

2    close the gate behind you because there was livestock running

3    loose around the property and could get out on the highway, as

4    had done before.

5             So there was a bankruptcy notice on that gate.

6    There was a bankruptcy notice on the main house.  There was a

7    bankruptcy notice on the barn.  And there were other

8    bankruptcy notices posted on the property.  I don't know

9    where.

10            Mr. Bennett's agent was adamantly yelling, "Get off

11   the ranch, this property is protected by the automatic stay,"

12   for Mr. Bennett's bankruptcy, and he was repeating that at a

13   rather loud decibel level.

14       Q    In your capacity as attorney for Wells Fargo Bank

15   and Bank of America, did you believe that there was any reason

16   to be concerned about the bankruptcy?

17       MS. KOUVABINA:  I would object on the grounds of work

18   product.

19       MR. JAMPOL:  Yes, I join.  It is work product, and I

20   instruct him not to answer the question.

21            It is also probably attorney-client privilege -- not

22   probably, I think it is.  So I will object on that ground as

23   well and I will instruct him not to answer on that ground as

24   well.

25       Q    BY MS. SAGHEB:  As an attorney practicing in the

1    area of real estate and banking -- and I think you mentioned

2    bankruptcy as well -- did you believe that independent of your

3    representation of Wells Fargo or Bank of America, that there

4    was an impact as to the removal of the horses --

5        MS. KOUVABINA:  Same objection.

6        MR. JAMPOL:  Yeah.  Let her finish.

7        Q    BY MS. SAGHEB:  -- that comes from Bennett's filing

8    a bankruptcy?

9        MR. JAMPOL:  I will object on the ground it calls for

10   both work product and attorney-client privilege and instruct

11   him not to answer on both of those grounds.

12       MS. DILL:  I will make the same objection.

13       THE WITNESS:  I will accept my Counsel's representation

14   to keep quiet.

15       Q    BY MS. SAGHEB:  Did you have any discussions

16   directly with Beth DeCaprio on that day?

17       A    I did.

18       Q    Tell me the sum and substance of that conversation

19   the way that you remember it.

20       A    The way I remember it is we were out at the ranch,

21   and we were -- it is not common that someone gets thrown into

22   contempt of court for violation of a receivership order.

23           And both Pete and Beth and most of the people that I

24   remember being at the ranch, we were talking about how -- for

25   lack of a better word -- crazy it was that he waived his

1    bankruptcy petition in front of the court and said, "Hey, you

2    can't -- you can't hold me in contempt of court because I

3    filed bankruptcy."  And we all got a bit of a chuckle out of

4    that.

5              And it sticks in my mind especially, because when

6    he -- I had told the Judge, you know, "Your Honor, we don't

7    need to hold him in contempt.  Let's let him go back to his

8    property, get the records, deliver them to the Receiver, and

9    then we can meet again this afternoon."  And the Judge was

10   appreciative of that suggestion, and began to go with that

11   suggestion.  And then Mr. Bennett started arguing with the

12   Judge again.  And the Judge had had enough, and so he ordered

13   him remanded to custody.

14             And Mr. Bennett -- I think if I said tried to sneak

15   out of court, that would be too strong of an explanation.  But

16   he appeared to try and get to the gallery to get out of court,

17   as he was yelling, "Call Carl, call Carl," to his agent that

18   was in court.  Carl, being his, quote, unquote, federal

19   attorney, as Mr. Bennett discussed during the course of the

20   hearing.  So it is fairly vivid in my memory because of the

21   strange circumstances of that day.

22        Q    Okay.

23             Prior to arriving on the ranch, had you met with

24   DeCaprio at Lozano's office first?

25        A    I had met with DeCaprio, Pete Heimbigner, and Vicki

1    Lozano.  We all sat -- I think Vicki was in the room.  I am

2    not certain of that, but I believe she was.  And I believe

3    Ms. DeCaprio's associate that came out with her that day, I

4    believe she was in the room as well.

5         Q    So in fact, you, when you left the court, there was

6    a stop at Lozano's office that was then followed by -- for

7    lack of a better word -- the meeting at Whispering Pines

8    ranch?

9         A    For lack of a better word, yes.

10        Q    What occurred, to the best of your recollection, at

11   Lozano's office?

12        A    I don't recall exactly what occurred.  I mean, we

13   met and we talked about going up to the ranch.  Pete had a

14   draft of a document that he thought was appropriate to deal

15   with the transfer of the horses.  And I think that Pete showed

16   me the document, or it was in the middle and I looked at the

17   document.  And --

18        Q    And I'm sorry to interrupt you, but the document you

19   are referencing, is that what we marked as Exhibit 13?

20        A    No, it is not.  I mean, it could be.  It did not

21   have an attachment.  It was not signed, but it was some sort

22   of document from Lassen County Animal Control.

23             I don't want to speculate that it was indeed what we

24   marked as Exhibit 13.

25        Q    If we eliminate the handwritten portion of

1    Exhibit 13, then would it constitute the document that you saw

2    on that date?

3        A    I wouldn't -- it would be inappropriate for me to

4    say that, because I just can't recall with 100 percent

5    accuracy.  I looked at it very quickly, and I just don't

6    remember its exact contents.

7            I know what I told Pete about that document, but it

8    was just in passing.  I don't remember exactly what the

9    document said as we sit here.

10       Q    What do you recall telling Pete about the document?

11       A    I told Pete I thought the document exceeded the

12   scope of the court order.

13       Q    And how, if at all, did Pete respond to your

14   statement?

15       A    I don't recall.  I mean, I likely would have

16   explained why I thought it exceeded the scope of the court

17   order.  But as we sit here, I just don't recall the exact

18   exchange.

19       Q    Well, what was the scope, if you recall it, of the

20   court's order with reference to the Whispering Pines horses?

21       MS. KOUVABINA:  I have to object again, on the grounds of

22   work product, if the testimony will reveal impressions, mental

23   impressions of Mr. Ryan.

24       MS. SAGHEB:  Let me rephrase the question, and I will

25   take care ot it.

1    Q    The scope of the Court's order with regard to the

2    horses, is that reflected in the -- I'm sorry, could I?

3            As to the transfer of the horses, is that reflected

4    in the July 29th Order in the Allen matter?

5    MR. JAMPOL:  Well, you are calling for a legal

6    conclusion.  But since he is a lawyer -- as long as you don't

7    ask him about his subjective knowledge or feelings or

8    understanding, it is fine.  I don't think the answer gets you

9    anywhere.

10           But you can answer that as to your legal conclusion

11   as to the scope of the Court's order.

12   THE WITNESS:  Sure.  I believe that the Court ordered

13   Vicki Lozano to surrender the animals to the County of Lassen.

14   Q    BY MS. SAGHEB:  I'm sorry.  I must have -- I must

15   have stated the question badly, because I can tell from the

16   way you are answering it we don't have the same thing in mind.

17           The document that you are looking at, is that marked

18   as Exhibit 3?

19   A    Yes, it is.

20   Q    Is that the only document that you know of that

21   encompassed the Court's order regarding the transfer of the

22   horses by Lozano?

23   A    I don't understand what you are asking me to say --

24   I'm sorry.

25   Q    I am sure it is my fault.  Let me try again.

1          Sometimes there are court orders that are amended.

2   Sometimes they are revoked, they are vacated.  Sometimes other

3   things happen to orders.  Sometimes they are augmented by a

4   subsequent order; right?

5          What I would like to know from you is, as the person

6   who applied for the order and received the order, to the best

7   of your knowledge, is Exhibit 3 the only order that you know

8   about that has to do with the transfer of the horses from

9   Ms. Lozano?

10      A    I'm trying to recall the process of getting the

11   order so I don't misstate.

12          It was on a telephonic.  I was appearing ex-parte.

13   And I was expecting an OSC re deciding the order in a week.

14   And the Judge decided then and there to issue the order.  I

15   believe that we had a proposed order that had been sent up the

16   day before that the Judge had in his chambers, but it was

17   difficult, because this case is in Susanville, and the only

18   available judge to hear this, I believe, was in Amador County.

19   And so that judge might have issued a minute order before he

20   ended up signing this order.  It took us about a day to track

21   him down and get the order.  So there could be a minute order

22   out there somewhere.  So I can't testify that there is not,

23   but this is the only order that I am aware of dealing with

24   this, and it was obtained on an ex-parte basis.

25      Q    Okay.  And the minute order that you reference, that

1    would be the minute order reflecting this order, or would it

2    be a different minute order relating to the transfer of the

3    horses?

4         A    Well, I don't believe I referenced any minute order.

5    I said that there could be a minute order out there because I

6    don't want to presume to know Judge Mason's process for

7    granting ex-parte applications.  He may issue a minute order

8    that goes in the file while he waits for the proper proposed

9    order to be sent to him to be signed.  So I just don't want to

10   inaccurately testify that there is no other order, when there

11   may be something that was issued prior to signing this.

12        Q    Well, we don't want you to speculate, we know that.

13   Let's do it another way.

14             Do you know of any order which amends the Exhibit 3?

15        A    No.

16        Q    Do you know of any order which augments Exhibit 3?

17        A    No.

18        Q    Do you know of any order which vacates Exhibit 3?

19        A    No.

20        Q    So as you sit here today, without any speculation,

21   the only order that you know about that relates to the

22   transfer of the horses is reflected in Exhibit 3?

23        A    To the extent I just don't know that the word

24   transfer has any legal meaning, but the word used in the order

25   is the word surrender.  So as long as we clarify that so I am

1    not improperly testifying, I agree with the premise of that

2    question, yes.

3        Q    Were you rendering advice to Vicki Lozano as she was

4    acting in the capacity of a court appointed Receiver?

5        A    I was providing to Vicki Lozano what I was hoping

6    would happen with the receievership.  I am sure there were --

7    there was a question or two going back and forth that I more

8    than likely answered.  That is really the best that I can

9    testify to.

10       Q    What do you mean "what I was hoping would happen

11   with the receivership"?

12       A    Well, a bank obtains a receievership, or anybody

13   obtains to receivership with certain goals in mind, one of

14   which is the preservation of the property.  And the other of

15   which is always making sure that it is done expeditiously.

16            So those are the kind of expectations I have with

17   every Receiver I work with.

18       Q    Sure.

19            So done expeditiously means quickly and at as little

20   cost as possible to the people paying the Receiver?

21       A    Expeditiously as I understand it means quickly.

22       Q    What about costs?  Did you address that issue?

23            Were you concerned about the costs regarding the

24   upkeep of the horses?

25            MR. JAMPOL:  Well --

1          MS. DILL:  I am going to object.

2          MS. KOUVABINA:  Objection.  Attorney-client privilege.

3     Work product.

4          MR. JAMPOL:  Yeah, I object on the same grounds and

5     instruct you not to answer.

6               But I mean, I think you can get it other ways.

7          MS. SAGHEB:  I do, too.  It is okay.  You can make your

8     objections.  I am not going to fight with you on your

9     attorney-client privileges.  There is people at Bank of

10    America and Wells Fargo that will ask all these questions,

11    too.

12              If you think you can tell us, tell us.  If not, we

13    will just move on and ask something else.

14         THE WITNESS:  I am going to accept my attorney's

15    instruction.

16         MS. SAGHEB:  Okay.

17         Q    Did you ever advise Vicki Lozano to sign the final

18    disposition document we have marked as No. 13?

19         A    No.

20         Q    Did you ever advise her not to sign that document?

21         A    No.

22         Q    Let me ask you the same basic questions as to the

23    next document.  We will mark this one Exhibit 14, and identify

24    it for the record as a document on the letterhead of Lassen

25    County Animal Control, indicating that it refers to the

1    Protective Custody of Animals.  It appears to be signed

2    8/26/11.

3        (EXHIBIT No. 14 WAS IDENTIFIED FOR THE RECORD AND

4    MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

5    INCLUDED HEREWITH.)

6    Q    BY MS. SAGHEB:  Have you seen that document before

7    today?

8    A    Yes, I have.

9    Q    Did you advise Ms. Lozano to sign this document?

10    A    No, I did not.

11    Q    Did you advise Ms. Lozano not to sign this document?

12    A    No, I did not.

13    Q    Did you see this document prior to its execution on

14    8/26/11?

15    A    The first time I saw this document is when I was

16    sent an e-mail the first or second week of July, 2012, with

17    Ms. DeCaprio's Complaint.  It was attached as an exhibit.

18    Q    I see.  Okay.

19        If I could have you put that on the stack so the

20    Reporter does not lose it, so that it doesn't get lost.

21        At what point, Mr. Ryan, did you start to represent

22    The Grace Foundation?

23    MR. JAMPOL:  If you ever did.

24    THE WITNESS:  Well, I -- it is going to be a bit of a

25    narrative.  Is that all right?

1      Q      BY MS. SAGHEB:  Yes.

2      A      On September 15, 2011, I went on The Grace

3   Foundation Facebook page, and on their website.  I appreciated

4   what The Grace Foundation had done in insuring that those

5   horses survived or were doing their best to do so, and I was

6   curious and wanted to find out how I would go about donating

7   money to them.

8           And when I saw the website, I noticed that -- I

9   think it was on the Facebook page -- that they had a banner or

10   something on Facebook that talked about the recent acquisition

11   of the Whispering Pines horses -- when I say recent

12   acquisition, I say -- I say that because they took some horses

13   from that same ranch in April of 2011 from the same owner

14   Dwight Bennett.  And on that post it said that there was going

15   to be an adoption day and they were going to be adopting out

16   those horses.

17           That concerned me, of course, because Mr. Bennett

18   had filed bankruptcy, and was expressing an ownership interest

19   in the horses, and because the order of transferring the

20   horses likely did not provide them with the ability to do that

21   for each and every horse.

22           So I picked up the phone or sent an e-mail -- I

23   believe I sent an e-mail -- what I didn't want to happen was

24   to have The Grace Foundation violate the automatic stay.

25   It was surprising that that post was on there, because I had

1    spoken with Taira Mulliken on August 2nd about the relief from

2    stay or the hearing in bankruptcy to divest the estate from

3    Dwight Bennett back into the Receiver, that occurred on 8/2.

4    I talked to her on about that on 8/1, and with that on 8/1 or

5    8/2, because we were going to hand deliver a check up to The

6    Grace Foundation when we were up there for that hearing.

7              So it surprised me that they were going to be

8    adopting out these horses that were likely subject to the

9    automatic stay and bankruptcy.

10             So I reached out to The Grace Foundation and sent

11   them an e-mail asking them -- or informing them that they

12   really shouldn't adopt out those horses right now and that in

13   order to do it proper -- you know, because of the Bennett

14   bankruptcy, and in order to adopt out the horses properly in

15   the future, it would likely require additional court orders.

16   And, you know, I said at that point -- because I did not want

17   to see them get sued by Mr. Bennett or anybody else -- that if

18   they worked on finding the proper adoptive homes, I would

19   assist them in obtaining the necessary orders to properly

20   re-home the horses so they would not be subject to liability

21   for doing so.

22        MS. DILL:  Can I just ask one clarification?  I think you

23   said you were saying August.  Do you mean September, in those

24   dates?

25        THE WITNESS:  Yes.  I apologize.  It was September 15th.

1    Q    BY MS. SAGHEB:  It was September 15th when you

2  communicated the fact that they should not be adopting out the

3  horses; right?

4    A    It was September 15th when I saw the Facebook page

5  that said they would be adopting out the horses, and that

6  concerned me.  And I reached out to The Grace Foundation and

7  provided them information that I testified to in that last

8  narrative answer.

9    Q    Correct.  I understand.

10        And you believe that -- that narrative answer, by

11  the way, was in response to my question as to when you started

12  representing them.

13        So from the narrative can we understand that in your

14  mind, you started representing them September 15th?

15    A    I think representing them might be too strong of a

16  word.  I did not want them to be sued by Dwight Bennett.  I

17  did not want them to be held in contempt of court by the

18  Bankruptcy Court or the Lassen County court, and I reached out

19  to try and insure that that would not happen.

20    Q    I understand.

21        And that is the same date on which you wrote to

22  Dwight Bennett stating specifically, do not contact Beth

23  DeCaprio or anyone related to The Grace Foundation concerning

24  any matters; right?

25    A    Yes.  Absolutely.

1          Q     And on that date, in that same e-mail to

2     Mr. Bennett, you stated:  Please be advised that our firm

3     represents The Grace Foundation concerning all animals removed

4     from Whispering Pines.

5                Correct?

6          A     That is absolutely what that e-mail says.

7          Q     Now, as to The Grace Foundation -- let's be clear,

8     not as to Wells Fargo Bank or Bank of America -- but as to The

9     Grace Foundation --

10         A     Yes.

11         Q     -- what conflict waivers did you provide prior to

12    taking on the representation of The Grace Foundation?

13         A     Well, it kind of assumes things.  No. 1, you are

14    assuming I took on representation of The Grace Foundation.  If

15    you read the follow-up e-mail to Beth after that or the

16    e-mails before that, she pleaded with me to contact

17    Mr. Bennett, because she believed he was poisoning animals at

18    The Grace Foundation that they had rescued from Whispering

19    Pines.  And his group -- people related to him, were stealing

20    dogs.

21                And so I wrote that e-mail later on that evening or

22    the next morning.  She thanked me, and I wrote an e-mail back

23    to her, which said -- I am paraphrasing, but it is pretty

24    close to a direct quote --  I've got your back, Beth, even

25    when I am your fake lawyer, period, end quote.  And I produced

1    that e-mail.

2         Q     All right.

3               What do you mean -- you told Beth that you were her

4    "fake lawyer?"

5         A     Yes.

6         Q     Okay.

7               What does that have to do with The Grace Foundation?

8         A     Beth is The Grace Foundation.

9         Q     So you were really saying that you were the fake

10   lawyer for The Grace Foundation?

11        A     I was -- yes.  That is what I was saying.  That I

12   sent Dwight Bennett an e-mail so that he would stop harming

13   and poisoning and killing the animals that The Grace

14   Foundation had rescued, yes.

15        Q     So when did you stop being the fake lawyer for The

16   Grace Foundation?

17        A     When did I stop being -- I stopped providing Grace

18   with any assistance on May 2, 2012.

19        Q     And the assistance you provided between

20   September 15, 2011 and May 2, 2012, that is legal assistance;

21   correct?

22        A     I don't want to characterize it.  I will tell you

23   what I did and you feel free to characterize it however you

24   like.

25        Q     Go ahead.

1     A     I did the things that I said a few moments ago.  I

2   gave them $1,000 of my money.  I spent a day up there trying

3   to understand how their operation ran.

4          I had a deposition in Sacramento on another matter,

5   and I went up a day early to spend a day with them so I could

6   try and understand their operation a little bit.  Because I

7   was moved by what they did and I wanted to provide assistance.

8   Now whether it would be financial, operational, I wanted to

9   help.

10         Thereafter, I passed on invoices from The Grace

11  Foundation to the County of Lassen.  And I attempted to get

12  Beth DeCaprio to make a decision on how she wanted to treat

13  the transfer of the animals, due to the ambiguity of the

14  County of Lassen document that we have labeled as Exhibit 13.

15  But she made herself unavailable and never responded to my

16  three or four oral requests and to requests via e-mail to

17  develop a game plan on how Grace wanted to treat those animals

18  to insure that they were treated properly.

19     Q     Well, one of the things you said -- and you did say

20  a lot of things in your answer -- thank you.

21         But one of the things that you said was that you

22  passed on an invoice?

23     A     I don't believe I said that.  I said I passed on

24  invoices.

25     Q     Invoices.  Thank you.

1      A      You're welcome.

2      Q      Did you understand that in representing Grace, that

3   Grace needed to make a claim against the County of Lassen?

4      A      I wasn't representing Grace.

5             Ms. DeCaprio called me.  She informed me that she

6   had a contract with the County of Lassen -- this was over

7   several conversations -- that she had a contract with County

8   of Lassen for them to repay the expenses.  She wasn't clear if

9   it was for the Whispering Pines horses from August or April or

10  how much it was for, she would just reference it upon

11  occasion.  And so we agreed to send those invoices to Lassen

12  County.

13     Q      And as a firm, you don't send invoices to public

14  entities without having first assessed that there is merit in

15  the claim; right?

16     A      No, that is -- you're -- that is not correct.  In

17  fact, when we received the invoices, Austin and I looked at

18  them and we thought they were absurd.

19     Q      Okay.

20            So you made a claim on behalf of The Grace

21  Foundation to the County of Lassen that you believed was

22  absurd?

23     A      I don't believe I made a claim.

24     MS. PRESTON:  Mischaracterizes his testimony.

25     THE WITNESS:  I passed on invoices.  And you can read the

1    letter if you like.

2         MS. SAGHEB:  Well, I am going to show you the letter.

3    You can read it if you like.

4              We are going to mark that as Exhibit 15 to the

5    deposition transcript.  If you wouldn't mind putting an

6    Exhibit tab on there.

7              (EXHIBIT No. 15 WAS IDENTIFIED FOR THE RECORD AND

8              MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

9              INCLUDED HEREWITH.)

10        Q    BY MS. SAGHEB:  Now, March 5, 2012 falls within the

11   ambit of the date you gave us during which time you were

12   providing legal services to The Grace Foundation.

13        MR. JAMPOL:  No, he didn't say that.  He said he

14   was providing assistance, is what he said.

15        MS. SAGHEB:  Legal assistance, excuse me --

16        MR. JAMPOL:  No, he didn't say legal assistance.

17        THE REPORTER:  Wait, wait, wait.  Could we go off the

18   record, please.

19        MR. JAMPOL:  No, let's not go off the record.  Let's just

20   continue with this.  I just want to make a point.

21        MS. PRESTON:  The Reporter is asking for a break.

22        MS. SAGHEB:  I think the Reporter is asking for a break.

23        MR. JAMPOL:  You want a break?  Is that what the idea is?

24        MS. SAGHEB:  I want a break.  Thank you.

25        THE VIDEOGRAPHER:  We are now going off the record.  The

1    time on the video monitor is now 15:37.

2             (RECESS HAD; 3:37-3:53 P.M.)

3        THE VIDEOGRAPHER:  We are now going back on the record.

4    The time on the video monitor is 15:53.

5             Counsel begin, please.

6        Q    BY MS. SAGHEB:  Okay.  If we did not mark it before,

7    let's mark the March 5, 2012 letter on the letterhead of The

8    Ryan Firm and its attachments as Exhibit 15 to the deposition

9    transcript.

10            Let's start with your letterhead, Mr. Ryan.

11            Can you confirm that that indeed is your letterhead

12   from March 5, 2012?

13       A    Yes, it is.

14            And I testified incorrectly earlier.  I said the

15   word demand wasn't in this document, and it clearly is.  I

16   read it in the first paragraph.  So I would just like to

17   correct that testimony.

18       Q    All right.  I would actually like to start with the

19   exhibits.

20       A    Sure.

21       Q    So let's go to the first page of the exhibits and --

22   excuse me, the second page.  It is an Invoice.  It indicates

23   Invoice No. 0000001, and it is dated 08/28/2011.

24            What aspect of this invoice did you find to be

25   ridiculous?

1          You know, actually, before you answer that --

2     A     The word was absurd.

3     Q     Well, whatever it was, let's start here.

4          When you indicated that it was ridiculous or absurd,

5     you are indicating that it did not have merit; correct?

6     A     I am indicating that I was surprised by the amount

7     on the invoices.  I don't whether it did or did not have

8     merit.  I just know that it seemed to exceed the numbers that

9     Ms. DeCaprio had talked about in the proposal on August 18,

10    2011.

11    Q     Let's then start there.

12         Let's just use the word that it exceeded in your

13    opinion what you thought it might have been.  Let's start with

14    the first one --

15    A     But that is a missrepresentation or

16    mischaracterization of my opinion.  My opinion isn't that it

17    exceeded what I thought it might have been.

18         My statement was that it exceeded what I understood

19    it would be based on Ms. DeCaprio's August 18, 2011 grant

20    proposal.

21    Q     Okay.

22         Well, did you advise The Grace Foundation to reduce

23    the amount of its demand?

24    A     No, I did not.

25    Q     Did you advise them to increase the amount of their

1    demand?

2        A    No, I did not.

3        Q    Did you assist them in the creation of either of the

4    invoices attached to this exhibit?

5        A    No, I did not.

6        Q    Did you indicate to them that given your views as to

7    whether or not particular claims were within reasonable bounds

8    might be important in considering before making the demand?

9        A    No, I did not.

10       Q    You presented this as a demand for reimbursement for

11   cost to the County of Lassen; is that correct?

12       A    That is correct.

13       Q    Did you assist the client in making an unmeritorious

14   claim to a public entity?

15       A    I don't think so.

16       Q    Why not?

17       A    I passed on these invoices.  I included it in a

18   demand.  I thought they were significantly higher than they

19   should have been.

20            You can characterize it however you like.

21       Q    Well, it is not a matter of characterization, it is

22   a matter really of fraud.

23            Did you assist The Grace Foundation in working a

24   fraud on the County of Lassen in making a demand that was

25   unmeritorious?

1      MR. JAMPOL:  Well, that is a compound question.  So I

2   will object and instruct him not to answer as phrased.  You

3   have to break it up into two separate questions.

4      MS. SAGHEB:  All right.

5      Q     Did you make a demand to the County of Lassen on

6   behalf of The Grace Foundation you found to be unmeritorious?

7      A     I made a demand upon the County of Lassen attaching

8   the invoices that The Grace Foundation had prepared, and I

9   thought the invoices that were attached significantly exceeded

10  what The Grace Foundation said back on August 18, 2011 it

11  would cost to maintain the animals rescued from Whispering

12  Pines on August 26, 2011.

13         You can characterize it however you wish.

14     Q     Did you seek the assistance of persons with

15  expertise in the field of invoicing for care of animals --

16     A     I did not know there was such a field.

17     Q     -- to determine whether or not the invoices in fact

18  exceeded reasonable sums?

19     A     Well, I have already answered that question.

20         I based my conclusion that the sums seemed

21  significantly higher than they perhaps should have been

22  because I based that analysis on The Grace Foundation's grant

23  proposal dated August 18, 2011.

24     Q     So why did you submit it?

25     A     Because I told The Grace Foundation I would.

1     Q    Well, why did you -- why didn't you tell her not to

2  submit it?

3     A    Why didn't I tell her not to submit it?

4         Because she was representing to me this is how much

5  everything cost.

6     Q    And did you tell her that based on your independent

7  assessment of what it should have cost based on her former

8  representations, that you needed some substantiation to insure

9  that you were not making a fraudulent claim?

10     A    I do not believe I did.

11     Q    And why not?

12     A    Because I had no -- I don't know.

13     Q    Let me ask you this:  When you made the demand to

14  The Grace Foundation, why didn't you put it on a claim form?

15     A    I didn't make a demand to The Grace Foundation.

16     Q    I'm sorry.

17  THE REPORTER:  I'm sorry?

18  MS. SAGHEB:  It's okay.  I am going to withdraw the

19  question.

20     Q    When you made a demand --

21  MS. PRESTON:  The witness made a statement on the record,

22  and I think it should be on the record.  It is going to be on

23  the video; so the Reporter might as well document what was

24  said.

25  MS. SAGHEB:  I don't have an objection to that.  I just

1   don't think --

2       MS. PRESTON:  Well, let's let him repeat what he said.

3       THE REPORTER:  Could you repeat your answer, please.

4       THE WITNESS:  I didn't make a claim to The Grace

5   Foundation.

6       MS. SAGHEB:  And then I withdrew the question.

7       Q    When you made the claim on behalf of The Grace

8   Foundation to the County --

9       A    Yes.

10      MS. PRESTON:  Misstates testimony.

11      MR. ROSENBERG:  Let her finish asking the question.

12      Q    BY MS. SAGHEB:  -- why didn't you put it on the

13  claim form for the County of Lassen?

14      MR. JAMPOL:  Yes, I will object that it does misstate his

15  testimony.  He never used the word claim.

16          If you can answer based upon what you actually did,

17  you can do that.

18      MS. SAGHEB:  Okay.  Let me withdraw the question and

19  re-ask it.

20      Q    When you made the demand on behalf of The Grace

21  Foundation to the County, why didn't you put it on a claim

22  form?

23      A    I don't know.

24      Q    Is it negligent to fail -- well, strike that.

25          Do you make claims on behalf of your clients in the

1    ambit of your law firm to public entities?

2         A    I do.

3         Q    Are you aware that there is a statutory time limit

4    in which to make those claims?

5         A    I am.

6         Q    So I ask you again:  Why not put the demand on the

7    claim form?

8         MS. PRESTON:  Argumentative.

9         MR. JAMPOL:  It is argumentative, and of course it

10   assumes a lot that is not in evidence.  In fact, a lot that

11   just is not true.

12             But if you have another answer or the same answer.

13        THE WITNESS:  It is the same answer.  I don't want to

14   repeat it because I don't want to misspeak.

15        MS. PRESTON:  And I will just make a belated objection it

16   actually not only mischaracterizes his testimony, it is

17   contrary to his prior testimony.

18        MS. SAGHEB:  Could I have the question and then the

19   answer so that I can move on.

20             (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

21             "Q    Are you aware that there is a statutory

22        time limit in which to make those claims?

23             "A    I am.

24             "Q    So I ask you again:  Why not put the demand

25        on the claim form?")

1      THE WITNESS:  I answered that question already.

2      Q    BY MS. SAGHEB:  Well, I don't recall the answer.

3   Would you tell us --

4      THE WITNESS:  You can -- you can read the transcript when

5   we are done.

6      Q    BY MS. SAGHEB:  All right.  Well, I was trying to be

7   kind.  I don't think you answered the question.

8      A    I did.

9      Q    Please answer it.

10      MR. JAMPOL:  Why don't you read back the question he is

11   going to be asked.

12      THE WITNESS:  Why don't we read back the question and the

13   answer.  It's already been done.

14      MR. JAMPOL:  She wants to ask you again, and it is

15   cross-examination.

16      THE WITNESS:  Sure.

17      MR. JAMPOL:  So let her ask you again.  And we will just

18   have it read back.  If I have to interpose an objection, I

19   will do so.

20          (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

21          "Q    So I ask you again:  Why not put the demand

22       on the claim form?")

23      THE WITNESS:  I don't know.

24      Q    BY MS. SAGHEB:  Was it simply oversight?

25      A    Mr. Beardsley was in charge of drafting the letter

1   and getting the claim together.  You will see in the e-mail

2   correspondence where he was following up with Ms. DeCaprio to

3   get the necessary information to make the claim.  So I think

4   you would have to ask Mr. Beardsley.  I ultimately signed the

5   letter; so it was made as it was made.  I don't know why a

6   claim form wasn't done.

7        MR. JAMPOL:  Excuse me.  I would like to take a break for

8   a second.

9            I need to talk to you outside.

10       THE WITNESS:  Sure.

11       THE VIDEOGRAPHER:  Counsel, we will stop the tape?

12       MS. SAGHEB:  Yes.

13       THE VIDEOGRAPHER:  We are now going off the record.  The

14   time on the video monitor is 16:03.

15           (RECESS HAD; 4:03-4:05 P.M.)

16       THE VIDEOGRAPHER:  We are now going back on the record.

17   The time on the video monitor is 16:05.

18           Counsel begin, please.

19       Q    BY MS. SAGHEB:  When Mr. Beardsley prepared the

20   March 5, 2012 letter to the Lassen County, he was acting as an

21   employee of The Ryan Firm; correct?

22       A    He was.

23       Q    When you signed the letter, the same letter,

24   March 5, 2012, to Lassen County, you were acting as a employee

25   of The Ryan Firm; correct?

1       A       Well, yes.  Yes, I was.

2       Q       And The Ryan Firm was acting as an attorney for

3   Grace; yes or no?

4       A       The Ryan Firm sent that letter on behalf of Grace.

5   You can draw your own legal conclusion.

6       Q       Why is it sent on your letterhead?

7       A       Because I told Ms. DeCaprio I would sent it.

8       Q       Because you believed that it would have more clout

9   or merit because it was on your letterhead; right?

10      A       Because Ms. DeCaprio asked me if I would do it and I

11  agreed.

12      Q       You agreed because it would have the force and

13  effect of making a demand to the County and threatening

14  litigation if it was not paid; right?

15      A       I don't think I threatened litigation.  Let me look

16  at the letter.

17      Q       No, I am only asking about the letterhead.

18      A       Oh, the letterhead.

19      Q       Did Beth ask you to send it on your letterhead?

20      A       I don't think she specified.  I think it was

21  presumed, assumed.

22      Q       And why didn't you ask Beth to send it herself?

23      A       I already answered that question.  I told Beth I

24  would send it.

25      Q       But if you were only a fake lawyer for The Grace

1    Foundation, why not just give them some advice and even

2    prepare it for them, but not on your letterhead?

3         A    The fact is I sent it.  The fact is Ms. DeCaprio

4    asked me to send it.  I made the decision to send it and I

5    have to live with sending it.  So it happened.

6         Q    So the March 5th letter demanding compensation on

7    behalf of The Grace Foundation was one of three letters that

8    were sent demanding reimbursement for Grace; correct?

9         A    I have no idea.

10        Q    Well, let's look at what we are going to mark as

11   Exhibits 16 and 17.  No. 16 is on The Ryan Firm's letterhead

12   dated March 16, 2013.  It appears to be correspondence

13   addressed to Close Associates Law Firm.  Let's look as 16

14   first.

15        MS. PRESTON:  I'm sorry, 2012 or 2013?

16        MS. SAGHEB:  I don't remember.  I said I think it said

17   2013, but that can't be right.

18        MR. JAMPOL:  It does, but you are right.

19        MS. SAGHEB:  That can't be right.

20        THE WITNESS:  It was --

21        MS. SAGHEB:  Let's do this.

22        THE WITNESS:  I'm sure what occurred is that is an auto

23   fill field, and this isn't a copy of the letter that was sent,

24   this is a copy that was attached to an e-mail.  So it is a

25   Word document with an auto fill field.  That is why it printed

1    out that way.

2         MS. SAGHEB:  Okay.  Let's withdraw 16 and have a new 16.

3              The new Exhibit 16 is a correspondence on The Ryan

4    Firm letterhead.  It is dated March 5, 2012, and it is

5    addressed to Close Associates Law Offices.

6         THE WITNESS:  Sounds about right.

7         Q    BY MS. SAGHEB:  Is that a letter that was prepared

8    at your office?

9         A    Well, it is not signed.  So I am going to have to

10   look at it for a moment to make sure it has not been altered

11   in any way.

12        Q    By the way, may I ask you a question regarding the

13   document production before you answer that?

14        A    Sure.

15        Q    We did receive those in the electronic format, and

16   when we look at them on the screen, they are signed.  When we

17   have to print them, they come out unsigned.

18        A    You have to talk to my Counsel about that.  I

19   presented everything to my Counsel, how it was produced.

20             We can work it out.

21        Q    Okay.

22        A    Because I am certain that there are signed -- as you

23   can see, signed documents.  We will have to figure out why

24   they are not printing out signed.

25        MS. SAGHEB:  Let me once again -- once again, let me

1    withdraw Exhibit 16.  This document is TMR 000749-000750, a

2    March 5, 2012 letter to Close Associates Law Offices.

3              (EXHIBIT No. 16 WAS IDENTIFIED FOR THE RECORD AND

4         MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

5         INCLUDED HEREWITH.)

6         Q    BY MS. SAGHEB:  Was that document prepared by your

7    law offices?

8         A    Let me review it.

9              (Pause)

10             Yes.  Yes, these letters were sent from my office,

11   signed by me.

12        Q    Were they prepared by you, or prepared by

13   Mr. Beardsley?

14        A    They would have been -- it says TMR:jcm, but I

15   thought Mr. Beardsley was doing this.  I could have done it.

16   I am not certain.

17        Q    All right.

18             And you were acting as counsel to Grace when you

19   sent that letter?

20        A    I was fulfilling a promise that I made to

21   Ms. DeCaprio on September 15, 2011 when I said that I would

22   work with her to try and make sure she re-homed the horses

23   correctly without subjecting herself to being sued.

24             You can characterize it however you would like to

25   characterize it.  Just leading up to my promise.

1       MS. SAGHEB:  I'm sorry, could you read that answer back,

2   please.

3           (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

4           "A      I was fulfilling a promise that I made to

5       Ms. DeCaprio on September 15, 2011 when I said that I

6       would work with her to try and make sure she re-homed the

7       horses correctly --")

8       MS. SAGHEB:  I'm sorry?  Re-homed?

9       THE WITNESS:  Re-homed.

10      MS. SAGHEB:  Re-homed.  Okay.  Thank you.  I got it.

11  Thank you.

12          Let's move on to Exhibit 17.

13          (EXHIBIT No. 17 WAS IDENTIFIED FOR THE RECORD AND

14      MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

15      INCLUDED HEREWITH.)

16      Q   BY MS. SAGHEB:  Could you confirm that that document

17  was one that was prepared in your office and signed by you and

18  sent on behalf of The Grace Foundation?

19          I'm sorry.  That one might be signed by Austin

20  Beardsley.

21      A   It is, but it has got my name underneath him.  He

22  must have been pretending to be me.

23      Q   Okay.

24      A   It appears to be something that was sent by my

25  office, yes.

1     Q     And this was, again, in the effort to re-home the

2  horses?

3     A     Well, as I stated before, this was -- I promised on

4  September 15, 2011 that I would attempt to work with

5  Ms. DeCaprio to make sure that in the process of re-homing the

6  horses or and/or adopting them out, that she didn't violate

7  any court orders.

8          And so the demand set forth in this Exhibit 17 and

9  this Exhibit 16 track the July 29, 2011 court order, and it

10  was my attempt to insure she did not violate the court order.

11     Q     On September 15, 2011 when you made the promise to

12  re-home and assist her in the adopting out of the horses, was

13  it your belief that Grace Foundation owned those horses?

14     A     No.

15     Q     Then how could it adopt out the horses?

16     A     It couldn't.

17     Q     Well, then, you were promising to assist them in

18  doing a wrongful act?

19     A     No.  You are -- let me explain.

20     Q     Please.

21     A     The horses were BLM horses.

22     Q     BLM?

23     A     Bureau of Land Management.

24     Q     Thank you.

25     A     Those are mustangs that are rescued off of a free

1    range.  They were --

2            And Ms. DeCaprio can correct my characterization

3    when we are done, because I am not an expert on it.

4            They were homes that were owned by a person who is

5    facing 64 felony counts of animal abuse, Dwight Bennett, and

6    they were owned by Ms. Wickwire and a woman named

7    Ms. St. John.

8            The court order of July 29, 2011 provides

9    Mr. Bennett is not to touch those horses again, as does the

10   criminal action against Mr. Bennett, he has been precluded

11   from having any sort of pet.  So the horses that were not

12   owned by other owners such as Ms. Wickwire or Ms. St. John

13   that were instead owned by Mr. Bennett, those would be adopted

14   out.

15           However, you couldn't just have an adoption day, as

16   I said in my September 15, 2011 e-mail.  It would require

17   additional orders of the Court.  Likely, what I said in my

18   e-mail, was one of the avenues that we would have to approach

19   is after providing services, we might have to actually engage

20   in litigation to essentially foreclose on the lien -- I didn't

21   use the words foreclose on lien -- but I described the process

22   that might have to be undertaken in order to properly adopt

23   out many of the horses. That is what I meant by the testimony.

24       Q    I'm sorry.  Maybe I don't understand.

25            I think your testimony, as given, is that

1    Mr. Bennett was the owner of the horses, except for the fact

2    that he was incarcerated and had various other problems.

3            But then you were making a demand to the County to

4    pay for the horses.  It seems a bit inconsistent.

5            Can you tell me what your thinking was?

6    A     Well, I am not sure that -- yeah, sure.

7            If you will look and see numerous e-mail, at least

8    three that come to mind.  November 11, I believe, a

9    December 30th, I believe, and a May 2nd, I believe, e-mail

10   that -- along with phone calls -- along with meeting in person

11   that informs Ms. DeCaprio, that the County order that you

12   identified as exhibit --

13   Q     Exhibit 3?

14   A     I don't want to get the wrong exhibit.

15         No, no.

16         -- 13, was ambiguous.  And I asked Ms. DeCaprio in

17   those three e-mails and on numerous occasions how she wanted

18   to treat the meaning of that order.  I informed her that there

19   were two ways that one could read the order, and they were --

20   Q     I'm sorry, are you calling exhibit --

21   A     I am calling Exhibit 13 an order.

22   Q     -- 13 an order?

23   A     My mistake.  It is a relinquishment form.

24         I informed Ms. DeCaprio that Exhibit 13, the

25   relinquishment form was ambiguous.  And there are two mutually

1    exclusive ways that you can treat the order due to the

2    ambiguity.  I asked her to make a decision on that how we

3    wanted to move forward, how she wanted to move forward with my

4    assistance.  And she never chose a path.

5            So, yes, there is some significant ambiguity related

6    to these horses.  And I tried to explain those ambiguities to

7    Ms. DeCaprio.

8        Q    Who created the ambiguities?

9        A    I don't know who drafted this form.

10       Q    So the person who --

11       A    I don't know who drafted Exhibit 13.

12       Q    So the person who drafted Exhibit 13 is the person

13   who created the ambiguity?

14       A    In my mind, Exhibit 13 is ambiguous; so yes.

15       Q    When the horses were transferred from Ms. Lozano to

16   the bank, was there any ambiguity in that transfer?

17       MS. DILL:  I am going to object.  That mischaracterizes

18   many of the documents.

19       MS. SAGHEB:  I'm sorry.  You know what?  I am getting

20   tired, and it is really warm in this room.  Let me ask my

21   question and we will address the air conditioning.

22       Q    Exhibits 13?

23       A    Yes.

24       Q    You have indicated that it created an ambiguity.  I

25   am wondering if it created an ambiguity in the step whereby

1    the Lozano transfers to the County and/or when the County

2    transfers to The Grace Foundation, or both?

3         A    Do you want my legal opinion?

4         Q    No.  I want to know what your thinking was when you

5    were discussing the ambiguity with my client.

6         A    That was a legal opinion.  So let me look at the

7    order, or the relinquishment document so I don't answer

8    incorrectly.

9              I believe the top part of the document -- everything

10   above Ms. Lozano's signature, or what Ms. Lozano was agreeing

11   to, tracks what the order was from Judge David A Mason.  I do

12   not believe that that is in any way ambiguous.

13        Q    So when Ms. Lozano gives final disposition of the

14   horses to the County, that is an unambiguous event?

15        A    Well, yes.  Because the document says:  Pursuant to

16   court order dated 7/29/11 et cetera, et cetera.  So it is

17   clear that the transfer is pursuant to that court order.

18        Q    And was it within the scope of the court order, or

19   did it exceed the scope of that order?

20        MS. KOUVABINA:  I would just have to object -- I'm

21   sorry -- on the ground of work product, if the testimony would

22   reveal impression.

23        MR. JAMPOL:  Well, to the extent that we were dealing

24   with his interface with Ms. DeCaprio, then I think he can

25   answer that question.  I don't think that involves his work

1    product with respect to --

2        MS. SAGHEB:  Well, it may, but it is as to the client who

3    is suing.

4        MS. KOUVABINA:  As long as he is testifying in his

5    capacity of Ms. DeCaprio's attorney or assistant or whatever

6    role Mr. Ryan assumed there, that's fine.

7        MR. JAMPOL:  He wasn't acting on behalf of the bank.

8        Q    BY MS. SAGHEB:  Yeah, well, I would incorporate what

9    the attorney said.

10           We are talking about your interface with Beth

11   DeCaprio, who was functioning as an agent of The Grace

12   Foundation.

13       A    Okay.  Here -- I will just list the ambiguities in

14   the document, and I think I explained them in several e-mails

15   to Ms. DeCaprio, as I expressed to Ms. DeCaprio.

16       Q    I'm very sorry.  Perhaps the question got lost with

17   all the talking.

18           The question is whether or not the exhibit that you

19   are holding, the final disposition, whether or not Ms. Lozano

20   exceeded the scope of the Court's order in transferring the

21   horses to the County of Lassen?

22       MR. JAMPOL:  Well, that now does involve his work

23   product, because you are asking him about a transaction which

24   he is representing the bank.

25           So I am instructing him not to answer on the ground

1    that it is work product and attorney-client privilege.

2        MS. SAGHEB:  It is exactly the same question.  I don't

3    want to argue with you.

4            I am talking about his interface with my client, and

5    he has repeatedly now testified that he told my client in

6    repeated e-mails and repeated phone calls that this was an

7    ambiguous situation, and that the ambiguity stemmed from this

8    document that the County created and we have marked as

9    Exhibit 13.

10       Q    So in order for me to understand what you were

11   telling Ms. DeCaprio, I am asking you:

12           Does the transfer from Lozano to the County exceed

13   the Court's order?

14       MR. JAMPOL:  I am going to object on those two grounds,

15   the attorney-client privilege and work product privilege and

16   instruct him not to answer.

17           But I am suggesting that you can get the information

18   that you want if you just ask the question in such a way that

19   it does not call for his present opinion or his opinion as of

20   August when he was representing the banks.  I am trying to

21   help you along with this.

22       MS. SAGHEB:  I appreciate that.  I just have to -- okay.

23       Q    Well, you heard what your attorney said.  He doesn't

24   want you to talk about what you thought about in your

25   representation of the banks.

1           He wants you to confine your testimony to explaining

2    why you were saying to The Grace Foundation this is an

3    ambiguous situation.

4        A    I am waiting for the objections.

5        MR. JAMPOL:  That's okay.

6           Let me ask you:  Did you explain the ambiguities to

7    Ms. DeCaprio?

8        THE WITNESS:  Yeah.  It's in three e-mails.  And I don't

9    remember the exact language I used in the e-mails.  They have

10   been produced, and you're welcome to look at them.

11       MR. JAMPOL:  So you can tell her what you told

12   Ms. DeCaprio as to what those ambiguities were.

13       THE WITNESS:  I am going to try to remember what I said.

14       MS. SAGHEB:  But that is not the question.

15       MR. JAMPOL:  But that is all you are going to get.  You

16   can keep asking, and I will let him answer as long as it

17   doesn't interfere with his representation of the banks.

18       MS. SAGHEB:  Well, I am trying to get at whether or not

19   the creation of the ambiguity had to do with the fact that

20   Lozano exceeded the scope of the Court's order in transferring

21   in the way that she transferred the horses to the County of

22   Lassen?

23       MR. JAMPOL:  I know, and you can't get that from him when

24   asked in that fashion.  Okay, listen, I've tried to help you

25   the best I can.  So I am just going to make the objections and

1  you will have to deal with it.

2       MS. SAGHEB:  Well, wait a minute.  You are saying that

3  you are trying to help me out in some ambiguous way, and I

4  appreciate your attempt to help.  But it doesn't help me, you

5  know, when you write your meet and confer letter, or when you

6  respond, you are going to say -- because I think whatever.  I

7  don't know what you are thinking; so why don't you share it

8  with me.

9       MR. JAMPOL:  I am just going to sit here and object and

10  you will have to ask the questions properly.  And if you ask

11  the right questions, you will get your answers.

12       MS. SAGHEB:  If I ask the questions you want me to ask.

13  Okay.

14       Q    So how is the situation ambiguous?  What made that

15  document ambiguous?

16       MR. JAMPOL:  All right.  That is the question he can't

17  answer.  So I will object to that on the grounds of

18  attorney-client privilege and work product, and instruct him

19  not to answer.

20       Q    BY MS. SAGHEB:  All right.

21            What did you tell Beth was ambiguous about the

22  situation?

23       MR. JAMPOL:  He can answer that.

24       THE WITNESS:  Well, I mean, the e-mails speak for

25  themselves, and I don't want to misrepresent what I e-mailed

1    because the last one was in July -- excuse me, May of 2012.

2        But I believe what I told Ms. DeCaprio was that the

3    term final disposition at the beginning appears to be

4    inconsistent with the second paragraph of the order.

5        MR. JAMPOL:  Not the order.

6        THE WITNESS:  Sorry.  Of the Lassen County Animal Control

7    relinquishment document.

8        I also said that the word relinquish is an odd word

9    to use in such a document.  So those aren't -- that is not

10   exactly how I phrased it, but those were the general ideas

11   that I provided to Ms. DeCaprio probably three to five times

12   orally and at least three times in writing.

13       Q    BY MS. SAGHEB:  And why were you -- what was the

14   kind of circumstance in which you were advising her in this

15   regard?

16       A    Well, I -- again, I promised her on September 15,

17   2011, that I would help to insure that she did not violate the

18   court order.

19       Q    That she did not violate a court order?

20       A    That she did not violate the bankruptcy stay, that

21   she wouldn't violate any court order, and that she would

22   re-home or return the horses to their proper owner in such a

23   way as to minimize the potential of being sued by Dwight

24   Bennett, who is amazingly litigious, or be held in contempt

25   of the Bankruptcy Court.  So this was -- this was what I

1    agreed that I would do for Ms. DeCaprio, and that was my

2    attempt to do it.

3        MS. SAGHEB:  Let's mark the next document as Exhibit 18.

4    It is Marked TMR 000005, 000006 and 000007.  It appears to be

5    a September 16, 2011 e-mail from Mr. Ryan to Taira Byrne.

6            (EXHIBIT No. 18 WAS IDENTIFIED FOR THE RECORD AND

7            MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

8            INCLUDED HEREWITH.)

9        Q    BY MS. SAGHEB:  In that e-mail -- well, let's start

10   here:

11           Is the e-mail authored by you, or is it authored by

12   somebody else?

13       A    Well, the e-mail is authored by me.

14       Q    Okay.

15       A    But it -- I mean, I guess if we are talking about

16   just the e-mail that is three lines down on the page, because

17   there is another e-mail that has been cut off that is above

18   that.

19           Are we talking about this Friday, September 16th

20   e-mail?

21       Q    Yes.

22       A    Let me look at it real quick.  I want to make sure

23   my testimony is precise.

24           I was using the date of September 15, that I made

25   that promise, and I should have used the date of September 16,

1    because this is the e-mail in which I made that promise.

2        Q    Okay.

3            It indicates, the front page of this e-mail starting

4    where it says "From," and your name is authored by you;

5    correct?

6        A    That -- let me just look at the document to make

7    sure that it is indeed the actual original document.

8            Yeah, that is authored by me.

9        Q    In the third paragraph of that e-mail you state that

10   "we will probably need to work together to get those horses

11   resettled."

12       A    Yes.

13       Q    And who is the "we" you are referencing there?

14       A    The Grace Foundation and me.

15       Q    And then it says, "with you guys doing the

16   adoption."

17           That is the Grace Foundation adopting out these

18   horses; right?

19       A    That is correct.

20       Q    On September 16th, did The Grace Foundation have the

21   authority to adopt out those horses?

22       A    Would you read the whole paragraph.

23       Q    I was asking a question.  Can you answer the

24   question?

25       A    Your question -- your question assumes that the rest

1    of the paragraph doesn't exist, and will presume that I acted

2    improperly.  So the paragraph reads:  ... with you guys doing

3    the adoption (finding the right home), and then us working

4    with the court to have a court order to confirm the adoption,

5    or bill the rightful owner (Bennett) for the feed and care...

6    and then (legally) "sell" the horse to pay off the feed and

7    care to the adopting family.

8         Q    So in your opinion, on September 16, 2011, the

9    rightful owner was Bennett; right?

10        A    No.

11        Q    You say "or to bill the rightful owner," and you

12   identify the rightful owner as Bennett for feed and care.

13             What is -- why are you saying no?

14        A    I am saying no because the horses that were owned by

15   other people would not need to be dealt with this way.

16        Q    Okay.

17        A    They would be dealt with according to the

18   July 29,2011 court order, which we have as an exhibit, which

19   says if the rightful owner can show that they have the

20   financial capacity to take the horse, that they provide the

21   legal documentation to show that they own the horse and they

22   show that they have the physical space for the horse, then the

23   rightful owner can obtain the horse.

24        Q    Yes, but --

25        A    So I am making a distinction.

1      Q      You are, in this e-mail you are making a

2   distinction?  Or today, as you sit here as a Defendant you are

3   making a distinction?

4      A      Well, the distinction didn't need to be made,

5   because I was just discussing Mr. Bennett's horses.

6      Q      So this paragraph only has to do with Mr. Bennett's

7   horses?

8      A      Well, let me read it.  It has been about two years

9   since I wrote it.

10          Yeah, this paragraph deals with Mr. Bennett

11  specifically.  And it accepts that there may be other owners

12  as well.  That is why there is the entire point of and then

13  legally sell the horse to pay off the feed and care to the

14  adoptive family.  Now, I only listed Bennett as the rightful

15  owner, because he owned most of the horses, but there were

16  other owners of the horses.

17     Q      Okay.  I do have an understanding that two or maybe

18  three or four of the horses were -- had identifiable owners.

19          With reference to 34 horses that did not have

20  identifiable owners, are you telling Grace in this e-mail that

21  they belong to Bennett?

22     A      Yeah.

23     Q      Okay.  Great.  That is all I was trying to get at.

24     A      That was -- that was my impression, that they

25  belonged to Bennett.

1      Q      Okay.  All right.

2             So on September 16, 2011, it is your impression that

3      these horses belong to Bennett; right?

4      A      And it was Grace's impression as well.  Yes.

5      Q      Okay.

6             Well, we don't need to worry about Grace's

7      impression, just your impression right now; okay?

8      A      Yes.

9      Q      So if they belonged to Bennett on September 16th,

10     what happened between September 16, 2011 and March 15, 2012

11     where you are making a demand to the County for the feed of

12     the horses?

13     A      Well, because the County relinquished or delivered

14     those horses to The Grace Foundation.  And clearly Mr. Bennett

15     couldn't care for them.  They were released to the County

16     because Mr. Bennett couldn't care for them.

17            So the County then released those horses to The

18     Grace Foundation, and if The Grace Foundation had not stepped

19     up, the County more than likely would have dealt with those

20     horses in some way.  So that was the basis for that March,

21     2012 letter.

22     Q      So the way that the County dealt with the horses was

23     that they deposited them with The Grace Foundation; correct?

24     A      I think that is the legal conclusion that I am not

25     sure I can answer.

1    Q    Well, either Bennett owned the horses and he

2    deposited them, or The Grace Foundation owned them, or some

3    other entity deposited them?

4    A    You are using the --

5    MS. PRESTON:  Just for the record --

6    MS. KOUVABINA:  I object on the ground it is a legal

7    conclusion.  Wells Fargo.

8    MS. PRESTON:  And it also lacks foundation.

9    MR. JAMPOL:  It lacks foundation and it assumes a lot of

10   things that are not necessarily in evidence and not

11   necessarily accurate.

12   THE WITNESS:  If by deposited you mean the colloquial

13   term of I gave something to someone, or transferred possession

14   of something to someone, rather, perhaps.  But if you are

15   using the legal term deposit, I can't answer that question.  I

16   don't know the answer to that question.

17   Q    BY MS. SAGHEB:  Okay.

18        So in using the word colloquially -- let's try that

19   again --

20        Using the word as it is used outside the legal

21   world, then, they were deposited -- in your view, at least --

22   with The Grace Foundation by the County of Lassen?

23   A    Well, let me think about the transfer.  It went from

24   the Receiver to the County to The Grace Foundation.  So the

25   transfer happened from the County to The Grace Foundation.  If

1    you want to call that transfer colloquially a deposit, I don't

2    have any problem with that label as long as you are not using

3    it in its legal sense.

4        MS. SAGHEB:  Let's give the Videographer a chance to

5    change out his video.

6        THE WITNESS:  While he is doing that I am going to use

7    the restroom.

8        THE VIDEOGRAPHER:  We are now going off the record.  The

9    time on the video monitor is 16:35.

10            This is the end of DVD No. 2 in the continuing

11    deposition of Timothy Ryan.

12            (RECESS HAD; 4:35-4:43 P.M.)

13        THE VIDEOGRAPHER:  We are now going back on the record.

14    The time on the video monitor is 16:43.  This is the beginning

15    of DVD No. 3 in the continuing deposition of Timothy Ryan.

16            Counsel, begin please.

17        Q    BY MS. SAGHEB:  When was the first time you

18    disclosed the bankruptcy that Bennett had filed to The Grace

19    Foundation?

20        MR. JAMPOL:  By disclosed, you mean discussed with them?

21    I mean, disclosed has certain implications.  I am not sure you

22    meant that.

23            I would object on the ground that it is vague and

24    ambiguous with that term in there, but subject to that, you

25    can answer.

1       THE WITNESS:  That would be August 19, 2011.

2       Q     BY MS. SAGHEB:  And tell me the circumstance, as

3   best you remember it, of the disclosure and who you made the

4   disclosure to?

5       A     I testified to that this morning, but I will gladly

6   tell you again.

7            We were out at the Whispering Pines ranch.  It was

8   after Mr. Bennett had attempted to -- apparently attempted to

9   run out of the courtroom after the Judge had ordered him

10  remanded to custody.  And was yelling, "Call Carl, call Carl,"

11  as he tried to scurry out of the courtroom before the

12  bailiff -- didn't have to tackle him, but had to interrupt his

13  exit.

14           And I was regaling -- Pete Heimbigner had been

15  there, and he was laughing about it.  And I was -- I don't

16  believe that Beth was there.  I think she met us in the --

17  Vicki's office.  I am not 100 percent certain.  But we were --

18  we probably talked about it at Vicki's office as well that

19  day.  But it was the topic A of conversation, because it was

20  such an incredibly unusual event.

21           And then, you know, there was the gentleman at

22  Whispering Pines who was yelling, you know, "Leave the

23  property, this is protected by the automatic stay," at a much

24  louder volume.  And I explained to Beth and to Vicki and to

25  the other people there that yeah, he has filed bankruptcy, but

1    we don't have to leave the property.

2           So it was on -- the first day I found out about it

3    was 8/19/2011, and that was the first day that Ms. DeCaprio

4    and whomever else was there from Grace Foundation found out

5    about it and the first day that Pete Heimbigner found out

6    about it and the first day that Vicki Lozano found out about

7    it.

8       Q    Okay.

9           So you said, "I know he is yelling about a

10   bankruptcy, but he is not right, we don't need to leave the

11   property."

12          That is one thing that you said?

13      A    I said, "Sir, the Judge Girdano said on the record

14   that he doesn't think the Bankruptcy Court is going to come up

15   here and take care of the horse, and essentially the horses

16   are not going to die on his watch," or words to that effect.

17   Mr. Bennett was in jail for the next five days.  So to the

18   extent that we left the property, the horses likely would have

19   died of thirst or starved to death.

20          So it was my determination under the public safety

21   exception to the automatic stay that the Court intimated at

22   the hearing that it was appropriate that we be on the property

23   that day.

24      Q    Did the Court intimate that despite the bankruptcy

25   filing, it was proper to remove Bennett's horses from the

1    property?

2        A    Judge McManus -- depends on which court you are

3    talking about.  Judge McManus, in an order issued in July of

4    2012, specifically in that order, stated that it was

5    appropriate because the automatic stay did not apply in this

6    circumstance to removing the horses because of the public

7    safety exception, because the horses were not only starving

8    and potentially dying of thirst, they were getting out on the

9    highway and creating a dangerous situation for motorists,

10   because the highway was right next to the property.

11           And there was tons and tons and tons of manure.

12   Each stall had manure about two feet high.  There was a pile

13   about ten feet high of manure next to some heavy equipment.

14   And there were death pits of rotting and decaying horses with

15   flies flying around.  So it was just -- the possibility of

16   airborne disease and the horses carrying that disease.

17   Judge McManus blessed the removal in a written order.

18       Q    That is in 2012?  I --

19       A    That is correct.

20       Q    What I asked you was:  On August 19th, during the

21   hearing --

22       A    Yes.

23       Q    -- did the Court state or even imply that removal of

24   the horses was appropriate?

25       A    Yes, he did.

1    Q    Did you thereafter make any call to The Grace

2    Foundation or to Ms. DeCaprio to tell her about the

3    bankruptcy?

4    A    No.  I did not call her to tell her about the

5    bankruptcy.  She already knew about the bankruptcy, as did the

6    person that was with her that day.  I spoke to Taira Mulliken

7    and likely Ms. DeCaprio on -- during -- let me consult my

8    notes.

9         I don't have a calendar; so I can't say week ending

10   X, Y, Z.  But between 8/26 and 9/1, I would have been speaking

11   with Beth DeCaprio and Taira Mulliken about our ex-parte

12   application to have the Bankruptcy Court vacate the automatic

13   stay and reinvest the assets of the real property back into

14   the Receiver as that was happening in Sacramento in the

15   eastern district in Sacramento division.  So I spoke to them

16   -- with them at length about that hearing, and even noted to

17   Taira and possibly to Beth that the U.S. Trustee was

18   personally attacking me for the fact that the horses were

19   removed on the day after the bankruptcy was filed.

20         So the answer is no, I did not call her or send her

21   some letter and say, hey, there has been a bankruptcy, because

22   she knew about the bankruptcy the day after it was filed on

23   the same day that I knew about it.

24   Q    So you think that -- I'm sorry.  Maybe I missed

25   this.  Something about the Trustee criticizing your removal of

1    those horses.

2         Do you remember the name of the Trustee?

3    A    No, I don't.  But Ms. DeCaprio corresponded with him

4    quite regularly.

5    Q    Was this Al Massey?

6    A    I believe so.  It could have been.

7    Q    Okay.

8         And you believe that Mr. Massey's criticisms were

9    not founded -- were not well founded?

10   A    Judge McManus believed that Mr. Massey's criticisms

11   were not well founded.  He is the bankruptcy judge.  In fact,

12   the bankruptcy judge issued a temporary stay of the bankruptcy

13   upon the filing of our ex-parte application before the

14   ex-parte application was even heard.  We filed the ex-parte

15   application, I believe on or about August 26 -- excuse me,

16   August 27, 2011.  It might have been on August 26th.  And on

17   August 27th, a preliminary order staying the effect of the

18   bankruptcy to insure that the horses were removed from the

19   property was issued by Judge McManus.

20   Q    Did you ever state in an e-mail to The Grace

21   Foundation that Mr. Bennett should be put in prison because he

22   was a thorn in your side and a thorn in their side?

23   A    You would have to show me the e-mail.  I know that I

24   believed Mr. Bennett should be put in prison, because he

25   admittedly choked a foal.  He admittedly shot a horse in the

1    head.  He admittedly starved 24 horses to death.  He --

2        Q    I'm sorry.  Let me stop you.  That is not the

3    question I asked you.

4             I am no fan of Mr. Bennett, nor did I imply that he

5    shouldn't go to jail.

6             I am asking you about your representations.

7        A    That is not a representation.  That is a statement.

8        Q    Did you make a statement that Mr. Bennett should go

9    to prison because he was a thorn in your side?

10       A    That doesn't sound like something I would say.  I

11   might have said it.  I mean, it was -- as you can imagine,

12   Ms. Sagheb --

13       MR. JAMPOL:  You answered --

14       THE WITNESS:  As you can imagine, Ms. Sagheb, I was out

15   on this ranch on August 19, 2011.  While I was there, there

16   was a 16-year-old foster child --

17       Q    BY MS. SAGHEB:  Okay.  I'm sorry --

18       A    -- who -- who -- who --

19       Q    There is no question pending.

20       A    There is a question pending.

21       Q    This is not your --

22       A    Who I had to tell --

23       Q    Then I am going to withdraw the question.

24       A    Well, then withdraw the question.

25       Q    I withdraw it.

1              Do you have the September 16, 2011 e-mail in front

2    of you, by any chance?

3         MR. JAMPOL:  This is your pile.

4         THE WITNESS:  It is marked 18.

5         Q    BY MS. SAGHEB:  Let's move down -- one, two, three,

6    four, five -- the fifth paragraph; okay?

7         MR. JAMPOL:  On Exhibit 18?

8         MR. ROSENBERG:  Yes.

9         Q    BY MS. SAGHEB:  You state:  "This is another reason

10   that this man needs to be behind bars... he will continue to

11   be a thorn in my side (but, hey, I get paid for it) and a

12   thorn in your side."

13             When you said that he is going to continue to be "a

14   thorn in your side," what did that mean?

15        A    Well, firstly, you have to read the English

16   language, when you say this, and there is language immediately

17   behind it, that is what you are generally expanding upon.

18        Q    Are you implying that I don't speak well -- English

19   well, or -- I am not sure what you mean.

20        A    I am not implying anything.  I am just -- you took

21   this paragraph and wanted me to read it in isolation, and it

22   should be read in context with the paragraph above.

23        Q    I don't know, you referenced the English language as

24   if I was inept in the use of it.  So --

25        A    I don't believe I did.  If you took it that way, I

1    am sorry.

2           That statement says:  We will need to do this --

3    meaning the adoption -- in such a way that ELIMINATES -- in

4    all caps -- Bennett's ability to sue the Grace Foundation ...

5    or at least makes his lawsuits more easy to defeat from the

6    beginning.

7           This is another reason that this man needs to be

8    behind bars...he will continue to be a thorn in my side (but,

9    hey, I get paid for it) and a thorn in your side.

10       Q    Okay.  So let's stop there.

11          How does the paragraph that you read above address

12   my question as to how he was a thorn in your side?

13       A    Well, your question wasn't whether he was a thorn in

14   your side.

15       Q    Actually, it was.

16       A    Okay, I'm sorry.

17       Q    So let's start again.

18       A    Go ahead.

19       Q    Could you tell us what you meant when you wrote this

20   e-mail as to that, you know, a reason that Mr. Bennett should

21   go to jail is because he would continue to be a thorn in your

22   side?

23       A    Well, you are mischaracterizing your testimony and

24   mischaracterizing what this says.  But I believe that

25   Mr. Bennett was a thorn in my side, because I would receive,

1    for example, when I appeared at the motion for summary

2    adjudication and the ex-parte application for appointment of

3    Receiver on July -- mid July, 2011, I got there early, as I

4    try to do.  And as I was setting up -- it was about an hour

5    early, because I had a lot of final prep to do just to make

6    sure that I was on point.

7           And as I was setting up, Judge Girdano took the

8    bench.  And he looked at me sitting out at counsel table -- no

9    one else was there -- and he said, "Good morning, Mr. Ryan,

10   how are you?"  And I said, "Good morning, Judge Girdano, I am

11   well.  I am well."  And he said, "Well, I am out here to hear

12   the OSC re preliminary injunction filed by Dwight Bennett

13   against you."  And I said, "Your Honor, I have no idea what

14   you are talking about."  And he says, "Well, he came in last

15   week on an ex-parte and he said he gave you notice and he

16   showed that he gave you notice, but he is not here this

17   morning.  So I am going to go ahead and just close this and

18   deny the preliminary injunction."

19          So that is the kind of thing that Mr. Bennett did to

20   be a thorn in my side.  He did things like that and -- you

21   asked --

22      Q     That is fine.  I just want to get a clarification.

23          So you just happened to be in court on the same

24   morning that this hearing was set by Bennett, even though he

25   didn't give you notice of it?

1      A      I -- as I testified to, I was in court preparing for

2   my summary adjudication motion and receivership application.

3      Q      So it was set for the same day?

4      A      It was set for the same day.  And I was in court

5   preparing.  So that is one example of him being a thorn in my

6   side.

7             Another example of him being a thorn in my side

8   would be continuous e-mails completely to everyone completely

9   misrepresenting what any court said.  Attempts to poison The

10  Grace Foundation's animals.  Attempts to kidnap The Grace

11  Foundation's animals.  That was -- that was a problem for me,

12  because I felt I had a moral obligation to assist Grace in

13  some way because of the work that they would doing.

14            Another way that he was a thorn in my side was the

15  physical threats that he would make to me whenever I would be

16  walking by him at a hearing.  Another way that he was a thorn

17  in my side is he would continually misrepresent anything that

18  occurred, any dialogue that occurred between he and I.  He was

19  unrepresented.  I tried to make sure that I only had dialogue

20  with him when the judge was present, but it wasn't always

21  possible.  And he would completely misrepresent that dialogue

22  to my extreme detriment.

23            So those were some examples of why he was a thorn in

24  my side.  You know, if I were prepared to look at all of the

25  reasons, I would probably come up with 50 more, but that is

1    all I have right now.

2         Q    So I just want to -- we just want to make sure.

3              You are saying that Beth had knowledge of the

4    bankruptcy because of the postings by Dwight Bennett's agent?

5         A    That completely mischaracterizes my testimony.

6         Q    Go ahead.

7         A    You want me to explain it again?  This will be the

8    third time.

9         Q    We are a little slow on this side of the table.

10        A    Well, I wish you luck.

11             The -- at the Whispering Pines ranch, in likely

12   before at Vicki Lozano's office, it was a -- an incredibly

13   unique event, wherein a person who was given an opportunity to

14   avoid being held in contempt of court spurned that opportunity

15   and invited being held in contempt of court practically and

16   used the excuse of 'I just filed bankruptcy' to not be held in

17   contempt of court.  I had to argue that quasi criminal does

18   not matter -- blah, blah, blah -- and then he literally tried

19   to make a jail break as the Court ordered the marshals --

20             I'm rehearsed?

21        Q    Yes, you are.  Let's move on to the next question.

22        A    No, I am going to continue answering the question

23   you asked, unless you want to withdraw the question.

24        MR. JAMPOL:  Well, just --

25        MS. SAGHEB:  Okay.  No problem.

1      MR. JAMPOL:  She has -- she has made that --

2      THE WITNESS:  We are going to take a break here, because

3  that is inappropriate.

4      MR. JAMPOL:  It is inappropriate, and she has made that

5  contention.  She has forfeited the right to any answer to that

6  question.

7      THE WITNESS:  Well, I am going to leave the room for a

8  minute, because I don't want to act similarly unprofessional.

9      THE VIDEOGRAPHER:  Counsel, are we taking a break?

10      MR. JAMPOL:  Yes, we are.

11      THE VIDEOGRAPHER:  Off the record?

12      MS. SAGHEB:  Yes, I guess so.

13      THE VIDEOGRAPHER:  We are now going off the record.  The

14  time on the video monitor is 17:01.

15          (RECESS HAD; 5:01-5:07 P.M.)

16      THE VIDEOGRAPHER:  We are now going back on the record.

17  The time on the video monitor is 17:07.

18          Counsel, begin please.

19      MR. JAMPOL:  Before she begins, I just want to point out

20  that the reason that -- the main reason that this break was

21  taken, we insisted upon it, was because of the comment by

22  Counsel about Mr. Ryan.  And I trust that will be the last

23  time Plaintiff's Counsel will make any comment about Mr. Ryan

24  or his testimony, or do anything but ask questions.

25      Q    BY MS. SAGHEB:  Do you have a home address for

1    Mr. Beardsley?

2         A    No, I do not.  I think he lives in Huntington Beach.

3         Q    Do you maintain records in your office that would

4    have Mr. Beardsley's home address as of the time he worked in

5    The Ryan Firm?

6         A    Absolutely.

7         MS. SAGHEB:  Let's mark as Exhibit 19 a document called

8    INDEMNIFICATION AGREEMENT.

9              (EXHIBIT No. 19 WAS IDENTIFIED FOR THE RECORD AND

10           MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

11           INCLUDED HEREWITH.)

12        Q    BY MS. SAGHEB:  Does your signature appear on this

13   agreement, sir?

14        A    It does.

15        Q    Does Ms. Lozano's signature appear on this document?

16        A    I believe that is Ms. Lozano's signature.  I have no

17   reason to disbelieve.

18        Q    Why was this document --

19             Well, tell me what is your understanding of the

20   document itself?

21        MR. JAMPOL:  What is his understanding of the document?

22        MS. SAGHEB:  Well, yes.  A document he signed, Alan.  I

23   mean, it is not unheard of to ask a witness to give us their

24   understanding of a contract that they entered into.

25        MR. JAMPOL:  Well, it might not be unheard of, but he is

1    not going to answer.  That invades his attorney-client

2    privilege and work product privilege, and I will instruct him

3    not to answer.  And his understanding, his subjective

4    understanding is inadmissible under Brandt, as I have

5    indicated before.

6         MS. SAGHEB:  You know --

7         MR. JAMPOL:  And doesn't lead to -- and there is no

8    reasonable possibility of it leading to admissible evidence.

9         Q    BY MS. SAGHEB:  Were you representing Ms. Lozano at

10   the time you signed this agreement?

11        A    No.

12        Q    Have you ever represented Ms. Lozano?

13        A    No.

14        MS. SAGHEB:  Exhibit 20 is a letter dated July 22, 2011

15   on the letterhead of Department of Public Works.

16        (EXHIBIT No. 20 WAS IDENTIFIED FOR THE RECORD AND

17        MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

18        INCLUDED HEREWITH.)

19        Q    BY MS. SAGHEB:  Did you receive this document from

20   the County of Lassen, sir?

21        A    Let me review it.  I did not receive this document

22   as it is being presented to me from the County of Lassen, no.

23        Q    What is different from the document you are looking

24   at that makes you answer in that way?

25        MR. JAMPOL:  Excuse me.  Different from what?  It is

1    vague.  You haven't -- what are you comparing it to?  I don't

2    think you can answer it that way.

3              So I will instruct him not to answer the question as

4    phrased, but you can phrase it properly.

5         Q    BY MS. SAGHEB:  Have you received this document --

6    did you receive this document in any format?

7         A    Yes.  I received this document with an attachment.

8         Q    Do you recall the attachment?

9         A    Yes.  It is discussed in the document itself.  It

10   says:  See attached veterinarian report by Michael W.Russell,

11   DVM for further details.

12        Q    I see.

13             So other than the attachment, does the document

14   appear to be a true and correct copy of the document received

15   in your office on or about July 22, 2011?

16        A    Well, let me look at it, because -- I want to make

17   sure that I am testifying correctly.

18             (Pause)

19             Yes, I did receive this document with the attachment

20   as discussed therein.

21        Q    And then you were on notice as of July 22, 2011, or

22   shortly thereafter when the document was received in your

23   office that at least in Mr. Heimbigner's perception of events,

24   there was some uncertainty expressed as to who legally is

25   responsible for caring of the animals as of that time;

1    correct?

2       MR. JAMPOL:  Well, you can answer if you understand.  I

3    did not understand that question at all.  But if you

4    understand it, you can answer.

5       THE WITNESS:  I understood that Mr. Heimbigner was

6    informing me that he perceived that there was uncertainty as

7    to the owners of the animals, yes.

8       Q    BY MS. SAGHEB:  And you knew as of July 22, 2011

9    that the only thing that the County was willing to arrange was

10   for removal and temporary protective custody of all animals on

11   the property until final disposition could be determined;

12   right?

13      A    No.

14      Q    Okay.  Why do you say "no?"

15      A    Well, because your question was it was the only

16   thing the County was willing to do.  And I don't know what

17   else the County might have done.

18           In this letter Mr. Heimbigner expressed to me one of

19   the things the County would be willing to do, and that was its

20   willingness to arrange for removal and temporary protective

21   custody of all animals on the property until final disposition

22   can be determined.

23      Q    All right.

24           So as to the animals from Whispering Pines, did the

25   County take any steps or conduct itself in a way that -- well,

1    strike that.

2            Was final disposition determined at some point?

3        A    I think you have -- not to my knowledge.

4        Q    Did you advise Ms. Lozano not to give final

5    disposition to the County?

6        A    I provided no legal advice to Ms. Lozano as to

7    disposition of the horses.

8        Q    And why did you sign an agreement agreeing to

9    indemnify Ms. Lozano with relation to her actions in this

10   litigation?

11       MR. JAMPOL:  All right.  I will object to that on the

12   ground it invades the attorney-client privilege, invades his

13   work product privilege, and instruct him not to answer.  It is

14   also irrelevant.

15       Q    BY MS. SAGHEB:  When you signed --

16       MR. ROSENBERG:  The other objections are okay, but not

17   irrelevant.

18       Q    BY MS. SAGHEB:  When you signed the indemnity

19   agreement, did you sign it on The Ryan Firm's behalf or on

20   behalf of one of your clients?

21       MR. JAMPOL:  You can -- you can answer that.

22       THE WITNESS:  On behalf of a client.

23       Q    BY MS. SAGHEB:  Which client or clients?

24       A    I would have to look at the indemnity agreement.

25            It says Timothy M. Ryan, Counsel for Wells Fargo

1    Bank, N.A., as Trustee for MLMI Trust Series 2005-HE3.  So

2    that would have been the entity on whose behalf I was

3    executing the agreement.

4         Q     And why on behalf of Wells Fargo Bank as opposed to

5    both Wells Fargo Bank and Bank of America?

6         MS. DILL:  I am going to object on the privileged work

7    product.

8         MR. JAMPOL:  Same objections.  It invades his work

9    product and attorney-client privilege --

10        MS. KOUVABINA:  And Wells Fargo.

11        THE WITNESS:  Wells Fargo objected as well.

12        MR. JAMPOL:  Short the objection.

13        MS. SAGHEB:  Let's mark this document as Exhibit 21 for

14   the record.  There is an e-mail exchange.  The last three

15   pages appear to be a letter from Grace to its supporters.  I

16   am going to pass it out for you.

17        (EXHIBIT No. 21 WAS IDENTIFIED FOR THE RECORD AND

18        MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

19        INCLUDED HEREWITH.)

20        Q     BY MS. SAGHEB:  Mr. Ryan, looking only at the first

21   page, is this an e-mail that you received in your office?

22        MR. JAMPOL:  When you say "this," do you mean the first

23   page only?

24        Q     BY MS. SAGHEB:  The top -- well, yes, looking at the

25   first page, I am looking at the very top portion.

1       A       Well, I need to read the -- so just the first page.

2       Q       Right now, yes.

3       A       Yes.  That does appear to be a document that was

4    received in my office.

5       Q       And then if you move down a quarter of the way on

6    the page, the portion that reads:

7               "Taira,

8               Just got back from a long day in court.

9               Here you go!

10              Tim."

11              That is an e-mail that you sent to Ms. Mulliken?

12      A       Yes.

13      Q       All right.  It --

14      A       And I believe, let me look -- you know, I am -- it

15   says TMR on the bottom right.  So I am going to have to say

16   yes.

17      Q       The next three pages were an attachment that was

18   forwarded to you by Ms. Mulliken and sent back to Ms. Mulliken

19   by you after you had revised it in some respects.

20              Is that an accurate statement?

21      A       Let me look at the document first, the three pages.

22   It is going to take me a moment.  Thank you.

23              (Pause).

24              Yes.  I do believe that that is a press release that

25   Taira sent me to ask me to take a look at to make sure they

1    weren't saying anything terribly inappropriate.

2         Q    Or inaccurate?

3         A    Terribly inappropriate.

4         Q    Meaning what?

5         A    Meaning I agreed to give the press release a look.

6         Q    Well, what were you looking at it, for what purpose?

7         A    I was looking at it to make sure that there were no

8    statements in there that could get Grace in trouble with

9    anybody.

10        Q    You were protecting Grace from a legal scandal;

11   correct?

12        A    Those are your words.  My words are I was looking at

13   this press release to make sure that Grace did not say

14   anything that could get them sued.

15        Q    Right.  They were avoiding liability by running it

16   past a lawyer?

17        A    Well, that is your characterization.  My testimony

18   is what my testimony is.

19        Q    Is it the right characterization or is it incorrect?

20        A    I don't know.  I mean --

21        Q    You don't know.  Thank you.

22             On the second page, the last full sentence which

23   starts, "The plan...":

24             "The plan was to begin to rehabilitate the horses

25        and place them into loving homes."

1              Do you see that?

2      A     No.

3      Q     First page of the press release, very bottom, moving

4    to the --

5      A     Yes, I do see that.  I do see that.

6      Q     So you didn't edit that in any way.  Why?

7      A     Well, because that was the plan.  I mean, there

8    were -- the vast majority of the horses -- one thing to keep

9    in mind is that at the time I looked at this document all the

10   way through until the date that I received a copy of the

11   original Complaint, I was not aware of any other agreement

12   that existed between The Grace Foundation and the County of

13   Lassen.

14             So looking at this document with this in mind, the

15   plan was to begin to rehabilitate the horses and place them

16   into loving homes. (Reading).  This is Grace saying what their

17   plan was.  So I have no reason to disbelieve that this was

18   their plan.

19     Q     And you had no reason to edit it because that was

20   the plan?

21     A     I had no reason to edit it because I did not think

22   that statement subjected them to liability.

23     Q     And you did not think it was a lie, they weren't

24   misrepresenting anything; right?

25     A     I did not say that.  I said I didn't think -- I

1    looked at this to make sure this statement didn't subject them

2    to liability.  That is what I was concerned about, and that

3    is -- you know, I made some small edits here and there, but

4    that is primarily why I looked at this and I did not think

5    this sentence -- The plan was to begin to rehabilitate the

6    horses and place them into loving homes -- subjected them to

7    any liability.

8         Q    But you would agree that in California,

9    misrepresentation, both intentional and negligent, does

10   subject people to liability all the time; right?

11        A    Well, there is some other elements.  So, no, I don't

12   agree with that.

13        Q    Now, if you could turn to the second page of the

14   press release.  It appears that you changed the word

15   "temporary" to "protective."

16             About half way down the page, do you see that?

17        A    Actually, it is the reverse.

18        Q    I'm sorry.  Protective to temporary, right.

19             Why did you make that change?

20        A    I had no idea where they were getting the word

21   protective from.  I didn't know there was a protective custody

22   agreement.  So that is why I changed the word from protective

23   to temporary, because they didn't have ownership of the

24   horses, they never thought they had ownership of the horses,

25   and protective did not make any sense to me, based on what I

1    knew about the documents existing between The Grace Foundation

2    and the County of Lassen.

3         Q    I'm sorry, who never thought they had ownership of

4    the horses?

5         A    The Grace Foundation.

6         Q    So are you saying that they never thought they had

7    ownership of the horses despite being given final disposition

8    of them?

9         A    Yes.  That is exactly what I am saying.

10         Q    We just reviewed a letter from Mr. Heimbigner that

11    indicated the last step was final disposition -- until final

12    disposition could be determined.

13              So Grace was given final disposition.  What did you

14    think was conveyed to them?

15         MS. PRESTON:  Lacks foundation.  Misstates the evidence.

16    Also calls for speculation.

17         MR. JAMPOL:  Yeah, it really does misstate the evidence.

18    And again, it calls for speculation.  So I will object on

19    those grounds.

20         THE WITNESS:  Can you repeat the question.

21         Q    BY MS. SAGHEB:  What did you think was conveyed to

22    The Grace Foundation by way of the final disposition?

23         A    What did I think was conveyed to the Grace

24    Foundation -- well, not only what I thought, but what Grace

25    knew, that the order provided certain very specific things.

1    Beth knew that there were certain elements of the order.  I

2    explained it in multiple e-mails, how they had to release

3    horses to their owners.  There is an e-mail from November of

4    2011 concerning Judy St. John coming onto the ranch where it

5    explained that, you know, these are the steps that needed to

6    be taken -- I don't know if it was November or March.  Excuse

7    me.

8            But an e-mail, where these are the steps that needed

9    to be taken for Ms. St. John to reclaim her horses.  So how in

10   the world can The Grace Foundation think that they got

11   ownership of these horses when they are getting e-mail after

12   e-mail from me about Judy St. John, Sharon Wickwire, claiming

13   their horses and taking them home.  So no, I do not believe

14   that The Grace Foundation -- and it is speculation -- but I

15   guess it isn't, because I believe I explained it to them in

16   some fashion in September or October of 2011.

17   Q     Let's be clear about this.

18           On Exhibit 13, it appears to me that The Grace

19   Foundation is given final disposition of a number of horses.

20           Would you agree with that general statement?

21   MS. PRESTON:  Misstates -- mischaracterizes the evidence.

22   THE WITNESS:  Looking at Exhibit 13 --

23   MS. PRESTON:  Calls for a legal conclusion.

24   THE WITNESS:  Go ahead.

25   MS. PRESTON:  Also calls for a legal conclusion.

1        MR. JAMPOL:  Yes.  Also, his understanding is irrelevant.

2   His subjective belief is irrelevant.  And to the extent it is

3   his work product, I object and instruct him not to answer.

4        MS. SAGHEB:  It is a malpractice action in which he is

5   advising his client who is now suing him about the advice

6   given.  So I -- again, I am going to ask the question, and you

7   can do your objection and do you your instruction.

8        Q     I am asking whether you see the distinction between

9   Exhibit 13, which gives final disposition of horses to The

10  Grace Foundation, and Exhibit 14 which gives protective

11  custody?

12       MR. JAMPOL:  That is your work product.

13            I will object and instruct him not to answer.

14       Q     BY MS. SAGHEB:  Did you tell The Grace Foundation

15  there was a difference between those two modes of holding the

16  animals?

17       A     I said probably six times now that I did not know

18  Exhibit 14 existed until The Grace Foundation decided to sue

19  me.

20       Q     Okay.

21            Well, then, even more reason to talk only about the

22  final disposition.

23       A     Sure.

24       Q     All right.

25       A     Let's talk about that.

1    Q    So did you tell The Grace Foundation that it had an

2   obligation to return horses to Judy St. John because it had

3   been given final disposition of Ms. St. John's horses?

4    A    That does not make sense.  You are going to need to

5   rephrase the question because it just makes absolutely no

6   sense.

7    Q    Right.

8    A    Why?

9    Q    I said "right."

10   MR. JAMPOL:  So you agree, then --

11   THE WITNESS:  So that was rhetorical?

12   MR. JAMPOL:  You have to restructure the question.

13    Q    BY MS. SAGHEB:  So Ms. Wickwire, her horse, is that

14   listed on the final disposition?

15   MR. JAMPOL:  What is the final disposition you are

16   referring to?

17    Q    BY MS. SAGHEB:  Exhibit 13.

18   MR. JAMPOL:  Is Ms. Wickwire's horse listed on Exhibit --

19   THE WITNESS:  Ms. Wickwire's horse is named "Chico."

20    Q    BY MS. SAGHEB:  Okay.

21    A    "Chico" is No. 1724.  It is listed on the final

22   disposition.

23    Q    What about -- Ms. -- was it Close?

24    A    No, it was Ms. St. John.

25    Q    Ms. St. John.  Thank you.

1           What about her horse?  Is that listed on the final

2    disposition?

3        A    She claimed a number of horses, one of which was a

4    stallion that is ironically on the protective custody

5    agreement that Ms. DeCaprio had gelded in January of 2012.

6    His name is "Latigo's Mandan Prince," and then she gave that

7    horse away to an adoptive family in Cool, California, I

8    believe in February of 2012.  So -- and Ms. St. John has a

9    number of horses on Attachment A that she claims are hers, and

10   then there is some horses on attachment -- excuse me, on

11   Exhibit 13 that she claims are her.  And then "Latigo's Mandan

12   Prince" on Exhibit 14, she claims to be hers.

13       Q    Okay.

14           So when you were advising The Grace Foundation, as

15   to the ownership of the horses, you didn't even have in your

16   possession the necessary documents, both the protective order

17   and the final disposition to be giving them advice; isn't that

18   right?

19       A    I don't know what you are calling a protective

20   order.

21       Q    Well, that would be Exhibit 14.

22       A    Grace hid this from me.  I didn't know it existed.

23       Q    They hid it from you?

24       A    Yes.  They never provided it to me.

25       Q    Did Ms. Lozano hide it from you?

1       A       Ms. Lozano wasn't my client.

2       Q       And what about Mr. Heimbigner?  Did he hide it from

3   you?

4       A       Mr. Heimbigner worked for the County.  We had

5   virtually no communication, other than when I would be at a

6   hearing.  He had no duty to give it to me.

7       Q       But you are saying that Grace somehow hid it from

8   you.

9               How did they do that?

10      A       They got it from the County on August 26th when I

11  wasn't there, and then despite my sending three e-mails having

12  at least three to four conversations about the ambiguity of

13  this order, and sending them this order, describing this

14  order --

15      MR. JAMPOL:  This order?  You mean --

16      THE WITNESS:  This order, meaning Exhibit 13, she never

17  mentioned not once the existence of Exhibit 14.

18      Q       BY MS. SAGHEB:  Well, which leads me to a different

19  question.  I do want to come back to the editing of this news

20  letter.

21              But in the meantime, I was a little confused by the

22  document production in that there are a number of e-mails

23  wherein you ask various people to forward to you e-mails that

24  you exchanged with The Grace Foundation during the involvement

25  period of time between September of 2011 and May of 2012.

1          In your office, is it your practice and procedure to

2    maintain a correspondence file for your clients, even ones you

3    are doing pro bono work for?

4        A    Well, firstly, you misstate the contents of the

5    document production.  There are e-mails to Taira Mulliken,

6    possibly other people, asking for correspondence that they

7    would have that I wouldn't have.

8        Q    Okay.

9        A    You know, like for example, Beth DeCaprio pretending

10   not to know what to do with the horses, when she is adopting

11   out one of the horses that is under Exhibit 14, the protective

12   custody agreement.

13       Q    Let's stay within the ambit of the question.

14       A    I am staying within the ambit of the question.

15       Q    The question has to do with your practice and

16   procedure --

17       A    Yes.

18       Q    -- of maintaining a correspondence file for your

19   clients, even the ones for whom you do work on a pro bono

20   basis.

21          Do you have that practice or procedure?

22       A    Well, have you abandoned the premise of your earlier

23   question?  This is just a self contained question now;

24   correct?

25       Q    Yes.

1        A       Okay.

2                It would be kept in an electronic fashion, yes.

3        Q       So are all of your correspondence files kept in an

4    electronic fashion, or just the ones you do pro bono work for

5    or -- I am not sure what is being kept in electronic fashion.

6        A       I keep everything in electronic fashion.

7        Q       Okay.

8        A       We have -- we have migrated away from a paper filing

9    system.  We maintain, in most circumstances, the physical

10   paper for each file.

11               I have determined it is not cost effective to pay

12   people to put that in any order.  And instead of ordering the

13   paper files, we have a database manager, who insures that the

14   information PDF files for each file are properly stored within

15   the system derived from.

16       Q       So now have you now produced all of your

17   communications in what would be considered a correspondence

18   file with The Grace Foundation?

19       A       I believe so.

20       Q       And what explains the fact that we, or The Grace

21   Foundation, has produced e-mails that -- and other

22   correspondence that was not contained in the production?

23       A       If you would show me the e-mails, I will go back to

24   my office and look and try to give you the answer why.  I did

25   not say my system is perfect.  I try to do the best job I can.

1    Q    I am wondering whether The Grace Foundation's

2    correspondence file was kept separate and apart from your

3    correspondence files, discovery files, pleadings files in the

4    Allen case?

5    A    They -- there are very few Grace documents.  I can't

6    answer that question right now.  I simply don't know.  But

7    they would have been kept -- I just don't know the answer.

8    Q    Well, what I am finding -- what I am trying to find

9    out is, you were representing Wells Fargo Bank --

10    A    I was.

11    Q    -- and Bank of America in the Allen matter?

12    A    Um-mm.  Yes.

13    Q    At some point you agreed to -- however you want to

14    characterize it -- give some legal service to The Grace

15    Foundation.

16    A    Um-mm.

17    Q    I am wondering if files were kept separate for The

18    Grace Foundation and the Wells Fargo representation and Bank

19    of America, or whether they were kept together?

20    A    I don't know if I ever opened a specific file for

21    The Grace Foundation.  So I don't think so.

22    Q    Okay.

23         So if Ms. DeCaprio wanted the original of her file,

24    that would be something that would be interlaced with what

25    other file?

1      A     If she wanted the original of her file -- I am not

2   sure.  It could be interlaced with -- what is it? -- 8045 1267

3   which is the Norman Allen file.  I just don't know the answer

4   to the question.

5      Q     And you don't know the answer to the question

6   because?

7      MR. JAMPOL:  Because what?

8      Q     BY MS. SAGHEB:  I don't know.  I don't know why.

9            Well, I mean, you know, if you were to ask me where

10  my correspondence files in this case are --

11     A     I don't -- I don't think I --

12     Q     -- pretty much I could tell you.

13     A     Well, they all exist in the system.  They all exist

14  electronically in the system.  So --

15     MR. JAMPOL:  That is your answer.

16     Q     BY MS. SAGHEB:  So you don't segregate anybody's

17  files, they just all exist all together for all clients?

18     A     I don't understand your question.

19     Q     Well, I don't understand your answer.  That is

20  probably why you don't understand my question.

21     A     They were probably -- let me try it this way.

22           There were probably seven documents, maybe ten

23  documents, other than e-mails that were dealing with The Grace

24  Foundation.  And we would not have created a separate file for

25  The Grace Foundation.  They very well may have just been put

1    in the 8045 1267 file, which is the BAC WFB file, because they

2    were similar -- they had similar issues and similar

3    circumstances.

4        Q    Okay.  Let's return to the exhibit that we were

5    talking about.

6        A    Yes.

7        Q    This is the news letter -- I don't know, it is a

8    letter to the supporters of Grace that you are editing.

9             Let's go down on Page 2 to the paragraph that starts

10   with the word "Although."

11       A    Page 2, yes.

12       Q    That reads:  "Although The Grace Foundation may now

13   begin the process of assessing and placing the horses that are

14   not pregnant up for adoption,...."

15            Okay?

16       A    Um-mm.

17       Q    And the question is:  What was it about January 6,

18   2012 that made it now an appropriate time for them to place

19   these horses up for adoption?

20       A    I am trying to remember a triggering event.  Let me

21   look at my time line that we have marked as Exhibit 1.

22            Let me look for it there.  Do you need a paperclip

23   for that or something?

24       MS. SAGHEB:  Please.

25       THE WITNESS:  This has been marked.  It appears to be a

1    duplicate.

2        MS. SAGHEB:  Thank you.

3        THE WITNESS:  Well, I e-mailed it to myself on my phone.

4    So let me look for it there.  Because it appears someone has

5    absconded with it --

6            Oh, I am sorry.  I have some of the exhibits here.

7    Oh, here.  I'm sorry, I didn't realize I had the actual

8    exhibits.

9        MR. JAMPOL:  Let's hand these back to the Reporter.

10           Exhibit 21?

11       THE WITNESS:  I don't want to make this pile any worse

12   than it is.  Let's put it in some kind of order.

13           Can we take a quick break and I will use the

14   restroom while you are finding that?

15       MS. SAGHEB:  That's a good idea.  And in the meantime,

16   could we get the binder that you said you reviewed in

17   preparation for deposition, can I grab that and take a look at

18   that?

19       THE WITNESS:  Yeah, sure.

20       MR. JAMPOL:  It's back there.

21       THE VIDEOGRAPHER:  We are now going off the record.  The

22   time on the video monitor is 17:43.

23           (RECESS HAD; 5:43-5:51 P.M.)

24       THE VIDEOGRAPHER:  We are now going back on the record.

25   The time on the video monitor is 17:51.

1          Counsel, begin please.

2     Q     BY MS. SAGHEB:  All right.  Let me cover a couple of

3  short things.

4          Were you paid for the work that you did related to

5  the criminal investigation and charges related to the Bennett

6  matter?

7     A     I felt that it was my duty as an officer of the

8  Court to spend my own time to compile a prosecution package,

9  because the District Attorney related to me on the telephone

10  that what he had received from the Public Works Department

11  wasn't sufficient.

12          So on a Saturday and a Sunday and another Saturday

13  and a Sunday, while watching NFL Red Zone, I believe, I

14  compiled a prosecution package containing everything that I

15  thought would help the District Attorney to achieve the

16  prosecution against Mr. Bennett.

17          So the answer is no.

18     Q     And you have mentioned a couple of times that you

19  felt Ms. DeCaprio in particular or The Grace Foundation had

20  altered documents related to either this action or the Allen

21  action.

22          We have discussed the August, 2011 e-mail --

23     A     Yes.

24     Q     -- in which you explained what you meant by that?

25     A     Um-mm.

1      Q     Aside from that, is there anything else that you

2  feel has been altered by The Grace Foundation or Beth DeCaprio

3  or anybody else related to or associated with The Grace

4  Foundation or Beth DeCaprio?

5      A     Yes.

6      Q     Okay.

7            Well, can you give us a listing of what that

8  evidence or documents you are referencing?

9      MR. JAMPOL:  Well, that is his work product.  I mean, it

10  is also part of our work product and it is a violation of the

11  attorney-client privilege.

12           So I will object and instruct him not to answer on

13  those grounds.

14      MS. SAGHEB:  Well, I guess I am a little confused by the

15  objection.

16      Q     But we are talking about the time period -- well,

17  strike that.

18           We are talking about your contentions in this

19  lawsuit.  Are you contending that Ms. DeCaprio, The Grace

20  Foundation, or anybody acting on her behalf or its behalf has

21  altered or modified documents in any way?

22      MR. JAMPOL:  All right.  You can answer "yes" or "no,"

23  whether you make that contention.

24      THE WITNESS:  Yes.

25      Q     BY MS. SAGHEB:  Aside from the August -- August 17

1    or August 18 e-mail that we have discussed already, what other

2    documents or evidence do you believe has been altered or

3    modified?

4        MR. JAMPOL:  That again is his work product privilege, my

5    work product privilege and attorney-client privilege.

6            And I will instruct him not to answer.

7        MS. SAGHEB:  All right.  Well, then, we are going to move

8    to exclude any such evidence because you are not allowing us

9    to do discovery on that.

10       MR. JAMPOL:  You do what you want.

11       Q    BY MS. SAGHEB:  And on this issue, are you electing

12   to follow your attorney's advice?  On this specific issue

13   related to altered or modified evidence?

14       A    I am going to follow my attorney's advice.

15           And even if I weren't going to follow my attorney's

16   advice, it is just not something that I prepared.  I would

17   have to take some time to specifically look for that.  So I

18   wouldn't -- even if my attorney didn't object, I wouldn't be

19   able to give you the universe of documents as I sit here

20   today.

21       Q    You indicated that there is a universe of documents

22   as you sit here today.

23           Can you give us an idea of how many documents we are

24   talking about?  Five?  500? 5,000?  What is the range?

25       A    I don't know.  It is something less than 5,000.

1    Something less than 100.  Probably could be between 50 and

2    100.

3         Q    Okay.  50 and 100 documents, that have been

4    modified.  In my opinion, not an insignificant number.

5              Are these generally e-mails or other forms of

6    evidence?

7         MR. JAMPOL:  Well, I will let you answer that much.  But

8    I am not going to let you answer any question regarding your

9    opinion of what documents have been altered.

10        THE WITNESS:  The reason I gave a could have in that

11   range is because -- I don't want to get in trouble from my

12   attorney.  So I will say generally e-mails.

13        Q    BY MS. SAGHEB:  Generally.  Okay.

14             Now, are these only e-mails as between you, your

15   firm, on the one hand, and The Grace Foundation and -- or are

16   they -- do they include e-mails between The Grace Foundation

17   and third parties or third entities?

18        MR. JAMPOL:  That is getting too close.  I will object on

19   the ground it invades the work product privilege for both of

20   us and the attorney-client privilege.

21             And instruct him not to answer.

22        THE WITNESS:  I will take my attorney's advice.

23        Q    BY MS. SAGHEB:  All right.

24             Let's go back to the document that we were

25   considering prior to the break.  This is the document that you

1    edited on -- for The Grace Foundation to prevent any liability

2    on their part.

3            We were discussing on Page 2 the paragraph that

4    begins the word "Although."  And the question posed prior to

5    the break is why, you know, as of the date of this e-mail,

6    which is January 6, 2012, why The Grace Foundation could now

7    place the horses up for adoption?

8        A    Well, that is not what it says.

9            And you mischaracterized my testimony.  I did not

10   say edited this document to prevent liability.  I said I

11   edited this document to guard against liability.  I wish I was

12   that good; I am not.

13           The paragraph does not say that.  It says:  Although

14   The Grace Foundation may now begin the process of assessing

15   and placing the horses that are not pregnant up for adoption,

16   et cetera, et cetera.  So it does not say they can place them

17   up for adoption.  It says they be can begin the process.

18       Q    What is the difference?

19       A    Well, one is saying you can adopt them out and the

20   other is saying you can begin the process.

21           I mean, is that explanation not sufficient for you?

22       Q    I don't quite understand why in January of 2012,

23   they could begin the process as opposed to December of 2011.

24       A    Fair question.  I appreciate that clarification.

25           The -- I am just going to look at my time line to

1    make sure I don't misstate the testimony.

2            I believe -- I don't want to -- don't hold me to the

3    exact date -- but I believe that approximately January 6, 2012

4    the Bankruptcy Trustee abandoned the Whispering Pines horses

5    within the bankruptcy.  I believe that happened on January 6,

6    2012.

7        Q    Very good.

8            So in your opinion, the only thing that was standing

9    in the way of The Grace Foundation adopting those horses out

10   was the fact that the Trustee had some claim over them, and

11   once that claim had been released or abandoned, then The Grace

12   Foundation could now start to adopt those horses?

13       A    No.  Absolutely not.

14       Q    Okay.

15           Then what was it that they could do at that point?

16       A    Well, if you recall, from the e-mails that were

17   produced, I was anticipating a conference call at the

18   beginning of the year.  I think my e-mail was December --

19   December 30, 2011 e-mail to The Grace Foundation about the

20   fact that The Grace Foundation needs to decide how it wants to

21   interpret the County transfer paperwork.

22       MR. JAMPOL:  Slow down.

23       THE WITNESS:  And the U.S. -- the Bankruptcy Trustee's

24   abandoning the horses from the estate relieves Grace of a

25   significant impediment to getting the adoption done.

1           I mean, if they are part of the estate, you know,

2    you can't do anything with them.  But once the U.S. Trustee

3    abandoned them, then Grace and I would look to see what other

4    orders that we needed to obtain, as discussed in my

5    September 16, 2011 e-mail, and get the horses adopted out

6    and/or return them to the rightful owners, whatever --

7    whatever path was chosen.

8           Q     Right.

9           So essentially once they are no longer part of the

10   bankruptcy estate, you gave Grace those two options:  You can

11   adopt them out, because the County gave you final disposition.

12   Or you can make the claim against the County to take care of

13   them.

14          Right?

15          A     No.  No.  I told The Grace Foundation that we needed

16   to meet to discuss the position that The Grace Foundation

17   would take.

18          Of course, with the background of the

19   September 16, 2011 clear correspondence that informed Grace

20   that there were likely -- or potentially additional court

21   orders that would be necessary prior to being able to adopt

22   out the remaining horses that weren't claimed by rightful

23   owners.

24          Q     Well, in September of 2011, you were aware that

25   Grace was planning an adoption day involving the Whispering

1    Pines horses.

2            Is that an untrue statement?

3        A    Let me think about that.

4    MS. PRESTON:  Could we have the question again, please.

5        (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

6        "Q      Well, in September of 2011, you were aware

7    that Grace was planning an adoption day involving the

8    Whispering Pines horses.

9            "Is that an untrue statement?")

10    THE WITNESS:  Well, I already testified to that.

11        I think my testimony was and is that on

12    September 15, 2011, when I was looking at The Grace Foundation

13    website to determine more information about the entity for the

14    purpose of helping them out in a financial capacity, I

15    stumbled upon the post on their -- I think it was the Facebook

16    page, about an adoption event.  So yes, on September 15, 2011,

17    I was aware that The Grace Foundation was attempting to adopt

18    out the August rescue from Whispering Pines.

19        Q    So are you saying that prior to September 15th, you

20    had no idea that an October event was planned to adopt out the

21    Whispering Pines horses picked up in August?

22        A    I would have to look at the correspondence.  I don't

23    want to make an untrue statement.  But as I sit here today, I

24    don't believe -- I don't believe I was aware that The Grace

25    Foundation -- no.  I know that I was not aware prior to

1    September 15, 2011, that The Grace Foundation intended to

2    adopt out the August rescue from Whispering Pines.

3              As to whether or not they had some adoption day

4    going on, you know, that was two years ago.  It really would

5    not have been an important issue for me.  So I don't want to

6    say with certainty that that wasn't communicated to me

7    somehow, but I don't remember.

8         Q    At some point your family spent some time up at The

9    Grace Foundation.

10             Can you time that for me?

11        A    I can.

12        Q    Okay.

13        A    I can.  My family including me?

14        Q    I believe so.

15             Was there more than one event that your family was

16   up there?

17        A    I was up there on October 20, 2011.  I wouldn't call

18   that an event.  I would call it a person who was moved by what

19   The Grace Foundation had done for these animals.

20             And so I had a deposition in Sacramento on the next

21   day, and I thought it was worthwhile for me to spend a

22   billable day at the ranch seeing what they -- what their

23   mission was and what they did and if I could help financially,

24   yeah.

25        Q    So when you indicate that it was a billable day, you

1    were there and you were getting paid by your clients?

2        A     No.  It was a billable day that I chose to spend at

3    The Grace Foundation and did not bill anybody.

4        Q     You referenced a meeting -- in the context of

5    answering the question related to what The Grace Foundation's

6    options were --

7        A     Yes.

8        Q     -- you referenced a meeting.

9              You said that you would have to meet with them and

10   discuss their options?

11       A     Yes.

12       Q     And this was after the Bankruptcy Trustee had now

13   abandoned the horses?

14       A     It was on December 30, 2011.  I sent an e-mail, as I

15   was just looking at my year end things and the things I wanted

16   to do the next year.  I had a very good relationship with

17   Counsel for the U.S. Trustee -- for the Bankruptcy Trustee,

18   excuse me.

19             And she informed either Austin or I before -- we

20   encouraged her to file the motion.  We gave her the underlying

21   facts.  She filed the motion.  And when she did not receive an

22   opposition, she picked up the phone and called me.  And so on

23   the 30th, I recognized that the horses would likely be

24   abandoned at the motion on January 6, 2012.

25             And so I sent an e-mail to Beth and Taira, I

1    believe, saying that we needed to set up a conference call for

2    the beginning of the year to determine exactly how we were

3    going to deal with and treat the horses moving forward.

4         Q     All right.

5               And did that meeting occur?

6         A     It never occurred.

7         Q     And why not?

8         A     Because Beth did not want it to occur.

9         Q     Are you saying that you pursued the idea of a

10   meeting and that Ms. DeCaprio declined?

11        A     I am saying I had e-mailed her about that decision

12   that needed to be made in October.  I had spoken with her

13   about it approximately three times at that point in time on

14   the time line.  And I e-mailed her again on December 30, 2011.

15              You know, if someone that I am trying to help insure

16   does not get sued because of good acts that they are doing

17   does not get back with me, you know, I can't control that.

18        Q     Did you personally contact Dr. Russell about his

19   Declaration involving the Bennett bankruptcy?

20        A     I believe that was Austin Beardsley's motion.

21   Because I think I was in trial at the time.  It was a very,

22   very busy two weeks.  But I believe Austin Beardsley was in

23   charge of that.

24        Q     So was the answer to my question no, you did not

25   contact Dr. Russell?

1      A      The answer to that question is I likely didn't

2   contact Dr. Russell.

3      Q      But you just don't have a recollection one way or

4   the other?

5      A      I don't have a hundred percent recollection.  I

6   don't want to speculate.

7      Q      Did you ever receive a response by the County on the

8   demand you had submitted on behalf of The Grace Foundation?

9      A      No, I did not.

10      Q      And why didn't -- strike that.

11              Did you follow up in regard to that demand?

12      A      I don't know that we did.

13              I know that approximately 45 days later Beth

14   DeCaprio sent me an e-mail implying that I had breached my

15   duty to her.  And I had to consider what the appropriate

16   communication or step should be in my relationship with

17   Ms. DeCaprio at that point in time.

18              And I will just -- I will add I don't want that to

19   be an incomplete answer.  Mr. Beardsley was charged with

20   following up with the County.  And so if he made any

21   additional phone calls, he would know that information.  But I

22   know that I did not send any letters and I know that no

23   letters left our office concerning the March 16th -- I think

24   it is -- or 6th -- whatever it is, letter to the County of

25   Lassen.

1    Q    As you sit here today, is it your impression that

2    when you negotiated the payment to The Grace Foundation, the

3    $40,000 that was paid, that you were negotiating on behalf of

4    the banks?

5    A    I didn't negotiate anything.

6    Q    Well, what do you mean?

7    A    The Grace Foundation made a demand to Vicki Lozano.

8    Vicki Lozano communicated with Grace exclusively.  Maybe Pete

9    talked to Grace -- I don't know.  Vicki Lozano communicated

10   with Grace regarding the amount of donation that would be

11   required.

12        I was under the impression, and Ms. Lozano was under

13   the impression up until the very beginning of August that

14   Grace was going to be taking the horses without the necessity

15   of a donation.  It came as a bit of a surprise to me in early

16   August when Ms. Lozano e-mailed me and said that -- I think

17   the e-mail says, are you sitting down, and then she tells me

18   that Grace wants $40,000 to take the horses.

19        So I had no part in any negotiation concerning the

20   amount of any donations to The Grace Foundation.

21   Q    Okay.

22        This is the August 4th e-mail that we discussed at

23   some length earlier in which The Grace Foundation sets forth a

24   couple of options, right, in which it could potentially be

25   paid for the care of the horses; correct?

1        A     No.  No, it is not.  You haven't shown me the e-mail

2    from Vicki Lozano where Vicki Lozano e-mails me on August 4th,

3    attaching the e-mail you reference, where she says, Tim, are

4    you sitting down -- words to that effect -- The Grace

5    Foundation wants $40,000 to take the horses.  I think I

6    e-mailed back OMG, or something similarly professional.

7        MS. SAGHEB:  I'm sorry.  Could you read my question.  I

8    can't tell if his response was there.

9             (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

10            "Q     This is the August 4th e-mail that we

11            discussed at some length earlier in which The Grace

12            Foundation sets forth a couple of options, right,

13            in which it could --")

14        MS. SAGHEB:  I got it.

15        Q     When you reviewed the August 4th e-mail setting

16    forth the various options, did you understand that e-mail to

17    mean that Grace Foundation expected to be paid for the

18    services that it was going to be rendering?

19        A     Well, I testified to that earlier, and you are

20    misstating my testimony.  I did not say that I reviewed the

21    exhibit that you have identified here.  What I said was I read

22    the e-mail from Vicki Lozano that said, holy cow, are you

23    sitting down -- whatever the words are -- they want $40,000,

24    and that I likely did not read the entire e-mail until this

25    lawsuit was initiated.

1          By the entire e-mail, I mean the e-mail from The

2     Grace Foundation to Vicki Lozano.

3          Q    Okay.  I got it.

4          Let's go back to Exhibit 21.  On the third page of

5     the letter that was edited by you at the very last paragraph.

6          A    Third page the exhibit, or third page of the

7     press release?

8          Q    Third page of the press release, last page of the

9     exhibit.

10         A    Okay.

11         Q    Last paragraph of the last page of the exhibit,

12    which starts:  January 3, 2012.

13         Do you see that?

14         A    Yes.

15         Q    As edited by you, that paragraph reads:

16         "January 3, 2012, the bankruptcy court, on the

17         motion of the Chapter 7 Trustee, ordered all of Bennett's

18         animals abandoned thereby affirming The Grace Foundation

19         of Northern California's legal custody of the animals."

20         Right?

21         A    Yes.

22         Q    Did the bankruptcy order address the legal custody

23    of the animals?

24         A    I'm not certain that it did.

25         Q    Then what is the basis for this particular

1    representation in this letter?

2        A    It was a nice paragraph.  The way that existed

3    misstated everything, you know, that nothing was turned over

4    to The Grace Foundation on January 3, 2012.  I did not see

5    anything terribly irresponsible about it, and it did not seem

6    to me that it exposed them to any liability at all whatsoever;

7    so I did not rewrite it.

8        Q    Is it --

9        A    Just changed a few words.

10       Q    Is it accurate, the way that it is rewritten by you?

11       A    Well, it wasn't -- you are misstating my testimony.

12   And it wasn't rewritten by me.  I just said I didn't rewrite

13   it.

14       Q    It is a differ question.  And it has to do with

15   the --

16       A    You framed the question as rewritten by me.  And I

17   just testified that I didn't rewrite it.  So if you could

18   please not change my testimony when you frame your questions.

19       Q    The modifications were made by you in that

20   paragraph; correct?

21       A    I believe so, yes.

22       Q    As modified by you, is that paragraph accurate?

23       A    Well, the first sentence is -- the first part before

24   the word "and" that has strike through, is accurate.  The

25   second part, affirming The Grace Foundation of Northern

1    California's legal custody of the animals -- I would not say

2    it is inaccurate.  They had custody of the animals.

3        Q    Did they have legal custody of the animals?

4        A    Yeah.  They were turned over to them by a valid

5    court order of July 29, 2011.  So, yeah, they had custody of

6    them.

7            And I understand custody to mean possession, not

8    ownership.  If you understand custody to mean something else,

9    then that is an inaccurate paragraph.

10       MS. SAGHEB:  We are going to mark the next document as

11   TMR 000718.

12       MR. JAMPOL:  That Exhibit 22?

13       MS. SAGHEB:  Yes.

14           (EXHIBIT No. 22 WAS IDENTIFIED FOR THE RECORD AND

15       MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

16       INCLUDED HEREWITH.)

17       Q    BY MS. SAGHEB:  If you would look at the top e-mail

18   and confirm that that is an e-mail that you drafted?

19       A    Yes.  Absolutely.

20       Q    And you sent?

21       A    Yes.

22       Q    Okay.  I only have one copy unfortunately, so I will

23   have to -- you will have to share with me so that I can ask

24   you a question.

25       MS. PRESTON:  Is it Bates stamped in any way?

1       MR. JAMPOL:  It is.

2       MS. SAGHEB:  TMR 000718.

3       MS. PRESTON:  Thank you.

4       Q    BY MS. SAGHEB:  This is an e-mail from you to

5  Ms. Lozano?

6       A    Yes.

7       Q    And in that e-mail you state:  This is a huge

8  financial drain.

9            Right?

10      A    I believe that is what I state at the end of the

11 e-mail, yes.

12      Q    And when you state that --

13      A    Yes.

14      Q    -- what do you mean?

15           Who is it a financial drain on?

16      A    Well, I mean that it is a big financial drain on the

17 Receiver in the receivership estate.

18      Q    And who was paying the Receiver?

19      A    Well, no one was paying the Receiver at the time.

20 But ultimately the entity that moves to appoint the Receiver

21 will have to make up the difference in the Receiver's approved

22 hours by the bankruptcy -- by the overseeing court versus the

23 cash that came into receivership estate during the term of the

24 receivership.

25      Q    Was there any cash coming into the receivership

1    estate?

2         MS. DILL:  Sorry.  I just wanted to object to his answer

3    to the extent that he is stating a legal conclusion as to how

4    the receivership works.

5              Sorry to interrupt.

6    THE WITNESS:  Yes, there was.

7         Q      BY MS. SAGHEB:  From what source?

8         A      A cell phone tower on the property.

9         Q      Do you know the amount of the -- of the income from

10   that?

11        A      I believe -- I don't want to try and give you an

12   exact amount.  It was somewhere between 500 and $2,000 a

13   month.

14        Q      So the financial drain that you were talking about,

15   that was -- I think you indicated as to the moving parties,

16   which would have been Wells Fargo and Bank of America?

17        A      I believe the moving party was Wells Fargo.  I am

18   going off the top of my head.  We can look at the order so we

19   can be accurate.

20        Q      Yes.

21        A      Yeah, the application was by Wells Fargo Bank.

22        Q      Okay.

23              So would it be a fair statement to state that

24   whatever the difference between the income from the cell tower

25   and the expenses of Lozano, it was Wells Fargo Bank that would

1    have been responsible for paying them?

2         MS. DILL:  Same objection.

3         MS. KOUVABINA:  I'm sorry, I did not hear the question.

4         MS. SAGHEB:  Lorrie, could you read that back.

5         (WHEREUPON THE RECORD WAS READ AS FOLLOWS:

6            "Q    So would it be a fair statement to state that

7         whatever the difference between the income from the cell

8         tower and the expenses of Lozano, it was Wells Fargo Bank

9         that would have been responsible for paying them?")

10   THE WITNESS:  Do I need to answer that?

11   MR. JAMPOL:  Yes, sure.

12   THE WITNESS:  Yeah, I mean, that is how it works.

13   Q    BY MS. SAGHEB:  So the huge financial drain that

14   would have been in reference to what Wells Fargo Bank would

15   have had to pay?

16        MS. DILL:  Same objection.  Legal conclusion.

17        THE WITNESS:  Ultimately, yes.

18   Q    BY MS. SAGHEB:  Why were both banks not involved in

19   the petition to appoint the Receiver.

20        MR. JAMPOL:  Well, if there is an objective reason that

21   does not come by communication from the banks and does not

22   involve your decision, you can testify to it.  As an example,

23   if somebody did not have the standing to do it or something

24   like that.  But to the extent that that was a decision that

25   was that made by somebody, then it is work product and

1    attorney-client privilege and you can't answer as to that.

2        MS. DILL:  Same objection.

3        THE WITNESS:  I am going to accept my Counsel's

4    instructions not to answer.

5        MS. SAGHEB:  Okay.

6        Q    Just so I -- maybe I should have asked you at the

7    beginning of the deposition:

8             Each bank, did it have the same relationship to

9    Bennett property or different relationship to the Bennett

10   property?

11       A    Relationship, meaning what was --

12       Q    They were both mortgagors and both lien holders?

13   Same relationship?  Different relationship?

14       A    Well, Wells Fargo Bank as Trustee to the named trust

15   was the beneficiary, current beneficiary of the deed of trust.

16   And BAC was the successor in interest to -- well, they were

17   the concurrent servicer.

18       Q    The current servicer of the loan?

19       A    Yes.

20       Q    Getting back to the Exhibit 22, the remainder of the

21   sentence:  "This is a huge financial drain.... "

22            Reads:

23            "... and I am going to make the other parties to the

24       settlement agreement bear this cost."

25       A    Yes.

1      Q      Who are the other parties to the settlement

2   agreement that you are referencing in the e-mail?

3      A      Well, on the day of the -- we never got there in the

4   time line, because you stopped asking questions.

5             But there was a Mandatory Settlement Conference.

6      Q      On which day are we talking about now?

7      A      On the day of the receivership hearing and the

8   Motion for Summary Judgment.

9      Q      Okay.

10     A      There was a Mandatory Settlement Conference.

11            And I am 99 percent sure that it happened that day.

12  I don't want to say with 100 percent certainty, because it was

13  two years ago, and there is a lot of dates flying through my

14  head.

15     Q      Okay.

16     A      But I am almost positive that it was that day.  And

17  at that Mandatory Settlement Conference, we discussed

18  settlement.

19     Q      I'm sorry --

20     A      Yes.

21     Q      Just so I have a bearing:  Mandatory Settlement

22  Conference is now coming after the Receiver has been

23  appointed --

24     A      Um-mm.

25     Q      -- and before or after Grace has picked up the

1    horses?

2         A    Before.

3         Q    Before Grace picked up the horses.  Okay.  Go ahead.

4         A    It is sometime at or near July 21, 2011.  It could

5    have occurred the day after.  It was right around that day.

6         MR. JAMPOL:  Let me interrupt just for a second.  I am

7    going to let him answer, but I just want to make a point.

8    Under Rojas, I am not sure how absolutely privileged any of

9    this is.  But since nobody is asserting this as a privilege,

10   it is not relevant as a privilege in this litigation unless

11   the banks feel otherwise.

12        MS. DILL:  I am not sure what you are asking about.

13        MS. SAGHEB:  I am not either.

14        MR. JAMPOL:  Well, if you are asking what occurred in a

15   Mandatory Settlement Conference --

16        MS. SAGHEB:  No, I am not.

17        MR. JAMPOL:  All right.  If you're not, then that was

18   only my concern.

19        Q    BY MS. SAGHEB:  So let me restate the question so we

20   don't have a lot of dialogue.

21             I want to get what you meant when you wrote:

22             "... I am going to make the other parties to the

23        settlement agreement bear this cost."

24             As you wrote it on August 4, 2011?

25        A    I will speak slowly so objections can be interposed

1    if Counsel feel it is appropriate.

2         MS. DILL:  Sure.

3         THE WITNESS:  At or around July 21, 2011, there was both

4    a Mandatory Settlement Conference, and thereafter -- it was

5    July 21, 2011.

6              And there was a meeting, if you will.  The

7    inspection that happened up at the Whispering Pines.  During

8    the Mandatory Settlement Conference, Judge Girdano got a

9    little bit frustrated and said, go try to settle this on your

10   own.

11             At the Whispering Pines property, the other

12   Defendants didn't quite understand what the Summary Judgment

13   Summary Adjudication Motion did.  They did not realize it

14   eliminated all of their interests in the property.  And when

15   we were up at the ranch, I explained that to them.

16             But I also explained that if we could get everyone

17   on board settling, that it would be a better result.

18             So we had drafted the broad outlines of a settlement

19   agreement, that wherein the Whispering Pines property would

20   undergo a lot line adjustment.  And certain parties would get

21   certain parcels.  I just wanted to insure that the bank

22   received the value, the valued parcels, and I didn't really

23   care what kind of dirt the other parties got.

24        MS. DILL:  Let me stop you for a second and ask you to --

25   excuse me -- not to disclose any other strategy reasons for

1    the things that happened --

2        THE WITNESS:  Sure.

3        MS. DILL:  -- and just talk about the actual settlement

4    conference to the extent that you can.

5        THE WITNESS:  Yeah, it is going to be tough.  So --

6        MR. JAMPOL:  I think you can just limit the testimony --

7        MS. SAGHEB:  Let me try to fix the question a little bit.

8        Q     Let's start here:

9              Who are the other parties?

10       A     The other parties are the other parties to the

11   Allen v. Bennett litigation.

12       Q     Okay.

13             So you had an idea that perhaps you could structure

14   a settlement agreement such at that other Plaintiffs,

15   Defendants, Cross-Complainants and Cross-Defendants could bear

16   the cost of what?

17             Taking care of the horses?  Feeding the horses?

18   Taking the horses to do what?

19       MS. KOUVABINA:  I have -- I have to object.  You know, it

20   is just a very touchy area there.

21       MR. JAMPOL:  Well, to the extent that the Bank's

22   objecting, I instruct you not to answer the question.

23       THE WITNESS:  Well, touchy area.

24       MS. DILL:  Do you mind if I look at the exhibit just for

25   a second.  Thank you.

1    MR. JAMPOL:  Any time they are going to object, you are

2  going to have to not answer the question.

3    THE WITNESS:  I am good with that.  That is why I was

4  answering slowly.

5    MS. DILL:  I will agree.  To the extent he is going to

6  talk about strategy talks that he had on how settlement was

7  going to be structured, and what it was going to contain,

8  outside of what actually happened at the settlement

9  conference, or what he actually said to Vicki Lozano in

10  connection with this, I am going to instruct him not to

11  answer.

12    MS. SAGHEB:  That is fine.

13    Q    So this cost, limiting the answer to just those two

14  words as you used them in the e-mail of August 4, 2011, this

15  cost, what are you referring to?

16    A    I am going to have to look at the e-mail.  I don't

17  want to be inaccurate in my testimony.

18    Q    Sure.

19    A    I believe so.

20    Q    You believe what?

21    A    I believe that cost was the cost associated with the

22  animals on the property.

23    Q    That would include caring for them medically and

24  feeding them, et cetera?

25    A    No.  I don't believe it would include medical care.

1    I believe it would include feeding them and keeping them

2    watered, yes.

3        Q    Did you ever figure out a way of doing -- doing what

4    you explained that you wanted to do in that e-mail?

5        MR. JAMPOL:  Excuse me.  Could you read the question

6    back, please.

7        MS. SAGHEB:  I am trying to avoid stepping on toes.

8        MS. DILL:  I am comfortable with him answering whether

9    there was a partial settlement agreement entered into that

10   resolved the issue.

11       MS. SAGHEB:  Okay.

12       MS. DILL:  In terms of figuring out an idea, I think it

13   is questionable.

14       MS. SAGHEB:  Okay.  Then let me restate the question.

15       Q    Was there any full or partial settlement agreement

16   with any other parties in the Allen matter that would have

17   resolved the issue of the finances for taking care of the

18   horses?

19       A    No.

20       Q    Did you call The Grace Foundation to ask them to

21   provide you with a letter that would indicate that the $40,000

22   being paid by the banks was a -- was a grant of some sort?

23       A    I think we have already trod that territory.  And I

24   answered about five hours ago that I don't remember if it was

25   Grace that called me or me that called Grace.  It was likely

1    me calling Grace.  It was on either August 16th or 17th, 2011.

2         And I didn't tell -- I did not instruct Grace to

3    characterize anything as anything.  I told them that the

4    financial institutions had amazingly decided to donate $40,000

5    to The Grace Foundation and that I needed a grant proposal to

6    provide to my clients to show what that $40,000 would be used

7    for.

8         Q    And did The Grace Foundation provide you with such a

9    grant proposal?

10         A    They provided me with a letter on August 18th, 2011.

11    It was unsigned.  But I accepted that as their grant proposal

12    and forwarded it on to the client.

13         Q    And were you involved in negotiating any sums to be

14    paid by the County of Lassen for the care of the horses?

15         A    No.

16         Q    If you were not involved in negotiating any sums

17    with the County of Lassen, what would have been the basis of

18    making a demand against the County for the feed of the horses?

19         A    Ms. DeCaprio's continued insistence that she had a

20    contract with the County of Lassen requiring the County of

21    Lassen to pay her back for feed and care of the Whispering

22    Pines horses.

23         As I testified to about four hours ago, she was

24    never clear as to whether it was the April rescue or the

25    August rescue.  I couldn't -- I couldn't get that information

1    out of her, and I couldn't get a copy of the contract.  But --

2    but she implied that a contract existed for the -- between The

3    Grace Foundation and the County of Lassen for the feeding and

4    care of animals rescued at Whispering Pines.

5        Q    Did you write up any agreement between Lassen and

6    The Grace Foundation regarding the horses?

7        A    I don't think there is any agreement between Lassen

8    and The Grace Foundation regarding the horses.

9             I think that question assumes facts not in evidence.

10       Q    So the answer is no, you did not write any such

11   document up; right?

12       A    No, I don't think any such document exists.

13            But no, I didn't -- I have never written anything on

14   behalf of the County of Lassen.

15       Q    What about on behalf of The Grace Foundation as it

16   references county -- the County's obligation to care for the

17   horses?

18       A    I don't understand your question.

19   MS. SAGHEB:  Let's mark a series of the documents No. 23.

20       (EXHIBIT No. 23 WAS IDENTIFIED FOR THE RECORD AND

21       MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

22       INCLUDED HEREWITH.)

23       Q    BY MS. SAGHEB:  I would like you to look at the

24   first page of the series of documents I have shown you, and I

25   would like you to go down to the section of the -- about

1    halfway down, the section of the e-mail that reads, from

2    Ms. DeCaprio to yourself:

3            "Also, I am wondering if you have the original

4        agreement that you wrote up between Lassen and us

5        regarding the horses."

6            Now, here is the question, the question is:  Did you

7    ever respond to Ms. DeCaprio by stating something like:  No?

8    Or:  I don't know what you are talking about?  Or:  Here it

9    is?

10            Did you respond in some fashion?

11    A    Well, firstly, you have presented this Exhibit 23 to

12    me and you have --

13    Q    I'm sorry.  Sir, I don't need your critique on the

14    exhibit.  All I need to know is the answer to the question

15    that I asked you.

16            Do you have an answer or not?

17    MR. JAMPOL:  Well, the answer -- the question supposes

18    that this is actually an e-mail sent to Mr. Ryan.  This is not

19    an e-mail form, it looks like the same word processing form

20    that we saw before.  So I think he would be remiss without

21    looking at the original e-mail to make sure that the e-mail

22    actually did say what this seems to say.

23    MS. SAGHEB:  Would you like to take a break to look at

24    the e-mail?

25    THE WITNESS:  Do you have it?

1          MS. SAGHEB:  I have what I showed you.

2          MS. MASON:  I have it.

3          MS. SAGHEB:  Oh, thank you.

4          MR. ROSENBERG:  Do you want to take five?

5          MS. SAGHEB:  Let's finish this.

6              Let's mark this as Exhibit 24.

7              (EXHIBIT No. 24 WAS IDENTIFIED FOR THE RECORD AND

8          MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

9          INCLUDED HEREWITH.)

10         Q     BY MS. SAGHEB:  Let's look at this reference of

11    Exhibit 24, referencing that section of Ms. DeCaprio's e-mail

12    to you, which reads:

13              "...I am wondering if you have the original

14         agreement that you wrote up between Lassen and us

15         regarding the horses."

16              The question is:  Did you respond to that inquiry

17    from your client?

18         A     I probably -- I responded angrily to Ms. DeCaprio.

19    I probably just shot her a copy of the agreement, the

20    agreement that you have identified as Exhibit 13 -- the

21    document that you identified as Exhibit 13.  I don't know that

22    it is an agreement.

23         Q     Is that a document that -- is that an agreement that

24    you wrote up between Lassen and The Grace Foundation?

25         A     Well, it is not an agreement, and I did not write it

1    up.

2         Q    All right.

3              Well, then, the question remains:  Did you respond

4    to her inquiry by stating:  I don't know what document you are

5    talking about?  Et cetera?

6         A    I don't know that I did.  I don't -- I don't see --

7    I don't recall an e-mail saying, what are you talking about,

8    or anything like that in my e-mail production, as I was going

9    through all of the e-mails.

10             So I don't know if I called her and said, "What are

11   you talking about?"  I know that I more than likely just

12   turned around and sent her a copy of Exhibit 13.

13        Q    Let me pull an e-mail.

14        THE VIDEOGRAPHER:  I am going to change the tape,

15   Counsel.  We have less than ten minutes.

16        MS. SAGHEB:  All right.  You know what?  Let's take five.

17        THE VIDEOGRAPHER:  We are now going off the record.  The

18   time on the video monitor is 18:39.  This is the end of DVD

19   No. 3 in the continuing deposition of Timothy Ryan.  We are

20   now going off the record.

21             (RECESS HAD; 6:39-6:53 P.M.)

22        THE VIDEOGRAPHER:  We are now going back on the record.

23   The time on the video monitor is 18:53.  This is the beginning

24   of DVD No. 4 in the continuing deposition of Timothy Ryan.

25             Counsel, begin please.

1      MS. SAGHEB:  Let's mark as Exhibit 25 a single e-mail

2  with two attachments.  The e-mail appears to be directed To:

3  beth@thegracefoundation, and appears to Cc Mr. Ryan and

4  appears that the sender is Austin Beardsley.

5          (EXHIBIT No. 25 WAS IDENTIFIED FOR THE RECORD AND

6      MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

7      INCLUDED HEREWITH.)

8      Q    BY MS. SAGHEB:  Would you take a look at that

9  e-mail, sir, and tell us whether you saw that e-mail on or

10 about the date that it purports to have been sent?

11     A    I would like to look at Exhibit 24 to make sure my

12 testimony is accurate.

13          Yeah, that makes sense.  I will clarify.

14     Q    The only question was whether -- did you see it?

15     A    Did I see it before it was sent?

16     Q    Did you see it in the ambit of your office?

17     A    Well, Austin cc'd me; so I am sure I did.

18     Q    Now, Exhibit 25 is a response to the e-mail sent by

19 Ms. DeCaprio that we marked as Exhibit 24; right?

20     A    Correct.

21     Q    And in that response Mr. Beardsley represents that

22 you have asked him to respond; correct?

23     A    Yes.

24     Q    And the particular question that he is responding to

25 is providing to Ms. DeCaprio the documents that she asks for

1    by way of her e-mail as -- "... the original agreement that

2    you --"  meaning, Mr. Ryan "-- wrote up between Lassen and

3    us --" meaning, the Grace Foundation "-- regarding the

4    horses"?

5         A    Yes.

6         Q    Now, that e-mail that you are holding as Exhibit 25

7    attaches two documents.

8              What are they?

9         A    Well, the court order surrendering the equines.  So

10   I believe the document we have marked as -- I don't remember

11   what exhibit.

12             But the July 29, 2011 order.

13        Q    Okay.

14             And that certainly is a document that would have

15   been drafted by you?

16        A    Um-mm.

17        Q    Yes?

18        A    Yes.  Absolutely.

19        Q    And then what is the second document that it

20   identifies?

21        A    I don't know.  It is a 1107K.  I would presume that

22   is the document that we have identified as Exhibit 13.  Let me

23   look.  It is more than likely the document that we have

24   identified as Exhibit 13.

25        Q    That is the final disposition document?

1        A      Yes, it is.

2        Q      So it seems to imply that you drafted that document

3   as an agreement as between Lassen County and The Grace

4   Foundation; correct?

5        MR. JAMPOL:  Well, is it correct that it seems to imply

6   that?

7        Q      BY MS. SAGHEB:  Right.

8             The next question is going to be:  Is the

9   implication accurate?

10             But right now the question is:  It seems to imply --

11        MS. PRESTON:  That misstates the prior testimony.  Also

12   misstates the evidence, and calls for speculation.

13        MR. JAMPOL:  It also calls for a conclusion by the

14   witness, and lacks foundation as to -- whatever that is.

15        THE WITNESS:  I actually remember the exchange.  And this

16   is actually quite helpful.  If you will allow me to answer in

17   a narrative, rather than the narrow question you have asked, I

18   can answer it.  But if you want me to answer that narrow

19   question, I think it is improperly phrased.

20        Q      BY MS. SAGHEB:  The document, does it not imply that

21   you drafted the final disposition agreement, as between The

22   Grace Foundation and Lassen County?

23        MR. JAMPOL:  Well, if you are asking him what inference

24   he drew from it, you can do that?  But when you put it in the

25   objective -- it does imply that.  That's -- I would object to

1   that.

2        MS. SAGHEB:   Okay.   Then let me restate.

3        Q     When you reviewed the e-mail that you were cc'd on

4   (indicating) --

5        A     Yes.

6        Q     -- indicating that there were documents attached and

7   those documents are in response to a request for written

8   agreements between Lassen County and The Grace Foundation --

9        A     Yes.

10        Q     -- did you deem that to be an accurate reflection or

11   an accurate answer to your client's question?

12        A     No.

13        Q     Did you do anything to clarify the issue for the

14   client?

15        A     Well, I am not sure I would go with the word client,

16   but it is what it is.

17             I remember the exchange.   I received the e-mail that

18   you have identified as Exhibit 24.   It was in my old office at

19   1100 North Tustin.   Austin's office was across the office.

20   And I either picked up the phone or yelled out to Austin,

21   "Hey, Austin, get in my office, Beth, she needs the transfer

22   agreement again."   And he came in and said, "What?"   And I

23   said, "Yeah, look at the e-mail, she is confused, just get her

24   out the -- just get her out the transfer agreement again."

25             Because Beth was notoriously disorganized and

1    constantly asking for things more than once.  So he laughed

2    and he said, "All right, I will send her the -- what do you

3    want me to send her?"  And I said, "Send her the disposition

4    agreement and send her the order, too."

5        Q    And you deemed those documents to be responsive to

6    Beth's request?

7        A    Yes.  Beth was a -- was very inexact in her

8    requests.

9        Q    That's fine.

10            I want to go back for a moment to Exhibit No. 22,

11   and the second line down from the beginning reads:  "Let's see

12   what the local rancher would charge... to just caretaker

13   them --" meaning, I assume the horses "-- until foreclosure."

14            Then the next sentence reads:  "But THEN what do we

15   do with them?.?.?"

16       A    Yes.

17       Q    Was that also a concern after the horses -- you

18   know, what do we do with them?

19            Well, let's start here.  I'm sorry.

20            The "we" that you are referencing, is that you, your

21   clients?  Who are you talking about?  You and the Receiver?

22            I am not sure who "we" is.

23       A    Well, we is -- she is a court appointed receiver.

24   My client is going to be ultimately responsible for, you know,

25   whatever the cost is at the end of the day.  So it was a

 1    collective statement.  My office, Ms. Lozano, and ultimately

 2    the client.

 3         Q    Okay.

 4         MS. DILL:  Sorry.  I would like to object to the portion

 5    of his testimony where he concluded it was his client's

 6    obligation.

 7         Q    BY MS. SAGHEB:  You used -- you said client in the

 8    singular as opposed to the plural.

 9              Were you referencing Wells Fargo or Bank of America?

10         A    Well, there is only one petitioner for the

11    receivership, and that was Wells Fargo.

12         Q    Okay.

13         A    That is who I was referring to.

14         Q    All right.

15         MS. KOUVABINA:  And I would make an objection -- the same

16    objection that the B of A's Counsel has just made.

17         Q    BY MS. SAGHEB:  When the --

18         MR. JAMPOL:  Just to make sure this is clear, based on

19    the objections, I move to strike that answer.

20         MR. ROSENBERG:  Overruled.

21         MR. JAMPOL:  All right.

22         Q    BY MS. SAGHEB:  When the --

23              Is it accurate to state that once those horses were

24    transferred to The Grace Foundation, the second part of your

25    sentence of:  "BUT then what do we do with them?" -- that was

1  remedied; right?

2      MS. DILL:  I don't think I understood the question.

3      MS. KOUVABINA:  I'm sorry, I did not hear the question.

4      Q   BY MS. SAGHEB:  Yeah, I am -- I am just trying to

5  determine whether at some point you figured that once The

6  Grace Foundation had the horses, then Wells Fargo no longer

7  had an obligation to care for the horses?

8      A   Well --

9      MS. DILL:  I am going to -- I am going to object to the

10 extent that that asks him to talk about either his mental

11 impressions or strategy or any attorney-client privilege, and

12 ask him not to answer

13     MR. JAMPOL:  I will join that.  And it also calls for a

14 conclusion as to what Wells Fargo's obligation, if any, was.

15     MS. PRESTON:  I will join in that objection.

16     MS. KOUVABINA:  And I join in that objection as well.

17     THE WITNESS:  Based on that cacophony of objections I

18 will not answer.

19     Q   BY MS. SAGHEB:  So at some point, did you make a

20 determination that Wells Fargo's obligation to care for the

21 horses had ceased?

22     MR. JAMPOL:  Well --

23     MS. DILL:  Same objection.

24     MR. JAMPOL:  Well, that calls for his work product.  You

25 are asking what the thought.  I mean, I thought we had gotten

1    that clear.  You are not going to get his thought processes in

2    representing the banks.  And so it is work product and it is

3    attorney-client privilege.

4           And I will object on both grounds and instruct him

5    not to answer.

6       MS. PRESTON:  It also assumes facts.

7       MR. JAMPOL:  I am sure there is plenty of other problems,

8    but that will do.

9       Q    BY MS. SAGHEB:  How did you receive the final

10   disposition agreement?

11      A    I have already testified to that.  I received it

12   from Beth DeCaprio sometime in the fourth quarter, I believe.

13   It would have been in late September or October of 2011.

14      Q    Did you have any --

15      A    Possibly November.  I don't want to be inaccurate.

16   Sometime in September or October or November.  No earlier than

17   the end of September.

18      Q    Did it come to you by e-mail?

19      A    I don't know.

20      Q    Or did anything ever come to you from The Grace

21   Foundation via mail?

22      A    I don't think so, but I -- you know, I don't open

23   the mail.  Stuff is -- when we receive a fax, it comes in the

24   same red folder that my assistant provides me for the mail.

25   When things are faxed to me, it appears as if it is mailed as

1    well.  So it could have come via fax, it could have come via

2    mail.  I don't want to speculate.

3         Q     So when things do come to you by mail, since you

4    indicated paperless, do they just get scanned and then tossed?

5         A     No.  They get scanned and then moved into a file

6    that isn't organized by category, but by client and matter

7    number.

8               And I have already testified that I did not open up

9    a client matter for The Grace Foundation.

10        Q     So the paper file, if I got it correctly, does

11   exist, but it is only as to matters received by your office?

12        A     No.  It is also as to matters sent for the most

13   part, yes.

14        Q     So you do print the e-mails that go --

15        A     No, not e-mails.  But pleadings.  You know,

16   correspondence.

17        Q     Could I see this again.

18        A     Sure.

19        Q     Did either Mr. Heimbigner or Lozano send you a copy

20   of the final disposition agreement?

21        A     I don't believe they did.  I believe the first time

22   I got it was from Ms. DeCaprio or Taira Mulliken.

23        Q     I'm sorry.

24               You are referencing the first time you got it.  I am

25   wondering if that is because it is just a phrase, or if you

1    got it from other people at other times?

2        A    Well, it was attached to the First Amended Complaint

3    and the Second Amended Complaint and the Third Amended

4    Complaint.  So I received it in various ways.

5            Prior to the Complaint being filed, I believe that

6    the only person or entity that I received it from was The

7    Grace Foundation.

8        Q    And what about the protective order that you seem to

9    believe was hidden from you by Ms. DeCaprio?

10           Was that sent to you by any other person or entity?

11       A    I don't believe that there is a protective order.

12   MR. JAMPOL:  Meaning Exhibit 14?

13       Q    BY MS. SAGHEB:  Exhibit 14, the one that says

14   "Protective Custody."

15       A    I want to make sure we are talking about the right

16   thing.  It was not an order.

17       Q    You called it an order --

18       A    I did.

19       Q    -- and now I am calling it an order.

20   MR. JAMPOL:  Let's refer to it as Exhibit 14.

21   THE WITNESS:  14.  The first time that I knew of the

22   existence of Exhibit 14 was when the First Amended Complaint

23   was, I believe, e-mailed to me by Stewart Levaton.

24       Q    BY MS. SAGHEB:  Have you or your firm ever

25   represented to the Bankruptcy Court that the removal of the

1    horses from Whispering Pines was a policing action?

2        A    No.  That phrase was used I think by Ms. DeCaprio at

3    some point in time.

4            What I told the Court was, and what I told every

5    court was that removal of the horses after filing of the

6    bankruptcy was authorized under the police power exception to

7    the automatic stay within the Bankruptcy Code.

8        Q    When the horses were removed, they had been being

9    fed by Ms. Lozano from at least July 21; right?

10       A    Correct.

11       Q    Were three in any danger where they were?

12       A    Yes.

13       Q    How so?

14       A    Dwight Bennett was not going to be in jail forever.

15   He had murdered, I am informed and believe 26 of them.

16       Q    Is that murdered as in taken the life of the horses

17   intentionally?

18       A    Through starvation, 23 to 24 of them.

19       Q    Okay.

20       A    Through hacking to death or shooting or strangling,

21   two or three.

22       Q    Okay.

23       A    So I was concerned with the safety of the horses,

24   yes.

25       Q    And other than Mr. Bennett, what other dangers were

1    imposed to leaving the horses where they were?

2        A    The ranch is a -- Whispering Pines is a beautiful

3    piece of property and overlooks the Susanville River at the

4    rear of the ranch.

5            When I walked the perimeter of the property on the

6    21st and again on the day of the August 19th -- July 21st, and

7    I noticed that the perimeter fencing was in very bad repair,

8    and a horse could actually fall off a cliff down to the

9    Susanville River down below.

10           Additionally, there was probably -- and I am just

11   going to estimate here -- there was probably hundreds of

12   thousands to millions of tons of manure that were lined up

13   three feet high within every stall, and there were mounds of

14   probably 20 feet by 40 feet that were piled 10 to 12 feet high

15   of manure decaying on the property, with flies going to and

16   fro.  Additionally, there were the decomposing carcasses of

17   between 23 and 26 horses and a couple dogs with flies and

18   disease, et cetera.  So it was a very -- was a fairly unsafe

19   place.

20       Q    So let's address those issues.

21           Had the horses stayed, it would have been the

22   responsibility of the Receiver to insure the safety of the

23   horses.  So she would have had to provide for removal of the

24   carcasses and manure; right?

25       A    Well, had the horses stayed?

1          Well, there was an order releasing them to the

2   County of Lassen.  So if I did not get that order releasing

3   the to the County of Lassen, the Receiver -- no, she wouldn't

4   have had to do that.

5          Q    And what about the dangerous condition of the

6   property involving the fencing issue?

7          Would the Receiver have to have brought the

8   property -- made it safe?

9          A    She could have kept them in the main corral.

10         MS. DILL:  Sorry.  I would just like to object to the

11   extent that this line of questions calls for a legal

12   conclusion.  And then I will try to not interrupt you.

13         MS. SAGHEB:  I'm sorry.

14         MS. DILL:  That's okay.

15         MS. SAGHEB:  It is getting late.

16         Q    So there was an alternative to keeping or exposing

17   the horses to the danger of falling off the cliff by keeping

18   them in a corral; right?

19         A    Yes.

20         Q    So those were the three issues Mr. Bennett -- the

21   dangerous fencing and the filth -- for want of a better

22   word -- on the property?

23         Those were the problems with keeping the horses

24   there?

25         A    Yeah.  Those are the problems that come to mind.  It

1    has been a while since I have been to the property.

2        MS. SAGHEB:  Okay.

3            Let's mark as Exhibit 26 to the deposition

4    transcript the Declaration of Beth DeCaprio filed in this case

5    No. 11-40155, United States Bankruptcy Court.

6            (EXHIBIT No. 26 WAS IDENTIFIED FOR THE RECORD AND

7        MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

8        INCLUDED HEREWITH.)

9        Q    BY MS. SAGHEB:  Mr. Ryan, did you -- did you or your

10   firm cause this Declaration to be filed with the United States

11   Bankruptcy Court?

12       A    It does appear to be a document my firm caused to be

13   filed with the United States Bankruptcy Court for the Eastern

14   District of California.

15       Q    And when your firm caused that document to be filed,

16   did you believe the contents of the document to be true and

17   accurate?

18       A    Well, I had no reason to disbelieve the contents of

19   the document were true and accurate.

20       Q    Well, would you have filed the document if you had

21   believed that the contents were not true and not accurate?

22       A    No.

23       MS. SAGHEB:  We were going to mark as Exhibit 27 the

24   Index of the binder of documents you indicated you reviewed in

25   preparation for the deposition today.

1          MR. JAMPOL:  Have they got copy facilities available?

2          MS. SAGHEB:  No, they don't have any copy facilities, but

3     the Reporter will certainly return what she takes from you in

4     tact.

5          THE WITNESS:  It is not leaving my possession.  I will

6     send it to her.  No?  Then that is not going to happen.

7          MR. JAMPOL:  Your obligation --

8          THE WITNESS:  You --

9          MR. JAMPOL:  Let us just copy --

10         THE REPORTER:  One -- one -- one, guys.

11         MR. JAMPOL:  Let us just send it to the Reporter and sent

12    it to you.  We will do it tomorrow.  We are not going to

13    change it.  We are not going to alter it.  We will give it to

14    you so she can mark it.  Just make sure that we have her card.

15         MS. SAGHEB:  Let me -- let me -- it is fine.  I think we

16    have all agreed it is fine.

17         Q     But let me just ask you a question, Mr. Ryan:  Is

18    this an index that exists on your computer somewhere?

19         A     It was -- it does exist on my computer.

20         Q     Okay.  So it is something that you can reprint,

21    alter, modify?  Right?

22         A     It is something that I can reprint, alter, or

23    modify.

24         MR. ROSENBERG:  Let's just do this.  Get a copy, identify

25    the number of total pages.

1        MS. SAGHEB:  Why don't we --

2        THE WITNESS:  The copy facilities are insured.

3        MR. JAMPOL:  No, what he is saying is just take it out

4    and identify it.

5        MR. ROSENBERG:  Identify it and then you can send us a

6    copy.

7        THE WITNESS:  Sure.

8        MS. SAGHEB:  And after we have done that task, I am going

9    to have to stop for the evening.

10           I completely understand your position, and you will

11   take your position, and I will take my position, but we are

12   not done with the deposition.

13       THE WITNESS:  Well, I won't --

14       MR. JAMPOL:  Well, hold on a second.  What I suggest you

15   do without making any commitments one way or the other, is

16   when you have a chance, let us know how much more you have.

17       MS. SAGHEB:  Sure.

18       THE WITNESS:  And I just want the record to reflect that

19   I was here at 11 o'clock today.  My Counsel thought that the

20   deposition should begin earlier so we would not be in this

21   position at 7:20 in evening.  I have cleared my day for this

22   deposition.  This is the day for my deposition.  This is when

23   my deposition is happening, and I am willing to stay here as

24   long as necessary to complete the deposition.

25       MS. SAGHEB:  Exhibit 27 as handed to me by Mr. Ryan

1    starts with the No. 1 and goes consecutively through to

2    No. 37.  It is a series of documents starting with the date

3    8/18/2011 and ending with the date 7/17/2012.

4        THE WITNESS:  I am incorrect.  There is a blank page

5    separating -- can you keep that blank page in there.  It is in

6    there for a reason.

7        MR. ROSENBERG:  In fact, there are 83 items.  And what

8    was the item that was -- what number was it -- that you

9    said --

10        THE WITNESS:  I believe it was No. 80.

11        MR. ROSENBERG:  No. 80 is not contained here, it says

12    spreadsheet and photographs?

13        THE WITNESS:  That is correct.  It is attorney work

14    product.

15        MR. ROSENBERG:  And that one you are claiming attorney

16    work product?

17        THE WITNESS:  I am not claiming attorney work product.  I

18    am telling you it is not in the binder.  So when we produce

19    the binder, you are not going to get that document.

20        MR. ROSENBERG:  Because you are claiming it is attorney

21    work product?

22        THE WITNESS:  No.  Because it is not in the binder right

23    now.

24        MR. ROSENBERG:  Well, given the semantics.

25        THE WITNESS:  It's not semantics, it is not in the

1  binder.

2      MR. JAMPOL:  It is not because we inadvertently forgot

3  it.

4      MR. ROSENBERG:  That is fine.  We can make a demand for

5  it.  You can assert your objection.

6          (EXHIBIT No. 27 WAS IDENTIFIED FOR THE RECORD AND

7      MARKED FOR IDENTIFICATION BY THE REPORTER AND IS

8      INCLUDED HEREWITH.)

9      MS. PRESTON:  May I ask one question without prejudicing

10  my right to further depose the witness?

11      THE WITNESS:  Absolutely.

12

13

14                      EXAMINATION

15  BY MS. PRESTON:

16      Q    Can I get you to look at Exhibit 15?

17      A    I am Looking at -- that is 25.  I am sorry.

18      Q    It is the March 5, 2012 letter transmitting the

19  invoices with the -- to the County of Lassen?

20      A    I am Looking at Exhibit 15.

21      Q    And that addressed to Lassen County Department of

22  Animal Control?

23      A    That is correct.

24      Q    Did you -- other than sending or directing this

25  letter to the Lassen County Animal Control Department, did you

1    direct or send it to any other department or representative of

2    the County of Lassen?

3        A    I don't believe so.

4        MS. PRESTON:  Thank you.

5        MR. JAMPOL:  Either of you have anything?

6        MS. DILL:  No.  I mean, subject to the agreement that was

7    stated at the beginning of the deposition that Bank of America

8    is reserving its rights to continue the deposition at a later

9    time, we don't have any questions today.

10        MR. JAMPOL:  Elena?

11        MS. KOUVABINA:  I don't have any questions, also subject

12    to the agreement and the statement we put on the record

13    earlier.

14        MR. JAMPOL:  Okay.

15        MR. ROSENBERG:  Why don't we just have a -- call it

16    Volume I with a signature so we can sign it.

17        MS. SAGHEB:  Let me do one follow-up question to the

18    County's question.  And I may have already done it.  It is

19    just late, I am sorry, and I don't remember.

20

21

22                    FURTHER EXAMINATION

23    BY MS. SAGHEB:

24        Q    But did you receive any response at all from the

25    County in response to Exhibit 15?

1      A      None that I recall.

2      MS. SAGHEB:  Let's conclude the deposition for today.

3 And we are going to call it Volume I, and we are going to have

4 a signature line.

5           Let's enter into the following stipulation with

6 regard to the original of the deposition transcript:  Let's

7 stipulate to relieve the Court Reporter of her statutory

8 obligation in terms of the handling of the original transcript

9 after it is prepared and sent to the Deponent's attorney for

10 handling; the Deponent's attorney will take responsibility for

11 getting the original of the deposition transcript to Mr. Ryan;

12 Mr. Ryan will have 30 days from his receipt of the transcript

13 to read and review and make any changes he deems necessary and

14 to sign the deposition transcript under penalty of perjury;

15 Counsel will have 30 days to advise us of any changes to the

16 deposition transcript, and the signature thereof; if we do not

17 receive notice of changes and signature, then the deposition

18 transcript will be used as is as if it were signed; the

19 original of the deposition transcript will remain with the

20 Deponent's attorney for the span of the litigation; he will

21 agree to make it available to any party litigating this matter

22 upon reasonable notice; if the transcript is lost, destroyed

23 or otherwise unavailable, then a certified copy can be used in

24 lieu thereof.

25      MR. ROSENBERG:  I know that is strange to you guys up

1    north.

2        THE REPORTER:  Ms. Mason?

3        MS. MASON:  So stipulated.

4        MS. PRESTON:  So stipulated.

5        MS. DILL:  So stipulated.

6        MR. JAMPOL:  Yes.  So stipulated.

7        THE REPORTER:  Ms. Kouvabina?  Could I have a so

8    stipulated from you, please.

9        MS. KOUVABINA:  Could you what, I am sorry?

10       THE REPORTER:  Could I have a so stipulated from you,

11   please.  Do you agree to the stipulation?  So stipulated?

12       MS. KOUVABINA:  Yes, I do.

13       MS. SAGHEB:  And we have an Exhibit No. 27.

14       MR. ROSENBERG:  That is the Table of Contents.

15       THE VIDEOGRAPHER:  We are now going off the record.  The

16   time on the video monitor is 19:24.  This is the end of DVD

17   No. 4, and the end of the day of the deposition of Timothy

18   Ryan.

19           We are now going off the record.

20           (WHEREUPON VOLUME I OF THE DEPOSITION OF TIMOTHY M.

21       RYAN WAS CONCLUDED SINE DIE AT 7:26 P.M.)

22                        *  *  *  *

23   //

24   //

25   //

1    STATE OF CALIFORNIA        )

                                )

2    COUNTY OF LOS ANGELES      )

3

4        I declare under penalty of perjury under the laws of the

5    State of California that I have read the foregoing transcript,

6    I have made any corrections, additions, or deletions that I

7    was desirous of making in order to render the within

8    transcript true and correct, and in witness whereof, I have

9    hereunto subscribed my name this _____ day of

10   _____, 20_____, at

11   _____ (City),

12   _____ (State).

13

14

15

16                        _____

17                                TIMOTHY M. RYAN

18

19

20

21

22

23

24

25

1   STATE OF CALIFORNIA      )

                            )  SS

2   COUNTY OF LOS ANGELES    )

3

4       I, Lorrie L. Poiry, Certified Shorthand Reporter,

5   No. 6003, RPR, declare:

6       That prior to being examined, the witness named in the

7   foregoing transcript was by me duly sworn to testify to the

8   truth, the whole truth, and nothing but the truth.

9       That said transcript was taken before me at the time and

10  place therein set forth and was taken down by me in shorthand

11  and thereafter transcribed under my direction and supervision,

12  and I hereby declare that the foregoing transcript is a true

13  and correct transcript of my shorthand notes so taken.

14      I further declare that I am neither counsel for nor

15  related to any party to said action nor in anywise interested

16  in the outcome thereof.

17      I declare under penalty of perjury under the laws of the

18  State of California that the foregoing is true and correct.

19      In witness whereof, I have hereunto subscribed my name

20  this 15th day of August, 2013.

21

22      _____

23              LORRIE L. POIRY, CSR NO. 6003

24

25